**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **LEONARD MAZZOLA**<br>c/o The Chandra Law Firm LLC<br>The Chandra Law Building<br>1265 W. 6th St., Ste. 400<br>Cleveland, OH 44113<br><br>            *Plaintiff,*<br><br>    vs.<br><br>**ANTHONY TOGLIATTI (IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES)**<br>6800 Brecksville Road<br>Independence, Ohio 44131<br><br>**MICHAEL KILBANE (IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES)**<br>6800 Brecksville Road<br>Independence, Ohio 44131<br><br>**GREGORY O'BRIEN (IN HIS OFFICIAL AND INDIVIDUAL CAPACITIES)**<br>6800 Brecksville Road<br>Independence, Ohio 44131<br><br>            and<br><br>**CITY OF INDEPENDENCE**<br>6800 Brecksville Road<br>Independence, Ohio 44131<br><br>            *Defendants.* | Case No.<br><br>Judge |
| **COMPLAINT WITH JURY DEMAND** ||

**NATURE OF THE ACTION**

1.     This is a civil-rights action to redress blatant First Amendment violations. Independence Mayor Anthony Togliatti, Police Chief Michael Kilbane, and Law Director Gregory O'Brien violated former police lieutenant Leonard Mazzola's constitutional rights when he was investigated and forced to retire because they believed—mistakenly—that he had provided information to a reporter about the mayor's scheme to increase revenue by imposing traffic-ticket

quotas on rank-and-file police officers. Though Lt. Mazzola did not actually tip the press to the quotas, doing so was constitutionally protected conduct. Defendants had no right to target him or strip him of his distinguished career in public service in retaliation for their embarrassment at someone having a light shined on the effort to raise revenue in Independence by targeting motorists.

## PARTIES

2.      Plaintiff Lt. Leonard Mazzola is a resident of Cuyahoga County.

3.      Defendant Anthony Togliatti is the Mayor of the City of Independence. Defendant Togliatti as Mayor directly oversees all department heads, including the Chief of Police, and serves as the City's Safety Director. He is sued in both his official and individual capacities. At all relevant times, he was acting in his capacity as a state actor.

4.      Defendant Michael Kilbane is the Chief of Police for the City of Independence. He is sued in both his official and individual capacities. At all relevant times, he was acting in his capacity as a state actor.

5.      Defendant Gregory O'Brien is the Law Director for the City of Independence. He is sued in both his official and individual capacities. At all relevant times, he was acting in his capacity as a state actor.

6.      Defendant City of Independence is a municipal corporation under Article XVIII of the Ohio Constitution, and a "person" subject to lawsuit within the meaning of 42 U.S.C. § 1983. The City operates and supervises the police department of Independence.

## JURISDICTION AND VENUE

7.      Jurisdiction over federal claims under 42 U.S.C. § 1983 and under 42 U.S.C. § 1988, which provides for attorneys' and expert fees for vindication of civil rights, is asserted under 28 U.S.C. §§ 1331, 1343(3) and (4).

8.      The Court has jurisdiction over state-law claims under 28 U.S.C. § 1367.

9.      The Court has jurisdiction over the parties under 28 U.S.C. § 1391 and venue is proper here because the events at issue took place in this jurisdiction.

## FACTUAL BACKGROUND

### Lt. Mazzola was an effective and well-respected police officer.

10.     Leonard Mazzola dedicated his life to serving his community. He joined the Independence police force at age 25 and served proudly for over 23 years, rising to the rank of lieutenant.

11.     Lt. Mazzola loved his work and was a model officer. He organized community events and engaged with Independence residents. He helped organize annual firework displays and carnival events, and police security for such events. He provided police K-9 demonstrations in schools, V.F.W. halls, and community centers. He organized a food and clothing drive for a local non-profit that focuses on drug rehabilitation.

12.     Lt. Mazzola did all this because he knows the great impact positive interactions with police can have on a community. He worked every day to make Independence a safer and more cohesive community.

13.     Lt. Mazzola received a number of commendations, awards, and positive comments from members of the community he served. His personnel file reflects no significant disciplinary issues.

14.     At the time of the relevant events, Lt. Mazzola was the patrol commander. His ordinary job responsibilities involved supervising the patrol officers. His ordinary job responsibilities did not involve communicating with the media about Independence policies or practices.

15.     Lt. Mazzola's promising career changed drastically when Defendants Togliatti and Kilbane decided to use traffic tickets to increase the community's revenue.

**Mayor Togliatti institutes a quota for traffic tickets.**

16.     After reviewing a report regarding the mayor's court revenues, Defendant Togliatti believed that fewer traffic tickets were issued in the first half of 2018 than in previous years, resulting in lower revenues. He contacted Defendant Kilbane about this perceived deficiency in the numbers.

17.     On July 20, 2018 Defendant Kilbane instructed Lt. Mazzola to "get this turned around" as soon as possible. Defendant Togliatti demanded that the police department impose a quota on the number of traffic citations issued. The goal of this quota was to increase revenue.

18.     In early August, Defendant Kilbane implemented the mayor's directive to impose the quota (which Kilbane insisted on referring to euphemistically as a "performance standard").

19.     In a memo to Lt. Mazzola dated August 6, 2018, Defendant Kilbane explained that "officer activity and productivity has declined significantly." Defendant Kilbane instructed Lt. Mazzola to perform a review of all "underperforming" officers, and develop a plan to make sure all officers are issuing traffic-tickets at acceptable "levels of productivity."

20.     Lt. Mazzola followed the directive to impose the quota and communicated the marching orders to his sergeants (Kurtz, Anders, Cross, and Tinnirello) via memo dated August 8, 2018. The new directive confused and angered officers because they had not previously been required to fulfill a traffic-ticket quota.

21.     Throughout the month of August, production increased by 27%. Nevertheless, Defendant Kilbane ordered Lt. Mazzola to appear for a pre-disciplinary hearing for not getting the numbers up more. During that hearing, Defendant Kilbane continued to stress the importance of increasing revenue through traffic tickets.

22.     On September 18, 2018, Defendant Kilbane again raised the issue of "declining volume in Mayor's Court" and the "performance standards" in terms of traffic tickets, stating "[y]our

responsibility is to institute and monitor accountability measures on an individual and aggregate level to ensure that this proficiency standard is met (and hopefully exceeded). Productivity should be monitored on an ongoing basis and appropriate adjustments made to ensure individual and aggregate goals are met." Defendant Kilbane continued to insist that he wasn't implementing a quota, saying: "To reiterate, this is not a quota, it is a performance standard fundamental to effective policing." Defendant Kilbane also required Lt. Mazzola to attend a course in "Performance Directed Management" with Dr. D.J. Van Meter, ostensibly to further the goal of implementing the quota.

23.     On September 25, 2018, at Defendant Kilbane's direction, Lt. Mazzola emailed all patrol officers and dispatchers further detailing the new quota or "performance standard." Defendant Kilbane had decided that 3,000 traffic-tickets was the minimum amount officers were collectively responsible for annually. This translated into 10 tickets per month per officer. Lt. Mazzola alerted his patrol that this new quota would be in place for the final quarter of 2018, with each officer expected to write 30 traffic tickets from October through December.

**Chief Kilbane directs Lt. Mazzola to discipline Officer Dalton for failing to meet the mayor's traffic-ticket quota.**

24.     On January 7, 2019, Defendant Kilbane instructed Lt. Mazzola to issue a written reprimand to Officer Dalton for failure to meet the traffic-ticket quota.

25.     Lt. Mazzola followed Defendant Kilbane's instruction and issued a written reprimand to Officer Dalton that same day for failure to issue at least 30 traffic tickets in the last quarter of 2018. This was the first and only formal write-up Lt. Mazzola issued in his years as patrol commander.

26.     The written reprimand infuriated Officer Dalton. He wrote that he was "SIGNING THIS UNDER DURESS!" when Lt. Mazzola delivered the write up as Defendant Kilbane instructed. On January 11, 2019, Dalton filed a grievance over the reprimand.

### The story of the mayor's traffic-ticket quota appears on the local news.

27.     On January 14, 2019, the local Fox 8 news broadcast featured a story by reporter Ed Gallek about the mayor's traffic-ticket quota.[1] This negative publicity caused uproar throughout Independence and surrounding communities (including the many people in Northeast Ohio who travel through Independence during their daily commute to work on Interstate 77).

28.     Mr. Gallek reported accurately that Independence police were required to issue at least 10 traffic tickets per month per officer. The report also revealed that at least one officer was disciplined for not reaching that quota.

29.     During the broadcast, images of certain documents were displayed. One of the images displayed was Lt. Mazzola's memorandum—issued at Defendant Kilbane's request—announcing the quota to the patrol officers.

30.     The records displayed during the Fox 8 broadcast on January 14, 2019 were public records not subject to any exemption from disclosure under Ohio law.

31.     It was not improper or prohibited for Mr. Gallek to possess the public records displayed during the Fox 8 broadcast on January 14, 2019.

32.     In the news report, Defendant Kilbane was interviewed. He looked silly adamantly insisting that officers do not face quotas despite the fact that his own internal emails and orders show that they do.

---

[1] Ed Gallek, *i-Team: Counting traffic tickets in busy northeast Ohio suburb*, Jan. 14, 2019, https://fox8.com/2019/01/14/i-team-counting-traffic-tickets-in-busy-northeast-ohio-suburb/?utm_source=related_1

33.    Mr. Gallek's exposé embarrassed Independence officials, who were angry about having their scheme to impose quotas revealed.

**There is community outrage about the quotas.**

34.    Residents and commuters in Independence were furious as the community discussed the Fox 8 story about the quotas. There were legitimate community concerns over this policy.

35.    One resident who was particularly incensed about the quota was Mary Jane Horton, a resident of Chestnut Road. Shortly after the Fox 8 news story aired, Ms. Horton sent an email to various Independence residents sharing the link to the story. Under the subject heading "Follow Up Email. RESIDENTS BEWARE!! Mayor wants more traffic ticket revenue so our Indy polic[e] are now given traffic ticket quotas," Ms. Horton warned residents about the mayor's traffic-ticket quota ("Independence Police officers are being directed by the Mayor to increase the number of traffic tickets written in the City") and shared the link to the news story. Ms. Horton complained that her 68-year-old husband and her neighbor's friend had been ticketed near their home on Chestnut Road. She called the quota the "most egregious kind of selective enforcement," "a disgusting practice," and "grossly unfair." She continued: "As a resident, I believe that it is totally unacceptable to give an excellent police officer a written disciplinary warning because he does not meet his quota for tickets." She went on to add: "**This must stop now!!!** Please send a quick email at togliattia@independenceohio.org or call the Mayor at (216) 524-4131 or Cell (216) 406-1879 to tell him so. We need to send the Mayor a message that we strongly object to raising revenue via our residents and we strongly object to putting our police officers in this unfair employment position where they would have to fear a performance warning if they do not write enough tickets." Ms. Horton concluded her email: "Please share this information with your friends and family members. Thank you so much for

joining your fellow residents in sending a loud message to the Mayor that we say 'NO' to police quotas and related ticketing of residents."

36.    Ms. Horton forwarded her email to the members of the Independence City Council saying: "this new policy of police performance standards is designed specifically to generate more revenue for the City at the expense of residents" and asked the City councilmembers to "intervene[] directly with the Mayor/Administration to get him to stop this harmful procedure."

37.    In addition to the email traffic, social media was abuzz with criticism of the quota as well. The decision to impose the quota was wildly unpopular.

### Despite Lt. Mazzola's concerns about the quota, he followed the chief's instructions to impose it and police his patrol officers' use of the term "quota."

38.    As community outrage over the quotas grew, so did Defendant Kilbane's frustration. Defendant Kilbane instructed Lt. Mazzola to speak to patrol officer Shane Bates regarding his use of the term "quota" and his recent citations to residents on Chestnut Road. Lt. Mazzola complied with the chief's order and spoke to Ptl. Bates on January 14, 2019.

39.    That same day, Ptl. Bates emailed Lt. Mazzola to confirm a conversation they had just completed. The email provides as follows:

> Lieutenant Mazzola,
>
>       Upon arrival at 1800 on 01/14/19 you spoke to me on behalf of the Chief of Police in regard to my use of the term "quota" describing the "performance standard" whereby a certain number of traffic citations are required in a prescribed period of time or disciplinary procedures will result. I will change my terminology from the word "quota" to "performance standard" in all future conversations.
>
>       Secondly, you indicated to me that the Chief of Police wished to convey a message that I was to exercise more discretion when deciding whether to cite a resident of the City of Independence. You indicated that Chief Kilbane was clear, if I didn't comply with this order my "limited involvement" in (The

Cuyahoga County Regional Human Trafficking Taskforce) "would become none". This message has been received. I will increase my standards for what I consider a "citable" violation for residents of the City of Independence. Also, I will try to avoid areas when possible where I know residents may be committing violations at a more frequent rate than other nonresidents.

Lastly, I was acting in good faith with my previous residential citations, I was attempting to meet the "performance standard" while at the same time enforcing traffic violations on Chestnut Rd. within the City Of Independence for any speed in excess of forty miles per hour in a posted twenty five mile per hour zone without regard to residential status. This location was picked by your office and was predicated on residential complaints. Please note, I requested that you place this conversation in writing for my records, and you advised that the Chief of Police instructed you "to keep it verbal."

Sincerely,

Patrolman Shane Bates 53

40. Defendant Kilbane was displeased with Ptl. Bates's message in response to his conversation with Lt. Mazzola. Defendant Kilbane responded to Ptl. Bates saying: "This patrol proficiency should be demonstrated by every officer on an ongoing basis and Lieutenant Mazzola, with my full support, has the right to expect reasonable performance outcomes that show officers are continually demonstrating this proficiency." The chief confirmed that whether a "driver lives/works in our city" was among the "factors that need to be considered when making this discretionary decision" about whether to issue a traffic ticket. Defendant Kilbane also stated—in no uncertain terms—his displeasure with Ptl. Bates's openness about the new requirements with the public: "Informing a driver that they are being cited because the officer is under a 'quota' or performance standard or any similar type language is unnecessary, unprofessional and serves no legitimate law enforcement purpose and these types of statements will cease immediately."

41.     Defendant Kilbane's written directive to Ptl. Bates reveals the chief's intention to prevent the public from receiving information about the new department policy. It also constitutes an unconstitutional prior restraint under the First Amendment.

42.     Shortly after documenting his conversation with Lt. Mazzola and being admonished by the chief, Ptl. Bates was moved to a different shift.

43.     During the controversy that followed Mr. Gallek's January report, the Independence police department continued to perform its duties effectively despite the negative publicity. The media coverage of the quota did not impair police officers from carrying out their responsibilities.

**Independence officials discuss residents' concerns about the traffic-ticket quota.**

44.     The uproar and backlash reached the mayor's office, and Defendant Togliatti met with Defendant Kilbane, Lt. Mazzola, and the city prosecutor, Chuck Cichocki, in January 2019. These officials discussed the traffic-ticket quota, related residential discord, and how to proceed.

45.     At the meeting, Lt. Mazzola explained that over 15 years ago, he developed and implemented a point-based system for productivity assessment (the "Point System"). The Point System allows traffic tickets to be one factor among many that determine whether an officer has met productivity standards. He recommended that the Point System be used instead of the quota or "performance standard" that required each officer to write a certain number of tickets or face discipline.

46.     Following their meeting, Lt. Mazzola understood that the group agreed to use the Point System and to stop using a traffic-ticket quota.

### Lt. Mazzola attends law-enforcement management training, which includes instruction that traffic-ticket quotas are illegal and unethical.

47.     On February 15, 2019, Lt. Mazzola attended the training in law-enforcement

management by Dr. Van Meter.

48.     At that training, Dr. Van Meter advised that traffic-ticket quotas are unethical and that

many states have statutes making them outright illegal. Dr. Van Meter explained that quotas

undermine public policy by creating public distrust; quotas also create perverse incentives for

police officers. Even in states without an anti-quota statute, Dr. Van Meter strongly advocated

against their use for ethical reasons.

49.     Lt. Mazzola did not want the City of Independence to be doing something illegal or

unethical. He wanted his department to be successful and respected by the community.

### The police chief doubles down on the quota and Lt. Mazzola raises concern about the quota's legality.

50.     On February 27, 2019, Defendant Kilbane emailed Lt. Mazzola at 1:53 p.m. informing

him that the Point System must include a traffic-ticket quota separate from other measurements

of productivity. In other words, Defendant Kilbane was directing Lt. Mazzola to maintain the

traffic-ticket quota despite their previous discussion about the Point System.

51.     Lt. Mazzola was concerned about the chief's change of position, particularly in light of

what Lt. Mazzola had been instructed at the management training about quotas being illegal and

unethical.

52.     Lt. Mazzola expressed internally via email on February 27, 2019 at 2:03 p.m. that the

insistence on the quota was not what he understood coming out of the previous meeting, and

requested another meeting to clarify expectations. Citing the management training that he had

just attended, he also expressed in the internal email his concern that the quota was "unethical

and illegal" as well as creating "a political problem when enforcement was on residents vs nonresidents." Despite his reservations, he expressed that he would "implement whatever is agreed upon."

53.     Lt. Mazzola engaged in protected conduct by raising concerns about the unpopular quota policy that, based on training he had attended, he reasonably believed to be against police ethics.

### Defendants launch an investigation to determine who "leaked" the ticket quota to the news media.

54.     Exactly 17 minutes after Lt. Mazzola sent the email expressing his concern about the legality of the quota, Defendant Kilbane sent an email retaining an outside vendor to "perform an Internal Affairs and/or workplace investigation involving a matter of unauthorized disclose of departmental information."

55.     This investigation was devoted exclusively to trying to ascertain who "leaked" the information about the traffic-ticket quota. Targeting an employee for sharing information about a government policy with the media is illegal and any reasonable public official—including any reasonable lawyer—would have known that.

56.     Defendant Togliatti and Defendant Law Director Gregory O'Brien signed the engagement agreement agreeing to pay up to $7,000 in city funds to an outside investigator to determine who had alerted media to the unethical quota.

57.     Defendants Togliatti, O'Brien, and Kilbane arranged for Lt. Mazzola's aggressive interrogation on baseless charges.

58.     In Ohio, public records are the people's records, and those who have custody of records hold them as trustees for the people.[2] Sharing public information or public records with the public or the news media is protected both under Ohio law and by the First Amendment to the

---

[2] *State ex rel. Kesterson v. Kent St. Univ.*, 156 Ohio St. 3d 22, 2018-Ohio-5110, 123 N.E.3d 895, ¶ 9.

United States Constitution.[3] A public employee cannot be disciplined for sharing a public record with the public.[4] A public employee cannot be disciplined for revealing a public policy (like a traffic-ticket quota) to the public.[5] Whoever tipped the press about the traffic-ticket quota was engaging in constitutionally protected conduct.[6] Nevertheless, Defendants aggressively pursued an investigation into who had engaged in protected conduct by alerting the media to the new traffic-ticket quota.

59.     The "investigation" that Togliatti, O'Brien, and Kilbane initiated was an utter waste of time and resources, as the "culprit" hadn't actually done anything wrong.

60.     An official investigation into constitutionally protected conduct would chill or dissuade a person of ordinary firmness into engaging in the protected conduct in the future.

61.     Independence officials had no compelling governmental interest in hiding from the public their efforts to increase revenue through traffic tickets.

---

[3] *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491–97 (1975) ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media. The freedom of the press to publish that information appears to us to be of critical importance to our type of government in which the citizenry is the final judge of the proper conduct of public business.").

[4] *See Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) (holding public employee's statements to reporter about public records were protected by First Amendment).

[5] *See Whitney v. City of Milan*, 677 F.3d 292, 297–98 (6th Cir. 2012) (revealing mayor's evasion of nepotism policy); *Spencer v. City of Catlettsburg*, 506 F. App'x 392, 395–96 (6th Cir. 2012) (revealing that public records were missing).

[6] *See Spencer*, 506 F. App'x at 395–96 (affirming that city clerk's statements to reporters about missing public records were constitutionally protected); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 182 (6th Cir. 2008) (public employee's conversations with reporter regarding public official's improprieties were protected by First Amendment).

**The investigation targets Lt. Mazzola even though he had not actually alerted the media to the ticketing policy and had instead dutifully implemented it at the chief's behest.**

62.     On March 7, 2019, Defendant Kilbane ordered Lt. Mazzola to appear for an interview regarding whether he had shared public information and public records with the media.

63.     Lt. Mazzola complied with Defendant Kilbane's order. During the questioning, Lt. Mazzola was repeatedly asked whether he had provided that information to the media or knew who had. He answered all questions fully and truthfully, denying any involvement.

64.     Lt. Mazzola was not the person who shared the public records about the traffic-ticket quotas with the news media. Lt. Mazzola does not know who shared the public records about the traffic-ticket quotas with the news media.

65.     Defendants remained convinced that Lt. Mazzola was the officer who "leaked" the public records, exposing official misconduct and public corruption.

66.     Defendant Kilbane ordered Lt. Mazzola to take a polygraph test on March 20, 2019.

67.     Under written Independence policy, polygraph examinations may not be administered to police unless they are part of a criminal investigation. Sharing information about public policies or non-exempt public records with the public or the media is not a crime. City policy therefore prohibited asking anyone to take a polygraph test under the circumstances.

68.     Had Lt. Mazzola shared public information or public records about the traffic-ticket quota with the media, it would have been his constitutional right to do so.

69.     Whoever shared the details about the traffic-ticket quota with the media, it was that person's constitutional right to do so.

70.     Lt. Mazzola attended the second interview as ordered, and submitted to the mandatory polygraph examination. He understood that refusal to take the exam would result in immediate termination.

71.     During the polygraph, the examiner denied Lt. Mazzola the right to have his attorney present. His union representative was also excluded.

72.     During the polygraph, the examiner asked Lt. Mazzola over and over again whether he had provided information to the media about the traffic-ticket quotas.

73.     Lt. Mazzola again answered the questions fully and truthfully.

74.     The polygraph examiner told Lt. Mazzola that he had failed the polygraph. But that could not have been true, because he had told the truth and was not responsible for sharing any information with Mr. Gallek. On information and belief, the polygraph examiner falsely claimed that Lt. Mazzola had failed to try to get him to admit to he was the source. The polygraph examiner never prepared a written report regarding the exam. Yet Defendants continued to insist that Lt. Mazzola was to blame (for this totally legal conduct).

75.     Lt. Mazzola left the polygraph examination devastated and desperate to dispel any notion that he was responsible. He feared discipline if Defendants continued to mistakenly believe he was the one who had shared information about the traffic-ticket quota with the media.

76.     In the evening after the interview, Lt. Mazzola reached out to Mr. Gallek, the reporter on the story that prompted Defendants to initiate the illegal investigation. Lt. Mazzola asked Mr. Gallek to confirm that Lt. Mazzola was not the source of the information in the article. Mr. Gallek declined at the time, citing company policy.

77.     Defendants remained convinced Lt. Mazzola had shared the information about the traffic-ticket quota. And they were determined to force him out of the department for it.

**Defendants retaliate against Lt. Mazzola for his perceived betrayal.**

78.     Following the sham investigation, Defendants next retaliated against Lt. Mazzola for his perceived exercise of First Amendment rights by threatening to demote him from lieutenant to patrolman (with the corresponding decrease in compensation) and threatening to put him on the

*Brady/Giglio* list, which would have destroyed his credibility as a witness.[7] Defendant O'Brien delivered this ultimatum. Defendants gave Lt. Mazzola only one option to avoid these adverse actions: retire immediately. They gave him less than three hours to decide.

79.     Lt. Mazzola had no desire to retire or to lose the substantial benefits of the Ohio Police & Fire Pension Fund's Deferred Retirement Option (DROP) benefit. But the adverse actions that Defendants threatened were too severe to endure. After working his way up the ranks for two decades, a demotion to patrolman would have been humiliating and financially harmful. An officer's credibility is crucial to his ability to perform his duties as a police officer, so inclusion on the *Brady/Giglio* list carries devastating stigma, resulting in damage to an officer's reputation along with limitations on assignments, advancement, and other job prospects. The community would have assumed that Lt. Mazzola had done something wrong to be subjected to such a penalty, even though he had done nothing wrong.

80.     Defendants' ultimatum—to retire now or be ruined—really was not a choice at all. Lt. Mazzola acquiesced to Defendants' demand to retire to avoid their threatened consequences over their mistaken belief that he shared the information that led to the embarrassing media coverage over the traffic-ticket quota (even though he was not the one who engaged in constitutionally protected speech by sharing it). Defendants successfully intimidated Lt. Mazzola into accepting retirement long before he was ready to go. His retirement was effective April 1, 2019.

---

[7] The *Brady/Giglio* list includes officers who have lied or have other serious marks on their records and can, in and of itself, be career ending. Being on this list means that prosecutors have to disclose the officer's damaged credibility to any defendant against whom the officer may be called as a witness in court. On information and belief, not one single officer in Independence was on the *Brady/Giglio* list at the time Defendants threatened to put Lt. Mazzola on it if he didn't agree to retire.

81.     In a broadcast on May 3, 2019, Mr. Gallek confirmed that Lt. Mazzola had not provided that information to Fox 8.[8] And despite this, Defendants did nothing to undo what they had done to Lt. Mazzola.

82.     The ripple effects of Defendants' scapegoating of Lt. Mazzola cannot be overstated: Independence employees are now less willing to share truthful information about department operations and policies lest they meet his same fate. The City of Independence has successfully chilled employee speech through its railroading of Lt. Mazzola.

## CLAIM 1
### FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. §1983
### (AGAINST DEFENDANTS TOGLIATTI, KILBANE, AND O'BRIEN INDIVIDUALLY)

83.     Plaintiff incorporates all previous allegations.

84.     Lt. Mazzola was a public employee, who Defendants believe engaged in protected activity by speaking out about a matter of public concern, i.e., the mayor's unethical traffic-ticket quota. It has been clearly established law for decades that public employees have the right to communicate about matters of public concern and that public officials may not retaliate against people, including public employees, for protected speech.[9] All public officials have been charged with knowing that public employees may not be disciplined for engaging in protected speech on matters of public concern. Despite department policies regarding "confidentiality" or "loyalty," this prohibition specifically includes public officials' inability to lawfully discipline or target

---

[8] Ed Gallek, *i-Team: Lie detector test given to local police officer over traffic tickets*, May 3, 2019, https://fox8.com/2019/05/03/i-team-lie-detector-test-given-to-local-police-officer-over-traffic-tickets/.

[9] *See v. City of Elyria*, 502 F.3d 484. 495 (6th Cir. 2007) ("a public employee's right to speak on matters of public concern without facing improper government retaliation is settled") (cleaned up); *Chappel v. Montgomery Cty. Fire Protection Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997) "All public officials have been charged with knowing that public employees may not be disciplined for engaging in speech on matters of public concern …").

employees who speak out, as such department policies cannot supersede employees' constitutional rights.

85.     A person does not actually have to engage in the protected activity to be protected from retaliation. Defendants' mistaken belief that an individual exercised his First Amendment rights brings that individual within the constitutional protection.[10]

86.     Lt. Mazzola's ordinary official duties did not involve communicating with the media. Had he shared information with the media about the unethical traffic-ticket quota, it would have been in his capacity as a private citizen and not as part of his ordinary job responsibilities.[11]

87.     The publicized information about which Defendants were angry—that City leaders were demanding that police write a certain number of tickets to increase mayor's court revenue—was on a matter of public concern and was of legitimate news interest in the community—as shown by the coverage the quota drew once revealed.

88.     Defendants engaged in the following acts of retaliation that would chill a person of ordinary firmness, including but not limited to the following:

    a.  Subjecting him to an investigation regarding whether he had shared information about the new department policy of imposing traffic-ticket quotas on police officers;

    b.  Subjecting him to a polygraph examination administered in violation of department rules regarding whether he had shared information about the new department policy of imposing traffic-ticket quotas on police officers;

    c.  Forcing him to resign or face demotion; and

    d.  Threatening to put him on the *Brady/Giglio* list if he did not submit to the demand to retire.

---

[10] *Heffernan v. City of Paterson, N.J.*, 136 S. Ct. 1412 (2016).
[11] *Buddenberg v. Weisdack*, 939 F.3d 732, 740 (6th Cir. 2019).

89.     The adverse actions described above were sufficient to deter a person of ordinary firmness from continuing to engage in the alleged protected conduct.

90.     Lt. Mazzola was constructively discharged when Defendants threatened to demote him and put him on the *Brady/Giglio* list, if he did not retire immediately.

91.     Defendants retaliated against Lt. Mazzola for, in their belief, causing negative publicity by sharing information with the media and thus exposing the unethical traffic-ticket quota. Their belief that he was responsible for this information being shared with the press was a substantial or motivating factor in their decision to begin the "investigation" and to eventually force him into retirement.

92.     The retaliation was temporally proximate to the protected conduct that prompted it, including Lt. Mazzola raising concern about the legality of the quotas (exactly 17 minutes before Defendants commissioned the retaliatory investigation).

93.     As a direct and proximate result of Defendants' retaliation, Lt. Mazzola has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages and benefits, and other terms, privileges, and conditions of employment.

94.     Defendants' acts were wanton, willful, egregious, and malicious, and are worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

## CLAIM 2
### LOCAL-GOVERNMENT LIABILITY FOR FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. §1983 (AGAINST THE CITY OF INDEPENDENCE)

95.     Plaintiff incorporates all previous allegations.

96.     Defendants Togliatti, Kilbane, and O'Brien—as the mayor, police chief, and law director respectively—are sufficiently empowered public officials that their acts constitute the customs,

policies, and practices of the City of Independence. Based on a mistaken belief that Lt. Mazzola engaged in protected speech, the individual Defendants instituted a campaign of retaliation that ended in Lt. Mazzola's constructive discharge.

97.    The retaliation was part of a custom, policy, pattern, or practice of using a prior restraint to curtail officer speech.

98.    The Defendant City has failed to provide the relevant personnel with training on the First Amendment and its protections—including the prohibition on retaliating against public employees for protected speech.

99.    As a direct and proximate result of Defendants' retaliation, Lt. Mazzola has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages and benefits, and other terms, privileges, and conditions of employment.

## CLAIM 3
### CIVIL LIABILITY FOR CRIMINAL ACTS–INTERFERING WITH CIVIL RIGHTS UNDER OHIO REV. CODE §§ 2307.60 AND 2921.45 (AGAINST DEFENDANTS KILBANE, TOGLIATTI, AND O'BRIEN INDIVIDUALLY)

100.    Plaintiff incorporates all previous allegations.

101.    Under Ohio Rev. Code § 2921.45 (interfering with civil rights), no public servant, under color of his office, employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of a constitutional or statutory right. This provision carries a criminal penalty.

102.     Under Ohio Rev. Code § 2307.60, anyone injured in person or property by a criminal act may recover full damages in a civil action.

103.    The individual defendants are public servants. Under color of their office, employment, or authority, each knowingly deprived Lt. Mazzola of his constitutional and statutory rights as

detailed above, including his right to be free from retaliation for engaging (or being perceived to have engaged) in protected First Amendment activity (including sharing public information and public records with the public or the media).

104.    As a direct and proximate result of Defendants' actions, Lt. Mazzola has suffered and will continue to suffer economic and non-economic damages for which Defendants are liable, including, but not limited to, pain and suffering, emotional distress, inconvenience, the loss of salary, wages and benefits, and other terms, privileges, and conditions of employment.

105.    Defendants' acts were wanton, willful, egregious, and malicious, and are worthy of substantial sanction to punish and deter them and others from engaging in this type of unlawful conduct.

**PRAYER FOR RELIEF**

For the reasons stated above, Plaintiff respectfully requests the following relief from the Court:

A.    Declare that Defendants' acts and conduct constitute violations of federal and state law and the United States Constitution;

B.    Enter judgment in Plaintiff's favor on all claims for relief;

C.    Award Plaintiff full compensatory damages, economic and non-economic, including, but not limited to, damages for back pay, front pay, pain and suffering, mental anguish, emotional distress, humiliation, and inconvenience that he has suffered and is reasonably certain to suffer in the future;

D.    Award Plaintiff punitive damages as appropriate for all intentional and malicious violations of federal and state law and constitutional rights;

E.    Award pre-judgment and post-judgment interest at the highest lawful rate;

F.    Award Plaintiff his reasonable attorneys' fees (including expert fees) and all other costs of this suit;

G.    Award all other relief in law or equity to which Plaintiff is entitled and that the Court deems equitable, just, or proper.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues within this complaint.

Respectfully submitted,

THE CHANDRA LAW FIRM LLC

*/s/ Ashlie Case Sletvold*
Ashlie Case Sletvold (0079477)
Subodh Chandra (0069233)
Brian Bardwell (0098423)
The Chandra Law Building
1265 W. 6th St., Ste. 400
Cleveland, OH 44113-1326
216.578.1700 Phone
216.578.1800 Fax
Ashlie.Sletvold@ChandraLaw.com
Subodh.Chandra@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Leonard Mazzola*