Bill Evans

Mazzola v. Togliatti, et al.

May 12, 2020



Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

1

2                IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF OHIO
3                       EASTERN DIVISION

4

5      LEONARD MAZZOLA,            )
                                   )
6               Plaintiff,         )
       vs.                         )   Case No. 19-CV-02519
7                                  )
       ANTHONY TOGLIATTI, ET AL.,)
8                                  )
                Defendants.        )
9                            - - - - -
10               THE DEPOSITION OF BILL EVANS
                    TUESDAY, MAY 12, 2020
11                           - - - - -

12

13          The deposition of BILL EVANS, called by

14     the Plaintiff for examination pursuant to the

15     Federal Rules of Civil Procedure, taken before me,

16     the undersigned, Aimee N. Szinte, Notary

17     Public in and for the State of Ohio, via

18     Zoom Videoconference, at 12:30 p.m., the day and

19     date above set forth.

20

21

22

23

24

25

                   CADY REPORTING SERVICES, INC.

```
 1      APPEARANCES:

 2     On behalf of the Plaintiff:

 3            Jessica Savoie, Esq.
              Subodh Chandra, Esq.
 4            The Chandra Law Firm, LLC
              1265 W. 6th Street
 5            Suite 400
              Cleveland, Ohio  44113
 6            216.578.1700
              Jessica.savoie@chandralaw.com
 7            subodh.chandra@chandralaw.com

 8     On behalf of the Defendant City of Independence:

 9            Steven Strang, Esq.
              Maia Jerin, Esq.
10            Gallagher Sharp
              1501 Euclid Avenue
11            Seventh Floor, Bulkley Building
              Cleveland, Ohio  44115
12            216.241.5310
              sstrang@gallaghersharp.com
13
              and
14
              William Doyle, Esq.
15            Taft, Stettinius & Hollister, LLP
              200 Public Square
16            Suite 3500
              Cleveland, Ohio  44114
17            wdoyle@taftlaw.com

18     On behalf of the Witness:

19            Bradley Snyder, Esq.
              Roetzel & Andress
20            41 S. High Street
              Huntington Center, 1st Floor
21            Columbus, Ohio  43215
              bsnyder@ralaw.com
22
       ALSO PRESENT:
23
              Leonard Mazzola, Plaintiff
24            Anthony Togliatti, Defendant

25                        - - - - -

                   CADY REPORTING SERVICES, INC.
```

3

```
1                    BILL EVANS DEPOSITION INDEX

2
        EXAMINATION BY:                   PAGE NO.
3
        MS. SAVOIE       ....................        5
4       MR. STRANG       ....................      101

5       EXHIBIT NO.      ....................   PAGE NO.

6            1           ....................        5
             2           ....................        6
7            3           ....................        8
             4           ....................       86
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
                CADY REPORTING SERVICES, INC.
```

```
 1          BILL EVANS, of lawful age, called by
 2     the Plaintiff for examination pursuant to the
 3     Applicable Rules of Civil Procedure, having been
 4     first duly sworn, as hereinafter certified, was
 5     examined and testified as follows:
 6     EXAMINATION OF BILL EVANS
 7     BY-MS.SAVOIE:
 8     Q   Mr. Evans, my name is Jessica Savoie.  I am an
 9         attorney at the Chandra Law Firm and we
10         represent Leonard Mazzola in a civil lawsuit he
11         has filed.
12             You're an attorney, correct, Mr. Evans?
13     A   Yes.
14     Q   I had trouble hearing that.  Is there any way
15         we can adjust the sound quickly?
16     A   Yes.  Is that better?
17     Q   It was actually easier to hear you before we
18         went on the record, so I would ask that we go
19         off the record and we do something to adjust
20         the sound on your end, please.
21                 (Recess taken.)
22     Q   So Mr. Evans, you're an attorney, correct?
23     A   Yes.
24     Q   You're well acquainted with depositions, right?
25     A   Yes.
```

```
 1    Q    You're familiar with the rules of depositions,

 2         right?

 3    A    Yes.

 4    Q    Because we are conducting this deposition via

 5         Zoom, I would ask that we take extra care to

 6         avoid talking over each other.

 7              Did you produce documents in response to

 8         a subpoena duces tecum dated December 4, 2019

 9         in the Lenny Mazzola civil lawsuit?

10    A    Yes.

11    Q    Have you had a chance to look at Plaintiff's

12         Exhibit 1, which is a copy of that subpoena?

13    A    Yes.

14    Q    If there are no objections, I'll introduce that

15         as Plaintiff's Exhibit 1 to your deposition so

16         we can establish why you produced those

17         documents.

18                        -  -  -  -  -

19              (Plaintiff's Exhibit 1 was marked.)

20                        -  -  -  -  -

21    Q    Now, are the documents you produced the

22         documents that we have been provided labeled

23         Plaintiff's Exhibit 2, Bates stamped

24         Evans/PTA 001 through 217?

25    A    This is what came yesterday or the day before,
```

CADY REPORTING SERVICES, INC.

```
1            correct?

2    Q   Yes.  I sent a copy of what we planned to use

3        to your attorney.

4    A   I'm just looking through the one marked

5        Exhibit 2.  I saw the one marked Exhibit 1.

6            And what was Exhibit 2 again?  I'm sorry.

7    Q   These are the documents you produced in

8        response to the subpoena, correct?

9    A   Oh, yes.  The documents that are Bates stamped?

10   Q   Yes.

11   A   Yes.

12   Q   So if there are no objections, we'll introduce

13       that as Plaintiff's Exhibit 2 to your

14       deposition.

15                   -  -  -  -  -

16           (Plaintiff's Exhibit 2 was marked.)

17                   -  -  -  -  -

18   Q   What else did you produce in response to our

19       subpoena that is Plaintiff's Exhibit 1?

20   A   I don't know of any documents that were

21       produced other than what was specifically

22       requested by your subpoena that has been

23       Bates stamped by Mr. Snyder's office.

24   Q   Did you produce any media files in response to

25       our subpoena?
```

                    CADY REPORTING SERVICES, INC.

```
 1      A    Yes.

 2      Q    So you produced some audio and video files,

 3           correct?

 4      A    That's correct.

 5      Q    We're not using that as part of the exhibit.  I

 6           just wanted to make clear that what we're using

 7           is just the actual documents you produced,

 8           correct?

 9      A    I understand.

10      Q    What did you do to prepare for your deposition

11           today?

12      A    I reviewed the Bates stamped documents that you

13           have in your possession, I have in my

14           possession, and that was all.

15      Q    Did you review anything else you produced in

16           response to the subpoena?

17      A    No.  Just the Bates stamped documents and what

18           you sent yesterday or the day before that we

19           just went over a moment ago.

20      Q    And since we did that off the record, I'll ask

21           you to explain what that is.

22      A    That documents was an I-Team -- it was in

23           written form that I reviewed.  It was an I-Team

24           type of narrative that had to do with this case

25           and that had contained some information
```

```
 1          relevant to a lie detector, I think it was

 2          characterized as a lie detector, and a question

 3          or questions posed by Mr. Gallek to the

 4          Chief of Police of Independence, Ohio.

 5     Q    Was that an I-Team article dated May 3 of 2019?

 6     A    I don't know the date on it.  I didn't pay

 7          attention to that.  But it was an I-Team

 8          article.

 9     Q    And do you have it in front of you now?

10     A    I do not.  It's on Mr. Snyder's computer.

11          Would you like me to confirm the date?

12     Q    Please, do.

13     A    The date on that is May 3.

14     Q    2019, correct?

15     A    That's correct.

16     Q    And we had a stamp on it that said Plaintiff's

17          Exhibit 3, correct?

18     A    Yes.

19     Q    If there are no objections, we'll use that as

20          Exhibit 3 to your deposition.  We'll talk about

21          that a little later.

22                    -  -  -  -  -

23             (Plaintiff's Exhibit 3 was marked.)

24                    -  -  -  -  -

25     Q    Did you communicate with anyone employed by the
```

```
 1          City of Independence to prepare for your

 2          deposition?

 3      A   No.

 4      Q   Did you communicate with anyone to prepare for

 5          your deposition?

 6      A   My attorney, Brad Snyder.

 7      Q   Other than your attorney, did you communicate

 8          with anyone else before your deposition?

 9      A   No.

10      Q   Mr. Evans, you own and operate a business

11          called PolyTech Associates, Incorporated,

12          correct?

13      A   That's correct.

14      Q   And you're the President, correct?

15      A   Yes.

16      Q   What services does PolyTech Associates provide?

17      A   Forensic lie detection polygraph services and

18          polygraph testing.  Lie detection services

19          involving ocular lie detection testing.

20          Evaluation for police applicants and fire

21          applicants before hire.  Internal affairs types

22          of investigations for public sector and private

23          sector agencies or entities.  We also do

24          promotional evaluations in the public and

25          private sector, and we write pandemic
```

CADY REPORTING SERVICES, INC.

```
 1            catastrophe emergency plans and continuation of

 2            -- government continuation of operation plans.

 3       Q    Do you still practice law?

 4       A    Yes.

 5       Q    What are your practice areas?

 6       A    It's a general area.  It's a small practice

 7            without any areas of specialized concern.

 8       Q    When did you first meet Police Chief

 9            Michael Kilbane?

10       A    It was in respect to this investigation

11            sometime shortly before the investigation.  I

12            don't have the exact date.

13       Q    Did you meet Chief Kilbane when he was working

14            for North Olmsted?

15       A    No.

16       Q    Were you or your company ever retained to do

17            work for North Olmsted Police Department?

18       A    No, Not for the police department, but for the

19            fire department.

20       Q    What was the work you did for North Olmsted?

21       A    This was evaluation for a Fire Chief.

22       Q    When you were retained or when were you

23            retained by the City of Independence for the

24            investigation that involved Lenny Mazzola?

25       A    I don't have the exact date at the tip of my
```

                         CADY REPORTING SERVICES, INC.

```
 1          tongue, but it was shortly before this
 2          investigation began.
 3     Q    Do you know when you first received the
 4          assignment from the City of Independence?
 5     A    I don't know the exact date.
 6     Q    Do you write down your activity on files in
 7          your activity logs?
 8     A    For my record keeping, which is internal, I
 9          write down activity that I do in my activity
10          log in general or notes as they're accumulated.
11     Q    So would you mind looking at Plaintiff's
12          Exhibit 2, which are your records, and the page
13          Bates stamped Evans PTA 103?
14     A    I'm looking at that.  Oh, 103 or 003?
15     Q    103.
16     A    Oh, okay.  I'm sorry.
17     Q    Thank you for clarifying.
18                    MS. SAVOIE:  Steven, can I ask
19          you to put your computer -- I'm getting some
20          background noise from someone.  It looks like
21          you may not be on mute.  Are you on mute?
22                    MR. STRANG:  No, I'm not on mute.
23                    MS. SAVOIE:  Would you mind
24          putting it on mute for now until you need to
25          make an objection?
```

CADY REPORTING SERVICES, INC.

```
 1              MR. STRANG:  I expect it's not
 2         me.  I'm on a speakerphone and there's nothing
 3         else in here, but I'll give it a shot.
 4              MS. SAVOIE:  Thank you.  That
 5         cleared it up.  That's good.
 6    A    I'm looking at 103 now.
 7    Q    All right.  So looking at 103, if the earliest
 8         date of any activity in your activity log is
 9         January 31, 2019, is that when you received
10         the assignment for this investigation from
11         Chief Kilbane or is that a separate meeting
12         where he first talked to you about it?
13    A    That's when he first talked to me about it.
14    Q    When did you receive the assignment from
15         Chief Kilbane?
16    A    I really don't know when that date was.
17    Q    When did you actually begin your investigation?
18    A    Well, I would look at this activity log and I
19         would say that it would be -- I would say it
20         would be on March 13 when I went to do some
21         interviews at the City of Independence.
22    Q    Can you tell me if there is any difference
23         between the activity log on -- let me back up
24         for a second.
25              So you have activity logs on pages
                    CADY REPORTING SERVICES, INC.
```

```
 1            Evans/PTA 102 and 103?
 2      A     102 did you say?
 3      Q     Yeah.  You have activity logs on 102 and 103.
 4            Are both of these your activity logs?
 5      A     Yes.
 6      Q     So do you keep these in chronological order?
 7      A     Well, I may go back if I forgot to make an
 8            entry and enter it at a different time if I
 9            don't have the activity log available, so
10            whether it's contemporaneous or chronological,
11            I'm not sure.
12      Q     I'm just trying to understand the chronology of
13            your investigation.  So does this accurately
14            represent the chronology?
15                 And it looks like Evans/PTA 103 is
16            actually early in time and then Evans 102 picks
17            up on March 22, 2019, is that correct?
18      A     Oh.  I see what you're asking.  Because one is
19            before the other, it's two pages, so.
20      Q     Right.
21      A     I understand.
22      Q     Yeah.  So does this set forth the chronology of
23            your investigation?
24      A     Yes.
25      Q     And your investigation actually began whenever
```

CADY REPORTING SERVICES, INC.

```
1            you did interviews on March 13 of 2019,
2            correct?
3     A     I guess if you would characterize the bright
4            line of beginning, that's the first that I
5            would have made reference to any investigatory
6            activity.  March 13 was when I left to go to
7            Independence to do the interviews.
8     Q     And Chief Kilbane first contacted you on
9            January 31, 2019?
10    A     Yes.
11    Q     And you had a meeting in person?
12    A     Yes.
13    Q     Whenever you met with Chief Kilbane on
14           January 31 of 2019, what did he tell you about
15           what he was looking for?
16    A     There may be notes or a series of notes in the
17           Exhibit 2 stack of documents that would
18           accurately reflect my understanding of that
19           meeting.  But just in memory, it was an
20           overview of information about the matter in
21           which he was trying to determine information
22           about dissemination of material from outside or
23           from two sources not within the police
24           department.
25    Q     What was the scope of your assignment whenever
```

1      you received the formal assignment to begin

2      your investigation?

3    A  To identify whether there was information

4      disseminated outside of the police department's

5      protocol which would be to outside sources not

6      authorized by the police department or the

7      public communications officer for the police

8      department.

9    Q  Did Chief Kilbane ask you to perform a criminal

10     investigation as part of this assignment?

11   A  He was uncertain at that point what type of an

12     investigation it may or may not be and had

13     indicated that it could be criminal or within

14     the department as an internal type of matter,

15     and he had identified some breaches of the

16     Ohio Revised Code, as well as identify areas

17     within the police department that were breaches

18     of policy.

19   Q  Are you able to possibly set your microphone

20     settings?

21   A  Maybe I got closer.  Is that better?

22   Q  It's a little better.

23        Mr. Evans, would you please continue your

24     answer from before about whether you were

25     performing a criminal investigation as part of

                CADY REPORTING SERVICES, INC.

```
 1         your assignment from Chief Kilbane?
 2    A    I really don't have anything to add to that at
 3         this point.
 4    Q    Did you actually perform a criminal
 5         investigation or was this an administrative
 6         investigation?
 7    A    I didn't know until I got to the City on the
 8         13th to do the interviews as to how we were
 9         going to proceed, at that point anyway, and so
10         Sara Liva was the representative for the
11         officers that I was going to interview, the
12         attorney representing the union, and she didn't
13         know either at that point.  And there was
14         contact with Bob Phillips who she worked for by
15         Sara Liva to make a decision at that point as
16         to how to proceed.
17    Q    What was your ultimate decision about how to
18         proceed with your investigation?
19    A    It was not my decision.  It was the decision of
20         the collective client, which would be the HR
21         Director, the Chief of Police and Bob Phillips
22         that we would proceed under Garrity to do the
23         interviews, because I was not a law enforcement
24         officer and if the interviews were going to be
25         done in a different way under a non-Garrity
```

CADY REPORTING SERVICES, INC.

```
 1          proceeding, I wasn't able to supply --

 2                        MR. CHANDRA:  At this point we

 3          are getting some distortion now that the

 4          microphone was raised to 90.  I see Aimee

 5          curling her brow the same time I am, so I think

 6          we need to go back to that 90 percent volume

 7          and let's see if that keeps the little

 8          distortion from coming in when you're

 9          emphasizing certain words.  Tell us when you're

10          ready and have been able to do that.

11                        THE WITNESS:  I've taken it down

12          to about 65 percent.  Maybe that's better even

13          than it was at 80 percent.

14              Can you hear me better now?

15                        MS. SAVOIE:  Yes, Mr. Evans.

16          Thank you.  That sounds better to me.

17     Q    Are you able to continue?

18     A    Yes.

19     Q    So as you were saying before, people suspected

20          of a crime have the right to be issued Miranda

21          Warnings before being questioned, correct?

22     A    Depending on the crime, yes.

23     Q    Can you clarify that answer, please?

24     A    Well, as I understand it -- I have been in law

25          enforcement for a long time, but as I
```

                    CADY REPORTING SERVICES, INC.

```
 1        understand it, it's going to be a situation

 2        involving --

 3                   MR. CHANDRA:  We lost you again.

 4        You dropped off again completely.  We've got

 5        real issues with your microphone.  I wonder if

 6        it might be possible to maybe just switch

 7        computers between Brad and Bill and see if that

 8        might help.  I'm spit balling here, but your

 9        voice suddenly dropped off to unintelligible

10        again.

11                   MS. SAVOIE:  Let's have the

12        question read back.

13                   (Record read.)

14   A    If it's a custodial interview and the person

15        isn't free to leave, then Miranda needs to be

16        given.

17   Q    Okay.  It sounded like you cut off there.  Was

18        your last word given?

19   A    Yes.

20   Q    Did you use Garrity during this investigation?

21   A    Yes.

22   Q    Did the City officials that you mentioned

23        before decide this was an administrative

24        investigation rather than a criminal

25        investigation?
```

                   CADY REPORTING SERVICES, INC.

```
 1     A    Yes.
 2     Q    Did Chief Kilbane or anyone ask you to
 3          investigate who violated any specific employee
 4          policies or department policies?
 5     A    Yes.  That was the general theme of the
 6          investigation was to try to identify who
 7          violated the policies.
 8     Q    Did Chief Kilbane or anyone at the City ask you
 9          to analyze which laws may be implicated by the
10          facts that you discovered during your
11          investigation?
12     A    No.
13     Q    Did anyone at the City ask you to analyze what
14          ordinances might have been implicated by the
15          facts you learned?
16     A    No.
17     Q    Did anyone at the City ask you to analyze
18          whether any of the facts you learned violated
19          any internal department policies?
20     A    No.
21     Q    Other than what we've discussed so far, can you
22          give me more information about the scope of
23          your assignment from the City of Independence
24          that we've been discussing?
25     A    No.  I think I pretty much summed it up.
```

                    CADY REPORTING SERVICES, INC.

20

```
1    Q    Can you explain the timing -- I just heard some
2         weird feedback.  Was someone trying to object
3         or say something?
4              With respect to the timing of your
5         assignment and your investigation, what
6         prompted your initial assignment?
7    A    I'm not clear on the question.
8    Q    What happened to prompt the City of
9         Independence to retain you to conduct an
10        investigation?
11   A    It was the -- as I testified earlier, the
12        dissemination of information in breach of
13        policy, as I understood it.
14   Q    And how did Chief Kilbane or anyone at the City
15        learn about that?
16   A    I don't know.
17   Q    Did Chief Kilbane talk to you about a news
18        article by Ed Gallek dated January 14 of 2019?
19   A    What was the date again, please?
20   Q    January 14, 2019.  In your documents that
21        we've labeled Plaintiff's Exhibit 2, at page
22        Evans/PTA 095 there's a copy of that article
23        with your documents.
24   A    095 you said?
25   Q    Correct.
```

CADY REPORTING SERVICES, INC.

```
 1    A    Okay.  I'm looking at that document.
 2    Q    Did Chief Kilbane tell you whether that
 3         document prompted him to contact you?
 4    A    Not specifically, no.
 5    Q    Was it your understanding that that news
 6         coverage prompted him to contact you?
 7    A    That was in part of something he referred to,
 8         but I really don't know what prompted him to
 9         contact me other than what I testified to.
10    Q    Did he give you the document that's labeled as
11         page 95 here?
12    A    Yes.
13    Q    Did Chief Kilbane also give you documents that
14         he thought were the source of the two circled
15         and underlined portions of that article?
16    A    He gave me that document that you're referring
17         to, 095.  Does that answer your question?
18    Q    Not quite, but I'll break it down a little
19         more.
20              So do you see how there are circled and
21         underlined portions on page 095 in that
22         document?
23    A    Yes.
24    Q    So one of them is a police memo that shows,
25         "Productivity standard.  Patrol officers shall
```

CADY REPORTING SERVICES, INC.

```
 1              meet or exceed 10 traffic citations per month."

 2              Correct?

 3        A     Correct.

 4        Q     And a second portion that is circled and

 5              underlined says -- another memo refers to,

 6              "At least two to three traffic enforcement

 7              actions per shift."  Correct?

 8        A     That's correct.

 9        Q     And the article also says, "These can include

10              warnings or crash investigations, not just

11              tickets."  Correct?

12        A     Correct.

13        Q     And then turning to the next page of

14              Plaintiff's Exhibit 2 to Evans PTA 096 --

15        A     Yes, I see that.

16        Q     Is there highlighted language on that page?

17        A     Yes.

18        Q     Did you highlight that or did someone else

19              highlight it?

20        A     I don't know.  I'm not sure who highlighted

21              that.

22        Q     Was that highlighted to correspond to similar

23              or the same language contained on page 095 in

24              the news article?

25        A     Yes.
```

                      CADY REPORTING SERVICES, INC.

|    |   |                                                              |
|----|---|--------------------------------------------------------------|
| 1  | Q | Can you identify that document on page 096?                   |
| 2  | A | That's the document from Leonard Mazzola to the              |
| 3  |   | patrol -- excuse me -- to police and                         |
| 4  |   | dispatchers dated September 25, 2018 and the                  |
| 5  |   | subject is, "Performance Standard."                          |
| 6  | Q | Okay.  And you also received a memorandum from               |
| 7  |   | Leonard Mazzola to JT Kurtz, correct?                        |
| 8  | A | You know, I'm sorry and I apologize.  I don't                |
| 9  |   | know the name specifically and if you could                  |
| 10 |   | reference the document, that might help me out.               |
| 11 |   | I don't know the names as well as I would the                |
| 12 |   | documents, so if we can refer to a specific                  |
| 13 |   | PTA number.                                                   |
| 14 | Q | Okay.  Yes.  Let me locate that really quickly.              |
| 15 |   |             MS. SAVOIE:   Let's take a quick                  |
| 16 |   | break for a second.                                          |
| 17 |   |             (Recess taken.)                                   |
| 18 | Q | Could you please turn to Evans/PTA 082?                       |
| 19 | A | Yes.                                                          |
| 20 | Q | And so Chief Kilbane gave you a copy of this                 |
| 21 |   | memo as well, correct?                                       |
| 22 | A | I'm not there quite yet.  So 082 you said,                    |
| 23 |   | correct?                                                      |
| 24 | Q | You can go to 082 or 081.  It looks like                     |
| 25 |   | they're the same document.                                    |

CADY REPORTING SERVICES, INC.

```
 1              Can you identify that document, please?

 2      A    This document is to Sergeant JT Kurtz from

 3           Lieutenant Mazzola.  There's a copy to

 4           Chief Kilbane.  The memo is dated August 8,

 5           2018 and the subject matter is, "Productivity."

 6      Q    Do you see the highlighted and underlined

 7           language?

 8      A    Yes, I do.

 9      Q    And what language is highlighted and

10           underlined?

11      A    "At least two to three traffic enforcement

12           actions per shift."

13      Q    Does that correspond to the quote from the news

14           article dated January 14, 2019 that we

15           discussed a moment ago?

16      A    And that was Bates stamp number?

17      Q    95.

18      A    95, okay.

19      Q    Yes.

20      A    Let's see.  "At least two to three law

21           enforcement actions per shift."

22      Q    So the question is was that document at

23           Evans/PTA 081 given to you because it needed to

24           correspond to the information in the news

25           article?
```

                    CADY REPORTING SERVICES, INC.

```
 1    A    I'm looking to see where "at least two to three
 2         traffic enforcement actions per shift" appears
 3         on Bates stamp 095 and I haven't found that
 4         yet.
 5    Q    There's some highlighted and underlined
 6         language.  So do you see about 40 percent of
 7         the way down the page where it says, "Another
 8         memo refers to 'at least two to three traffic
 9         enforcement actions per shift'"?
10    A    Yes.  I see that.
11    Q    Okay.  So --
12    A    I see it, yes.  I see the correlation, yes.
13    Q    Right.  So I'm just trying to understand who
14         gave you the documents in your file and why,
15         right?
16              So Chief Kilbane gave you this memo
17         that's on page Evans/PTA 081, correct?
18    A    Yes.
19    Q    And he gave it to you because he thought the
20         information was -- he thought that the
21         information in this memo was the source of the
22         information in the news article, correct?
23                    MR. STRANG:  Objection.
24    Q    Do you know why he gave you this memo?
25    A    No.  I can tell you that various memos were
```

CADY REPORTING SERVICES, INC.

1          given to me without highlighting.  I

2          highlighted -- I can identify this now better

3          because I highlighted the blue as being similar

4          and I believe I highlighted the blue on Bates

5          stamp 81 and the yellow on Bates stamp 81.

6     Q    So you made these highlights?

7     A    And I believe I highlighted 95.  You asked me

8          that earlier and I wasn't sure, but now that I

9          see the color on these two, I believe I

10         highlighted both of these pages.

11    Q    So you highlighted these in the course of your

12         investigation?

13    A    Yes, I believe I did.

14    Q    Chief Kilbane also gave you an e-mail from

15         Ed Gallek to Chief Kilbane dated January 14 of

16         2019 which is found at Evans/PTA 090, correct?

17    A    I want to make sure I keep these in order

18         because I am pulling them out, so let me put

19         this back.

20              090 is the one you're going to now?

21    Q    Correct.

22    A    All right.  Let me pull that out.  Okay.  I

23         have 090 in my hand.

24    Q    Chief Kilbane gave you this e-mail, correct?

25    A    Yes.

                    CADY REPORTING SERVICES, INC.

```
 1      Q   And this was an e-mail from Ed Gallek, correct?

 2      A   Yes.

 3      Q   He made a public records request for

 4          pre-disciplinary and disciplinary paperwork for

 5          Leonard Mazzola, correct?

 6      A   He being Ed Gallek?

 7      Q   Correct.

 8      A   That would be an assumption on my part.

 9      Q   So is it correct that the e-mail reads, "I'm

10          requesting the pre-disciplinary and

11          disciplinary paperwork for Lieutenant Mazzola."

12      A   Yes.  In other words, I'm assuming he made that

13          request.

14      Q   Okay.  I mean is that what the e-mail says?

15      A   Yes.  That's why my assumption is that he made

16          the request.

17      Q   Okay.  As opposed to someone else using

18          Ed Gallek's e-mail?

19      A   As opposed to someone else at the news station

20          on his behalf.

21      Q   Okay.  And in this e-mail Ed Gallek also

22          requested the pre-disciplinary, disciplinary

23          paperwork for officer Brian Dalton, correct?

24      A   Yes.

25      Q   And he requested other discipline for other
```

                    CADY REPORTING SERVICES, INC.

```
 1            supervisors or patrol officers issued since the

 2            previous August regarding traffic stops or

 3            tickets written, correct?

 4       A    Well, the third paragraph down says, "Officer

 5            Dalton filed a recently concerning number of

 6            traffic stops/tickets written and I'm also

 7            requesting any other discipline for any other

 8            supervisors or patrol officers issued since

 9            late August regarding traffic stops/tickets

10            written."

11       Q    Okay.  And what's the final thing he requested?

12       A    "I'm also requesting grievances filed for any

13            of these disciplinary issues or policies

14            concerning the number of traffic stops/tickets

15            written/performance expectations."

16       Q    At the page marked Evans/PTA 099, if you

17            wouldn't mind turning to that.

18       A    I'm at that now, yes.

19       Q    Is that an e-mail from Chief Kilbane to you

20            dated March 8, 2019?

21       A    Yes.

22       Q    Is it correct that Chief Kilbane indicated that

23            the only people who possessed the written

24            reprimand to Officer Dalton were Mr. Mazzola,

25            Mr. Dalton and the Chief?
```

1    A    I'm referring to, "Attached is the reprimand to

2         Officer Dalton that was requested by the

3         reporter.  This reprimand was written by

4         Lieutenant Mazzola, printed out and given

5         directly to Patrolman Dalton.  It was not

6         disseminated electronically and the only people

7         who possessed it were Lieutenant Mazzola,

8         Patrolman Dalton and myself after it was

9         presented to Dalton for his signature.  I also

10        included the ORC section below that addresses

11        accessing a computer system beyond the scope of

12        authority.  It is an F-5.  Please let me know

13        if you need anything else."

14   Q    Okay.  That is sufficient.  Thank you.

15             That's a reference to a potential felony

16        when he says, "F-5."  Correct?

17   A    Yes.

18   Q    So at this point during the course of your work

19        with the City, Mr. Mazzola was being

20        investigated by the City for a felony?

21   A    I don't know.

22   Q    Can you explain?

23   A    I don't know what he was being investigated

24        for.  I think this was provided to me by the

25        Chief for his own reasons as it relates to, as

                    CADY REPORTING SERVICES, INC.

1      I said, the direction of this case.  Whether it

2      was internal or not was to be determined as the

3      facts revealed themselves, but I don't know

4      what was in the Chief's mind in regard to how

5      it was being investigated or not.

6  Q  So what is your understanding based on your

7      communications with Chief Kilbane about why he

8      sent you this statute in Section 2913.04?

9  A  Well, you asked for my understanding, and that

10     would simply be to explain the gravity of the

11     situation as he perceived it in that someone

12     had obtained information and sent it outside of

13     the proper protocol for releasing that

14     information to unauthorized parties without

15     going through the communications officer for

16     the City.

17 Q  Did Chief Kilbane ask you to then to analyze

18     the facts and determine whether there was a

19     possible violation of this criminal statute?

20 A  Not necessarily of the criminal statute.  As I

21     indicated earlier, to determine whether or not

22     there was a breach of whether it be policy or

23     procedure.

24 Q  Right.  But I'm asking about what you

25     specifically did with this statute, Section

                  CADY REPORTING SERVICES, INC.

```
 1          2913.04?

 2     A    I didn't do anything with the statute.  I think

 3          it was just information he was supplying to me

 4          to identify what he perceived to be the

 5          severity of the situation in the City of

 6          Independence.

 7     Q    Did you read that statute at the time he sent

 8          it to you?

 9     A    I don't know whether I read it at the time he

10          sent it to me or not.

11     Q    Did you read it during your investigation?

12     A    I probably did.

13     Q    After you did the initial round of interviews

14          on March 13, did you think that there was a

15          violation of section 2913.04?

16     A    I don't think I ever arrived at that conclusion

17          or opinion.

18     Q    So no?

19     A    No.  Once again, the purpose of my

20          investigation was to determine who had released

21          information outside of proper City protocol.

22          That was really the scope of the investigation.

23          It wasn't beyond that.

24     Q    Did Chief Kilbane give you the document that is

25          on the page labeled Evans/PTA 087?
```

                    CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | A | Yes. |
| 2 | Q | Is this a document dated January 7, 2019? |
| 3 | A | Yes. |
| 4 | Q | Can you identify the document, please? |
| 5 | A | It's to Patrolman Brian Dalton from |
| 6 | | Lieutenant Len Mazzola, copy to Chief Michael |
| 7 | | Kilbane, dated January 7, 2019 referencing |
| 8 | | performance standards between October 1 of 2018 |
| 9 | | and December 31 of 2018. |
| 10 | Q | Is it correct that where there is a signature |
| 11 | | line at the bottom of this document that |
| 12 | | someone has written, "Refused.  No just cause. |
| 13 | | I was threatened and am signing this under |
| 14 | | duress." |
| 15 | A | Yes.  I see that written in there in |
| 16 | | handwriting as opposed to typed. |
| 17 | Q | Were you provided with any other versions of |
| 18 | | this written reprimand document? |
| 19 | A | Not that I know of, no. |
| 20 | Q | And to be more specific, were you provided any |
| 21 | | version of this document that was not signed |
| 22 | | and did not contain that writing that we just |
| 23 | | referenced? |
| 24 | A | Not that I recall, no. |
| 25 | Q | Let's turn back to your activity logs at |

CADY REPORTING SERVICES, INC.

```
 1          Evans/PTA 102 and 103, please.

 2    A     Okay.

 3    Q     As we discussed earlier, these logs provide a

 4          chronology of your activity on this matter,

 5          correct?

 6    A     Yes.

 7    Q     As we sit here today and you look at these, is

 8          there anything missing from these activity

 9          logs?

10    A     It's possible.

11    Q     Anything that you can recall that you would add

12          to it now?

13    A     It's been a year.  I can't recall anything that

14          I would add to it offhand.

15    Q     But as we sit here today, do you think that

16          these are complete?

17    A     Well, I don't know if we're always able to

18          capture all of our time on any type of a case

19          or activity, especially when you're doing

20          several things at one time.

21    Q     I think all of the parties know that.

22    A     Yeah.  That's why I'm saying that qualifying it

23          in that way.  I just don't know of any time

24          that I've ever been able to capture everything

25          and anything necessary, but I did the best I
```

CADY REPORTING SERVICES, INC.

```
 1            could, let's put it that way.

 2       Q    Okay.  Sure.  And, again, this isn't a trick

 3            question.  I'm just trying to see if there's

 4            anything that you can recall as we sit here

 5            right now that's not on this log that you would

 6            like to add to it?

 7       A    No.  And for clarity, I'm not perceiving it as

 8            a trick question.  I'm just trying to answer it

 9            as best I can.

10       Q    Good.  Who is Mike Esposito?

11       A    Mike Esposito is an attorney with the law firm

12            of Clemans Nelson.

13       Q    What relevance did he have to your work on this

14            matter?

15       A    I think he was the person who referred the

16            City of Independence to me because he and

17            Clemans Nelson represent the City in reference

18            to employment labor issues.

19       Q    Who is Kopp, K O P P?

20       A    Ron Kopp is a friend of mine and an attorney in

21            the Akron area.

22       Q    What did he have to do with this matter?

23       A    Other than he's a friend of mine, nothing.

24       Q    And you talked to him in connection with your

25            work on this matter?
```

CADY REPORTING SERVICES, INC.

```
 1    A   Yes.

 2    Q   Why did you talk to Kopp about this matter?

 3    A   I had contacted Ron Kopp because the Chief had

 4        indicated that the investigation fit squarely

 5        into a case that he was referring to that he

 6        uses as lecture material in a course that he

 7        teaches.

 8    Q   What case is that?

 9    A   I don't remember what the case is.

10    Q   What was the case about?

11    A   I don't remember.  Well, I never read the case,

12        so I really don't know what the case was

13        actually about.  I know the general content of

14        the case had to do with some disclosures of

15        some type, but I don't know the case because I

16        never read it.

17    Q   And I understand you haven't read it, but tell

18        me what Kopp told you about this case?

19    A   He didn't tell me anything about the case.

20    Q   Then why were you talking to Kopp about this

21        matter?

22    A   As I said, because the Chief had indicated that

23        this case of dissemination of information in

24        the manner in which it allegedly occurred at

25        the City of Independence was similar to the
```

CADY REPORTING SERVICES, INC.

```
 1              case that he was referring to and it was a call

 2              that I had made to Ron to show that I was doing

 3              an investigation for the City of Independence

 4              and explained to Ron the circumstances and the

 5              fact pattern in general and to make sure that

 6              this was good, solid ground to proceed under.

 7      Q    What did Ron tell you?

 8      A    He said sure, there was no problem.

 9      Q    Did you speak with Mr. Kopp about any

10              First Amendment issues?

11      A    Well, Ron Kopp is a First Amendment lawyer and

12              he represents the media and he's well known for

13              that.  And I knew that Ron Kopp had represented

14              the Akron Beacon Journal and was their lawyer.

15              And Ron was my neighbor at one time, so he was

16              a convenient call to make.

17      Q    So you did talk to him about the First

18              Amendment, correct, and how it related to this

19              case?

20      A    If it had to do with the fact pattern of that

21              case that I am referring to that I don't know

22              the name of, it had to do with the First

23              Amendment.  But I can't tell you as I sit here

24              whether that case had to do with exactly

25              First Amendment issues or not because, as I
```

                    CADY REPORTING SERVICES, INC.

```
 1              said, I never read that case.
 2      Q    What else did Mr. Kopp tell you in your
 3              conversation with him about your investigation
 4              for the City of Independence?
 5      A    As I said earlier, I just laid out the general
 6              fact pattern of the City of Independence and
 7              went over those issues with him as to whether
 8              or not my investigation was good to proceed as
 9              we had decided it to proceed with interviews
10              and with what I knew would be potential
11              polygraph examinations later on potentially.
12      Q    Did you have this conversation with Mr. Kopp on
13              March 14 as reflected in your activity log on
14              page Evans/PTA 103?
15      A    Yes.  I could have called Ron a day or two
16              before and he was delayed in getting back with
17              me and, if my memory serves me, that's what
18              happened.  He may have been out of town or
19              something like that.  I just don't have any
20              specific recollection of that.
21      Q    So on March 14 you called him and told him
22              about the results of your initial round of
23              interviews, correct?
24      A    No.  I didn't say I called him on March 14.  I
25              spoke to him on March 14.  I said my best
```

CADY REPORTING SERVICES, INC.

```
 1          recollection is I had contacted him sometime

 2          before that and he was out of town or something

 3          like that and returned my call.

 4    Q     So you spoke with Mr. Kopp on March 14 after

 5          your first round of interviews, correct?

 6    A     That's correct.

 7    Q     You also spoke with Mike Esposito on March 14

 8          as reflected in that same entry on your

 9          activity log, correct?

10    A     I updated Mike Esposito on March 14, as my

11          activity log indicates.

12    Q     What did you discuss or communicate to Mike

13          Esposito on March 14 of 2019?

14    A     Just in general what the interviews had

15          produced.  I don't have any specific

16          recollection of what I communicated to him

17          though.

18    Q     Did you discuss any First Amendment issues with

19          Mr. Esposito on March 14 of 2019?

20    A     I don't know about that.

21    Q     On that same entry it says, "Both say no

22          problem but retaliation could be a problem."

23          Correct?

24    A     Yes.

25    Q     If I'm reading that correctly, so would both
```

CADY REPORTING SERVICES, INC.

```
 1            refer to Mr. Kopp and Mr. Esposito?

 2     A    No problem.  I don't know what "no problem"

 3            actually means a year later, other than

 4            proceeding with the investigation it could have

 5            been referencing conducting polygraphs or

 6            something else.  I don't know what that means.

 7     Q    Let's back up to what my question was, which

 8            was when it says, "Both say no problem", and in

 9            that same entry you've mentioned Mr. Esposito

10            and Mr. Kopp, does the word "both" refer to

11            Mr. Esposito and Mr. Kopp?

12     A    Yes.

13     Q    And then going onto the substance of what that

14            means, you're saying you don't remember what

15            you meant by saying that both Mr. Esposito and

16            Mr. Kopp said no problem?

17     A    Not specifically I don't know.

18     Q    Does the fact that that came directly after a

19            reference to the First Amendment issue jog your

20            memory about whether they were saying there was

21            no problem with the First Amendment?

22     A    Well, as I testified earlier, I'm tying that

23            back to that case that I'm referring to having

24            to do with what Chief Kilbane taught in that

25            course that he referred to.
```

CADY REPORTING SERVICES, INC.

1    Q   Can you explain the meaning of the next part of

2        that sentence in the entry dated March 14, 2019

3        that says, "But retaliation could be a

4        problem."

5    A   I don't know if that's an editorial comment on

6        my part or what, but retaliation in what sense.

7        And the characterization in this activity log

8        would be speculation at this point on my part.

9    Q   So are you saying you don't know what you meant

10       whenever you wrote, "Retaliation be could be a

11       problem" in that entry?

12    A   No.  I know what it meant in terms of what the

13       words state, but I don't know whether that's an

14       editorial comment or a comment that was -- I

15       don't know why I put that in there.  I don't

16       know the specific reason I put that in there.

17    Q   You don't know why you put that in there, but

18       tell me what you meant by it?

19    A   Well, retaliation is an issue that's separate

20       and apart from a dissemination of information

21       outside of proper protocol.  This case and this

22       investigation had to do with dissemination of

23       information, as we discussed earlier, and

24       retaliation would be separate from a

25       dissemination of information as a different

CADY REPORTING SERVICES, INC.

```
 1          issue entirely.

 2               So, as I said earlier, it could have been

 3          an editorial comment offered by Ron Kopp.  And

 4          as I was speaking to him, I know that when he

 5          called me or we talked, he caught me off guard

 6          because I wasn't at my desk at that time and I

 7          was doing a couple of things at once, so I

 8          don't know why those words are recorded as they

 9          are.

10     Q    What is your understanding of the meaning of

11          retaliation?

12     A    Getting back at someone, in lay language.

13     Q    How about in legal language what does

14          retaliation mean in the context of this entry?

15     A    You broke up.  I'm sorry.  What was that again?

16     Q    What does retaliation mean in the context of

17          this entry?

18     A    Well, I don't know what it means in the context

19          of that entry.  That's what I was driving at.

20     Q    So you don't know retaliation from whom?

21     A    No.

22     Q    You don't know retaliation against whom?

23     A    No.

24     Q    You don't know if this was referring to

25          First Amendment retaliation?
```

                       CADY REPORTING SERVICES, INC.

```
1    A   I don't know based on that comment.

2    Q   Do you think that Mr. Kopp or Mr. Esposito

3        would know what that was referring to?

4    A   Mr. Kopp or Mr. Esposito, they may, they may

5        not.  I don't know.

6    Q   Did you initially raise the possibility of a

7        First Amendment issue?

8    A   As I recall, it was raised as a result of that

9        case that I was referring to.

10   Q   Who raised the issue?

11   A   Well, in asking me to go back a year and say

12       who raised it, I don't know who raised what

13       issue in terms of what context, as I had

14       indicated.  But what I recall is that the Chief

15       had indicated that he lectured on that topic.

16       I think you would probably need to ask the

17       Chief about the topic that he lectured on.

18   Q   Sure.  Put in a little different way because I

19       know you're a lawyer, did you spot the issue?

20       Did you spot the issue of a possible First

21       Amendment issue and talk to the Chief about it

22       before he brought up that Mr. Kopp lecture on a

23       case that might be related?

24   A   I think it's outside of that context in the

25       sense that I was sensitized to that topic in
```

```
 1        general.  And the reason I was sensitized to
 2        that topic in general is because I've had other
 3        cases where that issue was raised as a specter
 4        and I was simply sensitized to that topic based
 5        on the case that I continue to refer to.
 6    Q   So you brought up the possibility that there
 7        would be a First Amendment issue in this
 8        investigation?
 9    A   I didn't say that.
10    Q   Okay.  Well, that was my question.  Did you
11        bring up the First Amendment issue first or did
12        someone else?
13    A   I just said I don't know.  I don't have the
14        memory of how or why that topic was brought up,
15        but the topic was brought up in the context as
16        I recall it.  I'll have to repeat this several
17        times and I don't want to continue to do that
18        and I don't perceive your question as being a
19        trick question.  I'm just reiterating what I've
20        already said.  As I recall, it came up in the
21        context in some way of that case that was
22        referred to by the Chief.
23    Q   When you were doing work for this matter, did
24        you have concerns about whether there would be
25        issues of violating Mr. Mazzola's First
```

CADY REPORTING SERVICES, INC.

```
 1              Amendment rights or anyone's First Amendment
 2              rights?
 3        A     I didn't have that concern because I was
 4              assured and reassured is that there was a
 5              breach of departmental policy when this
 6              information was disseminated.  And the breach
 7              of departmental policy was predicated upon the
 8              fact that there were written policies in place
 9              that any information had to go through the
10              designated communications officer with the
11              City's police department.  And the Chief had
12              indicated and provided me documents that were
13              clearly proprietary in nature as they were
14              described to me, so I didn't have any issues or
15              concerns in that context, and the Chief had
16              assured me that he taught that subject matter
17              and referred to a specific case as authority on
18              that topic.
19        Q     Mr. Evans, did you have any concerns during the
20              course of your work on this matter that any of
21              the actions taken could be construed as
22              retaliation against one of the officers?
23        A     There was not any retaliation of anyone during
24              the course of the investigation because there
25              was a collection of information through
```

CADY REPORTING SERVICES, INC.

1      interviews being done, but there was no

2      retaliation to be concerned about.

3    Q  Did you have any concerns about whether any

4      actions taken by the City of Independence

5      pursuant to your investigation could be

6      construed as retaliation?

7    A  I didn't know of whether action was taken

8      against any employees, nor did I have any

9      knowledge of any perceived action being taken

10     by any employees to be concerned about other

11     than identifying who had breached the

12     departmental policy in obtaining the documents.

13   Q  Did you reach that conclusion in your

14     investigation?

15   A  Which conclusion?

16   Q  Well, I want to go back to what you were just

17     talking about.  What were the findings of your

18     investigation?

19   A  Wow, that's a broad question in regard to

20     findings.  But there were similarities in what

21     was disseminated that were derived from

22     internal documents involving not only the

23     documents that you've already identified in

24     exhibits in reference to the write-ups or

25     pre-disciplinary actions, but also some other

                CADY REPORTING SERVICES, INC.

```
1         documents that you referred to that were very
2         consistent, not only consistent, but
3         practically verbatim and, in most cases,
4         in fact, beyond verbatim in reference to the
5         public records request by Ed Gallek.  So the
6         parallels were significant, in my opinion,
7         after evaluating those documents.
8    Q    What other findings did you make and present to
9         Chief Kilbane in your investigation?
10   A    Well, other than the parallels, the results of
11        a polygraph examination would be presented to
12        Chief Kilbane.
13   Q    And you did not administer that polygraph
14        personally, correct?
15   A    That's correct.
16   Q    Did you evaluate the results of the polygraph
17        performed by your associate?
18   A    Yes.
19   Q    And what did you tell Chief Kilbane about the
20        polygraph?
21   A    That the preliminary evaluation was deceptive
22        in regards to the issues examined on.
23   Q    What do you mean by preliminary?
24   A    Well, there are algorithms that are evaluated.
25        There are a couple of algorithms that are
```

CADY REPORTING SERVICES, INC.

```
1        evaluated, actually, and there was a hand

2        scoring done of the charts.  There's an

3        evaluation of the charts that could be done as

4        the examination is being conducted.

5             And, as I recall, the first communication

6        that I had with the Chief was after the

7        polygraph examination was conducted and he was

8        interested in knowing the results, so that

9        information was conveyed to him.  And I don't

10       think we would have had time to interpret those

11       results through a hand scoring and evaluate it

12       accordingly at that point, so it would have

13       been a preliminary evaluation at that time.

14            Because, as I said, I think the

15       communication to the Chief in regard to the

16       results of the polygraph examination was

17       probably sometime in the early, you know, it

18       was probably after 4:00, but I don't remember

19       exactly when.

20   Q   Referring to your activity log on page

21       Evans/PTA 102, on the first entry is it correct

22       that you called Mike Esposito on March 22 to

23       brief him about polygraph?

24   A   Yes.  That's what the entry indicates, yes.

25   Q   What did you tell Mr. Esposito in that
```

```
 1        conversation?
 2    A   Going back, I don't know precisely what the
 3        details of that conversation would have
 4        included over a year ago.  It looks like I
 5        briefed him about the polygraph.
 6    Q   Tell me what you remember about what you said
 7        and what he said during that conversation?
 8    A   I honestly can't toll you any details that I
 9        remember about that conversation.
10    Q   Did he raise any concerns about First
11        Amendment?
12    A   Not that I recall, no.
13    Q   Did he raise any concerns about retaliation?
14    A   Not that I recall, no.
15    Q   Did he raise any concerns about retaliatory
16        discharge?
17    A   I don't even know that that would have been
18        talked about at that point.
19    Q   Did he raise anything about wrongful discharge?
20    A   I don't recall.
21    Q   We talked a little earlier about these activity
22        logs and how they weren't necessarily exactly
23        contemporaneous, but these entries were written
24        reasonably contemporaneously, correct?
25    A   Reasonably, yes.
```

```
 1    Q   So maybe you would go back and add something

 2        you did the day before or something, right?

 3        But we're not talking months later or weeks

 4        later you would add things back in, correct?

 5    A   No.  No.  No.  It was within reasonable time

 6        proximity.

 7    Q   About how reasonable?  What's your usual

 8        practice?

 9    A   Within a couple days I would say or less.

10    Q   Also on March 22 of 2019 your activity log

11        reflects that you had a telephone conference

12        with the Mayor, the Chief, the Law Director,

13        the HR Director and Mr. Esposito, correct?

14    A   Yes.  It looks like there was a call in to be

15        made at 1:30 to a particular number.

16    Q   What was discussed in that call with these

17        people from the City of Independence and

18        Mike Esposito?

19    A   I don't remember what the discussion was in

20        particular, other than the generalized place

21        where we were on the investigation with, as

22        I've already testified to, the similarities in

23        the documents and the polygraph examination.

24            You know, I note something here.  I'm not

25        positive every single person was on that call,
```

```
 1        but that was who was to be on the call.
 2        Because I've got a call in notations here, and
 3        at times I write on my activity log when
 4        something is to be taking place, so it looks
 5        like seven people to be on that call.  I don't
 6        know that every single person was on the call,
 7        but I can tell you that that's who was supposed
 8        to be on the call.
 9    Q   Did anyone raise any concerns about the
10        First Amendment during that call with respect
11        to your investigation and the actions to be
12        taken as a result of your investigation?
13    A   That detail is not noted and my answer would
14        have to be I don't know.
15    Q   Do you remember anyone raising any concerns
16        during that call about retaliation with respect
17        to your investigation or the results of your
18        investigation?
19    A   No.  I don't remember that.
20    Q   How long does it usually take to produce a
21        report following a polygraph exam?
22    A   Well, as I said, a report would be, you know, a
23        verbal report, a soft report and then a hard
24        analysis.
25    Q   Tell me the hard analysis?
```

                    CADY REPORTING SERVICES, INC.

```
 1    A    Yeah.  The hard analysis it may take -- hand
 2         scoring and so forth coupled with algorithm
 3         evaluations, it may take up to two hours to
 4         complete.
 5    Q    Why did your associate polygrapher not issue a
 6         report until December 2019 for Mr. Mazzola,
 7         over nine months after the polygraph took
 8         place?
 9    A    We weren't providing any reports of any kind
10         because there is a lot of time that it takes to
11         create a report, so that's why there was no
12         report completed or even created regarding the
13         investigation.  And the polygraph was part and
14         parcel to the investigation and that report was
15         not requested until then.  When it was
16         requested, we supplied a report.
17    Q    Why was time a concern?
18    A    Time?
19    Q    You mentioned that you did not prepare a report
20         because it takes a lot of time to prepare a
21         report.  Why was time an issue?
22    A    Well you're talking about time on case or time
23         on task?
24    Q    I'm asking you whatever you meant when you said
25         that it took time to create a report and that's
```

                    CADY REPORTING SERVICES, INC.

1          why you didn't do it until nine months later

2          when it was requested.  Was it a budget issue,

3          sir?  Was the City trying to avoid paying for

4          the report at that juncture?

5     A    No.  That wasn't the reason at all.

6     Q    Then what was --

7     A    Well, the reason the report was produced, as I

8          understood and remember, was because in the

9          pleading there was a -- I don't remember what

10         it was exactly, but there was an inference of

11         something having to do with a polygraph that

12         was incorrect, that there was something in my

13         office that was alluded to in the pleading that

14         was not only incorrect, but also casting

15         dispersion on Ken Butler's integrity of some

16         kind in rendering the report.  If I looked at

17         the pleading, I would be able to tell you

18         exactly what it was.

19    Q    And as we sit here, you don't know what that

20         is?

21    A    I can look at the pleading and tell you, but

22         you're asking me why the report was issued, and

23         it was in order to correct that incorrect

24         language, verbiage or inference in the

25         pleading.

                    CADY REPORTING SERVICES, INC.

```
 1    Q   Let's go back to my original question which was
 2        why did you not produce a report?  Why did your
 3        company not produce a report right after the
 4        polygraph?
 5    A   Well, it was simply because Lieutenant Mazzola
 6        resigned and there was no reason for a report
 7        to be issued.
 8    Q   Who asked you to issue the report after
 9        Mr. Mazzola filed this lawsuit?
10    A   It was a law firm representing -- let me think.
11        It was -- I'm trying to remember the name of
12        the law firm.  It was Mr. Doyle, I believe.
13    Q   Did Chief Kilbane ask you to give a polygraph
14        to anyone other than Mr. Mazzola?
15    A   Well, after Mr. Mazzola showed deception
16        indicating a problem, the investigation wasn't
17        necessarily complete.  And when he tendered his
18        resignation, there was no need to conduct an
19        examination on anyone else at that point.
20    Q   Why not?
21    A   Well, I didn't know that he had resigned.  I
22        didn't know that there was -- anything that
23        happened.  I had called the Chief to see what
24        else we needed to do and he indicated that
25        Lieutenant Mazzola resigned and I was kind of
```

CADY REPORTING SERVICES, INC.

```
 1              caught off guard because no one had informed me
 2              that had occurred.
 3      Q       So going back to my question, why was there no
 4              need to do a polygraph for anyone else after
 5              Mr. Mazzola resigned?
 6      A       I think they decided to unilaterally terminate
 7              the investigation at that point because there
 8              was no point in proceeding.
 9      Q       But why was there no point in proceeding?
10      A       You would have to ask them.  I don't know.
11      Q       Okay.  Is that something they told you?  Did
12              they tell you there's no point in proceeding?
13      A       No.
14      Q       Okay.  Then where is that coming from, that
15              inference?
16      A       It's just my generalized conclusion of the
17              facts at that point.  The information that we
18              examined on for the purpose of the polygraph
19              was predicated upon those similarities in the
20              dissemination of information, as I had
21              testified to earlier, and the highlighted areas
22              on several documents all ending up in the
23              public records request.  And it appeared as
24              though the public records request was merely
25              issued to cover the fact that information was
```

CADY REPORTING SERVICES, INC.

1          already in hand or as a possibility that that

2          was the case.  To identify then the concerns,

3          the polygraph was conducted.

4               Lieutenant Mazzola had narrowed the field

5          of potential people who could have disseminated

6          that to the news media to include himself, the

7          Chief and some other individuals on that list,

8          and his polygraph ended up deceptive.

9               So I'm speculating when I say that they

10         probably had no reason to proceed in their

11         minds.  Maybe I'm wrong on that speculation and

12         I don't want to speculate and I would pull that

13         back, but I really don't know the reason why

14         the investigation didn't go beyond that.

15    Q    Did they conclude that Mr. Mazzola shared the

16         information with the media?

17    A    Did they conclude that?  I don't know.

18    Q    Did you conclude that?

19    A    I concluded that there was deception on the

20         polygraph.

21    Q    Okay.  So you gave them the results of the

22         polygraph showing results indicative of

23         deception, correct?

24    A    Yes.

25    Q    And then they terminated your investigation,

                        CADY REPORTING SERVICES, INC.

```
 1           correct?

 2    A      I don't know if they carried the investigation

 3           on beyond what I did or not.  There were some

 4           loose ends that needed to be checked out, as I

 5           recall.

 6    Q      What loose ends would you have checked out?

 7    A      You're stretching my memory again, but what

 8           comes to mind was that there was a -- it's in

 9           some of the documents and I just don't remember

10           what the name of this IT issue might have been

11           as to whether it was captured -- in other

12           words, I'm referring specifically to the

13           disciplinary notice and the pre-D write-up; the

14           pre-D write-up and the pre-D notice of Officer

15           Dalton and Lieutenant Mazzola.

16                Lieutenant Mazzola had indicated to me

17           that his notice was placed in an envelope on

18           his keyboard and it was tri-folded in an

19           envelope.  And being placed on his keyboard, it

20           was an original.  And the Chief had indicated

21           that there was only one of those copies

22           generated and Lieutenant Mazzola got that copy.

23           And, as a result, it ended up in the hands of

24           the news media in some way, along with

25           Brian Dalton's write-up and pre-disciplinary
```

1          action.  And those were items that were not

2          common, popular or to be disseminated outside

3          of the police department.

4               Brian Dalton had told me that absolutely

5          he was very upset about the fact that it was

6          disseminated.  Lieutenant Mazzola was very

7          upset about the fact that information, as he

8          indicated to me, was retrieved from potentially

9          his office out of a very thick binder that he

10         had ultimately placed that tri-fold in.

11              And the loose end that I'm referring to

12         is whether or not that document had been

13         disseminated in some way and captured within

14         the computer system as a pdf file of some kind,

15         which was never nailed down in that regard.

16         And, as I said, that was a loose end that I had

17         intended to check out, but Lieutenant Mazzola

18         had resigned in the meantime and the

19         investigation was terminated.

20    Q    Did you intend to have a polygraph exam done on

21         anyone else?

22    A    I'm sorry.  Repeat that, please.

23    Q    I'll rephrase it even.

24              Did you plan to have anyone else undergo

25         a polygraph exam at the City of Independence

                    CADY REPORTING SERVICES, INC.

```
 1        Police Department?
 2    A   Well, the Chief had always indicated that more
 3        than one person could potentially have been
 4        involved in some way, but I didn't know if
 5        anyone else was involved or not.
 6    Q   Sir, I would like you to answer my question.
 7            Did you plan or want to have anyone else
 8        do a polygraph exam?
 9    A   I never told the Chief that I wanted to test
10        anyone else after the examination was completed
11        on Lieutenant Mazzola.
12    Q   But did you want to have anyone else do a
13        polygraph exam?
14    A   By name, no.  In the beginning potentially
15        others could be examined besides just one,
16        naturally.
17    Q   Did the Chief ask you to have anyone else do a
18        polygraph exam?
19    A   No.
20    Q   Did the Chief think that Mr. Mazzola was the
21        person who gave the information to the media
22        based on what he told you?
23    A   I don't know.  I think Lieutenant Mazzola was
24        on the list of potential suspects.
25    Q   He didn't give you an indication about whether
```

```
 1            he thought Mr. Mazzola was the person who

 2            disclosed or not?

 3      A    No.  And, actually, he thought that potentially

 4            Brian Dalton may be involved in it because of

 5            his write-up and others could potentially have

 6            been involved in some other way, others being

 7            unidentified by name.

 8      Q    I would like to you refer to Plaintiff's

 9            Exhibit 3, please, which is the news article

10            by Ed Gallek dated May 3, of 2019.

11                      THE NOTARY:  Before we start on

12            this document, can we take a quick break?

13                      MS. SAVOIE:  We can take a quick

14            break.

15                      (Recess taken.)

16      Q    Mr. Evans, before we took a restroom break we

17            were looking at Plaintiff's Exhibit 3.  Can you

18            identify that document, please?

19      A    Yes.  It's by Ed Gallek and it's May 3, 2019,

20            7:43 p.m., Independence, Ohio.  "Fox I-Team

21            found the Independence Police Department hired

22            an outside firm" that you referred to earlier.

23      Q    Yes.  And is it correct that within the last

24            few days you looked at this article on the

25            internet?
```

                     CADY REPORTING SERVICES, INC.

```
 1      A    I just looked at it this morning.  Can you see
 2           me all right on my picture?
 3      Q    Yeah.  I can see you better now.  Thank you for
 4           adjusting.
 5                So you read this this morning online,
 6           correct?
 7      A    Yes.
 8      Q    Have you ever watched the video or did you see
 9           it live?
10      A    No.  I don't think I ever -- I don't remember
11           ever seeing it before today.
12      Q    Did you watch the video today?
13      A    No.
14      Q    Do you see that Ed Gallek stated in that
15           article that Mr. Mazzola did not provide any
16           information to the news team?
17      A    However, he never supplied -- "During the
18           internal investigation one police supervisor
19           retired.  Multiple sources said he left under
20           pressure, however, he never supplied any
21           information to the I-Team."
22                I don't see that it says that he didn't
23           do it.  I see that -- I mean I'm taking
24           literally what the words say.  "However, he
25           never supplied any information to the I-Team"
```

CADY REPORTING SERVICES, INC.

1       is a statement.  I don't see that it says that

2       he said Lieutenant Mazzola said he never

3       supplied that, so I don't agree with that

4       conclusion.

5   Q   You don't agree that this news article says,

6       "He never supplied any information to the

7       I-Team", referring to the police supervisor who

8       retired?

9   A   I'm reading exactly what it says and it says,

10      "However, he never supplied any information to

11      the I-Team."  I see that as that's Ed Gallek

12      speaking and not Lieutenant Mazzola, because it

13      isn't a quote.

14  Q   Right.  No one is saying that this is

15      Leonard Mazzola speaking in this article.

16      This is an article written by Ed Gallek

17      according to the byline, correct?

18  A   Right.  I misunderstood your question.  If it

19      could be read back, the original question,

20      maybe I misheard it.

21  Q   I'll ask it again.  I'm not trying to make this

22      complicated.  I'm just trying to establish

23      what's written here in the article.

24          Is it correct that this article says that

25      this police supervisor who retired never

                CADY REPORTING SERVICES, INC.

```
1              supplied any information to the I-Team?

2        A     And as I said, what I'm -- and I'm not making

3              it complicated either.  I don't want it to be

4              perceived that way.

5                    The words say that he never supplied any

6              information to the I-Team as being that is

7              Ed Gallek's interpretation and presented in

8              statement form.  I don't see a quote that as

9              most news reporters would do, if it's a

10             verbatim statement, put it in quotes as to

11             that's the information that is being

12             identified.

13                   So the way I understood your question

14             earlier was that Lieutenant Mazzola told

15             Gallek, and I don't see it as that being the

16             way it's disclosed here in this text form, the

17             narrative.

18       Q     Right.  So the question is, is it correct that

19             this news article says that Mr. Mazzola was not

20             the person to supply information to Ed Gallek?

21       A     And as I said already, that's not what it says.

22             That would be an incorrect interpretation as to

23             what I'm reading.  It doesn't say that.

24                   If it said that, my familiarity with news

25             reporters would be it's a quoted type of
```

                    CADY REPORTING SERVICES, INC.

```
 1              response and it is preceded by, "He said" or,

 2              "Lieutenant Mazzola said" or, "So and so said",

 3              and then it's quoted thereafter.  But that's

 4              not what I'm reading in text form.

 5        Q     Who would be quoted to say what the I-Team

 6              knew?  Are you saying that you would expect one

 7              of their reporters to quote themselves in this

 8              article and that's why you won't agree that

 9              this is what this says?

10        A     No.  That's not what I'm saying at all.

11                    Let's go over this the way I'm

12              interpreting it.  That's what you're asking me

13              for.  "During the internal investigation one

14              police supervisor retired."  That's a statement

15              by Ed Gallek.

16                    "Multiple sources said he left under

17              pressure."  That's conjecture.  That's

18              third-party information.  I categorize that as

19              hearsay.

20                    "However, he never supplied any

21              information to the I-Team."  It doesn't

22              indicate that the source of that statement is

23              Lieutenant Mazzola.  I don't know who the

24              source of that information is.  And the way I

25              understood your original question was that it's
```

CADY REPORTING SERVICES, INC.

```
 1            Lieutenant Mazzola who said he never supplied

 2            information to the I-Team.

 3      Q    I'm not asking anything about what Mr. Mazzola

 4            said.  I'm asking about what this news article

 5            says.

 6                 Does this news article say that the

 7            police supervisor who retired never supplied

 8            any information to the I-Team?

 9                      MR. STRANG:  Objection.

10                      MR. SNYDER:  Objection also.

11            This is Brad Snyder.  I object.  This is

12            getting argumentative about something the

13            witness had no involvement in preparing.

14      Q    Mr. Evans, are you seriously saying that you

15            don't understand this paragraph in this

16            article?

17      A    I never said that.

18      Q    Tell me what your understanding of this

19            paragraph of this article is?

20                      MR. STRANG:  Objection.

21      A    No.  I understand what I'm reading.  So what

22            I'm reading is an interpretation by a news

23            reporter based on multiple sources who are

24            unidentified that states that the reporter

25            states and concludes he never supplied
```

                    CADY REPORTING SERVICES, INC.

1    information to the I-Team.  So I don't know the

2    authenticity or the accuracy of that conclusion

3    by this reporter any more than you do based on

4    what you're reading, what I'm reading.

5  Q  Okay.  I think I understand what you're saying.

6        Let's back up for a second and if you

7    would go up to the beginning of the article

8    which is page 2 of the 13-page pdf.

9        Do you see where the byline says,

10   "By Ed Gallek"?

11  A  Yes.

12  Q  And do you remember Ed Gallek was the reporter

13   who came to the police station and who made

14   public records requests indicating that he had

15   knowledge of the information that had been

16   provided to the media?

17  A  Yes.

18  Q  Do you remember he was the person who wrote

19   that article that came out January 14 of 2019?

20  A  Yes.

21  Q  Okay.  And do you understand that he is an

22   I-Team reporter?

23  A  Yes.

24  Q  Okay.  So you understand that Ed Gallek can

25   speak on behalf of the I-Team, correct?

                    CADY REPORTING SERVICES, INC.

```
 1                    MR. STRANG:  Objection.
 2      Q   This is not complicated.  I mean Ed Gallek is
 3          the reporter who was publishing stories about
 4          the information from the Independence Police
 5          Department, correct?
 6      A   Yes.
 7      Q   And he is saying here as a statement of fact
 8          that Lenny Mazzola never supplied any
 9          information to the I-Team, correct?
10      A   He's not stating that as fact.
11      Q   Are you in the prior sentence assuming that for
12          some reason he's continuing to refer to,
13          "Multiple sources said he left under pressure"?
14      A   If you could be clearer as to how that's a
15          statement of fact that Lenny Mazzola did not
16          supply it, I might understand the question
17          better.
18      Q   Okay.  If the statement is, "However, he never
19          supplied any information to the I-Team" and
20          that is something written by the I-Team, isn't
21          that a statement of fact?
22      A   The statement of fact is not predicated on
23          accuracy other than sources unidentified.  If I
24          had interviewed those individuals and I knew
25          that they had said something, then I could say
```

                    CADY REPORTING SERVICES, INC.

```
 1          it's a statement of fact.  Since I don't know
 2          who these interviews are of, how many there are
 3          and it's ambiguous in that regard, I don't know
 4          that that's the case at all.  It's a
 5          speculation on my part, as I would assume it
 6          would have to be a speculation on your part
 7          that Lenny Mazzola is saying, "I never supplied
 8          the information."
 9     Q    If I said to you that someone did not tell me
10          something, would that require speculation on my
11          part --
12                    MR. STRANG:  Objection.
13     Q    -- or do I have personal knowledge of what
14          people told me?
15     A    Let me be clear on what I'm trying to convey
16          here.  There is nothing in the narrative that I
17          see -- if it's there, please point it out to me
18          because I don't see it -- that he, Lenny
19          Mazzola, said anything.  However, I do see
20          quotations, "Chief Michael Kilbane said 'send
21          me an e-mail with questions.'"
22               My point is very simple.  As it relates
23          to a statement made by Lieutenant Mazzola, if
24          it were stated by Lieutenant Mazzola, I would
25          have to believe based on the tenor and way in
```

                        CADY REPORTING SERVICES, INC.

1          which this is created, that he would have also,

2          he being Gallek, would have put that in quotes

3          as well, because I see several things that are

4          quoted verbatim.

5               The next sentence after that, "We

6          responded with" -- he, Gallek, puts in quotes,

7          "We've done that."  And he's alluding then to

8          the previous statement by Chief Kilbane.  So

9          your conclusion that you're making that

10         Lieutenant Mazzola didn't supply the documents

11         doesn't make sense to me.

12    Q    Okay.  Mr. Evans, please read the short

13         paragraph that begins on page 3 of the pdf that

14         starts with, "During the initial investigation"

15         into the record.

16    A    All right.  Which Bates stamp?

17    Q    It's not Bates stamped.  It's page 3 of the pdf

18         toward the bottom of the page, the paragraph

19         beginning with, "During the initial

20         investigation."

21    A    "During the initial investigation."  All right.

22         You're referring to the May 3, 2019, 7:43

23         document that we've been talking about, you're

24         still referring to that, right?

25    Q    Yes.

                    CADY REPORTING SERVICES, INC.

```
 1    A    "And we've heard about these new traffic ticket
 2         violation quotas she said."
 3    Q    No.  I'm talking about page 3 of 13 of the pdf,
 4         toward the bottom of the page there's a
 5         paragraph that begins, "During the initial" --
 6         I mean, "During the internal investigation."
 7    A    Oh, okay.  Okay.  Okay.
 8    Q    Please read that out loud into the record and
 9         then we'll move on.
10    A    "During the internal investigation one police
11         supervisor retired.  Multiple sources said he
12         left under pressure.  However, he never
13         supplied any information to the I-Team."
14    Q    And to be clear, there's a period after the
15         word "pressure", correct?
16    A    Yes.
17    Q    And the word "however" begins a new sentence,
18         correct?
19    A    Yes.
20    Q    Okay.  Were you aware that Mr. Gallek also
21         acknowledged that Lieutenant Mazzola was not
22         the source who provided him information in a
23         phone call with union representative Chuck
24         Wilson and Lieutenant Mazzola?
25    A    When would that be?  I don't know anything
```

                    CADY REPORTING SERVICES, INC.

```
 1            about that.  I don't recall anything about
 2            that.
 3       Q    So were you aware of any phone call where
 4            Ed Gallek told Chuck Wilson and Lenny Mazzola
 5            that Mr. Mazzola didn't provide him any
 6            information?
 7       A    Was that during the investigation that you're
 8            referring to?
 9       Q    I'm talking about any phone call you would have
10            heard to that effect.  Were you aware of that?
11       A    No.  I don't know of anything like that.  I
12            know that Lenny Mazzola denied this the whole
13            time.  He denied it to me too, so.
14       Q    So you haven't heard a recording of a
15            conversation with Ed Gallek, Chuck Wilson and
16            Lieutenant Mazzola where Mr. Gallek
17            acknowledges that Lenny was not the source of
18            information?
19       A    No.  If you refresh my memory as to why I
20            should know that, that might help.  But I don't
21            know anything about that.
22       Q    Oh, sir, I'm not saying you should know that
23            necessarily.  I'm just asking if you had
24            knowledge of it.
25       A    No.  I don't recall anything like that.  I mean
```

CADY REPORTING SERVICES, INC.

1          it was -- Lieutenant Mazzola denied involvement

2          about this, so that was just -- I mean that was

3          the purpose for the polygraph, right.

4     Q    But Kilbane never told you that Mr. Gallek

5          acknowledged that Lenny was not the source,

6          correct?

7     A    I don't -- you know, I don't recall anything

8          like that.

9     Q    And the Law Director didn't tell you that

10         Mr. Gallek acknowledged that Mr. Mazzola was

11         not the source, correct?

12                   MR. STRANG:  Objection.

13                   MS. SAVOIE:  What's the

14         objection?  Is there a privilege between the

15         Law Director --

16                   MR. STRANG:  Is there a good

17         faith basis for asking these questions?  You

18         can go ahead and ask them, but my objection is

19         on the record.

20    Q    Mr. Evans, you can answer.

21    A    No.  I think I already have.  I knew that

22         Lieutenant Mazzola was denying any involvement

23         categorically.

24    Q    Yes, but I'm asking if anyone told you that

25         Mr. Gallek, Ed Gallek, the reporter who

                     CADY REPORTING SERVICES, INC.

1      reported the information, acknowledged and

2      specifically said that Lenny Mazzola was not

3      the source of that information?

4    A  You know, I could have heard about that at some

5      point in time by somebody at some point, but I

6      don't have any specific recollection of that

7      ever occurring.  But, you know, I certainly

8      wouldn't say that that might not have come up

9      at some point in time.  I just have no idea of

10      when or who or what.  I don't have any specific

11      recollection of that.

12    Q  So you have no recollection of anyone saying to

13      you that Gallek had acknowledged Mazzola was

14      not the source, correct?

15              MR. STRANG:  Objection.

16    Q  I'm just trying to understand what you're

17      saying, sir.  Can you answer the question?

18              MR. STRANG:  Objection.

19    A  I think I already have answered that question

20      several times.  I don't remember anything like

21      that at any time coming from anybody.  I'm not

22      going to say it didn't happen.  It would be a

23      very minor thing that I wouldn't -- I mean it

24      wouldn't be anything that I would have any

25      reason to recall.

                CADY REPORTING SERVICES, INC.

```
 1    Q   It would be a minor thing if someone told you
 2        that the news media acknowledged that Lenny
 3        Mazzola was not the source of the information
 4        related to your investigation?
 5    A   It would be in that sense because that was
 6        already on the table as being a denial by
 7        Lenny Mazzola.
 8            I'm going to go back to what I've already
 9        said.  I have no recollection of any
10        conversation like that at any time with
11        anybody.
12    Q   Your investigation was an attempt to find out
13        who provided information to Ed Gallek, correct?
14    A   Yes.
15    Q   And no one, including Law Director O'Brian,
16        told you that Ed Gallek said Lenny Mazzola was
17        not that source, correct?
18    A   No one that I recall ever told me anyone was
19        the particular source or not the particular
20        source as it related to my investigation
21        objective of trying to determine who it was
22        that I recall, other than the information that
23        I've already testified to that was people who
24        could have potentially had reason or cause to
25        disseminate the information.  Does that answer
```

CADY REPORTING SERVICES, INC.

1        your question?

2   Q    It provides some information, but I would like

3        the court reporter to read back my last

4        question and I would like you to say, "Correct"

5        or, "Incorrect" so I make sure I understand

6        you, please.

7                    (Record read.)

8   A    Okay.  The answer is I don't recall if anyone

9        ever said that or not or when, but to my best

10       recollection, it was never stated to me.

11            Now, I do remember one thing, and it

12       would be during the polygraph that Leonard

13       Mazzola -- or no.  It was maybe during the

14       interview, now that I think about it, before

15       the polygraph that Leonard Mazzola said that

16       there was an I-Team investigation that I had

17       never seen, an investigation type of news

18       commentary of some kind by Ed Gallek, but I

19       don't even remember what that was that he

20       showed me that day during the interview

21       preceding the polygraph.  So if that was what

22       you're referring to and it ties back into what

23       we're talking about now, this I-Team -- let me

24       get the date on it, the one that we've been

25       having this discussion about, then yes, I

                    CADY REPORTING SERVICES, INC.

```
 1          remember that.  But beyond that, I don't have
 2          any specific recollection of anything
 3          associated with what your questioning me about
 4          now.
 5     Q    Okay.  So that was a really long answer and I
 6          appreciate that you're providing information,
 7          but I want everything to be clear here.  Okay?
 8          So I'm not talking about what Lenny Mazzola
 9          said to you during a polygraph or at any time.
10          I'm talking about facts you were told by people
11          related to your investigation.  Okay?
12               So did anyone ever tell you that
13          Ed Gallek said Lenny Mazzola was not the source
14          of this information that he published about?
15                         MR. SNYDER:  Objection.
16                         MR. STRANG:  Objection.
17                         THE WITNESS:  Can I answer that?
18     Q    Yeah.  You can answer.
19     A    The reason that I'm trying to answer your
20          question is because your question has in it,
21          "Did anyone ever", all right.  That's pretty
22          broad.
23     Q    Yes.
24     A    So the reason that my answer is very long is
25          because anyone ever would include Leonard
                    CADY REPORTING SERVICES, INC.
```

```
 1            Mazzola, if that's what he pointed out to me
 2            the day that he was in the office for his
 3            polygraph.  If it happened to be the May 3,
 4            2019 -- well, I guess it couldn't have been
 5            because he was in my office in March.
 6                 So yeah, okay.  Back to that.  I don't
 7            have recollection of anything associated with
 8            this line of questioning.
 9       Q    Did Lenny tell you that Ed Gallek had
10            acknowledged that Lenny wasn't the source at
11            the time of the interviews or did Lenny Mazzola
12            tell you that he was not the source?
13       A    As I said earlier, he was categorically denying
14            any involvement in dissemination of any of the
15            information in general.
16       Q    Right.  Do you understand I'm not asking you
17            about what Lenny Mazzola said?  I'm asking you
18            about whether you knew what Ed Gallek had said.
19            Do you understand that?
20       A    Right.  The only conversation I've ever had
21            with Ed Gallek was when he called my office one
22            time and asked me to comment.  I gave him no
23            comment.  So I don't have --
24       Q    Okay.  And so did anyone at any time tell you
25            that Ed Gallek said Lenny Mazzola did not
                     CADY REPORTING SERVICES, INC.
```

1      provide this information to him?

2                      MR. SNYDER:  Objection.

3                      MR. STRANG:  Objection.

4   Q   I just need yes or no, sir.  Please answer the

5       question.

6   A   There are certain questions that can't be

7       answered yes or no.

8            The answer that I've given and I'll

9       continue to repeat is not that I recall did I

10      ever know that.

11  Q   So as we sit here today, you don't recall

12      anyone ever telling you that Ed Gallek said

13      Lenny Mazzola was not the source, correct?

14  A   I don't recall that.

15  Q   Okay.  Isn't that something that would be

16      important to your investigation and you would

17      probably remember it if someone had told you

18      that?

19  A   If that information was given to me after the

20      investigation ended, which I tried to point out

21      to you this dissemination of information was

22      May 3, 2019 that we've been talking about for

23      the last half hour.

24  Q   And I'm not talking about that right now.  What

25      I'm saying is if you found out that a reporter

                    CADY REPORTING SERVICES, INC.

```
 1          said, "Lenny was not the source", wouldn't you

 2          want to go back and complete your investigation

 3          and find out who the source was as an

 4          investigator?

 5   A      I would like to finish my point.  What day was

 6          the polygraph?

 7   Q      March 20, 2019.

 8   A      Correct.  This dissemination of information by

 9          the I-Team was May 3, a month-and-a-half or so

10          later.  It's irrelevant to me.  The

11          investigation was over and done as far as I

12          knew at that point, so I wouldn't have any

13          interest in knowing whether or not there was

14          some indication about who said what about whom.

15          It wouldn't matter to me at that point.

16   Q      That's because you were no longer doing the

17          work because your investigation had terminated,

18          right?

19   A      That's the point I've been trying to make.  So

20          if it was said, it was said.  If it wasn't

21          said, it wasn't said.

22              I don't remember it being said, so I take

23          exception to the fact of being pressed on an

24          issue that I've repeatedly said I have no

25          memory of.
```

                         CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | Q | As an investigator if you had learned that |
| 2 | | Lenny was not the source -- and I understand |
| 3 | | you weren't retained to go back, were you, |
| 4 | | isn't that correct?  Chief Kilbane, no one from |
| 5 | | the City of Independence retained you to come |
| 6 | | back after this news article came out, did |
| 7 | | they? |
| 8 | A | No.  We're talking about May 3? |
| 9 | Q | Sure.  Yeah. |
| 10 | A | So no.  No, I wasn't retained to go back. |
| 11 | Q | So since your investigation was terminated |
| 12 | | after Lenny Mazzola's polygraph, you haven't |
| 13 | | been back to do any further investigation for |
| 14 | | the City related to this dissemination of |
| 15 | | information, correct? |
| 16 | A | That's correct. |
| 17 | Q | Right.  And neither Kilbane, nor O'Brian asked |
| 18 | | you to reopen the investigation, correct? |
| 19 | A | Correct. |
| 20 | Q | Would you be curious to know who did it if |
| 21 | | Lenny didn't do it? |
| 22 | A | Well, I think anyone would be curious. |
| 23 | Q | I think so too. |
| 24 | | MR. STRANG:  Objection.  Move to |
| 25 | | strike. |

CADY REPORTING SERVICES, INC.

```
 1    Q   Were you involved in any discussions about the

 2        Independence Police Department's decisions

 3        related to Mr. Mazzola's employment?

 4    A   He had indicated to me during my questions, he

 5        being Lieutenant Mazzola, how long he had been

 6        employed at the department and when he started

 7        and so forth.  Are you referring to that?

 8    Q   I'm talking about his resignation or retirement

 9        or whatever word you used earlier.  Were you

10        involved in any discussions with anyone from

11        the City about what was going to happen with

12        Mr. Mazzola's employment as a result of the

13        investigation?

14    A   I wasn't employed to give that type of comment

15        or advice or information.  I was employed to

16        investigate the facts as a fact finder.

17    Q   Right.  I understand.  But were you part of any

18        discussions about what was going to happen with

19        his employment because of your investigation

20        even if you didn't have authority to make

21        decisions on that?

22    A   No.  I wasn't involved in making decisions or

23        having any input into what was going to happen

24        with him.  As I testified earlier, it came as a

25        surprise when I found out that he resigned.
```

1    Q    So you learned that he resigned because was it

2         Chief Kilbane called you, is that correct?

3    A    No.  I called to see if there was any

4         follow-up.

5    Q    About when did you call him?

6    A    I don't know.  It was within a week I would

7         say, within a week of the polygraph

8         examination.

9    Q    Was the polygraph examination on March 20 of

10        2019 the last action in your investigation?

11   A    Yes.

12   Q    So after the polygraph did you go home and

13        await further instructions from the City

14        regarding the investigation?

15   A    Well, this wasn't the only case that I was

16        working on.  I had multiple cases that I was

17        working on and there were other things that

18        were pressing, so in wasn't on my radar screen

19        in that context.

20             I was merely calling because I had

21        obviously a reason to call.  There was a break

22        in my schedule to see if we had had anything

23        else to do on it.  As I said, there might have

24        been a loose end or two that needed to be dealt

25        with and I hadn't heard anything, so I made a

                   CADY REPORTING SERVICES, INC.

1           phone call.

2    Q   Did you ever hear anything from anyone about

3        what the City told Mr. Mazzola were his options

4        based on the results of the investigation?

5    A   I think that resignation came as a surprise to

6        whomever it was tendered to and there are

7        always different options in any of these cases.

8        So, you know, one option obviously is to do

9        nothing.  The other option is to -- I mean

10       they're all the same.  All of these types of

11       cases are pretty much the same as it relates to

12       what options are.

13            So in this particular situation or case I

14       have no idea -- you have to understand that I

15       work on a lot of these cases and have for many,

16       many years, and they all kind of run together

17       in regard to what options may be or may not be.

18   Q   Mr. Evans, let me make the question more

19       specific because we have some time constraints

20       this afternoon.  So did anyone tell you that

21       the City of Independence gave Mr. Mazzola the

22       choice between being demoted from Lieutenant to

23       patrolman and put on the Brady Ohio list or

24       retiring immediately?  Did anyone tell you

25       that?

                    CADY REPORTING SERVICES, INC.

```
 1              MR. STRANG:  Objection.

 2     A   No one told me that they told him that.

 3     Q   Okay.  Thank you.  I'm going to move on

 4         because, like I said, we have time constraints.

 5         And I don't want to cut you off, but I need to

 6         get back to some other questions.

 7              Did Chief Kilbane or anyone at the

 8         City of Independence provide any other

 9         department policies to you other than what is

10         contained in the documents you've produced that

11         are Plaintiff's Exhibit 2?

12     A   No.

13     Q   Did Chief Kilbane or anyone else from the City

14         tell you that there was a policy against doing

15         polygraph examinations of employees unless

16         there was a criminal investigation?

17     A   Yes, much later after it was conducted.

18     Q   I'm sorry.  Can you repeat that, please?

19     A   I said yes, I found that out much later after

20         the examination was conducted.

21     Q   But at the time you were going in and doing

22         your investigation, no one told you before the

23         polygraph that policy 1033-F-2 prohibited that,

24         correct?

25     A   No.  That was something that I covered before
```

```
 1          we ever did that in one of the conversations
 2          either with Mike Esposito or the Chief or
 3          someone and it was -- in fact, I covered that I
 4          think with Sara Liva and during one of the
 5          interviews she had the CBA available to her and
 6          researched that and said that it was silent on
 7          that topic.
 8    Q     So the CBA is the Collective Bargaining
 9          Agreement between the Police Union and the
10          City of Independence, correct?
11    A     Yes.
12    Q     And the Union attorney, Sara Liva, told you
13          that the CBA was silent with respect to the
14          question on whether polygraphs were allowed,
15          correct?
16    A     Yes.
17    Q     And I mean, this is a question you went over
18          with Chief Kilbane, right, about whether
19          polygraphs were allowed, correct?  I mean --
20    A     Well, I don't know if I went over whether they
21          were allowed or not in terms of the context
22          that you put it in, because you had indicated
23          earlier about the criminal investigation aspect
24          of it.  The only time that I went over that was
25          after I was provided the Chief's order which
```

                    CADY REPORTING SERVICES, INC.

```
 1           was, I don't know, was several years old as I

 2           recall.  I saw it then for the first time.

 3      Q    I'm going to send everyone a document in the

 4           chat really quick.

 5                Is it correct that the first page of that

 6           is a letter from William Doyle to Ashlie

 7           Case-Sletvold, is that correct?  Are we looking

 8           at the same document?

 9      A    Yes.  July 12, 2019 public records request.

10      Q    Yes.  That's the RE line.

11                If you wouldn't mind going down to page 4

12           of the pdf, please.  And these pages are not

13           numbered, unfortunately, but we can see on the

14           pdf itself.

15                Okay.  Are you on page 4, sir?

16      A    Yeah.  You said they're not numbered.  What

17           does the page you're referring to -- is it

18           supervisor's responsibility, item Y.

19      Q    No.  The fist letter is F, examinations and

20           searches.

21      A    Okay.  Let me look there.

22      Q    Please read numbers 1 and 2 into the record?

23      A    "Examinations and searches.  The department may

24           direct the employee to undergo an alcohol,

25           blood, urine, psychological, polygraph, medical
```

CADY REPORTING SERVICES, INC.

```
 1          exam or any other exam not prohibited by law if
 2          it is believed that such examination is
 3          pertinent to the investigation."  That's item
 4          1.
 5              Item 2.  "Polygraph examinations shall
 6          only be used in criminal investigations."
 7     Q    We'll introduce this as Plaintiff's Exhibit 4
 8          to your deposition.
 9                  -  -  -  -  -
10          (Plaintiff's Exhibit 4 was marked.)
11                  -  -  -  -  -
12     Q    Do you see on page 2 of the pdf that this is
13          General Order number 103?
14     A    Yes.  Effective September 5, 2011.
15     Q    And were you given this order number 103
16          whenever you were doing your investigation?
17     A    No.
18     Q    If you had read this, would you have done a
19          polygraph on Mr. Mazzola?
20     A    I probably would have deferred to the
21          Law Director or someone else based on item 2
22          as to how we were proceeding if this were a
23          criminal investigation.
24     Q    But as of March 20 this was an administrative
25          investigation, correct?
```

CADY REPORTING SERVICES, INC.

```
 1    A    Yes.

 2    Q    You were doing this under Garrity, correct?

 3    A    Yes.

 4    Q    So if you were making the judgement on your

 5         own, would you have done a polygraph

 6         examination for Mr. Mazzola?

 7                    MR. STRANG:  Objection.

 8    Q    You can answer.

 9    A    As I said, I would have deferred to a higher

10         authority at that point.

11    Q    I understand your impression of the right thing

12         to do.

13                    MR. STRANG:  Objection.

14    A    What I would do is defer to a higher authority

15         on my part.  And the right thing to do on the

16         part of the decision-makers would have been to

17         make the determination as to whether to convert

18         this from Garrity back into a criminal

19         investigation if the polygraph examination was

20         that critical to the outcome.

21    Q    And in your work you only have the documents

22         that your clients provide to you, correct?

23    A    Yes.

24    Q    So if you didn't get this document, you

25         wouldn't be able to conjure it out of thin air,
```

                    CADY REPORTING SERVICES, INC.

```
 1            would you?
 2       A    You broke up the last four or five words.  I
 3            wouldn't feel what?
 4       Q    If someone from the City had not given you this
 5            document, you would have no reason to have it,
 6            correct?
 7       A    Right.  Yes.
 8       Q    Let's go back briefly to pages 102 and 103 of
 9            your documents that are Plaintiff's Exhibit 2,
10            your activity logs.
11       A    I have them now.
12       Q    So on page 103, let's return to that portion of
13            the language that is the entry for 3-14-19
14            where it references one or more conversations
15            with Mr. Esposito and/or Mr. Kopp.
16                 So you testified earlier about how you
17            didn't remember exactly why you wrote down the
18            comment about retaliation, correct?
19       A    Yes.
20       Q    And you couldn't remember if it was something
21            that it was your opinion or someone else's,
22            correct?
23       A    Yes.  I don't remember.
24       Q    But if you wrote this comment about
25            retaliation, that means retaliation was an
```

CADY REPORTING SERVICES, INC.

```
 1              issue, correct?

 2         A    I don't know.

 3         Q    Well, it had to come from somewhere.  How would

 4              it come up if it weren't a possible issue, sir?

 5                        MR. SNYDER:  Objection.

 6                        MR. STRANG:  Objection.

 7         Q    You can answer the question.

 8         A    I'll go back over this a second time.

 9         Q    I just need you to answer the question.

10         A    I don't know whether it was an anecdotal

11              comment made by Ron Kopp or by Mike Esposito or

12              my characterization associated with the case

13              that I referred to that the Chief had -- I

14              don't know the genesis of those words.

15         Q    It came up, correct?

16         A    Pardon me?

17         Q    But it came up, correct?

18         A    I don't know that it came up or didn't come up

19              in the context of this case.  It may have come

20              up in the context of this case, the Mazzola

21              case.  It may have come up in the context of

22              that case that the Chief had referred to.  And

23              you're asking me for specific recollection of

24              why those words end up on the paper and I don't

25              know.
```

                    CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | Q | Okay.  So let me ask you this.  If you wrote |
| 2 | | down that retaliation could be a problem, is it |
| 3 | | correct that that means either someone told you |
| 4 | | that, one of the two people mentioned in this |
| 5 | | entry, or you thought of it yourself? |
| 6 | | MR. STRANG:  Objection. |
| 7 | | MR. SNYDER:  Objection. |
| 8 | Q | You can answer. |
| 9 | A | I don't know. |
| 10 | Q | These are your notes on a case you're |
| 11 | | investigating, correct? |
| 12 | A | Yes. |
| 13 | Q | You wrote this, correct? |
| 14 | A | Yes. |
| 15 | Q | Okay.  So I'm trying to understand the possible |
| 16 | | ways this idea could have come about, sir.  And |
| 17 | | you've said that Mr. Kopp might have mentioned |
| 18 | | it, Mr. Esposito might have mentioned it.  And |
| 19 | | is it correct that Chief Kilbane could have |
| 20 | | mentioned it because he teaches classes that |
| 21 | | may have implicated a case related to it? |
| 22 | | MR. SNYDER:  Objection. |
| 23 | | MR. STRANG:  Objection. |
| 24 | Q | Is that correct?  Answer the question. |
| 25 | A | Anyone could have mentioned that and I don't |

CADY REPORTING SERVICES, INC.

```
 1         know why it's there; as I said, if it's an

 2         anecdotal comment or if it's an editorial

 3         comment, and I don't know how its predicated or

 4         why its predicated, and I don't know the

 5         genesis of why it's on my paper.

 6    Q    Okay.  So either someone mentioned it or you

 7         thought of it, correct?

 8                        MR. SNYDER:  Objection.

 9                        MR. STRANG:  Objection.

10                        MS. SAVOIE:  How is this an

11         objection?

12                        MR. STRANG:  He's been asked and

13         answered it 50 times.  We've been over this.

14    Q    Just answer the question, please.

15                        MR. SNYDER:  Could you repeat the

16         question, please?

17                        MS. SAVOIE:  Court reporter,

18         could you please read it back?

19                        (Record read.)

20    A    Well, I would say those two options are the

21         options that would be there as a possibility,

22         but the other option that you haven't indicated

23         is it may be part and parcel to that case that

24         I repeatedly referred to.  And if that is part

25         of the case, what I'm trying to convey, and I
```

CADY REPORTING SERVICES, INC.

```
 1            really wish I could convey it in better words,

 2            is that it may be part of that case whereby

 3            someone said retaliation could be a problem,

 4            but it wasn't a problem in that case.

 5       Q    Okay.  Thank you.

 6       A    I don't know how else to say this, ma'am.

 7       Q    That's fine, Mr. Evans.

 8                 So are there reasons that someone would

 9            show physiological signs indicative of

10            deception on a polygraph examination other than

11            actually being deceptive?

12       A    Well, the reactions, the physiology that's

13            presenting on a polygraph is a result of a

14            stimuli or stimulus, which would be the

15            question and the answer posed.

16       Q    Okay.  And there are lots of possible stimuli

17            why someone would show these signs of

18            physiological stress, correct?

19                      MR. SNYDER:  Would you let him

20            finish the answer, please?

21       Q    We have some time constraints, so if you can --

22       A    I get asked this question in many cases that I

23            testify to in Federal Court, State Court and

24            local courts, and it's a common question and

25            the question requires an answer that is
```

                    CADY REPORTING SERVICES, INC.

```
1        thorough.
2             So during the pre-test interview we
3        eliminate concerns associated with why a person
4        may respond to a question for reasons outside
5        of the normal response, purpose, reason, basis
6        for the physiology that presents.  And that
7        type of reaction or response is recorded
8        consistently over several tests for validity
9        and reliability.  So we didn't know of anything
10       that could potentially cause a reaction on the
11       test unless that person would convey -- the
12       person being tested would convey that
13       information of some kind.
14            And this was a pretty straightforward
15       test in that it was a categorical denial of any
16       involvement, period.
17   Q   Is it correct that it's possible for someone to
18       show those signs on a polygraph examination
19       because they have anxiety?
20   A   No.  That's not a reason.
21   Q   Aren't there other reasons why someone would
22       show signs of deception on a polygraph exam
23       other than actually being dishonest?
24   A   You said is it possible and I'm going to answer
25       honestly anything is possible.  So anything is
```

CADY REPORTING SERVICES, INC.

```
 1            possible in regard to that.

 2                   There's a known error associated with any

 3            scientific process, DNA or any type of

 4            scientific process, so we try to eliminate the

 5            reasons for any error ratio.

 6       Q    Sure.  You're not claiming to be infallible

 7            with the polygraph examination, are you?

 8       A    No.  Never have been.  Never would.

 9       Q    Right.  And, in fact, the results of polygraph

10            examinations aren't admissible in most courts

11            for those reasons, correct?

12                        MR. STRANG:  Objection.

13       Q    You can answer.

14       A    Well, I testified earlier that I testify very

15            frequently in many, many, many cases, and they

16            are admissible in court and I hold the case law

17            on admissibility for a non-stipulated polygraph

18            examination, but under most circumstances those

19            results are stipulated to or admissible, and

20            under Daubert they can be admitted without an

21            agreement stipulation as well.

22       Q    On this polygraph for Mr. Mazzola, it showed

23            signs of deception on all of the questions that

24            were asked of him by your associate, correct?

25       A    Well, the overall opinion is based on the three
```

1 relevant questions. Any one of those relevant

2 questions would cause a failure, however, there

3 were significant signs of deception on all

4 three areas, but any one of those areas if the

5 subject was not being honest, truthful about

6 any one of those three areas, there would be a

7 deceptive opinion rendered.

8 Q Looking to the three specific relevant

9 questions, one of them involved whether

10 Mr. Mazzola actually provided information to

11 the news media, Ed Gallek, correct?

12 A Do you want me to refer -- I can get that. Do

13 you know the Bates stamp? I'll pull the

14 questions up. It would be easier if I did

15 that, I think.

16         All right. The three questions. "Did

17 you provide any information contained in those

18 documents to the media?" The second question

19 was, "Do you know for sure who provided

20 information contained in those documents to the

21 media?" And, "Did you help provide information

22 contained in those documents to the media?"

23 Q And is it correct that according to the test,

24 Mr. Mazzola showed signs indicative of

25 deception on all three of those relevant

                    CADY REPORTING SERVICES, INC.

1          questions?

2      A   As I said, the one reaction to the one question

3          is going to cause a deceptive opinion, but

4          there were reactions to each relevant question.

5          So the overall opinion is based on those three

6          questions, and I don't know which particular

7          question gave him the most problem or the least

8          problem.

9      Q   But he had reactions on all of them?

10     A   Let me explain to you why I say that, okay, in

11         order to be clear.

12             If Lieutenant Mazzola provided

13         information himself, he would know for sure who

14         provided the information and he would have

15         acted in that way to help provide the

16         information if he did it himself.  However, if

17         he had someone do it for him, he would know for

18         sure who did that and he would aid or abet or

19         assist and help in doing it.  And he would also

20         have -- by constructively providing the

21         information, he would have provided it himself,

22         so he could theoretically react to all three

23         questions but literally know for sure who did

24         it or literally do it himself or aid, abet and

25         assist and help having it provided.

                    CADY REPORTING SERVICES, INC.

1          So a person can act directly or a person

2          can act through providing the access.

3     Q    Okay.  So if Ed Gallek said or even testified

4          that Lenny Mazzola did not provide any

5          information to the media, would that cause you

6          to question the findings of the polygraph

7          examination?

8                    MR. STRANG:  Objection.

9     A    Not at all.

10    Q    Not at all?  Because you think that a reaction

11         to any one of the three would cause a failure

12         overall, correct?

13    A    Well, if Lieutenant Mazzola helped, aided or

14         abetted, he would fail the test.  If he knew

15         for sure who did it and didn't tell us who did

16         it, he would fail the test.  So he wouldn't

17         have to have done it himself in order to fail

18         the test.

19    Q    Did you find any information in your

20         investigation indicating who actually did

21         provide the information to the media?

22    A    In other words, did Lieutenant Mazzola confess

23         that he did it?

24    Q    I'm asking if -- no.  Did you find any

25         information that would indicate who was the

                    CADY REPORTING SERVICES, INC.

```
 1            person to provide information to the media?
 2      A     Circumstantially there was a lot of information
 3            that suggested that there was involvement on
 4            his part, but circumstantially is not
 5            definitively.
 6      Q     I'm asking about other people, sir, because
 7            Mr. Gallek said that Mr. Mazzola was not the
 8            source.
 9                        MR. STRANG:   Objection.
10      Q     So do you have information about who was the
11            source?
12      A     Let me go to the -- without pulling a document,
13            let me go to something that was interesting in
14            regard to motive.
15                 There were few people that had motive and
16            there were few people that had access to
17            certain documents and, in this case, Lieutenant
18            Mazzola had access to certain documents.  And
19            based on the interviews that I did, including
20            the Chief of Detectives for the City of
21            Independence, there were a couple of documents
22            that that Chief of Detectives felt narrowed the
23            field of potential people that could be
24            involved in this.  I'm referring to Lieutenant
25            Wilson.
                        CADY REPORTING SERVICES, INC.
```

1           And so if I look at my notes, I could be

2      a little more clear on that.  But by virtue of

3      Lieutenant Mazzola's interview -- could you

4      give me a moment and I'll pull that out?  It

5      would be easier than me trying to speculate

6      on --

7    Q  We can take a break for a second if you want.

8    A  No.  I don't need a break.  It's okay.

9           This is the initial interview of

10     Lieutenant Mazzola.  And I'm referring to

11     Bates stamp 214, 213 -- 213, 214 and 215.  And

12     I asked Lieutenant Mazzola during that

13     interview who had access to his pre-D notice

14     and his answer was, "Me", him, himself.

15          And I asked him about the pre-D notice

16     regarding Dalton I think also.  And I

17     interviewed Dalton by then and Dalton was very

18     upset about the fact that his pre-D notice got

19     out to the general public.  And I asked

20     Lieutenant Mazzola to narrow the field of

21     people on Bates stamp 216 as to who he believed

22     distributed his pre-D notice and I asked him

23     about the possibilities that I knew that

24     existed at that point, being the Chief,

25     Letecia, Lieutenant Wilson, his attorney,

                    CADY REPORTING SERVICES, INC.

1      Bob Phillips.

2           And in 5 I said, "Could it be anybody

3      else?"  And he said, "I did not do it."  And

4      there was no other reference to anyone and that

5      didn't change between then when I interviewed

6      him and the time when he came in for his

7      polygraph in terms of the possibilities except

8      for he was unclear and unsure as to whether or

9      not the IT department kept a pdf on that pre-D

10     discipline or not.

11          So he eliminated the possibilities, or at

12     least narrowed them down to the Chief, Letecia,

13     Lieutenant Wilson, Bob Phillips and himself,

14     though he denied that he did it.  We all know

15     that.

16          So that's when Sara Liva brought up the

17     possibility, if you look down further on this,

18     I think it has to do with some other

19     speculation that she made as being another

20     possibility having to do with that IT pdf.

21          And so where I'm going with that is the

22     possibilities were pretty narrow at that point

23     and those possibilities didn't expand by the

24     time March 20 came around for the polygraph, so

25     that's the reason that these polygraph

                    CADY REPORTING SERVICES, INC.

1    questions were present during the polygraph;

2    "Do you know who did it?  Did you help do it?"

3    And, "Did you do it?"  They're very basic

4    questions to try to resolve a case like this.

5              MS. SAVOIE:  Okay.  Thank you,

6    Mr. Evans.  Those are all the questions I have

7    for you.

8              MR. STRANG:  Mr. Evans, this is

9    Steve Strang for the City.  I'm going to ask

10   you a couple questions.

11        Is it okay if we take ten minutes, get

12   up, stretch my legs, let me gather a document

13   or two?  I shouldn't be that long with you.

14              THE WITNESS:  Okay.

15              (Recess taken.)

16  EXAMINATION OF BILL EVANS

17  BY-MR.STRANG:

18  Q   Mr. Evans, I'm going to kind of bounce around a

19      little bit because a lot of the stuff that I

20      was going to ask you got covered.

21          I first want to direct your attention to

22      Plaintiff's Exhibit 3, which is this I-Team

23      e-mail you were shown.  Let me know when you

24      have it in front of you.

25              MS. SAVOIE:   Object to the form

              CADY REPORTING SERVICES, INC.

```
 1            there.  E-mail?

 2                      MR. STRANG:  Well, it came across

 3            as an e-mail.  It's an article.

 4      Q    Do you have it in front of you?

 5                      MS. SAVOIE:   It's a pdf.

 6      A    Yes.  Mr. Snyder has to bring his computer over

 7            to me.  He's pulling that up now.

 8      Q    Let me know when you have it.

 9      A    Okay.

10      Q    Are you still waiting for it, Mr. Evans?

11      A    Yes.  Mr. Snyder is having difficulty bringing

12            it back up.

13                 Okay.  We have it now.

14      Q    Great.

15                 Mr. Evans, are you looking at Plaintiff's

16            Exhibit 3 right now?

17      A    "I-Team lie detector test given to local police

18            officer over traffic tickets."  Is that the one

19            you're referring to?

20      Q    I am.  Can you tell me the date on that

21            document, the date of the story?

22      A    It says May 11, 2020.

23      Q    It says under the RE line on page 2, do you see

24            that it says, "May 3, 2019.  Updated May 3,

25            2019."
```

CADY REPORTING SERVICES, INC.

```
 1              Do you see that?
 2      A   Posted May 3, 2019 at 7:43 p.m.  Updated May 3,
 3          2019, 7:43 p.m.
 4      Q   Okay.  May 3, 2019 was after your interview
 5          with Leonard Mazzola, correct?
 6      A   Yes.
 7      Q   It was after the polygraph of Lenny Mazzola,
 8          correct?
 9      A   Yes.
10      Q   And it was approximately a month after Lenny
11          Mazzola quit, correct?
12      A   I don't know when he quit, but I know it was
13          within a week of the polygraph, I believe or
14          thereabouts, so it would have been probably
15          before April.
16      Q   So, in any event, it would have been
17          approximately a month before this story that
18          we're looking at came out, correct?
19      A   Yes.
20      Q   Okay.  And by that point your investigation,
21          you had essentially finished your
22          investigation, correct?
23      A   Yes.
24      Q   And some of these questions are pretty self
25          evident, but I'm going to ask them anyway.
```
                    CADY REPORTING SERVICES, INC.

```
 1              Mr. Evans, you don't know Ed Gallek

 2         personally, correct?

 3    A    I don't think I've ever met him.  I've seen him

 4         on TV.

 5    Q    You were not a contributor to this article,

 6         correct?

 7    A    No.

 8    Q    Ed Gallek didn't talk about this article to

 9         you?  He never has at any point, correct?

10    A    No.

11    Q    Ed Gallek hasn't talked to you about any of the

12         contents of this article, would that be

13         correct?

14    A    He called me the one time for comment and I

15         don't think there had been any conversation

16         associated with this particular article at all,

17         in fact, I don't remember what the content of

18         his call was about at this point.  I just said,

19         "No comment."

20    Q    Is this deposition the first time you've seen

21         this article?

22    A    As I recall, yes.

23    Q    Have you ever discussed this article with

24         anyone from the City of Independence?

25    A    As I had mentioned earlier, this couldn't have
```

```
 1          been what Lieutenant Mazzola was referring to

 2          because his polygraph was way before this.  I

 3          don't recall ever seeing this article before

 4          today.

 5     Q    Lenny Mazzola never referenced this article to

 6          you obviously during this investigation,

 7          correct?

 8     A    No.  Because the last time I talked to

 9          Lieutenant Mazzola would have been the 20th of

10          March.

11     Q    In your investigation did Leonard Mazzola ever

12          present you with any sort of statement from

13          Ed Gallek exonerating himself?

14     A    No.

15     Q    Did Leonard Mazzola ever give you any sort of

16          recording, any telephone call recording from

17          Ed Gallek exonerating Leonard Mazzola?

18     A    No.

19     Q    Are you aware that Leonard Mazzola was

20          recording conversations with his superiors for

21          approximately a year before he quit?

22                    MS. SAVOIE:   Objection.

23     A    No.

24     Q    Would that surprise you?

25     A    Well, they wear a body cam and police --
```

                         CADY REPORTING SERVICES, INC.

```
 1              nowadays police work is common with the body

 2              camera.  I don't know what kind of recording

 3              you would be referring to.

 4      Q       Did he ever mention to you that he was

 5              recording conversations with his superiors?

 6      A       No, not that I recall.

 7      Q       Do you think that's an honest thing to do?

 8                       MS. SAVOIE:    Object to the form.

 9      A       Well, for accuracy and note taking I guess it's

10              okay.

11      Q       Do you think that that's an honest thing to do

12              when the other person does not know that you're

13              recording the conversation?

14      A       Well, once again, for accuracy and note taking,

15              depends on the context in which it's taken in.

16      Q       But during your investigation he never pointed

17              to any audio recordings that he said would

18              exonerate him, correct?

19      A       No.

20      Q       And opposing counsel referenced some phone call

21              that Lenny Mazzola had with Ed Gallek wherein

22              Ed Gallek apparently exonerated Lenny.  And

23              just to be clear, you've never heard anything

24              like that, correct?

25      A       No.
```

CADY REPORTING SERVICES, INC.

```
 1     Q   And do you know whether any such phone call

 2         exists?

 3     A   No.  I don't know.

 4     Q   Do you know if reporters typically talk about

 5         who their sources are?

 6     A   They generally do not talk about sources.

 7     Q   And generally a reporter will not confirm or

 8         deny who a particular source is, is that

 9         correct in your experience?

10     A   In my experience that's correct, yes.

11     Q   And looking at this article which is

12         Plaintiff's Exhibit 3, I'm going to point you

13         to the paragraph that you were asked about at

14         great length during opposing counsel's

15         examination on page 3 of the pdf that starts,

16         "During the internal investigation, one police

17         supervisor retired."

18             Do you see that?

19     A   Yes.

20     Q   It says, "Multiple sources say he left under

21         pressure.  However, he never supplied any

22         information to the I-Team."

23             Do you see that?

24     A   Yes.

25     Q   Do you have any idea why Mr. Gallek chose to
```

                    CADY REPORTING SERVICES, INC.

```
 1          put a period between "pressure" and "however"?
 2    A    I have no idea.
 3    Q    It's not something he ever talked to you about?
 4    A    No.
 5    Q    Do you know who the multiple sources are in
 6          this article?
 7    A    I have no idea.
 8    Q    Could those multiple sources have been -- one
 9          of them possibly have been Lenny Mazzola?
10               MS. SAVOIE:   Object to the form.
11    A    Yes.  Anything is possible.
12    Q    Could one of those multiple sources possibly
13          have been Lenny Mazzola's legal counsel?
14               MS. SAVOIE:   Object to the form.
15    A    Yes.  Anything is possible.
16    Q    If anything is possible, and we don't know that
17          because the article doesn't tell us, right?
18    A    Correct.
19    Q    I want to go through the polygraph results with
20          you and that's starting on Evans 001.  Do you
21          see that?  Do you have that in front of you?
22          Do you want me to give you a second?
23    A    No.  I have it in front of me now.
24    Q    Thank you.
25          So I'm referring to -- and just so we are
```

1          referring to the same thing, when I'm talking

2          about a report, can you kind of thumb through

3          this and let me know -- it looks to me like the

4          report would be Evans 01 to Evans 02, but it's

5          possible that there's a lot of documents behind

6          it that I don't quite understand, some of these

7          graphs and questions.

8               Can you just look through this and tell

9          me where the report actually stops?

10    A    Well, if you look at the bottom of page 2 of

11         the report, it indicates, "Enclosures; OSS-3,

12         algorithm report, ESSM score sheet."  And then

13         the graphs themselves typically aren't part of

14         the report, but OSS-3 is an Objective Scoring

15         System version 3, and that's not developed by

16         us.

17              Our hand scoring is one way of

18         interpreting the results, as I mentioned

19         earlier when being questioned earlier.  That

20         takes some time to develop and evaluate.  That

21         hand scoring was deceptive, but then the

22         Objective Scoring System evaluates the data,

23         the physiological data on its own, and produces

24         a result.

25              And that result is on Bates stamps

                      CADY REPORTING SERVICES, INC.

1    3, 4 and 5 with a P value of .001, translating

2    to the probability that the result was from a

3    truthful person would be 1 in 1,000.  Reversing

4    that, the probability of deception would be

5    999 out of 1,000.

6         And then the other enclosure would be

7    006.  And 006 would be, once again, an

8    algorithm scoring where the algorithm evaluates

9    the data.  And that data is translated in a

10   little different form with a grand total of a

11   minus 40.  As I recall, the hand scoring was

12   very, very consistent with that algorithmic

13   scoring in a negative number.

14        And negative 40 is on the scale very

15   deceptive, on the scale on hand scoring, but on

16   the scale of the Empirical Scoring System,

17   which is another form of scoring this data,

18   ESS, the scoring odds are 991 to 1 that it's

19   produced by a deceptive person.

20        So the algorithms don't know who is being

21   tested and they don't care about the questions,

22   verbiage or content.  The only thing the

23   algorithm evaluates is physiological data, and

24   the physiological data comports with that of a

25   deceptive individual in those odds that are

CADY REPORTING SERVICES, INC.

1          generated by the algorithm.

2      Q   And to be clear, in this particular case the

3          data I think is the word you used, revealed

4          that Leonard Mazzola was a deceptive person,

5          correct?

6      A   The physiological information that was

7          evaluated, whether it be through hand scoring

8          or whether it be through algorithm, was

9          translated into a deceptive opinion.

10     Q   And can you tell me the odds or the level of

11         certainty that you have in those results?

12     A   Based on the meta-analysis studies that have

13         been done over time, the physiological

14         responses are consistent with deception at

15         about for an average examiner in an average

16         application of polygraph about 93 percent,

17         90 to 93 percent of the time for an average

18         examiner across the board.

19     Q   Were the results in this case unusually

20         certain?

21     A   They're very clear.  The higher the numbers,

22         the more clear the results are in terms of

23         confidence intervals.  When you combine

24         different scoring algorithms with hand scoring,

25         the confidence intervals go up.

                   CADY REPORTING SERVICES, INC.

1          I mean a better way of explaining that is

2       if you have one form of evidence suggesting

3       that a person is involved in a crime, you have

4       a confidence interval that's multiplied and

5       becomes more certain when you have two forms of

6       evidence or three forms of evidence, it becomes

7       even more certain in a confidence interval

8       evaluation.

9          So from a polygraph standpoint, when

10      there are different ways of interpreting the

11      same data, which is what we have here, we've

12      got a hand scoring coupled with two separate

13      algorithms, the confidence in that opinion of

14      deception goes up.

15   Q  And up to what?  What were the mathematical

16      conclusions in this?

17   A  Well, there is nothing more -- in terms of

18      these algorithms, there is nothing more certain

19      relative to the bandwidth -- I'll use that term

20      loosely -- the bandwidth of the deceptive

21      opinion doesn't go beyond 1,000, and this is

22      999 out of 1,000.  99 percent on the odds of

23      significant reactions indicative of deception

24      on the Empirical Scoring System, and the

25      Objective Scoring System, the P value there is

                   CADY REPORTING SERVICES, INC.

```
 1            .001.

 2     Q    And before this report was generated, I

 3            understand that the results were verbally

 4            conveyed to the City of Independence, is that

 5            correct?

 6     A    Yes.

 7     Q    By you or by the gentleman who took this,

 8            Mr. Butler?

 9     A    I think that was by me.

10     Q    And can you recall what you conveyed to the

11            City of Independence after the polygraph?

12     A    No.  I can't recall specifically what I

13            conveyed other than it was a deceptive opinion.

14     Q    And did you communicate to the City of

15            Independence how certain you were that the

16            results were deceptive?

17     A    Well, I mean I think I probably would have

18            conveyed based on what I would have known at

19            that point that they were very clear in terms

20            of deception.

21     Q    You mentioned before when you were asked why a

22            report wasn't generated at the time -- well,

23            let me ask you this again.  Why wasn't the

24            report produced at the time back in spring of

25            2019?
```

                        CADY REPORTING SERVICES, INC.

```
 1    A   Well, one reason was because there was no
 2        request for the report at that point because
 3        Lieutenant Mazzola resigned his position, so
 4        there was no need for a report.
 5            I wasn't going to create a report on
 6        anything that I did, per se, in order to be
 7        able to work on the case.  I mean the available
 8        resources on a particular case could be divided
 9        into work effort or into report creating effort
10        or both.  And there were I don't know how many
11        individuals to be interviewed, seven
12        individuals maybe, something like that.
13            There was a lot of work involved in doing
14        the case and the allocated dollars at that
15        point, I was trying to be considerate of how I
16        put my time in and where I put my time into
17        work effort.  So, consequently, creating a
18        report wasn't a priority, not that it wasn't a
19        priority on my part.  I think the City didn't
20        see a need for the report.  It became a moot
21        point when he offered his resignation.  And
22        eventually --
23    Q   I'm sorry.  I cut you off.  And eventually
24        what?
25    A   I think it became a moot point subsequent to
```

```
 1        the resignation.
 2    Q   You mentioned that you heard several later that
 3        the City did want a written report because
 4        there were allegations that Mr. Mazzola
 5        actually did pass the polygraph test.  Am I
 6        correct?
 7    A   Yes.
 8    Q   I'm going to read a couple statements and I
 9        want to ask you whether those statements are
10        true.
11             "Lieutenant Mazzola again answered the
12        questions fully and truthfully."
13    A   I'm sorry.  You broke up.  What was that again,
14        please?
15    Q   "Lieutenant Mazzola again answered the
16        questions fully and truthfully on the polygraph
17        test."
18                      MS. SAVOIE:   Object to the form.
19    A   Are you referring to the complaint that was
20        filed?
21    Q   I am referring to the complaint not that was
22        filed, but that was originally sent to the
23        City.  I'm just going to read you a couple
24        statements and ask whether they're true
25        statements or not.
```

CADY REPORTING SERVICES, INC.

```
 1      A    Okay.

 2      Q    "Lieutenant Mazzola again answered the

 3           questions fully and truthfully."

 4                      MS. SAVOIE:   Object to the form.

 5      A    Okay.  And your question would be?

 6      Q    Did Lenny Mazzola answer the questions on the

 7           polygraph truthfully?

 8                      MS. SAVOIE:   Object to the form.

 9           You can answer.

10      A    Well, as I testified, there was deception

11           indicated in regard to those three areas of

12           questions asked on the polygraph, so in the

13           forensic opinion world, no.

14      Q    The next is, "Lieutenant Mazzola was told also

15           that he had failed the polygraph, but that was

16           not true and Defendants continued to insist

17           that Lieutenant Mazzola was to blame."

18                Would that be a true statement that

19           Leonard Mazzola failed the polygraph?

20      A    Yes.

21      Q    And the written report that you generated

22           confirmed that Leonard Mazzola failed the

23           polygraph, correct?

24      A    Yes.

25      Q    And before you generated this PolyTech report
```

                     CADY REPORTING SERVICES, INC.

```
 1              dated December 20, 2019, there was no report

 2              specifically stating that Leonard Mazzola

 3              failed the polygraph, correct?

 4         A    Correct.

 5         Q    I'm going to ask you a couple questions about

 6              some of these documents in this report.  And

 7              I'm specifically looking at Evans 007.

 8         A    Okay.  I have it.

 9         Q    Can you tell me what that document is?

10         A    This is our waiver release form that's signed

11              before an examination is conducted.

12         Q    Before a polygraph examination?

13         A    Yes.

14         Q    And I see it's marked up.  Do you see that?

15         A    Yes.

16         Q    Can you tell he who made those revisions to the

17              polygraph examination waiver?

18         A    Sara Liva, the lawyer for the Union.

19         Q    And Sara Liva was actually Lenny Mazzola's

20              lawyer, correct?

21                        MS. SAVOIE:   Object to the form.

22         A    Yes.

23         Q    She was representing him?

24                        MS. SAVOIE:   Object to the form.

25         Q    Correct?
```

CADY REPORTING SERVICES, INC.

```
 1    A   Yes.

 2    Q   I'm going to direct your attention to Evans 76.

 3    A   Okay.

 4    Q   This is dated March 19, 2019 sent via e-mail to

 5        Bill Evans, and apparently it's from Sara Liva,

 6        L I V A.

 7            Did you actually receive this letter via

 8        e-mail?

 9    A   Yes.

10    Q   I'm going to direct your attention to the first

11        paragraph, specifically the third sentence.  It

12        states, "Please be informed that I am

13        Lieutenant Mazzola's legal and union

14        representative and that he has exercised his

15        right to union representation at all

16        investigatory interviews regarding this

17        matter."

18            Did I read that correctly?

19    A   Yes.

20    Q   Was that your understanding, that Leonard

21        Mazzola had a legal and a union representative

22        guiding him through this process?

23    A   Yes.  There were two actually, Bob Phillips and

24        Sara Liva worked for him, Bob Phillips, and she

25        consulted with Bob Phillips during the
```

CADY REPORTING SERVICES, INC.

```
 1          pendency.
 2     Q    And I think you talked before about some
 3          discussions about a polygraph examination with
 4          Sara Liva?
 5     A    Yes.
 6     Q    And what specifically was discussed with
 7          Sara Liva about a polygraph examination?
 8     A    Oh, boy.  The only thing that I recall would
 9          have been -- well, the first thing that I
10          recall would have been during the interview the
11          day of interviews about polygraph when I was
12          asking the interviewees, the people that I was
13          interviewing if they would take a polygraph and
14          that topic came up, that she looked at the CBA
15          and told me that it was silent on that topic,
16          Sara Liva.
17              After that I think the only other thing
18          that we probably would have talked about would
19          have been when there were polygraphs that were
20          being scheduled, a polygraph being scheduled in
21          regards to this case before you.  Beyond that I
22          can't remember any other conversations if there
23          were any.
24     Q    She never told you you don't have the right to
25          subject Lenny Mazzola to a polygraph or
                    CADY REPORTING SERVICES, INC.
```

```
 1            anything like that?

 2    A     No.

 3    Q     Did they ever instigate any sort of

 4            administrative or legal challenge to you

 5            putting Lenny Mazzola through a polygraph?

 6                        MS. SAVOIE:    Object to the form.

 7    A     No.  In fact, Bates stamp 007, those

 8            corrections on the right-hand side would be her

 9            initials, and this was the superseding document

10            of any information that was discussed about

11            polygraph or reference to conducting this

12            examination.  And she witnessed and signed next

13            to Lenny Mazzola's name down toward the bottom.

14    Q     So to your understanding, that's Sara Liva's

15            signature at the bottom?

16    A     No.  I know that's her signature because we --

17            no.  I'm positive that's her signature.

18    Q     And the signature next to it, is that Lenny

19            Mazzola's signature?

20    A     Yes.

21    Q     Did Lenny Mazzola ever object to taking a

22            polygraph examination?

23    A     Yes.

24    Q     What did he say?

25    A     Well, when I asked him during the first
```

CADY REPORTING SERVICES, INC.

```
 1           interview if he would take the polygraph, he
 2           said no.
 3      Q    And when were you advised that he would, in
 4           fact, take the polygraph?
 5      A    Well, he had to be ordered to take the
 6           polygraph by the Chief.
 7      Q    Do you know when that happened?
 8      A    No.  I really don't know when that happened.
 9      Q    Were you present for that discussion?
10      A    When he was ordered to take the exam?
11      Q    Correct.
12      A    No.  I think there was a directive of some kind
13           that went out by the Chief because the Chief
14           knew that he wasn't going to be taking a
15           polygraph after the first interview and he
16           didn't want to take a polygraph, and I think
17           that's why he had to be ordered to take it, but
18           I really don't remember any other details
19           associated with how that developed.
20      Q    And this document, Evans 00 7, this was signed
21           by Lenny Mazzola and his attorney the day of
22           the polygraph, correct?
23      A    Yes.
24      Q    Were you retained to interview witnesses or to
25           administer a polygraph examination?
                      CADY REPORTING SERVICES, INC.
```

```
 1    A    Well, I guess both, but I didn't want to do the
 2         polygraph because I had already done the
 3         interviews.
 4    Q    Well, whose idea was it to administer the
 5         polygraph?
 6    A    It would have been probably my suggestion that
 7         that's the next step at that point.
 8    Q    Do you specifically recall suggesting a
 9         polygraph examination in this case?
10    A    I think so, yeah.  I probably suggested that
11         that was probably the next step in this case
12         would be a polygraph at that point.
13    Q    And why did you believe that the next step in
14         this case would be a polygraph?
15    A    Well, because as I testified earlier, there
16         were a lot of common denominators that seemed
17         to be developing in reference to information
18         that got out of the police -- from a
19         proprietary perspective outside of the
20         communications officer, the appointed
21         communications officer without that
22         authorization.
23             So there was a denial by Lieutenant
24         Mazzola that he was involved, and the next
25         logical step based on those connections of the
```

CADY REPORTING SERVICES, INC.

```
1          common denominators associated with a public
2          records request and so forth, it just seemed to
3          be the next logical step.  It's not unusual to
4          ask for polygraph examinations during
5          investigations.
6     Q    And you thought at this point that Leonard
7          Mazzola was being deceptive, would that be
8          accurate?
9     A    Based on that polygraph examination.
10    Q    No.  Before the polygraph; after you
11         interviewed him, before the polygraph?
12                   MS. SAVOIE:   Object to the form.
13    A    Before the polygraph there seemed to be reasons
14         why the common denominators were lining up.  I
15         testified to this earlier.
16            Some of those documents were in the
17         hands, by his own admission, of himself in a
18         very protected way.  In particular, it was the
19         pre-disciplinary letter that was given to him
20         that didn't have any copies made of it beyond
21         the one that he had gotten.  And if there was
22         anyone that made a copy of it, it would have
23         been only him.  And he didn't recall any copies
24         that he had made for anybody, so that would
25         have been the only document that was -- that
```

CADY REPORTING SERVICES, INC.

1    document was in his possession, kept in his

2    possession within that three-ring binder that I

3    saw the day of the polygraph.

4        So in asking who could have obtained that

5    document, he said that his binder was in his

6    care, custody and control at the time.  He took

7    it home with him as well.  I think that's

8    probably, if I'm not mistaken, it's been a long

9    time since I revisited that polygraph

10   interview, but I think that was on the

11   polygraph interview that we supplied, the

12   recorded portion of that polygraph interview.

13       And that said to me that there had to be

14   someone that got into his office to obtain that

15   letter, that pre-disciplinary letter, left with

16   that letter, went to copy that letter and then

17   snuck it back to the same position in his

18   office or the three-ring binder or both in

19   order for there to be another person to have

20   had that in their possession to disseminate it

21   to the news media.  I mean at that time that

22   was the conclusion that I was making based on

23   that one document.

24       And then coupled with that would be the

25   Brian Dalton pre-disciplinary notice and

                CADY REPORTING SERVICES, INC.

1          write-up.  And, as I recall, that was also --

2          I'm almost certain of this -- that was also

3          contained in that three-ring binder and that

4          had to get to the media.

5               Plus, on top of that, there were other

6          documents with verbatim similarities and maybe

7          even quotations or mistakes or something like

8          that in regard to how the sentence was

9          structured that appeared then in public records

10         request.  And, actually, there were some things

11         that even appeared to me that was almost a cut

12         and paste of information that came out of these

13         documents that were contained proprietorially

14         within the City that ended up in the public

15         records request.

16              So when I alluded to earlier the

17         circumstantial information, that's the

18         circumstantial information that I was referring

19         to.  And knowing that if Lieutenant Mazzola

20         knew who did this and was protecting them, then

21         that was something that was important to know

22         if it caused him, Lieutenant Mazzola, to be

23         exonerated by direct involvement in delivering

24         this to the news media, that was something that

25         I was very interested in determining if he

                    CADY REPORTING SERVICES, INC.

```
1          simply knew who did this for a fact.  But he
2          said he had no idea who did it, he didn't know
3          of anyone who did it, he didn't do it and he
4          didn't aid, abet and assist in doing it.
5     Q    And I think you mentioned the Dalton reprimand.
6          Based on your interview, do you think that
7          Patrolman Brian Dalton was embarrassed about
8          that reprimand?
9     A    He was not only embarrassed about it, but he
10         was angry to find out that it was released.  He
11         didn't want anyone laundering his wash to the
12         public.
13    Q    And did you believe -- I'm sorry.
14    A    And he was angry that that had occurred and got
15         out.  So he was very upset during the interview
16         on the 20th or, excuse me, on the 13th.
17    Q    And based on that did you come to any
18         conclusions as to whether you felt that
19         Patrolman Dalton would have been the one to
20         leak the Dalton reprimand?
21              MS. SAVOIE:   Object to the form.
22    A    Well, I noted shock and awe when he knew that
23         it had gotten out.  I mean he was just very
24         angry about the fact that it got out.  He was
25         very angry about who might have done it.  He
```

CADY REPORTING SERVICES, INC.

1       wanted to get to the bottom of it.

2              In everybody's respect -- and I thought

3       that and I got the same sentiment from about

4       everybody that I interviewed, that they thought

5       that it was proprietary information, they

6       thought that it shouldn't have been released

7       and it was causing discord within the police

8       department.

9              And there was one person I interviewed, I

10      can't remember who it was, that said if they

11      did something wrong, you know, they would take

12      it on the face as a lump, but I don't remember

13      who that was, and they would accept the fact

14      that it had gotten out and they would have

15      accepted they did something wrong in terms of

16      it being disseminated.  But out of the rest of

17      them, everyone was upset that it had gotten

18      out.  You know, they took issue of it being

19      released outside of the proprietary confines of

20      the department.

21  Q   What, if any, relevance did motive have in your

22      investigation?

23  A   Well, that's a basic -- you know, the means,

24      the motive, the opportunity, that's always

25      basic investigatory A, B, C's.  Then you go to

                    CADY REPORTING SERVICES, INC.

1        the who, what, why, when and how and you try to

2        cross those T's and dot those I's as best you

3        can.

4    Q   In your investigation did you come up with who

5        may have had the motive to provide these

6        documents to Ed Gallek?

7    A   Well, that was part of what I asked to

8        everybody that I interviewed, you know, who had

9        the means.

10           The means would be --and I talked about

11       this earlier -- the means, the person that had

12       access to it, in other words, would be the

13       HR Director, the Chief, the person involved in

14       receiving the discipline, they would all have

15       access to that.  So that would be the means.

16           The opportunity, certain people had

17       opportunity to do it.

18           And the motive, certain people motive.

19           But on the flip-side of that, certain

20       people didn't have the means, didn't have the

21       opportunity and didn't have the motive.

22           So I guess in quantifying that the

23       question is did Letecia, I think her last name

24       is Linker, have the means?  Yeah, she probably

25       had access to everything.  Did she have the

                    CADY REPORTING SERVICES, INC.

1      opportunity?  Well, she had the opportunity

2      probably.  But did she have a motive to bring

3      embarrassment upon the department, the City and

4      the Chief?  I didn't see her high on the list.

5           Then the other person would be the

6      Chief of Police.  Did he have the means, did he

7      have the motive, did he have the opportunity?

8      Well, I wasn't quite clear on how he would have

9      the motive to bring embarrassment upon himself

10     or the police department or the City.

11          So, you know, I went through that list

12     and I had to apply common sense.  And there

13     were a couple of those interviewees that had

14     alluded to Lieutenant Mazzola had been in line

15     for the Chief of Police position at some point.

16     I mean the departmental politics didn't mean

17     anything to me one way or another, but there

18     was one person that said theoretically anyone

19     within the police department could have gotten

20     that Police Chief position, but in reality,

21     it's a different story.

22          Theoretically anybody in the police

23     department could have had the Chief position I

24     guess because of the way the Civil Service

25     worked up there, but I don't know that to be

                    CADY REPORTING SERVICES, INC.

1          the case or fact.  I'm just telling you what I

2          was told.  And so that was another item that

3          was out there.

4               But then the traffic citation enforcement

5          aspect of this, the Chief had indicated to me

6          that there were a couple of people that were

7          upset about the traffic enforcement aspect of

8          writing these citations.  So, you know, all of

9          that stuff at that point in time is a dynamic

10         that you take into consideration, at least I

11         did.

12    Q    And did you come to any conclusion as to who

13         had the means, the opportunity and the motive?

14    A    Well, on the list was Lieutenant Mazzola, and

15         so he was asked then to take the polygraph.  If

16         he cleared his polygraph, then we would have

17         moved onto another option.

18    Q    How many other options did you have at that

19         point, if any?

20    A    I don't know.  We would probably reevaluate the

21         situation at that point just like anything

22         else.  I mean if it's an investigation

23         involving any type of incident, you know, you

24         look at various options, you identify whether

25         or not those options are practical or not, and

                    CADY REPORTING SERVICES, INC.

```
 1              if they are practical, then you eliminate the

 2              option or you isolate the option.

 3                   So in this case we didn't get beyond

 4              conducting the polygraph of Lieutenant Mazzola.

 5       Q      Did any of the other officers interviewed

 6              indicate that they would be willing to take a

 7              polygraph?

 8       A      Yes.

 9       Q      Who?

10       A      Well, I think they all did.  I know Chuck

11              Wilson did.  I don't know.  I think several of

12              them did, if not all of them.  I didn't have

13              anybody refuse to take the polygraph.  I know

14              that.

15       Q      Well, with the exception of Mr. Mazzola,

16              correct?

17       A      Yes, except Lieutenant Mazzola.

18       Q      I'm going to direct your attention to Evans 86.

19       A      86?

20       Q      Yeah.

21       A      Okay.

22       Q      Is that the Dalton reprimand that we were

23              talking about earlier?

24       A      Yes.

25       Q      The date on that is January 7, 2019.  Do you
```

                         CADY REPORTING SERVICES, INC.

```
 1          see that?
 2     A    Yes.
 3     Q    Do you have any understanding as to how this
 4          document was generated?
 5     A    I'm not quite clear on your question.  Do you
 6          mean generated within the department?
 7     Q    Yeah.  Who wrote this?
 8     A    Apparently it was Lieutenant Mazzola, but I
 9          don't know for a fact who wrote it, who
10          actually drafted it.
11     Q    After it was signed do you see at the bottom of
12          it next to Patrolman Brian Dalton it says,
13          "Refused.  No just cause!"?
14     A    Yes.
15     Q    And it goes on a bit and then he eventually
16          signs the thing at the bottom.
17               Do you know where this document was
18          stored or kept after Patrolman Dalton signed
19          it?
20     A    Are you referring within the department?
21     Q    Correct.
22     A    No.
23     Q    Was it kept with Mr. Mazzola?  Did he have
24          custody of this?
25     A    Boy, I would have to reference my notes, but
```

CADY REPORTING SERVICES, INC.

```
 1              yes, he had custody of this I'm almost certain.

 2        Q    When I say, "This", I mean the hard copy of the

 3              document?

 4        A    Yes.  Because he told me it was in his

 5              three-ring binder.  I recall that during the

 6              polygraph examination pre-interview.

 7        Q    Do you know when and if he ever gave a hard

 8              copy of that document or an electronic copy of

 9              that document to the Chief?

10        A    I may have at one time, but I don't recall

11              right now.

12        Q    Do you know when this document, Evans 86, was

13              given to you?

14        A    This would have been given to me by the

15              Chief of Police at some point during the

16              pendency of this investigation.

17        Q    Do you know when during the investigation?

18        A    I can't say emphatically I know exactly when,

19              but I believe it would have been during the

20              early part of the investigation.

21        Q    The document is dated January 7, 2019 at the

22              top.

23                  Do you see that?

24        A    Yes.

25        Q    This document was not given to you on
```

CADY REPORTING SERVICES, INC.

```
 1          January 7, 2019, correct?

 2     A    Oh, no.  No, definitely not.

 3     Q    And based on your notes which I'm looking at,

 4          Evans 103, the first notation in your activity

 5          log is on January 31, 2019, is that correct?

 6     A    Well, I'm looking for -- I've got a lot of

 7          paperwork here on this table, but we're looking

 8          at my activity log, all right.  And you said it

 9          was January 31, yes.

10     Q    Do you know if Evans 86 was given to you on

11          January 31, 2019?

12     A    I really don't know.  It might have been shown

13          to me then potentially.  I don't remember when

14          I got that document.

15     Q    But the earliest it even possibly could have

16          been was January 31, 2019, correct?

17     A    Yes.

18     Q    And even then you're not sure if it was given

19          to you on January 31, 2019, correct?

20     A    I don't think it would have been received -- I

21          see here that I received some information from

22          Chief Kilbane, but it doesn't say what, on

23          February 8.

24               If I recall that meeting on the 31st, it

25          was just an informational meeting and I took
```

```
 1              some information down, some notes, and that was

 2              it.

 3                   I'm going to go back to what I said

 4              earlier.  I don't remember when I would have

 5              gotten that Dalton -- a copy of that Dalton

 6              discipline and pre-D notice.

 7         Q    Thank you.

 8                   I'm going to refer you to Evans 73.

 9         A    It's a blue form, yes.

10         Q    Can you tell me what this form is?

11         A    Biographical history form filled out during the

12              pre-test interview.

13         Q    And it's actually the second page of what

14              appears to start on Evans 72, would you agree

15              with that?

16         A    Yes.

17         Q    Can you tell me what this form is and what it's

18              used for?

19         A    It's used to get a background from a physical

20              standpoint and a psychological standpoint and

21              used to adjust parameters for the polygraph.

22              It's kind of like when we go and see a doctor,

23              they ask you to fill out a history, a

24              biographical history form.

25         Q    Who filled out this document?
```

| | | |
|---|---|---|
| 1 | A | Ken Butler, the polygraph examiner. |
| 2 | Q | Do you know what typically Ken Butler would |
| 3 | | have based these answers on?  Typically he |
| 4 | | would have asked these questions to Lenny |
| 5 | | Mazzola? |
| 6 | A | Well, he asked these questions during the |
| 7 | | pre-test interview and it's recording and it |
| 8 | | would be before any test questions were asked |
| 9 | | and it would be during the time that he was |
| 10 | | collecting generalized information. |
| 11 | Q | Were you physically present when he asked these |
| 12 | | questions? |
| 13 | A | No.  I was in the room next door which is a |
| 14 | | conference room watching and listening to the |
| 15 | | polygraph examination via closed circuit |
| 16 | | television. |
| 17 | Q | But you are a is the word polygrapher? |
| 18 | A | Yeah.  Polygraph examiner, polygraphist. |
| 19 | Q | And you're familiar with this form, correct? |
| 20 | A | Yes, I am. |
| 21 | Q | I'm going to refer you to the second page of |
| 22 | | this form under 12. |
| 23 | | Do you see that? |
| 24 | A | The copy is very hard to read, but I have the |
| 25 | | original, I believe, here.  That might be |

CADY REPORTING SERVICES, INC.

1          easier.

2     Q    Well, the numbers aren't important.  I can

3          start with the text.  Perhaps that might be a

4          little bit easier.

5     A    Okay.

6     Q    It starts with, "Anything physically wrong past

7          two years?"

8               Do you see that?

9     A    Yes.  I see that.

10    Q    Can you read the response?

11    A    "No."

12    Q    The next says, "How physical condition right

13         now/hours slept last night/average/night."

14              Do you see that?

15    A    Yes, I do.

16    Q    Can you read what it says under, "How physical

17         condition right now?"

18    A    "Good."

19    Q    Can you read under I think HRS.  I'm assuming

20         it's short for hours?

21    A    Yes.

22    Q    "Hours sleep last night?"  How many is that?

23    A    It says, "Five."

24    Q    And based on familiarity with Mr. Butler's

25         technique, would he have received these

                    CADY REPORTING SERVICES, INC.

 1          responses from Mr. Mazzola?

 2     A    Yes.  He got them from Mr. Mazzola.

 3     Q    And what is that field, "Average/night"?  Do

 4          you know what that means?

 5     A    That's how many hours he averages a night, that

 6          he averages a night, how many hours a sleep do

 7          you get on the average night.

 8     Q    It looks like -- can you find anything on this

 9          Evans 72 to Evans 73 where Lenny Mazzola

10          suggests that he is physically or mentally

11          incapable of taking a polygraph test that day?

12     A    No.

13     Q    And as a polygraph examiner do you account for

14          someone being nervous to take the test?

15     A    Yes.

16     Q    Would it be fair to say that most people taking

17          a polygraph examination are nervous about

18          taking the test?

19     A    Yes.

20     Q    And so are the nerves or trepidation someone

21          feels upon taking a polygraph examination, is

22          that kind of based into your analysis and

23          results?

24     A    Yes.  There's an acquaintance test that's

25          conducted before any relevant tests are

                    CADY REPORTING SERVICES, INC.

```
 1         conducted.  I don't remember how many tests
 2         were conducted on Lieutenant Mazzola, but I
 3         know there were at least three.
 4              I know also that the -- it's on the
 5         report, I believe.  Yeah.  There was a
 6         polygraph sensitivity test used to assess
 7         reaction capability.  It looks like there were
 8         five relevant tests conducted, six actually in
 9         total when you add the sensitivity test used to
10         assess reaction capability.  And that test is
11         done to make sure that not only the instrument
12         is recording properly, but also that the person
13         is responding properly and clear reactions are
14         present when the person tells a lie or tells
15         the truth, because the person is instructed to
16         tell a lie during that test as well as tell the
17         truth.
18    Q    And that was specifically done with
19         Mr. Mazzola, correct?
20    A    Yes.
21    Q    And, of course, you're aware that Mr. Mazzola
22         is a police officer, or at least was a police
23         officer, correct?
24    A    Yes.
25    Q    Being a police officer is a stressful job,
```

CADY REPORTING SERVICES, INC.

```
 1          would you agree with me?

 2    A    Yes.

 3    Q    You're life is on the line during a shift,

 4          correct?

 5                    MS. SAVOIE:   Object to the form.

 6    A    Yes.

 7    Q    Would I be correct in saying as a patrol

 8          officer you have to have I suppose I'll say

 9          nerves of steel to get through a shift?  Would

10          you agree with that?

11                    MS. SAVOIE:   Object to the form.

12    A    Well, it depends on your assignment.  In patrol

13          you never know what's going to be around the

14          next corner.

15    Q    Potentially life or death every shift, correct?

16                    MS. SAVOIE:   Object to the form.

17    A    Yes.

18    Q    Can you look at Evans 19?

19    A    Okay.  I have it.

20    Q    What is that document?

21    A    These are the questions that are asked during

22          the polygraph exam.

23    Q    And there are a couple of fields there; ID, ER

24          and text.  Do you see that?

25    A    Oh, yeah.  Yes, at the top.
```

                    CADY REPORTING SERVICES, INC.

1    Q    Can you tell me what those mean?

2    A    The ID is the identification for the question

3         asked.  The Examining Response is yes or no.

4         The text is the text of the question.  And the

5         series type is the format used.

6              I'm starting to get hoarse.  I need to

7         get a drink of water.  Excuse me for a quick

8         minute.  Is that okay?

9    Q    Yeah.  Of course.

10   A    I'll be right back.

11             All right.  I'm sorry.

12   Q    So the fields that you're referring to are just

13        part of the program that's used and the

14        questions then fall under the text field that

15        you're referring to.  So under the ER, are

16        those the actual responses Lenny Mazzola gave?

17   A    Yes.

18   Q    So am I correct in reading this that he was

19        asked, "In your entire life did you ever

20        violate a law?"  Was he asked that?

21   A    Well, yes, but he's instructed to lie to that

22        question.  It's called a directed lie

23        technique.  So the response to that question

24        that evokes a reaction on the test because we

25        know that's a lie.

                    CADY REPORTING SERVICES, INC.

```
 1              "In your entire life did you ever tell

 2         even one lie" is a "no" answer.  We know that's

 3         a lying response physiologically and that data

 4         then is compared to other data.  Where you see

 5         the response of "no" next to R-4, that's a

 6         relevant question.  It's a no response to a

 7         relevant question.

 8              And then you see the Y response; "Are you

 9         in the State of Ohio?  Are you sitting down?",

10         and, "Are the lights on?"  Those are truthful

11         responses.

12              The questions that are neutral questions,

13         the comparison question, "In your entire life

14         did you ever tell even one lie?"  When

15         answering no to that, that is a known lie and

16         it's a directed lie because the examinee is

17         told to answer the question with a no response,

18         and then the physiological data is compared

19         between the comparison questions to the

20         relevant questions through course and protocol

21         of the MGQT, which is the Multi General

22         Question Test.

23    Q    Would you look at document Evans 123?

24    A    Okay.  I have it.

25    Q    Can you tell me what that document is?
```

```
 1    A    This is the Garrity warning that was signed

 2         before the interview and was then used again

 3         before the polygraph exam.

 4    Q    Do you know if that's Leonard Mazzola's

 5         signature on the bottom?

 6    A    Yes, it is.

 7    Q    And the date is March 13, 2019?

 8    A    Yes.

 9    Q    There's a paragraph here, "You are further

10         ordered not to discuss this internal

11         investigation with anyone other than your chain

12         of command or attorney including, but not

13         limited to, witnesses or perspective

14         witnesses."

15              Do you see that?

16    A    Yes, I see that.

17    Q    Did I read that correctly?

18    A    Yes.

19    Q    Did you actually verbally give that to

20         Mr. Mazzola or just hand him the document?

21    A    Well, as a courtesy I would have given it to

22         his lawyer, Sara Liva, who's the witness.  And

23         she went over that with her client, in this

24         case Leonard Mazzola, but each one that I

25         interviewed got the same document.
```

CADY REPORTING SERVICES, INC.

```
 1     Q    And Sara Liva signed this, correct?

 2     A    Yes.

 3     Q    And it states that, "You are further ordered

 4          not to discuss this internal investigation with

 5          anyone other than your chain of command or

 6          attorney."  Right?

 7     A    Yes.

 8     Q    And Sara Liva signed this as Leonard Mazzola's

 9          attorney, correct?

10                    MS. SAVOIE:    Object.

11     A    Yes.

12     Q    Okay.  The next sentence says, "A violation of

13          this order will be considered an act of

14          insubordination which could result in

15          disciplinary action against you, up to and

16          including termination from employment with the

17          City of Independence."

18     A    Yes.

19     Q    That was conveyed to Leonard Mazzola?

20     A    It was signed by him and his lawyer at the time

21          that it was given twice; once before the

22          polygraph, the latter of the two, and the first

23          time would have been on the 13th when I

24          interviewed him.

25     Q    So Leonard Mazzola was advised at how serious
```

```
 1          it was that he not discuss this internal

 2          investigation with anyone in March of 2019,

 3          would you agree with that?

 4    A     The document speaks for itself in that regard.

 5    Q     Is this Garrity warning essentially the

 6          statements cannot be used against the person

 7          who's given the warning in a criminal

 8          proceeding, correct?

 9    A     Correct.

10    Q     Can the statements be used against another

11          third-party in a criminal proceeding?

12    A     Yes.

13    Q     So it's potentially if someone else was ever

14          brought up on criminal charges for improper

15          access to the police computers or improper

16          access to public records, Lenny Mazzola's

17          statements could have been used against that

18          third-party, correct?

19    A     Yes.

20    Q     Mr. Evans, I'm just going to look through my

21          notes for a second.  I think that might be all

22          I have.

23                    MR. STRANG:  That's all I have

24          for now.  Thank you.

25                    MS. SAVOIE:  I think we're done.

                CADY REPORTING SERVICES, INC.
```

```
 1          Let's take a quick break and we're going to

 2     review some notes really quick.  Okay?

 3                    (Recess taken.)

 4                    MS. SAVOIE:   Mr. Evans, we don't

 5     have any redirect questions for you.  We're

 6     finished.

 7                    THE WITNESS:  Okay.  Thank you.

 8                    MS. SNYDER:  He will read his

 9     deposition, please.

10          (Off the record at 5:10 p.m.)

11                    - - - - -

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CADY REPORTING SERVICES, INC.

```
 1     THE STATE OF OHIO,   )    SS:
       COUNTY OF CUYAHOGA.  )
 2

 3         I, Aimee N. Szinte, a Notary Public within and

 4     for the State of Ohio, duly commissioned and

 5     qualified, do hereby certify that BILL EVANS was

 6     first duly sworn to testify the truth, the whole

 7     truth and nothing but the truth in the cause

 8     aforesaid; that the testimony then given by him was

 9     by me reduced to stenotypy in the presence of said

10     witness, afterwards transcribed on a

11     computer/printer, and that the foregoing is a true

12     and correct transcript of the testimony so given by

13     him as aforesaid.

14         I do further certify that this deposition

15     was taken at the time and place in the foregoing

16     caption specified, that I am not a relative,

17     counsel or attorney of either party, or otherwise

18     interested in the events of this action.

19         IN WITNESS WHEREOF, I have hereunto set my

20     hand and affixed my seal of office at Cleveland,

21     Ohio, on this 6th day of July, 2020.

22

                                    
23         Aimee N. Szinte, Notary Public
24         within and for the State of Ohio
           My Commission expires July 15, 2023.
25

               CADY REPORTING SERVICES, INC.
```

148

```
1     THE STATE OF OHIO              )
                                     )    SS:
2     COUNTY OF CUYAHOGA             )

3

4          Before me, a Notary Public in and for said

5     state and county, personally appeared the

6     above-named BILL EVANS, who acknowledged that

7     she/he did sign the foregoing transcript and that

8     the same is a true and correct transcript of the

9     testimony so given.

10         IN TESTIMONY WHEREOF, I have hereunto

11    affixed my name and official seal at

12                                this      day of

13         , 2020.

14

15

16

17

18                         Notary Public

19

20    My Commission Expires:

21

22

23

24

25

                  CADY REPORTING SERVICES, INC.
```

```
1              DEPOSITION ERRATA SHEET

2       Page No.        Line No.      Change to:

3

4       Reason for change:

5       Page No.        Line No.      Change to:

6

7       Reason for change:

8       Page No.        Line No.      Change to:

9

10      Reason for change:

11      Page No.        Line No.      Change to:

12

13      Reason for change:

14      Page No.        Line No.      Change to:

15

16      Reason for change:

17      Page No.        Line No.      Change to:

18

19      Reason for change:

20      Page No.        Line No.      Change to:

21

22      Reason for change:

23      SIGNATURE:                   DATE:

24              BILL EVANS

25

                    CADY REPORTING SERVICES, INC.
```

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Ohio

| | |
|---|---|
| Leonard Mazzola | ) |
| *Plaintiff* | ) |
| v. | ) |
| Anthony Togliatti | ) |
| | ) |
| *Defendant* | ) |

Civil Action No.  1:19-cv-02519

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  William D. Evans, II, Co., L.P.A., 1185 S. Main St., Akron, OH 44301

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: All documents (communications, reports, drafts, videos, etc.) regarding services provided in 2019 to the City of Independence, its Division of Police, or its Law Department regarding an Internal Affairs and/or workplace investigation involving a matter of alleged unauthorized disclosure of departmental information.

| Place: Chandra Law Firm LLC, 1265 W. Sixth St., Ste. 400, Cleveland, OH 44113 | Date and Time: 12/18/2019 4:00 pm |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:  12/04/2019

CLERK OF COURT

OR _____

_____          _____
*Signature of Clerk or Deputy Clerk*                              *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Leonard Mazzola
_____ , who issues or requests this subpoena, are:

Ashlie Case Sletvold, 1265 W. Sixth St., Ste. 400, Cleveland, OH 44113 ashlie.sletvold@chandralaw.com 216.578.1700

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Plaintiff's Exhibit 1

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.  1:19-cv-02519

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

    ❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____

_____ on *(date)* _____ ; or

    ❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ____0.00____ .

I declare under penalty of perjury that this information is true.

Date: _____

                                         _____

                                                  *Server's signature*

                                         _____

                                                 *Printed name and title*

                                         _____

                                                 *Server's address*

Additional information regarding attempted service, etc.:

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1) For a Trial, Hearing, or Deposition.** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2) For Other Discovery.** A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1) Avoiding Undue Burden or Expense; Sanctions.** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2) Command to Produce Materials or Permit Inspection.**
  **(A)** Appearance Not Required. A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** Objections. A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3) Quashing or Modifying a Subpoena.**
  **(A)** When Required. On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** When Permitted. To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** Specifying Conditions as an Alternative. In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1) Producing Documents or Electronically Stored Information.** These procedures apply to producing documents or electronically stored information:
  **(A)** Documents. A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** Form for Producing Electronically Stored Information Not Specified. If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** Electronically Stored Information Produced in Only One Form. The person responding need not produce the same electronically stored information in more than one form.
  **(D)** Inaccessible Electronically Stored Information. The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) Claiming Privilege or Protection.**
  **(A)** Information Withheld. A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** Information Produced. If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

3.5 hours   1:30-5:00

1ˢᵗ I reported this was 1³⁰ₚₘ Sunday 12-8-19

⊙0½   SARA   BRIN DALTON

BRIN DALTON
- I dont know investigation will here
- CHIEF's answer by chief KILBANE Admin 3/7/19.
- Sect 2913.04 say a not apply I don't know where
  investigation is going to go.  section of the ORC
  says anything held up+⅛ copies of computer quite
  not be Documentation up freque millitory.

- I'm not at law and I ⊕ cant sign rushdox.
- did have to say yes I must confirality
- I cant say I ⊕ deither source mult
            lockut or mumret

- SARA says Do Garrity go on this
  w/smue y you like.

- SARA says mald I mwd f I call Bob
  I say sure! SARA CALLS BOB

- dave seen her 26 yrs . 2 yr 3 mos in Drug.

- (we Talk @ Drug & Kare in Drug.

- (we Talk @ Drug.

- SARA & I talk @ country after Sart
  this to Bob Arming.

- I say I can talk to HR Director & see
  what She wants

- Sara says shed advise they not sign this
  form unless demended by Employer.

- I ask employee to leave & summer & I
  talk w/ SARA Alone

- Bob advises to not have the /s/ Garrity
  form unless the Employer requests them
  to /s/ the form.

EVANS/PTA196

— until / He says I Discontinues all
his / stuff then (a/o gratuity) then
I'm a witness.

— So let me go thru it here.

(Rec 004) I thought he'd be really pissed when
he found out his "stuff" was sent out.

Note (there was no way he sent this stuff
out) (SWORN)

— Since said Items 3/4 fell from the
visors & 13th showed him 3 @ order
write up & dont think he show 4
from MAZOUR to chief

Exh #4 Note Pre Disc. Hearing (He says it
would have been told) in my report.

— order never got a pre-disc hearing
notice.

— "I give everybody the benefit of the
Doubt & that might be the deal
w/Kris"

Rec 004 Sgt Cross     NO INFO

Rec 005 Sgt Cross = checkbook discussion purposely @ minimize/gratuity
        — "Im not law enf & I can't
        potential criminal issue; I dont care
        what we do I'm not L E anymore I am
        giving Miranda; I'm not trying upon this
        to get anyone prosecuted anywhere.
        There was discussion leading up to filling

EVANS/PTA197     2

To [you] - you can refer to me at Bill
Cross units [loyalty] & Sgt Cross # 1/ on if
Cross complying with Sara that she is
there for the Union.

- Report of that [Read] controlled version of
  [gravity] - Sara witnessed gravity

- The [Sara] is in movement of the dissemination
  of info

- Bob asked me to tell you "thus" - - -
  I [then] tell him I said this too.

Dissemination of [flagrant] info created by the
Dept.

- I explain that is A criminal investigation +
  internal matter i.e. - analyze discrepancies.
  I explain policies/procedures real life
  in confines of the police dept.

- Fox 8 is part of appeal to what I am
  referring to.

Q. Has there been discussion & [instruct] of
   [assigning]

[Exhibit] 1  disseminated in August.
   "      2
   "      3
   "      4  [waves up] for officer Brian Dayton

Q. How long have you [been] at [magnitude].
   20 yrs  maybe 1995 B. of [that]
   [military] [service] age before that "

I stated unlawfully otherwise ORC could apply CHATTEL Believes this could be mu F.3. IE distribution by mfg w/o authorization & disloyalty to perme justice.

- Would you agree there are intense property in nature.
  & I would want i, Disbursed [?].

  I come from Different Background →
if you screw up.

- Are these 3 property confined to a "species" group + not particular distribution channel; for safety protect integrity of manufacturer & [?] officer [?] Have a personal right.

- Is Sgt w/DS make you deem them to be proprietary Ans Did recall they are not mfr'd to be distributed. IE. Sgt [?] could gave or disbursed w/ his family y -

- Even to & case he inspector & That something should not be terminated — Would you respect your job surely enough.

- [?] @ [?] if [?] stays [?] is [?] i about & dont want anyone Knowing my dirt [?] ([?] of [?] [?]) I [?] not anyone & know @ it !! no one ever have been matter us

Q  if someone disseminated they w/o my OK.
I'd be happy about write want to up
if someone disseminated it openly
Sgt. Agrees    It would be improper.

- its not right to disseminate it when
  it

- would you see it as a breach of
  internal policy to distribute - - -

  I see nothing out there to say it
  policy of this city ... there no I certain
  policy       →

Note: I investigated based upon
the info I was told could
not be disseminated.

Assume He did. I don't know
if he wrote it question or no

1st M  1:3  I can't think of my legitimate
reason why they be attempted to public

"if they were in my command I would
write them up if I found out
it. it will be breach of policy t
I'd write them up if I knew
they did it.

EVANS/PTA200

5

Iwo nam Exept #4 Before "

"It went to Sgt Kurtz & He hung His on
14/3 Desk ; How I probably got a copy. He Also

— 4 patrol sgts have Desks + no was a
my net
IF I gett A copy I would
not have given a copy to nyone +
I do Not give it or show it to
Anyone "

Item 2 @ Officer Arzuaby was A scheustic w/
Statistics - issued per chief to
patrol Division.

impertel From + Do you have my
thought @ inting them up if it
wint to Fox — — "did
Do my job.

Sgt
17

Please send this Docum't + my those
Attn + Item #17.

Take a look at how 9 + note
similarities in language

8 D/y see the similarities between 17 + 145 9
the one that has Insitions in it.
Direction 1st paragraph — — — Sorry
1st paragraph — I you I
Definitely see A conlation in
those Two // per sgt Chris.

I agree on the [?]

Earlier I was trying @ officer Dalton's
stuff getting out there ... & one in
the [?] Discovery Report 5?.

A/4 know [?] Anyone who would have
had access to write up for Dalton
Directing [?]
intense [?]
who would [?] had access

Answer probably not patrol officers
Chief would have [?] access to all
not Sgts they would not have had access to
Dalton's write up or Mazzoci's write-up.
No access to [?] 3, #4 [?]
I've [?] [?] #5 which is Garlick's
report.

No access to Dalton's write-up #3, No access
to Dalton's write up or #5

I only had access to #1 & #2

Q  D/4 promise or [?] anyone provide
Any of those documents to Fox?

A  No.

Q  As comm [?] who would have
had access besides the Chief.

A  I do not know [?] IT

No IT @ Dalton's write up it not
only created [?] by Chief outside
of the [?] IT system

EVANS/PTA202  7

Data units — up was not in computer.
Main screen His Info up unit
saids to only Data. But Cap
told Marshes they needed to
LT say MMS out —

most of the Dept Related @ this
units / up.

If media has the very documents in their
possession why don't we tell you
+ resume Data says I would
NOT want anyone to give my
units — up !!

(X) — Sgt True @ the "Marcy — Day".
Everyone wondered how anyone
got this information.
Note Evans says good point — no wonder this is
a policy to keep things private + we
obey policy @ the Dissemination

(X)(X) I do not support the Dissemination /
The stuff to media.

— Someone could have gotten the stuff to
Fox 8 in a "back door way".

These women
_____ of Data give to Data
by people possess nus MMS out.
Data "chief".

per Amr Rour issue is what else is
getting out they might be
pregratory in Matters...

So states He'd initiate the Discipline.

There are plenty of people who don't
met the Chief there & He took
a job somew else.

I have numeous things disappear from my
BMV

D/y have had stuff stolen many years
He phone be-cum room ① Flashlight
② Audio TPO of Traffic stops
③

Motive - Plenty of people that don't like Chief

outrider → moves otha ng if Printon
from within  All 30 of us were in
line for the Chief's spot

Interum Pollock Applied; Matz 024 &
Joe Smith
Smith Retired w/ aprt 5 yrs.
Dep Chief Pollock still Employeed Here

Tamarello - w/ Inexperience 21 yars. new.
chief stepped in w/ End of Sgt.

Sgt Tamarello    works 2-midnight 4 days /wk
Sht has seen printy it so how you.

— Chief gave me ORC. Section pertaing to
this case.
[s] doeuth w/ purpose of the cree investigation.

I gave pumon cases to Tamarello 3/17/19.
code sections
I got a copy of Item 1   coda section   _____ this _____
don't recall section  Item 2 even before approved for k. _____
                                                            pursue.
me me approving this nt in nonrestricting
                interim

chief gave me Reprimun 1) Button un Report before he
            passed by chief mas out a Button.

never this    Item 3
Nope          Item 4

Q Did You get the chief's order to intervien?
A yes

If you do your job you don't need my 1
the orders to get nursery

"I endorse productivity" per Tamarello.
productivity of monitoring of accountly

Assume there was dissention within of police channels

Q would you consider these to be internal proprietary Document

A yes.

I would imagine they are subject to public Records requests.

I say you can't Request Public Records

Q would you consider these to be internal proprietary & confidential.

A yes I would Agree

Q if one of you people in you command Discussed info in the Document would this be violation of procedure policy

A I would imagine I could write you I would write them up.

Q Its the content of Document the information Cannot be Disc on social by them?

A yes

Q D/4 Distributing Any of these y yourself

A Chiefs asked if I / was this foxing.

THE Answer is no

Q D/4 the more Documents —

A no Absolutely not.

Compare language to 1st ¶
here; do you see similarities

They are almost identical
Rules is not spelled right.
"Tradition" is the same in both.

ITEM 5 is Appendix WRITE up of Dayton.
Assume "I don't want anyone
Sharing my DIRTY laundry!"
(per Tinnerelo to HASSAM this.)

Q D/Y see anything in this public
record regard @ his write up?

A D/Y see Pub record ___ ___ ___
to Discussing ___ of Dayton
+ PRE D INFO. ___ "policies @
TRAFFIC STOPS
I see Similarities.

Acknowledges ___ ___
___ DOCS.
Like to ___ this prior knowledge

D/Y have Any Thought as I
who Disseminating ___

I have no Basis — ___
I know its not me

EVANS/PTA207

12

○ D/4 this _____ pardon has necess
    yes it meant against or Kurts

(XX) item 4 was pardon of Sgt had access
    to item 4.

— Sgts + _____ had access to _____
    means of sgt.

(XXX) item 3 okay pardon NA Chef _____
    of mayor.
    — not pardon
    — not Sgt's.
    — it was created by _____ .

—— item 2 was _____ to
    everyone

Common denominator would have been
A _____ officer _____ sgts
    1 _____
    2 Chief
    3 NA
    4 Mayor maybe
    5 Law Dept
    6 Asst Chief  Have issued
        it was out

Q WHAT'S Your opinion on who _____ this?
A Women did this is _____ Ridiculous, Petty.
    It was anyone for together.

Q MOTIVE?
A they only did so _____ —

ROC # continued w/ LT Wilson

Lt. Wilson
In charge of I.A. 8-4 5-5
w/dept 31 years.

I was hired by mayors office to determine distribution
of proprietary info outside the mayors office

I never saw this #2
I have seen this

I have scaled 1, 4, of Dalton's write up
other sgts got 1 at same time.

I saw the Mazzola Discipline Before.

Q. the most sensitive and
confidential is in my willor opinion.
Answer: personnel files info.
Q. is there a policy prohibiting taking item
3 copy if (Dalton's write up)
+ passed it out is it a violation?

A. Yes unless its a public
record request - I'm sure
there is a policy prohibiting it

Honestly, these are all proprietary
+ unless there is a public
record request, its violation of policy

EVANS/PTA209  147

I feel these are all public records
I enter its the immediate giving it
out unless its not released
in the proper channel it would be
a violation of policy

— I agree it is to be held w/
the police dept # if a
public records request it must
be ok to release it thru
proper channel.

— if there doc were provided within
the normal course then violating
its proper channel but not
violating channel fools its
improper + violation.

Exhibit 4  inury 17

— practices, transitions

officer Drivers write-up
— discipline) preparation
Docut #4 — prev discipline
Docut 2 — stormes personnel Expectations

for Wilson unless they had an sincere
orders its very suspicious
— Wilson draws conclusions:
① who had access to all 4 documents
besides chief?

Ⓠ Wilson says he only had access to
1, 3, 4   never 2
- as far as I know I now say 2
1 CHIEF had all 4
2 deputy chief
3 internal commander

- at Jim Kroger would not have
access privy to any of those
- the only one I can see that has
access to all 4 would be
if did not have access to the
Mattons write up b/c it was
charged the MAZOLA.
It could possibly have those
but chief says it was limited
to only a few people.

Ⓠ I have direct the person who
did it unless it went outside
the protocol for distribution

Q Assume the matter is carried out
out — I'd probably prosecute them.

A I'd prosecute all the same
reason we to why.

EVANS/PTA211  16

Wilson Remarked it is a
violation of policy & procedure to
release these [illegible].

Q what is notice.
A prior or quota
or
to make someone look bad.

Q Having to write 30 tickets.

- on the face of it it would be
  driven by anyone in [illegible].

- Q who would want to look bad?
  A They'd want to make Chief look [illegible]
    BPD is Chief.

Q So who would want to make Chief
  look bad
A Anyone in patrol.

Q to patrol looks who no access to

If I was in charge of patrol + get them
  pre overtime notice -- I'd [illegible]
  my SGTS & [illegible]

3. [illegible] BROWN  School Resource  in schools
   ANGELS  off on sick leave; maybe Arnold.
   Ross
   Ferrell
   KUTZ  something [illegible] But was around the

START PG 7 W/ Lenny/MARZOLLA

B' tells Lenny
SAMARITANS I'm NOT convinced there is
a crimve issue here But if it comes to
that... (she insert's   to B/ Grimutz

• 3/13/19.

• CHIEF's ORDER IS marked AS "O"
  w/ Dept 25 YEARS.

Have Discussed w/Mayor the Promoters ie Dissemination of
info @ stuff that went to fox news.
NO

Q Discussed it w/ others at th Station:
  I) Last Discussed fox Discussion w/Mayor
     Wst Thursday Between MAYOR & me.
     the correct date is 2/08/19 was His Discussion
     w/mayor.
  it was Discussion Between myself & mayor @ stuff it
  Dept Going on since it was a private
  conversation @ the onemore situation since
  MID July that myself & Dept was going
  Thru reforme to th onemore Dept
  enemies. I informed the mayor that
  this is what they Had              #1
  Lenny's page + A Strp who Lenny informed
  Dept @ the new TRAFFIC enforcement.

Evans Did not have the Memo But Chief told Lenny that
BARDE Had it wheny GODDEREA intercepted CHIEF in
LOBBY.

EF was Lenny's memo of Sept 25th 2018
  went from Lenny to PARMC + arsheders
  + on 2/28/19 is what he used in lenny's
  meeting w/mayor
Q When was Wst Time Discussion w/ mayor
                                         EVANS/PTA213

MAZZOLA

There was Documtin w/ Senad @ D/H do it or
Know who DID it.

- CHIEF ASKED me IF I GAVE Brian DALTON SOP/.

- mtg PROS CHz HOCKI, myself MAYOR Done to
the PERFORMANCE STANDARD MAYOR JAN 2019 or
FEB 2019.

1) D/H Recognize Item #1        (Memo From Larry I All 4
A  yes                                         SARGANT.
                                                        + CHIEF OF
                                                        TROOPS IT.

Q) D/H Recognize #2    FLOW CHIEF to PATROL
A  yes.  gur    Officer THROUGHOUT station
                    THIS WAS from + FLOW CHIEF to
                    PATROL - WENT Everywhere
Q) How BOUT #3    POSTED IN BACK ROOM; ALSO ON DOOR IN BB
A  yes                              went to 25 guys in PATROL
    Went From MAZZOLA to BRIAN DALTON DIRECTLY I DALTON or
    was home always A Copy to Sgt CRESS
Q) How Bout #4
A  yes (left on LONNY'S KeyBOARD.

NOTE @
CHECK IF
SEE IF
CRESS GET
A COPY
DALTON #3
NOTE

Q WHO HAD "PRE-d" Notice
A  me

- I WAS SERVED A LETTER weds 8/29/18  NOTICED
                              Recd 8-29-18.
Lonny's PRE-d HEARING TUESday 9-4-18  1 00 PM

(x) ITEM  THE envelope left on KeyBOARD was
    #4    serned.

WAS         4:35  I got Pred  Knew @ 15 Aud I
PRED DAY              wilson Chief RSBB DIAZELUS
                4:35  simple totter to family j I
                    didn't
(x)           (4:35) I don't make ANY Copies D/ IT my pre D notice.
PRE D FILE

EVANS/PTA214  19

I see Bundlepse on my Ray Berry
open it up ; said to self
Boy this dont look good

— No copies of the Pre-D

" I don't think either Pro-D mmo or
Daytons are emailed out my
Electronic Letterhead templarte.

proof
told I didn't make any copies But then said I
to assume Bob phillips + Wilson got
a copy also I wsen

note Chuck said He did not get a
copy of the Pre-D

EVANS/PTA215

Who Do You think Distributed You Pre-D

① CHIEF    No    probable   no

② Letitia    NO    possible    No

③ Lt Wilson   don't know if he had access but he
   would not have done it.

④ Not   Sgt Phillips.

⑤ Could Be Anybody.

I did not do it.

— I can see another possibility per Smith

— pissed off, grudge??

— Patrol went have access.

— common denominator 5 people including HR &
   Lenny.

— ⟶

— ⟶

would you be willing of to take a polygraph, no I'm
not willing of to take lie detector.

I'm told chief can order polys for CBA

• SABA Will checks the CBA
  its not in the interview
• I was told by H.R. it was ok
• there might be a policy

per Lisa I don't see anything @ polygraphs one way or
   the other — pers
   is silent.

LIDA says you assume the person
rgnt the Pre-D hearing notice; if
the template works.

what huts in the docunt rngnt will not
groupie to him. Pre-D notice.
    Lawyers

It's likely generic

— one person mittee off DALTON

How many PRE-D hearings are there
at Independence.

— Quoted generic orders standard of conduct
— 502 import standards of conduct is not specific
  & Lawsy.

— Verbaim language + only 3 people

— THE person Rogersting to move out of a
  35 page CBA.

— Probably standards of conduct is general & widely
  available.

— I can clear my name real fast.
  if they have those pocuits, I would move
  release these documents DALTON & name.

Check Is Standards of Conduct on internet?
  out.
    Lawyers                                    takes off list
    LT  Mazzout                                — MAYBE
    LT  Wilson          →  Suspect            — Bob Ausseys.
    HR  Not likely.

                (Could interview)
                                    EVANS/PTA217  22

41°

**NEWS**

# I-TEAM: Lie detector test given to local police officer over traffic tickets

Plaintiff's Exhibit 3

41°



by: **Ed Gallek**

Posted: May 3, 2019 / 07:43 PM EDT / Updated: May 3, 2019 / 07:43 PM EDT

*This is an archived article and the information in the article may be outdated. Please look at the time stamp on the story to see when it was last updated.*

INDEPENDENCE, Ohio — The FOX 8 I-TEAM found the Independence Police Department hired an outside firm with a lie detector to question officers on the town police force after the I-TEAM reported on traffic tickets there.

Friday, we found the Independence Police Chief in the parking lot outside of headquarters and he refused to answer questions about it.

Chief Michael Kilbane said, "Send me an email with questions."

We responded with, "We've done that."

41°

In January, the I-TEAM revealed internal police documents outlining targets for traffic tickets to be written by Independence patrol officers.

Multiple sources said that led to an internal investigation looking, at least in part, into how those documents ended up in the hands of the I-TEAM.

We reminded the chief, he's spending taxpayer money to find out who gave us the documents.

He responded again, "Send me an email."

Christine Novak lives in Independence and she's active with a senior citizens group.

"We've heard about these new traffic ticket violation quotas," she said.

Recently, she went to a council meeting to ask Independence town leaders about this. She received silence. No response.

The I-TEAM requested the contract between Independence and the firm brought in with the lie detector. Under the contract, Independence agreed to spend $5,000 and maybe a little more if needed. We contacted the outside company. They did not provide a comment.

During the internal investigation, one police supervisor retired. Multiple sources said he left under pressure. However, he never supplied any information to the I-TEAM.

Earlier, an officer got a written reprimand for not writing enough tickets.

The chief calls it a performance standard, not a quota.

But again, no answers when we met him in the parking lot. He said, "Because I'm late to an appointment, sir."

41°

The chief has also said he does not have any specific file or paperwork on the
internal investigation.

*Continuing coverage, here.*

**Suggest a Correction**

**SHARE THIS STORY**

**YOU MAY LIKE**          Sponsored Links by Taboola

**The CDC Recommends Protective Cloth Masks**
Brave New Look

**The Best Way to Stop a Barking Dog (It's Genius)**
Bark Begone

**Why This Mask Is Flying Off The Shelf - Grab Yours**
Marena Reusable Face Masks

**Order Now And Get $15 Off**
Wild Alaskan Company

**Back In Stock: Disposable Masks Available Here**
Stratton Medical Supply

**Soak Your Dark Spots With This One Thing (Trending Morning Routine)**
Gundry MD

41°

(Finance Wealth Post)

- **Caitlyn Jenner's No Makeup Photo Confirms The Rumors** (Loan Insurance Wealth)

- **This Doctor Fixes Guts — And He Begs You to Eat One Thing** (Gundry MD Total Restore Supplements)

- **Best price guarantee.Limited Stock. Place your order today & secure your items.** (OxyDeep)

- **Can't leave the house? Yes— we ship wine to Ohio** (Firstleaf)

- **California man accused of throwing daughter off cliff, killing her after stabbing attack**

- **Wild video shows praying mantis eating murder hornet**

- **26-year-old surfer killed in California shark attack**

- **Elyria woman charged in stabbing death of 20-year-old**

- **Video appears to show deadly shooting of Georgia man out for a jog**

by Taboola

## MORE NEWS STORIES



41°

**Police not planning to enter self-quarantine, Pusd beginning 'modified quarantine' after staffers test positive**

by CNNwire / May 11, 2020

**Read the Full Article** →



**Experts agree this hurricane season will be above-average, maybe even extremely active**

by CNNwire / May 11, 2020

41°

Read the Full Article  →



## Coronavirus headlines: Predicted COVID-19 US death toll keeps rising with states reopening

by CNNwire / May 11, 2020

Read the Full Article  →

---

**TOP STORIES**

41°



**Pence not planning to enter self-quarantine, Fauci beginning 'modified quarantine' after staffers test positive**



**Experts agree this hurricane season will be above-average, maybe even extremely active**



**Coronavirus headlines: Predicted COVID-19 US death toll keeps rising with states reopening**



**Cleveland's Own: Gregory and Shirley Turner**



**Weather: Cool start to the week with a chance of rain, snow mix**



**Jerry Stiller, comedian and 'Seinfeld' actor, dies at 92**

**MORE STORIES**

Case: 1:19-cv-02519-JPC Doc #: 64 Filed: 08/04/20 184 of 383. PageID #: 545

41°





**Viral video sensation 'double rainbow guy' dies at 57**

**Georgia attorney general requests DOJ investigation into handling of Ahmaud Arbery case**





**DeWine sees risks 'no matter what we do' amid reopening**

**Some local restaurants and salons opting not to reopen this week, owners say it's too soon**

**Read more stories** →

## AROUND THE BUCKEYE STATE

**Coronavirus headlines: Trump advisers cite need to stop 'permanent' economic toll**

**'Free Ohio Now' rallying across the state to encourage DeWine to loosen restrictions**

**Governor DeWine encourages to 'Light Ohio Blue' to honor l: enforcement members**

Coronavirus / 10 hours ago

Coronavirus / 2 days ago

News / 3 days ago







**More Ohio News** →

41°



41°

Links:

Select a weather link:

**HOT ON FOX 8**

---

① **Viral video sensation 'double rainbow guy' dies at 57**

---

② **Wild video shows praying mantis eating murder hornet**

---

③ **Offers pouring in to family of 5-year-old Utah boy who tried to drive to California to buy Lamborghini**

---

④ **Krispy Kreme unveils new key lime glazed doughnuts**

---

⑤ **Dash cam video: 5-year-old boy pulled over in Utah on his way to California to try to buy a Lamborghini**

---

⑥ **Ohio restaurant selling 'quarantine essentials' including toilet paper, carry-out cocktails**

**More Viral**

41°



FOLLOW US

     

NEWS APP

 

WEATHER APP

 

Contact Us    Watch Fox 8    Sign up for the daily FOX 8 Newsletter    Jobs    Weather    News
Around the Buckeye State

Online Public File / Public File Help / Terms of Use / Covers / Privacy Policy / FAQ / Do Not Sell My Personal Information

https://fox8.com/news/i-team-lie-detector-test-given-to-local-police-officer-over-traffic-tickets/                                                                                    12/13

41°

© 2020 - 2020 Nexstar Broadcasting, Inc. | All Rights Reserved.



1185 South Main Street
Akron, Ohio 44301
(330) 434-2344
Fax (330) 434-4611

4403 St. Clair Ave.
Cleveland, Ohio 44103
(216) 241-4661

**WILLIAM D. EVANS II, MS, JD, ACP**
*President*
December 20, 2019

Chief Michael J. Kilbane
City of Independence
6800 Brecksville Road
Independence, OH 44131

**Re:   Lt. Leonard Mazzola**

Dear Chief Kilbane:

On March 30, 2019, a polygraph examination was conducted on Lt. Leonard Mazzola under "CHIEFS ORDER." The subject matter tested upon was reference to documents and/or information derived therefrom, reportedly released in violation of Departmental Regulations or Standing City Procedural Regulations. The Chief of Police supplied potential violations of the Ohio Revised Code which were deemed pertinent to the matter being investigated; thus Garrity was provided prior to commencing the examination.

In addition, the proper waiver/release forms were read and signed by Lt. Leonard Mazzola (with counsel's review), indicating the examination was taken "under Garrity provisions and Chiefs Order." Enclosed is the Waiver/Release exempting Poly-Tech Inc., its affiliated officers and individuals from liability.

Best efforts were put forth to ascertain the facts, which included pre-test questioning of the person to be tested, coupled with facts supplied by your office. See notation at the bottom of our report letterhead page, regarding dissemination of this report; this report has been directed to the Chief of Police upon recent request.

During testing, the instrument used was a computerized Lafayette LX6 Polygraph using:

1) Two pneumograph parameters.
2) An upper arm blood pressure cuff with recording capacity for systolic/diastolic relative pressures, pulse/heart rate, diastolic notch and other cardio wave patterns.
3) EDA sensor with electrodes monitoring skin conductivity and resistance.
4) Blood volume monitoring via a finger plethysmograph.
5) A seat movement sensor.

Three phases of the examination were completed.

1) Pre-test interview
2) Testing phases
    a. One polygraph sensitivity test used to assess reaction capability.
    b. Five relevant tests, examining on the aforementioned issue using the Utah Technique.
3) Chart analysis and post-test interview.

*This report is furnished by your agent, Poly-Tech Associates Inc., for your exclusive use as merely an opinion concerning the person(s) interviewed and/or examined and absolutely for no other reason or purpose.*

Chief Michael J. Kilbane
City of Independence
December 20, 2019
Page 2

**Re:    Lt. Leonard Mazzola**

During testing phases, the following relevant questions were asked with elicited subject responses indicated.

1.      Did you provide any information contained in those documents to the media?

        Answer:        No.

2.      Do you know for sure, who provided information contained in those documents to the media?

        Answer:        No.

3.      Did you help provide information contained in those documents to the media?

        Answer:        No.

After careful review of the polygrams, and the examination in its entirety, physiological changes indicative of deception occurred.  This opinion is derived from hand-scoring; such result is produced by ESS-M (Empirical Scoring System Multinomial) and an algorithm result without Examiner input reference to scoring, such result is produced with the OSS-3 (Objective Scoring System).  For ease of interpretation, the examination was comprehensively evaluated and Examinee's physiology in response to various test questions was scored.  The algorithms match the Examiner's hand-scoring.

If I can be of further assistance, please do not hesitate to call.

                                Very truly yours,

                                Kenneth L. Butler

KLB:ra
Enclosures:
        OSS-3 Algorithm Report
        ESS-M Score Sheet
        Waiver/Release

032019klb Mazzola

## Lafayette Instrument Company
# Objective Scoring System - Version 3
### By Raymond Nelson, Mark Handler and Donald Krapohl (2007)

| | |
|---|---|
| Result | **Significant Reactions** |
| Description | **p-value: < 0.001 - Probability this result was produced by a truthful person** |
| Exam Type | Multi-facet (MGQT) |
| Scoring Method | OSS-3 Two-stage (Senter 2003) |
| Test of Proportions | None - No significant differences in artifact distribution |
| PF Name | 032019klb Mazzola |
| Report Date | Wednesday, December 11, 2019 |
| Subject | Leonard Mazzola |
| Examiner | Ken Butler |

### Decision Alpha (1 tailed)
Cumulative normal distribution (Barland 1985)

**Spot Scores**

| ID | p-value | Result | Setting | Value | Component | Weight |
|---|---|---|---|---|---|---|
| R4 | < 0.001 | Significant Reactions | NSR | 0.050 | Pneumo | 0.19 |
| R5 | < 0.001 | Significant Reactions | SR | 0.050 | EDA | 0.53 |
| R7 | < 0.001 | Significant Reactions | Bonferroni corrected alpha | 0.017 | Cardio | 0.28 |
| | | | Test of Proportions (1 tailed) | 0.050 | | |

### Relevant Questions

| ID | Question Text | Answer |
|---|---|---|
| R4 | Did you provide any information contained in those documents to the media? | No |
| R5 | Do you know for sure, who provided information contained in those documents to the media? | No |
| R7 | Did you help provide information contained in those documents to the media? | No |

### Charts Scored

| Exam | Chart | Date | Time |
|---|---|---|---|
| 1 | 2 | 3/20/2019 | 1:40 PM |
| 1 | 3 | 3/20/2019 | 1:48 PM |
| 1 | 4 | 3/20/2019 | 1:58 PM |
| 1 | 5 | 3/20/2019 | 2:09 PM |
| 1 | 8 | 3/20/2019 | 2:21 PM |

### Remarks

032019klb Mazzola

## Measurements
(Kircher and Raskin 1988)

**Exam 1 Chart 2**

|     | C3  | R4  | C6  | R5  | C8  | R7  |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 260 | 229 | 282 | 260 | 297 | 328 |
| P2  | 213 | 185 | 231 | 198 | 223 | 188 |
| EDA | 77  | 159 | 74  | 43  | 19  | 174 |
| Cardio | 24 | 141 | 86 | 67 | 12 | 54 |
| SE  | 39  | 30  | 52  | 38  | 43  | 37  |

**Exam 1 Chart 3**

|     | C3  | R4  | C6  | R5  | C8  | R7  |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 361 | 240 | 341 | 258 | 313 | 201 |
| P2  | 278 | 165 | 296 | 189 | 240 | 151 |
| EDA | 40  | 88  | 49  | 53  | 14  | 71  |
| Cardio | 171 | 62 | 43 | 76 | 28 | 7 |
| SE  | 56  | 43  | 60  | 38  | 68  | 25  |

**Exam 1 Chart 4**

|     | C3  | R4  | C6  | R5  | C8  | R7  |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 325 | 273 | 311 | 266 | 258 | 164 |
| P2  | 316 | 275 | 312 | 260 | 146 | 135 |
| EDA | 38  | 98  | 20  | 148 | 48  | 125 |
| Cardio | 43 | 94 | 29 | 83 | 68 | 41 |
| SE  | 63  | 56  | 49  | 57  | 48  | 34  |

**Exam 1 Chart 5**

|     | C3  | R4  | C6  | R5  | C8  | R7  |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 389 | 363 | 425 | 392 | 453 | 377 |
| P2  | 247 | 204 | 254 | 224 | 283 | 215 |
| EDA | 34  | 161 | 8   | 110 | 28  | 121 |
| Cardio | 3 | 57 | 29 | 40 | 19 | 69 |
| SE  | 34  | 33  | 33  | 35  | 43  | 35  |

**Exam 1 Chart 8**

|     | C3  | R4  | C6  | R5  | C8  | R7  |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 378 | 302 | 406 | 456 | 488 | 362 |
| P2  | 257 | 189 | 264 | 279 | 331 | 234 |
| EDA | 28  | 110 | 80  | 97  | 34  | 107 |
| Cardio | 9 | 63 | 92 | 109 | 133 | 113 |
| SE  | 26  | 28  | 44  | 31  | 46  | 39  |

## Standardized Lognormal Ratios

**Exam 1 Chart 2**

|        | R4    | R5    | R7    |
|--------|-------|-------|-------|
| P      | -1.51 | -0.72 | 0.00  |
| EDA    | -2.03 | 0.59  | -2.21 |
| Cardio | -3.00 | -2.72 | -1.59 |
| WMean  | -2.20 | -0.59 | -1.61 |
| Mean   |       | -1.47 |       |

**Exam 1 Chart 3**

|        | R4    | R5    | R7    |
|--------|-------|-------|-------|
| P      | -3.00 | -3.00 | -3.00 |
| EDA    | -1.85 | -0.83 | -1.42 |
| Cardio | 1.29  | 0.22  | 3.00  |
| WMean  | -1.19 | -0.95 | -0.48 |
| Mean   |       | -0.88 |       |

**Exam 1 Chart 4**

|        | R4    | R5    | R7    |
|--------|-------|-------|-------|
| P      | 0.00  | -0.70 | -3.00 |
| EDA    | -2.01 | -2.83 | -2.49 |
| Cardio | -3.00 | -3.00 | 0.20  |
| WMean  | -1.90 | -2.47 | -1.84 |
| Mean   |       | -2.07 |       |

**Exam 1 Chart 5**

|        | R4    | R5    | R7    |
|--------|-------|-------|-------|
| P      | -1.95 | -1.08 | -1.46 |
| EDA    | -3.00 | -3.00 | -3.00 |
| Cardio | -3.00 | -3.00 | -3.00 |
| WMean  | -2.80 | -2.63 | -2.70 |
| Mean   |       | -2.71 |       |

**Exam 1 Chart 8**

|        | R4    | R5    | R7    |
|--------|-------|-------|-------|
| P      | -3.00 | 1.04  | -1.45 |
| EDA    | -1.65 | -1.40 | -1.60 |
| Cardio | 1.03  | -1.86 | -2.05 |
| WMean  | -1.16 | -1.06 | -1.69 |
| Mean   |       | -1.30 |       |

## Channel Contributions

| Component | Proportion | Area  |
|-----------|-----------|-------|
| Pneumo    | 0.340     | 0.983 |
| EDA       | 0.335     | 0.109 |
| Cardio    | 0.325     | 0.447 |

| Chart         | Proportion | ID | Proportion |
|---------------|-----------|----|-----------|
| Exam 1 Chart 2 | 0.201    | R4 | 0.339     |
| Exam 1 Chart 3 | 0.175    | R5 | 0.328     |
| Exam 1 Chart 4 | 0.212    | R7 | 0.333     |
| Exam 1 Chart 5 | 0.216    |    |           |
| Exam 1 Chart 8 | 0.196    |    |           |

Note: Non-normal values

## Results

**Weighted Mean**

| -1.85 | -1.54 | -1.67 |
|-------|-------|-------|

**Grand Total Mean**

-1.69

EVANS/PTA004

032019klb Mazzola

## Advanced Options - OSS-3 v1.9

### General Scoring Settings

| | |
|---|---|
| Delete all zero measurements | Yes |
| Zero Threshold value | 1 |
| Allow a single CQ to score result (not for DLST) | No |
| Replace missing values with mean values | No |
| Check Extreme Contributions | No |
| Allow SR Result when extreme contributions | Yes |

### Alpha Values (one-tailed)

| | |
|---|---|
| Kruskal-Wallis | 0.1 |
| Non-Significant Response (NSR) | 0.05 |
| Significant Response (SR) | 0.05 |

### Test of Proportions

| | |
|---|---|
| Test of Proportions alpha value (two-tailed) | 0.1 |
| Use Test of Proportions | Yes |
| Allow significant reaction result | Yes |
| Use all questions | No |
| Score neutral questions as control | No |

### Multi-facet (MGQT)

| | |
|---|---|
| Use Bonferroni | Yes |
| Use Kruskal-Wallis | No |
| Minimum number of useable presentations for RQs | 2 |

### Measurement Periods

| | |
|---|---|
| P1 | 15 |
| P2 | 15 |
| EDA | 15 |
| Cardio | 15 |
| All other | 15 |

EVANS/PTA005

## Empirical Scoring System, Multinomial (ESS-M) Report

| | |
|---|---|
| **Examinee** | **Leonard Mazzola** |
| **Result** | **SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** |
| **Posterior odds** | **999 to 1 odds of deception (>.99)** |
| | **24.4 to 1 (.96, one tailed alpha = .05)** |
| Lower limit | |
| Prior odds | Deception 1 to 1 (.50)          Truth 1 to 1 (.50) |
| Baves factor | 999 |
| Decision Rule | Two-Stage Rules |
| Test of Proportions | No significant differences in artifact distribution (p = .5) |

### Question

| | |
|---|---|
| R4 | Did you provide any information contained in those documents to the media? (N) |
| R5 | Do you know for sure, who provided information contained in those documents to the media? (N) |
| R7 | Did you help provide information contained in those documents to the media? (N) |

### ESS-M Scores

**Test Details**

032019klb Mazzola

Exam Date   3/20/2019

Examiner   Ken Butler

Report Date   12/20/2019

**Questions**

| Questions | Lower limit | Result |
|---|---|---|
| R4 | | DI/SR |
| R5 | | DI/SR |
| R7 | | DI/SR |

**Analytic Parameters**

| | | Cutscores | |
|---|---|---|---|
| Prior probability | .5 | Total NSR/NDI | 3 |
| Cut ratio | 1.0 | Total SR/DI | -3 |
| CI alpha SR/DI (1 tailed) | .05 | | |
| CI alpha NSR/NDI (1 tailed) | .05 | Subtotal SR/DI | -7 |
| Pairwise Alpha (1 tailed) | .01 | | |
| Alpha - Test of Proportions | .05 | | |

**Series 1, Chart 2**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | 0 | 1 |
| P2 | -1 | 0 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | 1 | -1 |
| PLE | -1 | 0 | -1 |

**Series 1, Chart 3**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | -1 | -1 |
| P2 | 0 | -1 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | 1 | -1 |
| PLE | 1 | 0 | 0 |

**Series 1, Chart 4**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | 0 | -1 | -1 |
| P2 | 1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | 1 |
| PLE | 0 | -1 | 0 |

**Series 1, Chart 5**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | 0 | 0 | 0 |
| P2 | -1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | -1 |
| PLE | 1 | 1 | 1 |

**Series 1, Chart 8**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | 0 | 0 |
| P2 | -1 | 0 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | 1 | -1 | -1 |
| PLE | 0 | 0 | 1 |

| | R4 | R5 | R7 |
|---|---|---|---|
| Sub-Totals | -15 | -10 | -15 |
| Grand Total | | -40 | |

### Summary of Analysis

Recorded physiological data were evaluated with the Empirical Scoring System (ESS-M). The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classifier with a multinomial reference distribution. Bayesian analysis treats the parameter of interest (i.e., deception or truth-telling) as a probability value for which the test data, together with the prior probability, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of deception were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of deception using the Clopper-Pearson method and a one-tailed alpha = .05. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred for the statistically from the test data. A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

The categorical test result was parsed from the probabilistic result using two-stage decision rules. Two-stage rules are based on an assumption that the criterion variance of the test questions is non-independent, and make use of both the grand total and subtotal scores. The grand total score of -40 equaled or exceeded the required numerical cutscore (-3). These data produced a Bayes factor of 999. The posterior odds of deception was 999 to 1 for which the posterior probability was >.99. The lower limit of the 1-alpha Bayesian credible interval was 24.4 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 95% that the posterior odds of deception exceed the prior odds. These analytic results support the conclusion that there were SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

References          https://lafayettepolygraph.com/ess-11_8.pdf          Lafayette Instrument Company          LXSoftware Version: 11.8.5.266

EVANS/PTA006

**POLY-TECH ASSOCIATES, INC**
1185 S MAIN ST
AKRON, OH 44301-1322

Place: _____                                    Date: _3-20-19_

I, _Leonard Marsola_ _____ voluntarily, ~~without threats, duress, coercion, force~~, UNDER HARRITY UNDER CHIEF'S ORDER promises of ~~immunity or reward request~~, agree and stipulate to be interviewed and/or take a polygraph (truth verification) examination for the mutual benefit of myself, William D. Evans II, Kenneth L. Butler, POLY-TECH ASSOCIATES, INC. AND _City of INDEPENDENCE MAYOR AND LAW Dept_ _Director AND CLEMENS NELSON._

I fully realize that, I ~~am not~~ required to take this examination.  I may first consult with an attorney or anyone I wish before either signing this form or being interviewed and/or taking the examination. Nevertheless, I consent to the use of electronic hearing and recording devices, and I ~~voluntarily request and~~ authorize William D. Evans, II/Kenneth L. Butler to now proceed with the actual interview/examination.

I do hereby authorize William D. Evans, II/Kenneth L. Butler, his directors, officers, employees and/or agents to disclose both orally and in writing the interview/examination results and opinions to directors, officers, employees and/or agents of POLY-TECH ASSOCIATES, INC., AND _City of INDEPENDENCE MAYOR_ _AND LAW DEPARTMENT & DIRECTOR AND CLEMENS NELSON_ /

under order by the chief

I am fully aware that the opinion may be that I have not been truthful. Nevertheless, in consideration of and as inducement for William D. Evans, II/Kenneth L. Butler, to give me this interview/polygraph examination, I for myself and my successors, assigns, heirs, executors, administrator knowingly hereby totally release, absolve, remise, covenant, promise, agree to save harmless, waive, forever discharge, and hold free from all harm, liability, or damage whatsoever POLY-TECH ASSOCIATES INC., Kenneth L. Butler/ William D. Evans, II, as president and in his individual capacity, ~~the above named,~~ and their respective directors, officers, employees, and agents individually, collectively, and personally from any and all suits, actions or causes of actions at law, claims, demands, or liabilities whatsoever or in law or in equity including but not limited to false arrest, false imprisonment, libel, slander, or invasion of all my rights and privacy which I, my successors, assigns, heirs, executors, or administrators ~~have now or~~ may ~~ever~~ have resulting directly, indirectly, or remotely from being interviewed/examined, possible liabilities or damages, flowing from the operation of all electronic hearing and recording devices, the rendered ~~oral and~~ written opinions and statements, ~~and/or all future actions taken by any and/or all of the above~~ based upon my taking this interview/examination. Records are kept for limited periods due to the use of digital and analog equipment POLY-TECH ASSOCIATES, INC., or its officers cannot be held responsible for lost, or inability to retrieve, information in the event of loss due to negligence or otherwise.  The parties further release Poly-Tech Associates, Inc. and it officers for such loss. ~~As a further consideration and inducement to have WILLIAM D. EVANS, II/Kenneth L. Butler conduct the interview/examination,~~ I claim that I am in good mental and physical condition and that I know of no mental or physical ailment which might be impaired by the interview/examination.

IMPORTANT NOTICE: This agreement, stipulation, and release form is a legally binding contract!  If not completely understood, do not sign but seek competent advice, such as that rendered by an attorney.  Poly-Tech Associates, Inc. and William D. Evans, II, as its President, and Kenneth L. Butler are separate entities, each are hereby released in individual and/or collective capacities.  Mr. Evans/Mr. Butler will not provide legal advice or consultation regarding this matter. Mr. Evans/Mr. Butler will merely provide information relating only to polygraph technique and information relating to the case for which you are examined.

_Sam Lin_ _5/20/19_            _Marola_                        _11°⁰_
Witness                        Signature of person to be examined        Time

(other person(s) with any interest in examination results after reading the above in its entirety. I also agree to be bound by the terms of this release.) _34_ _Ended Interview_  _Ended Polygraph_ _2:30 PM_

This interview/examination was concluded at _11³⁴_ on the above date.

# Empirical Scoring System, Multinomial (ESS-M) Report

| | |
|---|---|
| **Examinee** | **Leonard Mazzola** |
| **Result** | **SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** |
| **Posterior odds** | **999 to 1 odds of deception (>.99)** |
| Lower limit | 24.4 to 1 (.96, one tailed alpha = .05) |
| Prior odds | Deception 1 to 1 (.50)    Truth 1 to 1 (.50) |
| Bayes factor | 999 |
| Decision Rule | Two-Stage Rules |
| Test of Proportions | No significant differences in artifact distribution (p = .5) |

## Questions

| R4 | Did you provide any information contained in those documents to the media? (N) |
|---|---|
| R5 | Do you know for sure, who provided information contained in those documents to the media? (N) |
| R7 | Did you help provide information contained in those documents to the media? (N) |

## Test Details

032019klb Mazzola

Exam Date  3/20/2019

Examiner  Ken Butler

Report Date  12/20/2019

### Questions

| Questions | Lower limit | Result |
|---|---|---|
| R4 | | DI/SR |
| R5 | | DI/SR |
| R7 | | DI/SR |

## Analysis Parameters

| | | | |
|---|---|---|---|
| Prior probability | .5 | Cutscores | |
| Cut ratio | 1.0 | Total NSR/NDI | 3 |
| CI alpha SR/DI (1 tailed) | .05 | Total SR/DI | -3 |
| CI alpha NSR/NDI (1 tailed) | .05 | | |
| Pairwise Alpha (1 tailed) | .01 | Subtotal SR/DI | -7 |
| Alpha - Test of Proportions | .05 | | |

## Summary of Analysis

Recorded physiological data were evaluated with the Empirical Scoring System (ESS-M). The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classifier with a multinomial reference distribution. Bayesian analysis treats the parameter of interest (i.e., deception or truth-telling) as a probability value for which the test data, together with the prior probability, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of deception were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of deception using the Clopper-Pearson method and a one-tailed alpha = .05. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred statistically from the test data. A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

The categorical test result was parsed from the probabilistic result using two-stage decision rules. Two-stage rules are based on an assumption that the criterion variance of the test questions is non-independent, and make use of both the grand total and subtotal scores. The grand total score of -40 equaled or exceeded the required numerical cutscore (-3). These data produced a Bayes factor of 999. The posterior odds of deception was 999 to 1 for which the posterior probability was >.99. The lower limit of the 1-alpha Bayesian credible interval was 24.4 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 95% that the posterior odds of deception exceed the prior odds. These analytic results support the conclusion that there were SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

## ESS-M Scores

**Series 1, Chart 2**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | 0 | 1 |
| P2 | -1 | 0 | -1 |
| EDA | -2 | 2 | -2 |
| Cardio | -1 | 1 | -1 |
| PLE | -1 | 0 | -1 |

**Series 1, Chart 3**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | -1 | -1 |
| P2 | 0 | -1 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | 1 | 1 |
| PLE | 1 | 0 | 0 |

**Series 1, Chart 4**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | 0 | -1 | -1 |
| P2 | 1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | 1 |
| PLE | 0 | -1 | 0 |

**Series 1, Chart 5**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | 0 | 0 | 0 |
| P2 | -1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | -1 |
| PLE | 1 | 1 | 0 |

**Series 1, Chart 8**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | 0 | -1 |
| P2 | -1 | 0 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | 1 | -1 | -1 |
| PLE | 0 | 0 | 1 |

| | R4 | R5 | R7 |
|---|---|---|---|
| Sub-Totals | -15 | -10 | -15 |
| Grand Total | | -40 | |

## Lafayette Instrument Company
# Objective Scoring System - Version 3
### By Raymond Nelson, Mark Handler and Donald Krapohl (2007)

| | |
|---|---|
| Result | **Significant Reactions** |
| Description | **p-value: < 0.001 - Probability this result was produced by a truthful person** |
| Exam Type | Multi-facet (MGQT) |
| Scoring Method | OSS-3 Two-stage (Senter 2003) |
| Test of Proportions | None - No significant differences in artifact distribution |
| PF Name | 032019klb Mazzola |
| Report Date | Wednesday, December 11, 2019 |
| Subject | Leonard Mazzola |
| Examiner | Ken Butler |

### Spot Scores / Decision Alpha (1 tailed) / Components

Cumulative normal distribution (Barland 1985)

| ID | p-value | Result | Setting | Value | Component | Weight |
|---|---|---|---|---|---|---|
| R4 | < 0.001 | Significant Reactions | NSR | 0.050 | Pneumo | 0.19 |
| R5 | < 0.001 | Significant Reactions | SR | 0.050 | EDA | 0.53 |
| R7 | < 0.001 | Significant Reactions | Bonferroni corrected alpha | 0.017 | Cardio | 0.28 |
| | | | Test of Proportions (1 tailed) | 0.050 | | |

### Relevant Questions

| ID | Question Text | Answer |
|---|---|---|
| R4 | Did you provide any information contained in those documents to the media? | No |
| R5 | Do you know for sure, who provided information contained in those documents to the media? | No |
| R7 | Did you help provide information contained in those documents to the media? | No |

### Charts Scored

| Exam | Chart | Date | Time |
|---|---|---|---|
| 1 | 2 | 3/20/2019 | 1:40 PM |
| 1 | 3 | 3/20/2019 | 1:48 PM |
| 1 | 4 | 3/20/2019 | 1:58 PM |
| 1 | 5 | 3/20/2019 | 2:09 PM |
| 1 | 8 | 3/20/2019 | 2:21 PM |

### Remarks

## Measurements
(Kircher and Raskin 1988)

### Exam 1 Chart 2

|     | C3 | R4 | C6 | R5 | C8 | R7 |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 260 | 229 | 282 | 260 | 297 | 328 |
| P2  | 213 | 185 | 231 | 198 | 223 | 188 |
| EDA | 77  | 159 | 74  | 43  | 19  | 174 |
| Cardio | 24 | 141 | 86 | 67 | 12 | 54 |
| SE  | 39  | 30  | 52  | 38  | 43  | 37  |

### Exam 1 Chart 3

|     | C3 | R4 | C6 | R5 | C8 | R7 |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 361 | 240 | 341 | 258 | 313 | 201 |
| P2  | 278 | 165 | 296 | 189 | 240 | 151 |
| EDA | 40  | 88  | 49  | 53  | 14  | 71  |
| Cardio | 171 | 62 | 43 | 76 | 28 | 7 |
| SE  | 56  | 43  | 60  | 38  | 68  | 25  |

### Exam 1 Chart 4

|     | C3 | R4 | C6 | R5 | C8 | R7 |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 325 | 273 | 311 | 266 | 258 | 164 |
| P2  | 316 | 275 | 312 | 260 | 196 | 135 |
| EDA | 38  | 98  | 20  | 148 | 48  | 125 |
| Cardio | 43 | 94 | 29 | 83 | 58 | 41 |
| SE  | 63  | 56  | 49  | 57  | 48  | 34  |

### Exam 1 Chart 5

|     | C3 | R4 | C6 | R5 | C8 | R7 |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 389 | 363 | 425 | 392 | 453 | 377 |
| P2  | 247 | 204 | 254 | 224 | 283 | 215 |
| EDA | 34  | 161 | 8   | 110 | 28  | 121 |
| Cardio | 3 | 57 | 29 | 40 | 19 | 69 |
| SE  | 34  | 33  | 33  | 35  | 43  | 35  |

### Exam 1 Chart 8

|     | C3 | R4 | C6 | R5 | C8 | R7 |
|-----|-----|-----|-----|-----|-----|-----|
| P1  | 378 | 302 | 406 | 456 | 488 | 362 |
| P2  | 257 | 189 | 264 | 279 | 331 | 234 |
| EDA | 28  | 110 | 80  | 97  | 34  | 107 |
| Cardio | 9 | 63 | 92 | 109 | 133 | 113 |
| SE  | 26  | 28  | 44  | 31  | 46  | 39  |

## Standardized Lognormal Ratios

### Exam 1 Chart 2

|        | R4 | R5 | R7 |
|--------|-----|-----|-----|
| P      | -1.51 | -0.72 | 0.00 |
| EDA    | -2.03 | 0.59 | -2.21 |
| Cardio | -3.00 | -2.72 | -1.59 |
| WMean  | -2.20 | -0.59 | -1.61 |
| Mean   | | -1.47 | |

### Exam 1 Chart 3

|        | R4 | R5 | R7 |
|--------|-----|-----|-----|
| P      | -3.00 | -3.00 | -3.00 |
| EDA    | -1.85 | -0.83 | -1.42 |
| Cardio | 1.29 | 0.22 | 3.00 |
| WMean  | -1.19 | -0.95 | -0.48 |
| Mean   | | -0.88 | |

### Exam 1 Chart 4

|        | R4 | R5 | R7 |
|--------|-----|-----|-----|
| P      | 0.00 | -0.70 | -3.00 |
| EDA    | -2.01 | -2.83 | -2.49 |
| Cardio | -3.00 | -3.00 | 0.20 |
| WMean  | -1.90 | -2.47 | -1.84 |
| Mean   | | -2.07 | |

### Exam 1 Chart 5

|        | R4 | R5 | R7 |
|--------|-----|-----|-----|
| P      | -1.95 | -1.08 | -1.46 |
| EDA    | -3.00 | -3.00 | -3.00 |
| Cardio | -3.00 | -3.00 | -3.00 |
| WMean  | -2.80 | -2.63 | -2.70 |
| Mean   | | -2.71 | |

### Exam 1 Chart 8

|        | R4 | R5 | R7 |
|--------|-----|-----|-----|
| P      | -3.00 | 1.04 | -1.45 |
| EDA    | -1.65 | -1.40 | -1.60 |
| Cardio | 1.03 | -1.86 | -2.05 |
| WMean  | -1.16 | -1.06 | -1.69 |
| Mean   | | -1.30 | |

## Channel Contributions

| Component | Proportion | Area | Chart | Proportion | ID | Proportion |
|-----------|-----------|------|-------|-----------|----|-----------|
| Pneumo | 0.340 | 0.983 | Exam 1 Chart 2 | 0.201 | R4 | 0.339 |
| EDA | 0.335 | 0.109 | Exam 1 Chart 3 | 0.175 | R5 | 0.328 |
| Cardio | 0.325 | 0.447 | Exam 1 Chart 4 | 0.212 | R7 | 0.333 |
| | | | Exam 1 Chart 5 | 0.216 | | |
| | | | Exam 1 Chart 8 | 0.196 | | |

Note: Non-normal values

## Results

**Weighted Mean**

| -1.85 | -1.54 | -1.67 |
|-------|-------|-------|

**Grand Total Mean**

-1.69

EVANS/PTA010

032019klb Mazzola                                                                    Page 3 of 3

| **Advanced Options - OSS-3 v1.9** | |
|---|---|
| **General Scoring Settings** | |
| Delete all zero measurements | Yes |
| Zero Threshold value | 1 |
| Allow a single CQ to score result (not for DLST) | No |
| Replace missing values with mean values | No |
| Check Extreme Contributions | No |
| Allow SR Result when extreme contributions | Yes |
| **Alpha Values (one-tailed)** | |
| Kruskal-Wallis | 0.1 |
| Non-Significant Response (NSR) | 0.05 |
| Significant Response (SR) | 0.05 |
| **Test of Proportions** | |
| Test of Proportions alpha value (two-tailed) | 0.1 |
| Use Test of Proportions | Yes |
| Allow significant reaction result | Yes |
| Use all questions | No |
| Score neutral questions as control | No |
| **Multi-facet (MGQT)** | |
| Use Bonferroni | Yes |
| Use Kruskal-Wallis | No |
| Minimum number of useable presentations for RQs | 2 |
| **Measurement Periods** | |
| P1 | 15 |
| P2 | 15 |
| EDA | 15 |
| Cardio | 15 |
| All other | 15 |

EVANS/PTA011

**032019kib Mazzola - Examiner Score Sheet (Event-Specific)**     **Page 1**

|  | 1 | 2 | 3 | Totals |
|---|---|---|---|---|

## Information

| | |
|---|---|
| Examiner Name | Ken Butler |
| Final Result | DI |
| Date Scored | 12/20/2019 |
| Countermeasures | None Suspected |
| | |
| Decision Rule: | Two Stage Rule |
| Prior Probability: | 0.500000 |

### Series 1, Chart 2

| | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | 0 | -1 |
| P1 | -1 | 0 | +1 |
| EDA | -2 | +2 | -2 |
| Cardio | -1 | +1 | -1 |
| PLE | -1 | 0 | -1 |

### Series 1, Chart 3

| | R4 | R5 | R7 |
|---|---|---|---|
| P2 | 0 | -1 | 0 |
| P1 | -1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | +1 | +1 |
| PLE | +1 | 0 | 0 |

### Series 1, Chart 4

| | R4 | R5 | R7 |
|---|---|---|---|
| P2 | +1 | -1 | -1 |
| P1 | 0 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | +1 |
| PLE | 0 | -1 | 0 |

### Series 1, Chart 5

| | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | -1 | -1 |
| P1 | 0 | 0 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | -1 |
| PLE | +1 | +1 | 0 |

### Series 1, Chart 8

| | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | 0 | -1 |
| P1 | -1 | 0 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | +1 | -1 | -1 |

|  | 1 | 2 | 3 | Totals |
|---|---|---|---|---|
| PLE | 0 | 0 | +1 | |

**Results**

| | | | | Grand Total |
|---|---|---|---|---|
| Sub-Totals | -15 | -10 | -15 | -40 |

## General Information

Subject Name: Leonard Mazzola
Notes:

EVANS/PTA013

## Empirical Scoring System, Multinomial (ESS-M) Report

| | |
|---|---|
| **Examinee** | **Leonard Mazzola** |
| **Result** | **SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION** |
| **Posterior odds** | **243 to 1 odds of deception (>.99)** |
| Lower limit | 18.7 to 1 (.95, one tailed alpha = .05) |
| Prior odds | Deception 1 to 1 (.50)          Truth 1 to 1 (.50) |
| Bayes factor | 243 |
| Decision Rule | Two-Stage Rules |
| Test of Proportions | No significant differences in artifact distribution (p = .5) |

### Questions

| | |
|---|---|
| R4 | Did you provide any information contained in those documents to the media? (N) |
| R5 | Do you know for sure, who provided information contained in those documents to the media? (N) |
| R7 | Did you help provide information contained in those documents to the media? (N) |

### Test Details

032019klb Mazzola

| | |
|---|---|
| Exam Date | 3/20/2019 |
| Examiner | Ken Butler |
| Report Date | 12/20/2019 |

### Questions

| Questions | Lower limit | Result |
|---|---|---|
| R4 | | DI/SR |
| R5 | | DI/SR |
| R7 | | DI/SR |

### ESS-M Scores

**Series 1, Chart 2**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | 0 | 1 |
| P2 | -1 | 0 | -1 |
| EDA | -2 | 2 | -2 |
| Cardio | -1 | 1 | -1 |
| PLE | -1 | 0 | -1 |

**Series 1, Chart 3**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | -1 | -1 | -1 |
| P2 | 0 | -1 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | 1 | 1 |
| PLE | 1 | 0 | 0 |

**Series 1, Chart 4**

| | R4 | R5 | R7 |
|---|---|---|---|
| P1 | 0 | -1 | -1 |
| P2 | 1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | 1 |
| PLE | 0 | -1 | 0 |

| | R4 | R5 | R7 |
|---|---|---|---|
| Sub-Totals | -10 | -4 | -8 |
| Grand Total | | -22 | |

### Analysis Parameters

| | | | |
|---|---|---|---|
| Prior probability | .5 | Cutscores | |
| Cut ratio | 1.0 | Total NSR/NDI | 3 |
| CI alpha SR/DI (1 tailed) | .05 | Total SR/DI | -3 |
| CI alpha NSR/NDI (1 tailed) | .05 | | |
| Pairwise Alpha (1 tailed) | .01 | Subtotal SR/DI | -7 |
| Alpha - Test of Proportions | .05 | | |

### Summary of Analysis

Recorded physiological data were evaluated with the Empirical Scoring System (ESS-M). The ESS-M is an evidence-based, standardized protocol for polygraph test data analysis using a Bayesian classifier with a multinomial reference distribution. Bayesian analysis treats the parameter of interest (i.e., deception or truth-telling) as a probability value for which the test data, together with the prior odds, are a basis of information to calculate a posterior probability. The multinomial reference distribution is calculated from the analytic theory of the polygraph test - that greater changes in physiological activity are loaded at different types of test stimuli as a function of deception or truth-telling in response to relevant target stimuli. The reference distribution for this exam describes the probabilities associated with the numerical scores for all possible combinations of all possible test scores for all recording sensors.

These results were calculated using a prior probability of .50 for which the prior odds of deception were 1 to 1. A credible-interval (Bayesian confidence interval) was also calculated for the posterior odds of deception using the Clopper-Pearson method and a one-tailed alpha = .05. The credible-interval describes the variability of the analytic result by treating the test statistic (posterior odds) as a random variable for which the limits of the credible interval can be inferred statistically from the test data. A test result is statistically significant when the lower limit of the credible interval for the posterior odds has exceeded the greater value of the prior odds or the required minimum cut-ratio.

The categorical test result was parsed from the probabilistic result using two-stage decision rules. Two-stage rules are based on an assumption that the criterion variance of the test questions is non-independent, and make use of both the grand total and subtotal scores. The grand total score of -22 equaled or exceeded the required numerical cutscore (-3). These data produced a Bayes factor of 243. The posterior odds of deception was 243 to 1 for which the posterior probability was >.99. The lower limit of the 1-alpha Bayesian credible interval was 18.7 to 1, which exceeded the prior odds (1 to 1). This indicates a likelihood of 95% that the posterior odds of deception exceed the prior odds. These analytic results support the conclusion that there were SIGNIFICANT REACTIONS INDICATIVE OF DECEPTION in the loading of recorded changes in physiological activity in response to the relevant test stimuli during this examination.

**032019klb Mazzola - Examiner Score Sheet (Event-Specific)**                                    **Page 1**

|  | 1 | 2 | 3 | Totals |
|---|---|---|---|---|

## Information

| Examiner Name | Ken Butler |
|---|---|
| Final Result | DI |
| Date Scored | 12/17/2019 |
| Countermeasures | None Suspected |

| Decision Rule: | Auto Select |
|---|---|
| Prior Probability: | 0.500000 |

### Series 1, Chart 2

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | 0 | -1 |
| P1 | -1 | 0 | +1 |
| EDA | -2 | +2 | -2 |
| Cardio | -1 | +1 | -1 |
| PLE | -1 | 0 | -1 |

### Series 1, Chart 3

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | 0 | -1 | 0 |
| P1 | -1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | +1 | +1 |
| PLE | +1 | 0 | 0 |

### Series 1, Chart 4

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | +1 | -1 | -1 |
| P1 | 0 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | +1 |
| PLE | 0 | -1 | 0 |

### Results

|  |  |  |  | Grand Total |
|---|---|---|---|---|
| Sub-Totals | -10 | -4 | -8 | -22 |

## General Information

Subject Name: Leonard Mazzola
Notes:

## Lafayette Instrument Company

# Objective Scoring System - Version 3

### By Raymond Nelson, Mark Handler and Donald Krapohl (2007)

| | |
|---|---|
| Result | **Significant Reactions** |
| Description | **p-value: < 0.001 - Probability this result was produced by a truthful person** |
| Exam Type | Multi-facet (MGQT) |
| Scoring Method | OSS-3 Two-stage (Senter 2003) |
| Test of Proportions | None - No significant differences in artifact distribution |
| PF Name | 032019klb Mazzola |
| Report Date | Tuesday, December 17, 2019 |
| Subject | Leonard Mazzola |
| Examiner | Ken Butler |

### Spot Scores — Decision Alpha (1 tailed) — Components

Cumulative normal distribution (Barland 1985)

| ID | p-value | Result | Setting | Value | Component | Weight |
|---|---|---|---|---|---|---|
| R4 | < 0.001 | Significant Reactions | NSR | 0.050 | Pneumo | 0.19 |
| R5 | < 0.001 | Significant Reactions | SR | 0.050 | EDA | 0.53 |
| R7 | < 0.001 | Significant Reactions | Bonferroni corrected alpha | 0.017 | Cardio | 0.28 |
| | | | Test of Proportions (1 tailed) | 0.050 | | |

### Relevant Questions

| ID | Question Text | Answer |
|---|---|---|
| R4 | Did you provide any information contained in those documents to the media? | No |
| R5 | Do you know for sure, who provided information contained in those documents to the media? | No |
| R7 | Did you help provide information contained in those documents to the media? | No |

### Charts Scored

| Exam | Chart | Date | Time |
|---|---|---|---|
| 1 | 2 | 3/20/2019 | 1:40 PM |
| 1 | 3 | 3/20/2019 | 1:48 PM |
| 1 | 4 | 3/20/2019 | 1:58 PM |

### Remarks

032019klb Mazzola

## Measurements
(Kircher and Raskin 1988)

### Exam 1 Chart 2

|  | C3 | R4 | C6 | R5 | C8 | R7 |
|---|---|---|---|---|---|---|
| P1 | 260 | 229 | 282 | 260 | 297 | 328 |
| P2 | 213 | 185 | 231 | 198 | 223 | 188 |
| EDA | 77 | 159 | 74 | 43 | 19 | 174 |
| Cardio | 24 | 141 | 86 | 67 | 12 | 54 |
| SE | 39 | 30 | 52 | 38 | 43 | 37 |

### Exam 1 Chart 3

|  | C3 | R4 | C6 | R5 | C8 | R7 |
|---|---|---|---|---|---|---|
| P1 | 361 | 240 | 341 | 258 | 313 | 201 |
| P2 | 278 | 165 | 296 | 189 | 240 | 151 |
| EDA | 40 | 88 | 49 | 53 | 14 | 71 |
| Cardio | 171 | 62 | 43 | 76 | 28 | 7 |
| SE | 56 | 43 | 60 | 38 | 68 | 25 |

### Exam 1 Chart 4

|  | C3 | R4 | C6 | R5 | C8 | R7 |
|---|---|---|---|---|---|---|
| P1 | 325 | 273 | 311 | 266 | 258 | 164 |
| P2 | 316 | 275 | 312 | 260 | 196 | 135 |
| EDA | 38 | 98 | 20 | 148 | 48 | 125 |
| Cardio | 43 | 94 | 29 | 83 | 58 | 41 |
| SE | 63 | 56 | 49 | 57 | 48 | 34 |

## Standardized Lognormal Ratios

### Exam 1 Chart 2

|  | R4 | R5 | R7 |
|---|---|---|---|
| P | -1.51 | -0.72 | 0.00 |
| EDA | -2.03 | 0.59 | -2.21 |
| Cardio | -3.00 | -2.72 | -1.59 |
| WMean | -2.20 | -0.59 | -1.61 |
| Mean | | -1.47 | |

### Exam 1 Chart 3

|  | R4 | R5 | R7 |
|---|---|---|---|
| P | -3.00 | -3.00 | -3.00 |
| EDA | -1.85 | -0.83 | -1.42 |
| Cardio | 1.29 | 0.22 | 3.00 |
| WMean | -1.19 | -0.95 | -0.48 |
| Mean | | -0.88 | |

### Exam 1 Chart 4

|  | R4 | R5 | R7 |
|---|---|---|---|
| P | 0.00 | -0.70 | -3.00 |
| EDA | -2.01 | -2.83 | -2.49 |
| Cardio | -3.00 | -3.00 | 0.20 |
| WMean | -1.90 | -2.47 | -1.84 |
| Mean | | -2.07 | |

## Channel Contributions

| Component | Proportion | Area | Chart | Proportion | ID | Proportion |
|---|---|---|---|---|---|---|
| Pneumo | 0.346 | 0.986 | Exam 1 Chart 2 | 0.342 | R4 | 0.346 |
| EDA | 0.333 | 0.106 | Exam 1 Chart 3 | 0.298 | R5 | 0.328 |
| Cardio | 0.322 | 0.434 | Exam 1 Chart 4 | 0.361 | R7 | 0.326 |

Note: Non-normal values

## Results

Weighted Mean

| -1.76 | -1.34 | -1.31 |
|---|---|---|

Grand Total Mean

-1.47

(Without Visual Inspection)

**Advanced Options - OSS-3 v1.9**

**General Scoring Settings**

| | |
|---|---|
| Delete all zero measurements | Yes |
| Zero Threshold value | 1 |
| Allow a single CQ to score result (not for DLST) | No |
| Replace missing values with mean values | No |
| Check Extreme Contributions | No |
| Allow SR Result when extreme contributions | Yes |

**Alpha Values (one-tailed)**

| | |
|---|---|
| Kruskal-Wallis | 0.1 |
| Non-Significant Response (NSR) | 0.05 |
| Significant Response (SR) | 0.05 |

**Test of Proportions**

| | |
|---|---|
| Test of Proportions alpha value (two-tailed) | 0.1 |
| Use Test of Proportions | Yes |
| Allow significant reaction result | Yes |
| Use all questions | No |
| Score neutral questions as control | No |

**Multi-facet (MGQT)**

| | |
|---|---|
| Use Bonferroni | Yes |
| Use Kruskal-Wallis | No |
| Minimum number of useable presentations for RQs | 2 |

**Measurement Periods**

| | |
|---|---|
| P1 | 15 |
| P2 | 15 |
| EDA | 15 |
| Cardio | 15 |
| All other | 15 |

**Mazzola AFMGQT.lxq**                          12/9/2019                                    Page 1 of 1

| ID | ER | Text | Series Type: MGQT |
|----|----|------|--------------------|
| I1 | Y | Are the lights on in this room? | |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? | |
| C3 | N | In your entire life, did you ever tell even one lie? | |
| R4 | N | Did you provide any information contained in those documents to the media? | |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? | |
| C6 | N | In your entire life, did you ever violate a law? | |
| R7 | N | Did you help provide information contained in those documents to the media? | |
| C8 | N | In your entire life, did you ever do anything that was dishonest? | |
| XX | | Remain still. | |
| I1A | Y | Are you in the state of Ohio? | |
| I1B | Y | Are you now sitting down? | |

EVANS/PTA019

**032019klb Mazzola Series 1 Chart 1**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 1:24:40 PM  End: 1:28:25 PM  Duration: 03:45
Cuff Pressure Start: 74  End: 74
ACQT Known Solution (Rank Acquaintance)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.0 | 2.7 | 4.3 | --- | 4.3 | --- | 1.4 | 2.2 | --- |
| Recorded: End | 3.0 | 2.7 | 4.3 | --- | 4.3 | --- | 1.4 | 2.2 | --- |
| Printed: Start | 3.0 | 2.7 | 4.3 | --- | 4.3 | --- | 1.4 | 2.2 | --- |
| Printed: End | 3.0 | 2.7 | 4.3 | 4.3 | 4.3 | --- | 1.4 | 2.2 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402



EVANS/PTA021



EVANS/PTA022

032019klb Mazzola Series 1 Chart 1

EVANS/PTA023



032019klb Mazzola Series 1 Chart 1

03:40

EVANS/PTA024

**032019klb Mazzola Series 1 Chart 1**

| | | | Questions Asked |
| --- | --- | --- | --- |
| | | | Series Type: Rank Acquaintance |

| ID | | ER Text |
| --- | --- | --- |
| 1 | N | Did you write the number 1? |
| 2 | N | Did you write the number 2? |
| 3 | N | Did you write the number 3? |
| 4K | N | Did you write the number 4? |
| 5 | N | Did you write the number 5? |
| 6 | N | Did you write the number 6? |

EVANS/PTA025

**032019klb Mazzola Series 1 Chart 2**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 1:40:42 PM  End: 1:45:50 PM  Duration: 05:08
Cuff Pressure Start: 73  End: 74
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.0 | 3.2 | 5.8 | | | | | | |
| Recorded: End | 3.0 | 3.2 | 5.8 | | | | | | |
| Printed: Start | 3.0 | 3.2 | 5.8 | | | | | | |
| Printed: End | 3.0 | 3.2 | 5.8 | --- | 4.3 | --- | 1.4 | 3.4 | --- |
| Recorded Electrodermal: Automatic | | | | --- | 4.3 | --- | 1.4 | 3.4 | --- |
| Printed Electrodermal: Automatic | | | | --- | 4.3 | --- | 1.4 | 3.4 | --- |

11.8.0.402

EVANS/PTA026



00:10
00:20
00:30
00:40
00:50
01:00
01:10

EVANS/PTA027



EVANS/PTA028



032019klb Mazzola Series 1 Chart 2

Page 3 of 5

EVANS/PTA029



03/20/19klb Mazzola Series 1 Chart 2

EVANS/PTA030



032019klb Mazzola Series 1 Chart 2

EVANS/PTA031

**032019klb Mazzola Series 1 Chart 2**

Series Type: MGQT

| ID | ER | Text |
|----|-----|------|
| I1 | Y | Are the lights on in this room? |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? |
| C3 | N | In your entire life, did you ever tell even one lie? |
| R4 | N | Did you provide any information contained in those documents to the media? |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? |
| C6 | N | In your entire life, did you ever violate a law? |
| R7 | N | Did you help provide information contained in those documents to the media? |
| C8 | N | In your entire life, did you ever do anything that was dishonest? |

Questions Asked

Page 1

EVANS/PTA032

**032019klb Mazzola Series 1 Chart 3**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 1:48:42 PM   End: 1:54:26 PM
Cuff Pressure Start: 71  End: 68
Mazzola AFMGQT (MGQT)                  Duration: 05:44

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.4 | --- | 4.3 | --- | 1.4 | 3.2 | --- |
| Recorded: End | 3.7 | 3.2 | 6.4 | --- | 4.3 | --- | 1.4 | 3.2 | --- |
| Printed: Start | 3.7 | 3.2 | 6.4 | --- | 4.3 | --- | 1.4 | 3.2 | --- |
| Printed: End | 3.7 | 3.2 | 6.4 | --- | 4.3 | --- | 1.4 | 3.2 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402

EVANS/PTA033

EVANS/PTA034

EVANS/PTA035

032019klb Mazzola Series 1 Chart 3

02:30
02:40
02:50
03:00
03:10
03:20
03:30

adjust

EVANS/PTA036

EVANS/PTA037



03020l9klb Mazzola Series 1 Chart 3

EVANS/PTA038

**032019klb Mazzola Series 1 Chart 3**

Series Type: MGQT

Questions Asked

| ID | ER | Text |
|----|----|------|
| I1 | Y | Are the lights on in this room? |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? |
| C6 | N | In your entire life, did you ever violate a law? |
| R4 | N | Did you provide any information contained in those documents to the media? |
| C8 | N | In your entire life, did you ever do anything that was dishonest? |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? |
| R7 | N | Did you help provide information contained in those documents to the media? |
| C3 | N | In your entire life, did you ever tell even one lie? |

EVANS/PTA039

**032019klb Mazzola Series 1 Chart 4**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 1:58:08 PM   End: 2:03:38 PM   Duration: 05:30
Cuff Pressure Start: 75  End: 72
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.4 | 3.8 | --- |
| Recorded: End | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.4 | 3.8 | --- |
| Printed: Start | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.4 | 3.8 | --- |
| Printed: End | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.4 | 3.8 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402

EVANS/PTA040



03201 9kib Mazzola Series 1 Chart 4

EVANS/PTA041

EVANS/PTA042

EVANS/PTA043



032019klb Mazzola Series 1 Chart 4

EVANS/PTA044



032019ktb Mazzola Series 1 Chart 4

EVANS/PTA045

**032019klb Mazzola Series 1 Chart 4**

Series Type: MGQT

Page 1

| ID | ER | Text | Questions Asked |
|----|----|----|----|
| I1 | Y | Are the lights on in this room? | |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? | |
| C8 | N | In your entire life, did you ever do anything that was dishonest? | |
| R7 | N | Did you help provide information contained in those documents to the media? | |
| R4 | N | Did you provide any information contained in those documents to the media? | |
| C3 | N | In your entire life, did you ever tell even one lie? | |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? | |
| C6 | N | In your entire life, did you ever violate a law? | |

**032019klb Mazzola Series 1 Chart 5**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 2:09:00 PM   End: 2:13:58 PM
Cuff Pressure Start: 76  End: 72   Duration: 04:58
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Recorded: End | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: Start | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: End | 3.7 | 3.2 | 6.4 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Recorded Electrodermal: Automatic |
| Printed Electrodermal: Automatic |

11.8.0.402

EVANS/PTA047

EVANS/PTA048

032019klb Mazzola Series 1 Chart 5

01:20

01:30

01:40

DB 01:50

02:00

02:10

02:20

Page 2 of 5

EVANS/PTA049

EVANS/PTA050

032019klb Mazzola Series 1 Chart 5

03:40

03:50

04:00

04:10

04:20

04:30

04:40

EVANS/PTA051



03201 9klb Mazzola Series 1 Chart 5

EVANS/PTA052

**032019klb Mazzola Series 1 Chart 5**

Series Type: MGQT

Page 1

| ID | ER Text | Questions Asked |
|---|---|---|
| I1 | Y | Are the lights on in this room? |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? |
| C8 | N | In your entire life, did you ever do anything that was dishonest? |
| R7 | N | Did you help provide information contained in those documents to the media? |
| C3 | N | In your entire life, did you ever tell even one lie? |
| R4 | N | Did you provide any information contained in those documents to the media? |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? |
| C6 | N | In your entire life, did you ever violate a law? |

**03209klb Mazzola Series 1 Chart 6**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 2:15:37 PM   End: 2:18:13 PM   Duration: 02:36
Cuff Pressure Start: 76  End: 0
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Recorded: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402

EVANS/PTA054



EVANS/PTA055

032019klb Mazzola Series 1 Chart 6

01:20

SR2

01:30

01:40

01:50

02:00

02:10

02:20

EVANS/PTA056



032019klb Mazzola Series 1 Chart 6

EVANS/PTA057

**03019klb Mazzola Series 1 Chart 6**

Series Type: MGQT

| ID | ER | Text | Questions Asked |
|----|----|------|-----------------|
| I1 | Y | Are the lights on in this room? | |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? | |
| C6 | N | In your entire life, did you ever violate a law? | |

EVANS/PTA058

**032019klb Mazzola Series 1 Chart 7**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 2:20:01 PM   End: 2:20:28 PM   Duration: 00:27
Cuff Pressure Start: 74  End: 5
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Recorded: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |
| Printed: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.0 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402

EVANS/PTA059

032019klb Mazzola Series 1 Chart 7

00:10

00:20



EVANS/PTA060

**032019klb Mazzola Series 1 Chart 8**
Subject: Leonard Mazzola
Examiner: Ken Butler
Date: 3/20/2019 View Size: Normal
Time Start: 2:21:42 PM   End: 2:27:26 PM   Duration: 05:44
Cuff Pressure Start: 74   End: 81
Mazzola AFMGQT (MGQT)

| Gain Settings: | CA | P1 | P2 | FE | SE | AR | EA | PL | AU |
|---|---|---|---|---|---|---|---|---|---|
| Recorded: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.5 | --- |
| Recorded: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.5 | --- |
| Printed: Start | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.5 | --- |
| Printed: End | 3.7 | 3.2 | 6.6 | --- | 4.7 | --- | 1.7 | 4.5 | --- |

Recorded Electrodermal: Automatic
Printed Electrodermal: Automatic

11.8.0.402

EVANS/PTA061

032019ktb Mazzola Series 1 Chart 8

EVANS/PTA062



EVANS/PTA063

032019klb Mazzola Series 1 Chart 8

02:30

02:40

02:50

03:00

03:10

03:20

03:30

Page 3 of 5

EVANS/PTA064

03:40

03:50

03:00

04:10

04:20

04:30

04:40

EVANS/PTA065

03019Kib **Mazzola** Series 1 Chart 8

04.50

05.00

05.10

05.20

05.30

05.40

EVANS/PTA066

**032019kib Mazzola Series 1 Chart 8**

Series Type: MGQT

| ID | ER | Text | Questions Asked |
|---|---|---|---|
| I1 | Y | Are the lights on in this room? | |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? | |
| C3 | N | In your entire life, did you ever tell even one lie? | |
| R4 | N | Did you provide any information contained in those documents to the media? | |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? | |
| C6 | N | In your entire life, did you ever violate a law? | |
| R7 | N | Did you help provide information contained in those documents to the media? | |
| C8 | N | In your entire life, did you ever do anything that was dishonest? | |

Page 1

EVANS/PTA067

| zola AFMGQT.lxq | 9/9/2019 | Page 1 of 1 |
|---|---|---|

| | ER Text | Series Type: MGQT |
|---|---|---|
| | Y | Are the lights on in this room? |
| SR2 | Y | Regarding the internal document information that was provided to the media, do you intend to answer each question truthfully? |
| C3 | N | In your entire life, did you ever tell even one lie? |
| R4 | N | Did you provide any information contained in those documents to the media? |
| R5 | N | Do you know for sure, who provided information contained in those documents to the media? |
| C6 | N | In your entire life, did you ever violate a law? |
| R7 | N | Did you help provide information contained in those documents to the media? |
| C8 | N | In your entire life, did you ever do anything that was dishonest? |
| XX | | Remain still. |
| I1A | Y | Are you in the state of Ohio? |
| I1B | Y | Are you now sitting down? |

NOTE : No WRITTEN REPORT OF INVESTIGATION OR POLYGRAPH WAS EVER GENERATED BY EVANS, BUTLER, POLY·TECH ASSOC., INC ; 3 PAGES OF THIS DOCUMENT IS GENERATED ONLY PURSUANT TO THE EMAIL REQUEST BY ATTY WM DOYLE ON 9-8-19  8:26 PM

WD Evans II
9-9-19

EVANS/PTA068
1 OF 3

032019klb Mazzola - Examiner Score Sheet (MGQT)                                               **Page 1**

|   | 1 | 2 | 3 |
|---|---|---|---|

### Information

| Examiner Name | Ken Butler |
|---|---|
| Final Result | DI |
| Date Scored | 3/20/2019 |
| Countermeasures | None Suspected |

| Decision Rule: | Auto Select |
|---|---|
| Prior Probability: | 0.500000 |

### Series 1, Chart 2

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | 0 | -1 |
| P1 | -1 | 0 | +1 |
| EDA | -2 | +2 | -2 |
| Cardio | -1 | +1 | -1 |
| PLE | -1 | 0 | -1 |

### Series 1, Chart 3

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | 0 | -1 | 0 |
| P1 | -1 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | +1 | +1 |
| PLE | +1 | 0 | 0 |

### Series 1, Chart 4

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | +1 | -1 | -1 |
| P1 | 0 | -1 | -1 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | +1 |
| PLE | 0 | -1 | 0 |

### Series 1, Chart 5

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | -1 | -1 |
| P1 | 0 | 0 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | -1 | -1 | -1 |
| PLE | +1 | +1 | 0 |

### Series 1, Chart 8

|  | R4 | R5 | R7 |
|---|---|---|---|
| P2 | -1 | 0 | -1 |
| P1 | -1 | 0 | 0 |
| EDA | -2 | -2 | -2 |
| Cardio | +1 | -1 | -1 |

2 of 3



| | 1 | 2 | 3 | |
|---|---|---|---|---|
| PLE | 0 | 0 | +1 | |

**Results**

| | 1 | 2 | 3 |
|---|---|---|---|
| Sub-Totals | -15 | -10 | -15 |
| Question Results | | | |

## General Information

Subject Name: Leonard Mazzola
Notes:

Did you provide ANY INFORMATION ~~CONCERNING~~ CONTAINED IN THOSE DOCUMENTS TO THE MEDIA?

Do you KNOW for SURE who provided information ~~CONCERNING~~ CONTAINED IN THOSE DOCUMENTS TO the MEDIA?

Did you help provide information ~~CONCERNING~~ CONTAINED IN those DOCUMENTS to the MEDIA?

D/L: LIE, violate LAW, SHARE SOMETHING TOLD in confidence, Dishonest, TALK About someone behind their back.

EVANS/PTA071

Name LEONARD MAZZ⬤    Ni⬤    Date 3-20-19

1. Where were you born?    What is the date of your birth?

2. Father living   (When die, M remarry)   What do (did)   Where live
   Last saw   How get along with Father:  As child   As adult

3. Mother living   (When die, F remarry)   What do (did)   Where live
   Last saw   How get along with Mother:  As child   As adult
   Living with F   Both raised U   (If not, who  How get along with)
   Anyone else help raise you   (Who  How get along with)

4. How many brothers   How many sisters   Your placement within family

5. Married  #  Exact date   (Ever: Married, Engaged, Have steady girl)
   What does wife do   Ever separated   (#,    Now,    Last)
   First yr how she get along with U   How does she get along with U now

   Any daughters   How many   Any sons   How many   Where live
   Favorite D's name   Why         Favorite S's name   Why
   How now get along with D's   How now get along with S's
   How does wife get along with:  D's   S's
   (If divorced, when last see:  D's   S's)

6. How many U support   Help anyone else   Who   Anyone helps U   Who

7. What do U do   How long   $/week   Take home pay   Think pay   Think job

8. How are in school
   Hi school (college) grad, aren't you?  Where (Major) specialized trainin
      BA Kent criminal justice

9. Military   What branch   Highest rank   Exact dates   Overseas
      No
   Awards or honors   What did U do   # of times busted   Type discharge

10. Last arrested   Why   # of juvenile   # of adult   Most serious ever
    Ever B4 for this   Ever B4 Q for this   When last in:  Jail   Court

EVANS/PTA072

11. When last to doct●● for nerves or hypertensi●● (What medication)
    *YES* .    *OFF AND ON*
    When last have tranquilizer (Details)  Last mental treatment

    ~~Last medicine or drug~~ (Details)  ~~Past 24 hrs how much: Alcohol Beer Wine~~
    *CURRENT PRESCRIPTION MEDICATION?*          *TAKING AS PROCRIBED?*
    When most to drink past 7 days  What  Why  What do U average each day
               *NO*                                *NO*

12. Anything physical wrong past **2** yrs  What  When  last to Dr.  Why
                            *NO*
    How physical condition right now /Hrs. sleep last nite /Average/night
          *Good*                               *5*                *2*
    Last time: Unconscious, In hospital  Why  How long in hospital
              *YES 4/T fall 87*                          *DC*
    Ever have: Ulcers  Heart condition  Emphysema  Asthma  Lung problem
              *NO*   /        *NO*     /        *NO*/    *NO*
    Diabetes  Epilepsy  Blackouts  When last in fight  HMTD  Why  Outcome
     *NO*                            *NO*

13. When last have b.p. taken  Ever low or high  ((Describe how tell))
              *JAN · 19*                  *GOOD*
    Last feel faint when got up fast  Last got buzz/ring due to high b.p.
    *EVERY NOW & THEN* .   *CAN'T RECALL LAST TIME*
    (Last kept awake at nite Buzz/Ring  How often get  Now have buzz/ring)

    (How long last  What sound like  Burning sensation  Pain neck)


14. # of loans & debts over $100  How many does your <u>wife</u> have over $100

    Who Owed to  Amount  What For  How far behind  Worry about

15. Favorite hobby or pastime  Favorite organization U belong to

    Best thing ever happen to U ·  Worst thing  Favorite animal

    (Animal dislike most  What one best way U use to get rid of)

    (How many times  Last time  What else did you do to disliked animal)

    Entire life: Respect most  Like most  Greatest ambition: Ever  Now

    How has society treated U  Does it hurt you to lie  Ever falsely accused

16. When child have religous training  What  Who took  Go now  Last

17. How feel towards this test  ~~Why are you taking it~~
       *PART of PROCESS . FORCED TO TAKE IT.*
18. What else do you think I should know about U which might help me

EVANS/PTA073

032019klb Mazzola - Examiner Score Sheet (MGQT)                                    Page 1

|   | 1 | 2 | 3 |
|---|---|---|---|

## Information

| | |
|---|---|
| Examiner Name | Ken Butler |
| Final Result | DI |
| Date Scored | 3/20/2019 |
| Countermeasures | None Suspected |
| | |
| Decision Rule: | Auto Select |
| Prior Probability: | 0.500000 |

### Series 1, Chart 2

|       | R4  | R5  | R7  |
|-------|-----|-----|-----|
| P2    | -1  | 0   | -1  |
| P1    | -1  | 0   | +1  |
| EDA   | -2  | +2  | -2  |
| Cardio| -1  | +1  | -1  |
| PLE   | -1  | 0   | -1  |
|       | -5  | +3  | -4  |

### Series 1, Chart 3

|       | R4  | R5  | R7  |
|-------|-----|-----|-----|
| P2    | 0   | -1  | 0   |
| P1    | -1  | -1  | -1  |
| EDA   | -2  | -2  | -2  |
| Cardio| -1  | +1  | +1  |
| PLE   | +1  | 0   | 0   |
|       | -3  | -2  | -2  |

### Series 1, Chart 4

|       | R4  | R5  | R7  |
|-------|-----|-----|-----|
| P2    | +1  | -1  | -1  |
| P1    | 0   | -1  | -1  |
| EDA   | -2  | -2  | -2  |
| Cardio| -1  | -1  | +1  |
| PLE   | 0   | -1  | 0   |
|       | -2  | -5  | -2  |

-10   -10   -8     -22
        -4

### Series 1, Chart 5

|       | R4  | R5  | R7  |
|-------|-----|-----|-----|
| P2    | -1  | -1  | -1  |
| P1    | 0   | 0   | 0   |
| EDA   | -2  | -2  | -2  |
| Cardio| -1  | -1  | -1  |
| PLE   | +1  | +1  | 0   |

### Series 1, Chart 8

|       | R4  | R5  | R7  |
|-------|-----|-----|-----|
| P2    | -1  | 0   | -1  |
| P1    | -1  | 0   | 0   |
| EDA   | -2  | -2  | -2  |
| Cardio| +1  | -1  | -1  |

| | 1 | 2 | 3 |
|---|---|---|---|
| PLE | 0 | 0 | +1 |

**Results**

| Sub-Totals | -15 | -10 | -15 |
|---|---|---|---|
| Question Results | | | |

## General Information

Subject Name: Leonard Mazzola
Notes:

EVANS/PTA075

# FAULKNER, HOFFMAN & PHILLIPS, LLC

ATTORNEYS AT LAW

SARA A. LIVA
DIRECT: 216.453.0587
MAIN: 216.781.3600
FAX: 216.781.8839
liva@fhplaw.com

March 19, 2019

**Sent via email (evans@polytechassoc.com and billevanslaw@sbcglobal.net)**
William D. Evans
Poly-Tech Associates Inc.
1185 South Main Street
Akron, OH 44301

**RE:    Polygraph of Lt. Leonard Mazzola Independence Police Department**

Dear Mr. Evans,

As you know, this law firm is legal counsel for the Fraternal Order of Police Lodge 67 ("Union" or "FOP"). It has come to my attention that you have been selected to perform a polygraph examination of Lieutenant Leonard Mazzola of the Independence Police Department. Please be informed that I am Lieutenant Mazzola's legal and union representative and that he has exercised his right to Union representation at all investigatory interviews regarding this matter. As you may know, certain requirements must be met in order to avoid violations of Chapter 4117 of the Ohio Revised Code as well as the terms of the Collective Bargaining Agreement ("CBA") between the City of Independence and the FOP.

Please review the following in preparing for Lieutenant Mazzola's polygraph examination, scheduled to take place on March 20, 2019 at 10:00 AM:

1.    Lieutenant Mazzola has been ordered to submit to this test by representatives of his employer, the City of Independence. He is not submitting to this test voluntarily, but is doing so under threat of disciplinary action if he refuses. Therefore, he will not sign any statement that suggests, in any way, that this is a voluntary test.

2.    While Lieutenant Mazzola maintains that he has committed no violation of state or federal law, he hereby invokes the protections of *Garrity v. New Jersey,* 385 U.S. 493 (1967) and no part of the test results may ever be used against him in any criminal investigation or prosecution.

3.    You must agree to keep the test results confidential and refrain from disclosing those results to anyone not authorized to receive them.

---

**One International Place** · 20445 Emerald Parkway Dr., Suite 210 · Cleveland, OH 44135-6029

FAULKNER, HOFFMAN
& PHILLIPS, LLC
ATTORNEYS AT LAW

William D. Evans
March 19, 2019
Page **2** of **2**

3.    Lieutenant Mazzola must not be required to waive his right to sue and will not sign any release, general or specific, which would waive his right to bring legal action against you or Poly-Tech Associates Inc., should he have any cause to do so under state or federal law.

4.    It is our understanding that the results of this test could potentially lead to disciplinary action against Lieutenant Mazzola. Under Ohio Revised Code § 4117.03(A) and under Article 13.01 of the CBA, Lieutenant Mazzola has a right the presence of a Union representative at any investigatory interview that could result in disciplinary action. His right to representation includes representation during the entire investigatory interview, regardless of where or how the interview is conducted. Moreover, under the terms of the CBA, said representative must not be a person who is subject to interrogation as a result of the incident out of which the investigation arose. If you have an objection to my presence in the room during the polygraph test, or any portion thereof, please inform me immediately so that we may discuss the matter.

5.    As Lieutenant Mazzola's legal and union representative, I will determine when and how such representation is necessary.  Please do not presume to instruct me to remain silent.

6.    Any explanations or descriptions of the testing process should be kept as brief as possible and should limited to only that information required for Lieutenant Mazzola to comply with the requirements of the test.

If you have any questions or comments, please do not hesitate in contact me.

Sincerely yours,

FAULKNER, HOFFMAN & PHILLIPS, LLC, by

Sara A. Liva

SAL:ms

cc:    Lt. Leonard Mazzola, FOP 67
       Lt. Chuck Wilson, FOP 67
       Robert M. Phillips, Esq.

EVANS/PTA077

EVANS & LIVA DISCUSSED ABOVE letter POINT BY POINT ON 3/19/19 Around 4:15 PM.

**Bill Evans**

| | |
|---|---|
| **From:** | Sara Liva <liva@fhplaw.com> |
| **Sent:** | Tuesday, March 19, 2019 11:39 AM |
| **To:** | Bill Evans; billevanslaw@sbcglobal.net |
| **Cc:** | Robert Phillips |
| **Subject:** | Questions for Lt. Mazzola |

Dear Mr. Evans,

Please provide me with a copy of the questions you intend to ask Lt. Lenny Mazzola during tomorrow's testing.

Thank you,

**Sara A. Liva, Esq.**
FAULKNER, HOFFMAN & PHILLIPS, LLC
20445 Emerald Parkway Drive, Ste. 210
Cleveland, Ohio 44135-6029
Direct Dial: 216.453.0587.
Phone: 216.781.3600. Ext. 3587
Fax: 216.781.8839.
liva@fhplaw.com

*The information contained in this email is attorney-client privileged and the confidential information is intended only for the use of the individual or entity named above.  If the reader of this message is not the intended recipient, or the employee or agent responsible to deliver it to the intended recipient, you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited.  If you have received this communication in error, please notify us immediately by telephone, and return the original message to us at the above address via the U.S. Postal Service.*

1

EVANS/PTA078

**POLY-TECH ASSOCIATES, INC.**

**Invoice**

1185 S. Main Street
Akron, Ohio 44301
PH (330) 434-2344

PAID
05/20/2019

| DATE | INVOICE # |
|------|-----------|
| 5/8/2019 | 10746 |

**BILL TO**

Att: Gregory J. O'Brien
Law Director
City of Independence
6800 Brecksville Road
Independence, OH 44131-5045

| DESCRIPTION | AMOUNT |
|-------------|--------|
| PLEASE REMIT THE SUM OF $850.00 FOR SCHEDULED SPECIFIC ISSUE COMPUTERIZED POLYGRAPH TESTING CONDUCTED: | |
| | |
| March 20, 2019 in Akron, OH | |
| Specific Issue Polygraph Testing Conducted On LT. LEONARD MAZZOLA | 850.00 |
| | |
| (Investigation) | |
| Summit Cty. Sales Tax | 0.00 |

| | | |
|---|---|---|
| DUE UPON RECEIPT. PLEASE INDICATE OUR INVOICE NUMBER ON REMITTANCE. THANK YOU. Tax Id:34-1353021 | **Total** | **$850.00** |

EVANS/PTA079

## Michael Kilbane

| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Thursday, March 07, 2019 01:55 PM |
| **To:** | Leonard Mazzola |
| **Subject:** | administrative investigation |

The city has retained an outside firm to conduct an administrative investigation into potential violations of city policies.  If you are in receipt of this email you will be required to be present for an interview on Wednesday, March 13 at the below listed time.  These interviews will take place in the council caucus room at City Hall.  You are required to answer all questions completely and honestly and assist investigators with any information they request.  If you fail or refuse to forthrightly answer any and all questions asked you may be subject to disciplinary action up to and including termination of employment with the City of Independence.

You are further ordered not to discuss any aspect of this administrative investigation with anyone other than your department head or chief, attorney or designated union representative (if applicable).  A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

If you are in a bargaining unit covered by a collective bargaining agreement which provides for presence of a union representative, it is your responsibility to make arrangements for such representation if you so desire.  Sufficient advanced notice is being provided and no interviews will be delayed or rescheduled.

If you have any questions regarding these proceedings please address them directly with your department head or chief.


Employee:  Leonard Mazzola

Interview time: 1200

EVANS/PTA080



Independence Police

# Memo

**To:**   Sgt. JT Kurtz

**From:**   Lt. Mazzola

**cc:**   Chief Kilbane

**Date:**   August 8, 2018

**Re:**   Productivity

---

Sgt. Kurtz,

As Sergeant of your shift, you are responsible for the productivity of your shift.  Year over year productivity has significantly declined.  Immediate action is required.  As Sergeant you will need to meet with each one of your officers on your shift, and identify officers performing below acceptable levels of productivity.  You shall immediately implement an action plan to reverse the declining trend.

Please be sure your officers are properly trained in the use of tools required to enforce our ordinances as well as procedures and efficiency in completing E tickets.  Performance should be monitored and documented on a daily basis until the problem has been resolved.

Patrol officers work 14 shifts a month; traffic enforcement range should include at least 2-3 traffic enforcement actions per shift.  If this cannot be accomplished, then officers will need to complete daily activity logs accounting for each hour of work, to address any time management issues.

Officers assigned to special units and details must understand that their assignment is in addition to patrol duties.  Production from these officers is expected, albeit at a reduced rate, in patrol activities and enforcement.

I have a deadline of 08/14/2018, therefore this needs to be immediately implemented.  Please have your action plan in place immediately.


Lt. Mazzola

EVANS/PTA081



**Independence Police**

# Memo

| | |
|---|---|
| **To:** | Sgt. JT Kurtz |
| **From:** | Lt. Mazzola |
| **cc:** | Chief Kilbane |
| **Date:** | August 8, 2018 |
| **Re:** | Productivity |

Sgt. Kurtz,

As Sergeant of your shift, you are responsible for the productivity of your shift.  Year over year productivity has significantly declined.  Immediate action is required.  As Sergeant you will need to meet with each one of your officers on your shift, and identify officers performing below acceptable levels of productivity.  You shall immediately implement an action plan to reverse the declining trend.

Please be sure your officers are properly trained in the use of tools required to enforce our ordinances as well as procedures and efficiency in completing E tickets.  Performance should be monitored and documented on a daily basis until the problem has been resolved.

Patrol officers work 14 shifts a month; traffic enforcement range should include at least 2-3 traffic enforcement actions per shift.  If this cannot be accomplished, then officers will need to complete daily activity logs accounting for each hour of work, to address any time management issues.

Officers assigned to special units and details must understand that their assignment is in addition to patrol duties.  Production from these officers is expected, albeit at a reduced rate, in patrol activities and enforcement.

I have a deadline of 08/14/2018, therefore this needs to be immediately implemented.  Please have your action plan in place immediately.

Lt. Mazzola

*[signature]*

EVANS/PTA082

 

**Michael Kilbane**

**From:** Michael Kilbane
**Sent:** Tuesday, September 18, 2018 10:06 AM
**To:** Police Patrol
**Subject:** officer activity

Patrol:

It has come to my attention that there have been rumors circulating regarding expectations for patrol officers, so I wanted to be clear about what is driving the discussion.

In July of this year I was asked by the Mayor why our number of traffic citations had declined from the previous year - through June we were down almost 200 tickets over the same period last year. In August he contacted me again to ask why the totals had declined even further over the month of July. I assured him that we would investigate our productivity and take steps to address any issues immediately.

Below are the comparisons year to year for the January through July time period (01-01-2017 to 08-03-2017 vs. 01-01-2018 to 08-03-2018):

|                      | 2017  | 2018 | Difference |
|----------------------|-------|------|------------|
| Traffic Stops        | 4071  | 3476 | (595)      |
| Misdemeanor Arrests  | 239   | 211  | (28)       |
| Felony Arrests       | 42    | 33   | (9)        |
| Warrant Arrests      | 91    | 87   | (4)        |
| Parking Cites        | 55    | 21   | (34)       |
| Traffic Cites        | 2042  | 1711 | (331)      |
| OVI                  | 23    | 24   | 1          |
| Enforcement Services | 6571  | 5578 | (993)      |
| MVA Reports          | 282   | 266  | (16)       |
| Incident Reports     | 457   | 407  | (50)       |
| Calls for Service    | 11889 | 9805 | (2084)     |

Lieutenant Mazzola and I have reviewed both individual officer and aggregate division performance at length, and there is no question our results are down. Staffing levels ebb and flow as officers retire, get promoted, are assigned away from patrol etc., but even with the slight reduction in total hours worked, our call volume and activity levels do not justify such a drastic reduction in productivity. When we identify deficiencies, we need to address them ASAP.

Lieutenant Mazzola has the responsibility for setting and maintaining performance expectations to ensure that both department-wide and individual productivity is attained, and he does so with my full support and backing. He will work with your sergeants to monitor performance and make adjustments when necessary. If anyone thinks that these expectations are unreasonable or unfair, after discussing it with your sergeant and Lieutenant Mazzola, please come see me.

From my experience, I know that we have it very good here, with great pay, flexibility, time off, strong administrative and community support and a reasonable workload. I appreciate your dedication to our community and look forward to your achieving strong results.

EVANS/PTA083

## Michael Kilbane



| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Tuesday, September 18, 2018 10:06 AM |
| **To:** | Police Patrol |
| **Subject:** | officer activity |

Patrol:

It has come to my attention that there have been rumors circulating regarding expectations for patrol officers, so I wanted to be clear about what is driving the discussion.

In July of this year I was asked by the Mayor why our number of traffic citations had declined from the previous year - through June we were down almost 200 tickets over the same period last year.  In August he contacted me again to ask why the totals had declined even further over the month of July.  I assured him that we would investigate our productivity and take steps to address any issues immediately.

Below are the comparisons year to year for the January through July time period (01-01-2017 to 08-03-2017 vs. 01-01-2018 to 08-03-2018):

| | 2017 | 2018 | Difference |
|---|---|---|---|
| Traffic Stops | 4071 | 3476 | (595) |
| Misdemeanor Arrests | 239 | 211 | (28) |
| Felony Arrests | 42 | 33 | (9) |
| Warrant Arrests | 91 | 87 | (4) |
| Parking Cites | 55 | 21 | (34) |
| Traffic Cites | 2042 | 1711 | (331) |
| OVI | 23 | 24 | 1 |
| Enforcement Services | 6571 | 5578 | (993) |
| MVA Reports | 282 | 266 | (16) |
| Incident Reports | 457 | 407 | (50) |
| Calls for Service | 11889 | 9805 | (2084) |

Lieutenant Mazzola and I have reviewed both individual officer and aggregate division performance at length, and there is no question our results are down.  Staffing levels ebb and flow as officers retire, get promoted, are assigned away from patrol etc., but even with the slight reduction in total hours worked, our call volume and activity levels do not justify such a drastic reduction in productivity. When we identify deficiencies, we need to address them ASAP.

Lieutenant Mazzola has the responsibility for setting and maintaining performance expectations to ensure that both department-wide and individual productivity is attained, and he does so with my full support and backing.  He will work with your sergeants to monitor performance and make adjustments when necessary.  If anyone thinks that these expectations are unreasonable or unfair, after discussing it with your sergeant and Lieutenant Mazzola, please come see me.

From my experience, I know that we have it very good here, with great pay, flexibility, time off, strong administrative and community support and a reasonable workload.  I appreciate your dedication to our community and look forward to your achieving strong results.

EVANS/PTA084

Sincerely,

Chief Kilbane

EVANS/PTA085



*3*

# City of Independence, Ohio

### "THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

### Police Department
**(216) 524-1234**
**FAX (216) 328-0110**

**To:**     Ptl. Brian Dalton

**From:**   Lt. Len Mazzola

**CC:**     Chief Michael Kilbane

**Date:**   01/07/2019

**Re:**     Performance Standard 10/01/18-12/31/18

---

Ptl. Dalton,

I have completed calculating the numbers for the 10/01/18-12/31/18 Performance Standard reporting period.  During this period you wrote 20 citations.  The Performance Standard outlined via email delivered to all Patrol, stated that each officer would be responsible to have a minimum of 10 citations per month, thus a total of 30 for each quarterly reporting period.

You have failed to comply with this directive issued.  Per Chief Kilbane, this letter serves as a written reprimand to document the situation.  Failure to meet acceptable Performance Standard numbers going forward will result in progressively more severe discipline.  All other members of the Patrol division have met the Performance Standard for this reporting period.

Please sign below acknowledging receipt of this written reprimand.

Ptl. Brian Dalton        *REFUSED No Just Cause!*
*I Have Threatened And Am Signing This Under Duress!*
Please let me know if there is anything I can do to help moving forward to avoid any issues.

Lt. Len Mazzola

1

EVANS/PTA086

*3*

# *City of Independence, Ohio*
## "THE HEART OF CUYAHOGA COUNTY"
6800 BRECKSVILLE ROAD                INDEPENDENCE, OHIO 44131

## Police Department
(216) 524-1234
FAX (216) 328-0110

**To:**     Ptl. Brian Dalton

**From:**   Lt. Len Mazzola

**CC:**     Chief Michael Kilbane

**Date:**   01/07/2019

**Re:**     Performance Standard 10/01/18-12/31/18

---

Ptl. Dalton,

I have completed calculating the numbers for the 10/01/18-12/31/18 Performance Standard reporting period.  During this period you wrote 20 citations.  The Performance Standard outlined via email delivered to all Patrol, stated that each officer would be responsible to have a minimum of 10 citations per month, thus a total of 30 for each quarterly reporting period.

You have failed to comply with this directive issued.  Per Chief Kilbane, this letter serves as a written reprimand to document the situation.  Failure to meet acceptable Performance Standard numbers going forward will result in progressively more severe discipline.  All other members of the Patrol division have met the Performance Standard for this reporting period.

Please sign below acknowledging receipt of this written reprimand.

Ptl. Brian Dalton     REFUSED  No Just Cause!
I Have Threatened And Am Signing This Under Duress!
Please let me know if there is anything I can do to help moving forward to avoid any issues.

Lt. Len Mazzola

1

EVANS/PTA087

# City of Independence, Ohio

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

---

## Police Department
### (216) 524-1234
### FAX (216) 328-0110

**To:**   Lieutenant Mazzola

**From:**  Chief Kilbane

**CC:**   H.R. Director Linker

8/19/18  **Date:**  ~~9-14-2018~~ ~~8/29/18~~  

**Re:**   Pre-disciplinary Hearing

---

Lt. Mazzola:

On August 6, 2018 I issued a written directive instructing you to complete several specific actions. These actions are necessary to address identified performance deficiencies within the patrol division that is under your command. As of this date I believe you have failed to comply with several of the assigned tasks. Please be present on Tuesday, September 4th at 9:00 A.M. for a pre-disciplinary meeting in the Chief's office as required under the terms of your collective bargaining agreement. You are entitled to representation at this meeting under the terms of your collective bargaining agreement.

You may voluntarily waive your right to a pre-disciplinary hearing if you choose to do so by signing the attached waiver and having it witnessed.

This meeting will provide the opportunity for you to respond to alleged violations of the following departmental orders:

GENERAL ORDER: 502 Uniform Standards of Conduct

12. Displaying Competent Performance and Achieving Competent Performance Results.

16. Insubordination

17. Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions

Please consult your union representative if you have any questions regarding these proceedings.

Chief Michael J. Kilbane

1

# City of Independence, Ohio

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD           INDEPENDENCE, OHIO 44131

## Police Department
### (216) 524-1234
### FAX (216) 328-0110

**To:** Lieutenant Mazzola

**From:** Chief Kilbane

**CC:** H.R. Director Linker

**Date:** ~~04/21/2019~~ 8/29/18

8/19/18

**Re:** Pre-disciplinary Hearing

Lt. Mazzola:

On August 6, 2018 I issued a written directive instructing you to complete several specific actions. These actions are necessary to address identified performance deficiencies within the patrol division that is under your command. As of this date I believe you have failed to comply with several of the assigned tasks. Please be present on Tuesday, September 4th at 9:00 A.M. for a pre-disciplinary meeting in the Chief's office as required under the terms of your collective bargaining agreement. You are entitled to representation at this meeting under the terms of your collective bargaining agreement.

You may voluntarily waive your right to a pre-disciplinary hearing if you choose to do so by signing the attached waiver and having it witnessed.

This meeting will provide the opportunity for you to respond to alleged violations of the following departmental orders:

GENERAL ORDER: 502 Uniform Standards of Conduct

12. Displaying Competent Performance and Achieving Competent Performance Results.

16. Insubordination

17. Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions

Please consult your union representative if you have any questions regarding these proceedings.

Chief Michael J. Kilbane

1

EVANS/PTA089

**Michael Kilbane**

| | |
|---|---|
| **From:** | Gallek, Ed <egallek@fox8.com> |
| **Sent:** | Monday, January 14, 2019 11:08 AM |
| **To:** | Michael Kilbane |
| **Subject:** | discipline requests |



I am requesting the pre-disciplinary and disciplinary paperwork for:

Lt. Mazzola—process started last August for Achieving Competent Performance Results, Insubordination, Knowing .. ..All Directives, Rues, Policies, Procedures, Practices, and Traditions

Officer Brian Dalton—filed recently concerning number of traffic stops/tickets written.

I am also requesting any other discipline for any other supervisors or patrol officers issued since last August regarding traffic stops/tickets written.

I am also requesting any grievances filed for any of these disciplinary issues or policies concerning the number of traffic stops/tickets written/performance expectations.

Thanks
Ed Gallek
FOX 8
216-403-3727

EVANS/PTA090

**Michael Kilbane**

| | |
|---|---|
| **From:** | Gallek, Ed <egallek@fox8.com> |
| **Sent:** | Monday, January 14, 2019 11:08 AM |
| **To:** | Michael Kilbane |
| **Subject:** | discipline requests |



I am requesting the pre-disciplinary and disciplinary paperwork for:

Lt. Mazzola—process started last August for Achieving Competent Performance Results, Insubordination, Knowing .. ..All Directives, Rues, Policies, Procedures, Practices, and Traditions

Officer Brian Dalton—filed recently concerning number of traffic stops/tickets written.

I am also requesting any other discipline for any other supervisors or patrol officers issued since last August regarding traffic stops/tickets written.

I am also requesting any grievances filed for any of these disciplinary issues or policies concerning the number of traffic stops/tickets written/performance expectations.

Thanks
Ed Gallek
FOX 8
216-403-3727

1

# I-Team: Counting traffic tickets in busy Northeast Ohio suburb

Posted 6:33 pm, January 14, 2019, by Ed Gallek

https://fox8.com/2019/01/14/i-team-counting-traffic-tickets-in-busy-northeast-ohio-suburb/

INDEPENDENCE, Ohio - The FOX 8 I-Team is investigating if some police officers are feeling pressured to write more traffic tickets in a suburb many of you pass through every day.

We're asking questions about what we found in Independence.

A police memo shows a "…Productivity Standard…Patrol Officers shall meet or exceed 10 traffic citations/month."

Another memo refers to "…at least 2-3 traffic enforcement actions per shift." Those can include warnings or crash investigation and more, not just tickets.

Drivers such as Yolanda Hamilton reacted, saying, "It is troublesome because then it puts pressure on the officers that they feel obligated that they have to pull people over."

The I-Team went to Independence Police Chief Michael Kilbane. He argues, officers do not face random quotas. He says more traffic enforcement means more safety, and he wants patrol officers held to an equal standard.

We asked about one officer given a written warning.

Chief Kilbane said, "For not performing to the standards that we expect of our officers. It means all of the other officers are carrying an unfair share of the burden. You're getting paid to do a job. It's reasonable to expect a certain performance level for that pay.'

So, what led to this? The I-Team has learned talk about it began in the police department months ago. Documents show the chief said he had been questioned by the mayor about why the number of traffic tickets had gone down by hundreds.

We also asked the chief, if the mayor is saying numbers are down, and you're telling officers to step it up, is that more about safety or numbers? He responded, "If you pick that number and cherry-pick 'em, you can make that argument."

Maclane Nugent, another driver, said, "I don't think there should be quota for something like that."

The Independence mayor did not return a message.

We've learned the officer given a warning has filed a grievance, an appeal. We've requested a copy of that, and we're watching to see how that gets handled.

INDEPENDENCE, Ohio - The FOX 8 I-Team is investigating if some police officers are feeling pressured to write more traffic tickets in a suburb many of you pass through every day.

We're asking questions about what we found in Independence.

A police memo shows a "…Productivity Standard…Patrol Officers shall meet or exceed 10 traffic citations/month."

Another memo refers to "…at least 2-3 traffic enforcement actions per shift." Those can include warnings or crash investigation and more, not just tickets.

EVANS/PTA093

7  5A

INDEPENDENCE, Ohio – The FOX 8 I-Team is investigating if some police officers are feeling pressured to write more traffic tickets in a suburb many of you pass through every day.

We're asking questions about what we found in Independence.

A police memo shows a "…Productivity Standard…Patrol Officers shall meet or exceed 10 traffic citations/month."

Another memo refers to "…at least 2-3 traffic enforcement actions per shift." Those can include warnings or crash investigation and more, not just tickets.

# I-Team: Counting traffic tickets in busy Northeast Ohio suburb

Posted 6:33 pm, January 14, 2019, by Ed Gallek

https://fox8.com/2019/01/14/i-team-counting-traffic-tickets-in-busy-northeast-ohio-suburb/

INDEPENDENCE, Ohio - The FOX 8 I-Team is investigating if some police officers are feeling pressured to write more traffic tickets in a suburb many of you pass through every day.

We're asking questions about what we found in Independence.

A police memo shows a "...Productivity Standard...Patrol Officers shall meet or exceed 10 traffic citations/month."

Another memo refers to "...at least 2-3 traffic enforcement actions per shift." Those can include warnings or crash investigation and more, not just tickets.

Drivers such as Yolanda Hamilton reacted, saying, "It is troublesome because then it puts pressure on the officers that they feel obligated that they have to pull people over."

The I-Team went to Independence Police Chief Michael Kilbane. He argues, officers do not face random quotas. He says more traffic enforcement means more safety, and he wants patrol officers held to an equal standard.

We asked about one officer given a written warning.

Chief Kilbane said, "For not performing to the standards that we expect of our officers. It means all of the other officers are carrying an unfair share of the burden. You're getting paid to do a job. It's reasonable to expect a certain performance level for that pay.'

So, what led to this? The I-Team has learned talk about it began in the police department months ago. Documents show the chief said he had been questioned by the mayor about why the number of traffic tickets had gone down by hundreds.

We also asked the chief, if the mayor is saying numbers are down, and you're telling officers to step it up, is that more about safety or numbers? He responded, "If you pick that number and cherry-pick 'em, you can make that argument."

Maclane Nugent, another driver, said, "I don't think there should be quota for something like that."

The Independence mayor did not return a message.

We've learned the officer given a warning has filed a grievance, an appeal. We've requested a copy of that, and we're watching to see how that gets handled.

EVANS/PTA095

⑦   5B

## Leonard Mazzola

| | |
|---|---|
| om: | Leonard Mazzola |
| ⸰ent: | Tuesday, September 25, 2018 04:11 PM |
| To: | Police; Dispatchers |
| Cc: | Data Entry |
| Subject: | Performance Standard |

Patrol,

Effective 10/01/2018,

Over the last month, I have had multiple conversations with Chief Kilbane, concerning Patrol Productivity, discussed at length was traffic citations totals.

After much discussion, it has been decided by the Chief of Police, that I now implement, monitor and manage a Performance Standard for all the officers in the Patrol Division. This Performance Standard will include everything from effective policing to performance and productivity.

The Patrol Sergeants will have a significant role in monitoring their individual shifts' compliance with the Performance Standard.

Chief Kilbane has set a minimum Performance Standard of approximately 3000 traffic citations/year for Patrol ⁀s a whole, this figure includes Overtime Traffic Details. To obtain this goal, approximately 2000 tickets need be written on shift, and approximately 1000 tickets need to be written on Overtime Traffic Details.

We have a total of 18 Full Time Patrolman in our Patrol Division, Monthly breakdown is 2000/18/12 = 9.26;

To meet this Productivity Standard, Patrol Officers shall meet or exceed 10 traffic citations/month.

This Productivity Standard is independent of time off, special assignment, and OIC assignment.

To ensure this Performance Standard is met, I will be running quarterly reports on officers to ensure compliance, this way an officer with extended time off or assignment will have sufficient time to meet the Productivity Standard without unreasonable demand. The first reporting period will be the last quarter of 2018, Oct18-Dec18.

It is also understood that each Patrol Shift is different in the amount and types of traffic they may encounter daily and that your first responsibility is to protect and serve the public; however this does include traffic enforcement. We will not in any way reduce our level of service, professionalism, or officer safety to meet our Performance Standard.

Please keep in mind that the Performance Standard set by the Chief is not unattainable and can be met.

I have been directed to report any Officer failing to meet their Performance Standard to their Sergeant & Chief Kilbane.

This is a new procedure for us, so no doubt there will be items to work out, I understand, and will do the best I can to operate Patrol as efficiently as possible.

1

With our transition to Chagrin Valley Dispatch, Officers **MUST log into Sun~~device~~ on vehicle computers!  Dispatchers & Sergeants need to coordinate info to ensure ALL officers are logged in!**

Officers failing to comply with this computer procedure will be subject to discipline.  This email will be considered and reviewed in any discipline process.  If your computer is not functioning, please report the problem to IT and/or Lt. Kroeger immediately.

Officers assigned to camera cars **MUST use cameras within accordance to our policy!**  Officers failing to comply with this camera procedure will be subject to discipline.  This email will be considered and reviewed in any discipline process.  If your camera is not functioning, please report the problem to Ptl. Pacl and/or Lt. Kroeger immediately.

Lt. Mazzola

Patrol Commander

2

⑦          5B

**Leonard Mazzola**

| | |
|---|---|
| om: | Leonard Mazzola |
| ~ent: | Tuesday, September 25, 2018 04:11 PM |
| To: | Police; Dispatchers |
| Cc: | Data Entry |
| Subject: | Performance Standard |

Patrol,

Effective 10/01/2018,

Over the last month, I have had multiple conversations with Chief Kilbane, concerning Patrol Productivity, discussed at length was traffic citations totals.

After much discussion, it has been decided by the Chief of Police, that I now implement, monitor and manage a Performance Standard for all the officers in the Patrol Division. This Performance Standard will include everything from effective policing to performance and productivity.

The Patrol Sergeants will have a significant role in monitoring their individual shifts' compliance with the Performance Standard.

Chief Kilbane has set a minimum Performance Standard of approximately 3000 traffic citations/year for Patrol ~s a whole, this figure includes Overtime Traffic Details. To obtain this goal, approximately 2000 tickets need to be written on shift, and approximately 1000 tickets need to be written on Overtime Traffic Details.

We have a total of 18 Full Time Patrolman in our Patrol Division, Monthly breakdown is 2000/18/12 = 9.26;

To meet this Productivity Standard, Patrol Officers shall meet or exceed 10 traffic citations/month.

This Productivity Standard is independent of time off, special assignment, and OIC assignment.

To ensure this Performance Standard is met, I will be running quarterly reports on officers to ensure compliance. this way an officer with extended time off or assignment will have sufficient time to meet the Productivity Standard without unreasonable demand. The first reporting period will be the last quarter of 2018, Oct18-Dec18.

It is also understood that each Patrol Shift is different in the amount and types of traffic they may encounter daily and that your first responsibility is to protect and serve the public; however this does include traffic enforcement. We will not in any way reduce our level of service, professionalism, or officer safety to meet our Performance Standard.

Please keep in mind that the Performance Standard set by the Chief is not unattainable and can be met.

I have been directed to report any Officer failing to meet their Performance Standard to their Sergeant & Chief Kilbane.

This is a new procedure for us, so no doubt there will be items to work out. I understand, and will do the best I can to operate Patrol as efficiently as possible.

1

EVANS/PTA098

**Bill Evans**



| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Friday, March 08, 2019 11:40 AM |
| **To:** | Bill Evans |
| **Subject:** | Dalton reprimand |
| **Attachments:** | BD Reprimand.pdf |

Bill,

Attached is the reprimand to Officer Dalton that was requested by the reporter.  This reprimand was written by Lt. Mazzola, printed out and given directly to Patrolman Dalton.  It was not disseminated electronically and the only people who possessed it were Lt. Mazzola, Patrolman Dalton and myself after it was presented to Dalton for his signature.  I also included the ORC section below that addresses accessing a computer system beyond the scope of authority, it is an F5.

Please let me know if you need anything else.

Thanks,

Chief Mike Kilbane

# 2913.04 Unauthorized use of property - computer, cable, or telecommunication property.

(A) No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.

(B) No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

(C) Except as permitted under section 5503.101 of the Revised Code, no person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.

1

EVANS/PTA099

**Bill Evans**



| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Friday, March 08, 2019 11:40 AM |
| **To:** | Bill Evans |
| **Subject:** | Dalton reprimand |
| **Attachments:** | BD Reprimand.pdf |

Bill,

Attached is the reprimand to Officer Dalton that was requested by the reporter. This reprimand was written by Lt. Mazzola, printed out and given directly to Patrolman Dalton. It was not disseminated electronically and the only people who possessed it were Lt. Mazzola, Patrolman Dalton and myself after it was presented to Dalton for his signature. I also included the ORC section below that addresses accessing a computer system beyond the scope of authority, it is an F5.

Please let me know if you need anything else.

Thanks,

Chief Mike Kilbane

# 2913.04 Unauthorized use of property - computer, cable, or telecommunication property.

(A) No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.

(B) No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

(C) Except as permitted under section 5503.101 of the Revised Code, no person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.

1

EVANS/PTA100

6

**Bill Evans**
_____

| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Friday, March 08, 2019 11:40 AM |
| **To:** | Bill Evans |
| **Subject:** | Dalton reprimand |
| **Attachments:** | BD Reprimand.pdf |



Bill,

Attached is the reprimand to Officer Dalton that was requested by the reporter.  This reprimand was written by Lt. Mazzola, printed out and given directly to Patrolman Dalton.  It was not disseminated electronically and the only people who possessed it were Lt. Mazzola, Patrolman Dalton and myself after it was presented to Dalton for his signature.  I also included the ORC section below that addresses accessing a computer system beyond the scope of authority, it is an F5.

Please let me know if you need anything else.

Thanks,

Chief Mike Kilbane

# 2913.04 Unauthorized use of property - computer, cable, or telecommunication property.

(A) No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.

(B) No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

(C) Except as permitted under section 5503.101 of the Revised Code, no person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.

EVANS/PTA101

## ACTIVITY LOG

Case: _____

| DATE/TIME | ACTIVITY | TIME |
|---|---|---|
| 3-22-19 | 1⁰⁰ call ∄ Mike Esposito to brief him about _____ | .6 |
| 3-22-19 | 13⁰ call-in to 216 524·1562 teleconference with | 1.5 |
| | Mayor Togliatti, Chief Kilbane Law Dir. Greg O'Brien | |
| | Ha Lititia Lincoln, Mike Esposito | |
| 3/25/19 | Follow-up w/Chief btre 5³⁰ pm | .3 |
| 3/26/19 | call to Greg O'Brien @ W-9 etc . | |
| ~~3/40~~ | Rafter payments @ a new Firm. | |
| 9-9-19 | Sent to Wm Doyle (pursuant to 9/8/19 request) the following by Wm Doyle. | |
| | ① Our release Form | |
| | ② Chief's order to Firo Poly. | |
| | ③ Phegro test Qs | |
| | ④ Argonthing or test results by Butter. | |
| | ⑤ Polygrap Tutorial | |
| | ⑥ Law office Invoices of 5/27/19 | |
| | ⑦ 4389.24 payment by city | |
| | ⑧ 5,000 retainer | |
| | ⑨ 350 pmyt to PTI + Invoice | |
| | ⑩ complaint for professional services.  copies/ | .8 |
| | call to Doyle 9-7-19 | .2 |
| | call to D. Yoho to see if he wants the | |
| | report generated by computer or Polygra Results. | |
| 6/18/19 | T/c w/ Law Director @ invoice | |

## ACTIVITY LOG

Case: *Independence*

| DATE/TIME | ACTIVITY | TIME |
|---|---|---|
| 1/31/19 | Mtg here w/ Cp.   0  216 - 524 - 1234   2hrs | 2.0 |
| 2/3/19 | Rcvd info from Cp. Kilbane | |
| 2/13/19 | Called Greg O'BRIEN.  left mssg + Read reviewed file | .8 |
| " | T/C w/ Greg | |
| " | email Contract for Atty Svcs. to Greg O'Brien (Law Dir) | |
| ~~3-5-19~~ | ~~Mtg at PTI w/ Chief~~ ~~& Ms Linkov~~ | |
| 3-5-19 | prepared for meeting  read File (completely) | 1.0 |
| 3-5 | Mtg  3⁰⁰ 445  Chief + Linkov | 1.7 |
| 3-5-19 | T/C w/ Chief Kilbane | .5 |
| 3-13-19 | left home at 5⁴⁵ am  Back Home at 6¹⁵ pm   PLUS FLIGHT | 13.5 |
| 3-14-19 | Wrote Mike Esposito 2x's; re w/ Kaye @ 1ˢᵗ Amendmt issue | .5 |
| | Both say no problem but petitioner would do a motion. | |
| 3-15-19 | T/C w/ Chief Kilbane | .2 |
| 3-17-19 | Contacted Ken Buttler @ Execs for Poly | .5 |
| 3-18.19 | Confirmed w/ Chief Kilbane that Mazzola is sch'd for | .1  R |
| | interview (Bill) on 3-20-19 @ 10 & Poly w/Ken @ noon | |
| | (copy of email from Chief to Mazzola re 3-20 appt | |
| | Rec'd.) | .1 |
| 3-18-19 | T/C w/ Chief + Linkov | 1.1 |
| 3-19-19 | Confirm mtg w/ Buttler.; prepare Qods for interview etc | 2.5 |
| 3-20-19 | 9 am to ~~prep~~ polygraph   pre polygraph interview | 9=5 5⁰⁰ pm |
| | by Ewis ✓ | |
| | polygraph          T/C w/ chief @ the memo provided | |
| | by Mazzola (email from Mazzola to Dispatcher + | |
| | Patrol) Chief said he did not know of the content until | |
| | the day of Mazzola's interview on 3-13-19 when Mazzola | |
| | provided it to Ewis and compared the content of it | |
| | to Chuck's request for Documents under PRR | |
| | Mazzola was claiming the Chief withheld the same from | |
| | Dunn for a purpose of some kind + "make | |
| | Mazzola and make it look like he was involved." | |
| | Mazzola's reason seemed Unclear. Mazzola also | |
| | claimed the options of releasing his pro-d to redact | |
| | were 1 Chief 2 PAR 3 Chuck Wilson 4 Bob Phillips Atty 5 | |
| | the Bus Hub 6 someone got into his 3" blue binder when | |
| | it was left alone in his office -- copied or photo'd | |
| | the pre-d and Daton's write up and left the office; | |
| | Mazzola re affirmed that he did not copy his pre-d | |
| | unless it was PDF'd to Wilson and or Phillips. Mazzola | |
| | says he kept his original + showed me the bi-fold | |
| | original stating it was left in an envelope by the | |
| | Chief on his keyboard at his desk in his office. | |
| | Lenny is the only one who raised again the performance | |
| | standards. | |
| | - T/C w/chief at 8⁰⁰ pm chief says no one was notified but Lenny | |
| | re the PRE-D of personnel or info @ Lenny's pro-d | |

# William D. Evans, II, Co., L.P.A.
### Attorney at Law

## CONTRACT FOR PROFESSIONAL SERVICES

I/We, _Greg O'Brien, City _____/Title/Position, on

behalf of the City of Independence, Ohio and the Division of Police and Law Department

("Client"), request that William D. Evans, II, Co., LPA be engaged to perform an Internal Affairs

and/or workplace investigation involving a matter of unauthorized disclosure of departmental

information, and the Client engages Mr. Evans to exercise the attorney/client privileges that are

inherent in such relationship so as to protect and ensure the confidential nature of such

information derived during such investigative work.  In order to ensure such relationship, the

Client agrees to provide William D. Evans, II, Co., LPA an initial retainer totaling $5,000. _total not to exceed $7000.0_

Client agrees to pay William D. Evans, II his legal hourly rate of $275 (portal to portal –

if/when travel is required) from inception (1/31/2019), through the end of the case, or ancillary

involvement as noted below.[1]  The hourly fee will be deducted from the retainer supplied

beginning on the first day of engagement being January 31, 2019.

Client further understands that any and all pertinent expenses will be paid, or reimbursed

by the City through the aforementioned retainer and/or paid through invoice, including but not

limited to utilization of authorized employees or outside contractors of William D. Evans, II, Co.,

LPA including auxiliary expenses and/or fees that are enumerated below, including but not

limited to expenses such as mileage (State ratio 54.5¢/mile), meals, lodging, telephone expenses,

transcription fees, stenographer fees, copy costs, photographer expenses, miscellaneous

investigative expenses, out of pocket expenses associated with said case and any other legitimate

expenses associated with the retained investigative work.  No expense expenditures over $250

will be made without the written consent of the Law Director.  It is agreed that Attorney Evans

---

[1] Client agrees to pay Mr. Evans' time and expense into the future for unforeseen reasons such as, but not limited to, any required deposition(s), court appearance(s), along with any other ancillary time necessary for furtherance of the case, as in defense of any adverse action resulting in legal filing(s), and/or retaliatory action(s) emanating from any investigated City employee(s) resulting from, or in connection with this internal affairs/workplace investigation. Should Mr. Evans or his company become a deponent, witness or defendant, as a result of any matter involving the investigation relating to this investigation, Mr. Evans will be entitled to reimbursement for his time and expenses under the aforementioned terms of this agreement as if the investigation were on-going; this provision also applies in the event that Mr. Evans is for any reason named as the City's co-defendant, witness, deponent, or in any other capacity relevant to the objectives under which Attorney Evans has been retained.  This section will not apply if Mr. Evans and/or his company, employees, agents have acted in a negligent or reckless manner.

1185 S. Main Street • Akron, Ohio 44301-1322 • (330) 434-4050 • Fax (330) 434-4611 • billevanslaw@sbcglobal.net
3973 Massillon Road • Uniontown, Ohio 44685 • (330) 896-2500 • Fax (330) 434-4611 • billevanslaw@sbcglobal.net

EVANS/PTA104

may engage other staff members within his organizational structure, at a rate of $145/hour, to assist him on this investigative endeavor so as to judiciously, economically and expeditiously further the collection of information; all such ancillary work will be reviewed by Attorney Evans for purposes of this Attorney/Client relationship.

William D. Evans II, Attorney at Law, reserves the right to withdraw as counsel or investigator if he determines that there is no adequate basis for proceeding with the case, or for any other unspecified reason. The City may terminate this Contract upon notice to William D Evans II at any time.

It is agreed that any ancillary costs and expenses associated with the investigation will be paid or advanced, due to any litigation, grievance, or other formal process which Mr. Evans may be drawn into, as a result of this undertaking on behalf of the City of Independence except to the extent that Mr. Evans, his company, employees and agents act in a negligent or reckless manner in pursuing the investigation.

It is agreed that such engagement and work is protected by the attorney/client relationship and any work product emanating therefrom is privileged communication.

Any effort to protect such privilege will be the responsibility of the City of Independence and such expense(s) will be borne by the Client and shall inure to the benefit of William D. Evans. II and his law office, as an individual in his personal and/or corporate capacity.

Date  **2-26-19**

Anthony L. Togliatti, Mayor

Date **/-/-19**

William D. Evans, II
Attorney at Law
William D. Evans, II, Co., LPA

Approved as to form:

Gregory J. O'Brien
Law Director

Evans and/or his company, employees, agents have acted in a negligent or reckless manner.
24351145.2

- Lt. MAZZOLA          0 YRS. all 40 AM-8? SHIFTS
                                        4 SGTS   a evite SHIFT
- HR Director                    4/5 patrolmen.
                                          MIKE ⟶
- Law Director

                    ( SHANE BATES )

- Public Records

    Ed Gallick shows up   indepndence Hts District
    Lt. got Discipline for not

- Mayoris Court

1  Policy @ RECORDS  Process  approved by Lennea Clerk &
                                              Lt. Kroger.
2        PIO ⟶       predin inquiries go the PIO.   No record made.
          Chief

SHIFT
① Ptr. BRIAN DALTON —
② Ray PATTE PALL
③ Bates sgt John KURTZ

|            |       | Time                    |
|------------|-------|-------------------------|
| 1-31-19    | 2.0   | service hours provided  |
| 2-13-19    | .08   |                         |
| 3-5-19     | 1.0   |                         |
| 3-5-19     | 1.7   |                         |
| 3-12-19    | .5    |                         |
| 3-13-19    | 13.5  | + Miles                 |
| 3-14-19    | .5    |                         |
| 3-13-19    | .2    |                         |
| 3-15-19    | .5    |                         |
| 3-18-19    | .1    |                         |
| 3-18-19    | 1.1   |                         |
| 3-19-19    | 2.5   |                         |
| 3-20-19    | 8.0   |                         |
| 3-22-19    | .6    |                         |
| 3-22-19    | 1.5   |                         |

34.5
27.5

9 × 87.50

850 ⁰⁰ Polygraph.

EVANS/PTA107

3-22-19

IDEA's

The D no Electronic copies & paper & printed
of Unused I
→ Him

Same w/ Dayton

2/27/19 several guys were deficient. Leung was he ruled a
point system not just ticket but needed to meet
traffic metrics

Leung went to mayor & printed point system &
told mayor Chief was ok w/ points
class was uniform @ A 1 car accident left
a sgt off on DUI from another city
DUB records request from Amwell for that
accident.

In Duty as her chief → all info had to go thru chain of Command.

one March 7th/8 after retiring Evans

- 5 officers went Instructed to cooperate w/ Evans

3/11/19 A fire dept (interview) approached Mrs that Leung had
info that would bury Mayor

GAHER requested Poly who for after polygraph.

FLSA

3/19/19 mtg, w/Leon                    T/C Chief
                                        /C Staff

Per Chief

→     IF IT comes out B.4 test, it
will be treated less harshly

→     IF IT comes out after it will
be dealt with much more severely.

○ THE major issue is the release of info in your
  memo

/✓○

/✓○

*Story online by Fox w/ video - Cutlek*

5A

INDEPENDENCE, Ohio - The FOX 8 I-Team is investigating if some police officers are feeling pressured to write more traffic tickets in a suburb many of you pass through every day.

We're asking questions about what we found in Independence.

A police memo shows a "…Productivity Standard…Patrol Officers shall meet or exceed 10 traffic citations/month."

Another memo refers to "…at least 2-3 traffic enforcement actions per shift." Those can include warnings or crash investigation and more, not just tickets.

▷ *from Mazzola memo provided in interview*

▷ *in Dayton - JT Kurtz document #1 to*

**Michael Kilbane**

| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Thursday, March 07, 2019 01:55 PM |
| **To:** | Leonard Mazzola |
| **Subject:** | administrative investigation |

The city has retained an outside firm to conduct an administrative investigation into potential violations of city policies. If you are in receipt of this email you will be required to be present for an interview on Wednesday, March 13 at the below listed time. These interviews will take place in the council caucus room at City Hall. You are required to answer all questions completely and honestly and assist investigators with any information they request. If you fail or refuse to forthrightly answer any and all questions asked you may be subject to disciplinary action up to and including termination of employment with the City of Independence.

You are further ordered not to discuss any aspect of this administrative investigation with anyone other than your department head or chief, attorney or designated union representative (if applicable). A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

If you are in a bargaining unit covered by a collective bargaining agreement which provides for presence of a union representative, it is your responsibility to make arrangements for such representation if you so desire. Sufficient advanced notice is being provided and no interviews will be delayed or rescheduled.

If you have any questions regarding these proceedings please address them directly with your department head or chief.


Employee: Leonard Mazzola

Interview time: 1200

EVANS/PTA111

3/18/19  1.15
LNTITIA / CHIEF

2/08ᵗʰ/19 Lenny brought up case that
the police officer will deal
a few days prior is
A PRR from Struck

- IN w/ Mayor discussing previous
staff

outline to cover documents —

1 - Chief  }
2 - Chuck  }  PRE. D.
3 - Lititia }

• DALTON, closely held - Regiment
  Regiment
            — No one knows is but
              Lenny.
              —

**Bill Evans**

| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Saturday, March 16, 2019 8:42 AM |
| **To:** | Leonard Mazzola |
| **Subject:** | administrative investigation |

The city has retained an outside firm to conduct an administrative investigation into potential violations of city policies. This firm has determined that follow up interviews are required.  If you are in receipt of this email you will be required to be present for an interview on Wednesday, March 20 at the below listed time.  These interviews will take place at the offices of William D. Evans, 1185 South Main Street, Akron, Ohio 44301.  You are required to answer all questions completely and honestly and assist investigators with any information they request.  If you fail or refuse to forthrightly answer any and all questions asked you may be subject to disciplinary action up to and including termination of employment with the City of Independence.

If you are directed to take a polygraph as part of this investigation you are ordered to submit to a polygraph examination as directed and without delay. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

You are further ordered not to discuss any aspect of this administrative investigation with anyone other than your department head or chief, attorney or designated union representative (if applicable).  A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

If you are in a bargaining unit covered by a collective bargaining agreement which provides for presence of a union representative, it is your responsibility to make arrangements for such representation if you so desire.  Sufficient advanced notice is being provided and no interviews will be delayed or rescheduled.

If you have any questions regarding these proceedings please address them directly with your department head or chief.

Employee:  Leonard Mazzola

Interview time: 1000

Location: 1185 South Main Street, Akron, Ohio 44301

1

EVANS/PTA113

✓ LT LEONARD MAZZOLA

✓ Q1 COULD BOB PHILLIPS OR LT WILSON HAVE GIVEN THE "HARD COPY" OF THE PRE DISCIPLINE NOTICE TO MEDIA?

Q2 DID MEDIA ONLY HAVE THE "HAND COPY"?

Q3 WAS HE VOCAL @ NOT WANTING TO WRITE UP DALTON? → COPY STORED ON CHIEFS
(KEPT TO HIMSELF)

MEDIA ONLY HAD A COPY OF MY CRUISER THAT WENT TO PATROL @ TRAFFIC PROCESSING — W/THE SOUND.

✓ LT CHARLES WILSON

Q1 DID HE HAVE THE "HARD COPY" OF PRE-D? → MAYBE THAN MAZZOLA PHILLIPS

Q2 COULD HE HAVE PROVIDED IT TO MEDIA?

Fg. UNION REP FOR SUPERVISORS

✓ PTL BRIAN DALTON   (DENIES SPEAKING TO MEDIA)  WHO HAS ACCESS TO PRE-D MEMO

Q1 DID THE MEDIA GET MAZZOLA'S REPRIMAND ISSUED TO DALTON IN A HAND COPY OR ELECTRONIC COPY FORM — IN WHICH

Q2 MEDIA ASKED FOR THE "REPRIMAND... DID MEDIA REQUEST YES THE PRE-D IN THE PRR?

Q3 BY REQUESTING THE REPRIMAND, MIGHT MEDIA HAVE WANTED TO NOT "TIP THEIR HAND' THEY HAD ALREADY REC'D IT? (TO GET IT ALL LEGITIMATELY)

✓ PTL SHANE BATES  (DENIED TALKING TO MEDIA)

Q1 BY ADVISING MOTORISTS HE HAD A "QUOTA" WHEN ISSUEING CITES WAS HE ANGRY OR VOCAL ABOUT THIS "QUOTA" IN ANY OTHER WAY? HE WAS UPSET WITH ISSUING THE CITES  (MOTORISTS COMPLAINED IN COURT)

Q2 CAN I GET A COPY OF THE INTERNAL MEMOS IE THE ONE BY LT MAZZOLA DIRECTING OFFICERS TO HAVE 2-3/SHIFT THIS DOCUMENT COULD ONLY GO TO MEDIA VIA MAZZOLA OR ONE OF THE SERGEANTS — WHO ARE THEY?

EVANS/PTA114

✓ Sgt Greg Tinirello

John Kurtz (injured) off

Dan Anders off

✓ Chris Cross (injury leave, not available)

Ray Rapp Paul Andrews    Previously disciplined for performance issues!

Need
Lt Mazzola sent memo. Only sgts had it last mtg, but chief was going to ask a sgt for the copy -- Did chief get the memo? → From Tinirello. Got it

Need
Chief's email to patrol division.

Need org chart

✓ Bob Phillips

EVANS/PTA115

t/c "either 3/12/19 Mike 2

Service Dept Worker? Ritchie

Did work for Lenny went to Mayor @

Lenny [?] discussing @ the investigation @ hand

Lenny is firing Dalton the Mayor

→ Discussed last week w/ Mayor @

→ ESPER Brian sgt. w/ Brooklyn.
→ on scene our shave rates ours.

Q

Q  D/y discuss this memo w/ anyone other than
Ho .

4th Dalton's   Firing 3-8-19
this              Reprimands that Lenny WROTE-ing Dalton on 15:
                  Firing & meet performance schedules for
                  traffic schedules.

                  notice to all 6 officers
                  Lenny is less.

─ ORC un unauthorized use of ─ .

Bob phillips is name of the investigation
→ Administrate investigation [?] how private .
─

6800 Brooksville Rd.
Independence g Ohio

Lt. Chuck [Wilson] my legal pursue
EVANS/PTA116

— D/4 Rescind Any of this Notification

Q  D/4

Discussed w/ Ritchie the upcoming
   investigation

EVANS/PTA117

— D/Y Reserve Any of this Notification

S     D/Y

Discussed w/ Ritchie the upcoming
      investigation

EVANS/PTA118

# TRAFFIC CRASH REPORT

Ohio Department of Public Safety

*DENOTES MANDATORY FIELD FOR SUPPLEMENT REPORT

**LOCAL REPORT NUMBER** * : 2 U 1 9 0 0 8 4

LOCAL INFORMATION: 6724 Brecksville Rd

- ☐ PHOTOS TAKEN
- ☐ OH-2  ☐ OH-3
- ☐ OH-1P  ☐ OTHER
- ☐ SECONDARY CRASH
- ☐ Private Property

**REPORTING AGENCY NAME** * : INDEPENDENCE POLICE DE

**NCIC** * : 0 1 8 2 5

**HIT/SKIP** : 1 - Solved  2 - Unsolved

**NUMBER OF UNITS** : 0 1 1

**UNIT IN ERROR** : 98 - ANIMAL  99 - UNKNOWN

| COUNTY * | LOCALITY * | LOCATION: CITY, VILLAGE, TOWNSHIP * | CRASH DATE/TIME * | CRASH SEVERITY |
|---|---|---|---|---|
| 1 8 | 1 (1-CITY, 2-VILLAGE, 3-TOWNSHIP) | INDEPENDENCE | 0 1 2 4 2 0 1 9  0 1 1 9 | 5 |

CRASH SEVERITY:
1 - FATAL
2 - SERIOUS INJURY SUSPECTED
3 - MINOR INJURY SUSPECTED
4 - INJURY POSSIBLE
5 - PROPERTY DAMAGE ONLY

| ROUTE TYPE | ROUTE NUMBER | PREFIX | LOCATION ROAD NAME | ROAD TYPE | LATITUDE DECIMAL DEGREES |
|---|---|---|---|---|---|
| S R | 2 1 | (1-NORTH 2-SOUTH 3-EAST 4-WEST) | | R D | 4 1 . 3 7 9 6 |

| ROUTE TYPE | ROUTE NUMBER | PREFIX | REFERENCE ROAD NAME (ROAD, MILEPOST, HOUSE #) | ROAD TYPE | LONGITUDE DECIMAL DEGREES |
|---|---|---|---|---|---|
| | | (1-NORTH 2-SOUTH 3-EAST 4-WEST) | 6724 | | 8 1 . 6 4 0 7 |

**REFERENCE POINT**
3 (1 - INTERSECTION  2 - MILE POST  3 - HOUSE #)

**DIRECTION FROM REFERENCE**
2 (1-NORTH 2-SOUTH 3-EAST 4-WEST)

**ROUTE TYPE**
IR - INTERSTATE ROUTE (TP)
US - FEDERAL US ROUTE
SR - STATE ROUTE
CR - NUMBERED COUNTY ROUTE
TR - NUMBERED TOWNSHIP ROUTE

**ROAD TYPE**
AL - ALLEY
AV - AVENUE
BL - BOULEVARD
CR - CIRCLE
CT - COURT
DR - DRIVE
HE - HEIGHTS
HW - HIGHWAY
LA - LANE
MP - MILEPOST
OV - OVAL
PK - PARKWAY
PI - PIKE
PL - PLACE
RD - ROAD
SQ - SQUARE
ST - STREET
TE - TERRACE
TL - TRAIL
WA - WAY

**DISTANCE FROM REFERENCE**
1 0

**DISTANCE UNIT OF MEASURE**
2 (1 - Miles  2 - Feet  3 - Yards)

**INTERSECTION RELATED**
☐ WITHIN INTERSECTION OR ON APPROACH
☐ WITHIN INTERCHANGE AREA
■ ROADWAY DIVIDED

**NUMBER OF APPROACHES**

**LOCATION OF FIRST HARMFUL EVENT**
0 1
1 - ON ROADWAY
2 - ON SHOULDER
3 - IN MEDIAN
4 - ON ROADSIDE
5 - ON GORE
6 - OUTSIDE TRAFFICWAY
7 - ON RAMP
8 - OFF RAMP
9 - CROSSOVER
10 - DRIVEWAY / ALLEY ACCESS
11 - RAILWAY GRADE CROSSING
12 - SHARED USE PATHS OR TRAILS
13 - BIKE LANE
14 - TOLL BOOTH
99 - OTHER / UNKNOWN

**MANNER OF CRASH COLLISION/IMPACT**
1
1 - NOT COLLISION BETWEEN TWO MOTOR VEHICLES IN TRANSPORT
2 - REAR-END
3 - HEAD-ON
4 - REAR-TO-REAR
5 - BACKING
6 - ANGLE
7 - SIDESWIPE, SAME DIRECTION
8 - SIDESWIPE, OPPOSITE DIRECTION
9 - OTHER / UNKNOWN

**DIRECTION OF TRAVEL**
2
1 - NORTH
2 - SOUTH
3 - EAST
4 - WEST

**MEDIAN TYPE**
4
1 - DIVIDED FLUSH MEDIAN (<4 FEET)
2 - DIVIDED FLUSH MEDIAN (≥4 FEET)
3 - DIVIDED, DEPRESSED MEDIAN
4 - DIVIDED, RAISED MEDIAN (ANY TYPE)
9 - OTHER / UNKNOWN

**WORK ZONE RELATED**
☐ WORK ZONE RELATED
☐ WORKERS PRESENT
☐ LAW ENFORCEMENT PRESENT
☐ ACTIVE SCHOOL ZONE

**WORK ZONE TYPE**
1 - LANE CLOSURE
2 - LANE SHIFT/CROSSOVER
3 - WORK ON SHOULDER OR MEDIAN
4 - INTERMITTENT OR MOVING WORK
5 - OTHER

**LOCATION OF CRASH IN WORK ZONE**
1 - BEFORE THE 1ST WORK ZONE WARNING SIGN
2 - ADVANCE WARNING AREA
3 - TRANSITION AREA
4 - ACTIVITY AREA
5 - TERMINATION AREA

**CONTOUR**
2
1 - STRAIGHT LEVEL
2 - STRAIGHT GRADE
3 - CURVE LEVEL
4 - CURVE GRADE
9 - OTHER /UNKNOWN

**CONDITIONS**
2
1 - DRY
2 - WET
3 - SNOW
4 - ICE
5 - SAND, MUD, DIRT, OIL, GRAVEL
6 - WATER (STANDING, MOVING)
7 - SLUSH
9 - OTHER/UNKNOWN

**SURFACE**
2
1 - CONCRETE
2 - BLACKTOP, BITUMINOUS, ASPHALT
3 - BRICK/BLOCK
4 - SLAG, GRAVEL, STONE
5 - DIRT
9 - OTHER /UNKNOWN

**LIGHT CONDITION**
3
1 - DAYLIGHT
2 - DAWN/DUSK
3 - DARK - LIGHTED ROADWAY
4 - DARK - ROADWAY NOT LIGHTED
5 - DARK - UNKNOWN ROADWAY LIGHTING
9 - OTHER / UNKNOWN

**WEATHER**
4
1 - CLEAR
2 - CLOUDY
3 - FOG, SMOG, SMOKE
4 - RAIN
5 - SLEET, HAIL
6 - SNOW
7 - SEVERE CROSSWINDS
8 - BLOWING SAND, SOIL, DIRT, SNOW
9 - FREEZING RAIN OR FREEZING DRIZZLE
99 - OTHER / UNKNOWN

**NARRATIVE**

DRIVER OF UNIT #1 RAN OFF THE ROAD LEFT AND STRUCK THE MEDIAN. THE DRIVER CONTINUED ON TOP OF THE MEDIAN AND STRUCK TWO BRICK PLANTER BOXES CAUSING LISTED DAMAGE.

Indicate the north direction with an "N" in the compass diagram.

NOT TO SCALE
N
SR 21 NORTH

| CRASH REPORTED DATE/TIME | DISPATCH DATE/TIME | ARRIVAL DATE/TIME | SCENE CLEARED DATE/TIME | REPORT TAKEN BY |
|---|---|---|---|---|
| 0 1 2 4 2 0 1 9  0 1 1 9 | 0 1 2 4 2 0 1 9  0 1 1 9 | 0 1 2 4 2 0 1 9  0 1 1 9 | 0 1 2 4 2 0 1 9  0 1 3 7 | ■ POLICE AGENCY  ☐ MOTORIST  ☐ SUPPLEMENT (CORRECTION/ADDITION) |

| TOTAL TIME ROADWAY CLOSED | OTHER INVESTIGATION TIME | TOTAL MINUTES | OFFICER'S NAME * S V Bates | CHECKED BY OFFICER'S NAME * S Bates |
|---|---|---|---|---|
| 0 | 3 0 | 4 6 | OFFICER'S BADGE NUMBER * 3 9 5 3 | CHECKED BY OFFICER'S BADGE NUMBER * 3 9 5 3 |

HSY7001OH1 1/19 [760-0820]

PAGE    OF

EVANS/PTA119



OHIO DEPARTMENT OF PUBLIC SAFETY

**MOTORIST / NON MOTORIST**

LOCAL REPORT NUMBER
0 1 9 0 0 8 4

| UNIT # | NAME: LAST, FIRST, MIDDLE | | DATE OF BIRTH | AGE | GENDER |
|---|---|---|---|---|---|
| 0 1 | ESPER   BRADLEY   A | | 0 1 3 1 9 7 1 | 4 8 | M |

ADDRESS: STREET, CITY, STATE, ZIP
7681  CASCADE CREEK LANE   INDEPENDENCE OH  44131

CONTACT PHONE - INCLUDE AREA CODE
4 4 0 3 9 1 2 2 3 1

| INJURIES | INJURED TAKEN BY | EMS AGENCY (NAME) | INJURED TAKEN TO MEDICAL FACILITY (NAME, CITY) | SAFETY EQUIPMENT USED | | DOT-COMPLIANT MC HELMET | SEATING POSITION | AIR BAG USAGE | EJECTION | TRAPPED |
|---|---|---|---|---|---|---|---|---|---|---|
| 5 | | | | 0 4 | | | 0 1 | 1 | 1 | 1 |

| OL STATE | OPERATOR LICENSE NUMBER | OFFENSE CHARGED | LOCAL CODE | OFFENSE DESCRIPTION | CITATION NUMBER |
|---|---|---|---|---|---|
| O H | RH021625 | | ☐ | | |

| OL CLASS | ENDORSEMENT SELECT UP TO 2 | RESTRICTION SELECT UP TO 5 | DRIVER DISTRACTED BY | ALCOHOL / DRUG SUSPECTED | CONDITION | ALCOHOL TEST | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | STATUS | TYPE | VALUE | STATUS | TYPE | RESULT SELECT UP TO 4 |
| 4 | | | 1 | ☐ ALCOHOL  ☐ MARIJUANA  ☐ OTHER DRUG | 1 | 1 | 1 | 1 | 1 | 1 | |

| UNIT # | NAME: LAST, FIRST, MIDDLE | | DATE OF BIRTH | AGE | GENDER |
|---|---|---|---|---|---|
| | | | | | |

ADDRESS: STREET, CITY, STATE, ZIP

CONTACT PHONE - INCLUDE AREA CODE

| INJURIES | INJURED TAKEN BY | EMS AGENCY (NAME) | INJURED TAKEN TO MEDICAL FACILITY (NAME, CITY) | SAFETY EQUIPMENT USED | | DOT-COMPLIANT MC HELMET | SEATING POSITION | AIR BAG USAGE | EJECTION | TRAPPED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| OL STATE | OPERATOR LICENSE NUMBER | OFFENSE CHARGED | LOCAL CODE | OFFENSE DESCRIPTION | CITATION NUMBER |
|---|---|---|---|---|---|
| | | | | | |

| OL CLASS | ENDORSEMENT SELECT UP TO 2 | RESTRICTION SELECT UP TO 3 | DRIVER DISTRACTED BY | ALCOHOL / DRUG SUSPECTED | CONDITION | ALCOHOL TEST | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | STATUS | TYPE | VALUE | STATUS | TYPE | RESULT SELECT UP TO 4 |
| | | | | ALCOHOL   MARIJUANA   OTHER DRUG | | | | | | | |

| UNIT # | NAME: LAST, FIRST, MIDDLE | | DATE OF BIRTH | AGE | GENDER |
|---|---|---|---|---|---|
| | | | | | |

ADDRESS: STREET, CITY, STATE, ZIP

CONTACT PHONE - INCLUDE AREA CODE

| INJURIES | INJURED TAKEN BY | EMS AGENCY (NAME) | INJURED TAKEN TO MEDICAL FACILITY (NAME, CITY) | SAFETY EQUIPMENT USED | | DOT-COMPLIANT MC HELMET | SEATING POSITION | AIR BAG USAGE | EJECTION | TRAPPED |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | |

| OL STATE | OPERATOR LICENSE NUMBER | OFFENSE CHARGED | LOCAL CODE | OFFENSE DESCRIPTION | CITATION NUMBER |
|---|---|---|---|---|---|
| | | | | | |

| OL CLASS | ENDORSEMENT SELECT UP TO 2 | RESTRICTION SELECT UP TO 3 | DRIVER DISTRACTED BY | ALCOHOL / DRUG SUSPECTED | CONDITION | ALCOHOL TEST | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | STATUS | TYPE | VALUE | STATUS | TYPE | RESULT SELECT UP TO 4 |
| | | | | ALCOHOL   MARIJUANA   OTHER DRUG | | | | | | | |

**INJURIES**
1 - FATAL
2 - SUSPECTED SERIOUS INJURY
3 - SUSPECTED MINOR INJURY
4 - POSSIBLE INJURY
5 - NO APPARENT INJURY

**INJURED TAKEN BY**
1 - NOT TRANSPORTED /TREATED AT SCENE
2 - EMS
3 - POLICE
9 - OTHER / UNKNOWN

**SAFETY EQUIPMENT USED**
1 - NONE USED
2 - SHOULDER BELT ONLY USED
3 - LAP BELT ONLY USED
4 - SHOULDER & LAP BELT USED
5 - CHILD RESTRAINT SYSTEM - FORWARD FACING
6 - CHILD RESTRAINT SYSTEM - REAR FACING
7 - BOOSTER SEAT
8 - HELMET USED
9 - PROTECTIVE PADS USED (ELBOWS, KNEES, ETC.)
10 - REFLECTIVE CLOTHING
11 - LIGHTING - PEDESTRIAN / BICYCLE ONLY
99 - OTHER / UNKNOWN

**SEATING POSITION**
1 - FRONT - LEFT SIDE (MOTORCYCLE DRIVER)
2 - FRONT - MIDDLE
3 - FRONT - RIGHT SIDE
4 - SECOND - LEFT SIDE (MOTORCYCLE PASSENGER)
5 - SECOND - MIDDLE
6 - SECOND - RIGHT SIDE
7 - THIRD - LEFT SIDE (MOTORCYCLE SIDE CAR)
8 - THIRD - MIDDLE
9 - THIRD - RIGHT SIDE
10 - SLEEPER SECTION OF TRUCK CAB
11 - PASSENGER IN OTHER ENCLOSED CARGO AREA (NON-TRAILING UNIT, BUS, PICK-UP WITH CAP)
12 - PASSENGER IN UNENCLOSED CARGO AREA
13 - TRAILING UNIT
14 - RIDING ON VEHICLE EXTERIOR (NON-TRAILING UNIT)
15 - NON-MOTORIST
99 - OTHER / UNKNOWN

**AIR BAG USAGE**
1 - NOT DEPLOYED
2 - DEPLOYED FRONT
3 - DEPLOYED SIDE
4 - DEPLOYED BOTH FRONT / SIDE
5 - NOT APPLICABLE
9 - DEPLOYMENT UNKNOWN

**EJECTION**
1 - NOT EJECTED
2 - PARTIALLY EJECTED
3 - TOTALLY EJECTED
4 - NOT APPLICABLE

**TRAPPED**
1 - NOT TRAPPED
2 - EXTRICATED BY MECHANICAL MEANS
3 - FREED BY NON-MECHANICAL MEANS

**OL CLASS**
1 - CLASS A
2 - CLASS B
3 - CLASS C
4 - REGULAR CLASS (OHIO = D)
5 - M/C MOPED ONLY
6 - NO VALID OL

**ENDORSEMENT**
H - HAZMAT
M - MOTORCYCLE
P - PASSENGER
N - TANKER
Q - MOTOR SCOOTER
R - THREE-WHEEL MOTORCYCLE
S - SCHOOL BUS
T - DOUBLE & TRIPLE TRAILERS
X - TANKER / HAZMAT

**RESTRICTION**
1 - ALCOHOL INTERLOCK DEVICE
2 - CDL INTRASTATE ONLY
3 - CORRECTIVE LENSES
4 - FARM WAIVER
5 - EXCEPT CLASS A BUS
6 - EXCEPT CLASS A & CLASS B BUS
7 - EXCEPT TRACTOR-TRAILER
8 - INTERMEDIATE LICENSE RESTRICTIONS
9 - LEARNER'S PERMIT RESTRICTIONS
10 - LIMITED TO DAYLIGHT ONLY
11 - LIMITED TO EMPLOYMENT
12 - LIMITED - OTHER
13 - MECHANICAL DEVICES (SPECIAL BRAKES, HAND CONTROLS OR OTHER ADAPTIVE DEVICES)
14 - MILITARY VEHICLES ONLY
15 - MOTOR VEHICLES WITHOUT AIR BRAKES
16 - OUTSIDE MIRROR
17 - PROSTHETIC AID
18 - OTHER

**DRIVER DISTRACTED BY**
1 - NOT DISTRACTED
2 - MANUALLY OPERATING AN ELECTRONIC COMMUNICATION DEVICE (TEXTING, TYPING, DIALING)
3 - TALKING ON HANDS-FREE COMMUNICATION DEVICE
4 - TALKING ON HAND-HELD COMMUNICATION DEVICE
5 - OTHER ACTIVITY WITH AN ELECTRONIC DEVICE
6 - PASSENGER
7 - OTHER DISTRACTION INSIDE THE VEHICLE
8 - OTHER DISTRACTIONS OUTSIDE THE VEHICLE
9 - OTHER / UNKNOWN

**CONDITION**
1 - APPARENTLY NORMAL
2 - PHYSICAL IMPAIRMENT
3 - EMOTIONAL (E.G. DEPRESSED, ANGRY, DISTURBED)
4 - ILLNESS
5 - FELL ASLEEP, FAINTED, FATIGUED, ETC.
6 - UNDER THE INFLUENCE OF MEDICATIONS / DRUGS / ALCOHOL
9 - OTHER / UNKNOWN

**ALCOHOL TEST STATUS**
1 - NONE GIVEN
2 - TEST REFUSED
3 - TEST GIVEN, CONTAMINATED SAMPLE / UNUSABLE
4 - TEST GIVEN, RESULTS KNOWN
5 - TEST GIVEN, RESULTS UNKNOWN

**ALCOHOL TEST TYPE**
1 - NONE
2 - BLOOD
3 - URINE
4 - BREATH

**DRUG TEST TYPE**
1 - NONE
2 - BLOOD
3 - URINE
4 - OTHER

**DRUG TEST RESULT**
1 - AMPHETAMINES
2 - BARBITURATES
3 - BENZODIAZEPINES
4 - CANNABINOIDS
5 - COCAINE
6 - OPIATES / OPIOIDS
7 - OTHER
8 - NEGATIVE RESULTS

EVANS/PTA120

# UNIT
OHIO DEPARTMENT OF PUBLIC SAFETY

LOCAL REPORT NUMBER: 0 1 9 0 0 8 4

| UNIT # | OWNER NAME: LAST, FIRST, MIDDLE ☑ Same As Driver | OWNER PHONE: INCLUDE AREA CODE ☑ Same As Driver |
|---|---|---|
| 0 1 | ESPER BRADLEY A | 4 4 0 3 9 1 2 2 3 1 |

OWNER ADDRESS: STREET, CITY, STATE, ZIP ☑ Same As Driver
7681 CASCADE CREEK LANE  INDEPENDENCE  OH 44131

COMMERCIAL CARRIER: NAME, ADDRESS, CITY, STATE, ZIP

LP STATE: O H  LICENSE PLATE #: EHW1699
VEHICLE IDENTIFICATION #: 2 HNYD2H56BH545888
VEHICLE YEAR: 2011  VEHICLE MAKE: Acura

INSURANCE VERIFIED ☑
INSURANCE COMPANY: STATE FARM
INSURANCE POLICY #: 68841629C1035P
VEHICLE COLOR: BLK  VEHICLE MODEL: MDX

TOWED BY: HILLTOP

# OCCUPANTS: 0 1

DAMAGE SCALE: 4
FIRST HARMFUL EVENT: 2  MOST HARMFUL EVENT: 2

UNIT SPEED: 3 5  POSTED SPEED: 3 5  DETECTED SPEED: 1

EVANS/PTA121

# William D. Evans II, Co., L.P.A.
## Attorney at Law

May 22, 2019

Attn: Gregory J. O'Brien
Law Director
City of Independence
6800 Brecksville Road
Independence, OH 44131-5045

## STATEMENT

**FOR PROFESSIONAL SERVICES RENDERED [P.D. Investigation]:**

| Date | Description | Hours |
|------|-------------|-------|
| 1/31/2019 | Meeting (my office) with Chief Kilbane | 2.0 |
| 2/8/2019 | Received information from Chief Kilbane. | N/C |
| 2/13/2019 | Called Greg O'Brien – left message.  Read/reviewed file; telephone conference with Greg. | N/C |
|  | Email Contract for Professional Service to Greg O'Brien, Law Director. | N/C |
| 3/5/2019 | Prepared for meeting – read file completely. | 1.0 |
|  | Meeting with Chief Kilbane and Letitia Linker 3:00-4:45 | 1.7 |
| 3/12/2019 | Telephone conference with Chief Kilbane. | .5 |
| 3/13/2019 | Left home at 5:45 a.m./back home at 6:15 p.m. plus mileage [72 miles r/t - $39.24] | 13.5 |
| 3/14/2019 | Update (2 calls) Mike Esposito; telephone conference with Ron Kopp. | .5 |
| 3/15/2019 | Telephone conference with Chief Kilbane. | .3 |
|  | Conference with Ken Butler. | .5 |
| 3/18/2019 | Telephone conference with Chief Kilbane to confirm Lt. Mazzola is scheduled for interview (w/Bill) on 3/20/2019 @ 10 a.m. and a polygraph (w/Ken) at Noon.  Copy of email from Chief to Lt. Mazzola re: 3/20/2019 appointment received. | N/C |
|  | Telephone conference with Chief Kilbane and Letitia Linker. | 1.1 |
| 3/19/2019 | Conference meeting w/Ken Butler; prepare documents for interview, identify similarities thru highlights. | 2.5 |
| 3/20/2019 | 9 a.m. to prepare for interview by Bill Evans and follow-up polygraph by Ken Butler; telephone conference with Chief Kilbane about the memo provided by Lt. Mazzola (email from Lt. Mazzola to Dispatch Patrol). Evans witnessed entire polygraph procedure and evaluated the Lt. Mazzola polygraph charts and scoring process in a Peer Review capacity; conducted post-test interview with Lt. Mazzola; including needed follow-up. | [9 to 5 p.m.] 8.0 |
| 3/22/2019 | 1 p.m. call to Mike Esposito to brief him about polygraph. | .6 |
|  | 1:30 p.m. call to 216.524.1562 – teleconference with Mayor Togliatti, Chief Kilbane, Law Director O'Brien, H.R. Letitia Linker and Mike Esposito. | 1.5 |
| 3/25/2019 | Follow up with Chief at about 5:30 p.m. | .3 |
| 3/26/2019 | Call to Greg O'Brien about W-9, etc. | N/C |
| NOTE | Several telephone conferences and status calls were not invoiced...... | N/C |

| | | |
|---|---|---|
| 34 hrs. @ $275 | | **$9,350.00** |
| **Retainer** | | **(5,000.00)** |
| | | **$4,350.00** |
| 72 miles r/t @ $4.5 per mile | | **39.24** |
| **BALANCE DUE** | | **$4,389.24** |

Thank you!
William D. Evans, II, Esq.
William D. Evans, II, Co., L.P.A.
1185 S. Main Street
Akron, OH 44301
*Please make checks payable to William D. Evans, II, Attorney at Law

1185 S. Main Street • Akron, Ohio 44301-1322 • (330) 434-4050 • Fax (330) 434-4611 • bill@billevanslaw.com

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: 3/13/2019

Officer's Signature: _Mazz___

Officer's Printed Name: _LEONARD MAZZOLA_

Witness: _____

RECEIVED

From Chief

1

Bill,

Here is the list of officers that you may want to interview as part of the internal investigation:

Lt. Leonard Mazzola - He was the sole source of the prediscipinary notice that made it's way to the media. He was hand-delivered a hard copy and did not receive an electronic copy. As part of the discipinary process he could have provided a copy of it to Bob Phillips the FOP attorney and Lt. Charles Wilson his employee rep.

Lt. Charles Wilson - The employee rep for Lt. Mazzola during the discipinary process.

Patrolman Brian Dalton - He was the only officer issued a reprimand for failing to meet performance standards. Lt. Mazzola issued that reprimand and the reporter specifically requested the reprimand and named Ptl. Dalton in his public records request

EVANS/PTA124

2

INDICATING THAT THE REPORTER HAD PRIOR SPECIFIC KNOWLEDGE OF THE REPRIMAND

PATROLMAN Shane BATES: HE RESERVED ANY TYPE OF PERFORMANCE STANDARD, TELLING MOTORISTS THAT HE WAS ISSUING THEM A CITATION BECAUSE HE WAS FORCED TO BY A PERFORMANCE STANDARD. WHEN THE CITY PROSECUTOR QUESTIONED HIM ABOUT THE QUALITY OF SOME OF HIS CITATIONS HE TOLD THE PROSECUTOR THAT HE WAS UNDER A "QUOTA". HE WAS SUBSEQUENTLY COUNSELED ABOUT PROFESSIONAL TRAFFIC STOPS.

THE FOUR PATROL SERGEANTS WERE ALSO ISSUED A MEMO BY Lt. MAZZOLA DIRECTING THEM TO HAVE THEIR OFFICERS HAVE "2-3 TRAFFIC ENFORCEMENT ACTIONS PER SHIFT" THIS SPECIFIC LANGUAGE WAS INCLUDED IN THE REPORTER'S STORY AN PUBLIC RECORDS REQUEST. THIS DOCUMENT COULD ONLY REACH THE MEDIA VIA Lt. MAZZOLA OR ONE OF THE SERGEANTS. THOSE SERGEANTS ARE: GREG TINNIRELLO, JOHN KURTZ, DAN ANDERS AND CHRIS CROSS. ANDERS IS CURRENTLY

3

OFF ON AN INJURY LEAVE AND
will BE UNAVAILABle.

EVANS/PTA126

**Rosemary Abney**

| | |
|---|---|
| **From:** | Rosemary Abney |
| **Sent:** | Tuesday, March 05, 2019 9:18 AM |
| **To:** | 'Michael Kilbane'; 'linkerl@independenceohio.org' |
| **Subject:** | ON BEHALF OF BILL EVANS:  RE: 3 p.m. meeting today |

Chief and Ms. Linker:  Bill asked that you bring (1) your Garrity Form or whatever you use for Garrity and (2) a schedule for each officer you anticipate having Bill interview in order to coordinate their schedules with his.  Any questions, let me know.  Thanks.

Rosemary S. Abney
Secretary
William D. Evans II, Co., LPA
1185 S. Main Street
Akron, OH 44301
330.434.4050
Fax 330.434.4611

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom it is addressed.  This communication may contain material protected by lawyer-client privilege.  If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email and any file attachments is strictly prohibited.  If you have received this email in error, please immediately notify us by telephone at 330.434.2344 or by reply email to the sender.  You must destroy the original transmission and its contents.  You will be reimbursed for reasonable costs incurred in notifying us.

EVANS/PTA127

## Rosemary Abney

| | |
|---|---|
| **From:** | Rosemary Abney |
| **Sent:** | Friday, March 01, 2019 4:00 PM |
| **To:** | Gregory J. O'Brien (gobrien@taftlaw.com) |
| **Subject:** | City of Independence - Contract for Professional Services |
| **Attachments:** | City of Independence Contract.pdf |

ON BEHALF OF BILL EVANS, attached for your file is the Contract that he initialed.  Thank you.

Rosemary S. Abney
Secretary
William D. Evans II, Co., LPA
1185 S. Main Street
Akron, OH 44301
330.434.4050
Fax 330.434.4611

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom it is addressed.  This communication may contain material protected by lawyer-client privilege.  If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email and any file attachments is strictly prohibited.  If you have received this email in error, please immediately notify us by telephone at 330.434.2344 or by reply email to the sender.  You must destroy the original transmission and its contents.  You will be reimbursed for reasonable costs incurred in notifying us.

EVANS/PTA128

**Rosemary Abney**

| | |
|---|---|
| **From:** | O'Brien, Gregory J. <gobrien@taftlaw.com> |
| **Sent:** | Wednesday, February 27, 2019 5:10 PM |
| **To:** | Rosemary Abney |
| **Cc:** | Bill Evans Law; Barone, Donna |
| **Subject:** | RE: City of Independence - Contract for Professional Services |
| **Attachments:** | William Evans - contract for professional services.pdf |

Bill

Please see the attached. The City wanted to place a maximum amount in the contract.  If that is acceptable please initial and return to me. Thank you.

# Taft /

**Gregory J. O'Brien** / Partner
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, Ohio 44114-2302
Tel: 216.241.2838 • Fax: 216.241.3707
Direct: 216.706.3870 • Cell: 216.789.7879
**www.taftlaw.com** / gobrien@taftlaw.com


Subscribe to our law updates


This message may contain information that is attorney-client privileged, attorney work product or otherwise confidential. If you are not an intended recipient, use and disclosure of this message are prohibited. If you received this transmission in error, please notify the sender by reply e-mail and delete the message and any attachments.

**From:** Rosemary Abney <RAbney@polytechassoc.com>
**Sent:** Thursday, February 14, 2019 11:24 AM
**To:** O'Brien, Gregory J. <gobrien@taftlaw.com>
**Cc:** Bill Evans Law <Bill@billevanslaw.com>
**Subject:** City of Independence - Contract for Professional Services

On behalf of Bill Evans, attached is the Contract for Professional Services which he has signed.  Per your email late yesterday, please provide a copy signed by the Mayor together with the $5,000 retainer.  Thank you.

Rosemary S. Abney
Secretary
William D. Evans II, Co., LPA
1185 S. Main Street
Akron, OH 44301
330.434.4050
Fax 330.434.4611

1

**Rosemary Abney**

| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Wednesday, February 27, 2019 2:20 PM |
| **To:** | Rosemary Abney |
| **Subject:** | City of Independence agreement |
| **Attachments:** | William Evans retainer agreement.pdf |

Attached is a copy of the agreement signed by Mayor Togliatti and Law Director O'Brien.  The finance department is processing the retainer check.  Please let me know if any additional information is needed.

Thanks,

Chief Michael J. Kilbane
Independence Police Department

1

## Rosemary Abney

| | |
|---|---|
| **From:** | Rosemary Abney |
| **Sent:** | Thursday, February 14, 2019 11:24 AM |
| **To:** | Gregory J. O'Brien (gobrien@taftlaw.com) |
| **Cc:** | Bill Evans Law |
| **Subject:** | City of Independence - Contract for Professional Services |
| **Attachments:** | Independence Contract for Prof Services - to G. O'Brien.pdf |

On behalf of Bill Evans, attached is the Contract for Professional Services which he has signed.  Per your email late yesterday, please provide a copy signed by the Mayor together with the $5,000 retainer.  Thank you.

Rosemary S. Abney
Secretary
William D. Evans II, Co., LPA
1185 S. Main Street
Akron, OH 44301
330.434.4050
Fax 330.434.4611

This email and any files transmitted with it are confidential and are intended solely for the use of the individual or entity to whom it is addressed.  This communication may contain material protected by lawyer-client privilege.  If you are not the intended recipient or the person responsible for delivering the email to the intended recipient, be advised that you have received this email in error and that any use, dissemination, forwarding, printing, or copying of this email and any file attachments is strictly prohibited.  If you have received this email in error, please immediately notify us by telephone at 330.434.2344 or by reply email to the sender.  You must destroy the original transmission and its contents.  You will be reimbursed for reasonable costs incurred in notifying us.

EVANS/PTA131

Shift of Paperwork

Paul ORLOWSKI

officer held accountable   no officer initiated security

Chief told him to be more active

eye team shows up. using venunulator out of
city squeeze trying to create a
new story.

— Chief not happy.

F-3  2913
Illegal Access to Computer Data
System.

EVANS/PTA132

Direct Line     Cell 216 789-7879                    3 police officers
706·3870        Caled OBrien
                (216) 241off + DIR.   NOTES
                        2838 - front
1/3/19

QUOTA vs. PRODUCTIVITY

7/2018   Mayor GINO has no down — Mayors Ct.

         Chief went to LT.          ↓ 400 from 2017

         Chief told to the LT — ⊃ come up w/ ACTION PLAN
              and meet w/ SGT.

         LT sat 4 SGTs a memo — Did not meet

                  tell officers to get 2-3 traffic
                     RETRIBUTION / SHIFT —

( YES
(  OBS on camera )   Discipline for not following orders
                                on
         Laticia sat    a pre-D - of LT

         LT having    MK2200    came up w/ excuses due to
                 his

         LT got  360°   from Broska
                     OR VW metals

         — Directed to come up w/ performance
                     standards   for period.

(⊗)      — 10 tickets/guy per month were the performance
                          estimate   50 tickets in
                          3 months uses the force.

         Last QTR 2018 was the extra force

         1957 30  MET  the benchmarks

         LT told me director didn't meet

Ⓐ MAZZOLA
Someone else that was his cut out                    ②

performa standards I ordered the
LT. MAZZOLA & the D's not want
to write up review during a
write-up.

next they Chief Knows. End Gacik is in
my office
BD

⊛  Gacik's point Had a Chief that
        Gacik has that Chief sent

Chief out to all patrol.

Gacik had other events.

12, 16, 17   work

#N Only  Has the document A Me Mazzola by Mazzola Needed
#A  #1  1-2-19 memo.
#A 3 9  → Dalton pre disc.
        Bob Phillips BA
        Chief wilson Union Rep.

⊛ A#  Lt Mazzola sent
A#12  A memo to Sgts that chief wants sgts
        we do not write st. & to write 2-3 Enforcement
        Actions per shift.
A# #1,  #2  Gacik's story refers to memos by
        Mazzola to his Sgts
⊛ A#  #1  Chief E wrote to patrol division

EX H
#3

GALLOX ASKED for DALTON'S grievance + letter
issued to DALTON
DALTON said I did not talk to media.

On days leading up to this leak MAZZOLA
DID not log IN of New Does.

(X) ORDER WAS Sent out to Log IN
2 orders  1) Before public release
2) one after

KENNY we are looking for who
MAZZOLA    Takin your order
down.

PATROLMAN           WILSON
DALTON              LEAD
got mixed            PRO-D
up                   Notice
                     Rep into
                     ROOM Lenny
                     Hold them            PATROLMAN
                                          SUANE
                                          BATES
                                          VOCK
                                          KENST
                                          performed
                                          screwed
                                          & reprimanded

                                                        S.T.S.
                                                        1 KLETZ
                                                        2 TWINIBERO
                                                        3 CROSS
                                                        4 OUT ANDERS

Need
Org Chart

COPS Lenny Took
His copy gone it to
Central records house
IE. WILSON & PHILLIP.
IF They HAD IT where Hands
Did it go then

START interview w/ Don't You Think
Its Injured & Dissemble confidential
info $ general public
sources.

EVANS/PTA135

City admin has a big problem
hr hir & mayor.

- Chiefs not the answer.

- the person who was inside chief
  choice was  Pollick dep chief
                Mazza at
                banger R LT.

EVANS/PTA136

**Michael Kilbane**

| | |
|---|---|
| **From:** | Gallek, Ed <egallek@fox8.com> |
| **Sent:** | Monday, January 14, 2019 11:08 AM |
| **To:** | Michael Kilbane |
| **Subject:** | discipline requests |

I am requesting the pre-disciplinary and disciplinary paperwork for:

Lt. Mazzola—process started last August for Achieving Competent Performance Results, Insubordination, Knowing .. ..All Directives, Rues, Policies, Procedures, Practices, and Traditions

Officer Brian Dalton—filed recently concerning number of traffic stops/tickets written.

I am also requesting any other discipline for any other supervisors or patrol officers issued since last August regarding traffic stops/tickets written.

I am also requesting any grievances filed for any of these disciplinary issues or policies concerning the number of traffic stops/tickets written/performance expectations.

Thanks
Ed Gallek
FOX 8
216-403-3727

EVANS/PTA137

## Michael Kilbane

| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Friday, July 20, 2018 04:48 PM |
| **To:** | Police |
| **Subject:** | Communications with city administration and council members |

Information from the police department to city leadership needs to be complete, accurate and coordinated, and all such dissemination should be done at the direction of the Chief or Deputy Chief. This is a reminder that all communication regarding any departmental business to the Mayor, department heads, City Council member or any other members of the city administration must be approved by myself or Deputy Chief Polak. No information regarding police operations, ongoing calls or incidents may be disseminated without approval of the Chief or Deputy Chief. Any texts or messages regarding police department business or operations sent from a personal device can open that device to disclosure under Ohio Public Records Law.

Please let me know if you have any questions.

Thanks,

Chief K.

EVANS/PTA138

**THE CITY OF INDEPENDENCE**
**DEPARTMENT OF POLICE**

**GENERAL ORDER:** 502
**SUBJECT:** Uniform Standards
of Conduct
**EFFECTIVE DATE:** April 2, 1999
**REVIEWED:** October 1, 2017

I.   **POLICY**

To promote adherence to the Standards of Conduct through education,
training, counseling, and enforcement.

II.  **PURPOSE**

To provide employees of the Independence Police Department with clear
Standards of Conduct that they are expected to observe.

III. **PROCEDURES**

A.   UNIFORM STANDARDS OF CONDUCT

1.   **Affirmatively Promoting a Positive Public Image**

Employees shall not be discourteous to members of the
general public, and they shall conduct themselves (on duty as
well as off duty) in a manner that does not damage or have the
probable expectations of damaging or bringing the public
image, integrity or reputation of the Independence Police
Department into discredit or disrepute.

a.   Employees shall accept full responsibility for their
behaviors and the results of their behaviors on duty as
well as off duty.  Behavior that may not be considered
wrong in private employment could be wrong in the
public sector because of the nature of the public service
mission.

Historically, citizens are quick to criticize and require
that public safety employees be "right" as well as look
"right" in their conduct and behavior.  Management
recognizes its responsibility to balance standards of

EVANS/PTA139

conduct designed to promote public trust while at the same time to avoid unnecessary infringements on the employee's rights to privacy.  At the same time, employees who which to hold the honor of a public position and enjoy the privileges of public trust share an affirmative responsibility to conduct themselves (on duty as well as off duty) in a manner that does not bring public image or trust into question.  The employee's right to privacy does not create an obligation on management to finance those rights at the expense of effective, efficient, or safe operations of this department.

2.  **Aiding Other Employees**

Employees shall, during the line of duty, come to the aid of another employee when necessary.

a.  The nature of public safety work frequently requires the support, assistance and safety of other employees. Knowing this support will be rendered in time of need promotes and maintains morale and a sense of well-being among all employees.

3.  **Alcohol Use and Related Conduct**

Employees shall not possess or consume alcoholic beverages on duty or while in uniform on duty or off duty unless authorized.  Nor shall any employee consume alcoholic beverages in proximate time to his or her reporting time for duty or report to duty with evidence of having consumed any alcoholic beverage.

a.  The consumption or possession of alcoholic beverages by public officials is high scrutinized by the public. Improper and excessive uses of such chemicals lead to severe criticisms of this Department and of all its employees.  Because a large portion of public safety work depends on the employee's ability to evaluate critical situations and make judgments that often affect public confidence, life, liberty, and safety, it is critical that judgments be as unimpaired as practicable.  The effects of alcoholic beverages interfere with this decision making ability.

4.    **Maintaining an Acceptable Level of Availability for Work**

Each employee must maintain a satisfactory level of availability for work during any regular reporting period.

a.    Public safety work requires team effort, and each employee plays an important part as an employee of the team.  Unless employees are regularly available for duty, work cannot go on effectively or efficiently.  Excessive absenteeism causes unnecessary increases in official operating expenses.  Employees who are excessively unavailable for work (regardless of cause) force others to carry their extra loads as well as tie up job opportunities and positions for more available personnel.

5.    **Committing or Condoning Illegal or Forbidden Harassment**

Illegal or forbidden harassment (e.g., sex, race, religion, national origin, ethnic, disability or age) are prohibited as a basis for conduct, behavior, or decisions affecting another employee's or potential employee's terms or conditions of employment.  Employees shall not use sex, race, religion, national origin, ethnic background, disability or age in their words, actions, gestures, conducts or behaviors that could be construed or perceived by another employee or potential employee as hostile, offensive or intimidating.

a.    It is management's right and responsibility to channel, control, and otherwise prohibit employee's behavior or conduct that has the potential to cause employer liability or disruption in the work force or to subject management to civil liability for violations of en employee's civil rights.

On-the-job or job related sexual, ethnic, racial, national origin, or religious harassment is a serious violation of an employee's, or potential employee's, civil rights.

EVANS/PTA141

6.      **Committing Unsafe Acts or Endangering Self or Others**

Employees shall not commit acts or behave in such a manner that has the potential for endangering or injuring themselves, property, or another person.

a.      Safe behavior in public service work is paramount due to the level of public trust and the nature of the equipment involved (e.g., firearms, motor vehicles, impact tools, chemicals, etc.).  Unsafe behavior and unsafe use and handling of equipment significantly increases the risk of injuries to citizens and personnel plus increases the risk of potential liability for this Department.

7.      **Conflicts of Interest**

Employees shall not create conflicts of interest with the duties and obligations of their positions within this Department.

a.      Public service work requires that employees do not compromise the authority, integrity, trust, or confidence inherent in their offices.
Public safety officials have easy and often uncensored and unquestioned access to people, information, resources and positions of trust not easily available to the general citizen.  This "freedom of office" must be governed and controlled if the public trust is to be preserved.  Failure to do so will severely restrict the ability of this Department to provide its services in an effective and efficient manner.  When conflicts of interest occur between the employee's private rights as a citizen and privileged rights attributed to the employee's position with this Department, management attempts to bring about a reasonable balance, if possible.  When this balance cannot be made and the employees' interests are in promoting their own personal interests, management must initiate action designed to promote the mission of the Department.

8.      **Co-Operation with Employees and Other Officials**

Employees are required to affirmatively seek ways to cooperate and work with other employees, other public

EVANS/PTA142

officials, and employees of any organization with whom the employee or this Department needs to have a good working relationship in order to deliver lawful, effective, efficient, and safe services.

    a.    The need to work in a cooperative manner with employees of other agencies and public officials is self-evident.  In today's society, the effective, efficient and safe delivery of public services requires a coordinated effort of all employees and public service agencies.

**9.    Supervisors Shall Display Respect Towards Subordinate Ranked Personnel**

Supervisors shall treat subordinates with the same courtesy and respect that is required of subordinates to display to supervisors.  Criticisms of a employee or an employee's performances will be made directly to the subordinate and, when practicable, in a private setting.

    a.    Employees who are treated with respect, concern, and courtesy are typically better performers and have higher morale.  Supervisors who respect subordinates and limit criticisms to unsatisfactory work performances obtain higher levels of employee cooperation than those who direct their criticisms at the employee's person.

        Because supervisors are management's representatives, higher levels of performance are expected of them in this area; and they are expected to set a positive example for others to follow.

**10.    Discriminating or Establishing Patterns of Discrimination in the Performance of Duties**

In words, deeds, gestures, performance of jobs, duties, tasks and delivery of services, employees shall not discriminate; nor shall they establish a pattern of adverse impact in the delivery of services when such discrimination has a basis in such areas as a person's sex, ethnic background, race, color, national origin, lifestyle, preferred sexual orientation, religion, criminal history, age, disability or social status.

EVANS/PTA143

a.  Public employees must strive to maintain neutrality in the performance of duties and delivery of services to all persons regardless of their personal characteristics social status or work conditions  Discriminatory services and treatment of all citizens creates a serious threat to the well-being of all as well as exposes this Department to the possibility of civil and/or criminal action.

**11.    Dishonesty or Untruthfulness**

Employees shall not lie, give misleading information, or falsify written or verbal communications in official reports or in their actions with another person or organization when such information may be relied upon because of the employee's position or affiliation with this Department.

a.  Public work is based on public trust and confidence. Performance standards in this area are much higher for public employees than for the ordinary citizen.

**12.    Displaying Competent Performance and Achieving Competent Performance Results.**

Employees shall willfully display competent performance and consistently achieve competent performance results on all assigned or assumed job responsibilities, duties and tasks.

a.  In a public safety organization where much of the work effort involves citizens' liberties and physical safety, incompetent performance cannot be tolerated.  When incompetent performance is discovered, its source must be dealt with effectively and efficiently or the potential of damage or injury exists.  When this potential occurs, the organization runs the risk of incurring severe criticism, the loss of public trust and the creation of civil liability.

NOTICE:  As the term is used here, **competency is a characteristic of a performance outcome, not a characteristic of an individual.**
Employees are hired to achieve results; and if an employee brings about an acceptable performance outcome, he or she has displayed the ability to apply his or her combination of knowledge, skill, and attitude

within the context of the situation to bring about a useful outcome for the organization.  Knowledge, skill, and attitude are useless to the organization if the employee is unable to apply them in a productive manner.

**13.    Establishing Patterns of Absenteeism**

Employees shall not establish patterns of absenteeism. Establishing a pattern of absenteeism is a violation of official standards regardless of whether any part of the absenteeism within the pattern has been approved or disapproved by management.

a.    All absenteeism affects the effective, efficient, and safe operations of this Department.  The nature of public safety/security work requires a cadre of workers capable and ready to handle any established or expected service demanded by the public.  Public personnel have specialized and specific training that cannot be easily replaced or substituted by other persons, and replacement or substitutions are usually difficult for management.

Management accepts the fact that a certain amount of "planned absenteeism" will occur in any organization, and in many cases the causes are justified by the nature of the individual and specific circumstances existing at the time.  However, when an employee establishes patterns of absenteeism, management interprets this as substantial evidence of abuse and violation of this standard.

**14.    Physical and Mental Readiness to Perform Primary Duties and Tasks**

Employees shall report to work and while working remain mentally, physically, and emotionally ready to assume and competently perform all their responsibilities, duties, and tasks.

a.    Effective, efficient and safe public service depends on employees being ready to perform competently and effectively at a moment's notice.  Public trust and quite often threats to employee safety can occur in a public

safety organization if management had to wait for nonperformance to occur before testing and monitoring for readiness. It is reasonable and logical to assume that employees who are physically and mentally ready to perform will be better performers than those who are not as physically and mentally prepared.

Employees who lack the physical and mental capabilities to assume the responsibilities and duties expected of their jobs create a public safety hazard for themselves as well as others who may depend on their performance to provide an effective, efficient and safe protective service.

It will be job tasks that are performed on a regular basis that are used to determine in part the expected level of the employee's fitness and mental and emotional readiness. For example, it is reasonable to expect a uniformed employee (e.g., law enforcement officers, firefighters, emergency medical personnel) who encounter physical exertion on a regular basis to maintain a higher level of physical and mental readiness than perhaps an administrative employee whose regular duties are more sedentary in nature.

Conversely, the non-uniformed employee who deals daily with administrative decision is expected to be able to handle higher levels of administrative stress than perhaps the street officer or firefighter. It is reasonable to expect differences in their levels of performance because of the priority and repetitive nature of their daily tasks.

15. **Giving a Full Day's Work for a Full Day's Pay**

Employees shall give a full day's work for a full day's pay and not establish patterns of nonproductive work time.

a. The concept of expecting employees to give a full day's work for a full day's pay is heavily embedded in joint American Labor/Management.

Although public work is typically reactive in nature, a large portion of non-responsive work time can be spent performing self initiated work. It is during self-initiated work periods that the preventive and deterrent

nature of protective and safety services is achieved and provides the creates opportunities to effectively and efficiently deliver services.

The concept of a full day's work for a full day's pay does not mean employees are expected to have identical levels of work from one day to the next. However, work patterns do exist and an analysis of data on a monthly, quarterly, semi-annual, or annual period provides a descriptive picture of the amount and type of work that can be reasonably expected from employees who are truly giving a full effort.

16.   **Insubordination**

Employees shall willfully observe and obey the verbal and written rules, duties, policies, procedures, and practices of the Independence Police Department. They shall also subordinate their personal preferences and work priorities to the verbal and written rules, duties, policies, procedures and practices of this Department, as well as to the orders and directives of supervisors and superior command personnel of this Department. Employees shall willfully perform all duties and tasks assigned by supervisory and/or superior ranked personnel. Direct, tacit or constructive refusal to do so is insubordination.

a.   Employment is a mutual exchange of interests and benefits between management and its employees. In exchange for the privilege of employment and paid compensation, management has the right to expect employees to willfully perform the duties and tasks of their positions or any other task assigned and to achieve effective and efficient performance results. It is reasonable to expect employees to obey operational directives and the orders of the Department's supervisors. When disagreements between management and employees occur, management has the right to expect employees to follow the accepted labor principle of "obey now and grieve later".

Insubordination and insubordinate behavior are considered to be among the most serious offenses. If insubordination is allowed to go unchecked,

management loses control and authority over its work force.

17.   **Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions**

Employees shall display an affirmative, consistent effort to observe and comply with the directives, rules, policies, procedures, practices and traditions established for the effective, efficient, and safe operations of this Department. This standard applies to policies, procedures, and practices that are written as well as those established by past patterns or practices.

Affirmative effort as the term is used here means to self initiate acceptable ways to comply.  In other words, look for ways to comply with the standard and not look for the exceptions to the standard.

a.   Policies, procedures, and practices are management's tools to achieve overall official efficiency and effectiveness in day-to-day operations and decision making.  They are designed to communicate management's intent and to help management focus its resources.

18.   **Observance of Criminal and Civil Laws**

Employees shall obey the constitutional, criminal and civil laws of the township, city, county, state, and federal government.

a.   Service and protection of the public, impartial administration and carrying out of duties, observing and obeying the very laws sworn to uphold, and providing equal service to all are covenants public officials have with citizens and are bound to honor if they wish to remain in public office.  Officials who violate those very laws and canons that they are sworn to uphold and observe destroy public faith and respect for this Department and weaken this Department's ability to perform its service mission.

EVANS/PTA148

19. **Courteous and Respectful Behavior Toward Positions of Authority**

Employees shall be subordinate and display courtesy and respect in words, deeds, gestures, and actions towards personnel holding higher levels of official authority.

a. The purpose of supervisory positions is to ensure reasonably that the mission, goals and directives of this Department are carried out in an efficient, effective, and safe manner as well as to provide accountability for the performance of the work unit.

Management requires subordinates to display respect and courtesy to higher positions because it provides a sense of order as well as serves as a tangible indication that subordinates are willing to subordinate personal priorities, goals, and objectives to the needs and mission of this Department.  In addition, the willingness and ability of an employee to subordinate personal interests and to display respect and courtesy to a supervisor is a reasonable assessment of the employee's capabilities to set aside personal feelings and priorities when dealing with citizens.

20. **Use or Unlawful Sale or Possession of Illegal or Unauthorized Drugs**

Employees shall not unlawfully possess, sell, consume, use or assist in the use of any illegal or unauthorized drugs or medications on duty or off duty.  Nor shall any employee consume any unauthorized drug or medication in proximate time to his or her reporting time for duty, nor shall he or she report to duty with evidence of having consumed such drugs or medication.

NOTE: **Unauthorized means any substance, drug or medication that is illegal to possess as well as any legal substance, drug or medication that is used without medical approval as well as drugs used without the knowledge of management.**

EVANS/PTA149

a.  The illegal and improper use of drugs is a national problem.  Public officials who are known to use illegal drugs or use authorized drugs in an improper manner subject this Department to severe public criticism and damage the image of the total Department.  By its very nature, public safety work depends on the employee's ability to evaluate critical situations and make judgments that affect public confidence and often citizen's lives, liberties and safety.  It is critical that judgments be as unimpaired as practicable and free from the adverse effects of any drugs.

## 21.  Use and Care of Property and Equipment

Employees are accountable for the proper use and care of any property or equipment assigned to them, used by them, or under their direct or constructive care.

a.  Constructive care means caring for equipment not being used, found, left unattended, or unsupervised.  All employees are accountable for assuming the care for such equipment and are required to take action affirmatively to return it to its place of proper storage.

Property means tangible and intangible ownership of goods, rights, or privileges of this Department (e.g., tools, weapons, copyrights, logos).  Equipment is the tool by which this Department is able to accomplish its objectives and mission and represents a capital investment of public resources.

Management has the specific right and inherent interest in assuring the public that its equipment will be cared for and used in an effective, efficient and safe manner.  Part of this responsibility includes designating what equipment will be used, how it will be used, who shall and shall not use Department equipment or property, and how it shall be cared for while entrusted to an employee.

Approved by the Order of:

_____

Chief of Police, Mike Kilbane

EVANS/PTA150

EVANS/PTA151

**THE CITY OF INDEPENDENCE
DEPARTMENT OF POLICE**

**GENERAL ORDER:** 108
**SUBJECT:** Media Relations
**EFFECTIVE DATE:** September 5, 2011
**REVIEWED DATE:** November, 1, 2015

I.  **POLICY**

To inform the news media of events which occur within our jurisdiction in a timely manner, with accuracy, and with as much detail as allowed by the circumstances.

II.  **PURPOSE**

To provide Police Department personnel with guidelines to follow during interactions with the media.

III.  **PROCEDURES**

A.  General

1.  The Department is committed to informing the community, and the news media, of events within the public domain that are handled by or involve the Department. The release of information to the media shall be governed by standards that respect ORC 149.43.

B.  Public Information Responsibility

1.  The Chief of Police is responsible for the public information function.

2.  In the absence of the Chief of Police, the Officer-in-Charge shall:

a.  Provide the media with the legally required amount of basic information.

b.  Advise the media that the incident is under investigation, and

c.  That no further information is available at this time, and

EVANS/PTA152

      d.      That they will be contacted when more information is available.

      e.      The Officer-in-Charge shall leave a report for the Chief of Police advising him of the information released and to whom it was released to.  This report may be in written form or an e-mail.

3.      Should a critical incident or serious situation occur that generates a great deal of media interest, the Chief of Police shall be contacted to handle the media inquires at the scene or to advise the Officer-in-Charge on the scene of the information which may be released.

4.      News media questions regarding ongoing criminal investigations shall be handled by the Chief of Police in conjunction with the Commander of the Detective Bureau and the appropriate prosecutor's office.

5.      Only the Chief of Police may release information relating to internal personnel files and investigations.

6.      Personnel assigned to the Communications Center or the Front Office who receive telephone inquiries from the media shall:

      a.      Transfer the phone call to Chief of Police, if he is available;

      b.      If the Chief is not available, transfer the phone call to the Officer-in-Charge, or the Detective Bureau OIC.

      c.      If the Officer-in-Charge is not available, take the name, phone number, and media affiliation of the party calling and advise him that the Officer-in-Charge will return his call shortly; and

      d.      Under no circumstances are personnel assigned to the Communications Center authorized to release any information without the approval of the Officer-in-Charge; unless there is a press release that has been approved by the Chief of Police, or his designee.

7.      Telephone calls from the media should be returned with as little delay as possible.

EVANS/PTA153

8.    Anytime a representative of the media is denied access to certain information, as outlined in this order, that representative shall be given a courteous explanation of the reasons for such denial.

9.    The Chief of Police or his designee shall prepare media releases concerning newsworthy events or incidents where minimal information was given out.

10.    Personnel of the Police Department shall not submit to personal interviews or write letters to editors without first consulting with the Chief of Police under the following conditions:

    a.    That person is representing himself as an employee of the City of Independence and

    b.    The content of the letter or interview involves City issues.

C.    Frequency of Dissemination of Information to the Media.

The Chief of Police shall determine the frequency and content of media releases.  Information shall be released to the media when it becomes available and is determined by the Chief of Police to be of importance to the media.  Information shall be made available to all media sources on an equal basis.

D.    Access of the Media to Incident Scenes

1.    The Officer-in-Charge of the shift or his designate shall control the access of the media at the scene of a crime, accident, or other incident that is under the control of the Department.

2.    The news media shall be denied access under the following circumstances:

    a.    If the owner of the private property requests they be excluded; and such exclusion is in conformity with the law.

    b.    If there is a possibility evidence will be damaged, tampered with or removed from the scene of a crime, or the investigation will be hampered; and

    c.    During an in-progress incident, if the media's presence would disrupt operations, or place a citizen or Police Officer in substantial risk of injury or loss of life.

E. Guidelines for Disseminating Information to the Media

1. In instances where members of the Department are actively involved or have just concluded with an incident, care should be used before speaking with media representatives.

    a. All reports containing the pertinent information on the incident shall be completed prior to conversing with the media to ensure that any information given out is accurate and consistent.

    b. If the Chief of Police is not available, the Officer-in-Charge shall release a minimum amount of information and consult with the Chief of Police concerning what other information is appropriate for release.

2. The following guidelines shall be followed when releasing information:

    a. Information which may be released:

        1. Edited information concerning criminal acts and traffic accidents that is contained on the face of the offense/incident report and traffic accident report forms;

        2. A brief description of the incident to include location, time, injuries sustained, or damages resulting from incident;

        3. Identity of victim **after** notification of the family;

        4. Whether there are suspects or not;

        5. Information concerning unidentified suspects to include a general description, vehicle description and other pertinent information;

        6. Identification and photograph of a fugitive from whom a warrant had been issued; and

        7. The name of the Officer-in Charge of the investigation.

b.    Information which may **not** be released

    1.    Information that would endanger the life or physical safety of law enforcement personnel, a crime victim, a witness or a confidential information source.

    2.    Information concerning an ongoing investigation, whether it be a crime or traffic accident, shall not be released if the information would jeopardize the investigation or prosecution of a subject;

    3.    The identity of suspects who have **not** been charged;

    4.    Information on matters that are currently in litigation in the courts.

    5.    Information that may incur liability upon the City.

c.    Information **Not** Released Without Proper Authorization:

    1.    Names of City employees involved in accidents without approval of the Law Department; and

    2.    Information regarding personnel of this Department and internal investigations.

d.    Information released after arrest and charged:

    1.    Time and place of the arrest;

    2.    The arrestee's name, age, sex, residence and charges may be released.

    3.    The circumstances surrounding the arrest, such as place of arrest, resistance, pursuit, use of weapons, and evidence seized may be released if this information will not hinder the outcome of the case; and

    4.    The name of the arresting officer and the probable duration of the investigation.

  e.  Information **not** released after arrest;

    1.  Information regarding the character, reputation, or prior criminal record of the defendant;

    2.  Photographs of the accused;

    3.  Confessions, statements, or refusal of same by the accused.

    4.  Results of any test or examinations taken by or given to the arrestee.

Approved by the order of:

_____
Mike Kilbane,
Chief of Police

EVANS/PTA157

**THE CITY OF INDEPENDENCE**
**DEPARTMENT OF POLICE**

**GENERAL ORDER:** 601
**SUBJECT:** Records Security and
Privacy
**EFFECTIVE DATE:** April 2, 1999
**REVIEWED:** February 1, 2018

**I.     POLICY**

To establish security and privacy measures for police records and to protect
the integrity of the information contained therein; thusly protecting the
privacy and rights of individuals who may be identified in the file.

**II.    PURPOSE**

To define the various security and privacy measures for the Records
Unit and to direct any department members who may interact with records.

**III.   PROCEDURES**

A.   Unauthorized Dissemination of Information Prohibited

1.   No information is to be released to any person outside of the
department except as may be authorized by practices
established by the Chief of Police.

a.   The Chief of Police is the Department's designated Public
Information Officer, unless so delegated by him/her to
someone else.

2.   Records may not be copied and held by members of the
department without permission of the Chief.

a.   This does not apply to officers working within the scope
of their duties.

3.   Persons copying or releasing information in an unauthorized
manner may be disciplined.

EVANS/PTA158

B.  Unauthorized Destruction or Theft of Records Prohibited

1.  Offenses that are punishable under the law (Ohio Revised Code Section 2913.42, Tampering with Records) will be investigated and may result in criminal and/or administrative action.

C.  Access to Records

1.  Only the following personnel are authorized direct access to departmental records stored in the archives. (All other personnel shall request that the records be accessed by authorized personnel.)

a.  The Chief of Police, Deputy Chief, Lieutenants, and Record Clerks.

D.  Criminal History Information

1.  This department utilizes the Ohio Computerized Criminal History (CCH) available through LEADS and the Interstate Identification Index (III) available through NCIC.

2.  Criminal History information available through either of these computerized files will only be obtained and disseminated according to procedures and restrictions established by LEADS and NCIC.

3.  Any person obtaining or disseminating criminal history information contrary to those procedures and restrictions will be subject to internal investigation.

Approved by order of:

_____

Mike Kilbane,
Chief of Police

EVANS/PTA159

EVANS/PTA160

**THE CITY OF INDEPENDENCE**
**DEPARTMENT OF POLICE**

**GENERAL ORDER:** 602
**SUBJECT:** Report Release Procedures
**EFFECTIVE DATE:** April 2, 1999
**REVIEWED:** February 1, 2018

**I.      POLICY**

To prepare and make available all police department public records
in an efficient and timely manner staying within the Ohio Sunshine Law.

**II.     PURPOSE**

To advise personnel of the requirements contained in Section 149.43, Availability
of Public Records, and to provide an internal system for responding to requests for
inspection from members of the public.

**III.    PROCEDURE**

    A.    Public Records

        1.    Definition "Records"

            a.    Includes any document, device, or item, regardless of
                  physical form or characteristic, created or received by or
                  coming under the jurisdiction of any public office of the
                  state or its political subdivisions, which serves to document
                  the organization, function, policies, decisions, procedures,
                  operations, or other activities of the office.

        2.    Definition "Public Record"

            a.    Means any record that is kept by any public office,
                  included, but not limited to state, county, city, village,
                  township, and school district units, except medical records,
                  records pertaining to adoption, probation, and parole
                  proceedings, records pertaining to actions under section
                  2151.85 of the Revised Code and to any Appeals actions
                  arising under that section, records listed in Chapter 3107 of
                  the Revised Code, trial preparation records, confidential

EVANS/PTA161

law enforcement investigatory records, records containing information that is confidential under section 4112.05 of the Revised Code, and records the release of which is prohibited by state or federal law or further exempted in ORC 149.43A1.

B.    Availability

1.    All public records shall be promptly prepared and made available for inspection to any person at all reasonable times during regular business hours. Upon request, a member of the department who is authorized by the Chief of Police shall make copies available at the established cost, within a reasonable amount of time.

   a.    All established costs associated with the release of public records, which are maintained by the department, are set by the City Finance Department.

   b.    Record availability shall also conform to the record retention schedule established by the City Of Independence's Public Records Committee.

2.    The regular business hours for the Records Bureau are from 8:00am to 4:00pm, Monday through Friday, excluding any holiday adjustments that will be posted.

3.    If a citizen allegedly is aggrieved by the failure of a member of the department to promptly prepare a public record, maintained by the department, the citizen shall:

   a.    Request a meeting with the lieutenant in charge of the Records Bureau and advise him of the complaint. If the citizen is still not satisfied with the results they then:

   b.    Request a meeting with the Chief of Police. If the citizen is still not satisfied with results, they shall be requested to place their complaint into written form and it shall be forwarded to the HR and Mayors Office for reconciliation.

   c.    Allegedly aggrieved citizens shall also be advised that ORC 149.43 provides a legal means for addressing their complaints in these disputes.

C.    Confidential Law Enforcement Investigatory Records

1.    No member of the department is authorized to release any public record  maintained by the department which contains information that is classified as a Confidential Law Enforcement Investigatory Record.

2.    Confidential law enforcement record means any record that pertains to a matter of a criminal, civil, or administrative nature, but only to the extent  that the release of the record would create a high probability of disclosure of any of the following:

   a.    The identity of a suspect who has not been charged with an offense to which the record pertains, or information source or witness to whom confidentiality has been reasonably promised.

   b.    Information provided by an information source or witness to whom confidentiality has been reasonably promised, which information would reasonably tend to disclose his or her identity.

   c.    Specific confidential investigatory techniques or procedures specific to investigatory work product.

   d.    Information that would endanger the life or physical safety of law enforcement personnel, a crime victim, a witness, or a confidential information source.

3.    Employees of the department, who are authorized to release public records maintained by the department, shall take the appropriate action to ensure that confidential law enforcement information is not released.  Excluded information shall be redacted from releasable information in the following manner:

   a.    After reviewing the requested record and determining that it contains non-releasable information, the releasing employee shall make a copy of all pages containing the excluded information.

   b.    The releasing member shall then place the date, their badge number, initials, and the name (if given) of the requester (person seeking the information) on the reproduced page.

      c.     The releasing member shall then color over the restricted information on the reproduced copy with a black marking pen in a neat manner.

      d.     The releasing member shall then reproduce a copy of this page which shall be the page that is released to the requester.

      e.     The first reproduction page, which is the worksheet, shall then be attached to the original report, which is maintained by the department.

D.    General exceptions to the Release of Public Records

    1.    Members of the department are not authorized to release any investigatory report falling under the following criteria:

      a.     During the pendency of a criminal case, information subject to discovery pursuant to Crim. R. 16 is not a public record.

      b.     During the investigation of a criminal case, both before and after criminal charges are initiated, law enforcement records are not public records under the work product exception, except for routine offense and basic incident reports.

      c.     After the defendant has been convicted, records which are not discoverable under Crim. R 16 are still not public records until all appeals and post-conviction proceedings are completed.

    2.    All requests for police investigatory reports in which criminal prosecution is pending, or possible, shall be handled as follows. This request shall be reviewed by the Detective OIC or by the Chief of Police.  Only with the approval of the Det. OIC or Chief of Police shall any information, other than what is allowed above, be released.

EVANS/PTA164

E.   Access

    1.   Police Records Bureau

        a.   All requests for public documents maintained by the department shall be directed to the Records Bureau.

            i.   All persons requesting to review, and/or gain copies of public records shall be requested to place their request in writing, on a form provided by the Independence Police Department.

            ii.  If the requesting persons refuse to place the request in writing, a member of the department shall complete the form, by asking the requester for the required information.

            iii. No person shall be refused access to public records based on their refusal to submit a written request for the records.

        b.   Persons requesting public records maintained by the department, but not as part of the general retention of the Records Bureau, shall have their request forwarded to the office of the Administrative Lt.

            i.   Persons requesting public records that are maintained in an area other than the Records Bureau shall be advised that their request shall normally be reviewed and processed within three to five days.

            ii.  This time period is provided to allow the administrative staff adequate time to search, review, and copy the requested public records.

F.   Video, Audio Tapes, Photographs, and Computer Media

    1.   The department maintains a limited storage of audio, video tapes and computer media.

2.  Persons requesting copies of these records may be required to furnish blank recording tapes or discs of sufficient quality, to allow reproduction of the requested material.

3.  Costs shall be determined on a request basis, following the guidelines established in this policy.

4.  Photographs

   a.  Persons requesting photographs pursuant to this policy shall be charged only the actual cost incurred by the department for the reproduction of these photographs.

G.  A.D.A. Compliance

1.  The Independence Police Department shall facilitate all requests made by all citizens, regardless of handicap or disabilities. Departmental personnel shall take all reasonable steps to ensure that no one is denied access to public information on the basis of a handicap or disability.

2.  The department shall follow all standards and guidelines established by local, state and federal laws or mandates, as it pertains to the Americans with Disabilities Act, and any other applicable laws.

Approved by the order of:

_____

Mike Kilbane,
Chief of Police

EVANS/PTA166

o INTRO: W⁰ EVANS: INV ATTORNY: PTI ; HIRED to INV. UNAUTH DISSEMINATION of
o GARRITY OR NOT INV UNDER 2913.04 (From Delene).

o READ Ho ORDER (From phone words illegible)
o Generally the FIRST interview IS INFORMATION Gathering, AND A
  SECOND interview IS Necessary AFTERWARDS, LATER ON.

o NAME RANK DATES of EMPLOYMENT ; prior EMPLOYMENT

• FORMALITIES FOR reference , TAPE FOR MY NOTES (kept wont B
  EXH O ORDER DISCUSSED.
• EXH 1 From MAZZOLA to SGT KURT @ PRODUCING or SGT SU/P.

    2 to PATROL DIV From CHIEF @ Officer ACTIVITY.

    3 DALTON RETO Performance STANDARDS (Expectations)

    4 K MAZZOLA PRE-D NOTICE (LANGUAGE IS IN EXH 5)

    5 GALLER PRR

    6 ORC 2913.04 HIGHLIGHT AREA

o HAVE
o IS IT PERMISSIBLE FOR AN Officer to PROVIDE INTERNAL AFFAIRS
  INFORMATION (FOR PROPRIETARY purposes ONLY) to OUTSIDERS?

✓Q IS EXH 1, 2, 3, 4, 5, B AN INTERNAL PROPRIETARY
   POLICE
   CITY COMMUNICATION? WHY?

✓Q CAN YOU THINK OF A LEGITIMATE REASON WHY the POLICE ANYONE WOULD WANT CITY
                                                        PROPRIETARY INFO
                                                        SENT OUTSIDE
                                                        THE DEPT

✓Q ANY THOUGHT ABOUT WHY EMPLOYEES SHOULD
   BE PRODUCTIVE, OR SHOULD NOT BE PRODUCTIVE
   FOR THE Benefit of Ho Community They SERVE?

✓Q IF AN OFFICER OF THIS DEPT PROVIDED THE PRESS
   WITH EXH 1 2 3 4 TO THE PUBLIC, IS THAT A
   REASON TO BE DISCIPLINED FOR Ho PERSON WHO DISSEMINATED.

EVANS/PTA167

## GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: _03/13/2019_

Officer's Signature: _____

Officer's Printed Name: _SHANE BATES_

Witness: _____

EVANS/PTA168

SHANE BATES.
7:00 AM
3-13-19

SARA LIVA

SHANE w/ CITY IND 2003.
    BOSTON HTS 5/2001 - 2003 SGT Chief/Lieutenant
    MARSHALLVILLE 1/2001 - aug 01.

DIDNT KNOW @ this very investigation.

CFH   1  @ Aug 8th  I SAW IT around then.
         IN EMAIL or HANGING ON wall outside commander's office
         ON wall (LT MAZZOLA).

      2  I SAW this in my Email. & on DOOR/wall

      3  I don't Recall maybe if it was laying out

      4  I dont Recall

         I drove Bratton's CRUISER & it fell from the
         VISOR. ref ITEMS 3 & 4. @ Jan 15 2019.

- I've never made copies of ABOVE.

- I agree they are prurient.

- I did not DISSEMINATE nor Do I know who
- These were jokes @ guns Joked                did.
  "Bombs"     I mean took my seriously.

- WHY ARE they prurient; ANS they are interest in nature.
- I've been one of the most
  productive employees here at P.D.

- when Bratton was written up he was upset
  @ IT.

- Policy I presumably dont Have A problem w/ policy.

EVANS/PTA169

## Internal Investigation Pre-Interview

Name _SHANE BATES_     Shift _6p - 6A_

Department _PATROL POLICE_     Division _P/T W HUMAN TRAFFICKING_

Date _3-13-19_    Time _7:00 AM_     Location _CITY HALL_

Interviewer _EVANS_     Title _____

You are the subject of an administrative investigation.  The known allegations are:

_DISTRIBUTION/DISSEMINATION/DISCLOSURE OF PROPRIETARY_
_POLICE INFORMATION/DOCUMENTS._
_____
_____

**Ask** the employee if he/she wants a labor representative.  Yes ✓ No _NA_

If yes, representative's name _SARA LIVA_     Phone _____

Department _BOB PHILLIPS OFFICE   SARA LIVA_    Division _____

If a request for a labor representative is made, do not interview until a representative is available.

Concluded at_____     Rescheduled for_____

================================================================

You are being interviewed as part of an official administrative investigation by the _MAYOR'S OFFICE_
_THRU WM D. EVANS II_ _____.  This investigation is being handled by the
representatives from Poly-Tech Associates, Inc.  You will be asked questions relating to the
performance of your official duties or fitness for office.  If you refuse to answer questions completely and/or
accurately, you may be subject to disciplinary action up to and including dismissal. Statements provided
under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.

================================================================

Signature of employee: X _____

Date _03/13/19_

Signature of witness: X_____

Date _3·13·19_

================================================================

Interview breaks: Stop_____Start_____Stop_____Stop_____

Interview completed at: _740 AM_

Tape recording made of the interview?  Yes_____ No_____

If yes, tape recording made by: _____

Signature of interviewer: X_____

Employee to receive a copy of completed form.

EVANS/PTA170

157 2

Brian Darrow

Did you You Know a copy of Leurys Pre D.
w/out come 9/7/93
B.4 w/Paper company
B.4 in Air Force
• This is IA. can't remember my other Except Guy co so.
Destroyed Evidence @ Chief Dogan @ 10 yrs ago.
all of us on the Nar.

Ex# 1  D/4 See it B.4  Yes all Four Sgt got a copy
I saw it when Sgt went over it w/me & others collectively
my sgt is worens.

Ex# 2  I don't recall the specific stock, I don't recall seeing it
~~saw it before~~  Before

Ex# 3  I s/it I saw it

Ex# 4  Does not recall saw it ever.

I had gone Bladder Surgery 1/7/19 I went to
Hospital @ 5 pm on the 7th. Rick Price
took over my shift I think. I only Had
copy away w/ chief. I put my copy in
a manilla envelope & put it in my
mailbox w/ my grievance & I put the
envelope in M/B at office on or @
Friday 1/11 or on Friday /19. I didn't
Seal the Envelop. my only copy was in
the Envelope. I never saw Ex14 4 before.
Did you ever told it put in Sun visor
I thought I put it in my Box myself I
put it in my Visor But I NEVER SAW

EVANS/PTA TPD

Item 4/11 maybe I did not it also my Visor.

2 of 2

Darren

would you agree of 1, 2 me interaffio

2 Have not Directly or indirectly Disseminate
1-4

I would want you to find out who sent out
my write-up Measure

news Report @ guelta
I'm not a fan of Gruelk

(X) I didn't tell the media @ my write up
only Sgt ~~____~~ my Sgt
② myself
③ chief
④ Lt Mazzola

Permanent
in Earth
Brice over 1/2 hr
at the P.D.

(X) I don't KFS if I put it above my
visor.

says he can't stand Gruelk & doesn't trust him
I had no reason to tell the media.
so you think the CORRECT aired you out, Wendy?

Don't know
would he
have gave
He wouldn't
air it

NOT ME !!!

Mazzola   I don't think so.
my other narrative was NO
Don't than Before   Mazzola = Chief

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: 13 Mar 19

Officer's Signature: _____

Officer's Printed Name: Brian Walton

Witness: Sam Iwa

## Internal Investigation Pre-Interview

Name _BRIAN DALTON_          Shift _6A — 6P_
Department _PATROL Police_       Division _PATROL_

Date _3-13-19_   Time _8⁴⁰ AM_   Location _City Hall_
Interviewer _Evans_          Title _____

**You are the subject of an administrative investigation. The known allegations are:**

_DISTRIBUTION / DISSEMINATION / DISCLOSURE OF PROPRIETARY_
_Police INFORMATION / Documents._
_____
_____

Ask the employee if he/she wants a labor representative.  Yes _✓_  No _____
If yes, representative's name _SAM LIVA_          Phone _____
Department _Bob Phillips Office Sam Liva_ Division _216 781 3600_

If a request for a labor representative is made, do not interview until a representative is available.
Concluded at _____   Rescheduled for _____

You are being interviewed as part of an official administrative investigation by the _Mayors Office_
_thru WM D. Evans II_ _____. This investigation is being handled by the
representatives from Poly-Tech Associates, Inc. You will be asked questions relating to the
performance of your official duties or fitness for office. If you refuse to answer questions completely and/or
accurately, you may be subject to disciplinary action up to and including dismissal. Statements provided
under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.

Signature of employee: X _[signature]_
Date _3 - 1 3 -19_

Signature of witness: X _____
Date _____

Interview breaks:  Stop _____ Start _____ Stop _____ Stop _____
Interview completed at: _9⁵⁰ AM_
Tape recording made of the interview?   Yes _____   No _____
If yes, tape recording made by: _____

Signature of interviewer:X _____

Employee to receive a copy of completed form.

## Internal Investigation Pre-Interview

Name _Sgt Clair Cross_                Shift _____

Department _Independence PD_          Division _____

Date _3-13-19_  Time _10⁰⁰ AM_  Location _City Hall_

Interviewer _____  Title _____

You are the subject of an administrative investigation.  The known allegations are:

_Dismisation / Dissemination / Disclosure of Proprietary_
_Police Information / Documents ._

_____

Ask the employee if he/she wants a labor representative.  Yes __✓__  No _____

If yes, representative's name _Tom Liva_      Phone _216 781 3600_

Department _Bob Phieps Office_            Division _____

If a request for a labor representative is made, do not interview until a representative is available.

Concluded at _____  Rescheduled for _____

═══════════════════════════════════════════════════════════════

You are being interviewed as part of an official administrative investigation by the _Majors Office_
_Thru Wm A. Evans II_ . This investigation is being handled by the
representatives from Poly-Tech Associates, Inc.  You will be asked questions relating to the
performance of your official duties or fitness for office.  If you refuse to answer questions completely and/or
accurately, you may be subject to disciplinary action up to and including dismissal.  Statements provided
under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.

Signature of employee: X _Sgt C Cross #023_

Date _03/13/19_

Signature of witness: X _____

Date _____

═══════════════════════════════════════════════════════════════

Interview breaks:  Stop _____ Start _____ Stop _____ Stop _____

Interview completed at: _11⁰⁰ AM_

Tape recording made of the interview?      Yes _____  No _____

If yes, tape recording made by: _____

Signature of interviewer: X _____

Employee to receive a copy of completed form.

EVANS/PTA175

1 of 2

Cliric Cross.

Sgt; 20+ years.
Nsque HTS 1½ yr.
Dosty Sareace ago

Seen Item 0
I've seen all 1-3 ~~Att Attady~~ not Item 4 (Pri D)
6 Items, 6 Shown — arc 2913.044 — Cliric rela it.

It is a breech 1-4 maybe 3
I'd write them up.
I can't think of a Legit retgon for
DIIT of 1-4.

DIST is a retgon for DISI

I've never seen. #4 Before
Sgt Kutz Hung His on his desk.
If I get a copy of #1 I did not said
mine out a show it

I see Similarty Between 2 & 4
1st 4ft

I Have NO Accen #3 #4 to DALMOS
write up on Callens #5
I only Have Access to ~~#324~~ #1 & #2

D/4 said Any of those Exhibits to Fox &
No problum Have Access to #1-4
WGO Besides Chief Have Access to #1-4
I don't Know

EVANS/PTA176

2012

- I know most of the Dept. knew Brian was butter up.

- the watch Dog @ the mayor. people that dint like the mayor.

- I do not support the dissemination of the documents!

Re: Motive Q to Brian.
There are plenty of people that dint want the Chief Here. He Took Job from Others.

I had - such for the watch Room Years ago.
   - 250 micro cassette Early 2000s
   - 150 Flash Light.    " "

chief all 30 of us would have Been in line

is they anyone whod be upset they sara got chief.
   - Pollick gone here
   - Mazzola still here
   - John Smith ( Retired now )
      ( @ 45 yrs old.

EVANS/PTA177

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: _3 - 13 - 19_

Officer's Signature: _Sgt. _____ #023_

Officer's Printed Name: _SGT. CHRISTOPHER CROSS #023_

Witness: _Gen _____

EVANS/PTA178

3·13·19.
10/2

GReg TiNNiRello.
- 21 yrs w/ RD
- SGT.

Are you familiar w/ 1, 2, 3, 4?
only seen #1

I can't Recall #2 before maybe 1 did?

I never saw #3
I never saw #4

Are 1-4 interior confidential police property
Docs. as you

Discrepancy   I would write up anyone in my command if
they distributed the contents of
Document itself

I DID NOT DISTRIBUTE. to
I Did not have anyone DISTRIBUTE.

Compare Item 17 to 1st Sgt of Public
Records request by Fox.

I see Daltons write up + summary to
Pub records Request.

would you use a poly to verify
veracity.

EVANS_PIA170

D J 2

I Know its not me.
PTRL & Sgt Did not have acess to #3
Item #1 was put on a magnet on
Sgt Kutz & I gave it to
Chief per his request a
couple weeks ago

#3 only Barron LT & Chief had had
        acess to #3
#2 Accessible to anyone

(*) Above Sgt is Mass264 had
    Mayor Asst, chief Police!

→ Whom did this is petty & its B/S.
st majority of P.D. feels this way.

I'm willing to take poly I didn't
    do anything!!

## Internal Investigation Pre-Interview

Name _Greg Tinnirello_     Shift _2 - Midnight_
Department _Police Department_     Division _Patrol_

Date _3/13/19_ Time _____ Location _City Hall_
Interviewer _Evans_     Title _____

**You are the subject of an administrative investigation. The known allegations are:**

_Distribution / Dissemination / Disclosure of_
_proprietary police information / documents_
_____
_____

**Ask the employee if he/she wants a labor representative. Yes__✓__ No_____**
If yes, representative's name _Sara Liva_      Phone _____
Department _Bob Phillips_      Division _____

**If a request for a labor representative is made, do not interview until a representative is available.**
Concluded at_____ Rescheduled for_____

You are being interviewed as part of an official administrative investigation by the _Mayor's office_
_thru W. D. Evans ID_____. This investigation is being handled by the
representatives from Poly-Tech Associates, Inc.  You will be asked questions relating to the
performance of your official duties or fitness for office.  If you refuse to answer questions completely and/or
accurately, you may be subject to disciplinary action up to and including dismissal. Statements provided
under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.

Signature of employee: X _Sgt Greg T_____
Date _3/13/19_

Signature of witness: X_____
Date_____

_To: 11:46 AM   End_

Interview breaks:  Stop_____ Start_____ Stop_____ Stop_____
Interview completed at:_____11:46 AM_____
Tape recording made of the interview?      Yes_____ No_____
If yes, tape recording made by: _____

Signature of interviewer:X_____

Employee to receive a copy of completed form.

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: _3/13/19_

Officer's Signature: _Sgt Greg Tiannello_

Officer's Printed Name: _Greg Tiannello_

Witness: _Gann Lim_

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: 3/13/2019

Officer's Signature: Charles Wil

Officer's Printed Name: CHARLES Wilson

Witness: Sara Jun

EVANS/PTA183

## Internal Investigation Pre-Interview

Name LT CHARLES Wilson                   Shift 8 - 4  or 9 - 5

Department Police .                       Division Det Bureau

Date 3-13-19    Time_____    Location Independence City

Interviewer_____    Title_____

You are the subject of an administrative investigation.  The known allegations are:

Disuse Ation / DISSEmination / DISclosure of Prejuntry
police information / Documents

_____

Ask the employee if he/she wants a labor representative.  Yes ✓    No_____

If yes, representative's name SARA  L-IUA          Phone_____

Department BOB Pikingr .                  Division_____

If a request for a labor representative is made, do not interview until a representative is available.

Concluded at_____    Rescheduled for_____

You are being interviewed as part of an official administrative investigation by the Mayor's Office
FRANK Wm. A. Evms ( II          .  This investigation is being handled by the
representatives from Poly-Tech Associates, Inc.  You will be asked questions relating to the
performance of your official duties or fitness for office.  If you refuse to answer questions completely and/or
accurately, you may be subject to disciplinary action up to and including dismissal.  Statements provided
under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.

Signature of employee: X Charles Allen
Date 3/13/2019

Signature of witness: X_____
Date_____

Interview breaks:  Stop_____ Start_____ Stop_____ Stop_____
Interview completed at:_____
Tape recording made of the interview?     Yes_____    No_____
If yes, tape recording made by: _____

Signature of interviewer:X_____

Employee to receive a copy of completed form.

EVANS/PTA184

LT Charles Wilson                                    3/13/19

31 years. w/ neighbors.

5 item    items 1-4
Are you familiar 1-4?

Never saw item # 2
I did see before #1, B/c I was
      LT Interview union Reg.
I Also saw # 3 9/c Dalton showed it to
I Also saw # 4 I          me Copy of
      Requisition M422921.     Dalton document
                              Looking for guns
                              Weapons

The most collection of sensitive doc___ is
   item.

Admits its proprietary

I did not distribute anything words or property +
   LT should be listed inmate police
Dept.

Look at # 17 Compare to Pg 1 of PRR.

EVANS/PTA185

Ⓧ Access only By CHIEF, Deputy CHIEF
~~EVANS~~ & LT MAZZOLA.
LT Kroger would not have
access to any of the 1-4.

LT — I don't think LT Hus is THO

Motive pissed @ their quote? or —
To make someone look Bad?
not option the incident met to look.
make CHIEF look Bad. if anyone
in danol.

Why'd MAZZOLA Funneled His
Pro & I His SGTs.
would have    ~~Bad~~ Bokowy   not in a positio to see the prol dis.
would not have    SGTs: ~~alows~~   ~~''   ''   ''
   CROSS.
& Cpaing   Threnolds
 notice.     ~~Kovac~~

~~Deputy~~ Chief would have likely been involved.

EVANS/PTA186

3/20/19

3-20-19

① gave a copy of my PO-D
To: Bob Phillips

② I kept my orginal

[3]  H.R

[4]  Chief

Binder is kept w/me
or in my file

- Photo of my Binder info

- my write up could have
Been Scanned in Bus HUB

[ ] Bob Phillips or
LT Sgt PDF maybe throw
Ho Bus Hub

? is there a scan to File ?

EVANS/PTA187

## **Internal Investigation Pre-Interview**

Name _Leonard MAZZOLA_      Shift _X 6 pm & noon · 12 pm_

Department _Police_      Division _____

Date _3 · 13 · 19_   Time _1⁴⁵_    Location _City Hall_

Interviewer _Evans_      Title _____

**You are the subject of an administrative investigation.  The known allegations are:**

_Distribution / Dissemination / Disclosure / of Proprietary_
_Police Information / Documents_
_____
_____

**Ask the employee if he/she wants a labor representative.  Yes** _✓_ **No** _____

**If yes, representative's name** _San Liva_      **Phone** _____

**Department** _Bob Phillips 33160_    **Division** _____

**If a request for a labor representative is made, do not interview until a representative is available.**

**Concluded at** _____   **Rescheduled for** _____

**You are being interviewed as part of an official administrative investigation by the** _Mayors Office_ _Wm D. Evans._ **.  This investigation is being handled by the representatives from Poly-Tech Associates, Inc.  You will be asked questions relating to the performance of your official duties or fitness for office.  If you refuse to answer questions completely and/or accurately, you may be subject to disciplinary action up to and including dismissal. Statements provided under threat of disciplinary action may not be used against you in any subsequent criminal proceedings.**

**Signature of employee: X** _Mazzola_

**Date** _3/13/2019_

**Signature of witness: X** _____

**Date** _____

**Interview breaks:  Stop** _____ **Start** _____ **Stop** _____ **Stop** _____

**Interview completed at:** _2:19 pm_

**Tape recording made of the interview?**   **Yes** _____   **No** _____

**If yes, tape recording made by:** _____

**Signature of interviewer: X** _____

**Employee to receive a copy of completed form.**

# *City of Independence, Ohio*

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD           INDEPENDENCE, OHIO 44131

### Police Department
(216) 524-1234
FAX (216) 328-0110

**To:**    Ptl. Brian Dalton

**From:**  Lt. Len Mazzola

**CC:**    Chief Michael Kilbane

**Date:**  01/07/2019

**Re:**    Performance Standard 10/01/18-12/31/18

---

Ptl. Dalton,

I have completed calculating the numbers for the 10/01/18-12/31/18 Performance Standard reporting period. During this period you wrote 20 citations. The Performance Standard outlined via email delivered to all Patrol, stated that each officer would be responsible to have a minimum of 10 citations per month, thus a total of 30 for each quarterly reporting period.

You have failed to comply with this directive issued. Per Chief Kilbane, this letter serves as a written reprimand to document the situation. Failure to meet acceptable Performance Standard numbers going forward will result in progressively more severe discipline. All other members of the Patrol division have met the Performance Standard for this reporting period.

Please sign below acknowledging receipt of this written reprimand.

Ptl. Brian Dalton    *REFUSED No Just Cause!*

*I Have Threatened And Am Signing This Under Duress!*

Please let me know if there is anything I can do to help moving forward to avoid any issues.

Lt. Len Mazzola

1

EVANS/PTA189

**Bill Evans**

| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Friday, March 08, 2019 11:40 AM |
| **To:** | Bill Evans |
| **Subject:** | Dalton reprimand |
| **Attachments:** | BD Reprimand.pdf |

Bill,

Attached is the reprimand to Officer Dalton that was requested by the reporter. This reprimand was written by Lt. Mazzola, printed out and given directly to Patrolman Dalton. It was not disseminated electronically and the only people who possessed it were Lt. Mazzola, Patrolman Dalton and myself after it was presented to Dalton for his signature. I also included the ORC section below that addresses accessing a computer system beyond the scope of authority, it is an F5.

Please let me know if you need anything else.

Thanks,

Chief Mike Kilbane

# 2913.04 Unauthorized use of property - computer, cable, or telecommunication property.

(A) No person shall knowingly use or operate the property of another without the consent of the owner or person authorized to give consent.

(B) No person, in any manner and by any means, including, but not limited to, computer hacking, shall knowingly gain access to, attempt to gain access to, or cause access to be gained to any computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service without the consent of, or beyond the scope of the express or implied consent of, the owner of the computer, computer system, computer network, cable service, cable system, telecommunications device, telecommunications service, or information service or other person authorized to give consent.

(C) Except as permitted under section 5503.101 of the Revised Code, no person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the law enforcement automated database system created pursuant to section 5503.10 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the chair of the law enforcement automated data system steering committee.

(D) No person shall knowingly gain access to, attempt to gain access to, cause access to be granted to, or disseminate information gained from access to the Ohio law enforcement gateway established and operated pursuant to division (C)(1) of section 109.57 of the Revised Code without the consent of, or beyond the scope of the express or implied consent of, the superintendent of the bureau of criminal identification and investigation.

EVANS/PTA190

3/13/19

Leonard MAZZOCA
w/ Dept 25 yrs
no other Dept.

Rec'D Item (o)
Have Not Discussed Dissmintion of Fox news stuff
w/ Fox itself; Last discussed was with the May in
mayor's mtg w/ mayor + me ~~3/14/19~~ 2/28/19 at 3
No one else since then of any type or kind
Din you inform your Pre D
to you Sgts.

at all.
w/ mayor it was private discussion w/ mayor; since
stuff relative to dept operations. Has nothing to
do w/ Fox but it came up 3/c of the
memo written By me when I informed
patrol ~~& patrol~~ 9/25/18 went
From Leaving to Patrol + Dispatchers.

No Discussion; ~~informed~~ Fox since mid to end of
January 19 in general conversation only.

Mtg Chief Leng Pms. Clihoki mayor
Due to performance standard.

weds
date //

EVANS/PTA191

2

8/4 recognize #1   yes
           #2   "
           #3   "
           #4   "

#1 went to all 4 Sgts & Chief.
#2 wait anywhere through out the service.

Noticed my Pred D was ~~over the matter~~ disputed Any Woods 8/29/18
Hearing was Tues 9/4/18.

#2 was posted in Roll Call room & Door #D.1
#1 went to all 4 Sgts individually E ha've
    Brown did not get it. Posted in
Sgts office.

#3 I gave it Directly to Dayton
& myself Sgt Cross. In person Not
Electrinety. it was a physical
copy. it was on the city system.
I run it by the Chief to
make sure it was Count 3.4 2
served it to Dayton; I printed it
& also gave it to Chief & gave to
Sgt Cross. It was not sent E-mail I
dont think. Its too serious it was
Briggs armes

EVANS/PTA192

3

#4 I got it by chance, in case I hurled. It was in envelope on my keyboard on my desk. Envelope HR failed so I felt betrayed by how I was "noticed"

- I was written up on 8/6/18 for ticket issues

- (27.6 increase after I did the memo)

#4 only I had it, Chuck Wilson Chief. It's my guess I didn't make any copies.

⊗ I assume ~~saw~~ Bob Phillips got a copy, I assume LT Chuck Wilson. No one else.

None no good reason for dissemination pissed off at me for putting the order out. pissed off at me + the chief.

Sometime

- Chief + me have had our issues
- I don't think had do it but possible.
- Chief   No, possible
- H/R Lottie   No ; possible
- LT Wilson   No.
- Bob.   No.
- me   no, I did not.

I'm NOT willing to this poly
& CBA I am willing to remember of
your Q's

I han

EVANS/PTA194

POLY-TECH ASSOCIATES INC
1185 S MAIN ST
AKRON, OH 44301-1322

Place: _____  Date: 3-20-19

I, Leonard _____ voluntarily, ORDER GENERAL UNDER CHIEF'S ORDER, hereby consent (truth verification) examination for the mutual benefit of myself William D. Evans II, Kenneth L. Butler, POLY-TECH ASSOCIATES, INC. AND City of COLUMBUS NELSON

DIRECTOR AND MJ DEPARTMENT DIRECTOR AND City Ellison/EVIDENCE MAYOR

I fully realize that, I am not required to take this examination. I may first consult with an attorney or anyone I wish before either giving consent to this form or being interviewed and/or taking the examination. Nevertheless, I hereby request and consent to the use of electronic hearing and recording devices, and I voluntarily request and authorize William D. Evans, II/Kenneth L. Butler to now proceed with the actual interview/examination.

I do hereby authorize William D. Evans, II/Kenneth L. Butler, his directors, officers, employees and/or agents to disclose both orally and in writing the interview/examination results and opinions to directors, officers, employees and/or agents of POLY-TECH ASSOCIATES, INC., AND City of COLUMBUS NELSON
AND MJ DEPARTMENT & DIRECTOR AND City Ellison/EVIDENCE MAYOR

[handwritten left margin: under order by the chief]
[handwritten: AND MJ DEPARTMENT & DIRECTOR]

I am fully aware that the opinion may be that I have not been truthful. Nevertheless, in consideration of and as inducement for William D. Evans, II/Kenneth L. Butler, to give me this interview/polygraph examination, I for myself and my successors, assigns, heirs, executors, administrators knowingly hereby totally release, absolve, remise, covenant, promise, agree to save harmless, waive, forever discharge, and hold free from all harm, liability, or damage whatsoever POLY-TECH ASSOCIATES INC., Kenneth L. Butler/ William D. Evans, II, as president and in his individual capacity, the above named _____ and their respective directors, officers, employees, and agents individually, collectively, and personally for any and all suits, actions or causes of actions at law, claims, demands, or liabilities whatsoever or in law or in equity including but not limited to false arrest, false imprisonment, libel, slander, invasion of privacy and all my rights and privacy which I, my successors, assigns, heirs, executors, administrators have or may ever have resulting directly, indirectly or remotely from being interviewed/examined, possible liabilities or damages, flowing from the operation of all electronic hearing and recording devices, the rendered oral and written opinions and statements, and/or all future actions taken by any and/or all of the above based upon my taking this interview/examination. Records are kept for limited periods due to the use of digital and/or other equipment. POLY-TECH ASSOCIATES, INC., or its officers cannot be held responsible for loss or inability to retrieve information in the event of loss due to negligence or otherwise. The parties further release Poly-Tech Associates, Inc. and it officers for such loss. _____ I claim that I am in good mental and physical condition and that I know of no mental or physical ailment which might be impaired by the interview/examination.

IMPORTANT NOTICE: This agreement, stipulation, and release form is a legally binding contract! If not completely understood, do not sign but seek competent advice, such as that rendered by an attorney. Poly-Tech Associates, Inc. and William D. Evans, II, as its President, and Kenneth L. Butler are separate entities, each are hereby released in individual and/or collective capacities. Mr. Evans/Mr. Butler will not provide any legal advice or consultation regarding this matter. Mr. Butler will merely provide information relating only to polygraph technique and information relating to the case for which you are examined.

_____  5/30/19                    _____
Witness                          Signature of person to be examined

                                                             11:00
                                                             Time

(other person(s) with any interest in examination result(s) after reading the above in its entirety. I also agree to be bound by the terms of this release.) _____

EVANS/PTA195