Chief Michael Kilbane

LEONARD MAZZOLA v. ANTHONY TOGLIATTI, et al.

July 29, 2020



Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

```
 1              IN THE UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF OHIO
 2                      EASTERN DIVISION


 3


 4     LEONARD MAZZOLA,            )
                                   )
 5              Plaintiff,         )
       vs.                         )  Case No. 19-CV-02519
 6                                 )
       ANTHONY TOGLIATTI, ET AL.,)
 7                                 )
                Defendants.        )
 8                          - - - - -
 9      THE VIDEOTAPE DEPOSITION OF CHIEF MICHAEL KILBANE
                    WEDNESDAY, JULY 29, 2020
10                          - - - - -

11

12          The deposition of CHIEF MICHAEL KILBANE,

13     called by the Plaintiff for examination pursuant to

14     the Federal Rules of Civil Procedure, taken before

15     me, the undersigned, Aimee N. Szinte, Notary

16     Public in and for the State of Ohio, via

17     Zoom Videoconference, at 9:06 a.m., the day and

18     date above set forth.

19

20

21

22

23

24

25

                  CADY REPORTING SERVICES, INC.
```

```
 1      APPEARANCES:

 2        On behalf of the Plaintiff:

 3              Jessica Savoie, Esq.
                Subodh Chandra, Esq.
 4              The Chandra Law Firm, LLC
                1265 W. 6th Street
 5              Suite 400
                Cleveland, Ohio  44113
 6              216.578.1700
                jessica.savoie@chandralaw.com
 7
          On behalf of the Defendants City of Independence,
 8        Gregory O'Brien and Chief Michael Kilbane:

 9              Steven Strang, Esq.
                Gallagher Sharp
10              1501 Euclid Avenue
                Seventh Floor, Bulkley Building
11              Cleveland, Ohio  44115
                216.241.5310
12              sstrang@gallaghersharp.com

13        On behalf of Anthony Togliatti:

14              John T. McLandrich, Esq.
                Mazanec, Raskin & Ryder
15              100 Franklin's Row
                34305 Solon Road
16              Cleveland, Ohio  44139
                440.287.8298
17              jtm@mrrlaw.com

18        ALSO PRESENT:

19              Leonard Mazzola, Plaintiff
                Gregory O'Brien, Defendant
20              Greg Kurtz
                Alex Cook, Videographer
21
                            - - - - -
22

23

24

25

                   CADY REPORTING SERVICES, INC.
```

CHIEF MICHAEL KILBANE DEPOSITION INDEX


EXAMINATION BY:                          PAGE NO.

MS. SAVOIE        ...................        5


EXHIBITS PREVIOUSLY MARKED AND INTRODUCED

Plaintiff's Exhibit

                2
                3
               13
               16
               17
               20

Defendant's Exhibit

                1
                3

```
 1                    THE VIDEOGRAPHER:  We're on the

 2         record.  The time is 9:06.

 3                    CHIEF MICHAEL KILBANE, of lawful

 4         age, called by the Plaintiff for examination

 5         pursuant to the Federal Rules of Civil

 6         Procedure, having been first duly sworn, as

 7         hereinafter certified, was examined and

 8         testified as follows:

 9                    MS. SAVOIE:  Jessica Savoie for

10         Leonard Mazzola.

11                    MR. STRANG:  Steven Strang for

12         the City of Independence, Greg O'Brien,

13         Chief Michael Kilbane.

14                    MR. McLANDRICH:  John McLandrich

15         for Mayor Togliatti.

16                    MR. O'BRIEN:  Greg O'Brien.  And

17         Mayor Kurtz is having audio trouble.  He wanted

18         me to let you know that if he doesn't chime in,

19         that he is attending as well.

20                    MS. SAVOIE:   Mr. Mazzola, are

21         you there?

22                    MR. MAZZOLA:  Yes.  Leonard

23         Mazzola.

24                    MS. SAVOIE:   Steven, I was

25         having a little trouble hearing you before.
```

CADY REPORTING SERVICES, INC.

1          Would you mind saying something so I can hear

2          you again?

3                  MR. STRANG:  Something so you can

4          hear me again.

5                  MS. SAVOIE:   Thank you for that.

6          That helps a little bit.  I may have to ask you

7          to repeat yourself at some point if we're

8          engaging in colloquy.

9    EXAMINATION OF CHIEF MICHAEL KILBANE

10   BY-MS.SAVOIE:

11   Q   Chief Kilbane, can you hear me okay?

12   A   Yes.

13   Q   Chief Kilbane, my name is Jessica Savoie.  I'm

14       an attorney at the Chandra Law Firm

15       representing Leonard Mazzola in his lawsuit in

16       which you are a Defendant.

17       Have you ever given a deposition before?

18   A   Yes.

19   Q   How many times.

20   A   Twice.

21   Q   Are you familiar with the general rules of

22       depositions?

23   A   Yes.

24   Q   Are you represented by one or more attorneys in

25       this matter?

                 CADY REPORTING SERVICES, INC.

```
 1    A    Mr. Strang is representing myself and the
 2         City of Independence for this matter.
 3    Q    Have you consulted with any other attorneys
 4         about this case?
 5    A    No.
 6    Q    I'm going to briefly review some of the general
 7         rules of deposition just so that we're clear
 8         for today.  Our format is a little unusual
 9         because we're doing this via Zoom for your
10         safety and the safety for all people who are on
11         this call during the Covid 19 pandemic.
12              One thing that will be kind of important
13         because of the medium we are using on Zoom is
14         the problem of cross talk.  Even under normal
15         circumstances it can be difficult for a court
16         reporter to transcribe what we are saying if we
17         talk over each other, but what I would ask is
18         because this is a question/answer format, would
19         you please wait until I finish asking the
20         question to provide an answer even if you're
21         sure you know what I'm going to ask?
22    A    Yes.
23    Q    If at any time you do not understand any of my
24         questions, would you please let me know?
25    A    Yes.
```

CADY REPORTING SERVICES, INC.

```
 1    Q   Otherwise, if I ask a question and you provide
 2        an answer, I will assume you've understood me.
 3        Is that fair?
 4    A   Yes.
 5    Q   I'm sure your counsel, who is very competent,
 6        has instructed you about how you are not
 7        supposed to talk about things that are
 8        protected by attorney/client privilege.  And so
 9        what I want to say at the outset is that none
10        of my questions today are intended to elicit
11        information about communications you have had
12        with Mr. Strang about this matter.  Okay?  Is
13        that understood?
14    A   Yes.
15    Q   You are the Chief of Police for the City of
16        Independence Police Department, correct?
17    A   Yes.
18    Q   And you were in that role for all of 2019,
19        correct?
20    A   Yes.
21    Q   Does the City Charter give you authority to
22        formulate policies for the police department?
23    A   It gives me a participatory role in policy
24        formulation.
25    Q   How does that work in practice?
```

```
 1    A    When we formulate a policy for the city, it's

 2         obviously, you know, the Mayor runs the city.

 3         He has ultimate approval.  I usually consult

 4         the Law Director any time we institute a new

 5         policy or significant changes in a policy to

 6         make sure that it's constitutional and

 7         everything is acceptable with the policy.

 8    Q    Does the City Charter also give you authority

 9         to formulate general and specific rules or

10         orders for your police department?

11    A    I'm not sure if it's the City Charter, city

12         ordinances, but I do believe the authority is

13         in there somewhere for me to take necessary

14         steps to run the police department.

15    Q    And you are able to also formulate rules and

16         regulations for your police department,

17         correct?

18    A    Yes.

19    Q    Are you responsible for enforcing police

20         department policies and rules through officer

21         discipline?

22    A    Again, I have a role in the process, but the

23         overall authority, especially for any type of

24         punitive discipline, rests with the Mayor as

25         the appointed authority for the city.  I can
```

CADY REPORTING SERVICES, INC.

|    |   |                                              |
|----|---|----------------------------------------------|
| 1  |   | certainly recommend actions to the Mayor.    |
| 2  | Q | Is that within the Mayor's role as Mayor or as |
| 3  |   | Safety Director?                             |
| 4  | A | I believe under the Charter the role of      |
| 5  |   | Safety Director as chief conservator of peace |
| 6  |   | is part of the Mayor's duties, so it would be |
| 7  |   | one in the same.                             |
| 8  | Q | What did you do to prepare for today's       |
| 9  |   | deposition?                                  |
| 10 | A | Had some discussions with Mr. Strang and     |
| 11 |   | reviewed some documents.                     |
| 12 | Q | What documents did you review?               |
| 13 | A | Actually, there's quite a multitude of       |
| 14 |   | documents that have been back and forth and  |
| 15 |   | produced in this case.  So, again, we would  |
| 16 |   | have to discuss specific individual documents |
| 17 |   | as to the level of which I reviewed them and |
| 18 |   | how intensively.                             |
| 19 | Q | Right.  And so that's what I'm asking you for. |
| 20 |   | What documents did you review?               |
| 21 | A | Specifically for this I briefly skimmed over |
| 22 |   | the discovery stuff that you sent me late    |
| 23 |   | yesterday afternoon.  Again, I didn't have   |
| 24 |   | sufficient time to review it in detail.  And |
| 25 |   | because of the shear amount of documents and |

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  |   | the fact that many of them are related to                |
| 2  |   | similar topics, again, as part of the process I          |
| 3  |   | would need to review a specific document before          |
| 4  |   | being able to answer specific questions about            |
| 5  |   | it.                                                       |
| 6  | Q | So you're referring to the folder of exhibits            |
| 7  |   | that was shared yesterday at about 1:30 p.m.             |
| 8  |   | with exhibits for your deposition, correct?              |
| 9  | A | Yes.  I did receive -- I don't know when you             |
| 10 |   | sent it, but I received it about 3:30.  I                |
| 11 |   | believe it came into my inbox while I was at a           |
| 12 |   | meeting at City Hall.  I saw it when I got back          |
| 13 |   | and I had commitments last evening, so I didn't          |
| 14 |   | have a whole lot of time to dedicate to going           |
| 15 |   | through it.  There's quite a large amount of            |
| 16 |   | data included in there.                                  |
| 17 | Q | Have you seen these documents before?                    |
| 18 | A | I believe I've seen some of them before.                 |
| 19 | Q | Did you read the news coverage of the alleged            |
| 20 |   | traffic ticket quota or performance standard             |
| 21 |   | that Ed Gallek of the Fox News I-Team published         |
| 22 |   | January 14 of 2019?                                      |
| 23 | A | I would need to see the specific either article          |
| 24 |   | or video that you're talking about.                      |
| 25 | Q | Sure.  So I'm going to direct you to                     |

CADY REPORTING SERVICES, INC.

1    Plaintiff's Exhibit 2 and I'm going to ask

2    Mr. Cook, if he's able to put that up on our

3    screen.

4                 MS. SAVOIE:   Are you able to do

5    that, sir?

6                 THE VIDEOGRAPHER:  Yeah.  Give me

7    one moment.

8                 MS. SAVOIE:   Thank you.

9                 THE VIDEOGRAPHER:  That was

10   Exhibit 2?

11                MS. SAVOIE:   Yes.  And can we

12   please go to the page that is marked

13   Evans/PTA 092.

14 A  Ms. Savoie, if you would excuse me, if you see

15   me looking to the right to look at these

16   documents, it's not out of any disrespect to

17   you.  There's a big screen on the wall here and

18   it would be easier for me to read them on the

19   larger screen than the laptop I'm talking to

20   you on.

21 Q  Certainly.  I understand that because I have

22   three computer screens in front of me that I'm

23   also using to look at while I have you on my

24   laptop.

25           Chief, while he is pulling that up, can I

                CADY REPORTING SERVICES, INC.

```
 1            ask who is in the room with you where you are

 2            sitting right now?

 3   A    Mr. Strang.  No one else is in the room.

 4   Q    Where are you as we take this deposition right

 5            now?

 6   A    Mr. Strang's office.

 7   Q    Gallagher Sharp?

 8   A    Yes.

 9   Q    Is it a conference room?

10   A    Yes, it is.

11                    THE VIDEOGRAPHER:  Is it

12            Exhibit 2 or Exhibit 3?

13                    MS. SAVOIE:   Exhibit 2, please.

14            Can you please scroll down to the page that's

15            marked 92?

16                    THE VIDEOGRAPHER:  Is that the

17            one?

18                    MS. SAVOIE:   Yes, it is.

19   Q    Chief Kilbane, would you please take a moment

20            to read through this article that is contained

21            on page 92 of Bill Evans' records that he

22            produced in response to a subpoena?

23   A    Okay.  I've read to where it ends at the bottom

24            of the screen.  Is there any more below that?

25   Q    Yes, it is.  Yes, there is, yes.
```

CADY REPORTING SERVICES, INC.

```
 1    A    Okay.  Is that all of it?

 2    Q    I believe so.  Does this refresh your

 3         recollection regarding whether you saw this

 4         news coverage when it came out January 14,

 5         2019?

 6    A    I don't know if I saw it when it came out, but

 7         I know subsequent to it coming out, I did see

 8         it sometime after it was published.

 9    Q    Did you send this document, along with other

10         materials, to Bill Evans?

11    A    I don't recall exactly which documents I did

12         send to Bill Evans.

13    Q    Did anyone else from the department send him

14         documents?

15    A    I believe my administrative assistant,

16         Mary Cox, may have sent some documents to him

17         at my direction.

18    Q    Did you see TV coverage of this news story?

19    A    Again, not when it originally aired.  I did see

20         it on their website sometime afterwards.  I'm

21         not sure exactly how long after the original

22         airing.

23    Q    But you saw the coverage and you're familiar

24         with this news story, correct?

25    A    Yes.
```

                    CADY REPORTING SERVICES, INC.

```
 1    Q    And, in fact, Ed Gallek approached you for

 2         questioning or comment before he published the

 3         story, correct?

 4    A    Yes.

 5    Q    Do you know Ed Gallek personally?

 6    A    No.

 7    Q    What was your reaction whenever he approached

 8         you in person before publishing this article?

 9    A    When he approached me for this article or --

10         because I've spoken with Mr. Gallek

11         professionally before on other stories he was

12         covering.

13    Q    Yes.  For this article tell me about your

14         interaction with Ed Gallek.

15    A    I remember he had approached me with some

16         allegations that, you know, he had been told

17         that there was a quota system allegedly for the

18         police department.  And, you know, I explained

19         to him that there wasn't.  That we expect our

20         officers to perform their duties and, you know,

21         earn the money that they're paid to do the job

22         they're expected to do.

23    Q    So in the paragraph where he quotes you that is

24         about three-fourths, two-thirds of the way down

25         the bottom of the screen where it says, I'll
```

```
 1          read it into the record, "Chief Kilbane said
 2          we're not performing the standards that we
 3          expect of our officers.  It means all of the
 4          other officers are carrying an unfair share of
 5          the burden.  They're getting paid to do a job.
 6          It's reasonable to expect a certain performance
 7          level for that pay."
 8              Did he accurately quote you in the
 9          article?
10    A    I don't know if that's an exact quote because
11          it was quite some time ago.
12    Q    Does that appear to be accurate to the best of
13          your recollection?
14    A    It does.  But, again, it was quite some time
15          ago and I can't, you know, state that those are
16          the exact words.
17    Q    Right.  And putting aside the exact words, does
18          that quote capture what your opinion was at
19          that time?
20    A    I believe it's part of the discussion that we
21          had.
22    Q    Okay.
23                  MS. SAVOIE:   Alex, we can take
24          this down.  Thank you.  We might use that again
25          a bit later.
```

CADY REPORTING SERVICES, INC.

1    Q   Who decided to start an investigation to find

2        out who shared documents with Ed Gallek?

3    A   Well, originally when the story aired we looked

4        at it and when Mr. Gallek first ambushed me in

5        the lobby of City Hall, I recognized the

6        document he was holding in his hand.  It was an

7        e-mail that I had sent out to the patrol

8        division sometime before.

9            Subsequently there were specific quotes

10       in his coverage and I believe on the

11       television, the video version of it, he showed

12       excerpts of specific department documents.  It

13       was obvious at that point that those documents

14       had not been released through our public

15       records process and that somebody had stolen

16       those particular documents or the data

17       electronically from the city.

18           So I consulted with the Mayor and with

19       our HR Director, and that's when we decided to

20       initiate an investigation into the data breach.

21   Q   Would you characterize it as a joint decision

22       to start the investigation?

23   A   Yes.

24   Q   The Mayor at that time was Anthony Togliatti,

25       correct?

                    CADY REPORTING SERVICES, INC.

```
 1     A    Yes.

 2     Q    Was the HR Director Latecia Linker?

 3     A    Yes, it was.

 4     Q    Is she still the HR Director today?

 5     A    Yes, she is.

 6     Q    Did you ever work with Latecia Linker before

 7          you came to the City of Independence?

 8     A    No, I did not.

 9     Q    When did you have the conversations or

10          conversation regarding starting an

11          investigation into who provided the documents

12          to Ed Gallek?

13     A    I don't remember exactly when.  It was shortly

14          after all the publicity from the story.

15     Q    Why specifically did you want to do an

16          investigation?

17     A    Well, because it was obvious from the documents

18          that were stolen that there was sensitive

19          information involved there, so whoever had

20          access to those documents had access to a high

21          level of sensitive information in the

22          department.  And, you know, that information

23          would include personal information of police

24          officers, identity of undercover officers on

25          federal tasks forces, family information,
```

CADY REPORTING SERVICES, INC.

1          sensitive medical and mental health information

2          on officers, stuff that, you know, absolutely

3          would be a major concern if it got out in the

4          public.

5     Q    For the documents that you believed Ed Gallek

6          had, were those documents public records?

7     A    I don't know.  They did not go through our

8          public record process.

9     Q    So I understand that what you're saying is that

10         they did not go through the public record

11         process to be released to Ed Gallek, but you

12         also referred to sensitive information within

13         the documents.

14              Did any of the information that you saw

15         in the documents exempt them from the public

16         records laws of the State of Ohio?

17    A    I don't know all of the documents that were

18         released to Ed Gallek, so I don't know whether

19         or not any of them did convey information that

20         should have been redacted.

21              All I do know is that they were stolen

22         from the department and somehow made their way

23         to Ed Gallek in violation of, you know,

24         numerous department and city policies.

25    Q    And so what I was asking about in my question

                    CADY REPORTING SERVICES, INC.

```
 1        are specifically the documents that you

 2        believed Ed Gallek had.  I understand that

 3        you're saying now that, you know, you're

 4        speculating he could have had any number of

 5        other documents.  But for the documents that

 6        you sent to Bill Evans as documents you

 7        believed he had based on what you saw in person

 8        and what you saw in the video, were any of

 9        those documents public records?

10    A   Again, in my estimation it's not a public

11        record until it goes through the public record

12        process.  There's a request for a public

13        record.  We produce that public record.  Once

14        we produce it, it's a public record.

15            The documents Mr. Gallek had were not

16        produced pursuant to that process, so I have no

17        way of knowing whether or not they would be a

18        public record.  That would be a legal

19        definition that would need to be, you know,

20        decided by somebody other than me.

21            All I can say is the records he had did

22        not go through our public records process that

23        we use to release records as public records.

24    Q   But you respond to public records requests,

25        correct?
```

CADY REPORTING SERVICES, INC.

| 1 | A | I'm one of the people that's involved in the |
|---|---|---|

1    A    I'm one of the people that's involved in the

2         process.  We have several employees in the

3         department that are designated to be able to

4         handle public records requests.

5    Q    But you make determinations on whether

6         something is a public record that should be

7         disclosed in response to a request, correct?

8    A    I'm one of the people that can make that

9         determination, but there are several others as

10        well.

11   Q    Okay.  So let's talk about these -- you can

12        make those determinations, so I'm asking you to

13        tell me about these documents and whether they

14        would be released as public records.

15   A    They were never requested as a public record,

16        so I can't speculate as to whether or not they

17        would have been released as public records.

18   Q    When you say they were never released -- never

19        requested as public records, you're talking

20        about before Ed Gallek's story of January 14,

21        2019, correct?

22   A    Correct.  The documents that he displayed in

23        his story and the document he had in his hand

24        when he talked to me were not processed through

25        our public records process.

                    CADY REPORTING SERVICES, INC.

```
 1    Q   But he then did do a public records request for

 2        those documents, correct?

 3    A   He did a public records request for some

 4        documents and I complied with that public

 5        records request and provided him with those

 6        documents he requested.

 7    Q   And you provided him with the same documents

 8        that you believe he already had, correct?

 9    A   I provided him with the documents he requested.

10        Whether or not those were the same ones he had,

11        I have no idea because I didn't know which

12        documents he had.

13    Q   And, again, I'm talking about only the records

14        that you knew he had that you sent to

15        Bill Evans.  Did you produce those same

16        records?

17    A   If he requested them, I did.

18    Q   You did.

19            And one or more other individuals also

20        made public records requests for those same

21        four documents, correct?

22    A   I don't know.

23    Q   Did Mary Jane Horton also request those

24        documents?

25    A   I know Mary Jane Horton is a prolific document
```

CADY REPORTING SERVICES, INC.

1    requester from the city.  She's requested

2    thousands of documents from the City of

3    Independence over the years, so she may well

4    have requested some of those records.

5  Q  As we sit here right now, do you remember

6    whether you responded to a public records

7    request for Mary Jane Horton in January 2019?

8  A  I know I have -- I have responded to public

9    records requests for Mary Jane Horton.

10  Q  Right.  Let me finish my question.  Okay?

11  A  Okay.

12  Q  I understand that you think normal human

13    conversation, but I just need to finish this

14    question because I'm asking something more

15    specific than what you just answered.

16       Do you recall answering a public records

17    request from Mary Jane Horton for the four

18    specific documents that Ed Gallek appeared have

19    in his news coverage?

20  A  I would need to see the specific request to

21    remember whether or not.

22  Q  Okay.  We might come back to that.  I'm going

23    to ask you some more questions about the

24    investigation right now.

25       So would you consider it important to

                CADY REPORTING SERVICES, INC.

```
 1            find out who had released these documents to
 2            Ed Gallek?
 3    A    No.  The focus was the -- of the investigation
 4            was to find out who stole the documents and the
 5            data from the city.  You know, Ed Gallek
 6            receiving the documents was just a piece of
 7            evidence that alerted us a theft had occurred.
 8    Q    So how is that different than what I just said?
 9            Can you explain?
10    A    Certainly.  The focus of the investigation was
11            the theft of documents and data from the police
12            department.  Somebody without authorization
13            and/or outside the scope of their authority
14            took city documents and accessed the city's
15            electronic systems and took data that --
16            outside the policies and procedures of the
17            department.  That was a serious violation of
18            city rules and procedures.
19    Q    How do you know that someone accessed the
20            city's electronic data?
21    A    Because Mr. Gallek had a copy of an e-mail that
22            I had sent in his possession.  So for someone
23            to get a copy of that e-mail, they would have
24            to access the e-mail system.
25    Q    Well, he had a printed copy of the e-mail,
```

|     |     |                                                              |
| --- | --- | ------------------------------------------------------------ |
| 1   |     | correct?                                                     |
| 2   | A   | Right. And to print a copy, you need to access               |
| 3   |     | the system.                                                  |
| 4   | Q   | Or someone could hand you a printed copy,                    |
| 5   |     | correct?                                                     |
| 6   | A   | Okay. I think you're getting confused. I'm                   |
| 7   |     | talking about the origin of the stolen                       |
| 8   |     | material.                                                    |
| 9   |     | That e-mail existed on our e-mail server.                    |
| 10  |     | Somebody had to go onto the e-mail server and                |
| 11  |     | print a copy or make an electronic copy or                   |
| 12  |     | however it was copied and somehow that copy                  |
| 13  |     | made its way to Ed Gallek. But it started with               |
| 14  |     | somebody going into our electronic e-mail                    |
| 15  |     | system.                                                      |
| 16  | Q   | Right. And what I'm asking you is why are you                |
| 17  |     | making the connection that the same person who               |
| 18  |     | had access to the e-mail system was the person               |
| 19  |     | who provided a paper copy to Ed Gallek?                      |
| 20  | A   | Oh, I'm not making that contention at all.                   |
| 21  |     | They may have been two different persons.                    |
| 22  |     | What I'm saying is the person that                           |
| 23  |     | started the breach that committed the theft,                 |
| 24  |     | could well have passed it off to somebody else               |
| 25  |     | who passed it off to Ed Gallek. But like many                |

<div align="center">CADY REPORTING SERVICES, INC.</div>

```
 1          investigations, you follow the evidence, and

 2          you either follow it from where it started or

 3          follow it from where it ended up or both.

 4    Q     Did you follow the evidence to find out whether

 5          anyone had printed copies of that e-mail in

 6          their office?

 7    A     That was part of Bill Evans' investigation was

 8          to ask those questions.  I'm sure he did.

 9    Q     Other than trying to find out who sent

10          documents to Ed Gallek, what else were you

11          specifically trying to learn through Bill

12          Evans' investigation?

13    A     Bill Evans' investigation, he was retained to

14          find out who was responsible for the violation

15          of city and department policies.

16    Q     What facts were you trying to discover through

17          his investigation specifically?

18    A     We were trying to find out who was responsible

19          for removing the city's property and who was

20          responsible for disseminating the city's

21          property because we have policies and

22          procedures.

23               There was also the potential criminal

24          question of somebody accessing the city's

25          computer system outside the scope of their
```

CADY REPORTING SERVICES, INC.

```
 1          authority.
 2     Q    Were you considering any other potential
 3          criminal questions at the time you were
 4          planning this investigation with Bill Evans?
 5     A    No.  But oftentimes in many investigations, as
 6          they develop, you become aware of more facts.
 7          You become aware of more evidence.  So it's
 8          quite possible that during the investigation
 9          you discover, you know, other actual issues
10          either administratively or criminally.
11     Q    What is the Revised Code statute for the
12          unauthorized access?
13     A    I would have it review it for sure.  It's in
14          the 2913 chapter.  I believe it's 2913.04, but
15          I'm not sure off the top of my head.  I would
16          have to review the statute to let you know for
17          sure.
18     Q    Were you trying to find out whether anyone
19          spoke to Ed Gallek with this investigation
20          besides just providing documents to Ed Gallek?
21     A    No.  It doesn't matter.  You know, obviously,
22          you know, we have a media relations policy that
23          says if a member of the department is going to
24          talk about departmental business to the media,
25          they have to get it cleared through the chain
```

CADY REPORTING SERVICES, INC.

```
 1           of command.  So we had a policy for that.  But

 2           that was not the focus of the investigation.

 3      Q    But Bill Evans asked questions in the polygraph

 4           about whether each officer talked to Ed Gallek,

 5           correct?

 6      A    You would have to ask Bill Evans about that.

 7      Q    Have you reviewed Bill Evans' notes or

 8           documents that he produced in response to your

 9           counsel's subpoena?

10      A    No.  The only thing I saw from Bill Evans was

11           the polygraph report.

12      Q    Do you know when you decided to have Bill Evans

13           conduct the investigation?

14      A    I don't know the exact date.  I know that

15           shortly after the story aired, I discussed it

16           with the HR Director and the Mayor and

17           consulted the city's labor counsel.  And

18           subsequently, you know, it was recommended that

19           we retain Bill Evans because his firm conducted

20           these types of investigations.

21      Q    Who is the city's labor counsel?

22      A    At the time it was the firm of Clemans Nelson

23           and Michael Esposito was the city's specific

24           labor counsel.

25                      MR. STRANG:  Chief, I know
```

```
 1          Jessica covered this before, but I just want to

 2          remind you that any conversation that you had

 3          with Mike Esposito or Clemans Nelson, don't go

 4          into those.

 5    Q     Was an attorney named Ron Kopp also involved in

 6          discussions as a labor attorney for the city?

 7    A     Not with me.  I'm not familiar with the name.

 8    Q     Is Clemans Nelson still working with the city

 9          as its outside labor counsel?

10    A     I don't believe so.

11    Q     Who is the city's outside labor counsel now?

12    A     I believe the current Mayor retained Joseph

13          Lesowitz.

14    Q     I'm going to refer back to Exhibit 2 and we're

15          going to look down at Mr. Evans' notes that are

16          contained on pages 102 and 103 of this

17          document.

18                    MS. SAVOIE:   Mr. Cook, would you

19          mind putting it up on the screen?  Can you

20          please scroll down?  Let's go to 103 first.

21    Q     Chief, I'm showing you a copy of the activity

22          log of notes that Bill Evans produced in

23          response to a subpoena for his records, and it

24          looks like he wrote here in the first entry on

25          page 103, Evans/PTA 103, that he met with you
```

CADY REPORTING SERVICES, INC.

1       in person.  It says, "Here", so I take that to
2       mean his office, on January 31 of 2019.
3            Do you remember that in-person meeting?
4   A   I remember meeting with Mr. Evans and
5       HR Director Linker.  It was at Mr. Evans'
6       office in Akron, but I don't recall the exact
7       date.
8   Q   Does the date of January 31 sound correct to
9       you?
10  A   It was probably around that time frame, but
11      again, I can't, you know, specify the exact
12      date.
13  Q   Sure.  But do you have any reason to dispute
14      Bill Evans' notes about what the date was?
15  A   No.
16  Q   So at the time you spoke with Bill Evans on or
17      about January 31 of 2019, what did you discuss
18      about this planned investigation?
19  A   We basically explained, you know, why we were
20      considering retaining his services, the issues
21      that the city had.  And, you know, we were
22      consulting with him as to what he thought the
23      best course would be to conduct the
24      investigation.
25  Q   Is it correct that he conducted the first round

                    CADY REPORTING SERVICES, INC.

```
 1              of interviews on March 13 of 2019?
 2      A    Again, I don't know the exact date, but yes,
 3              that sounds about the right time frame.
 4      Q    If his records reflect that, you wouldn't have
 5              any reason to dispute that?
 6      A    Correct.
 7      Q    What was your understanding of the results of
 8              Bill Evans' first round of interviews with your
 9              officers?
10      A    You would probably have to ask Mr. Evans about
11              his results.
12      Q    I'm asking what was your understanding of the
13              results of his interview?
14      A    Mr. Evans felt fairly strongly that Leonard
15              Mazzola was heavily involved with the data
16              leak.
17      Q    Why did he feel that?
18                      MR. STRANG:  Objection.
19      A    Again, you would need to ask Mr. Evans.  He
20              just told me that the results of the interview
21              seemed to indicate that.
22          I was not present for the interview.  I
23              don't know exactly what the specific questions
24              and answers were that led him to that
25              conclusion.
```

```
 1    Q   Did he say anything to you to explain why he

 2        thought that?

 3    A   I recall him saying that he had determined that

 4        Mr. Mazzola seemed to be the only person that

 5        had access to all of the documents and that,

 6        you know, the other people he interviewed had

 7        reasonable explanations.  And he also indicated

 8        that he felt Mr. Mazzola was being deceptive in

 9        some of his answers.

10    Q   Why did he say Mr. Mazzola was being deceptive

11        in some of his answers?

12                   MR. STRANG:  Objection.

13    A   I don't recall him giving me any specifics, but

14        again, you know, Mr. Evans is, you know, a

15        trained, experienced investigator.  He's been

16        doing it for a long time.  And I have no reason

17        to doubt the confidence he had in his

18        conclusions.

19    Q   Have you worked with Bill Evans before the

20        investigation in March 2019?

21    A   No, I have not.

22    Q   So you never worked with Bill Evans whenever

23        you were at North Olmsted before you were at

24        the City of Independence?

25    A   No.  I never worked with him at North Olmsted.
```

CADY REPORTING SERVICES, INC.

```
 1     Q   Did you know Bill Evans was a polygrapher?

 2     A   I knew that he had an investigative firm, he

 3         conducted sensitive internal investigations of

 4         both the public and private sector and that

 5         truth verification and detection were part of

 6         the services that he offered.  It was one of

 7         the many services that he performed.

 8     Q   I'm not asking about truth verification.  I'm

 9         asking about polygraphs.

10             You knew that Bill Evans did polygraphs

11         when you retained him, correct?

12     A   Yeah.  He made us aware that that was one of

13         the services that he offered in his

14         investigative services.

15     Q   How was the decision made to do a polygraph

16         during this investigation?

17     A   Mr. Evans suggested it.

18     Q   What did he say when he suggested it?

19     A   He said he felt certain -- he was fairly

20         certain that the evidence strongly indicated

21         Mr. Mazzola was responsible and he would like

22         to confirm those suspicions by conducting a

23         polygraph exam.  And he also felt that

24         Mr. Mazzola may have some information that

25         could possibly implicate other people in
```

                    CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | | potentially criminal activity with the theft of |
| 2 | | documents and data from the department. |
| 3 | Q | Why did he think that Mr. Mazzola may have |
| 4 | | information that would implicate other people |
| 5 | | in criminal activity?  How did he explain that? |
| 6 | A | Because he felt that from the answers |
| 7 | | Mr. Mazzola gave, that it was very possible |
| 8 | | that, you know, he was responsible for being |
| 9 | | the source of the data.  He had assistance from |
| 10 | | someone else to actually facilitate the |
| 11 | | documents getting outside the department. |
| 12 | Q | Did he have any factual basis that he relayed |
| 13 | | to you for that opinion? |
| 14 | A | Again, you would have to ask Mr. Evans for his |
| 15 | | exact thought process and, you know, the |
| 16 | | evidence that he evaluated to reach that |
| 17 | | conclusion. |
| 18 | Q | After Bill Evans suggested that you do a |
| 19 | | polygraph -- well, let me back up a second. |
| 20 | | Did Mr. Evans suggest that anyone be |
| 21 | | subjected to a polygraph besides Mr. Mazzola? |
| 22 | A | He suggested that because Mr. Mazzola was the |
| 23 | | most likely and the one that was indicated, he |
| 24 | | would perform a polygraph on him and, based on |
| 25 | | the results of that, he would -- the |

CADY REPORTING SERVICES, INC.

```
 1            investigation would lead where it would.  If it
 2            indicated that maybe other individuals would
 3            need to take a polygraph, he would certainly,
 4            you know, give us that advice.
 5       Q    But after the interviews, the initial round of
 6            interviews, there was no plan to do a polygraph
 7            on anyone else, just Mr. Mazzola, correct?
 8       A    From what Mr. Evans told me, Mr. Mazzola would
 9            have the initial polygraph and if, for
10            instance, you know, if he had indicated
11            somebody else was involved, then they would be
12            subject to a polygraph.
13       Q    Right.  But based on the initial interviews,
14            there was no plan to do a polygraph on anyone
15            else, was there?
16       A    Oh, absolutely there was.  There was a plan to
17            polygraph anyone that Mr. Mazzola would
18            indicate as being complicit with him in the
19            theft of the documents.
20       Q    Right.  But that would be dependent on the
21            later polygraph of Mr. Mazzola, correct?
22       A    Yes.
23       Q    So after the initial round of interviews, there
24            was only one polygraph scheduled, correct?
25       A    Yes.
```

```
 1    Q   And that was Mr. Mazzola, correct?

 2    A   Yes.

 3    Q   How did you make the decision to accept

 4        Mr. Evans' suggestion and allow him to do a

 5        polygraph on one of your officers?

 6    A   Because Mr. Evans was retained based on his

 7        professional reputation, his experience, his

 8        curriculum vitae, everything that he had, so we

 9        trusted him to give us guidance as to the best

10        way forward with the investigation.  It was his

11        area of expertise.

12    Q   How were you familiar with his reputation?

13    A   He was recommended to us by our city's labor

14        counsel.

15    Q   Which person was that?  And I'm not asking

16        about anything they specifically said to you.

17        I'm asking which person recommended him?

18    A   Mr. Esposito.

19    Q   Had Mr. Esposito worked with him before, to

20        your knowledge?

21    A   I can't talk about any specific discussions

22        that I had with Mr. Esposito.  He was our labor

23        counsel.

24    Q   Did you have to go through the Mayor to

25        authorize Mr. Evans to do the polygraph he
```

```
 1        recommended?

 2    A   No.

 3    Q   Were you able to unilaterally authorize the

 4        polygraph when Mr. Evans suggested it?

 5                    MR. STRANG:  Objection.

 6    A   I don't know what you mean by unilateral.

 7        Obviously before we took that step, I made sure

 8        that the Mayor and the HR Director were aware.

 9    Q   So you made sure they were aware, but you

10        weren't required to ask the Mayor's permission,

11        correct?

12    A   Not so much ask his permission, but part of the

13        process was to make him aware of what I was

14        doing and if he had any objections about it, we

15        would certainly address those objections.  The

16        Mayor is my boss.

17    Q   Certainly.  But please listen to my specific

18        question.

19             Were you required to get the Mayor's

20        permission before you authorized Bill Evans to

21        conduct a polygraph?

22                    MR. STRANG:  Objection.  Asked

23        and answered.

24    A   I'll stand by my previous answer.

25    Q   Well, you didn't answer the question, so please
```

CADY REPORTING SERVICES, INC.

37

```
 1        answer it.
 2   A    Again, I'll stand by my previous answer.  I
 3        believe I did answer it and that's the answer
 4        I'm going to stick with.
 5                   MS. SAVOIE:   Court reporter,
 6        would you please read back my previous question
 7        and the answer?
 8                   (Record read.)
 9   Q    Would it be fair to say you kept the Mayor
10        informed of what you were doing?
11   A    Of course.
12   Q    And were you required to ask the HR Director's
13        permission to have Bill Evans do this
14        polygraph?
15   A    No.
16   Q    And I'm not asking for anything specific that
17        you talked to Greg O'Brien about at this point,
18        but did you talk to Greg O'Brien about the
19        decision to have Mr. Evans do a polygraph on
20        Mr. Mazzola?
21                   MR. STRANG:   Objection.
22   A    I had numerous conversations with Mr. O'Brien.
23        I'm not going to talk about any of the
24        specifics we discussed.
25   Q    Other than talking to the Mayor and Ms. Linker,
                   CADY REPORTING SERVICES, INC.
```

```
 1          did you talk to anyone else before you

 2          authorized Bill Evans to proceed with the

 3          polygraph on Mr. Mazzola?

 4     A    The Mayor, Mr. Evans, Ms. Linker.  I believe

 5          I may have had some conversation with

 6          Mr. Esposito about it.  I don't recall exactly.

 7     Q    Before you decided to have Bill Evans do an

 8          investigation generally, did you do anything to

 9          try to find out which of your officers provided

10          the documents to Ed Gallek?

11     A    The decision was made to have an outside entity

12          do the complete investigation, so I did not do

13          any investigatory work myself.  I didn't do

14          anything other than provide support and

15          information to Mr. Evans.  He conducted the

16          complete investigation.

17     Q    Did you ask your officers who sent the

18          documents to Ed Gallek?

19     A    Not that I recall.

20     Q    Did you meet with any officers to talk to them

21          about who sent the documents to Ed Gallek?

22     A    No, not specifically about who sent the

23          documents to Ed Gallek.

24     Q    When you were preparing to send information and

25          documents to Bill Evans, did you look at any
```

<div align="center">CADY REPORTING SERVICES, INC.</div>

```
 1        computer activity that was accessible to you on
 2        the department's computer system?
 3   A    Pretty broad question.  What do you mean by
 4        computer activity?  What sort of things would
 5        you --
 6   Q    So you alluded earlier to the possibility that
 7        there was unauthorized access of the department
 8        computer system, correct?
 9   A    Yes.
10   Q    When you were gathering documents and
11        information to send to Bill Evans for his
12        investigation, did you look at the department's
13        computer system to in any way find out whether
14        there was evidence of unauthorized access?
15   A    I did not.
16   Q    Did you consider who would be likely to provide
17        documents to Ed Gallek when you were gathering
18        information and evidence to send to Bill Evans?
19   A    As Mr. Evans was conducting the initial
20        investigation and gathering information, he did
21        ask me to discuss with him which officers would
22        have access to the specific documents he was
23        looking at.
24   Q    Did he also ask you about which officers would
25        have motive to provide documents to Ed Gallek?
```

CADY REPORTING SERVICES, INC.

1    A   I can't recall any specific discussions about

2        that, but I'm certain as part of the

3        investigation it was one of the topics we

4        discussed.

5    Q   What did you tell him about who would have had

6        motive to provide these specific documents to

7        Ed Gallek?

8    A   Again, I don't think it was necessarily me

9        telling him who had motive.  It was more of me

10       describing what role each of these officers

11       played in the department and what they did and

12       he would decide or he would make an evaluation

13       as to whether or not they would have motive or

14       devise what questions to ask them to determine

15       whether or not they had motive.

16    Q  What facts did you provide him pertinent to his

17       determination of who might have had motive?

18    A  You would have to ask Mr. Evans that question.

19    Q  Well, I'm asking what you facts you provided to

20       him with that in mind?

21    A  I provided him any specific information he

22       asked for.

23    Q  Did you provide him with your impressions about

24       who was likely to have provided the documents

25       to Mr. Gallek?

CADY REPORTING SERVICES, INC.

```
 1      A    I believe I provided him with a list of
 2           officers that had access to any of the
 3           documents we identified as being stolen.  And,
 4           you know, that was -- I provided him the names
 5           of the officers and which documents I believed
 6           they had access to.
 7      Q    And you were only focused on access, not on
 8           any opinion you might have had about who would
 9           have wanted to provide these documents to
10           Mr. Gallek?
11      A    Well, obviously that would be part of the
12           investigation as to -- anytime you're
13           investigating a theft offense, motive is part
14           of the investigation.
15      Q    Exactly.  And so what I'm asking you is what
16           information or opinions did you provide to
17           Mr. Evans about that motive consideration?
18      A    I provided him information so he could form the
19           opinion as to who had the strongest motive to
20           commit the offense.
21      Q    Right.  What information did you provide him?
22      A    Again, I've answered this question twice
23           already.  I'll answer it a third time.
24               I provided him with a list of officers
25           that had access to different documents.
```

CADY REPORTING SERVICES, INC.

|    |   |                                                          |
|----|---|----------------------------------------------------------|
| 1  | Q | Okay.  And you didn't provide him any other              |
| 2  |   | specific information that you considered                 |
| 3  |   | relevant to his determination of who had motive          |
| 4  |   | to provide the documents?                                |
| 5  | A | Again, I may have answered some specific                 |
| 6  |   | questions.  You know, if there's some specific           |
| 7  |   | information you want to ask me about, I'll be            |
| 8  |   | more than happy to answer it.  But broadly, I           |
| 9  |   | can't -- yes, I answered all of Mr. Evans'              |
| 10 |   | questions.  I provided him quite a bit of                |
| 11 |   | information.  But as to specifics, I would have         |
| 12 |   | to see the specific information you're                  |
| 13 |   | referring to.                                            |
| 14 | Q | Okay.  So it sounds like you don't have much            |
| 15 |   | memory of this.                                           |
| 16 |   | Did you consider any less invasive means                 |
| 17 |   | of finding out who released these documents              |
| 18 |   | than launching an investigation by an outside           |
| 19 |   | firm?                                                     |
| 20 | A | It was determined that the best course of                |
| 21 |   | action for the investigation was to retain an           |
| 22 |   | outside firm.                                             |
| 23 | Q | How was that determined?                                 |
| 24 | A | Consultation with the HR Director, the Mayor            |
| 25 |   | and our city's labor counsel.                            |

CADY REPORTING SERVICES, INC.

```
 1    Q   Why was it determined that it was best to have

 2        an outside firm conduct an investigation?

 3                  MR. STRANG:  Chief, I just want

 4        to admonish you that at this point when you

 5        answer, don't disclose anything that you were

 6        told specifically by Clemans Nelson.  If you

 7        can answer the question without that --

 8    A   Yeah.  I can't answer that question because the

 9        answer would be based on, you know, privileged

10        communication.

11    Q   So there were no communications you had with

12        the Mayor or Ms. Linker or anyone else other

13        than an attorney that played into the decision

14        to retain an outside investigative firm?

15    A   We had discussions and the labor counsel was

16        involved in all of those discussions.

17    Q   Before you permitted Bill Evans to conduct a

18        polygraph on your Lieutenant, Mr. Mazzola, did

19        you check department policies to find out

20        whether that was permitted?

21    A   Yes.

22    Q   What were the results of your check of

23        department policies?  What did you find?

24    A   That under the circumstances that Bill Evans

25        was investigating, that a polygraph would be
```

                    CADY REPORTING SERVICES, INC.

1       permissible.

2    Q   I would like to direct your attention to

3        Defendant's Exhibit 1 which is included in that

4        exhibit folder.

5              MS. SAVOIE:   Mr. Cook, if you

6        could put that on the screen, I would

7        appreciate it.

8          Steven, did you have a status conference

9        you needed to attend this morning?

10             MR. STRANG:   Pardon?

11             MS. SAVOIE:   I have a note that

12       from my paralegal that you may have had a

13       status conference this morning.  Is that

14       correct?

15             MR. STRANG:   I had someone cover

16       it.  Thank you.

17             MS. SAVOIE:   Oh, okay.  I just

18       wanted to make sure.

19             MR. STRANG:   Thank you for

20       checking.

21   Q   Chief Kilbane, would you please look at this

22       General Order Number 103, which is Defendant's

23       Exhibit number 1.

24          Did you review this General Order before

25       you authorized Bill Evans to conduct a

                   CADY REPORTING SERVICES, INC.

```
 1          polygraph examination of Mr. Mazzola?
 2     A    Yes, I did.  Yes, I did.
 3     Q    And why did you think that this allowed -- that
 4          a polygraph was permitted under this policy?
 5     A    I'm sorry, Ms. Savoie, the very first part of
 6          your question was a bit garbled.  Could you
 7          please repeat it?
 8     Q    Certainly.  Thank you for asking.
 9              Why did you think that a polygraph
10          examination was permitted under this policy?
11     A    Because there was a potential criminal
12          investigation involved and polygraphs are
13          authorized in criminal investigations.
14     Q    But at the time the polygraph was conducted, it
15          was not a criminal investigation, correct?
16     A    From the outset Mr. Evans was investigating the
17          possibility of a violation of the Ohio Revised
18          Code section that we spoke about about the
19          unauthorized access to computer systems, so
20          there was a criminal element to the
21          investigation.
22              Now, obviously with some of the
23          individual officers, if they're offered
24          Garrity, they themselves -- anything under
25          Garrity protection isn't going to be usable
```

                    CADY REPORTING SERVICES, INC.

1           in that criminal investigation against them,

2           but they are also duty bound to give any

3           testimony or information that they have about

4           anyone else's involvement in a crime.

5      Q   So you recognize that on page -- on the page

6           that is Bates numbered Defendants 0000948,

7           which is I think the third page of that pdf if

8           you scroll down, under section F number 2 when

9           it says, "Polygraph examinations shall only be

10          used in criminal investigations", you

11          considered this to be a criminal investigation

12          of Mr. Mazzola at the time you required him to

13          submit to a polygraph examination, is that what

14          you're saying?

15                    MR. STRANG:  Objection.

16     A   No.  The criminal investigation was not focused

17          on Mr. Mazzola.  He was the subject of an

18          administrative investigation, but the polygraph

19          was also part of a criminal investigation into

20          who stole the department documents.

21              Mr. Evans felt that there was more than

22          one person that could possibly be involved and,

23          if there was, Mr. Mazzola would have material

24          information to be able to identify that person.

25     Q   Why did you interpret this particular section

                    CADY REPORTING SERVICES, INC.

```
 1            of the policy, section F-2 that's on this page,

 2            to mean that it was permissible to do a

 3            polygraph if Mr. Mazzola himself was not under

 4            criminal investigation?

 5       A    Because it says, "Polygraph examinations shall

 6            only be used in criminal investigations", and

 7            there was a criminal investigation.

 8       Q    Okay.

 9       A    I mean there was also a concurrent

10            administrative investigation, but this says

11            you can use it in a criminal investigation.

12            We used it in a criminal investigation.

13       Q    So you're saying now that Mr. Evans was not

14            doing an internal administrative investigation,

15            he was doing both an internal and

16            administrative investigation and a criminal

17            investigation?

18       A    There was a potential for a criminal

19            investigation from the outset that was, you

20            know, made clear to everybody he interviewed.

21       Q    Are criminal investigations supposed to be

22            conducted by police officers?

23       A    We often -- it's not unheard of to outsource

24            parts of criminal investigations to experts

25            that aren't necessarily police officers.
```

                        CADY REPORTING SERVICES, INC.

```
 1    Q    Was that contemplated within the scope of

 2         Mr. Evans' engagement agreement?

 3    A    I don't know about what the specific agreement

 4         said, but it was certainly part of his

 5         investigative focus when he discussed it with

 6         me.

 7    Q    Did Mr. Evans ever administer Miranda warning

 8         to anyone he interviewed?

 9    A    I wasn't present for the interviews, so I don't

10         know.

11    Q    Do you have any knowledge or information about

12         whether he administered Miranda warning to

13         anyone he interviewed?

14    A    I wasn't there.  I don't know what he

15         administered to them.

16    Q    Right.  And what I'm asking is do you have any

17         information from anyone else to indicate that

18         he provided a Miranda warning to any person?

19    A    Again, I don't know what Mr. Evans said or

20         didn't say.  I was not present and I don't --

21         nobody gave me any information, other than

22         Mr. Evans.

23    Q    So did Mr. Evans ever tell you that he

24         administered a Miranda warning to any person

25         during this investigation?
```

                    CADY REPORTING SERVICES, INC.

```
 1    A    No, he did not.

 2    Q    Did Mr. Evans ever specifically talk to you to

 3         clarify whether this was a criminal

 4         investigation or an administrative

 5         investigation?

 6    A    It was both and Mr. Evans and I had discussed

 7         that.

 8    Q    Did you sit in on Mr. Evans' deposition?

 9    A    Yes, I did.

10    Q    Did you hear him testify about how it was his

11         understanding this was an administrative

12         investigation?

13    A    Yeah.  But that's not the recollection of the

14         conversations that I had with him.  And I know

15         for a fact that he provided each of the people

16         he interviewed with a section of -- with a copy

17         of the Ohio Revised Code section that was

18         potentially violated.

19    Q    But you heard that it was his understanding

20         this was an administrative investigation,

21         correct?

22    A    I don't recall that exact words, no.

23    Q    And I'm not asking for exact words.  I've

24         definitely paraphrasing because I don't have

25         the transcript from front of me, okay.
```

                    CADY REPORTING SERVICES, INC.

50

```
 1          Do you remember Mr. Evans testifying that

 2          he understood this to be an administrative

 3          investigation, not a criminal investigation?

 4    A    No.  I don't remember that specific testimony.

 5    Q    Okay.  But you would disagree with that

 6          testimony if he provided it?

 7                    MR. STRANG:  Objection.

 8    A    No.  I'm saying I don't remember that specific

 9          testimony.

10    Q    And separate question.  If he testified to

11          that, would you disagree with that, his

12          characterization?

13                    MR. STRANG:  Objection.

14    A    I'm not going to speculate about what ifs.

15    Q    I'm not asking you to speculate.  What I'm

16          asking is do you disagree with the notion that

17          this was an administrative investigation?

18    A    Again, you're asking me to speculate about if

19          someone said something would I, and that's the

20          definition of speculation.

21    Q    But you can't say whether or not you would

22          disagree with the idea that this was an

23          administrative investigation, really?

24                    MR. STRANG:  Objection.

25    A    Again, as I've already said, it was an
```

                    CADY REPORTING SERVICES, INC.

```
 1        administrative and criminal investigation.
 2        And the union and Mr. Mazzola had no objection
 3        to the polygraph.  They accepted it.  They
 4        didn't post any objection based on this policy.
 5    Q   Oh.  Did you sit in on the depositions of
 6        Sara Liva and Bob Phillips?
 7    A   Yes, I did.
 8    Q   Did you hear Sara Liva testify that she
 9        objected to the polygraph?
10    A   What I mean by --
11                    MR. STRANG:  Objection.
12    A   -- objected to is that if there was any
13        violation of the Collective Bargaining
14        Agreement, Mr. Phillips and Ms. Liva were very
15        clear that their sole purpose was to make sure
16        that the terms of the Collective Bargaining
17        Agreement were adhered to with respect to
18        Mr. Mazzola.  They had a remedy within that
19        Collective Bargaining Agreement through the
20        grievance and arbitration process to address
21        any instance where a member of their union was
22        treated unfairly.
23            Subsequently they didn't file any
24        grievance.  They didn't file any action at all
25        under the CBA.  That indicated that they
```

CADY REPORTING SERVICES, INC.

```
1        accepted the polygraph; otherwise, they would
2        have objected to it via the grievance process.
3    Q   Did you hear Sara Liva testify that she stated
4        an objection to the polygraph to Bill Evans?
5    A   Yes.  She stated that she did, but she also had
6        her client submit to the polygraph.
7    Q   The polygraph was administered under your
8        order, correct?
9    A   Yes, it was.
10   Q   And under threat of discipline, correct?
11   A   If you fail to follow or refuse to follow a
12       direct order, it is grounds for disciplinary
13       action.
14   Q   Right.  The e-mail you sent to Mr. Mazzola
15       ordering him to submit to the polygraph
16       included a provision that if he did not submit,
17       he would be subject to discipline up to and
18       including termination, correct?
19   A   Yes, it did.  But that order, like any order I
20       give, is subject to the grievance and
21       arbitration process.  And, again, the union
22       chose not to avail themselves to that remedy.
23   Q   You mentioned a moment ago that Sara Liva did
24       not object to the polygraph on the basis of
25       policy 103 and then you went on to say some
```

CADY REPORTING SERVICES, INC.

1    things about how she made clear she was present

2    to enforce the terms of the CBA.  And I'm

3    paraphrasing.  I'm not saying those were your

4    exact words just now.

5        So what I want to ask you about is what

6    is your understanding of whether a union lawyer

7    is responsible for knowing about police

8    department policies that are not within the

9    CBA?

10                MR. STRANG:  Objection.

11   A   It's very simple.  The CBA is the contract

12   between the employees, the representative union

13   and management and the city.  It's signed off

14   on by the Mayor and the Law Director and it's

15   signed off on by the representative of the

16   union and their lawyer.  That's the guidelines

17   under which we have to operate, including

18   discipline.

19        Any discipline has to be fair.  There's

20   mechanisms in there to enforce that.

21   Discipline is based on the departmental

22   policies.  Ms. Liva and Mr. Phillips had full

23   access to the policies, any applicable policies

24   to any discipline that could potentially be

25   administered against any of their union members

              CADY REPORTING SERVICES, INC.

```
 1              fall under the CBA.  And if any unfair action
 2              or any violations to the CBA were made based on
 3              violations of these policies, they could grieve
 4              it under the terms and conditions of the CBA.
 5        Q    Do you have an understanding of whether this
 6              investigation conducted in March 2019 was
 7              considered a disciplinary action that the union
 8              could grieve?
 9        A    The investigation itself isn't a disciplinary
10              action.  Any disciplinary action that would
11              result from the findings of the investigation
12              are contestable through the grievance and
13              arbitration process.
14        Q    So do you have knowledge of any provision of
15              the CBA that would have allowed the union to
16              protest this investigation?
17        A    Yes.  Absolutely.  Once the investigation was
18              completed, if there was any discipline imposed
19              on their client that was unfair as a result of
20              any element of the investigation, they could
21              definitely grieve it.
22        Q    Okay.  So let's back up for a second.  My
23              question was not about whether they could
24              grieve the results of the investigation.  My
25              question was whether there's anything in the
```

CADY REPORTING SERVICES, INC.

```
 1              CBA, to your understanding, that permits the

 2              union to grieve the investigation itself.

 3                   Do you have any knowledge of that?

 4      A    No.  They can't grieve an investigation.  They

 5              can certainly -- but they're present to

 6              represent and advise their clients, the union

 7              member, during the course of the investigation

 8              as to what's permissible, what's not, what

 9              actions to take, with the knowledge that if

10              they are ordered to do anything that violates a

11              policy or violates the CBA, that their remedy

12              available is a grievance if there's any

13              discipline imposed based on that violation.

14      Q    Right.  And you keep talking about if there's

15              any discipline imposed.  To be clear, I'm not

16              asking about discipline imposed as a result of

17              an investigation.  What I'm asking you about

18              right now is whether you are aware of any

19              ability of the union to grieve the

20              investigation and its procedure themselves.

21              Okay?

22                   With that predicate in mind, are you

23              aware of anything in the CBA that would allow

24              the union to grieve the order for Mr. Mazzola

25              to submit to a polygraph examination?
```

                    CADY REPORTING SERVICES, INC.

1    A    Well, much like you say lawyers can sue anybody

2         for anything, unions can grieve anybody for

3         anything.  If they felt that there was

4         something in the investigation that violated a

5         term and condition of their employment or a

6         term and condition of that Collective

7         Bargaining Agreement, absolutely they could

8         file a grievance immediately during the

9         investigation if they felt there was, you know,

10        a violation during the course of the

11        investigation.

12   Q    And, again, my question is are you aware of

13        anything in the CBA that would authorize the

14        union to grieve a polygraph specifically?

15   A    Again, polygraphs are not specifically

16        mentioned anywhere in the CBA.

17   Q    When you engaged Mr. Evans, what parameters did

18        you set for his investigation generally?

19   A    Generally the parameters of the investigation

20        were to take the steps he felt necessary to

21        discover who was responsible for the theft of

22        the documents and data from the police

23        department.

24   Q    Is Bill Evans a police officer?

25   A    He's a former police officer.  He's currently

                 CADY REPORTING SERVICES, INC.

```
 1          an attorney and a polygraph operator.

 2     Q    But at the time of this investigation he was

 3          not actually a police officer, correct?

 4     A    Correct.

 5     Q    Did you tell Bill Evans that you thought

 6          Mr. Mazzola was Ed Gallek's source of

 7          documents?

 8     A    I don't believe so, no.

 9     Q    Did you provide Bill Evans with a complete copy

10          of department policies?

11     A    I provided him with copies of policies that he

12          requested.

13     Q    Did you provide him with a copy of policy 103

14          that we just reviewed?

15     A    I can't recall whether he specifically

16          requested 103 or not.  If he did, I would have

17          provided it for him.

18     Q    And you're referring to specific requests he

19          may have made.  How would he know what policies

20          to request?  What was your discussion that

21          provided him the information he needed to make

22          requests?

23     A    He would discuss different elements of the

24          investigation and he would, you know, ask if we

25          had a policy, for instance, regarding public
```

CADY REPORTING SERVICES, INC.

```
 1          records, regarding media relations or, you

 2          know, any policies that would cover any of the

 3          potential, you know, issues that were raised

 4          during the course of his investigation.

 5     Q    All right.  So he would ask for policies by

 6          subject area of the investigation, correct?

 7     A    Yes.

 8     Q    He wouldn't say, "Give me policy number 502."

 9          Correct?

10     A    No.  He would say, for instance, if he asked

11          for this policy, he would say, "Hey, what's

12          your policy on internal investigations?"  And I

13          would provide him with 103.  And if he had any

14          questions about it, he would call me and we

15          would discuss the specifics.

16     Q    Did he ask for the policy on internal

17          investigations?

18     A    I can't recall exactly which policies he asked

19          for.

20     Q    Did he ask for a policy on polygraphs?

21     A    Again, I don't recall the specific policies.

22          All I recall was I provided him a number of

23          policies based on different topics that we had

24          discussed.  103 may or may not have been one of

25          those.  I don't recall exactly.
```

CADY REPORTING SERVICES, INC.

```
 1    Q   And you sat in on Bill Evans' deposition,
 2        correct?
 3    A   Yes.
 4    Q   Did you hear him testify about the documents he
 5        produced in response to his -- to your
 6        counsel's subpoena that are Bates stamped
 7        Evans/PTA include all documents he received
 8        from you?
 9    A   Yeah.  I believe he did testify to that.
10    Q   If policy 103 is not in there, would you have
11        any reason to dispute whether or not he
12        received it?
13                    MR. STRANG:  Objection.
14    A   Again, I don't know whether he asked for it or
15        not, as I testified.  If he asked for it, I
16        would have given it to him.  If he didn't ask
17        for it, he wouldn't have received it.
18    Q   So if he didn't ask for the policy on
19        polygraphs specifically, you wouldn't have
20        given it to him even though you reviewed that
21        policy?
22    A   If he -- again, as I said, if he asked for a
23        policy, I provided it for him.  If he did not
24        ask for a policy, I didn't.
25    Q   So if he didn't ask for a policy, you would not
```

1          provide it to him even though you knew it was

2          pertinent to the investigation, is that

3          correct?

4                    MR. STRANG:  Objection.

5     A    I answered the question already about providing

6          policies to Mr. Evans.

7     Q    Please answer the question I just asked which

8          was different.

9     A    If Mr. Evans requested a policy, I provided it

10         to him.  If he did not request a policy, I did

11         not provide it to him.

12    Q    And that's true even if you knew that a policy

13         was pertinent to the investigation he was

14         doing?

15                   MR. STRANG:  Objection.

16    A    It wasn't my decision as to whether or not a

17         policy was pertinent.  That's his decision to

18         decide what policies he needed to be able to

19         conduct his investigation.

20    Q    Oh, but you did review 103 in connection with

21         this investigation, correct?

22    A    Yes, I did.

23    Q    You testified to that earlier.

24              So you're saying now it was his

25         determination, but you actually did look at

                     CADY REPORTING SERVICES, INC.

```
 1          policies that you considered important,

 2          correct?

 3     A    In as much that he was proposing doing a

 4          polygraph test on Mr. Mazzola.

 5     Q    Okay.  Did you look at any other policies

 6          during Mr. Evans' investigation that you did

 7          not share with him?

 8     A    I'm sure I did.  I reviewed all of the

 9          policies.

10     Q    How many policies are there for the police

11          department or were there at the time of this

12          investigation in March 2019?

13     A    Oh, I can't give you the exact number, but

14          there are dozens of General Orders in our

15          policies.

16     Q    Did you communicate with Bill Evans about

17          whether to administer Garrity warnings to the

18          officers he interviewed before the polygraph

19          was conducted?

20     A    He had requested the Garrity form that we use

21          at our departmental internal investigations and

22          I provided it to him.

23     Q    Did you have any discussions with him about

24          whether it was appropriate to do a Garrity

25          warning or Miranda warning?
```

CADY REPORTING SERVICES, INC.

```
 1    A   Garrity, absolutely.  Miranda warning, I don't
 2        know if they would be appropriate in Mr. Evans'
 3        capacity because, you know, a Miranda only
 4        applies when somebody is in custody being
 5        interrogated.  If they're free to leave,
 6        they're obviously not in custody.
 7            You know, I don't think he had anybody in
 8        custody at his office that he was preventing
 9        from leaving, so Miranda wouldn't apply.
10                    MR. STRANG:  Can we have just a
11        short like five or ten-minute break, Jessica?
12                    MS. SAVOIE:   Yeah.  We're fine
13        to do it now, yeah.
14                    MR. STRANG:  Thanks.  Thank you.
15                    THE VIDEOGRAPHER:  Off the
16        record.  The time is 10:13.
17                    (Recess taken.)
18                    THE VIDEOGRAPHER:  Back on the
19        record.  The time is 10:23.
20                    MS. SAVOIE:  Madam court
21        reporter, would you mind reading my last
22        question so I can remember where exactly we
23        left off, please?
24                    (Record read.)
25    Q   So Chief Kilbane, if an officer has a polygraph
```

CADY REPORTING SERVICES, INC.

1    as a result of your order and that polygraph

2    exam shows physiological responses consistent

3    with signs of deception, what would be the

4    consequences for that officer?

5    A    It would depend on the totality of the

6    circumstance of the investigation.  I can't

7    speculate on a what if on a general question

8    because every single investigation is unique.

9    Q    How about for this investigation?  After you

10   spoke with Bill Evans about Mr. Mazzola's

11   polygraph examination, how did you react?

12   A    I believe we had scheduled a meeting with -- we

13   were going to have Mr. Evans come in and speak

14   to myself and the HR Director, quite possibly

15   the Mayor and Law Director, and review all of

16   the evidence and decide what the next steps in

17   the investigation would be.

18   Q    Did you contemplate any discipline for

19   Lieutenant Mazzola?

20   A    No.  The investigation wasn't complete yet and,

21   you know, any of those considerations don't

22   occur until the investigation is complete and

23   you have everything you need to make that

24   decision.

25              MR. CHANDRA:  I'm sorry to

                CADY REPORTING SERVICES, INC.

```
 1        interrupt.  This is Subodh Chandra.  I just
 2        wanted to note for the record that I've been
 3        able to join the deposition.  Thank you.
 4    Q   Is it correct -- Chief, you have been a police
 5        officer for many years, correct?
 6    A   A little over 31 years, yes.
 7    Q   31 years.  Wow.
 8             As a long time police officer and
 9        Police Chief, you know that polygraph results
10        are virtually never admissible in court to show
11        an individual's truthfulness or untruthfulness
12        because they only gauge certain physiological
13        responses, correct?
14                  MR. STRANG:  Objection.
15    A   I would leave the legal opinion on the
16        admissibility of polygraphs up to the experts.
17    Q   And I understand.  But what I'm asking is
18        you've seen a lot of criminal trials, correct?
19    A   Yes.
20    Q   You're familiar with the rules of evidence
21        generally, correct?
22    A   Generally, yes.  But for specifics I would
23        obviously consult legal advice.
24    Q   As a factual matter, are you generally familiar
25        with the facts that courts generally do not
```

```
 1        admit polygraph results as evidence of

 2        truthfulness or deception?

 3                    MR. STRANG:  Objection.

 4    A   Again, that's a case by case basis decision

 5        and, you know, that would probably be a better

 6        question to ask Mr. Evans based on his

 7        expertise.

 8    Q   Do you think it's a case by case determination

 9        on whether polygraph results are admissible in

10        court?

11    A   According to conversations I had with

12        Mr. Evans, he has had cases where polygraph

13        results were used and admitted as evidence.

14    Q   For truthfulness?

15    A   I believe so.  Again, you would have to ask

16        Mr. Evans.  I know he has told me that he's had

17        results of his tests admitted into evidence

18        before.

19    Q   Did the union provide any parameters for the

20        investigation?

21    A   What do you mean by parameters, please?

22    Q   Did the union provide you with any

23        specifications that they would require as a

24        result of the CBA for the investigation you

25        planned to conduct in March of 2019?
```

                    CADY REPORTING SERVICES, INC.

```
 1      A    No.

 2      Q    Did the union provide any specifications or

 3           parameters for the polygraph to be administered

 4           to Mr. Mazzola?

 5      A    Again, I wasn't there.  I know that Ms. Liva

 6           was there and she had discussions with

 7           Mr. Evans and Mr. Butler regarding the

 8           specifics of the polygraph, but as to the exact

 9           conversation, no, I don't know what that

10           consisted of.

11      Q    What happens to an officer if you believe they

12           have been untruthful while executing their

13           duties?

14                      MR. STRANG:  Objection.

15      A    Well, it doesn't matter what I believe.  If

16           there's evidence of dishonesty or ethical

17           integrity violations, the county prosecutor has

18           mandated that any findings of such be reported

19           to his office.

20      Q    Is that the Brady Giglio list?

21      A    I do not know if Prosecutor O'Malley has a

22           list, per se.  All I know is that every year he

23           sends out a mandate to every Police Chief in

24           the county with the directive that, hey, if you

25           have findings of any of these types of ethical
```

                      CADY REPORTING SERVICES, INC.

```
 1              or integrity-related violations, you're to

 2              report them to my office.  What he does with

 3              those reports, I don't know.

 4        Q     Are you familiar with the term Brady list or

 5              Brady Giglio list?

 6        A     Yes, I am.

 7        Q     What is your understanding of what that is,

 8              just so we make sure we're on the same page?

 9        A     Yes.  Under Brady v. Maryland, the prosecution

10              is required to disclose any exculpatory

11              evidence to the defense, and the dishonesty or

12              integrity of an officer as a witness is

13              considered exculpatory evidence that has to be

14              disclosed under Brady.

15                   So what prosecutors in many jurisdictions

16              have done is they have constructed a list of

17              officers that have been found to be dishonest

18              or have those integrity-related violations.

19              And, again, it varies from jurisdiction to

20              jurisdiction as to what those individual

21              prosecutors decide to do with that.  Whether

22              they prohibit the officer at all from being a

23              witness or whether they disclose it to the

24              defense to try to mitigate it at trial, again,

25              that's a legal question.
```

CADY REPORTING SERVICES, INC.

```
 1      Q    What have been your observations of how the

 2           Cuyahoga County Prosecutor has implemented

 3           that?

 4      A    I have not seen any action based on that taken

 5           by the cases I've been involved with in the

 6           county prosecutor's office.

 7      Q    So you don't know if they have any general

 8           strategy for handle officers who are on

 9           Brady Giglio?

10      A    No.  Again, all I know is we're required to

11           report it to Mr. O Malley's office.  What they

12           do with it internally, I'm not aware.

13      Q    Have you ever been present at a trial or aware

14           of a trial where an officer who testified was a

15           Brady officer?

16      A    Not to my knowledge.

17      Q    So have you ever been at a trial where the

18           defense brought up Brady Giglio evidence as

19           evidence against a testifying officer?

20      A    Not that I could recall.

21      Q    What would be your criteria for submitting an

22           officer's name to the county prosecutor

23           whenever you receive that yearly notice

24           mandating that you provide any officers' names

25           for people who have been dishonest?
```

CADY REPORTING SERVICES, INC.

```
 1    A    Well, it's never occurred, so we don't have to
 2         do anything about it.  But if it were, you
 3         know, if there was a finding through an
 4         internal investigation that there were
 5         integrity or truthfulness, honesty-type charges
 6         that were sustained, I would probably -- the
 7         first thing I would do is probably consult with
 8         our Law Director to determine, you know, I
 9         would give him the prosecutor's letter and
10         discuss it with him and then take his advice as
11         to the best way to proceed.
12    Q    So you've never added an officer to the
13         Brady Giglio list with the Cuyahoga County
14         Prosecutor's Office?
15    A    Again, I don't know if they have a list,
16         per se.  I have never provided any information
17         regarding the types of violations that the
18         prosecutor requests through the Prosecutor's
19         Office.
20    Q    Are you aware of any legal requirement in the
21         Brady case or otherwise that an officer must be
22         formally disciplined for dishonesty-related
23         issues to be added to -- to be submitted to the
24         prosecutor in response to the yearly letter
25         asking for this information?
```

```
 1    A    No.  There was no such requirement in the

 2         letter from Mr. O'Malley.

 3    Q    Have you ever known any officers who told you

 4         that they were on a Brady Giglio list?

 5    A    No.

 6    Q    Are you aware of what happens to officers who

 7         are added to the Brady Giglio list of any

 8         particular prosecutor's office?

 9    A    I imagine that would depend on the locality.

10    Q    As a general matter are you aware that it would

11         destroy their credibility in court as a

12         witness?

13              MR. STRANG:  Objection.

14    A    Again, that would be a consideration for the

15         prosecutor to make with the information that's

16         provided to him or her.

17    Q    Would you think that it would make someone an

18         ineffective police officer if they would be

19         subject to impeachment through that evidence?

20              MR. STRANG:  Objection.

21    A    That's a legal question that I would defer to

22         our legal counsel about.

23    Q    Well, I'm not asking for a legal conclusion.

24         I'm asking for your opinion on whether someone

25         could still be an effective police officer if
```

CADY REPORTING SERVICES, INC.

1      every time they were to testify in court they

2      were subject to attack by evidence that they

3      had previously been dishonest.

4           What is your opinion on that?  Would that

5      person still be an effective police officer for

6      your department?

7                MR. STRANG:  Objection.

8   A  My opinion is it would be dependent on the

9      prosecuting attorney's opinion of how effective

10     that -- it's not my opinion that matters on how

11     effective a witness is.  It's the prosecutor's

12     opinion that matters.  I would defer to their

13     judgement on it.

14  Q  And I'm not asking about how effective a

15     witness this person would be.  I'm asking you

16     about how effective they would be to you as the

17     Chief of your department.  How effective would

18     a police officer be if you knew that any time

19     they had to testify in court they would be

20     impeached with information that they had been

21     dishonest before?

22                MR. STRANG:  Objection.

23  A  Again, that's asking for a what if speculation.

24     You know, it's a very individual set of

25     circumstances.  It would be, you know, a

                    CADY REPORTING SERVICES, INC.

```
 1            decision made by a legal expert as to whether

 2            or not I could use that officer.  And, again,

 3            until such time as that individual

 4            determination is made, I can't speculate as to

 5            what I would or would not do within the

 6            department because that would involve the input

 7            from the legal department, from the Mayor and

 8            the HR department and all sorts of other

 9            aspects besides just what my opinion is.

10    Q    So you would require input from other people to

11            form an opinion on whether one of your own

12            officers was an effective officer or not?

13    A    No.  I would have an opinion as to whether or

14            not they're an effective officer by their

15            performance, but as to whether they are

16            specifically precluded or disabled from doing

17            their duties, that's definitely an opinion that

18            other people would have input upon.

19    Q    And you understand I'm not asking about the

20            latter.  I'm asking about your opinion of

21            whether this person would be an effective

22            officer for you, correct?  You understand that?

23    A    Yes.  And, again, I would assess the individual

24            circumstances and make the assessment based on

25            that set of individual circumstances.
```

CADY REPORTING SERVICES, INC.

1   Q  If you had an officer whom you knew would be

2       subject to impeachment by evidence of previous

3       dishonesty, would you consider reassigning them

4       perhaps to an area of your department where

5       they would not have to testify?

6              MR. STRANG:  Objection.

7   A  Again, that would be a case by case individual

8       assessment of the specific circumstances

9       surrounding it.

10  Q  And you have no idea in general about what

11      considerations would inform your decisions

12      about how to handle an officer who's put on the

13      Brady Giglio list?

14  A  I'm unaware of the existence of a Brady list in

15      our jurisdiction.  And, again, that's an

16      individual decision based on an individual set

17      of circumstances.

18  Q  Mr. Mazzola never said that he provided the

19      documents to Ed Gallek to you, correct?

20  A  Correct.

21  Q  In fact, he always denied that he provided the

22      documents to Ed Gallek when speaking to you,

23      correct?

24  A  As far as I'm aware, he's denied it, yes.

25  Q  Right.  I mean when he was talking to you, he

                CADY REPORTING SERVICES, INC.

```
 1          always denied it, correct?
 2     A    Yes.
 3     Q    To your knowledge did Mr. Mazzola ever tell
 4          anyone that he was Ed Gallek's source of the
 5          documents?
 6     A    I don't know who he said that to or not.
 7     Q    And I'm asking -- so my question started with
 8          the phrase to your knowledge, so let me ask
 9          again.
10               To your knowledge did Mr. Mazzola ever
11          tell anyone that he was Ed Gallek's source for
12          the documents that were released to him?
13     A    No.  I don't know what Mr. Mazzola said to
14          other people, you know.  Again, to me he denied
15          it.  As to what he said to other people, I
16          can't -- to my knowledge I can't speculate as
17          to what he said to them.  Not in my presence he
18          didn't.
19     Q    And, again, I'm not asking you to speculate
20          about what he actually told other people or
21          not.  I'm asking if you have any knowledge of
22          whether he told anyone else that he was
23          Ed Gallek's source.
24               Do you have any knowledge that he ever
25          said to anyone that he was the source?
                    CADY REPORTING SERVICES, INC.
```

```
 1    A    No.
 2    Q    And do you remember even Bill Evans
 3         acknowledged that Mr. Mazzola consistently
 4         denied that he provided the documents to
 5         Ed Gallek?
 6    A    Yes.
 7    Q    Did you ever discuss any First Amendment free
 8         speech concerns with Bill Evans whenever you
 9         were speaking with him about this internal
10         investigation?
11    A    I believe he briefly brought it up on one
12         occasion because there was a reporter involved,
13         you know, he wanted to make sure that there was
14         nothing there.  But it was determined that
15         there was absolutely no First Amendment
16         concerns because the focus of the investigation
17         was on the theft of the data and the documents,
18         not on what communications someone had with a
19         member of the media.
20    Q    What was specifically the concern about a
21         reporter being involved?
22    A    I don't remember exactly what Mr. Evans was
23         concerned about, but I believe he had said that
24         in a prior case there was something involving
25         another reporter and he just wanted to make,
```

CADY REPORTING SERVICES, INC.

```
 1          you know, make certain that everything he was
 2          doing fell within parameters that were, you
 3          know, acceptable and legal and he wasn't
 4          exposing himself or the city to any potential
 5          issues.
 6     Q    Did you talk to Bill Evans about a First
 7          Amendment case that you teach in a course at
 8          Cuyahoga Community College?
 9     A    No.
10     Q    Do you teach any kind of First Amendment cases
11          in your work teaching at Tri-C?
12     A    Not at Tri-C, no.
13     Q    Do you teach any kind of First Amendment free
14          speech or other kinds of First Amendment cases
15          anywhere?
16     A    I'm a professor at Strayer University.  I teach
17          several courses there.  In one of the
18          administration courses we touch briefly on
19          public agency First Amendment, public employee
20          First Amendment.  And I believe the Garcetti
21          case is the controlling case that's mentioned
22          in the textbook.
23              So I did mention that to Mr. Evans and he
24          said he was going to talk to a fellow attorney
25          that was familiar with that case and decide
```

CADY REPORTING SERVICES, INC.

1          whether or not, you know, it applied.  And

2          eventually he came back and said, "Yeah, we're

3          good.  Everything is fine.  It's not a

4          concern."

5     Q    Do you know which attorney he consulted with?

6     A    No, I do not.

7     Q    But you know that Garcetti was the case you

8          raised?

9     A    Yes, it was.

10    Q    What is your understanding of the Garcetti case

11         holding that you teach in that class?

12                    MR. STRANG:  Objection.  I just

13         want to differentiate, Chief, anything that you

14         and I have discussed with respect to legal

15         theory in this case about Garcetti, how it

16         applies, I'm going to instruct you not to

17         answer.

18             To the extent that she's asking you about

19         what you knew at the time or whether to what

20         extent you teach in your class, then you can

21         answer that, but I just want to caution you not

22         to discuss the case or whether we have

23         discussed it or how it may apply to our defense

24         of this case.

25                    THE WITNESS:  Okay.

                       CADY REPORTING SERVICES, INC.

1    A    Yeah.  Specifically I would have to refer to

2         the textbook we use in the course for the

3         specifics, but generally Garcetti is a case of

4         a public employee that had made some public

5         statements regarding his official duties.  I

6         believe he was an assistant prosecutor.  And

7         his job duties were changed because of that and

8         he filed a lawsuit based on First Amendment.

9         And I believe the Supreme Court had issued

10        parameters under which public employees' speech

11        would or would not be First Amendment

12        protected.

13   Q    What is your understanding of what those

14        parameters are and whether public employees

15        speech is protected or unprotected speech as of

16        the time of this investigation in March 2019?

17   A    And, again, the specific discussions I had with

18        Mr. Strang about it in-depth and research, you

19        know, I can't discuss.  But I would -- for the

20        specifics I would have to refer back to the

21        textbook.  But, in general, I remember there

22        was some sort of several prong test that

23        determined whether or not it was protected

24        speech.

25   Q    Do you have a copy of the textbook that you

                    CADY REPORTING SERVICES, INC.

1      would have been using as of March 2019 for that

2      course?

3   A  I have haven't taught that course in a couple

4      years.  I'm teaching different courses now.

5      And the textbook for that was electronic.  I

6      don't have a physical copy of it.  It was

7      within the course module that the university

8      uses.

9   Q  I'm a little confused because you just said you

10     haven't taught that course for a couple of

11     years and I was asking about March 2019.

12         When did you stop teaching the course

13     that included information on Garcetti?

14  A  Oh, between one and two years ago, because I

15     transitioned into a different role at Strayer.

16     I'm in curriculum development now, so I had to

17     cut back on the course load I was teaching and

18     that was one of the courses that I stopped

19     teaching.

20  Q  Do you know, how would we request a copy from

21     the university of the course module that would

22     include that electronic text book?

23                 MR. STRANG:  Objection.

24  A  I imagine you would have to contact them and

25     ask them.

```
1    Q    Okay.  What was the specific name of the

2         course?

3    A    I want to say criminal justice administration,

4         I believe.

5    Q    Do you remember if the course module had a

6         separate name?

7    A    No, I don't.  It was separated into weekly

8         units over an 11-week period and each week

9         would cover several different chapters or

10        modules in there and I don't recall

11        specifically where in the course that

12        particular material was.

13   Q    And do you have any information on the

14        electronic textbook specifically, the title?

15   A    No, I don't.  No.

16   Q    Did you ever teach in your class anything about

17        a case called Lane v. Franks?

18   A    Not that I recall.

19   Q    Do you remember speaking about the case

20        Lane v. Franks with Bell Evans?

21   A    No, I do not.

22   Q    Are you familiar with that case?

23   A    No, I'm not.

24   Q    I'm sorry.  Let me ask this a different way.

25             Were you familiar with that case as of
```

```
 1          March 2019 when you were doing this

 2          investigation?

 3     A    No.

 4     Q    Do you know whether Bill Evans spoke to more

 5          than one attorney about any First Amendment

 6          issues?

 7     A    I don't know who he spoke to about it.

 8     Q    Did Mr. Evans tell you anything about whether

 9          retaliation could be a problem in this

10          investigation?

11     A    He never raised it as a concern.

12     Q    Okay.  I'm going to refer you to Exhibit 2

13          again and back on page 103.

14              Are you able to read the handwriting for

15          the entry that begins on 3-14-19?

16     A    I'm sorry.  It's fairly illegible.

17     Q    Okay.

18     A    I'll say, yeah, something First Amendment

19          issue.  30 say no problem but determine would

20          be problem.

21     Q    Okay.  And if I were to represent to you that

22          this says "First Amendment issue.  Both say no

23          problem but retaliation could be a problem."

24          Did Mr. Evans say anything to that effect to

25          you whenever he talked to you on 3-15-19 as

                    CADY REPORTING SERVICES, INC.
```

1           reflected in the next entry on this activity

2           log?

3                       MR. STRANG:  Objection.

4      A    No, not that I could recall.

5      Q    Did you have any other discussions with

6           Mr. Evans before Mr. Mazzola was subjected

7           to the polygraph examination about any

8           constitutional rights issues that might be

9           implicated by this investigation?

10     A    I apologize again, Ms. Savoie, the last part of

11          your question was a little bit garbled.  Could

12          I please ask you to repeat it?

13     Q    Certainly, yes.  I may have scooted far away

14          from my microphone.

15               Can you hear me okay right now?

16     A    Yes, I can.  Thank you.

17     Q    Yes.  At any time before Mr. Mazzola was

18          subjected to the polygraph examination on

19          March 20 of 2019, other than what we've already

20          discussed, did you ever have any discussions

21          with Bill Evans about any constitutional rights

22          issues that may be implicated by this

23          investigation, including the polygraph?

24     A    Not that I can recall.

25     Q    Did you ever specifically consider that

                       CADY REPORTING SERVICES, INC.

1       contemplating discipline for an officer based

2       on talking to a reporter might violate the

3       officer's First Amendment free speech rights?

4                       MR. STRANG:  Objection.

5    A  That was never a consideration.  As I said

6       before, the main focus of the investigation was

7       the theft and data breach that occurred at the

8       police department.

9    Q  So you didn't have any plans to discipline any

10      officers who had just talked to the media,

11      correct?

12                      MR. STRANG:  Objection.

13   A  Again, we had a policy that governed media

14      relation and dealings with the media.  If

15      during the course of the investigation

16      Mr. Evans determined any violations of this

17      policy had occurred, they certainly would have

18      been taken into consideration.

19   Q  At any time before or during this investigation

20      did you ever consider that disciplining an

21      officer based on sharing public records with a

22      reporter might violate the officer's First

23      Amendment rights?

24                      MR. STRANG:  Objection.

25   A  No discipline was considered because the

                    CADY REPORTING SERVICES, INC.

```
 1            investigation was never completed.  Again,

 2            upon completion of the investigation we would

 3            have assessed which departmental policies,

 4            rules and/or laws had been violated and decided

 5            the appropriate actions, potential charges at

 6            that time.

 7       Q    Right.  But whenever you started this internal

 8            investigation, you knew that if you found

 9            violations of policy, you might discipline an

10            officer, correct?

11       A    If there are violations of policy, there is a

12            potential for discipline, yes.

13       Q    So there's a potential for discipline in any

14            internal investigation where you're looking

15            into possible wrongdoing, correct?

16       A    Yes.

17       Q    So the scepter of discipline was raised by the

18            investigation itself, correct?

19       A    No, not necessarily.  Because if an employee is

20            being investigated -- the mere investigation

21            itself is not disciplinary action.

22       Q    Right.

23       A    And an officer -- and quite often a lot of

24            times I've seen it where an investigation will

25            be initiated and there's a reasonable
```

```
 1        explanation for the officer's actions and

 2        there's no discipline at all.

 3            The decision to discipline is then made

 4        or not discipline isn't made until the

 5        conclusion of the investigation when all of the

 6        evidence is on the table.

 7    Q   Right.  But the point is just that you're aware

 8        of the possibility that there will be

 9        discipline any time you start an investigation

10        into possible wrongdoing, correct?

11    A   Absolutely not.  There's no determination that

12        there will be discipline at the conclusion of

13        an investigation.

14    Q   And I understand that.  But what I'm saying is

15        you understood that discipline could be meted

16        out based on the results of this investigation

17        whenever you started the investigation,

18        correct?

19    A   Yes.

20    Q   So going back to my question about the public

21        records, understanding that discipline was a

22        possibility even if you hadn't yet made a

23        decision about discipline, did you consider at

24        the outset of this investigation whether

25        possibly disciplining an employee for sharing
```

```
 1           public records with the media could violate

 2           that employee's First Amendment rights?

 3                     MR. STRANG:  Objection.

 4     A     Again, any specific set of circumstances,

 5           especially hypothetical ones, I can't make a

 6           determination on.  The determination whether or

 7           not to discipline for a specific act or actions

 8           is made at the conclusion of the investigation,

 9           not at the outset.

10     Q     Right.  And so I'm not -- that's not the

11           question I'm asking.

12                 What I'm asking about is what were your

13           considerations at the time you were starting

14           this investigation about what rights might be

15           implicated for your officers if this

16           investigation went forward and you considered

17           discipline for them.  Are you saying that you

18           wouldn't consider whether discipline would

19           violate your officer's rights until after the

20           investigation was concluded?

21                     MR. STRANG:  Objection.

22     A     No discipline would withstand violating an

23           officer's rights or any of the city's

24           obligations under the terms and conditions of

25           the Collective Bargaining Agreement.  There's
```

CADY REPORTING SERVICES, INC.

1       too many checks and balances and protections

2       built into the procedures and the policies to

3       prevent that from happening.

4    Q  So that's not my question and I would like you

5       to listen to my question carefully, please.  I

6       understand that some of this could be a little

7       complicated, so please let me know if you don't

8       understand.  But I'm trying to understand what

9       your thought process was as you planned and

10      executed this investigation through Bill Evans.

11      Okay?

12           And you've said that at the outset of the

13      investigation, because there had been no

14      decision on discipline, you were not

15      considering whether sharing public records

16      would violate a person's First Amendment

17      rights.  But what I'm asking is, is that

18      something you would have considered later in

19      the process?

20           So after the investigation was concluded

21      and you had the results of your investigation,

22      is that a time at which you would have

23      considered whether an officer sharing public

24      records with the media would violate that

25      officer's First Amendment rights?

                    CADY REPORTING SERVICES, INC.

```
 1                      MR. STRANG:  Objection.

 2         Compound.

 3    A    Which question would you like me to answer?

 4         There were several in there.

 5    Q    Would you consider whether sharing public

 6         record documents with the media violated an

 7         officer's First Amendment rights before

 8         administering discipline to an officer for

 9         that?

10                      MR. McLANDRICH:  Objection.

11    A    Again, I couldn't make that consideration until

12         I had all of the facts.  At the outset of this

13         investigation it was focused on the theft of

14         data and the theft of documents.  Any policy

15         violations that were discovered during the

16         process of that investigation by Mr. Evans

17         would be considered at the end.

18              We didn't go into the investigation with

19         any of these hypothetical what ifs or did you

20         or could you consider this.  So, no, I wouldn't

21         make that consideration prior to the

22         investigation's conclusion.

23    Q    Would you make that consideration at the

24         investigation's conclusion?

25    A    I can't tell you what consideration I could
```

```
 1         make at the investigation's conclusion because
 2         it never concluded, so I can't speculate as to
 3         what conclusions would have been made.
 4    Q    When you administer discipline to officers as a
 5         general matter, do you consider whether the
 6         discipline is lawful?
 7    A    The discipline contractually has to be for
 8         just cause and it has to be proportional.
 9    Q    Can you go back and answer my question, please?
10                   MR. STRANG:  Objection.
11    A    I did answer the question.
12    Q    Well, you referred to other things than the
13         law.  And what I'm asking is whenever -- as a
14         general matter, whenever you administer
15         discipline to officers, do you consider whether
16         it is legal and lawful?
17    A    What do you mean by legal and lawful?  You
18         know, I'm bound by the terms and conditions of
19         a Collective Bargaining Agreement when it comes
20         to the discipline.  And, by definition, to
21         comply with that, it would have to be legal and
22         lawful.
23    Q    Right.  So do you consider whether discipline
24         is -- violates other laws that are outside the
25         scope of the Collective Bargaining Agreement
```
                    CADY REPORTING SERVICES, INC.

1      whenever you administer discipline?

2                      MR. STRANG:  Objection.

3    A   Again, it would be a specific case by case

4        decision.  Obviously if it was some sort of

5        punitive-type discipline that's, you know,

6        allowable like a suspension, demotion,

7        termination, that sort of thing, I wouldn't

8        make that decision.  The Mayor would.  And

9        certainly we would get legal input from the

10       Law Director as to, you know, whether it fits

11       those parameters.

12           So it wouldn't be my decision.  I would

13       certainly take steps to make sure something of

14       that severity would be legal and lawful by

15       getting appropriate legal input.

16   Q   What would the appropriate discipline be for

17       releasing public records outside of official

18       channels for a public records request?

19   A   Every disciplinary investigation and case is

20       different.  It would depend on the individual

21       circumstances and there would be a multitude of

22       factors that would need to be considered.  So

23       you can't make a blanket assumption of, you

24       know, X violation equals Y discipline.  It's a

25       very individualized process.

                   CADY REPORTING SERVICES, INC.

```
 1    Q   Can you describe the general range of

 2        disciplinary action that would be appropriate

 3        for a violation of this policy?

 4    A   No, I can't.  Because it would depend on the

 5        severity of the violation, the extenuating

 6        circumstances, everything surrounding the

 7        violation, you know.  So, as I said, it has to

 8        be an individual determination based on a very

 9        specific set of facts.

10    Q   So applying the question I've just asked to

11        the specific documents that were released to

12        Ed Gallek in 2019, what would be the range of

13        appropriate discipline that you would consider

14        for releasing the documents in that way?

15    A   I don't know.  We never reached the stage of

16        the investigation where disciplinary

17        considerations were even brought up.

18    Q   Right.  So I'm asking you now, what would the

19        range of disciplinary action have been if you

20        had concluded the investigation and gotten to

21        that point?

22                    MR. STRANG:  Objection.

23        Hypothetical.

24    A   Yeah.  I can't tell you.  It's a hypothetical

25        and it would, as I said before, you don't make
```

CADY REPORTING SERVICES, INC.

```
 1        those decisions until you've concluded the
 2        investigation and you have everything you need
 3        to make a recommendation to the Mayor for the
 4        appropriate discipline.
 5    Q   So you can't give a range of options that you
 6        would consider for this?
 7    A   Not on a hypothetical, no.
 8    Q   Well, it's not a hypothetical, is it, because
 9        you knew that these documents were released to
10        Ed Gallek, correct?
11    A   I knew that documents and data were stolen from
12        the police department and eventually made their
13        way to the media, yes.
14    Q   And why do you say that they were stolen?
15    A   Well, because someone without authorization to
16        do so took those documents and data from the
17        police department and distributed them outside
18        the police department outside of our
19        established policies and procedures to do so.
20    Q   So are you assuming that the person who
21        provided the documents to Ed Gallek didn't have
22        authorized access to those documents?
23    A   I don't know who provided them to Ed Gallek.
24        What I'm saying is whoever took them from the
25        police department and distributed them outside
```

CADY REPORTING SERVICES, INC.

```
 1          of the police department did not have

 2          authorization to do so and did so outside of

 3          our policies and procedures.

 4     Q    Right.  And you can't even tell me the

 5          appropriate range of discipline for that

 6          offense had this investigation been completed?

 7                    MR. STRANG:  Objection.

 8     A    No.  Because I don't know all of the elements

 9          and all of the findings and all of the

10          potential policy violations.

11              The investigation wasn't completed.  I

12          don't know all of the elements that I need to

13          know to be able to make any type of even a

14          range, as you're referring to, of disciplinary

15          considerations.

16     Q    Let's say it was a violation of only that

17          policy specifically and there were no other

18          policy violations in play.  Would you have

19          terminated someone for violating that policy?

20     A    I can't make that hypothetical speculation.

21                    MR. STRANG:  Objection.

22     Q    Why not?

23     A    Because it calls for speculation without

24          knowing all of the specific facts.  And the

25          termination -- to recommend termination of
```

CADY REPORTING SERVICES, INC.

1 employment to the appointed authority to make

2 that recommendation to the Mayor, it would

3 require a huge amount of corroborating and

4 convincing evidence.  And, you know, until you

5 reach that point, you can't hypothesize about

6 what you do.

7   And even before that happens there's

8 several checks and balances and hoops you have

9 to jump through.  So without going through

10 those, you know, those procedures, it would be

11 highly unprofessional to make that sort of

12 speculation.

13 Q Well, you understand I'm not asking for your

14 speculation, correct?  I'm asking for your

15 opinion.  This is something within the scope of

16 your authority as Chief, correct?

17 A The amount of opinion and speculation are sort

18 of hand and hand with this particular question

19 you're asking.  You're asking for an opinion

20 that requires me to speculate and I'm telling

21 you I'm not willing to speculate on a

22 hypothetical to give you an opinion.

23 Q Are there any departmental standards, policies

24 or orders that provide general standards for

25 what is appropriate discipline for different

CADY REPORTING SERVICES, INC.

```
 1          types of policy violations?
 2     A    No.  The Collective Bargaining Agreement
 3          mirrors the statutory language.  It simply says
 4          that the employer has the exclusive right to
 5          discipline its employees for cause.  The scope
 6          of that discipline and mechanism of that
 7          discipline is left up to the employer.
 8     Q    And so what I'm asking is does the police
 9          department, or did they in 2019, have any
10          internal policies that governed what was
11          appropriate discipline?
12     A    No.  We defer to the Collective Bargaining
13          Agreement.
14     Q    But you just said that the Collective
15          Bargaining Agreement deferred to the individual
16          department to decide what was appropriate
17          discipline.  So does the department --
18     A    Right.  No.  Because the Collective Bargaining
19          Agreement recognizes that every single
20          disciplinary situation is very unique based on
21          the unique single set of circumstances.  So you
22          can't have a one-size-fits-all disciplinary
23          policy because there's really no way to
24          consider every possible consideration and it
25          leaves latitude for the department to make sure
```

CADY REPORTING SERVICES, INC.

```
 1          that they're taking appropriate disciplinary

 2          steps.

 3     Q    Are there any policies at all within the police

 4          department that provide guidelines for

 5          appropriate discipline?

 6     A    I'm not aware of any policies that specifically

 7          lay out appropriate discipline.

 8     Q    Is it solely within your discretion to make

 9          recommendations about what is the appropriate

10          discipline?

11     A    No.  No.  I can make recommendations.  I can

12          certainly consult and I can advise the Mayor

13          as to what I think is appropriate discipline,

14          you know, with some of the internal types of

15          discipline.  And, again, a lot of times

16          discipline is a very misunderstood term.

17               The purpose of discipline is to correct a

18          behavior so it falls within what the department

19          needs to accomplish its mission.  And in my

20          experience and in my practice, that discipline

21          is very rarely punitive in nature.  It's

22          usually supportive and educational.

23     Q    Did you give any consideration to whether this

24          internal investigation was worth the

25          expenditure of funds to pay Bill Evans to
```

CADY REPORTING SERVICES, INC.

```
 1        handle it?

 2   A    Considering the severity of the offense and the

 3        fact that there was a, you know, a very

 4        concerning breach of confidential departmental

 5        information, we did not know how broad or how

 6        extensive that particular leak was, absolutely.

 7        It was an urgent situation that needed to be

 8        immediately addressed and I believe it was

 9        appropriate to retain Mr. Evans and pay him his

10        professional rate to do so.

11   Q    Do you have an internal affairs division in

12        your department?

13   A    No, we don't.

14   Q    Do you have anyone who handles internal affairs

15        in your police department?

16   A    It would depend on the specific types of

17        allegation.

18   Q    Do you routinely outsource internal

19        investigations?

20   A    The only time I would outsource an internal

21        investigation is if it was a very severe and

22        even, you know, potentially criminal violation.

23        You know, in my tenure as Chief this is, you

24        know, the only occurrence that has risen to

25        that level of concern.
```

CADY REPORTING SERVICES, INC.

```
 1    Q    Before you were Chief were you a Captain at
 2         North Olmsted?
 3    A    Yes, I was.
 4    Q    In your tenure at North Olmsted, did you ever
 5         see an internal investigation conducted by an
 6         outside person?
 7    A    Yes.  On at least two occasions I'm aware of.
 8    Q    And how many years were you at North Olmsted?
 9    A    A little over 20 years.  But, again, I'm only
10         aware of the internal investigations when I was
11         a Captain and for a little while when I was a
12         Lieutenant.  Prior to making those ranks, I
13         wasn't involved in the internal investigation
14         process, so I'm unaware if prior to that time
15         if there were any outsourced investigations.
16         Just in my tenure as administrator, there were
17         at least two occasions where we brought in
18         outside agencies to conduct internal
19         investigations.
20    Q    Is it factually accurate that you required
21         officers to write a minimum number of tickets
22         as of January 14, 2019?
23    A    No.
24    Q    Explain what performance standard was
25         actually in effect as of January 14, 2019
```

CADY REPORTING SERVICES, INC.

```
 1            when Ed Gallek's news article came out?
 2      A     The performance standard that Lieutenant
 3            Mazzola was instructed to institute would look
 4            at the performance of the entire patrol
 5            division and look at it on a quarterly basis
 6            and determine the mean, average of performance
 7            for officers in a number of categories, and
 8            officers would need to perform within
 9            80 percent of that mean to reach an effective
10            performance standard.
11      Q     I'm sorry.  Can you please repeat, the officers
12            would have to perform within what percent of
13            that mean?
14      A     I believe 80 percent.
15      Q     Okay.  So for those of us who are not super
16            math inclined, can you explain what that would
17            mean?
18      A     Certainly.  For the time period in question
19            here, the performance of the entire group had a
20            particular mean or median.  You use whichever
21            one is lower under Dr. Van Meter's performance
22            theory.  And you take 80 percent of that number
23            and that is the minimum performance standard
24            that the officer is held to.
25                  And I believe for that one quarter that
```

CADY REPORTING SERVICES, INC.

1        80 percent number came out to I think it was

2        right around 11 or so tickets per officer for

3        that.  And, you know, they rounded it down to

4        ten, which would have been the performance

5        standard that they would have had to meet to be

6        within acceptable range of the same similar

7        work their peers were doing.

8    Q   So they were graded or evaluated on whether

9        they had at least ten citations they had

10       written for that particular quarter, correct?

11   A   No.  They were graded on whether or not they

12       had performed a sufficient amount of work in

13       comparison to their peer group.  They weren't

14       given an arbitrary number that they had to

15       write.  The number was created by the work of

16       the group.

17   Q   So but the number -- there was still a number

18       of citations that they were supposed to have,

19       correct?

20   A   Well, obviously the performance is going to

21       translate into a number.

22   Q   Right.  So what I'm trying is understand is how

23       is -- maybe it would be easier to look at some

24       of these e-mails.

25                    MR. SAVOIE:  Let's look at

                  CADY REPORTING SERVICES, INC.

 1          Plaintiff's Exhibit 13, if we could, Mr. Cook.

 2     Q    Do you see where the second e-mail on this page

 3          says, "From: Michael Kilbane.  Sent:

 4          Wednesday, February 27, 2019 at 1:53 p.m.

 5          To:  Leonard Mazzola.  Subject line Re:

 6          Productivity."

 7     A    Yes.

 8     Q    Okay.  I'm going to read this and ask you if

 9          I've read it correctly.

10              "Lenny, several officers are low in

11          traffic citation productivity.  As we

12          discussed, any point system you set up must

13          include acceptable minimum performance

14          standards for citations as one of the

15          requirements and cannot be construed in a

16          manner that officers can avoid meeting minimum

17          performance standards in traffic enforcement by

18          doing other activities?"

19              Did I read that correctly?

20     A    Yes.

21     Q    So can you explain for me how the phrase

22          "acceptable minimum performance standards for

23          citations" is different than a traffic ticket

24          quota?

25     A    Absolutely.  The performance standards are

                        CADY REPORTING SERVICES, INC.

1       based on the performance of their peer group.

2       A quota is a fixed arbitrary number that's

3       assigned to them.  A performance standard is

4       based on acceptable productivity across an

5       entire peer group that's doing similar work.

6            Now, the point system that's referred to

7       in here, Lieutenant Mazzola years ago had come

8       up with a point system where officers had to

9       get a certain number of points over a

10      three-month period.  And, unfortunately, some

11      of the officers had figured out a way to game

12      the system.  So they could avoid taking a

13      report or they could avoid doing accident

14      reports or they could avoid having to issue

15      traffic citations by doing things like business

16      checks or, you know, by calling out stops and

17      things like that.

18           So what I told him is to make sure that

19      we're holding these guys accountable across the

20      board for all of their performance is to

21      instead of make it a massive point system where

22      they need a number of points, take away the

23      ability for those officers to game the system.

24      Treat it more like a report card where you have

25      to meet individual minimum performance

1            standards in each category or in each subject,

2            if you will.

3                 So, you know, if you go out and do

4            100 business checks, you don't get 100 points

5            across all of the parameters.  You'll get an

6            A in business checks, but you still have a get

7            a passing grade in OVI enforcement and in

8            reports and accidents and traffic citations and

9            traffic stops.

10    Q    So why did you impose a requirement for a

11           certain number of citations as opposed to just

12           traffic enforcement stops?

13    A    Because traffic enforcement citations are an

14           integral tool for crime reduction.

15                And I know during Mr. Mazzola's

16           deposition, as a matter of fact, he

17           misrepresented a very important study, the

18           Kansas City Patrol Experiment.  He said that

19           that proved that, you know, traffic stops were

20           just as important as traffic citations.  And

21           that -- I think he said if officers were

22           actually stopping cars and writing citations,

23           that took them off of patrol and they couldn't

24           visibly patrol.

25                In reality, the Kansas City Patrol

                    CADY REPORTING SERVICES, INC.

1      Experiment had absolutely no consideration of

2      traffic.  Traffic stops and traffic citations

3      were not even variables that were considered in

4      that study.  As a matter of fact, the Kansas

5      City Patrol Experiment disproved his contention

6      that random patrol and visible patrol reduced

7      crime.  It showed that it didn't.

8           Much more on point and much more accurate

9      is subsequent work that that very same

10     researcher, George Kelly did, along with a

11     social scientist from Harvard University named

12     James Wilson.  It's a broken windows theory.

13     And their theory says that active enforcement

14     of minor criminal activities, including and

15     especially traffic violations, out there

16     enforcing traffic, has a direct effect on

17     lowering violent crime and serious property

18     crime rates.

19          Now, in 2013, I believe, the National

20     Highway Traffic Safety Administration and the

21     National Institute of Justice published a

22     metadata study based on Wilson and Kelly's work

23     which has been replicated in jurisdictions

24     large and small across the country, and it

25     clearly shows unequivocally that traffic

                  CADY REPORTING SERVICES, INC.

1       enforcement, aggressive traffic enforcement,

2       issuing of citations drastically reduces

3       violent crime and property crime.  And this has

4       been a hallmark of keeping cities safe all

5       across the country.

6           And, again, we're not asking our officers

7       to go out there and write cheap tickets.  We're

8       asking them to go out there and enforce the

9       traffic violations that are out there.

10           So the whole purpose behind this is to

11       make sure our officers were performing a very

12       key, vital and important function to keep our

13       city safe.

14   Q   So you adhere to the broken windows policing

15       philosophy, correct?

16   A   Yes.

17   Q   And so it's your opinion based on that, based

18       on the broken windows theory, that it is

19       necessary to actually write citations, not just

20       conduct traffic stops, to control even more

21       violent crime, correct?

22   A   That's not my contention.  That's the findings

23       of the metadata study done by NHTSA and the

24       National Institutes of Justice.

25   Q   And you're not aware of other studies that have

1          called that into question?

2      A   Well, that's why they did a metadata study.

3          They collected all of the available evidence

4          and all of the relevant studies that they had,

5          there may be some isolated studies here and

6          there, but broad picture, the vast majority,

7          you know, the Federal Government did the

8          research and they came to the determination

9          that yes, aggressive traffic enforcement does

10         have an effect on lowering crime.

11     Q   So when the Mayor came to you in late summer of

12         2018 about the reduced number of traffic

13         citations, did he raise that as his concern or

14         was he concerned about traffic ticket income?

15     A   No.  Traffic ticket income or revenue isn't

16         even a consideration.  As far as I'm concerned,

17         the main issue is safety.

18             Now, he may have mentioned revenue was

19         down as, you know, one of the ancillary items,

20         but the biggest concern was what are the

21         officers doing with their time.  You know, if

22         they're not out there -- because he had asked,

23         hey, did we have an increase in other calls or

24         other activities, and we didn't.  You know, it

25         was just a drop in the productivity and the

                    CADY REPORTING SERVICES, INC.

```
 1        activity levels of the officers conducting, you

 2        know, an activity that's absolutely vital in

 3        the safety of the city.

 4   Q    Was that overall drop in productivity reflected

 5        in Mr. Mazzola's point system he was using at

 6        that time?

 7   A    He wasn't using the point system at that time.

 8        It had been discontinued by one of my

 9        predecessors due to its ineffectiveness.

10             When this came up, he tried to reinstate

11        the point system.  And when we initially

12        discussed it, I had made it very clear from the

13        get-go that, yeah, absolutely he ran a patrol

14        division.  I encouraged him to go ahead, but to

15        make sufficient alterations to his point system

16        to fix the identified gaps in it.

17   Q    Okay.

18                   MS. SAVOIE:   Alex, would you

19        mind taking down this exhibit.

20   Q    I'm going to direct you to Plaintiff's Exhibit

21        Number 17, which is an audio file, and I'm

22        going to play it on my computer.  We'll see how

23        well that works.

24                   THE VIDEOGRAPHER:  Jessica, I do

25        have it if you want me to play it.
```

CADY REPORTING SERVICES, INC.

1            MS. SAVOIE:  Well, yeah.  That

2       would be great.  I just don't know how easy it

3       would be to say stop just so that we don't have

4       an extended thing on the record.

5            I'll try to see if I can play it so you

6       can hear it this way.

7    Q   Chief Kilbane, do you have any understanding of

8       Dr. Van Meter's opinions on whether minimum

9       traffic citation requirements are legal or

10      ethical?

11   A   According to Dr. Van Meter, in some states

12      quotas are illegal.  Ohio is not one of them.

13           Again, as to whether or not they're

14      ethical, that's an individual decision, you

15      know.  But overall, you know, we didn't have

16      quotas, don't have quotas, so it really isn't a

17      consideration for us.  We adhere to the

18      performance standard that Dr. Van Meter

19      proposed.

20   Q   Okay.  I'm going to see if this is audible and

21      attempt to play this.  This is Exhibit 17

22      starting at about 5 minutes and 34 seconds.

23           That is not going to be audible.

24           MS. SAVOIE:  Alex, would you be

25      able to pull up Exhibit 17 and play at 5:38,

                 CADY REPORTING SERVICES, INC.

1        please?

2                        THE VIDEOGRAPHER:  Yes.  Hold on.

3                        MS. SAVOIE:    Thank you.

4                        MR. STRANG:  Before we pull it

5        out, I just want to object to using part of

6        these audio files based on the rule of

7        completeness.

8                        MS. SAVOIE:    And I note your

9        objection for the record.

10            I will point out in return that we have

11       used the entire audio files as they exist as

12       exhibits even if we're not going to play all of

13       them during the deposition.  So, in other

14       words, I have not selected a snippet to produce

15       as an exhibit or anything.  These are the

16       complete files.

17                        THE VIDEOGRAPHER:  All right.

18       I've got it pulled up now.

19                        MS. SAVOIE:    Can you please play

20       beginning at 5:38.

21                    (Audio clip played.)

22                        MS. SAVOIE:    Stop it, Alex.

23    Q   Chief Kilbane, was that your voice explaining

24       that the Mayor was asking, hey, why is there a

25       significant decline in the income we're getting

                    CADY REPORTING SERVICES, INC.

1       from traffic citations?

2                       MR. STRANG:  Objection.

3   A   I'm sorry.  That's a very small snippet.

4       Number one, I got the exhibit.  I obviously

5       didn't have time, because it was quite a

6       lengthy recording, to listen to the whole

7       thing, but I really can't discuss or say

8       something about a small piece of conversation

9       taken out of context of a much, much larger

10      presentation other than to say the main thrust

11      of that, and I think you heard at the end was,

12      you know, the revenue wasn't a big deal.  The

13      important part was the productivity of our

14      officers making sure that they were doing the

15      job that they were paid to do.

16  Q   Okay.  So you've just said you didn't have time

17      to listen to the recording.  Are you talking

18      about how I sent this to you as an exhibit

19      yesterday or how you received this about

20      five months ago in discovery?

21  A   Again, I haven't had time to sit down and

22      listen in detail to hours and hours of

23      recordings.

24  Q   In the past several months you haven't had time

25      to listen to the recordings that were produced

                    CADY REPORTING SERVICES, INC.

```
 1          in this case?

 2    A    No.  I've reviewed some of them.  I've listened

 3          to parts of them.  But, you know, there's such

 4          a great volume, I had no idea that these

 5          recordings were being made without anybody's

 6          knowledge and in violation of departmental

 7          policy.  But, again, I didn't have time to

 8          review because of the shear volume of them.

 9    Q    Even though they were produced months ago,

10          you're saying the volume was such that months

11          of time would not have been sufficient for you

12          to review them?

13    A    And the ones I may have listened to months ago,

14          it was months ago, and I've done a lot of stuff

15          between them and probably wound not have a

16          super recollection of it.

17               And, again, to take a -- I don't know how

18          long the complete recording is, but to take a

19          several second snippet out of context would be

20          problematic for me to really comment accurately

21          on.

22    Q    Is there a context in which you saying that

23          the Chief -- I mean that the Mayor said, hey,

24          why is there a significant decline in the

25          income we're getting from traffic citations
```

<div align="center">CADY REPORTING SERVICES, INC.</div>

```
 1            would mean that the Mayor was not concerned

 2            about income from traffic citations?

 3                      MR. STRANG:  Objection.

 4      A   Again, it's part of a much, much larger

 5            context.  You're isolating a small snippet out

 6            of an incredibly large, complex conversation

 7            that had multiple facets.  So it really

 8            wouldn't be responsible of me to comment just

 9            on that one tiny snippet.  I wouldn't be able

10            to accurately do that.

11      Q   So putting aside the recording itself, as we

12            sit here today, did Mayor Togliatti tell you

13            that he was concerned about reduced income or

14            revenue from traffic tickets?

15      A   He may have mentioned it in passing as part of

16            a much larger problem of lack of productivity

17            of our officers.

18      Q   Isn't it correct that the reason this came to

19            his attention is because he noticed decreased

20            revenue?

21      A   No.  Absolutely not.  The reason it came to his

22            attention was because he noticed the decreased

23            number of cases being sent over to our

24            Mayor's Court.

25      Q   And that, in turn, has a direct bearing on
```

                      CADY REPORTING SERVICES, INC.

```
 1          revenue, correct?

 2     A    Not necessarily.  Because, you know, you never

 3          know how many of those defendants are indigent

 4          and are unable to pay.  How many of them refuse

 5          to show up and they turn into warrants and it's

 6          more expensive to process them.  So there's no

 7          real way to gauge the revenue.  And the revenue

 8          produced by the Mayor's Court is absolutely

 9          minuscule in the grand scheme of the total city

10          budget.

11     Q    If that's true, then why was Mayor Togliatti

12          concerned about it?

13                    MR. STRANG:  Objection.

14     A    It was merely one of the factors as an

15          indicator in the drop of productivity.

16              He wasn't concerned about the revenue.

17          He was concerned that the police officers

18          weren't effectively doing the job that they're

19          being paid very well to do.  And, in return,

20          that's a major concern of mine.  You know, the

21          Mayor holds me to a certain standard making

22          sure the officers are doing their jobs and I'm

23          obligated to make sure those officers meet that

24          standard.

25     Q    And that standard includes a minimum number of
```

                          CADY REPORTING SERVICES, INC.

```
 1            citations based on the performance of the

 2            peer group, correct?

 3     A      That standard is based on maintaining

 4            productivity that's consistent with their

 5            peers.

 6     Q      Right.  And productivity consistent with their

 7            peers in this circumstance means the number of

 8            citations they actually write, correct?

 9     A      That's one of the criteria that they're

10            measured on, yes.

11     Q      Right.  And I understand that you don't want to

12            call that a quota and I would like to ask, if

13            quotas are legal in Ohio, why would you shy

14            away from referring to that as a quota?

15                      MR. STRANG:  Objection.

16     A      Because the effective way to manage is with a

17            performance standard.  With a quota it's very

18            non-scientific.  It's a random number that you

19            pick out of the air, you choose, you assign and

20            you tell them to meet it.

21               A performance standard is based on the

22            overall atmosphere of work.  And a prime

23            example of that is occurring right now.  The

24            performance standard last year was much higher

25            because of levels of activity.  Once the Covid
```

                        CADY REPORTING SERVICES, INC.

1           crisis hit, according to the traffic counts

2           that I've been seeing on our interstate

3           highways, traffic is down up to 80 percent of

4           what it was prior to the quota.  So obviously

5           because of that, the activity levels, the

6           citation levels, the offense levels are going

7           to be much lower.

8                So, you know, the performance standards

9           are influenced by outside circumstances,

10          events.  The quota isn't.  It's just a number

11          that you assign an officer that they have to

12          hit.

13     Q    So your objection -- would it be fair to say

14          that your objection to the term quota is that

15          it seems to refer to an arbitrary number as a

16          standard?

17     A    No.  Performance standard is the preferred

18          course of action because of the fact that it

19          takes into account the entire job of the police

20          officer, as well as external factors and

21          influences that may occur that would affect the

22          productivity of individual and aggregate groups

23          of officers.

24     Q    Right.  And my question was about trying to

25          clarify why you oppose the term quota.  Is that

                    CADY REPORTING SERVICES, INC.

```
 1          because the term quota seems to refer to some
 2          arbitrary standard rather than the kind of
 3          performance standard that you've just
 4          described?
 5     A    I never proposed the term quota.  We don't have
 6          a quota.  We don't use it.  So there's no need
 7          to use the term quota.
 8     Q    But you understand that this seems to be a
 9          matter of semantics to residents who may not
10          know that quota refers to an arbitrary
11          standard, a performance standard refers to
12          these type of metrics that you are discussing
13          now, right?
14                    MR. STRANG:  Objection.
15                    MR. McLANDRICH:  Objection.
16     A    I understand that subject to misrepresentation
17          and wrong information that may be presented to
18          the public, they couldn't get that -- they
19          could reach that mistaken conclusion.  But if
20          they were educated on the actual facts behind
21          it and the procedures, the policies and what
22          goes into the enforcement and, you know, what
23          affect traffic enforcement has on their safety
24          in their city, I'm sure that would assuage a
25          lot of their fears.
                    CADY REPORTING SERVICES, INC.
```

```
 1    Q   Have you ever done any other internal

 2        investigations because an officer allegedly

 3        provided documents to the media?

 4    A   No.

 5    Q   Have you ever done any other internal

 6        investigations regarding an officer potentially

 7        speaking to a member of the media?

 8    A   No.

 9    Q   Has anyone within the police department at

10        the City of Independence ever been subject to

11        discipline or investigation for improperly

12        responding to a public records request?

13    A   Not as far as I know.

14    Q   Did you oppose the idea of Ed Gallek's use of

15        the term counting traffic tickets and the use

16        of the term quota to describe the city's

17        performance standard in 2019 because of the

18        reputational impact it would have on your

19        department?

20    A   I really don't have any opinion on what

21        Mr. Gallek does or doesn't write or say in

22        his stories.

23    Q   So that's not the question.  Let me ask it a

24        different way.  Maybe this will make more sense

25        to you.
```

CADY REPORTING SERVICES, INC.

1             Do you think that referring to the

2        performance standard that the city was using in

3        2019 as a quota would damage the reputation of

4        the city, I mean the police department?

5    A   It certainly had that potential.

6    Q   Was that a concern of yours at the time you

7        started this investigation into who provided

8        the documents to Ed Gallek?

9    A   No.  The thrust of the investigation was to

10       determine the scope and depth of the breach of

11       our confidential records, who was stealing the

12       records from the city.

13   Q   And, again, you're saying stealing even though

14       you acknowledged that whoever gave the

15       documents to Ed Gallek could have actually been

16       someone who had authorized access to those

17       records, correct?

18   A   Oh, I never said that.  No.  It was very

19       apparent that the records were taken without

20       authorization.

21   Q   Well, what you've said before, and I just want

22       to be very clear on this point, is it correct

23       that you're referring to this as stealing

24       because you're referring to the act of taking

25       the documents out of the police department and

                    CADY REPORTING SERVICES, INC.

1         giving them to Ed Gallek as stealing?

2    A   No.  The act of taking of documents without

3         authorization from the police department or the

4         act of accessing the city's computer system

5         outside the scope of authority would be theft.

6         What they did with them afterwards --

7    Q   Right.

8    A   That's part of the investigation, but the theft

9         is the actual taking of the documents.

10   Q   Right.  And that's actually the question I just

11        asked you and you said no.  So I want to make

12        sure that we're speaking -- that we're on the

13        same page here.

14            Okay.  So you're saying that -- you're

15        calling this stealing because of the action of

16        taking these documents from the police

17        department and giving them to Ed Gallek or

18        accessing the documents on a computer system

19        and giving them to Ed Gallek, correct?

20   A   That's not a yes or no question.

21         The act of taking the documents is

22        stealing them.  The act of giving them to

23        Ed Gallek has no bearing on the actual theft.

24        They're not part of the same thing.

25         The actual theft itself is the theft.

```
 1          What happens with the stuff they stole, where

 2          it ends up, whether they give it to Ed Gallek

 3          or some stranger on the street doesn't matter.

 4          It doesn't justify the theft offense.

 5     Q    Well, right.  So are you saying that this

 6          person's possession of these documents was

 7          evidence of the theft?

 8     A    I'm saying the disclosure that those documents

 9          were out in public and may have been released

10          out into public without going through the

11          processes, the checks and balances and the

12          authorizations, indicated that somebody without

13          authorization accessed sensitive city records.

14     Q    Well, right.  And so what I'm trying to

15          understand is why are you saying that someone

16          accessed the records without authorization?

17          These were documents that any officers had

18          authorized access to, correct?

19     A    No.

20     Q    Okay.

21     A    No.  To release documents outside the police

22          department there has to be specific procedures

23          that you have to follow.  And there's a scope

24          of authority to access our computer systems,

25          what you can and can't do with those e-mails
```

                    CADY REPORTING SERVICES, INC.

```
 1              and with that data.
 2        Q     So stop right there okay.  I need you to listen
 3              to what I'm asking, okay, because you're
 4              talking about release again and I'm talking
 5              about these people having authorized access to
 6              it.  I want to understand exactly where you're
 7              saying that theft occurs.  Okay?  Because isn't
 8              it correct that there were officers who would
 9              have access to these documents?
10        A     They may have access to the documents, but by
11              physically taking those documents out of the
12              police department and using them for
13              unauthorized purposes and violating our
14              policies could very well be a theft offense.
15        Q     Right.  Okay.  So that's just what I want to
16              make clear.  That it's not necessarily theft.
17              It's for someone to have unauthorized access
18              to -- for someone to have accessed these
19              documents because many officers had access to
20              the documents, correct?
21        A     I don't understand the distinction.  I mean
22              I have authorization to use the computer in
23              my office.  I don't have authorization to take
24              my computer home and sell it on eBay.
25        Q     Right.  That's just it.  That's the
```

```
 1              distinction, because I've heard you say a

 2              couple of different things about access and

 3              releasing the documents and I want to be clear

 4              about that distinction, right.

 5                   So you're saying that it is the taking of

 6              the documents and releasing them, that would be

 7              theft, correct?

 8       A      Taking them outside of the department, outside

 9              of our authorized policy or accessing the

10              computer system outside the specified scope of

11              authority would constitute a theft offense.

12       Q      Right.  So if someone had done the latter,

13              someone did not otherwise have authorized

14              access to the documents, had gotten to the

15              computer system and gotten them, that would be

16              theft in your view?

17       A      It would be theft if someone outside the scope

18              of their authority or outside their

19              authorization did that, yes.

20       Q      Who is responsible for public records requests

21              in your department?

22       A      Depends on how they come in.  Generally we have

23              an administrative staff.  There are two

24              administrative employees that process the

25              routine daily public records request.
```

CADY REPORTING SERVICES, INC.

```
 1     Q   Who are those people?

 2     A   Mary Cox and Jamie Pollack.

 3     Q   How do -- how are public records requests

 4         usually received by your department?

 5     A   We make it as broad a scope as possible.  We

 6         take requests in person, over the phone, via

 7         e-mail.  I believe we've received fax requests

 8         before.  Sometimes people will come in person

 9         up to the window and request.  However they

10         request it, we do our best to accommodate those

11         requests.

12     Q   And you do that because public records are the

13         people's records in Ohio, right?

14     A   With very specific exceptions.  And, you know,

15         obviously it's a complex issue.  The state

16         issues a very extensive guideline on, you know,

17         what are public records and what aren't public

18         records, what can't be released, what may be

19         released.

20             So it's imperative that you have

21         specially trained employees that don't

22         inadvertently release records that shouldn't

23         be released and that are making sure they're

24         making proper redactions and that all of the

25         information the public is entitled to, they
```

CADY REPORTING SERVICES, INC.

```
 1          get, but we're also protecting the information

 2          that the public is not entitled to get.

 3     Q    Right.  But as a very simple proposition, the

 4          records that are actually the public records

 5          are the people's records under the law,

 6          correct?

 7     A    Yes.

 8     Q    Do you have knowledge of anyone in the police

 9          department ever improperly responding to a

10          public records request and providing documents

11          that they should not have released?

12     A    I can't recall any specifics.  I mean with the

13          volume of public records we do, there may have

14          been something inadvertent or something, but

15          nothing intentional that I'm aware of.

16     Q    Well, are you aware of anything unintentional?

17     A    Not specifically, no.

18     Q    So have you ever taken any discipline against

19          any employee for improperly releasing records

20          that should not have been released in response

21          to a public records request?

22     A    Not that I'm aware of, no.

23     Q    Have you ever seen -- have you ever disciplined

24          or known of any discipline against any employee

25          for improperly redacting a document before
```

 1      releasing it in response to a public records

 2      request?

 3  A   No.

 4  Q   Have you ever disciplined any employee for

 5      improperly altering a document before releasing

 6      it in response to a public records request?

 7  A   No.

 8  Q   Do you know of anyone in your department, any

 9      officer, including yourself, who has ever

10      destroyed a public record that was then later

11      requested in a public records request?

12  A   No.

13              MS. SAVOIE:   If it's okay, can

14      we take a five-minute break for a restroom

15      break at this time?

16              MR. STRANG:  Sure.

17              MS. SAVOIE:   Thank you.

18              THE VIDEOGRAPHER:  Off the

19      record.  The time is 11:39.

20              (Recess taken.)

21              THE VIDEOGRAPHER:  We're back on

22      the record.  The time is 11:49.

23  A   Okay.  I just wanted to say that earlier when

24      you were talking about the performance

25      standard, I don't think I did a sufficient job

                CADY REPORTING SERVICES, INC.

 1         of telling you that the performance standard

 2         for traffic citations was just one of the

 3         elements of a much larger context.

 4              The goal is to make sure that the patrol

 5         officers are doing the job that the city is

 6         paying them very well for.  And that includes a

 7         multitude of elements that we evaluate them on.

 8         It's not just traffic stops, traffic citations.

 9         We look at things like, you know, warrant

10         arrests and parking citations and accident

11         investigations and felony arrests and

12         misdemeanor arrests and reports taken and calls

13         responded to.

14              So it's, you know, the traffic citations

15         are very important, traffic enforcement is

16         very, very important to keep our city safe, but

17         it's just one element of the entire package

18         that we evaluate our police officers on.

19    Q    Yes.  And thank you for that.  I think actually

20         your testimony was very clear to that effect

21         earlier.  So I appreciate the clarification,

22         but I think that it was very clear.

23              And to follow up on that -- excuse me.

24                   MR. STRANG:  I just wanted to

25         object to that statement.

                   CADY REPORTING SERVICES, INC.

```
1    Q    But to follow up on what you just said, even

2         if it is one part of a broader standard, the

3         point is that there were minimum standards for

4         traffic ticket citations; productivity,

5         correct?

6    A    There were performance standards that were

7         established by the performance of their peer

8         group, yes.

9    Q    Right.  And that means a minimum number of

10        traffic citations as a category of a broader

11        performance standard, correct?

12   A    That was one of the, you know, dozen or so

13        categories that they were evaluated on,

14        correct.

15   Q    Before we went off the record I was asking you

16        some questions about public records in your

17        department.  I would like you to look, please,

18        at exhibit, Plaintiff's Exhibit Number 2, which

19        is again the Evans documents, and specifically

20        beginning at page 82.

21             What is the document that is on page 82

22        of these Evans documents?

23   A    I'm sorry.  I didn't hear that.

24   Q    What is this document?  Can you identify it for

25        the record, please?
```

```
 1    A    It appears to be a copy of a memo that

 2         Lieutenant Mazzola sent to Sergeant Kurtz.

 3    Q    Is this a document that you or your office sent

 4         to Bill Evans as one of the documents that

 5         Ed Gallek had received from someone in the

 6         department?

 7    A    I'm not sure.  I believe so.

 8    Q    Scrolling down to the next page, if we could

 9         scroll down to page 83.  Is this an e-mail from

10         you to Police Patrol dated September 18 of

11         2018?

12    A    Yes, it is.

13    Q    And is this another one of the documents that

14         you or your office sent to Bill Evans as one of

15         the documents that Ed Gallek received?

16    A    Yes, it is.  I personally observed Mr. Gallek

17         in possession of this specific document.

18    Q    If we could please scroll down to page 86 of

19         this same exhibit, please.

20              Is this a reprimand to Patrolman Brian

21         Dalton from Lieutenant Mazzola with a cc to you

22         dated January 7 of 2019?

23    A    Yes, it is.

24    Q    Is this also a document that you or your office

25         sent to Bill Evans as one of the documents that
```

```
 1        Ed Gallek had received?
 2    A   I believe so.
 3    Q   I mean whenever you say you believe so, is
 4        there doubt about whether you sent the
 5        documents to Bill Evans or is there doubt about
 6        whether this is one of the documents that
 7        Ed Gallek had?
 8    A   It means I believe it is, but I don't know that
 9        this is the specific document with no changes
10        or alterations or anything.  It appears to be
11        one of the documents and I believe it is.
12    Q   Okay.  Can you please take a quick look at it
13        and see if there's anything that appears to
14        have been altered in this document?
15    A   And, again, it's been a long time since I've
16        specifically looked at this, so I have no way
17        of knowing, but it appears to be one of the
18        documents that was sent to Mr. Evans.
19    Q   Okay.  Right.  And the reason I'm asking, sir,
20        is because this is something that Bill Evans
21        produced in response to a subpoena for his
22        records.  So if you do see any indications on
23        any of these documents that Mr. Evans may have
24        altered them before producing it, would you
25        please tell me?
```

```
 1    A    Absolutely.

 2    Q    Thank you.

 3              And next scrolling down to the page that

 4         is page 88 of Mr. Evans records, Evans/PTA 088,

 5         is this a fourth record that Mr. Gallek was

 6         believed to have from someone in your

 7         department?

 8    A    Yes.  I believe so.

 9    Q    What is this document?  Can you describe it,

10         please?

11    A    This was a -- I believe it's a pre-disciplinary

12         hearing notice for Lieutenant Mazzola.  He was,

13         on August 6, given a written directive telling

14         him to take some specific actions.  He failed

15         to perform many of those actions so, as such,

16         it was necessary to schedule a pre-disciplinary

17         hearing to determine the best course to get him

18         back on track and to make sue that he was

19         moving in the direction the department needed

20         him to.

21    Q    What was the basis for the department's belief,

22         or your belief or whoever it was, that

23         Ed Gallek had received a copy of this document?

24    A    I believe that he had either quoted or

25         displayed some specific text from this document
```

CADY REPORTING SERVICES, INC.

 1              in one of his stories.

 2    Q    Was there anything about that quote or the text

 3         displayed that was unique to this document as

 4         opposed to just quoting from General Order 502?

 5    A    I don't remember the specifics.  You would have

 6         to ask Mr. Evans how he made that specific

 7         connection.

 8    Q    Oh.  So was that a connection that Mr. Evans

 9         made?

10    A    No.  This was a document that was provided to

11         Mr. Evans and he made the decision that this

12         was information that had been provided outside

13         the department.

14    Q    Okay.  So did you think that this document had

15         been provided to Ed Gallek independent of

16         Bill Evans' determination?

17                   MR. STRANG:  Objection.

18    A    Again, I may have if I was aware of specific

19         language from this document that was -- or an

20         image of this document that was provided on the

21         news story, absolutely I would believe that.

22    Q    Is General Order 502 something that appears in

23         pre-disciplinary notices routinely?

24    A    Generally the pre-disciplinary notice is going

25         to give specifications of what sections of our

                   CADY REPORTING SERVICES, INC.

1    General Orders are specifically being

2    addressed.  So if there are violations of 502,

3    502 would definitely be addressed in the

4    pre-D notice.

5  Q  Okay.  With having just reviewed those

6    documents, do you remember providing any other

7    documents to Bill Evans that you thought could

8    have been provided by someone in your

9    department to Ed Gallek?

10                  MR. STRANG:  Objection.

11  A  Not that I know of.

12  Q  Let's turn to Exhibit 20, please.

13                  MS. SAVOIE:  If you could please

14    put that up on the screen for the witness,

15    Mr. Cook, I would appreciate it.

16                  MR. McLANDRICH:  Is that the one

17    you sent this morning or last night?

18                  MS. SAVOIE:  Late last night,

19    yes.  That's the one I sent the e-mail about

20    alerting everyone to because I had forgotten to

21    include it in the folder early yesterday

22    afternoon.

23  Q  So Chief Kilbane, is this a letter from

24    Greg O'Brien, the Law Director of the City of

25    Independence, dated March 11, 2020?

CADY REPORTING SERVICES, INC.

```
 1    A   It appears to be, yes.

 2    Q   And scrolling down to the last page of the

 3        letter itself, which is page 5 of the pdf,

 4        were you cc'd or copied on this letter from

 5        Mr. O'Brien?

 6    A   Yes, I was.

 7    Q   And you received this letter whenever you were

 8        cc'd on it?

 9    A   Yes, I did.

10    Q   As we sit here right now, do you remember

11        receiving a copy of this letter?

12    A   Yes, I did.

13    Q   And I'm not asking about any advice you may

14        have -- or legal advice you may have received

15        from Mr. O'Brien, but did you provide facts to

16        Mr. O'Brien that he used in this letter?

17                    MR. STRANG:  Objection.  He can't

18        answer that.  This regards a pending mandamus

19        case which your firm filed and we're not going

20        to get into any work product or discussions

21        between Greg and Chief Kilbane about contents

22        of this letter or how this letter was composed

23        or how they responded to the mandamus action.

24                    MS. SAVOIE:   And I'm not asking

25        about a mandamus action right now.  I'm asking
```

                    CADY REPORTING SERVICES, INC.

1    about whether he provided factual information

2    for this letter.  I'm not asking what

3    conversations were had or what advice was given

4    or requested.  I'm asking about facts.

5        Steven, are you going to object to that

6    question?

7                MR. STRANG:  I am and instruct

8    him not to answer based on potentially

9    attorney/client, but certainly work product,

10    because at this point Mary Jane Horton v.

11    Michael Kilbane, et al., Ohio Supreme Court

12    Case Number 2020-0348 was already filed and

13    pending, so certainly they had notice of

14    litigation and were preparing a defense for the

15    litigation.  So who put what information in

16    this letter is protected by work product as

17    well as potentially the conversations being

18    attorney/client privilege.

19                MS. SAVOIE:   Your objection is

20    noted.

21  Q  Okay.  I'm going to ask you about whether some

22    of the things that are included in this letter

23    are factually accurate.

24  A  I can save us both some time.  On advice of

25    counsel, I'm not going to address anything

                    CADY REPORTING SERVICES, INC.

```
1          having to do with this document because of the

2          objections that Mr. Strang raised.

3     Q    Okay.  And you're saying that before hearing

4          any questions I'm about to ask, you're not

5          going to answer any questions related to this

6          document?

7                    MR. STRANG:  Well, Chief, I will

8          clarify that Ms. Savoie, I did send you an

9          e-mail this morning essentially telling you

10         that I think it's improper to fish for -- to

11         use this deposition as a pretext for this

12         Ohio Supreme Court case that's filed, which

13         appears to be what's going on with this e-mail.

14         It has absolutely nothing to do with the facts

15         at issue in this case.

16             Chief, you can answer factual questions

17         that, to the extent that she has any based on I

18         guess if she reads part of this, but you're not

19         to talk at all about how that came into the

20         letter, how the letter was formulated,

21         et cetera, et cetera, et cetera.

22             You can -- to the extent that she asks

23         you factual questions and simply points to this

24         letter, you can answer the factual questions

25         that she's giving you.  Just don't talk about
```

```
 1          this letter or how this letter was composed or

 2          any discussions you had with Greg O'Brien or

 3          counsel relating to this Horton v. Kilbane case

 4          that's still pending in the Ohio Supreme Court.

 5                    MS. SAVOIE:   So just to be clear

 6          for the record, Steven, thank you for your

 7          objection and instruction and I note your

 8          concerns.

 9               Just to be clear, this is not a fishing

10          expedition for another case.  This document has

11          been provided basically as a visual aid and an

12          easy reference for some of the factual

13          questions I'm about to ask.  Okay.

14               So with that in mind, I'll ask the

15          specific questions.

16     Q    I'm going to refer to page 1 of this letter for

17          your reference.

18               Is it factually correct that Mary Jane

19          Horton sent a public records request on

20          January 16, 2019 for some of the documents

21          that Ed Gallek appeared to have in his

22          reporting of January 14, 2019?

23     A    She may have.  I'm not, you know, conversant

24          with specific dates and specifics that she

25          asked for.
```

                    CADY REPORTING SERVICES, INC.

1   Q   Okay.  And so the reason that I'm showing you

2      this letter is because it does include a

3      recitation of exactly what she requested from

4      Mr. O'Brien, just to make it easier and to

5      refresh your recollection.

6          Do you see this number 1 through 4 that's

7      on page 1 of Mr. O Brian's letter showing the

8      documents that she requested?

9          I'll read them into the record and ask if

10     I've read them correctly.

11         "On January 16, 2019 the city's police

12     department received the following public

13     records request from Ms. Horton which stated in

14     pertinent part... 1, the police memo that shows

15     a 'productivity standard patrol officers shall

16     meet or exceed 10 traffic citations per month.'

17     2, the memo that refers to 'at least two to

18     three traffic enforcement actions per shift.'

19     Those can include warnings or crash

20     investigations and more, not just tickets.

21     3, a copy of the written warning given to the

22     police officers who did not write enough

23     tickets.  And 4, a copy of the grievance that

24     was filed by the police officer in this case?"

25        Okay.  Did I read that correctly, sir?

              CADY REPORTING SERVICES, INC.

```
 1    A    I don't see it on the document that's on the

 2         screen right now.  I'm sorry.

 3    Q    Okay.  Yeah.

 4    A    It's on page 5.

 5                    MS. SAVOIE:   Alex, can you

 6         please take it up to page 1, the document.

 7    Q    Can you please briefly review the numbers

 8         1 through 4 where Mr. O'Brien sets forth the

 9         items that Ms. Horton requested?

10    A    Okay.

11    Q    And so we just reviewed the documents that were

12         provided to Bill Evans as documents that

13         Ed Gallek was believed to have.  Is it correct

14         that there's overlap between those documents

15         and these documents Ms. Horton requested?

16    A    Yes.

17    Q    Did you say yes?

18    A    I believe so, yes.

19    Q    There's a reference in number 4 in

20         Mr. O'Brien's letter to a copy of the

21         grievance.  Was that provided to Mr. Evans?

22    A    No.

23    Q    So but numbers 1, 2 and 3 were documents that

24         Mr. Evans had received as documents that

25         Ed Gallek was believed to have been given,
```

                    CADY REPORTING SERVICES, INC.

```
 1        correct?

 2    A   I believe so, yes.

 3    Q   And is it correct, and again for your

 4        reference, on page 2 of this letter Mr. O'Brien

 5        indicated at the top that you actually

 6        responded to Ms. Horton's public records

 7        request yourself, is that correct?

 8    A   Yes.  I responded to Ms. Horton, but I also had

 9        some conversations regarding the specific

10        public records request with the city

11        prosecutor, Charles Cichocki.

12    Q   Can you explain why you mention that

13        conversation with the prosecutor?

14    A   Yes.  Because as I was processing part of her

15        request, I was informed by the Court Clerk that

16        she had also made requests for some records

17        from the Mayor's Court and that she had

18        specifically told them it was in regards to a

19        pending case that her husband had in front of

20        the court just putting a defense together.  So

21        I reached out to the prosecutor and said, "Hey,

22        I've got this public records request.  How

23        would you like me to handle it?"  And I got

24        advice and guidance from him.

25    Q   Right.  And I'm not asking -- okay.  So you
```

                   CADY REPORTING SERVICES, INC.

1          raised that because you talked to the

2          prosecutor before you responded to Ms. Horton's

3          request, correct?

4     A    No.  I had partially responded to her request

5          and then after I responded, I spoke with the

6          prosecutor.  And I can't give the specifics of

7          what we spoke about, but she was directed to

8          make any request for further public records or

9          clarifications regarding her husband's case

10         directly through the prosecutor and he would

11         screen the public records requests.

12    Q    So on that same page of Mr. O'Brien's letter,

13         just for your reference, is it correct that

14         where it quotes from the response you provided

15         Ms. Horton in item number 2, is it correct that

16         that reads, "Item 2.  We have no records

17         responsive to this request.  If you have a

18         specific date, sender, receiver or any other

19         identifying information" -- okay.  Hold on.

20         All right.  I didn't realize that that wasn't

21         on the correct page.

22              Okay.  I'm going to try this again.

23         Please bear with me, Chief.  This technology

24         can make it difficult.

25              So is it correct that in response to

                    CADY REPORTING SERVICES, INC.

```
 1        Ms. Horton's public records request for item 2

 2        on page 2 that you wrote, "Item 2.  We have no

 3        records responsive to this request.  If you

 4        have a specific date, sender, receiver or any

 5        other identifying information to more

 6        specifically identify a record, we can attempt

 7        to locate it."

 8             Did I read that correctly?

 9   A    Yes, you did.

10   Q    Yes.  To the best of your recollection, does

11        that accurately transcribe your response to

12        that part of Ms. Horton's request?

13   A    Again, this was quite a time ago.  I don't know

14        my specific response.  But I can say it would

15        not be unusual when I make a response for

16        public requests if I can't immediately locate

17        the records they're requesting, to request

18        clarification.  And then obviously any

19        clarification they would get back to me to help

20        me narrow the scope of the search, I would,

21        you know, further search for responsive

22        records.

23   Q    Okay.  So I guess the short answer, do you have

24        any reason to disagree with what Mr. O'Brien

25        quoted here from your response?
```

CADY REPORTING SERVICES, INC.

```
 1              MR. STRANG:  Objection.  Are you

 2        asking whether that's his recollection that

 3        that is his actual -- that was his actual

 4        response?

 5              MS. SAVOIE:  Well, that was my

 6        first question.  And I'm just trying to be

 7        clear.  I mean, again, we're trying to use this

 8        for ease of reference, you know, trusting that

 9        Director O'Brien would accurately copy down

10        what you had responded with.

11    Q   Do you have any reason to disagree that that

12        portion of your response to item 2 is accurate?

13    A   As I said, it was quite some time ago that I

14        made the response, so it may well be accurate.

15        It's probably a question better posed to

16        Mr. O'Brien as to where he came up with that

17        specific language, but I did respond to her

18        records request.

19    Q   Okay.  And just to refresh our recollection,

20        let's please go back up to page 1 of this

21        document to see what the item 2 was.

22            And do you see where item 2 here is the

23        memo that refers to at least two to three

24        traffic enforcement actions per shift?

25    A   Yes.
```

CADY REPORTING SERVICES, INC.

```
 1    Q   And referring quickly to page -- going to

 2        Exhibit 2, please, and going to page 82 of

 3        Exhibit 2, if you would.   Is this document a

 4        memo?

 5    A   Yes, it is.

 6    Q   And is this, to your understanding, the memo

 7        that refers to officers having at least two to

 8        three traffic enforcement actions per shift

 9        based on what it states here in the third

10        paragraph?

11    A   Yes, it is.

12    Q   Let's return to Exhibit 20, please.  Let's

13        scroll down to page 3.  On page 3 of that I'm

14        going to read the paragraph that begins,

15        "Response to A" and ask you if I've read that

16        correctly.

17            "Following receipt of Ms. Horton's

18        January 16, 2019 public record request,

19        Chief Kilbane performed an electronic search

20        in the city's police department e-mail system

21        using Ms. Horton's phrase two to three traffic

22        enforcement actions per shift.  No responsive

23        document was identified and Chief Kilbane

24        informed Ms. Horton of that occurrence and

25        sought additional information to locate the
```

                    CADY REPORTING SERVICES, INC.

```
 1          particular memo Ms. Horton requested.

 2          Ms. Horton provided no additional information,

 3          nor did she attempt any follow up to her

 4          January 16, 2019 public records request."

 5               Did I read that paragraph correctly?

 6     A    Yes, you did.

 7                    MR. STRANG:  I'm going to object

 8          again.  You know, you represented before this

 9          question that this was not going to be a

10          fishing expedition for the other mandamus

11          action.  That appears to be exactly what it is.

12               To the extent that this is being used as

13          a deposition for that case, he should be

14          represented by the attorney handling that case

15          and that attorney is not me.  So I don't even

16          feel comfortable defending what appears to be a

17          deposition involving the public record response

18          of Chief Kilbane leading to the Mary Jane

19          Horton litigation.

20               So I just -- I gave you some leeway in

21          trying to establish how this is at all relevant

22          to Mr. Mazzola's claims, and I don't see it.

23          This appears to be simply using this proceeding

24          as a deposition for another case.

25                    MS. SAVOIE:   So your objection
```

CADY REPORTING SERVICES, INC.

1         is noted and I think that your objection will

2         be satisfied by the next question I'm going to

3         ask.

4              Alex, can you scroll down just a little

5         bit, please?

6    Q    So Chief Kilbane, is it correct that this

7         document that the paragraph I just read was

8         referring to was a memo by Mr. Mazzola to all

9         of his sergeants, correct?

10   A    Yes.

11   Q    Okay.  And starting the paragraph that begins,

12        "During the city", I'm going to read this

13        and ask you if I've read it correctly.

14             "During the city investigation commencing

15        on or about March 1, 2019, over a month after

16        he responded to Ms. Horton's public records

17        request, Chief Kilbane first discovered the

18        existence of the memo dated August 8, 2018

19        regarding productivity written by Mr. Mazzola,

20        August 8 memorandum.  The city's investigation

21        is a paramount issue in the Mazzola case.

22        Chief Kilbane was never provided a copy of the

23        August 8 memorandum by Mr. Mazzola on that

24        date, nor was he aware of this document's

25        existence at any time until the city's

                    CADY REPORTING SERVICES, INC.

1       investigation."

2            Did I read that correctly?

3   A   Yes.

4   Q   Are those statements factually accurate?

5   A   I believe so.

6   Q   Okay.  So let's take it piece by piece here.

7            I'm going to ask you about the first

8       sentence.  "During the city investigation

9       commencing on or about March 1, 2019,

10      Chief Kilbane first discovered the existence

11      of the memo dated August 8, 2018 regarding

12      productivity written by Mr. Mazzola."

13           Is that correct?

14  A   You know, I feel uncomfortable discussing

15      this without getting some specific advice

16      regarding, you know, from the attorney that's

17      handling the mandamus request.  I understand

18      you're claiming it's part of the current case,

19      but there's also significant overlap.  So, if

20      possible, I would like to take a break and get

21      some advice from the attorney who is handling

22      it.

23           Mr. Strang said it's a little bit outside

24      of what he's been retained to handle.  And I

25      just want to make sure that I'm getting

                CADY REPORTING SERVICES, INC.

1     competent legal advice before I go into

2     answering specific questions about something

3     that's sort of off base away from the case at

4     hand.

5            MR. STRANG:  I think now would be

6     a good time to take a lunch break.  And, again,

7     I'm uncomfortable -- I strongly object to the

8     extent that this deposition testimony ever

9     appears in the Ohio Supreme Court case that

10    you're -- Mr. Kilbane right now is represented

11    by counsel for this matter, but he is

12    unrepresented by counsel for the Ohio Supreme

13    Court matter in this case, and it appears that

14    he's being asked questions about the mandamus

15    case purposely without counsel present for the

16    mandamus case.

17           And so I think this is a decent time to

18    take a break, and I think we're overdo for it,

19    but it will allow us to iron out some of these

20    issues too.

21           MS. SAVOIE:   Listen, I need to

22    object on the record to your characterization

23    of what I'm attempting to do here.

24           Obviously this letter refers to factual

25    representations about Mr. Mazzola's documents

                CADY REPORTING SERVICES, INC.

1    and the documents that are the subject of the

2    investigation into Mr. Mazzola.

3         I'm not asking any questions about

4    Mary Jane Horton's mandamus action.  I'm asking

5    questions about the facts related -- I'm asking

6    facts about when Chief Kilbane learned about

7    this particular document.

8         And, if you like, we can take this

9    exhibit off the screen and I can ask these

10   questions without the exhibit after we come

11   back.

12                MR. STRANG:  I mean I could tell

13   you that that would make me quite a bit more

14   comfortable.

15                MS. SAVOIE:  Let's take it off

16   the screen and I'll ask a quick wrap-up

17   question before we go to lunch.

18                MR. STRANG:  Sure.

19   Q  Chief Kilbane, when did you first learn about

20   the memo dated August 8, 2018 that Mr. Mazzola

21   wrote to his sergeants about the productivity

22   standard?

23   A  It was sometime after we had initially started

24   the investigation into the leak of the

25   documents.  So eventually it was identified.  I

CADY REPORTING SERVICES, INC.

```
 1        don't recall the exact date.  But one of the

 2        sergeants provided me a copy of the memo.  It

 3        had never been given to me and there was no

 4        electronic copy of it anywhere.  I was given a

 5        hard copy by one of the sergeants.

 6   Q    Okay.  And do you recall seeing a moment ago

 7        when we looked at that memo that you were

 8        cc'd on the memo?

 9   A    It said I was cc'd on the memo, but I don't

10        recall ever receiving a copy of it.  Just

11        because it says I was cc'd on the memo, you

12        know, quite often there were, you know,

13        documents that I didn't receive.

14   Q    Documents you didn't receive from whom, from

15        Mr. Mazzola specifically or from your officers

16        generally who listed you as a cc?

17   A    A lot of times officers would send memos back

18        and forth and I wouldn't be aware of them.

19        And, you know it wouldn't be out of the realm

20        of possibility for them to think they cc'd me

21        on it.  And especially with this.

22             It's easy to cc me on an e-mail.  You put

23        in my e-mail address and I get a copy of it.

24        Well, the actual physical hard copy document

25        sometimes maybe slips through the cracks with
```

CADY REPORTING SERVICES, INC.

1          the distribution, or for whatever reason

2          Mr. Mazzola never gave me a copy of it when he

3          originally issued it to the sergeants.

4     Q    Did you receive signed copies from each of the

5          sergeants after they had a chance to read this

6          memo?

7     A    I don't recall that, no.

8                    MS. SAVOIE:  Okay.  That will be

9          all for now.  We may come back to a related

10         topic on that, but we can take a lunch break

11         now if everyone is ready.

12                   MR. STRANG:  Thank you.

13                   THE VIDEOGRAPHER:  Off the

14         record.  The time is 12:20.

15                   (Recess taken.)

16                   THE VIDEOGRAPHER:  Back on the

17         record.  The time is 1:01.

18    Q    Chief Kilbane, before we went off the record I

19         was asking you some questions about a memo from

20         August, 8 of 2018 that Leonard Mazzola wrote to

21         sergeants and it said it was cc'd to you, but

22         you mentioned that you did not actually receive

23         a cc at that time, correct?

24    A    Correct.

25    Q    And is it correct that you said you did not

                   CADY REPORTING SERVICES, INC.

```
 1              actually ever see that memorandum of

 2              August 8, 2018 until the investigation began

 3              in March 2019?

 4         A    Yes.

 5         Q    Do you remember when Mr. Mazzola had a

 6              pre-disciplinary meeting with you where

 7              Bob Phillips was present on September 4, 2019?

 8         A    Yes.

 9         Q    And did that pre-disciplinary meeting cover

10              the topic of patrol productivity?

11         A    Yes, it did.

12         Q    Do you remember whether anyone brought that

13              memo of August 8, 2018 to your attention at the

14              pre-disciplinary meeting of September 4, 2018?

15         A    Yes.  I believe that he mentioned -- that it

16              was mentioned during there that he had written

17              a memo to the sergeants, but I don't recall

18              ever seeing the memo.

19         Q    Do you remember being told what the contents of

20              the memo were?

21         A    Yeah.  I imagine I was as part of the

22              pre-disciplinary hearing, but I don't remember

23              the specifics of it.

24         Q    I'm going to see if we have something that

25              would refresh your recollection.
```

CADY REPORTING SERVICES, INC.

```
 1                    MS. SAVOIE:   Mr. Cook, if you

 2        would please play the audio clip from

 3        Exhibit 16 that goes from 8 minutes 48 seconds

 4        until 9 minutes and 20 seconds.  I'll ask the

 5        witness if that refreshes his recollection.

 6                    (Audio clip played.)

 7    Q   Okay.  So was that your voice at the last part

 8        there referring to a memo where the officers

 9        should each have two to three traffic

10        enforcement actions per shift?

11    A   I believe so.

12                    MR. STRANG:   I'm just going to

13        object to that clip being not totally played

14        based on the completeness.

15    Q   And just for the record, do you understand,

16        Chief Kilbane, that I played a clip from a

17        larger audio file that was previously produced?

18    A   Right.  And, you know, obviously I can't speak

19        to what else was on that clip or anything else

20        or the contents of that particular snippet that

21        you played.

22    Q   Right.  And I'm not asking you that.

23            I'm asking you do you understand that I

24        produced to you in discovery in an exhibit a

25        larger audio file and that I just played an
```

                    CADY REPORTING SERVICES, INC.

```
 1            excerpt from that.  Did you understand that?

 2     A     Yes.

 3     Q     And you have access to the complete file.

 4            Do you understand that?

 5     A     I may have.  I don't recall listening to it.

 6     Q     Right.  That's not my question.

 7            Do you understand that you have the

 8            entire file of the entire audio recording?

 9     A     Again, I don't know what the entire specific

10            recording is.  I may have.

11     Q     Okay.  And that was your voice at the end of

12            that excerpt of this recording.  And is it

13            correct that you acknowledged in this portion

14            of the recording that there was a memo where

15            Mr. Mazzola put each sergeants' name on it,

16            gave it to them and told them to his have --

17            told them to have their officers include

18            two to three traffic enforcement actions

19            per shift?

20     A     Yes.  There was a discussion of a memo that

21            was issued by Lieutenant Mazzola.

22     Q     And having listened to that, do you recall now

23            seeing that memo at that meeting?

24     A     No.  I don't recall seeing the actual memo.  I

25            remember a rather lengthy discussion of the
```

                    CADY REPORTING SERVICES, INC.

```
 1          contents of the memo.  But at the end of the

 2          day, the memo really wasn't a big part of the

 3          pre-D hearing.  It was just sort of a minor

 4          aside because we were addressing the larger

 5          issue of the insubordination by refusing to

 6          carry out the orders.

 7     Q    Well, wasn't that memo part of his explanation

 8          for how he was carrying out the orders?

 9     A    Not really, because the orders he failed to

10          carry out, he was specifically instructed to

11          individually meet with each of the sergeants,

12          assess every individual officers' performance,

13          identify officers that weren't performing up to

14          acceptable standards, come up with a full, you

15          know, performance improvement or action plan

16          to, you know, address those individual needs,

17          and also do a complete assessment of his

18          officers to make sure that they had the

19          training, the equipment and the tools they

20          needed to do the job.  He didn't do any of

21          that.

22     Q    Right.  So that's not my question.

23              My question was -- and I'll rephrase it

24          so it's more clear.

25              Did Mr. Mazzola present that memo to you
```

                    CADY REPORTING SERVICES, INC.

```
 1            in his pre-disciplinary hearing to show you

 2            that he had tried to comply with your orders

 3            and directions?

 4     A    Again, I don't recall seeing the actual memo.

 5            I remember him saying, "I sent a memo to the

 6            sergeants."  Because I specifically asked him,

 7            "Did you meet with the sergeants?"  He said,

 8            "I sent them a memo."  So I remember a

 9            discussion of the memo.

10     Q    Do you remember if Bob Phillips gave you a

11            memo?

12     A    I don't remember Mr. Phillips giving me a memo.

13            I remember, again, Mr. Phillips discussing the

14            contents of the alleged memo.

15     Q    Did you hear paper shuffling around during that

16            recording that we just played?

17     A    There may have been.  You know, I'm sure there

18            was lots of paper there.  Mr. Phillips is an

19            attorney.

20                        MR. STRANG:  I just after the

21            break I want to renew my objection that it

22            appears that the testimony is being elicited to

23            introduce or to prosecute a currently pending

24            mandamus action in the Ohio Supreme Court.

25                    My understanding is that depositions are
```

1        not allowed in that case.  It appears that this

2        deposition is at least being used, in part, to

3        gather evidence for that mandamus proceeding.

4            I am not the attorney of record in that

5        mandamus proceeding.  My client here would be a

6        potential witness.  He is, therefore,

7        unrepresented to the extent that this is --

8        he's being questioned about the mandamus

9        lawsuit.

10           I strongly object to any testimony from

11       this deposition being used in any way in that

12       mandamus action.  And I'm stating this for the

13       record to the extent that if it ever does,

14       please note that I believe it is unethical to

15       be asking my client questions about that case

16       when he is unrepresented during another

17       deposition.  He does not have an attorney

18       present with respect to that action.  I

19       mentioned that repeatedly on the record.

20           And, you know, so be forewarned that to

21       the extent that that does pop up in the

22       mandamus action that one of the issues, the

23       ethical issues with respect to him being

24       questioned without being represented by

25       counsel.  I mean also there are potential

                CADY REPORTING SERVICES, INC.

1       issues with respect to basically perverting

2       this District Court action for use in another

3       proceeding that I suppose we could take up with

4       Judge Gwin, but I've made my peace for the

5       record.

6                    MS. SAVOIE:   Your objection is

7       noted, but I will remind you that I was asking

8       Chief Kilbane just now about an audio recording

9       of Mr. Mazzola's pre-disciplinary hearing

10      related to this case and that you seem to be

11      referring to prior questions, Mr. Strang, that

12      I was asking him about a letter which, again,

13      was used as a visual reference for the Chief's

14      convenience which was a public record letter

15      from the City of Independence Law Director.

16      That that does not mean that anything from this

17      deposition is being used in that case and that

18      is, in fact, not correct.

19           So your objection is noted and

20      understood, but I do not want to hear any more

21      long speaking objections whenever I'm asking

22      him about evidence in this case.

23                    MR. STRANG:  But you're not and

24      you know it.  So, you know, I'm not going to

25      belabor the point with you, but we both know

                CADY REPORTING SERVICES, INC.

```
 1      what's happening right now.  And I'll state
 2      whatever objection I feel like saying as long
 3      as it's not suggesting an answer to the
 4      witness, which that was not, that was
 5      preserving the potential ethical issue for you
 6      guys.
 7                  MS. SAVOIE:   It is inappropriate
 8      for you to make this extended objection and try
 9      to impune my ethics for asking a question about
10      a recording that is discovery in this case.
11      This has nothing to do with the prior letter at
12      this point and you know that.
13                  MR. STRANG:  It's not a letter.
14      It's the mandamus action.  You know what's
15      going on right now.
16          So, you know, you can argue back and
17      forth about it that you don't have the letter
18      up, but I also know where the questioning is
19      going and I know enough about the mandamus
20      lawsuit to know that this is exactly what your
21      -- you showed the letter and we know what
22      you're doing.
23          Anyway, the objection is noted, so go
24      ahead.
25                  MS. SAVOIE:   The objection is
                  CADY REPORTING SERVICES, INC.
```

Chief Michael Kilbane

```
 1        noted, but I'm not going to accept any more

 2        extended speaking objections where you're

 3        simply trying to malign me on the record for no

 4        reason.  So that's enough.

 5             We're finished with your speaking

 6        objections and I will take it up with the Court

 7        if you continue to make these baseless

 8        accusations and inappropriate comments on the

 9        record taking up valuable time in my

10        deposition.  So that's enough.  We're moving on

11        now.

12   Q    So Chief Kilbane, again, your contention as we

13        sit here today is that you didn't actually

14        receive the memo of August 8, 2018 in March of

15        2019?

16   A    I don't recall ever receiving that memo prior

17        to March of 19, no.

18   Q    But having listened to that audio record from

19        the pre-disciplinary hearing, that refreshes

20        your recollection that you had some knowledge

21        of the memo at the time of the pre-disciplinary

22        meeting?

23   A    Well, the contents of the memo may have been

24        discussed.  Again, without knowing the larger

25        context of the entire conversation, just from
```

                    CADY REPORTING SERVICES, INC.

1           that brief snippet it doesn't -- you know, it

2           indicates that the contents of that memo in

3           retrospect looking back may have been discussed

4           at that pre-disciplinary hearing.

5    Q      Did you ever discuss any potential action that

6           could be taken against Lieutenant Mazzola with

7           the union representative Charles Wilson?

8    A      No.

9    Q      Did you ever talk to Chuck Wilson about the

10          investigation that was going on in March of

11          2019?

12   A      I believe he was told, you know, Lenny had to

13          appear and, you know, if he had any questions

14          about representation or union involvement, I

15          may have had discussions about him.  He was

16          certainly authorized to discuss it with me.

17          You know, all of the people who were involved

18          in the investigation were permitted to discuss

19          it with, you know, the Chief, their union

20          representative, their attorney.

21   Q      So did you have any specific discussions with

22          Chuck Wilson about this investigation?

23   A      Not that I recall.

24   Q      Do you remember having any specific discussions

25          about the investigation in March 2019 with

                      CADY REPORTING SERVICES, INC.

```
 1        Bob Phillips?

 2   A    No.  Again, not that -- I may have in passing.

 3        You know, Bob was involved in it.  But I don't

 4        recall any specific discussions I had with him.

 5        I believe most of the discussions Mr. Phillips

 6        had were with Law Director O'Brien.

 7   Q    Did you discuss with Chuck Wilson any plans or

 8        possibilities for discipline for any officer as

 9        a result of the investigation in March 2019?

10   A    No.  It would be way premature to even think --

11        we weren't complete with the investigation.

12        There was no, you know, nothing to base

13        discipline on.

14   Q    And so that would include even the possibility

15        of discipline that might be brought as a result

16        of the investigation?

17   A    Again, I don't recall any specific, you know,

18        questions about that, but I'm sure the response

19        would have been we're not at that point yet.

20   Q    Did you tell Chuck Wilson that if Mr. Mazzola

21        retired, then the investigation would not be

22        finalized?

23   A    Absolutely not.  I didn't have the authority to

24        do that.

25   Q    So I didn't ask whether you had the authority
```

CADY REPORTING SERVICES, INC.

```
 1              to do that.  What I asked about is whether you

 2              had that communication with Chuck Wilson.  Do

 3              you understand that?

 4      A    Yeah.  And I believe my answer was absolutely

 5              not.

 6      Q    So did you have any discussion with

 7              Chuck Wilson about how the investigation

 8              could be stopped if Mr. Mazzola retired?

 9      A    No.

10      Q    Did you have any discussion with Chuck Wilson

11              to the effect of if Mr. Mazzola retired, he

12              would not be subject to any discipline?

13      A    No.

14      Q    Did you ever talk to Chuck Wilson and say that

15              if Mr. Mazzola retired, then this investigation

16              would not include -- I'm going to strike that

17              and go back and ask you again because I wasn't

18              speaking very well.

19                   Did you ever tell Chuck Wilson that if

20              Mr. Mazzola retired, that no paperwork from

21              this investigation would be included in

22              Mr. Mazzola's personnel file?

23      A    No.

24      Q    Did you ever tell Bob Phillips that if

25              Mr. Mazzola --
```

CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | A | I'm sorry. You were garbled a little bit with |
| 2 | | that question. Could you please repeat it? |
| 3 | Q | Thank you for telling me. |
| 4 | | Did you ever tell Bob Phillips that if |
| 5 | | Mr. Mazzola retired, he would not be subject to |
| 6 | | any discipline as a result of this |
| 7 | | investigation? |
| 8 | A | No, I did not. |
| 9 | Q | Did you ever tell Bob Phillips that if |
| 10 | | Mr. Mazzola retired before the investigation |
| 11 | | was complete, that no paperwork from the |
| 12 | | investigation would be put in his personnel |
| 13 | | file? |
| 14 | A | No, I did not. |
| 15 | Q | Did you ever have any conversations with |
| 16 | | Bob Phillips about how Mr. Mazzola could stop |
| 17 | | the investigation by retiring? |
| 18 | A | No. |
| 19 | Q | Who had authority to decide whether the |
| 20 | | investigation was halted or not? |
| 21 | A | The Mayor would overall. You know, he could |
| 22 | | decide whether or not to cease our efforts. He |
| 23 | | was the one that authorized the retention of |
| 24 | | Mr. Evans, so he would certainly have the |
| 25 | | ability to pull the plug on the investigation |

CADY REPORTING SERVICES, INC.

1        at any time he wanted.

2    Q   When was the plug pulled on the investigation?

3    A   I don't know the exact timing of it, but some

4        time after, you know, after Mr. Mazzola

5        voluntarily retired from the police department,

6        you know, we discussed the investigation and

7        where it was with Mr. Evans.  And Mr. Evans,

8        you know, felt that we had exhausted

9        investigative avenues, that, you know,

10       Mr. Mazzola, all of the evidence indicated he

11       was the strongest suspect in it and there

12       really weren't a whole lot of other avenues to

13       pursue in the investigation.

14   Q   Whenever you say that -- I think you said,

15       "We decided."  Who had input into the decision

16       to stop the investigation besides Bill Evans?

17   A   I know there were discussions had that involved

18       the Mayor and also with the Law Director.

19   Q   Did you have any discussion with the Mayor

20       about whether to stop the investigation?

21   A   I believe I had discussions with the Mayor and

22       the Law Director.

23   Q   Do you contend that those discussions are

24       protected by privilege?

25   A   I believe they would be.  We were seeking legal

                    CADY REPORTING SERVICES, INC.

```
 1        advice from the Law Director.

 2   Q    Who made the ultimate decision about whether to

 3        terminate the investigation?

 4   A    I'm sorry, Ms. Savoie, you're fading in and

 5        out.

 6                    MR. STRANG:  I'm going to ask

 7        someone to stop hammering next to us.

 8   A    There's a contractor in the space next door.

 9                    MR. STRANG:  I'll be back in

10        30 seconds.

11                    THE VIDEOGRAPHER:  Off the

12        record.

13                    (Recess taken.)

14                    THE VIDEOGRAPHER:  Back on the

15        record.

16                    MS. SAVOIE:  Madam court

17        reporter, would you mind telling me what the

18        last question was?

19                    (Record read.)

20   Q    And we didn't get an answer to that question,

21        so can you please answer, sir?

22   A    I believe we consulted with the Mayor, the

23        Law Director and Mr. Evans.

24   Q    So who had the authority to make the final

25        decision?
```

CADY REPORTING SERVICES, INC.

```
 1    A    The Mayor would have the authority.  But,

 2         again, it was a discussion we had with the

 3         Law Director to get advice on how best to

 4         proceed.

 5    Q    Right.  And I'm not asking about that

 6         discussion.  I'm trying to understand how the

 7         decision-making process happened.  Okay?

 8              So after -- so was the Mayor the person

 9         who had the last word in the conversation,

10         so to speak?

11    A    Again, it was a discussion we had with the

12         Law Director and we followed the legal advice

13         we got from the Law Director and I believe that

14         advice is privileged.

15    Q    I'm not asking about that.  What I'm asking

16         about is who had the authority to make the

17         decision.  Can you tell me that?

18    A    The Mayor --

19                   MR. McLANDRICH:  Objection.

20    A    The Mayor would have that authority.  The

21         Law Director would definitely have some input.

22         And, of course, my input was listened to as

23         well.

24    Q    So you had input into the decision, correct?

25    A    Yes.
```

CADY REPORTING SERVICES, INC.

```
 1    Q   But you did not have the authority to terminate

 2        the investigation alone, correct?

 3    A   No.

 4                    MR. McLANDRICH:  Objection.

 5    Q   And did you talk to Bill Evans to convey to him

 6        that the investigation was going to be over?

 7    A   I believe there was a conference call with

 8        myself and Mr. Evans and Mr. O'Brien and maybe

 9        the Mayor.  I'm not exactly certain.

10    Q   Did you have any other communications with

11        Bill Evans about concluding the investigation?

12    A   I may have.  I don't recall any specifics.

13        I mean there may have been some housekeeping

14        about, you know, where to send his statements

15        and who in the finance department to contact,

16        that sort of thing.

17    Q   You had mentioned a moment ago some of

18        Bill Evans' impressions at that stage whenever

19        you decided to terminate the investigation.

20        So after Mr. Mazzola retired, what was your

21        impression -- let me ask you this.

22            When Mr. Mazzola retired, did you think

23        that that meant that he had given the documents

24        to Ed Gallek?

25    A   That determination was never reached.  The
```

CADY REPORTING SERVICES, INC.

```
 1        investigation was never completed.

 2   Q    My question is about what you thought.  Can you

 3        please answer?

 4   A    I did not think anything one way or the other.

 5        I mean I didn't have an opinion on the matter.

 6        The investigation ended.

 7   Q    You didn't have an opinion on whether or not

 8        Mr. Mazzola was the source of the information

 9        for Ed Gallek after he retired during the

10        investigation?

11   A    No.  Mr. Evans was fairly certain that

12        Mr. Mazzola was the source of the documents

13        leaving the department.  You asked if, you

14        know, I reached a decision whether or not he

15        gave them to Ed Gallek.  And, again, that

16        wasn't really much of a concern for me.  I was

17        concerned with the actual theft of the

18        documents and data from the police department.

19   Q    Okay.  So when Mr. Mazzola retired before the

20        investigation concluded, did you think that

21        Mr. Mazzola removed the documents from the

22        police department?

23   A    Again, Mr. Evans conducted the investigation

24        and it was his opinion that Mr. Mazzola was

25        responsible.
```

CADY REPORTING SERVICES, INC.

```
 1    Q   Did you agree with his opinion?

 2    A   I had no reason not to agree with him.  He was

 3        a professional that we hired to conduct the

 4        investigation.

 5    Q   So did you agree?

 6    A   Again, I took him at his professional opinion.

 7    Q   So you accepted his opinion, fair to say?

 8    A   Yes.

 9    Q   So at that point did you think it was most

10        probable that Mr. Mazzola was the person who

11        had removed these documents from the police

12        department?

13    A   Again, the investigation wasn't complete.  And,

14        you know, I usually won't make a definitive

15        decision until I have all of the evidence and

16        everything I need to make that decision.

17            All I know is that Mr. Evans felt that

18        the evidence was strongly indicating that

19        Mr. Mazzola was involved in it and Mr. Mazzola

20        decided to retire and at that point the

21        investigation ceased.

22    Q   Right.  And so that's what I'm trying to ask

23        you about, right.

24            Why did the investigation cease because

25        Mr. Mazzola retired?  How were those two --
```

CADY REPORTING SERVICES, INC.

```
 1    A    Well, because as I said before, Mr. Evans felt

 2         that, you know, there were no other

 3         investigative avenues to pursue.  He felt that,

 4         you know, that by leaving, by deciding to

 5         retire, he would be removed from the

 6         opportunity to be able to access any other

 7         sensitive documents.  And since his retirement

 8         there's been no other breaches or loss of

 9         documents or thefts.

10    Q    Were you aware of any breaches or loss of

11         documents or thefts before this incident where

12         Ed Gallek published the news story in

13         January 2019?

14    A    No.

15    Q    So this is the only one of those instances of

16         which you're aware?

17    A    Yes, it is.

18    Q    Do you know what Mr. Evans did to rule out any

19         other suspects who would have been a suspect?

20              Do you know what Mr. Evans did to rule

21         out any other possibilities about who removed

22         the documents from the department or provided

23         them to Ed Gallek?

24    A    I don't know all of the details on the specific

25         steps that Mr. Evans took to include or exclude
```

CADY REPORTING SERVICES, INC.

1        anybody from involvement in that.

2    Q    So what was your role in overseeing his

3        investigation?

4    A    I didn't oversee the investigation.  Mr. Evans

5        ran the investigation.  I provided support.

6        If he needed documents, if he needed policies,

7        if he needed me to direct certain employees to

8        do certain things, I would provide that for

9        him, but I had no active role in the actual

10       investigation itself.

11   Q    And so when I say, "Oversee", maybe that word

12       is not the right word for you.  Perhaps

13       monitor.

14            Were you monitoring the progress of

15       Bill Evans' investigation?

16   A    He would give me occasional reports as he

17       completed steps in his investigation.  He would

18       give me updates.  Nothing too terribly

19       detailed.  He wouldn't go step by step with

20       what he did and the questions he asked.  He

21       would just give me general impressions of how

22       he believed the investigation was progressing.

23   Q    So did you stay acquainted with the progress of

24       the investigation only on that higher level of

25       generality as opposed to being familiar with

                 CADY REPORTING SERVICES, INC.

```
 1           the specifics of what he was doing and finding?
 2     A     Pretty much, yeah.  He would keep me apprised
 3           of the direction the investigation was going.
 4           And as it went along, if he needed anything
 5           specific, I would do my best to facilitate that
 6           for him.
 7     Q     And so were you taking kind of a hands off role
 8           to the investigation?
 9     A     Yes.  It was an outside investigation that we
10           hired Mr. Evans to complete and I didn't want
11           to influence that in any way, shape or form or
12           make it look like I was, you know, pushing him
13           in any specific direction.
14     Q     Right.  And so, on the one hand, you didn't
15           have any active involvement because -- for
16           those reasons you just articulated, correct?
17           You were not actually involved in the
18           investigation, correct?
19     A     Yes.
20     Q     And then, on the other hand, you maintained an
21           observation of the investigation only at a more
22           generalized level without keeping abreast of
23           the specifics, is that correct?
24     A     Yes.
25     Q     Did you have any plan in place, formal or
```

CADY REPORTING SERVICES, INC.

```
 1          otherwise, to insure that Bill Evans'

 2          investigation was done properly?

 3     A    What do you mean by done properly?  Could you

 4          explain what properly is?

 5     Q    Sure.  You know, I mean you have many years of

 6          law enforcement experience and are, no doubt,

 7          skilled in investigation.

 8               From your perspective did you have any

 9          standards or ideas on how to insure that

10          Bill Evans' investigation lived up to your

11          particular standards about what would be proper

12          at best?

13     A    First off, for Mr. Evans' reputation, he had a

14          solid resume of conducting these types of

15          investigations; sensitive, complicated,

16          internal investigations, both in the private

17          and public sector.  So he knew what was

18          involved in public sector investigations.  He

19          was very familiar with it.

20               I know I remember when Bob Phillips was

21          deposed, he said he's had interactions with

22          Mr. Evans on internal investigation for other

23          departments that he represents.  So I had

24          confidence that he was knowledgeable about what

25          was required.
```

```
 1              And, again, at the end of the

 2        investigation, before any disciplinary

 3        proceedings would, you know, be considered or

 4        any charges would be considered, you know, I

 5        would do a comprehensive review with Mr. Evans

 6        to make sure that all of the I's were dotted

 7        and the T's were crossed and that there were

 8        no potential violations of the Collective

 9        Bargaining Agreement.

10   Q    Thank you.  I think you're getting to what I

11        was trying to understand.

12              Certainly I know whenever lawyers

13        outsource work to outside counsel, they stay

14        involved in things because they're lawyers and

15        they can't help themselves.  And I would

16        imagine with your expertise, it might be

17        difficult for you to see someone else do it and

18        then not exercise some degree of supervision.

19              So was your plan then to get together

20        with him after he completed his investigation

21        to go over his findings, look at the evidence

22        and make sure you agree before you made any

23        decisions or recommendations on discipline?

24   A    Oh, absolutely.  It would be identical to the

25        process we use for major cases in the police
```

CADY REPORTING SERVICES, INC.

 1          department for criminal cases.  I don't get

 2          involved in the day to day details; the

 3          interview, the interrogation, the evidence

 4          collection, the investigation.  But once all of

 5          that is done, before the detectives bring a

 6          major case to the Grand Jury or something, they

 7          will sit down with me, we'll go over

 8          everything.  And, you know, it's just another

 9          layer of review to make sure that they hit all

10          of the benchmarks that they needed to.

11               I have great confidence and a lot of

12          experience with the detectives and with

13          Lieutenant Wilson who runs the Detective Bureau

14          that, even absent my involvement, they do a

15          great job.  But it's just another layer to make

16          sure something is done up to par and I was

17          taking the same approach with Mr. Evans'

18          investigation.

19     Q    And in this particular investigation of

20          Mr. Mazzola and of the document release, you

21          didn't get to that point because the

22          investigation stopped, correct?

23     A    Correct.

24     Q    Did you do any kind of review of the work at

25          the time you decided to conclude the

                    CADY REPORTING SERVICES, INC.

1     investigation?

2  A  No.

3  Q  Did you see Ed Gallek's follow up reporting

4     that was released May 3, 2019?

5  A  Yes.

6  Q  How did you see that reporting?

7  A  I don't remember the exact day that I saw it,

8     but I believe somebody in the police department

9     mentioned there was a follow up story, so I

10    looked it up online on his news station's

11    website.

12 Q  What was your understanding of the article?

13 A  I don't recall exactly what the specifics were.

14    You know, if you have the specific article,

15    I could probably give you a better idea of how

16    I thought at the time.

17 Q  Yeah.  So that would be Exhibit 3.

18              MS. SAVOIE:   Alex, if you would

19    not mind putting it up on the screen, I would

20    appreciate it, Plaintiff's Exhibit 3.

21              THE VIDEOGRAPHER:  Yeah.  Give me

22    one moment.

23              MS. SAVOIE:   Would you mind

24    scrolling down.

25 Q  Okay.  Do you see this title and picture in

              CADY REPORTING SERVICES, INC.

```
 1        Plaintiff's Exhibit 3?
 2                    MS. SAVOIE:  Can you please
 3        scroll down to the second page of the exhibit?
 4    Q   Do you remember seeing this article on the
 5        website?
 6    A   Yes.
 7    Q   If you wouldn't mind taking a minute to review
 8        it briefly and let us know whenever you're
 9        ready to --
10                    MS. SAVOIE:  Scroll down to the
11        next page.
12    A   Okay.
13                    MS. SAVOIE:  Please scroll down,
14        please.
15    A   Okay.  All right.  I've reviewed the document,
16        ma'am.
17    Q   Thank you.
18                    MS. SAVOIE:  Can you scroll back
19        up to page 2, Alex?
20            Can you scroll down a little bit, please?
21        Sorry.  Yeah.  I'm sorry.  I said page 2.
22            Can you go down to the next page, please?
23        Yeah.
24    Q   So Chief Kilbane, do you see the paragraph that
25        is on the bottom of the screen right now that
```

1         begins, "During the internal investigation"?

2    A    Yes.

3    Q    I'm going to read that and ask you if I read it

4         correctly.

5              "During the internal investigation one

6         police supervisor retired.  Multiple sources

7         said he left under pressure.  However, he never

8         supplied any information to the I-Team."

9              Did I read that correctly?

10   A    Yes.

11   Q    During the internal investigation into who took

12        documents from the police department and/or

13        provided them to Ed Gallek, did anyone else

14        retire besides Mr. Mazzola?

15   A    I don't believe so, no.

16   Q    Did anyone else retire in connection with this

17        investigation?

18   A    Not that I'm aware of, no.

19   Q    How many lieutenants do you have in your

20        department?

21   A    Currently we have three.

22   Q    And in March 2019 how many did you have?

23   A    Either two or three.  I don't know if we had

24        done promotions in the open Lieutenant spot

25        yet.

                    CADY REPORTING SERVICES, INC.

```
 1    Q   So whenever this article came out, did you
 2        understand then that Ed Gallek, the journalist
 3        who published this article, as well as the
 4        article of January 14, 2019, was saying that
 5        Mr. Mazzola never supplied any information to
 6        the I-Team?
 7    A   I don't know what Mr. Gallek said or didn't
 8        say.  I didn't speak with Mr. Gallek about it.
 9    Q   No.  I'm not asking you about oral
10        conversations you may have had with Ed Gallek.
11        I'm asking you about what's written in his
12        articles.  Do you understand that?
13    A   Yes.
14    Q   So what I'm asking you about is whenever you
15        read this article, Exhibit 3, which has a
16        byline by Ed Gallek, the same person who had a
17        byline on the article from January 14, 2019,
18        was it your understanding that Ed Gallek was
19        saying that Lieutenant Mazzola never supplied
20        any information to the I-Team?
21    A   No.  That's not my understanding at all.  I
22        don't know exactly what Ed Gallek intended with
23        what he wrote.
24    Q   I'm asking what your understanding -- first,
25        let's back up.
```

CADY REPORTING SERVICES, INC.

1           I'm asking what was your understanding at

2      the time this article came out.  Can you answer

3      that question, please?

4  A   My understanding was Ed Gallek wrote what he

5      wrote.  What he meant by what he wrote, I don't

6      understand.

7  Q   And I'm not asking you to speculate on

8      someone's individual intent.  I'm asking you

9      what was your understanding of the words on

10     the page?

11 A   That multiple sources may have said he never

12     supplied any information to the I-Team.

13 Q   That was your understanding from the paragraph

14     I just read correctly into the record on

15     Exhibit 3?

16 A   Yeah.  "Multiple sources said he left under

17     pressure.  However, he never supplied any

18     information to the I-Team."

19          So apparently he had multiple sources

20     claiming that he never supplied any information

21     to the I-Team.  I don't know where Mr. Gallek

22     got the information, you know, and I don't know

23     if it was supplied by somebody as a proxy for

24     whoever actually took the documents or anything

25     else.

                CADY REPORTING SERVICES, INC.

```
 1              You know, again, at the end of the day,
 2         this mattered very little to me how he got the
 3         documents.  The important thing was figuring
 4         out who breached our, you know, our policies,
 5         our records and stole the documents and data
 6         from the police department.
 7    Q    And so are you really saying as we sit here
 8         today that at the time you read this article
 9         after it came out May 3, 2019, before this
10         litigation commenced, that you did not
11         understand that Ed Gallek was saying that
12         Leonard Mazzola did not provide the information
13         to the I-Team?
14    A    No.  Again, I don't care.  I never gave it much
15         thought as to whether or not what Mr. Gallek
16         said or didn't say or what he wrote in his
17         article.  I didn't have an opinion on that.
18    Q    That's not my question.  Can you please answer
19         my question?
20    A    As I told you, I didn't have an opinion one
21         way or the other.
22    Q    And I'm not asking about whether you had an
23         opinion.  I'm asking are you really saying that
24         it was your understanding that he was not
25         saying Leonard Mazzola did not give me the
```

CADY REPORTING SERVICES, INC.

 1       information?

 2                       MR. STRANG:  Objection.

 3   A   Again, I didn't have any understanding.  I

 4       wasn't concerned about where Mr. Gallek -- who

 5       physically handed him the documents.  That

 6       wasn't a concern of mine.  And what he did or

 7       did not say about that, frankly, didn't -- it

 8       was no concern to me.  I didn't have any

 9       opinion on it one way or the other.  I didn't

10       have any understanding on it.

11   Q   So you didn't care where Ed Gallek got the

12       documents?

13                       MR. STRANG:  Objection.

14   A   Again, my concern was the theft of data and

15       documents from the police department.  How they

16       got to Ed Gallek may or may not have been a

17       part of that investigation.  That was

18       Bill Evans' responsibility.  You know,

19       Ed Gallek ended up with those documents

20       eventually, but that wasn't the focus of the

21       investigation.  The focus of the investigation

22       was the theft and breach.

23   Q   So because the focus of the investigation or

24       because Bill Evans was handling the

25       investigation, you didn't care if Ed Gallek

                    CADY REPORTING SERVICES, INC.

```
1          was saying that Leonard Mazzola didn't provide
2          him the documents, correct?
3                        MR. STRANG:  Objection.
4     A    Again, it didn't play into any of my decisions.
5          It wasn't a concern.
6     Q    It wasn't a concern, correct?
7     A    What Ed Gallek says or doesn't say doesn't
8          concern me, no.
9     Q    Then why did you look up his news article after
10         your officers told you about it?
11    A    Because any time Independence is mentioned in
12         the news, I want to see what they say and if
13         it's accurate, if I need to provide information
14         to the city to rebut it.  Because the media has
15         -- a lot of times sometimes they will leave out
16         important facts or they won't put a complete
17         story in there.  And I have to make sure that
18         my boss, the Mayor, if he's going to get
19         questioned about it, has the whole story and is
20         able to answer any queries he gets from the
21         public about it.
22    Q    Oh.  So did you have to do that about this
23         article?
24    A    I believe I made sure the Mayor was aware of it
25         and I think he was and, you know, he was ready
```

                    CADY REPORTING SERVICES, INC.

1          to respond to it if he needed to.

2     Q    Did you ever call Ed Gallek for clarification

3          on what this piece meant?

4     A    No.

5     Q    Did you have any interest in doing that?

6     A    No.

7     Q    Did you ever think about asking Ed Gallek to

8          confirm that Mr. Mazzola didn't provide him any

9          information to clarify what he wrote in this

10         piece?

11    A    No.

12    Q    Why not?

13    A    No.  I'm not going to discuss sources with a

14         member of the media.  That's unprofessional on

15         both ends of that conversation.

16    Q    Well, and I'm not asking you if you considered

17         discussing who his source was.

18              What I'm asking is did you consider

19         calling him to ask for clarification on what he

20         meant in his piece?

21    A    No.  That would be tantamount to asking who his

22         source was.

23    Q    Well, you just said that this could pertain --

24         this could be relevant to the city's

25         investigation and that it was part of your job

                    CADY REPORTING SERVICES, INC.

```
 1           to read -- or it was a duty you assumed to read
 2           articles about the city of Independence and
 3           keep the Mayor apprised of anything relevant,
 4           right?
 5      A    Yes.
 6      Q    So did you consider calling Ed Gallek to get
 7           some clarification on what all this meant so
 8           that you could keep the Mayor informed of the
 9           fact that you've done an investigation that
10           prompted a Lieutenant --
11      A    No.
12      Q    Listen.  A Lieutenant to retire and then
13           stopped that investigation.  Now a reporter is
14           saying he's not the one who provided
15           information to him.  You didn't think that was
16           important to clarify?
17                     MR. STRANG:  Objection.
18      A    It was -- that was a multi compound question
19           there, you know, multiple -- which portion of
20           that would you like me to address?
21      Q    Well, did you understand my question?
22      A    Quite frankly, no.  It was rather meandering.
23      Q    You understand my question.  I can see you're a
24           smart man, Chief.  I think that you can
25           understand even a compound question.  So tell
                    CADY REPORTING SERVICES, INC.
```

```
 1            me what you understood.

 2                      MR. STRANG:  Objection.

 3     A    You jumped from the Mayor to Ed Gallek to your

 4            duties to did you.  I mean did I apprise the

 5            Mayor of the article?  Absolutely I did, to

 6            make sure he was forewarned about it in case he

 7            got any questions and he needed any information

 8            from me.  I believe I answered that in the

 9            prior question.

10     Q    And in this article Ed Gallek did not say who

11            his source was, correct?

12     A    I don't believe so, no.

13     Q    Instead he said who his source was not,

14            correct?

15     A    Again, you would have to ask Ed Gallek if

16            that's what he meant by that statement.  And

17            like I said again, whether or not he did or

18            didn't, it really didn't matter to me who his

19            actual source was that handed him the

20            documentation.  Again, our concern was the

21            theft that originally occurred.

22     Q    So you didn't think that him saying in this

23            article that Mr. Mazzola was not his source of

24            the documents was pertinent to the

25            investigation that the city had decided to
```

                    CADY REPORTING SERVICES, INC.

```
 1        stop?
 2                    MR. STRANG:  Objection.
 3   A    It wasn't pertinent because the investigation
 4        had been concluded and it was actually
 5        forestalled by Lieutenant Mazzola's voluntarily
 6        decision to retire.
 7   Q    And so you've kind of made some distinctions
 8        during this deposition about how the
 9        investigation concluded but wasn't actually
10        over, is that right?  Or that it wasn't
11        complete, is that correct?
12   A    Yeah.  Mr. Evans didn't complete the
13        investigation.  It never went to the stages
14        where we were considering charges or potential
15        discipline or anything of that nature.
16   Q    Right.  So the investigation wasn't complete
17        and more information came out in this news
18        article that was pertinent to that
19        investigation.  Did you consider resuming the
20        investigation?
21   A    No.  Absolutely not.
22   Q    Did Mayor Togliatti express any concerns to you
23        about this article and about what Ed Gallek
24        said in it?
25   A    No, he did not.
```

CADY REPORTING SERVICES, INC.

Chief Michael Kilbane

```
 1     Q    Did Mayor Togliatti express any concerns about

 2          the fact that Ed Gallek said in the article

 3          that Mr. Mazzola was not his source of the

 4          documents?

 5                    MR. STRANG:  Objection.

 6     A    That's a question you have to ask

 7          Mayor Togliatti.

 8     Q    Do you remember the specific questions that

 9          Bill Evans asked Mr. Mazzola during the

10          polygraph examination?

11     A    No.  I don't remember the exact questions that

12          he asked.

13     Q    Let's refer to Exhibit 2, Evans/PTA page 68.

14                    MR. McLANDRICH:  Was that 58 or

15          68?

16                    MS. SAVOIE:   68, please.

17                    MR. McLANDRICH:  Thank you.

18     Q    So Chief Kilbane, isn't it correct that as a

19          foundational matter here, during a polygraph

20          the examiner will ask some questions that are

21          designed to elicit a false response as sort of

22          a control question for the exam?

23     A    I'm not intimately familiar with the specific

24          procedures of a polygraph, so I would be out of

25          my depth to answer specific questions about the
```

CADY REPORTING SERVICES, INC.

1   polygraph procedures.

2   Q   Right.  And I'm not trying to ask really

3       specific questions.  I just want to get kind of

4       a general understanding to make sure we're on

5       the same page as I ask you about this.

6           Do you have an understanding of the way

7       that polygraph examiners will include the

8       questions that are probative to the

9       investigation among other questions that are

10      not probative?

11  A   I don't know exactly how they do it.  Again,

12      the actual nuts and bolts of how they

13      administer the exam and what questions they ask

14      and how they mix them, I don't know.

15  Q   Okay.  Well, let's look at some of these

16      questions here.

17          Is it correct that the question next to

18      R-4 says, "Did you provide any information

19      contained in those documents to the media?"

20  A   Yes.  That's what it says.

21  Q   Do you have knowledge that Bill Evans asked

22      that question to Leonard Mazzola during the

23      polygraph?

24  A   I believe Bill Evans in his polygraph report

25      did say that that was one of the questions he

                CADY REPORTING SERVICES, INC.

```
 1              asked.
 2    Q   And would it be easier for you if we looked at
 3        the polygraph report?  Would that be a easier
 4        reference document?
 5    A   It may if you look at the report that says the
 6        exact question he asked and, you know, the
 7        responses and those sort of things.  I, you
 8        know -- yeah.  His report was pretty extensive
 9        and there was a lot of, you know, technical
10        information and graphs in there.
11    Q   Right.
12                  MS. SAVOIE:  Okay.  So why don't
13        we -- let's go up, I'm sorry, Alex, to page
14        Evans/PTA 002.  This might be an easier way to
15        show these questions.
16    Q   Chief Kilbane, is it correct that Bill Evans
17        asked Mr. Mazzola, "Did you provide any
18        information contained in those documents to the
19        media?"
20    A   No.  That would not be correct.
21    Q   Okay.  Why do you say that?
22    A   Because I believe the polygraph was
23        administered by Kevin Butler, not Bill Evans.
24    Q   Right.  Okay.  So Bill Evans' associate,
25        Kevin Butler.
```

1          Is it correct that Mr. Butler asked, "Did

2      you provide any information contained in those

3      documents to the media?"

4   A  I wasn't there at the polygraph, but according

5      to this documentation, that is a question that

6      he asked.

7   Q  Okay.  And according to this documentation

8      where he's reporting the questions asked, is it

9      correct that Mr. Butler wrote that he asked,

10     "Do you know for sure who provided information

11     contained in those documents to the media?"

12  A  Yes.

13  Q  And is it correct that Mr. Butler reported that

14     he asked the question, "Did you help provide

15     information contained in those documents to the

16     media?"

17  A  Yes.  That's correct.

18             MS. SAVOIE:   We can take that

19     one off the screen.

20  Q  Okay.  So knowing that those were the questions

21     asked and that Mr. Mazzola answered no to --

22     well, let me back up for a second.

23         Was it your understanding from what we

24     just viewed that Mr. Mazzola had answered no to

25     each of those?

                CADY REPORTING SERVICES, INC.

```
 1    A   That's correct.

 2    Q   And was it your understanding from Mr. Butler

 3        and Mr. Evans that, in their opinion, based on

 4        the polygraph examination, Mr. Mazzola showed

 5        signs consistent with physiological indicia of

 6        deception?

 7    A   That's what Mr. Evans and Mr. Butler indicated

 8        in their reporting.

 9    Q   So whenever you saw Ed Gallek's reporting of

10        May 3, 2019, did that call into doubt for you

11        the accuracy of their conclusions based on the

12        polygraph exam?

13    A   No.

14    Q   Why not?

15    A   Well, first off, because the polygraph exam was

16        administered by experienced professionals that

17        are very good at what they.  I trust their

18        results implicitly.

19            And, secondly, that they had explained --

20        and, again, it was a rather detailed

21        explanation, but the gist of it was that even

22        if, you know, he was deceptive in an answer

23        where, you know, maybe there was some

24        explanation that he might have not been

25        involved, but he knew about it or he felt
```

1   guilty about it because he was peripherally

2   involved, he would still indicate deception on

3   that particular question.

4 Q Okay.  So the first question that we just went

5   over that they asked Mr. Mazzola was, "Did you

6   provide any information contained in those

7   documents to the media?"  Correct?

8 A Correct.

9 Q And then Ed Gallek published an article and he

10   specifically wrote that, "The police supervisor

11   who retired never supplied any information to

12   the I-Team."  Correct?

13       MR. STRANG:  Objection.

14 A I don't think that's exactly what Mr. Gallek

15   wrote.

16 Q Would you like to look at the document again?

17 A Yes, please.

18 Q Okay.  That's Exhibit 3, please.  It's on page

19   3 of the pdf.

20   Okay.  On the last paragraph you can see

21   in that -- okay.

22   In the paragraph beginning, "During the

23   internal investigation", isn't it correct that

24   the last sentence of that paragraph says,

25   "However, he" -- referring back to the police

       CADY REPORTING SERVICES, INC.

194

```
 1          supervisor who retired -- "never supplied any
 2          information to the I-Team."
 3     A    Right.  I don't know whether he meant he
 4          meaning multiple sources said that he never
 5          supplied or that Gallek is saying he never
 6          supplied.  It's sort of unclear from the syntax
 7          there.
 8               But, again, it really doesn't matter what
 9          Mr. Gallek is saying.  I wasn't relying on
10          Mr. Gallek as, you know -- and, again, this
11          article was written months after the
12          investigation was concluded.
13     Q    Wasn't the investigation concluded at the end
14          of March 2019?
15     A    I believe so, yes.
16     Q    And this article came out about a month later
17          on May 3, 2019?
18     A    Yes.
19     Q    And why do you think that the passage of a
20          month and change would affect Ed Gallek's
21          knowledge of who his source of information was?
22     A    Well, this wasn't relevant to the investigation
23          because the investigation was done.  We were --
24          you know, it had been concluded.  Mr. Mazzola
25          had retired.  The investigation showed, you
```

 1     know, deception on the polygraph.

 2  Q  That's not answering my question, you know, so

 3     let's back up for a minute to what my question

 4     was.  Okay?

 5              MS. SAVOIE:  Court reporter,

 6     would you please read my question back into the

 7     record?

 8              (Record read.)

 9  Q  Right.  So Chief, you said a moment ago

10     whenever I asked you about this, about the

11     reliability of the information contained in

12     this article, you said months had gone by.  And

13     I pointed out that only a month and change had

14     gone by and asked why that passage of time

15     would affect Ed Gallek's knowledge and ability

16     to say who his source was or was not.

17              What is your answer to that question?

18  A  Okay.  I'm sorry.  Yeah.  Let me answer that

19     question then.

20              I have no idea what affects Ed Gallek's

21     sources or knowledge or whatever affects

22     Ed Gallek.  Those are questions you have to ask

23     Mr. Gallek.

24  Q  Okay.  But the point is that this article

25     directly refuted the polygraph's findings on

                 CADY REPORTING SERVICES, INC.

```
 1          one question, didn't it?
 2                    MR. McLANDRICH:  Objection.
 3                    MR. STRANG:  Objection.
 4     Q    You can answer.
 5     A    Again, I don't have an idea one way or the
 6          other.  Certainly I'm, you know, not going to
 7          give weight to a journalist's ideas as opposed
 8          to the investigation of Mr. Butler and
 9          Mr. Evans.
10     Q    What do you mean by you're not going to give
11          weight to a journalist's ideas whenever a
12          journalist is saying someone was not his
13          source?
14     A    Again, it doesn't matter what the journalist is
15          saying.  The investigation was conducted by
16          Mr. Evans and Mr. Butler.  They conducted a
17          polygraph.  They provided the results of that
18          polygraph.  I was satisfied with their
19          experience, their knowledge, their professional
20          reputation, their ability.  That's what I was
21          relying on.
22     Q    Right.  And you're answering a different
23          question than the question I asked.  So -- and
24          I understand what you're saying, but let's back
25          up to what my question was here.  Okay?
```
                    CADY REPORTING SERVICES, INC.

1          You just said that you didn't necessarily

2      trust what a journalist would say.  And I can't

3      remember your exact words, but I would like you

4      to explain what you meant.

5          Why would you not be able to rely upon

6      Ed Gallek, the journalist who wrote the article

7      of January 14 of 2019 on behalf of the I-team,

8      about who his and the I-Team's sources were?

9   A  Because the opinion of a journalist or what a

10     journalist writes doesn't have any bearing or

11     affect on the investigation that our police

12     department did.

13  Q  Why are you calling Ed Gallek's recitation of

14     who his source was not an opinion of Ed Gallek?

15                 MR. STRANG:  Objection.

16  A  It's what he wrote.  That's his opinion.  I

17     mean, you know, he made a conclusion as to

18     where he did or didn't get his information.

19          And, again, how he defines a source, I

20     don't know.  What steps or intermediaries there

21     were between who actually physically gave him

22     the stuff and where it originated from, I don't

23     know.  And those are all questions that are

24     appropriate for the investigation.

25          And, again, I don't know the context that

                 CADY REPORTING SERVICES, INC.

Mr. Gallek had for making that statement, so obviously I can't judge the accuracy of it.

Q Well, but you understand that the plain print here says, "However, he never supplied any information to the I-Team." Correct? You see that, right?

A Yes. And, again, I don't know the context of that statement, so I can't make -- you know, with Mr. Evans and Mr. Butler, I had piles of context and scientific evidence and polygraph results and their professional opinions and estimations. With Mr. Gallek I just -- not knowing his background or any of the specifics that went into him making that statement, I can't make the same judgement on what he's saying as I can what Mr. Butler and Mr. Evans are saying.

Q Why would you need to make a judgement on what a reporter says about his own source and his own information and knowledge?

A Because you need to evaluate the voracity of the source. You need to evaluate what he defines a source is. You have to determine is there a source to the source to the source. Is he hiding behind a technicality. Again, I

1    don't know any of this.  There's, you know,

2    without more detail, there's really no way to

3    make an accurate judgement as to exactly what

4    he meant.

5    Q  Okay.  So let's go back then.

6         So the first question that Mr. Mazzola

7    was asked in the polygraph that we went over

8    from the report of Kenneth Butler was, "Did you

9    provide any information contained in those

10    documents to the media?"  Correct?

11   A  I answered that question already.

12   Q  And your answer was yes, correct?

13   A  I answered the question already.

14   Q  And we're redirecting.  So was your answer yes?

15   A  Again, I'll stand by the answer I gave to that

16    same question before.

17   Q  Okay.  So then tell me, sir, why you -- why you

18    don't want to acknowledge the contradiction

19    between that question, Mr. Mazzola's answer of

20    no, the polygraph's findings on his answer and

21    then an article where a journalist directly

22    refutes that?

23   A  And, again, I will stand by the same answer I

24    gave the last time you asked the question

25    regarding the voracity between Mr. Evans and

                    CADY REPORTING SERVICES, INC.

```
 1        Mr. Butler and their extensive work and
 2        extensive knowledge and extensive technology
 3        and the limited, extremely limited availability
 4        of knowledge I have of Mr. Gallek's sources and
 5        how he considers those sources.
 6    Q   So his limited availability.  Why didn't you
 7        call him or e-mail him?
 8    A   I'm sorry.  I didn't hear the question.
 9    Q   If you were concerned about the limited
10        information you had about Ed Gallek and the
11        statement he made in this article about how the
12        police supervisor who retired didn't supply any
13        information, thereby contradicting the results
14        of the polygraph on that first question, why
15        didn't you call Ed Gallek to ask him about it?
16    A   Because it wasn't any concern to me.
17    Q   You didn't care anymore because the
18        investigation was over, correct?
19    A   The investigation was concluded.  I was
20        satisfied with the information that I got from
21        Mr. Evans and Mr. Butler.  And, again, you
22        know, what the media writes, the media writes.
23        They're absolutely free to do so.
24    Q   No one is questioning whether the media is free
25        to do so.  What I'm trying to understand is
                    CADY REPORTING SERVICES, INC.
```

```
 1        what your thought process was in reviewing this

 2        article and leaving the investigation

 3        incomplete.

 4              Why didn't you reopen the investigation

 5        whenever this article came out?

 6                    MR. STRANG:  Objection.  Asked

 7        and answered.

 8    A   Yeah.  I'll stand by the answer I gave last

 9        time you asked that question.

10    Q   Which was what?  Because I don't think you

11        actually answered the question whenever you

12        responded.

13    A   I did.

14    Q   Oh.  So you're going to refuse to answer now?

15                    MR. STRANG:  Let's do this.  You

16        answer the question and then we'll take a

17        break, take a five or ten-minute break.

18    A   Okay.  Could you repeat the question, please?

19    Q   Let's move on to something else for a moment.

20              You speculated a few moments ago about

21        intermediaries that Ed Gallek might have had.

22        What is your basis for that?

23    A   It was one of the theories advanced by

24        Mr. Evans.

25    Q   That Mr. Mazzola gave documents to someone who
```

CADY REPORTING SERVICES, INC.

```
 1              gave them to the media, is that correct?

 2      A    Yes.  His theory was that there may have been,

 3              you know, layers of insulation that, you know,

 4              perhaps the person that stole the documents

 5              wasn't the person that actually gave them to

 6              the media and they did it through an

 7              intermediary.

 8      Q    Did this article of May 3, 2019 make you

 9              question the validity or reliability of the

10              polygraph results?

11      A    No, it did not.

12      Q    Did you consider that if the polygraph findings

13              on that first question we discussed about

14              whether he provided information to the media

15              was wrong, did you consider whether the

16              polygraph findings on the other two questions

17              were wrong?

18      A    No.  I was satisfied with the work that

19              Mr. Butler and Mr. Evans did.

20      Q    Did you ever consider the possibility that

21              Mr. Mazzola's polygraph exam results might have

22              been based on extreme stress or fear rather

23              than actual deception?

24                        MR. STRANG:  Objection.

25      A    Again, I relied on Mr. Evans and Mr. Butler's

                         CADY REPORTING SERVICES, INC.
```

| | |
|---|---|
| 1 | | professional experience to be able to account |
| 2 | | for and, you know, exclude those factors and |
| 3 | | make sure they didn't affect the validity of |
| 4 | | the test.  They had quite a bit of experience |
| 5 | | conducting polygraph tests and I'm sure that's |
| 6 | | part of a process is to make sure that those |
| 7 | | types of factors are considered. |

1    professional experience to be able to account

2    for and, you know, exclude those factors and

3    make sure they didn't affect the validity of

4    the test.  They had quite a bit of experience

5    conducting polygraph tests and I'm sure that's

6    part of a process is to make sure that those

7    types of factors are considered.

8  Q  So if Mr. Mazzola did not actually give the

9    I-Team documents or information, then is it

10    your conclusion that he could have still

11    somehow been involved in the release of

12    information by removing documents from the

13    police department?

14  A  Again, Mr. Evans indicated that his

15    investigation showed that that was a

16    possibility, that he was the likely person

17    involved.

18  Q  But the only question that addressed that that

19    Mr. Mazzola was asked in the polygraph was,

20    "Did you help provide information containing

21    those documents to the media", correct?

22  A  I'm not sure I understand the question.

23  Q  So I'm trying to understand your distinction,

24    okay, between if Mr. Mazzola is not the one who

25    provided information to the media, then what is

CADY REPORTING SERVICES, INC.

```
 1            left that he could have done that was wrong
 2            that would justify not reopening this
 3            investigation.  Okay?  And it's my
 4            understanding from your earlier testimony that
 5            it would be the fact that he could have used an
 6            intermediary to transfer the documents to the
 7            media, is that correct?
 8      A     That was one of the theories that Mr. Evans
 9            presented.
10      Q     Right.  And in your view that would be -- that
11            would be problematic because it would indicate
12            that Mr. Mazzola had removed documents from the
13            police department, correct?
14      A     The focus of the investigation was to determine
15            who stole the documents and data from the
16            police department.  Yes.
17      Q     And so did you consider the fact that the
18            questions that were asked of Mr. Mazzola during
19            the polygraph didn't directly implicate that
20            particular conclusion?
21      A     Again, as to the technology as to why the
22            deception was indicated to those specific
23            questions, those are questions you need to
24            direct to Mr. Butler or Mr. Evans.  I was
25            relying on their professional opinion based on
```

                    CADY REPORTING SERVICES, INC.

```
 1           their experience and abilities that the

 2           deception was indicated and why the deception

 3           was indicated is questions for them.

 4      Q    Right.  And I'm not asking about why deception

 5           was indicated, nor am I saying that that is

 6           what a polygraph actually represents.

 7                 What I asked you a moment ago was

 8           about whether you considered the fact that

 9           Mr. Mazzola was not directly asked questions

10           about the conclusion that you and/or Mr. Evans

11           ultimately reached about the results of this

12           investigation?

13                      MR. STRANG:  Objection.

14      A    I'm not sure what you mean about what question

15           he wasn't asked.

16      Q    We adjust went over the questions he was asked

17           during the polygraph and he wasn't asked

18           whether he removed documents from the

19           department, correct?

20      A    Could we look back at the specific questions

21           from the polygraph, please?

22      Q    Sure.  That would be Exhibit 2 in the second

23           page of that document is the letter.

24      A    I believe that would be covered under question

25           3.  "Did you help provide information contained
```

1    in these documents to the media?"  That would

2    involve obviously stealing the documents.

3  Q  Well, is that obvious though?  Wouldn't that

4    include all kinds of other things that are not

5    stealing documents?  Is that really direct

6    evidence of the conclusion that was reached?

7  A  It would absolutely indicate complicity in the

8    theft.  Absolutely.

9  Q  So it's your position as we sit here today that

10    the question, "Did you help provide information

11    contained in those documents to the media"

12    would cover someone stealing documents from the

13    police department?

14  A  Yes.  That was Mr. Evans' intent, I believe.

15  Q  And is it your understanding or your contention

16    as we sit here right now that Mr. Butler asked

17    all the questions he needed to ask to support a

18    conclusion that Mr. Mazzola took documents

19    without authorization from the police

20    department?

21  A  That's a question you need to ask Mr. Butler.

22  Q  Well, I'm asking your opinion.

23  A  Okay.  Again, Mr. Butler is the polygraph

24    professional, as is Mr. Evans.  I will rely on

25    their, you know, professional opinions as to

                CADY REPORTING SERVICES, INC.

```
 1          what the results of their evaluation shows.  So
 2          if they tell me that deception is indicated,
 3          I'm going to accept that from them.
 4    Q     Right.  And I'm not asking about what the
 5          session indicated or the technology or the
 6          polygraphy machinery.  What I'm asking about is
 7          your opinion as someone who has been asking
 8          questions of individuals and interrogating
 9          people for decades, do you think they asked all
10          of the questions they needed to ask to support
11          the conclusion that you reached after this
12          investigation was concluded?
13                       MR. STRANG:  Objection.
14    A     I believe that Mr. Evans was confident that he
15          had asked all of the pertinent questions during
16          the interviews, during his investigation,
17          during the pre-polygraph interview and, you
18          know, during the polygraph itself that he and
19          Mr. Butler had, you know, asked sufficient
20          questions and asked the correct questions to
21          reach the conclusions they did.  I have
22          confidence in their investigation.
23    Q     So it sounds like your -- but you don't have
24          much specific knowledge of polygraphy, correct?
25    A     No.
                    CADY REPORTING SERVICES, INC.
```

1    Q   So you would just defer to their expertise

2        without much specific knowledge on their area

3        of purported expertise, correct?

4    A   Yes.

5    Q   Did you ever consider whether any conduct or

6        speech that Mr. Mazzola allegedly engaged in

7        was protected under the law?

8                   MR. McLANDRICH:  Objection.

9    A   Again, what do you mean by speech and

10       protected?  Which specific speech are you

11       talking about or --

12    Q  During the course of this investigation did

13       you ever consider whether any speech that

14       Mr. Mazzola engaged in was protected under

15       the law?

16                MR. McLANDRICH:  Objection.

17    A  I don't believe we investigated any speech at

18       all.  We were investigating the theft of

19       documents and the breach of departmental

20       policies.

21    Q  Which would include talking to a reporter,

22       correct?

23    A  Again, if the evidence at the conclusion of the

24       investigation indicated that our media

25       relations policy was violated, we would address

                    CADY REPORTING SERVICES, INC.

Chase Moshalek i0b4e4e

```
 1            it at that time.
 2    Q    Your investigation included looking into
 3         whether Mr. Mazzola talked to the media,
 4         correct?
 5    A    Again, that was one of the policies I provided
 6         to Mr. Evans.  As to the specific questions
 7         that he may or may not have asked about that
 8         particular policy, I'm not aware.  You would
 9         have to ask Mr. Evans.
10    Q    I am not asking about the questions Mr. Evans
11         asked.  What I'm asking about is did the
12         investigation involve trying to find out
13         whether Mr. Mazzola talked to the media?
14    A    Again, I don't know specifically if that was
15         investigated.  Mr. Evans was the one asking the
16         questions.  I do know he asked me for a copy of
17         our media relations policy which I provided to
18         him.  But as to the specific questions he asked
19         about that, I don't know.
20    Q    You really don't know whether this
21         investigation included looking into whether any
22         officer communicated with the media?
23    A    No.  Again, Mr. Evans was conducting the
24         investigation.  As that investigation
25         proceeded, he asked for a copy of our media
```

                    CADY REPORTING SERVICES, INC.

```
 1        relations policy.  I believe he may have
 2        believed that there were violations of the
 3        policy.  I don't know.
 4              So no, again, you would have to ask
 5        Mr. Evans if he was investigating or he thought
 6        that there were violations of that particular
 7        policy.
 8   Q    You continued to stay generally apprised of
 9        what he was investigating, correct?
10   A    Yes.
11   Q    And are you really saying that you don't know
12        whether his investigation included looking into
13        whether someone from your department
14        communicated with the media?
15   A    If he asked for our media relations policy, he
16        may well have been investigating that.  But I
17        did not specifically ask him about that or talk
18        to him about that specific aspect of the
19        investigation.
20   Q    You didn't include that --
21                   MS. SAVOIE:  I'm sorry.  Did you
22        say something?
23                   MR. STRANG:  Yeah.  I've just got
24        to take a five-minute restroom break.
25                   MS. SAVOIE:   Okay.  We're at a
                     CADY REPORTING SERVICES, INC.
```

```
 1         good stop for that.  Let's go ahead and do

 2         that.

 3                        THE VIDEOGRAPHER:  Off the

 4         record.  The time is 2:13.

 5                   (Recess taken.)

 6                        THE VIDEOGRAPHER:  We're back on

 7         the record.  The time is 2:23.

 8    Q    So Chief Kilbane, you've mentioned a couple of

 9         times that Mr. Mazzola retired while this

10         investigation was still ongoing, correct?

11    A    Yes.

12    Q    Why did he retire, to your knowledge?

13                        MR. STRANG:  Objection.

14    A    I wasn't in on the decision.  I don't know why

15         he decided.  It was, you know, a voluntarily

16         decision on his part.

17    Q    So I'm not asking you to read his mind.

18         Obviously you can't do that.  What I'm asking

19         is what information do you have about why he

20         retired?

21    A    None.  I heard from the Mayor that he had

22         decided to retire.

23    Q    Did the Mayor tell you why?

24    A    No.

25    Q    Have you talked to any of your officers who
```

1       have told you what they knew about why he

2       retired?

3    A  No, I have not.

4    Q  And let me ask -- let me back up for a second

5       here.

6          I understand that as an experienced law

7       enforcement officer you're familiar with what

8       hearsay is and you may be weary of it, but this

9       is a discovery deposition.  I'm allowed to ask

10      you things that might lead me to more evidence.

11      So I just want to make sure that you're not,

12      you know, you're not giving me answers based on

13      a belief that you shouldn't say anything about

14      hearsay.

15         And, of course, you can defer to your

16      counsel on my explanation here, but did anyone

17      tell you anything they had heard about why

18      Mr. Mazzola retired?

19   A  No, not that I know.

20   Q  Did you hear any talk around the squad room,

21      any talk in the office about why he retired?

22   A  No.

23   Q  You didn't have any discussions with anyone

24      about why Lenny Mazzola said he retired?

25   A  No.  When an officer retires, they retire.  You

                   CADY REPORTING SERVICES, INC.

```
1        know, we put out an e-mail to the department

2        that on such and such date, this officer is

3        retiring, wish him well, and that's the extent

4        of it.

5             I mean if they talk to their friends and

6        everybody else, that's up to them.  If they

7        talk to me, that's fine.  But, you know, again,

8        I'm not knowledgeable of any conversations of

9        that nature revolving around Mr. Mazzola.

10  Q    Did you ask him why he was retiring in the

11       middle of an investigation where he had just

12       been given a polygraph examination?

13  A    No, I did not.

14  Q    Did you think that the timing of his retirement

15       was related to the timing of the investigation?

16  A    I had no -- he chose to retire.  You know,

17       that's a private decision that every individual

18       makes.  And if they want to share their reasons

19       for it with me, they're welcome to.  If they

20       don't, that's fine too.

21  Q    So despite the timing, you didn't have any

22       discussion with anyone about whether the

23       investigation was the reason that Mr. Mazzola

24       was retiring?

25  A    No.  The Mayor told me that Mr. Mazzola was
```

CADY REPORTING SERVICES, INC.

```
 1              retiring.  That's the first I heard of his

 2              intention to retire.

 3       Q   Did you have a retirement party for

 4              Mr. Mazzola?

 5       A   No, I did not.

 6       Q   Why wasn't there a retirement party for him?

 7       A   Usually it's friends, family or co-workers that

 8              throw a retirement party.  It's not the

 9              department.  Our Deputy Chief just retired a

10              couple of weeks ago and he hasn't had a

11              retirement party.

12       Q   Really?  Was that -- what was his name?  Is it

13              Jim Pollack?

14       A   Jim Pollack.

15       Q   He didn't have a retirement party?

16       A   Nope.

17       Q   Is that because of Covid 19?

18       A   Again, that's a personal decision.  I don't

19              know why.

20       Q   And before Covid 19 was it normal for there to

21              be retirement parties whenever someone retired

22              from your department?

23       A   Since I've been there there have only been a

24              couple of retirements.  I know Officer Kavaras

25              when he retired did not have a retirement
```

                    CADY REPORTING SERVICES, INC.

```
 1          party, but Lieutenant John Smith did when he

 2          retired.  So it's my experience with this

 3          department some do and some don't.

 4               That's was the same when I was with

 5          North Olmsted.  Some officers kept it very

 6          private and didn't want any to-do when they

 7          left and a couple of them threw some pretty

 8          epic bashes when they retired.

 9    Q     So when Mr. Mazzola -- did he send you an

10          e-mail saying he was going to retire?

11    A     He sent an e-mail to the Mayor.

12    Q     Okay.  Did he copy you on it?

13    A     I don't believe so.  I believe Mayor Togliatti

14          informed me of it.

15    Q     Was Lieutenant Mazzola a valued officer in your

16          department?

17    A     All the officers there are valued officers.

18          They all add value to the organization and we

19          do our best to make sure we provide them what

20          they need to continue to be contributing

21          members.  The safety of the community is so

22          important to us, it's vital that we have a team

23          of officers dedicated to that.  And for a long

24          time Mr. Mazzola was very effective doing that

25          in a lot of ways.
```

                    CADY REPORTING SERVICES, INC.

```
 1     Q   He was a Patrol Commander and Lieutenant,

 2         correct?

 3     A   Yes.

 4     Q   And whenever he retired, that created a vacancy

 5         you had to fill, correct?

 6     A   Yes.

 7     Q   Who filled that vacancy?

 8     A   I believe Lieutenant -- well, at the time he

 9         was Sergeant Greg Tenarello finished first on

10         the Civil Service exam, so he was promoted to

11         Lieutenant.

12     Q   Do you know or have you heard whether

13         Mr. Mazzola received an ultimatum to retire or

14         be demoted to patrolmen and added to -- and

15         have his name submitted to the County

16         Prosecutor's Office as a dishonest officer?

17     A   No.

18     Q   So no, you had not heard anyone say that,

19         correct?

20     A   No.  No knowledge of it until it was brought up

21         at somebody's deposition.  I had never heard

22         any such ultimatum.

23     Q   And, yet, you inferred nothing peculiar about

24         the timing of Mr. Mazzola's retirement with

25         respect to this investigation and his
```

                    CADY REPORTING SERVICES, INC.

```
 1        polygraph?

 2    A   Again, the decision to retire is up to the

 3        individual.  It's a private decision.  As to

 4        why they make that decision, that's theirs to

 5        make.  I'm not going to question why they

 6        choose to retire at any particular time.

 7    Q   And in this particular case were you also not

 8        questioning it because it resolved the

 9        investigation that you had?

10    A   No.  I wasn't questioning it because I don't

11        question an individual's private decision to

12        retire.  That's their personal decision.

13    Q   After Mr. Mazzola decided to retire, who

14        alerted Bill Evans or Kevin Butler that the

15        investigation would be over?

16    A   I'm not sure who alerted them, but I know it

17        came after consultation with the Mayor and the

18        Law Director.  I'm not exactly sure who exactly

19        told them, okay, you know, we're going to cease

20        our efforts right now.

21    Q   Did anybody call Bill Evans to tell him the

22        investigation was over?

23    A   I imagine somebody did.  I don't recall doing

24        it.  It may have been the Law Director.

25    Q   Do you have any knowledge of whether Bill Evans
```

```
 1            himself had to call the city and ask what was

 2            going on with the investigation?

 3     A    No, I don't.

 4     Q    Whenever Mr. Mazzola announced that he was

 5            going to retire, did you ask him to stay?

 6     A    No.

 7     Q    Did you consider asking him to stay?

 8     A    Again, when an employee decides to retire, they

 9            make that decision for their own personal

10            reasons and it's not my place to try to

11            influence that decision.  Again, you know, he's

12            a valued employee, but they earned their

13            retirement and they certainly have the right to

14            retire whenever they want to.

15     Q    And that's not what I'm asking.  I'm just

16            asking about communications you had with

17            Mr. Mazzola.  Okay?

18               So did you have any conversations at all

19            with Mr. Mazzola about his retirement,

20            understanding that --

21     A    No, I did not.

22     Q    You sat in on other depositions in this case,

23            correct?

24     A    Yes.

25     Q    In fact, I think you've sat in on every
```

CADY REPORTING SERVICES, INC.

```
 1          deposition in this case, is that right?

 2     A    There have been so many, I'm not sure.  I try

 3          to, but a lot of it may be -- I know on several

 4          of them I've had to pop in and out to handle

 5          things that came up at work, so I may have

 6          missed some bits and pieces here and there.

 7     Q    Did you sit in on former Mayor Togliatti's

 8          deposition last Friday?

 9     A    I did.  And that was one that several times I

10          had to leave the deposition and go take care of

11          some business.  So yeah, I was there for a

12          large part of it, but there was also chunks of

13          it that I missed.

14     Q    Did you disagree with anything former

15          Mayor Togliatti said at his deposition?

16                    MR. STRANG:  Objection.

17     Q    That you heard?

18     A    Nothing that I can think of specifically

19          offhand.  Is there something specific you want

20          to ask me if I agree or disagree with, I would

21          be glad to answer it.

22     Q    I'm just asking about your general impressions

23          and whether there was anything that stuck out

24          in your mind as something that you didn't think

25          was accurate or an opinion that you disagreed
```

CADY REPORTING SERVICES, INC.

```
 1            with based on what you heard when you were

 2            present.  Is there anything like that?

 3                        MR. STRANG:  Objection.

 4       A    Again, generally without specifics, no, not

 5            that I can think of without -- and, again,

 6            without reviewing it.

 7       Q    Did you call your sister, Cathy, about

 8            Mr. Togliatti's deposition?

 9       A    No.

10       Q    Your sister is Cathy Kilbane, the attorney at

11            Sherwin Williams, correct?

12       A    She's retired from Sherwin Williams.

13       Q    Well, she was at Sherwin Williams, correct?

14       A    Yes.

15       Q    She was an attorney there?

16       A    Yes.

17       Q    She's well respected in the legal community,

18            correct?

19       A    Yes.

20       Q    And are you close with your sister, Cathy?

21       A    Yes, I am.

22       Q    Do you talk to her often from your office?

23       A    Sometimes from my office.  Sometimes from --

24            yeah.  Depends on where I am and if she calls

25            or I need to call her for something.
```

                    CADY REPORTING SERVICES, INC.

```
 1    Q   Have you spoken with her in the past week about

 2        your deposition?

 3    A   I believe I let her know that I had a

 4        deposition scheduled.

 5    Q   Have you spoken with her in the last week about

 6        the progress of discovery in this case?

 7                    MR. STRANG:  You know, Jessica,

 8        before we get into some of this stuff he talked

 9        to his sister about, I haven't talked to him

10        about it.  It's his sister.  She's also an

11        attorney.  I don't know what capacity she acts

12        as personal counsel or advisor to him.  I'm not

13        a part of that relationship.  But I don't want

14        to -- I suspect that there's probably some sort

15        of professional --

16    A   Yes.  With what Mr. Strang is saying, I have

17        asked my sister for professional advice in her

18        capacity as an attorney who's very conversant,

19        obviously, with employment law and concerns of

20        that matter.

21            I've asked her for advice, you know, with

22        potential ramifications of things that may or

23        may not happen with this particular case and

24        she has given me advice and, obviously, all

25        those would be privileged conversations.
```

                    CADY REPORTING SERVICES, INC.

222

| | | |
|---|---|---|
| 1 | Q | Oh, okay. So whenever I asked you at the |
| 2 | | beginning of this deposition who your attorneys |
| 3 | | were in this case, you said it was just |
| 4 | | Mr. Strang, correct? |
| 5 | A | Yes, for the purposes of this case here. You |
| 6 | | know, for potential ramifications of any |
| 7 | | outcomes of this case or any issues of that |
| 8 | | matter, then I would obviously consult my |
| 9 | | sister. You know, there were some areas where, |
| 10 | | you know, Mr. Strang -- |
| 11 | | MR. STRANG: Don't get into that. |
| 12 | A | I won't get into specifics. |
| 13 | Q | Let me cut you off right here, because I have a |
| 14 | | feeling you're going into territory that might |
| 15 | | be privileged. Okay? And I'm not trying to be |
| 16 | | rude. I just don't want you to accidentally |
| 17 | | say anything that might be privileged because |
| 18 | | that would be improper. |
| 19 | A | Okay. |
| 20 | Q | What I want to be really clear on is this. Is |
| 21 | | at the beginning of the deposition I asked you |
| 22 | | who your attorney was in this case and you said |
| 23 | | Mr. Strang. And I asked you if you had |
| 24 | | consulted with any other attorneys about this |
| 25 | | case and you said no. And so I want to be very |

CADY REPORTING SERVICES, INC.

```
 1          clear, because it was my understanding based on

 2          that that any conversations you had with your

 3          sister were not in any kind of capacity where

 4          she represents you.

 5               So what I want to understand now is is

 6          that correct or incorrect?  Please explain to

 7          me whether you have an attorney/client

 8          relationship with your sister?

 9     A    Okay.  Let me clarify my answer.  Where I

10          didn't talk to my sister to specifically

11          represent me in the case that Mr. Strang is

12          representing me in, I did consult her about --

13                    MR. STRANG:  Don't talk about --

14     A    Yeah.  I consulted her about peripheral issues

15          surrounding it.  So, again, my mistake.  I

16          didn't assume those were directly applicable to

17          this case, but, you know, peripherally they may

18          well be, so let me correct my testimony.

19               I did consult my sister.  She did, you

20          know, provide me advice as to things that may

21          somewhat be related to this case.

22     Q    Okay.  And you talked to your sister in her

23          capacity as an attorney representing you as a

24          client; is that what you're saying?

25     A    She provided me legal advice, so I believe so.
```

CADY REPORTING SERVICES, INC.

1    Q    Do you consider her your attorney?

2    A    Yes.

3    Q    Other than conversations you had with your

4         sister about this case in that capacity where

5         she is your attorney and you consider her to

6         represent you in some capacity, have you had

7         any actual conversations with your sister in a

8         capacity where she does not represent you about

9         this case?

10   A    Not about this case, no.  We've had factual

11        conversations about other things.

12   Q    Are you aware of people overhearing any

13        conversations you've had with your sister,

14        Cathy, that take place in your office?

15   A    No, I'm not.

16   Q    Is it correct that Mary Cox sits right outside

17        of your office?

18   A    Yes, she does.

19   Q    And do you have an understanding of how well

20        she can or cannot overhear conversations that

21        take place in your office?

22   A    No, I don't.

23   Q    Has she ever mentioned to you that she could

24        overhear something that had just happened in

25        your office?

                    CADY REPORTING SERVICES, INC.

```
1    A   Not to my knowledge.  She may have, but I don't

2        recall any specifics.

3    Q   Based on your knowledge of the kind of sound,

4        you know, kind of the acoustics of your office

5        and that area outside of it where she sits, do

6        you think that she can overhear conversations

7        you have with the door open?

8    A   I don't know.

9    Q   She's never told you?

10   A   No.

11   Q   Do you have any knowledge of Mary Cox telling

12       guys around the station about things she's

13       overheard you talk about in your office?

14   A   No, not to my knowledge.

15   Q   Have any officers ever come to you and told you

16       that Mary Cox told them things she overheard

17       you talking about?

18   A   No.

19   Q   And speaking of Mary Cox, you sat in on her

20       deposition too, correct?

21   A   Yes.

22   Q   And were you in the same room with her

23       physically during her deposition?

24   A   I believe so.

25   Q   And recognizing that this is an usual time,
```

CADY REPORTING SERVICES, INC.

1          because I believe her deposition took place

2          right around the time everything was kind of

3          going into quarantine and some people were and

4          some people weren't, normally we would all be

5          in a room together, but we were doing the

6          deposition by Zoom, right?

7     A    Yes.

8     Q    And you were in the room with Mary, right?

9     A    I believe so, yes.

10    Q    You're Mary Cox's boss, right?

11    A    Yes.

12    Q    What is her title?

13    A    Administrative supervisor.

14    Q    And to your knowledge, she needs this job to

15         support her family, right?

16    A    I don't know whether or not she needs it to

17         support her family.  I know her husband, Don,

18         works.  As to the finances of her family, I'm

19         not familiar with it.

20    Q    So she's never made any comments about that to

21         you?

22    A    No.

23    Q    Has anyone ever told you -- let me back up for

24         a second.

25              Whenever Mr. Mazzola retired in the

                    CADY REPORTING SERVICES, INC.

```
 1        middle of an investigation, did you want him to
 2        sign some kind of waiver or release so that he
 3        could not later bring an employment-related
 4        claim against the city?
 5   A    I never asked him to -- I never brought that up
 6        with him.
 7   Q    And I'm not asking you whether you brought that
 8        up with Mr. Mazzola.  I'm asking is that
 9        something that crossed your mind as something
10        you would like to happen at the time he
11        retired?
12   A    Again, I had a discussion, but it was with the
13        Law Director and I believe there's privilege
14        involved there, so I'm not sure I can speak
15        about what was discussed or what was proposed
16        or who made any discussions about --
17   Q    Right.  And I'm not trying to be rude and
18        interrupt you and make hand gestures where I'm
19        holding my fingers out in an X.  I just don't
20        want you to say anything that you spoke with
21        legal counsel about right now.
22             What I'm asking about is what were you
23        thinking.  Okay?  What was your thought -- I'm
24        not asking about any conversations right now.
25        Okay?
```

CADY REPORTING SERVICES, INC.

```
 1              I mean you're the Chief of Police.  You

 2         have a sister who's an attorney.  You teach

 3         courses on the law.  Did you think in your mind

 4         that you would like to see Mr. Mazzola sign a

 5         waiver or release whenever he retired?

 6    A    No.

 7    Q    That never crossed your mind?

 8    A    No.  I didn't say it didn't cross my mind, but

 9         I didn't want to or like to or desire to.

10         Obviously, you know --

11    Q    Did it cross your mind?

12    A    It was one of a list of subjects that were more

13         of a checklist that -- and, again, this was

14         part of a discussion with the Law Director

15         that's privileged, so.

16    Q    I'm not asking you about any discussions.

17         Okay?  So just please note that.  The questions

18         I'm trying to ask you about right now are

19         solely what you were thinking about, what was

20         inside your head, not anything you talked about

21         with anyone.  Okay?

22              So what I want --

23                   MR. STRANG:  Yeah.  I'm going to

24         even caution you to not start talking about a

25         topic and then say, "But that's something I
```

CADY REPORTING SERVICES, INC.

```
 1              talked about with the Law Director."  That's

 2              getting into stuff that you got into with the

 3              Law Director.

 4      A       Okay.  All right.  In my head there was a

 5              checklist of items that should be considered or

 6              talked about or addressed when an employee

 7              separates from employment.  And I discussed

 8              that checklist with the Law Director to get

 9              input about it, about my thoughts.

10      Q       And I'm not trying to be difficult with you

11              here, but please don't tell me about your

12              conversations with the Law Director.  That is

13              protected by the privilege.  Okay?

14                          MR. STRANG:  Yeah.  Even the,

15              "Yes, they did."  And, "I talked to the

16              Law Director about it", don't even allude to

17              your discussions with the Law Director.

18                  I think she's trying to limit her

19              question to what was going on in your mind to

20              get around -- to not involve any discussions

21              you had with the Law Director, but even noting

22              that there would be a potential privilege with

23              the subject matter of the conversation.  I

24              don't think either of us even want you to get

25              into subject matter of any conversation you had
```

 1          with the Law Director.

 2                    THE WITNESS:  Okay.

 3     Q    Right.  I'm solely interested in your thoughts

 4          at that time.  Okay?

 5               So it crossed your mind, correct?

 6     A    There was a checklist of sorts of things when

 7          someone separates from employment that crossed

 8          my mind, and whether or not a -- pardon?

 9     Q    Go ahead.  Sorry.  I didn't realize you were --

10     A    Oh, yeah.  Any time when someone separates from

11          employment, there's a list of things that I

12          consider to make sure that, you know,

13          everything goes smoothly.  And, you know, among

14          those things are do we need any paperwork for

15          retirement.  What's the insurance, you know,

16          situation.  What sort of materials or keys have

17          to be turned in.  What sort of departmental

18          property.  What do they need going out the

19          door.

20               With police officers, one of the things

21          we do is we issue them their badge and firearm

22          upon retirement.  But that has to be done

23          through legislation, so I have to request

24          legislation for that.  And whether any releases

25          of any type of liability or releases for

                    CADY REPORTING SERVICES, INC.

1      insurance or releases for, you know, anything

2      else that the department needs, there's a form

3      that they have to fill out to meet the federal

4      requirements to transfer the firearm from the

5      department to the individual retiring officer.

6      So we need the ATF regulations.

7           So there's a whole plethora of things

8      that I have to consider when an employee

9      separates from our service either via

10     retirement or any other reason, and whether or

11     not a release of liability is needed is one of

12     those considerations among them.

13  Q  Why would an employee who was voluntarily

14     retiring require a release or waiver of

15     liability?

16  A  Again, generally speaking, every single

17     departure is different.  You know, I've seen

18     some officers that have departed with, you

19     know, potential liability issues hanging over

20     their head.

21          And, again, this is, you know, something

22     that we learn about at the Chiefs conference

23     every year where, you know, hindsight always

24     being 2020 where a Chief says, hey, maybe I

25     should have done this differently or done that

                CADY REPORTING SERVICES, INC.

```
 1          differently.  That's where this entire list
 2          comes from.
 3               So, you know, there's been situations
 4          that other Chiefs have been in where they said,
 5          there were issues we should have considered and
 6          maybe gotten a signed off release or had the
 7          officer sign off on possession of certain
 8          property or something where they wish they
 9          would have done it differently before.
10     Q    You mentioned two officers that you knew of who
11          had previously retired whenever I was asking
12          you about office retirement parties.  Did
13          either of those officers sign waivers or
14          releases of liability when they retired?
15     A    No.  Neither did lawsuit Mazzola.  None of them
16          did.
17     Q    Right.  And so whenever Lieutenant Mazzola
18          retired, he didn't sign any kind of waiver or
19          release regarding any liability that the city
20          might have for his separation from employment,
21          correct?
22     A    Not as far as I know.
23     Q    And did you ever have any discussions with
24          anyone where the conversation did not include a
25          lawyer about your checklist of items, including
```

CADY REPORTING SERVICES, INC.

```
 1            the possibility of a waiver or release of

 2            liability?

 3     A    I know I discussed some of these items with

 4            Lieutenant Kroger who is our Administrative

 5            Lieutenant.  He's in charge of, you know,

 6            everything physical in the department.  So any

 7            keys and equipment and radios and firearms

 8            would have to be turned into him.

 9                 And I know with Deputy Chief Pollack, he

10            processes the firearms releases and things of

11            that nature.  So I may or may not have

12            discussed the entire checklist with either or

13            both of those officers.  And, again, as to

14            which specifics, I can't recall exactly what we

15            talked about.

16     Q    As we sit here right now, do you have any

17            recollection of whether you discussed with

18            either of those two whether Lieutenant Mazzola

19            should sign a waiver or release of liability

20            when he separated from employment?

21     A    Again, I can't remember the specifics.

22     Q    And, to be clear, whenever I was just asking

23            you that question, I was not asking about a

24            release of liability about firearms or anything

25            like that.  Do you understand that?
```

CADY REPORTING SERVICES, INC.

1    A   Yes.

2    Q   And so what I was asking about was specifically

3        regarding a release or waiver of liability

4        for the city for circumstances regarding

5        Mr. Mazzola's separation of employment.  You

6        understood that when I was asking that before,

7        correct?

8    A   Yes.

9    Q   Okay.  Just making sure.  As I replayed your

10       answer in my head, I wanted to make sure that

11       we were communicating clearly.

12            And so, to your knowledge, did

13       Mr. Mazzola sign a waiver or release of any

14       kind at the time he retired releasing anyone

15       from liability, whether the city or you or the

16       Mayor anyone?

17   A   I was not present when he did the separation

18       papers.  I was out of town.  Deputy Chief

19       Pollack handled that.  But, again, I'm not

20       aware of any such liability waiver that you're

21       speaking specifically of being signed by him.

22   Q   Okay.  So you haven't seen any kind of waiver

23       signed by Mr. Mazzola at the time he retired?

24   A   No, I have not.

25   Q   And you haven't heard anyone say that there is

                 CADY REPORTING SERVICES, INC.

```
 1           one, correct?
 2     A    No.
 3     Q    I'm going to ask you some questions about
 4           Defendant's Exhibit number 3.
 5                      MS. SAVOIE:   Alex, if you would
 6           not mind, can you please put that up on the
 7           screen?  It's Defendant's Exhibit number 3
 8           distinct from Plaintiff's.
 9                      THE VIDEOGRAPHER:  Okay.  Give me
10           one second.
11                      MS. SAVOIE:   Thank you.
12     Q    Chief Kilbane, do you recognize this document
13           that's marked Defendant's Exhibit 3?
14     A    Yes, I do.  Yes.
15     Q    Is it an e-mail from you to police sent
16           Thursday, January 15, 2015 at 2:11 p.m.?
17     A    Yes.
18     Q    Is the subject line, "Personal electronic
19           devices and recording"?
20     A    Yes, it is.
21     Q    In 2015 what was your usual practice or
22           procedure for publicizing new orders or
23           policies to your police officers?
24     A    Well, it's dependent on the type of policy.  If
25           it was a specific directive like this directed
```

CADY REPORTING SERVICES, INC.

```
 1            at one particular device, we would put out a
 2            directive like this.  If it was a policy for an
 3            entire new policy section, like use of force or
 4            pursuits or domestic violence, we would create
 5            a new General Order for it.
 6       Q   So is there a difference for a directive and a
 7            General Order?
 8       A   Other than General Orders are usually broader
 9            in subject matter in topics that they cover and
10            directives are usually more specific and
11            narrow.  They have the same force and effect.
12       Q   Did you ever have a practice of having officers
13            read and physically sign off on directives as
14            they were added?
15       A   No.  Generally the directives are distributed
16            to all personnel.  You know, they're confirmed
17            by the e-mail system that they received them.
18            We do have a General Order that requires the
19            officers to check their e-mail on a regular
20            basis and read and understand departmental
21            e-mails and they have an affirmative
22            responsibility to contact a supervisor if they
23            don't understand or have questions about any
24            specific directives received via e-mail.
25       Q   Has any officer ever been disciplined for
```

                    CADY REPORTING SERVICES, INC.

| 1 | | violating this directive that's in |
| 2 | | Defendant's Exhibit 3? |
| 3 | A | No. |
| 4 | Q | Has any officer ever been investigated for a |
| 5 | | violation of this directive? |
| 6 | A | No. |
| 7 | Q | But you do have knowledge that officers conduct |
| 8 | | or make recordings on their personal devices, |
| 9 | | right? |
| 10 | A | No.  This is the first I became aware that an |
| 11 | | officer had violated this particular directive. |
| 12 | Q | And no one has ever told you about other |
| 13 | | officers making recordings? |
| 14 | A | Not to my knowledge and not since this |
| 15 | | directive was issued. |
| 16 | Q | Would it surprise you if other officers were |
| 17 | | regularly making recordings of meetings in the |
| 18 | | police department? |
| 19 | A | It would, because there's a directive, you |
| 20 | | know, prohibiting it, obviously, unless they |
| 21 | | follow it and if I became aware of it, it would |
| 22 | | be addressed. |
| 23 | Q | If you became aware of it, would you enforce |
| 24 | | the directive with that particular officer who |
| 25 | | made a recording? |

CADY REPORTING SERVICES, INC.

```
 1      A    Yes.

 2      Q    What is appropriate discipline for making a

 3           recording?

 4      A    It would depend on the individual

 5           circumstances.  You know, as I said before,

 6           every investigation, every disciplinary issue

 7           is very unique with its circumstances.  And,

 8           you know, as such, they each have to be

 9           investigated on their own before a disciplinary

10           decision could be made.

11      Q    Would it depend on how the recording was used?

12      A    Again, it would depend on the entire context of

13           the investigation.

14      Q    Right.  And I'm trying to understand what

15           factors would be relevant to you for that

16           context.  Okay?

17                So would the way the recording was used

18           be relevant to you as consideration in that

19           context?

20      A    It depends again, because it says you cannot

21           distribute it outside of the department.  So if

22           somebody used it on somebody outside the

23           department or if they distributed it outside

24           the department, that would be a specific

25           violation of the policy.
```

                    CADY REPORTING SERVICES, INC.

```
 1    Q   Can you state for sure that you would terminate
 2        someone for violating this policy?
 3    A   No.  Again, every single disciplinary
 4        investigation is unique.  You can't make a
 5        determination of what you're going to do before
 6        you complete the investigation.
 7    Q   Then as you sit here today, you can't say that
 8        you would fire any person who violated this
 9        directive, correct?
10    A   I would say that any person who violated this
11        directive would get investigated and
12        appropriate discipline would result from the
13        investigation.
14    Q   Right.  And what I'm trying to understand is
15        it's not an automatic termination for violating
16        this policy, correct?
17    A   It's not -- there's no -- the determination is
18        a form of discipline and that disciplinary
19        decision is not made until after the
20        investigation.  And it depends on the
21        individual circumstances of the particular
22        investigation, not the policy.
23    Q   Right.  And so I just want you to answer my
24        particular question.  Okay?
25            And my question is as we sit here today,
```

```
 1            would you -- can you -- would you fire someone

 2            automatically for violating this policy after

 3            conducting an investigation and determining

 4            that they had violated it?

 5     A     I can't make that speculation one way or the

 6            other.

 7     Q     But there's no rule saying that you would need

 8            to terminate someone if they violated this

 9            directive, correct?

10     A     Again, I'm not going to speculate as to what

11            would happen if somebody violated it.  It

12            doesn't say the policy -- it doesn't say you're

13            fired if you violate the policy.  It doesn't

14            say that.

15     Q     Right.  And what I'm saying is there's no rule,

16            written or otherwise, that would require you to

17            fire someone for violating this directive,

18            correct?

19     A     Not as far as I'm aware.

20     Q     You have the discretion to formulate

21            appropriate discipline after an investigation

22            and determination, correct?

23     A     I can recommend appropriate discipline.  If

24            it's internal discipline, if it's counseling or

25            training, I can impose that.  Anything
```

CADY REPORTING SERVICES, INC.

1          punitive, such as a suspension or a

2          termination, I could only recommend that to

3          the Mayor and the Mayor would have to make the

4          decision as to whether or not that would be

5          appropriate.  The Mayor has the final say on

6          what the appropriate discipline is.

7     Q    Right.  So the Mayor has final say, but you

8          have discretion on what you can recommend to

9          the Mayor based on the factual context as you

10         described before, correct?

11    A    Yes.

12    Q    Have you ever suspected that officers made

13         recordings at the police department even if you

14         don't know or have any specific information to

15         that effect?

16    A    No.

17    Q    Whenever you sent out this e-mail of

18         January 15, Defendant's Exhibit 3, did you do

19         anything in advance to insure that it was a

20         lawful directive?

21    A    Yes.  What I did was the background behind

22         this, we were one of the agencies that was

23         involved very heavily in the pre-planning for

24         the Republican National Convention.  And, you

25         know, as such, we knew well in advance that we

1     were going to have several delegations staying

2     here.  And there were questions that were

3     raised about some officers, whether or not we

4     would have body cams, and some agencies had

5     them and some didn't and some officers want to

6     know for their own protection could they record

7     interactions with crowds or protesters on their

8     own personal devices.

9        So I did some research on it.  I looked

10     at the International Association of Chiefs of

11     Police model policy.  I also checked with some

12     of my colleagues in the Cuyahoga County Police

13     Chiefs Association to get their input if any of

14     them had personal electronic device use

15     policies like this, looking at several model

16     policies.  And this was based on some of those

17     policies that were already implemented.

18        And usually I do this -- again, I can't

19     recall specifically when it happened, but I

20     will send it to the Law Director for review and

21     have him review it and say, "Hey, is there any

22     issues?  Are there any legal issues?  Is this

23     an okay policy?"  And, you know, if it is,

24     we'll go ahead and implement it.

25  Q  And do you have records of the communications

1    where people sent you their personal electronic

2    device recording policies or model policies?

3  A  Not offhand.  It was in 2015, so I don't know,

4    you know, where those particular pieces of

5    correspondence may be.

6  Q  Well, this is also an e-mail from 2015, so do

7    you know if you still have access to e-mails

8    from then?

9  A  Yeah.  I imagine the IT department does.

10  Q  Do you remember who sent you model policies

11    that you used to create this one?

12  A  No.  It's very common, you know, with the

13    Chiefs, we send these requests back and forth

14    all of the time for various different policies

15    and procedures and situations, so I don't

16    recall exactly who was helping me out with this

17    or providing me with their stuff.

18  Q  Did you take what other Chiefs gave you and

19    modify it to create this or did you just use

20    one of the other policies that was sent to you?

21  A  I can't recall.  If there were modifications,

22    they were fairly minor.  You know, again, I

23    don't recall the exact process behind this

24    policy, but I'm fairly certain it was already

25    somebody else's existing policy that maybe just

CADY REPORTING SERVICES, INC.

```
 1            needed a couple little tweaks or language

 2            changes to fit what we needed for our purposes.

 3       Q    And so this was -- you sent out this directive

 4            based on the upcoming Republican National

 5            Convention, correct?

 6       A    Yeah.  I'm pretty sure that's why the whole

 7            thing came up.  I know there was a question

 8            about body cams and that's what, you know,

 9            caused me to start, you know, looking into it

10            to address it before it became an issue.

11       Q    Did you consider that it would include all

12            recording using personal electronic devices at

13            that time or did you consider that it would

14            only apply to the types of situations that you

15            mentioned the officers raised that came up with

16            the RNC?

17       A    No.  It was specifically meant to encompass any

18            recording devices an officer may or may not

19            use.

20       Q    Did you have any meetings about this directive

21            when it was issued?

22       A    I don't think we had any specific meetings

23            about this.  It may have been discussed at a

24            staff meeting or a supervisors meeting.  I

25            can't recall.
```

```
 1    Q   Did you do anything to evaluate whether this

 2        kind of directive prohibiting employees from

 3        making recordings on personal devices would

 4        violate their First Amendment rights?  And,

 5        again, I'm not asking you for any conversations

 6        that were privileged, but did you do anything

 7        to evaluate that?

 8    A   I imagine this would be one of the items that

 9        the Law Director would consider when he, you

10        know, evaluates a policy as to whether or not

11        it's acceptable.  Whether that was done, you

12        know, I --

13    Q   I'm not asking you to speculate on what the

14        Law Director did or didn't do.  I'm asking if

15        you did anything to evaluate whether this

16        violated First Amendment rights for your

17        officers?

18    A   No.  I deferred that analysis to the

19        Law Department.

20    Q   At that time were you teaching Garcetti in the

21        course that -- I'm sorry.  What college was it

22        where you taught that course?  Was it Strayer?

23    A   Strayer University.  Yes, Strayer.

24    Q   Yes.  At that time were you teaching Garcetti

25        at Strayer University?
```

CADY REPORTING SERVICES, INC.

```
 1   A   I may or may not.  I don't know.  I can't
 2       remember exactly which courses I was teaching
 3       in winter quarter of '15 when this was written.
 4   Q   At the time this was written, did you have
 5       knowledge of employees First Amendment --
 6       public employees First Amendment rights?
 7   A   I had some knowledge based on, you know, what I
 8       knew and what I had learned.  But, again, as to
 9       an analysis as to the constitutionality of it,
10       I would defer to the Law Department to make
11       that analysis.
12   Q   Okay.  So you would defer to the Law
13       Department, but I guess I'm still a little
14       confused on what your answer was a minute ago.
15       And forgive me, please.  My computer blipped
16       out a little while you were answering.
17           Did you say that you did or you did not
18       think about the constitutionality of this
19       before you deferred it to the Law Department?
20   A   I did not see anything that brought any
21       constitutional concerns to my knowledge
22       regarding it.  But, again, I'm not an attorney.
23       I'm not a constitutional specialist.  That's
24       why I have these policies reviewed by the
25       Law Department because they are able to provide
```

```
 1          the input if they see potential issues or
 2          something that, you know, we need to address
 3          from that perspective.  It's not my area of
 4          expertise.
 5    Q     Okay.  Are you familiar with police
 6          accountability groups who film the police on a
 7          regular basis?
 8    A     I've heard about them.
 9    Q     Are they active in Independence?
10    A     I believe we've had maybe a run-in or two with
11          them.
12    Q     And do you have an understanding of whether
13          they assert that it is their First Amendment
14          free speech right to film or record the police?
15    A     I have no knowledge of what they assert their
16          rights are or aren't.
17    Q     I'm just trying to understand what your
18          knowledge is on this.
19              So you haven't heard anything about
20          whether these police activists who like to
21          film the police assert that it's their
22          First Amendment right to do so?
23    A     I imagine they do.  We've never had any issues
24          with that.  If they had been filming our
25          officers at any point in time, we've done
```

CADY REPORTING SERVICES, INC.

 1           nothing to impede that or stop that.
 2      Q    Right.  And have you heard about issues with
 3           people recording officers from neighboring
 4           communities?  You just mentioned we haven't had
 5           that, but have you read news stories about
 6           police activists filming people in other
 7           communities?
 8                      MR. McLANDRICH:  Objection.
 9      A    Yes.
10      Q    And whenever you read coverage about other
11           localities dealing with these activists filming
12           police, police accountability groups, however
13           they characterize themselves, have you read
14           about how they say it's their First Amendment
15           right to film the police as citizens?
16      A    Basically I believe that if they're, you know,
17           in a public place and they're not directly
18           impeding the investigation and interfering with
19           it, they believe they have the right to film
20           the police.
21      Q    And do you support the idea of police
22           accountability generally?
23      A    Absolutely.  All the police officers that work
24           in Independence need to be accountable.
25      Q    You want your officers held to a high standard,

                    CADY REPORTING SERVICES, INC.

1      correct?

2   A   Yes.

3   Q   Chief Kilbane, you mentioned earlier that you

4      don't have any knowledge of Mary Cox being able

5      to overhear conversations that happen in your

6      office.  Since we discussed that have you had

7      the opportunity to remember any instances where

8      someone has told you that Mary Cox overheard

9      something that happened in your office?

10  A   Not that I can recall.

11  Q   If Mary Cox told one of your officers that she

12     overheard you yelling that Leonard Mazzola

13     should have signed a release or waiver of

14     employment-related liability before he retired,

15     would that be correct?

16  A   I have no knowledge of that.  No.

17  Q   Have you ever told anyone that you thought

18     Leonard Mazzola should have signed a release of

19     liability at the time he retired from the city

20     of Independence?

21            MR. STRANG:  And I'm cautioning

22     you not to -- to the extent that you did talk

23     about that with the Law Director, I'm just

24     cautioning you not to even mention if the

25     general topic was discussed.

                CADY REPORTING SERVICES, INC.

```
 1                    THE WITNESS:  Okay.

 2                    MR. STRANG:  I'm not saying if

 3          you did one way or another, but --

 4     A    No.

 5     Q    And I'm not asking any questions about who you

 6          may have said this to, but have you ever been

 7          in your office and communicated to anyone

 8          loudly in any way that Mr. Mazzola should have

 9          signed a waiver or release at the time he

10          retired?

11     A    Not to my knowledge.

12     Q    So if Mary Cox told someone that, do you have

13          any reason to believe she would -- I guess do

14          you know any reason she would have to make that

15          up?

16                    MR. STRANG:  Objection.

17     A    You would have to ask Mary Cox that.  Again, as

18          I said before, I have no knowledge of that.

19     Q    Well, I think you know that I did ask Mary Cox

20          that in her deposition because you were

21          present.  And so I'm asking you, do you know of

22          any information that would motivate Mary Cox to

23          say that if it wasn't true?

24     A    No.

25     Q    Do you know of any information about why any
```

<div align="center">CADY REPORTING SERVICES, INC.</div>

```
 1        officers would say that Mary Cox overheard you

 2        yelling that Mr. Mazzola should have signed a

 3        waiver or release when he retired if that

 4        wasn't true?

 5    A   No.

 6    Q   Do you know of any officers that have any kind

 7        of vendetta against you who would make

 8        something like that up?

 9    A   No.

10                    MR. STRANG:  Objection.

11    Q   Do you know if anyone ever told Mr. Mazzola

12        that if he retired, the records of the

13        investigation would not be placed in his

14        personnel file?

15    A   No.

16    Q   In fact, are the records of the investigation

17        included in Mr. Mazzola's personnel file as it

18        is currently composed today?

19    A   I believe the only thing regarding the

20        investigation that is in his personnel file is

21        the results of the polygraph test.

22    Q   When were those added to his personnel file?

23    A   Sometime after this lawsuit was initiated.

24    Q   Why were they added to his personnel file after

25        he was no longer employed?
```

CADY REPORTING SERVICES, INC.

```
 1    A    That's a privileged conversation.  I'm sorry.
 2    Q    Okay.  So who's responsible for personnel files
 3         in your department?
 4    A    I am.
 5    Q    So you were the one who had to add the
 6         polygraph results to the personnel file,
 7         correct?
 8    A    Yes.
 9    Q    And other than any privileged conversation you
10         may have had about this, what facts can you
11         tell me about why you added that to his file?
12    A    Privileged communication.  I'm sorry.
13    Q    There are no other -- I guess other than a
14         privileged communication, there are no other
15         facts you can provide to me to explain why that
16         was added?
17    A    That is correct.
18    Q    Let me ask you this.  Did you want to add that
19         to his personnel file?
20    A    Again, I had no desire one way or the other.
21    Q    Do you just in your personal opinion without
22         considering anything privileged that may have
23         been said to you, in your opinion, do you think
24         that those results should be in his personnel
25         file?
```

CADY REPORTING SERVICES, INC.

```
 1                         MR. STRANG:  Objection.

 2    A   I think they should be in there?

 3    Q   Yeah.

 4    A   That would be a result of a privileged

 5        communication, so I really can't answer that.

 6    Q   I'm not asking for anything about any

 7        privileged communication or anything about

 8        privileged communication you had on this topic.

 9        I'm saying that you, in your opinion as

10        Mr. Mazzola's former supervisor, his former

11        boss, do you think those results should be in

12        his personnel file?

13                         MR. STRANG:  And, again, I'm just

14        going to admonish your answer not to have any

15        legal opinions or information that you have

16        gleaned from any conversation with any

17        attorney.  Okay?

18    A   I have no personal opinion one way or the other

19        about whether or not they should be in there.

20    Q   Really?  You don't have any opinion on whether

21        those should be in there?

22    A   No personal opinion whatsoever whether or not

23        they should or should not have been in there.

24    Q   As we sit here right now, are you aware that

25        Mr. Mazzola has been seeking other employment
```

                   CADY REPORTING SERVICES, INC.

| | | |
|---|---|---|
| 1 | | since his retirement? |
| 2 | A | Yes.  I heard that on his deposition. |
| 3 | Q | And do you think it could be harmful to him |
| 4 | | that the polygraph results are now in his |
| 5 | | personnel file as he seeks other employment? |
| 6 | A | I don't know.  That would be up to a |
| 7 | | prospective employer. |
| 8 | Q | Was that something that you considered at the |
| 9 | | time you added this to his personnel file? |
| 10 | | Again, not asking for any privileged |
| 11 | | conversations.  You personally.  Did you think |
| 12 | | about that? |
| 13 | A | Again, I had no opinion one way or the other or |
| 14 | | any consideration one way or the other as to |
| 15 | | whether or not they should or should not be in |
| 16 | | there. |
| 17 | Q | Other than the polygraph results -- let me ask |
| 18 | | you this. |
| 19 | | When you say the polygraph results are in |
| 20 | | his file, what specific documents are included |
| 21 | | in that? |
| 22 | A | The letter that Mr. Butler sent I believe that, |
| 23 | | you know, explained the results.  I believe it |
| 24 | | was one of your exhibits.  And also the |
| 25 | | numerical reports that gave the scoring on each |

CADY REPORTING SERVICES, INC.

1       of the three individual questions that

2       indicated deception, I believe that was in the

3       packet that Mr. Evans sent over.

4    Q  Did you include Mr. Evans' entire packet, the

5       200 something pages that comprised the exhibit

6       I sent over or just the report of Mr. Evans?

7    A  Just the report.  I don't believe Mr. Evans

8       sent the actual graphs over that are included

9       in the exhibit here.  I don't think those are

10      in the personnel file.  I believe it's just the

11      cover letter and the three -- the numerical

12      pages with the scoring and the explanation of

13      the scoring.

14   Q  Do you think that the question of whether the

15      City of Independence requires its police

16      officers to issue a certain number of traffic

17      citations is a matter of public concern?

18                  MR. STRANG:  Objection.

19   A  It would depend on a particular, you know,

20      individual context of how it's raised and how

21      it's brought up, you know.  So, again, it would

22      depend.  It depends.  I wouldn't know one way

23      or the other without the specific context.

24   Q  And so the specific context is a situation

25      where a police department is purportedly

                 CADY REPORTING SERVICES, INC.

1          requiring its officers to write a certain

2          number of tickets to residents or

3          non-residents.  Can you tell me a situation

4          where that wouldn't be a matter of public

5          concern for citizens?

6                        MR. STRANG:  Objection.

7     A    No.  I can't tell you one way or the other.

8     Q    Really?  You don't have any thought or opinion

9          on that?

10                       MR. STRANG:  Objection.

11    A    No.  No.  Other than, you know, we need to hold

12         our officers accountable to make sure they're

13         doing their jobs keeping the city safe and

14         doing what they need to do to earn what the

15         city pays them.

16    Q    So do you think police accountability is a

17         matter of public concern?

18                       MR. STRANG:  Objection.

19    A    Yes, it is.

20    Q    And would you consider questioning whether or

21         not a performance standard constitutes a

22         traffic ticket quota or an appropriate

23         performance standard is a matter of public

24         concern?

25                       MR. STRANG:  Objection.  Calls

                    CADY REPORTING SERVICES, INC.

```
 1            for a legal conclusion.

 2    A    That's a legal opinion I'm not qualified to

 3         make.

 4    Q    I'm not asking for a legal opinion.  I'm asking

 5         if you think this is something that citizens

 6         would be concerned about?

 7    A    You would have to ask the citizens.

 8    Q    Well, you're a citizen.  Are you a citizen of

 9         the United States?

10    A    Yes, I am, last time I checked.

11    Q    Yeah.  And so do you think that the question of

12         whether a performance standard includes a

13         traffic ticket quota or includes a minimum

14         number of citations as part of a broader more

15         appropriate performance standard is something

16         that citizens would be concerned about?

17                    MR. STRANG:  Objection.

18    A    Speaking as a citizen, what I would be

19         concerned about is -- and, fortunately, I live

20         in Independence, which is one of the safest

21         cities in the country.  And as a citizen I

22         would be concerned in maintaining that safety.

23         And part of that is I would be concerned that

24         the officers that are tasked with maintaining

25         that safety are doing everything they can,
```

CADY REPORTING SERVICES, INC.

1       following best practices and doing the best

2       that they possibly can do what they need to do

3       to maintain that safety.

4  Q  But you as a citizen and as a Chief also care

5       about making sure the patrol officers exercise

6       appropriate discretion in writing tickets,

7       correct?

8  A  Yes.

9  Q  You as a Chief, you as a citizen, you don't

10      want your patrol officers out there writing way

11      too many tickets where they shouldn't be

12      writing them, correct?

13  A  It depends on what you mean by way too many

14      tickets when they shouldn't be writing them.

15         They should be writing tickets where the

16      serious traffic violations are occurring.  They

17      should be writing tickets for violations that

18      have an impact on public safety.  They should

19      be writing tickets for serious and dangerous

20      traffic violations with an aim to reduce

21      traffic crashes.

22         So absolutely they should be issuing

23      appropriate citations, but by no means do I

24      want officers out there writing, you know, bad

25      tickets or questionable tickets.

CADY REPORTING SERVICES, INC.

```
 1    Q   Well, and that's what I mean.  I mean you would
 2        say that's a matter of public concern, right?
 3    A   Not in Independence.  We've never been accused
 4        of writing inappropriate or bad tickets, to the
 5        best of my knowledge.
 6    Q   Well, isn't this whole news story coverage that
 7        we're here about today an example of that?
 8                    MR. McLANDRICH:  Objection.
 9    A   Nowhere in that coverage did I see any
10        allegation that officers wrote bad or
11        inappropriate tickets.  I mean they're talking
12        about numbers of citations, but not one example
13        anywhere in any of this, you know, made an
14        allegation of, hey, the officer wrote me and I
15        was only going 2 miles over, or, hey, I didn't
16        stop all the way at the stop sign, it was a
17        cheap ticket.  There's nowhere in there says an
18        inappropriate ticket was issued or that the
19        officer failed to exercise appropriate
20        discretion.
21    Q   So you're not aware of anyone saying that an
22        officer exercised inappropriate discretion in
23        writing tickets?
24    A   Not to my knowledge.  I mean somebody may make
25        that allegation and then we would investigate
```

CADY REPORTING SERVICES, INC.

```
1          it.

2    Q     Are you aware of anyone alleging that you were

3          requiring officers to use disparate enforcement

4          when writing traffic tickets depending on

5          whether the people they pulled over were

6          Independence residents or not?

7    A     No.

8                     MR. STRANG:  Objection.

9    Q     You haven't heard that?  Is that what you're

10         saying?

11   A     No.  Absolutely not.

12                    MR. STRANG:  Objection.

13                    MS. SAVOIE:   I think we're about

14         done here.  If we can take like a one-minute

15         break so I could review my notes, we should be

16         done.  I may have no more questions after this.

17             Is that okay with everyone.

18                    MR. STRANG:  Sure.

19                    THE WITNESS:  Absolutely.  My

20         dogs are at home.  They will thank you for

21         getting us out of here.

22                    THE VIDEOGRAPHER:  We're off the

23         record.

24             (Recess taken.)

25                    THE VIDEOGRAPHER:  We're back on

                  CADY REPORTING SERVICES, INC.
```

```
 1        the record.  The time is 3:25.
 2    Q   Chief Kilbane, do you know who actually
 3        provided the documents to Ed Gallek?
 4    A   No, I don't.
 5    Q   Do you have any suspicion about who provided
 6        the documents to Ed Gallek?
 7    A   No, I don't.
 8    Q   Did you provide any information contained in
 9        those documents to the media?
10    A   I'm sorry.  I didn't hear the question
11        completely.
12    Q   Did you provide any information contained in
13        those documents to the media?
14    A   Only pursuant to public records requests that
15        came in after the story was run.
16    Q   Before the story was run?
17    A   No.  After the story was run.
18    Q   Right.  And my question --
19    A   No.  I didn't provide anything, no, not before
20        the story was run.
21    Q   Do you know for sure who provided information
22        contained in those documents to the media
23        before the story was run?
24    A   No, I do not.
25    Q   Did you help provide information contained in
```

1        those documents to the media before the story

2        was run?

3   A   No, I did not.

4               MS. SAVOIE:  Those are all the

5        questions I have for you.

6               MR. STRANG:  Okay.

7               MR. McLANDRICH:  No questions.

8               MR. STRANG:  He's going to read.

9               MS. SAVOIE:  We appreciate your

10      time.  Thank you very much for coming in.

11      (Off the record at 3:26 p.m.)

12             - - - - -

13

14

15

16

17

18

19

20

21

22

23

24

25

263

```
 1      THE STATE OF OHIO,    )    SS:
        COUNTY OF CUYAHOGA.   )
 2

 3          I, Aimee N. Szinte, a Notary Public within and

 4      for the State of Ohio, duly commissioned and

 5      qualified, do hereby certify that CHIEF MICHAEL

 6      KILBANE was first duly sworn to testify the truth,

 7      the whole truth and nothing but the truth in the

 8      cause aforesaid; that the testimony then given by

 9      him was by me reduced to stenotypy in the presence

10      of said witness, afterwards transcribed on a

11      computer/printer, and that the foregoing is a true

12      and correct transcript of the testimony so given by

13      him as aforesaid.

14          I do further certify that this deposition

15      was taken at the time and place in the foregoing

16      caption specified, that I am not a relative,

17      counsel or attorney of either party, or otherwise

18      interested in the events of this action.

19          IN WITNESS WHEREOF, I have hereunto set my

20      hand and affixed my seal of office at Cleveland,

21      Ohio, on this 1st day of August, 2020.

22


23      
        Aimee N. Szinte, Notary Public
24      within and for the State of Ohio
        My Commission expires July 15, 2023.
25

            CADY REPORTING SERVICES, INC.
```

1    THE STATE OF OHIO            )
                                 )    SS:
2    COUNTY OF CUYAHOGA          )

3

4        Before me, a Notary Public in and for said

5    state and county, personally appeared the

6    above-named CHIEF MICHAEL KILBANE, who acknowledged

7    that she/he did sign the foregoing transcript and

8    that the same is a true and correct transcript of

9    the testimony so given.

10       IN TESTIMONY WHEREOF, I have hereunto

11   affixed my name and official seal at

12                                   this      day of

13        , 2020.

14

15

16

17

18                        Notary Public

19

20   My Commission Expires:

21

22

23

24

25

```
1              DEPOSITION ERRATA SHEET

2       Page No.        Line No.      Change to:

3

4       Reason for change:

5       Page No.        Line No.      Change to:

6

7       Reason for change:

8       Page No.        Line No.      Change to:

9

10      Reason for change:

11      Page No.        Line No.      Change to:

12

13      Reason for change:

14      Page No.        Line No.      Change to:

15

16      Reason for change:

17      Page No.        Line No.      Change to:

18

19      Reason for change:

20      Page No.        Line No.      Change to:

21

22      Reason for change:

23      SIGNATURE:                     DATE:

24           CHIEF MICHAEL KILBANE

25

              CADY REPORTING SERVICES, INC.
```