Sara Liva

LEONARD MAZZOLA v. ANTHONY TOGLIATTI, et al.

July 21, 2020



Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

```
 1                IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF OHIO
 2                         EASTERN DIVISION

 3


 4


 5     LEONARD MAZZOLA,                    )
                                          )
                      Plaintiff,          )
                                          )
 6     vs.                                ) Case No. 1:19-cv-02519
                                          ) Judge James S. Gwin
       ANTHONY TOGLIATTI, et al.,         )
                                          )
 7                    Defendants.         )
                                          )
10

11                          -  -  -  -  -
                   THE DEPOSITION OF SARA LIVA
12                 TUESDAY, JULY 21, 2020
                            -  -  -  -  -
13

14            The deposition of SARA LIVA, called by the

15     Defendant for examination pursuant to the Federal Rules

16     of Civil Procedure, taken before me, the undersigned,

17     Tracy Lam, Notary Public within and for the State of

18     Ohio, taken remotely via Zoom, Cleveland, Ohio,

19     commencing at 10:00 a.m., the day and date above set

20     forth.

21

22

23

24

25
```

CADY REPORTING SERVICES, INC. 216-861-9270

2

```
 1    APPEARANCES:

 2

 3     On behalf of the Plaintiff:

 4       Jessica Savoie, Esq.
         The Chandra Law Firm, LLC
 5       The Chandra Law Building
         1265 W. 6th Street, Suite 400
 6       Cleveland, Ohio 44113
         jessica.savoie@chandralaw.com

 7

 8

 9     On behalf of Defendants City of Independence,
       Michael Kilbane and Greg O'Brien, Esq.:

10       Steven D. Strang, Esq.
         Maia E. Jerin, Esq.
11       Gallagher Sharp, LLP
         Sixth Floor Bulkley Building
12       1501 Euclid Avenue
         Cleveland, Ohio  44115
13       216.241.5310
         sstrang@gallaghersharp.com
14       mjerin@gallaghersharp.com

15

16     On behalf of Defendant Anthony Togliatti:

17       John T. McLandrich
         Mazanec, Raskin and Ryder Co., L.P.A.
18       100 Franklin's Row
         34305 Solon Road
19       Cleveland, Ohio 44139
         jmclandrich@mrrlaw.com

20

21     ALSO PRESENT:

22       Mr. Leonard Mazzola
         Mr. Anthony Togliatti
23       Mr. Michael Kilbane
         Mr. Gregory O'Brien
24       Mr. Gregory Kurtz

25
```

July 21, 2020

3

1              SARA LIVA DEPOSITION INDEX

2

3    EXAMINATION BY:                    PAGE NO.

4    MR. STRANG          ....................   4

5    MR. MCLANDRICH      ....................   57, 86

6    MS. SAVOIE          ....................   77

7

8    EXHIBIT NO.                        PAGE NO.

9              (All exhibits were premarked.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1                         SARA LIVA

 2        of lawful age, called by the Defendants for examination

 3        pursuant to the Federal Rules of Civil Procedure,

 4        having been first duly sworn, as hereinafter certified,

 5        was examined and testified as follows:

 6                    EXAMINATION OF SARA LIVA

 7     BY MR. STRANG:

 8     Q    Ms. Liva, my name is Steven Strang.  I'm

 9          representing the defendants in a lawsuit

10          pending in the Northern District of Ohio,

11          Mazzola vs. City of Independence and others.

12          I'm representing Defendants Kilbane, O'Brien

13          and the City of Independence.  I'm going to ask

14          you some questions and they're going to relate

15          to some involvement I understand you had with

16          Leonard Mazzola in early 2019; and I'll kind of

17          establish when you got involved in that and

18          when your involvement ended.

19               But first, just some general background.

20          Are you presently an attorney at Faulkner,

21          Hoffman & Phillips, LLC?

22     A    Yes.

23     Q    And what areas of law do you practice?

24     A    Labor law and ERISA.

25     Q    Do you know or have you ever worked with Greg
```

1          O'Brien?

2     A    Can you tell me who that is?

3     Q    Okay.  Greg O'Brien is my defendant in the

4          case, he's an attorney at Taft, and I was just

5          wondering whether you ever had any professional

6          interactions with him.

7     A    Honestly the name sounds very familiar.  I'm

8          sure I have, but I don't remember the details.

9     Q    Okay.  Do you know Chief Kilbane?

10    A    Yes.

11    Q    How long have you known Chief Kilbane?

12    A    I believe I first met him in early 2019 with

13         this situation that you just referred to with

14         Mr. Mazzola.

15    Q    How long have you known Mr. Mazzola?

16    A    The same.  I met him around the same time I met

17         Chief Kilbane.

18    Q    You did not know Mr. Mazzola before your

19         involvement in -- I'll just kind of say it

20         sloppily -- this matter in March of 2019?

21    A    Right.  I may have met him prior to March, but

22         the events which gave rise to this case, my

23         understanding is that is when I first met him.

24         I don't know whether I first met him in

25         February or March, but it was around that time.

July 21, 2020

```
 1      Q    In your role at Faulkner, Hoffman & Phillips,

 2           do you -- are you involved with Bob Phillips in

 3           his police union work?

 4      A    Yes.  I'm his associate attorney.

 5      Q    What is Bob and your role with respect to

 6           police unions?

 7      A    We represent the union, the FOP's.

 8      Q    Do you have any -- what do you do with respect

 9           to individual union members, if anything?

10      A    Well, if -- I'm not sure -- I don't think I

11           understand the question.  We talk to them in

12           terms of if, say, there's a grievance, they

13           become witnesses; if they have a disciplinary

14           issue, then we talk to them.  I mean,

15           basically, in my interactions with them, they

16           serve as either witnesses, or as members of a

17           negotiation committee, we talk to them about

18           what they want from the contract.

19      Q    What about with respect to disciplinary issues

20           or possible disciplinary issues, what's your

21           involvement with union members?

22      A    If the union files a grievance on the basis

23           that the disciplinary action taken is in

24           violation of the contract, then we, as

25           attorneys for the FOP, pursue the grievance on
```

July 21, 2020

```
 1         that basis.
 2     Q   Would that be on behalf of the individual union
 3         members?
 4     A   No.  It's on behalf of the union because it
 5         would be a violation of the contract.
 6     Q   Do you provide advice to union members?
 7                   MS. SAVOIE:  Objection.
 8     A   I don't -- you have to be more specific.
 9     Q   Yeah.  If a union member is subject to an
10         investigation, are you available or do
11         you -- do you provide advice with respect to
12         that union member's rights under the collective
13         bargaining agreement?
14     A   Typically, all questions on that come through
15         the union reps or the union president or some
16         individual working in a capacity as a
17         representative of the FOP.  So, for example,
18         if -- my interaction is primarily almost
19         entirely with the designated representative of
20         the FOP, be that a bargaining unit committee
21         member, a business agent, the president, the
22         vice president.  Whoever it is who has been
23         officially tasked with pursuing that grievance,
24         overseeing those negotiations, I will interact
25         with that person.  They will ask me questions.
```

July 21, 2020

```
 1              So for every member that has a
 2         disciplinary action taken against them, their
 3         union rep guides them through that process and
 4         their union rep will come to me with questions
 5         regarding, you know, is this violating the
 6         contract if the city does this or if the city
 7         does that.
 8    Q    Okay.  So then you provide advice to the union
 9         rep; is that correct?
10    A    Correct.
11    Q    As to the union member's rights under the
12         collective bargaining agreement; is that
13         correct?
14    A    Right.
15    Q    Okay.  And then it's generally the union rep
16         then communicates that advice to the specific
17         union member; is that correct?
18    A    I mean, there is no set protocols.  I mean, we
19         are also often in the same room, so it's kind
20         of like splitting hairs sometimes whether -- we
21         all usually meet together to discuss these
22         things.  But as far as who I'm giving advice
23         to, it's the union.  And who I'm representing,
24         it's the union.
25    Q    Okay.  But in a practical sense, though, you
```

Sara Elward
July 21, 2020

9

```
 1          are often providing advice directly to the
 2          union member as to the union member's rights
 3          under the collective bargaining agreement; is
 4          that correct?
 5                    MS. SAVOIE:  Objection.
 6     A    I can't answer that because I don't really
 7          understand.
 8     Q    So, Sara, I'm trying to separate out your -- I
 9          think we're talking about two things.  We're
10          talking about your general professional duties
11          that are kind of lofty; and then we're talking
12          about, on the other hand, what actually happens
13          when the rubber meets the road and you're
14          actually out there doing what you do.
15               Do you believe that you owe professional
16          duties as a lawyer to the union members?
17                    MS. SAVOIE:  Objection.
18     A    As just individuals?
19     Q    Yeah.
20     A    I really don't know how to answer that
21          question, I'm sorry.
22     Q    Okay.  Do you believe that you -- well, as a
23          lawyer, you do have professional duties,
24          correct, like a duty of competent
25          representation?
```

July 21, 2020

1    A   To my client, yes.

2    Q   Okay.  And you believe that the union is your

3        client, correct?

4    A   Right.  Correct.

5    Q   Do you believe that those professional duties

6        extend to the individual union members when

7        providing advice?

8    A   Not beyond my duty to the union, no.

9    Q   Okay.  But the union is made up of individual

10       members, correct?

11    A   Correct.  But my professional duties is to the

12       union.  So if, for example, there is

13       disciplinary action taken against a member and

14       the union decides that there was no violation

15       of the contract, under no circumstances would I

16       be interacting with that member trying to give

17       them advice.  I am only at the service of the

18       union.

19    Q   Okay.  But when you do interact with a union

20       member, do you believe that you have duties to

21       the union member to provide competent legal

22       representation?

23              MS. SAVOIE:  Objection.

24    A   Again, not beyond my duties to the union.

25       There is overlap, obviously there is overlap

July 21, 2020

```
 1            there, but it begins and ends with my
 2            representation of the union.  So to the extent
 3            my duties to the union are the same or they
 4            overlap with that member, then that's it.  But
 5            they don't go beyond any duty to the union.
 6       Q    So you do advise the -- when asked by the union
 7            representative, you do provide advice about
 8            individual union members' rights under the
 9            collective bargaining agreement though,
10            correct?
11                      MS. SAVOIE:  Objection.
12       A    All members have the same rights under the
13            contract unless there are different -- unless
14            specifically stated in the contract that such
15            and such employees holding such and such
16            position have different rights.  But to my
17            knowledge, I have never seen any contract that
18            specifically names certain members as having
19            distinct rights.
20       Q    Okay.  All members of a bargaining unit have
21            certain rights under that collective bargaining
22            agreement though, correct?
23       A    Correct.
24       Q    And it is generally your job to interpret the
25            collective bargaining agreement and to provide
```

```
 1              advice to the union representative as to

 2              someone's rights under the collective

 3              bargaining agreement, correct?

 4                        MS. SAVOIE:  Objection.

 5       A      I don't know.  It would be the same answer

 6              regardless of who the member was.  So if one

 7              member has these certain rights, assuming that

 8              they have the same position and there are no

 9              special circumstances of the contract, they all

10              have the same rights.  So it's not about the

11              individual member.

12       Q      Well, do you advise -- if an individual

13              member -- would you answer an individual

14              member's questions about any rights that they

15              have under the collective bargaining agreement?

16       A      Only if the union representative asks me to.

17              First of all, the members typically don't even

18              have my contact information.  So if for some

19              reason they got my phone number or got my

20              e-mail and started contacting me directly, the

21              first thing I would do is call the union and

22              say, Hey, I got a call from this member, do you

23              want me to answer these questions, do you want

24              me to refer them to the business agent, how do

25              you want me to handle this.
```

July 21, 2020

13

```
 1    Q   Okay.  And we mentioned this earlier that the
 2        union rep is kind of the official go-between,
 3        right?
 4    A   Sometimes.  Sometimes it's the president of the
 5        FOP himself.  Sometimes it's the vice
 6        president.  Right.  Yeah.  Whoever it is on
 7        that particular matter.
 8    Q   So part of the confusion may just be -- and I
 9        was omitting that middle man for some of these
10        questions -- but if an individual member has
11        questions about the member's rights under the
12        CBA, I understand the union member would ask
13        their union rep the question and the union rep
14        could pass that question on to you; is that
15        correct?
16                    MS. SAVOIE:  Objection.
17    A   The union reps are pretty well versed with the
18        contract.  They typically only come to me if
19        there is a complicated question, special
20        situation, they will come to me, yes.
21    Q   Okay.  I understand that we're here because of
22        your involvement with Leonard Mazzola.  And I
23        think you mentioned earlier the first time you
24        became involved with him was in the spring of
25        2019; is that correct?
```

July 21, 2020

```
 1    A    Correct.

 2    Q    Okay.  How did your involvement in -- how did

 3         your involvement begin?  How did you get tapped

 4         into this?

 5    A    What I recall, and I don't have the file with

 6         me, but what I remember is that the city was --

 7         Chief Kilbane was especially upset because he

 8         believed that one of the patrolmen had leaked

 9         certain information to a news reporter -- and I

10         apologize I don't remember his name either --

11         and there was a big news story about quotas and

12         speeding tickets that he felt made the

13         department or himself look bad in some way.

14         And the first thing the city did was they

15         wanted to interview every single person in the

16         police department.  And the person doing the

17         interviewing -- forgive me if I don't remember

18         his name, he was a polygraph expert.  So for

19         the first round of meetings he was there and

20         was asking everybody questions about this

21         information going to the media.

22    Q    Was the gentleman's name Bill Evans?

23    A    Yes.  Evans.

24    Q    Okay.  What specifically was your involvement?

25         So I understand -- and I'm specifically asking
```

July 21, 2020

15

```
 1            about -- I understand that you worked with Bob

 2            Phillips, and I'm trying to figure out what you

 3            handled and what Bob handled with respect to

 4            the interview.

 5     A      The first round of interviews that took place

 6            in the police department with

 7            everybody -- with all these different people --

 8            I don't know if it was everybody, but it was a

 9            lot of different members of the FOP, a lot of

10            different members of the police department were

11            being interviewed.  I sat in for all those

12            interviews.  So every member who came in, I was

13            there.  I was there with the business agent as

14            each member was interviewed.

15     Q      Who is the business agent?

16     A      I could get that for you later.  I don't recall

17            off the top of my head which business agent was

18            there.

19     Q      Just generally, what does that word mean?  Is

20            that the same thing as a union rep?

21     A      Sorry.  Union rep.  They go by different terms.

22     Q      So those terms are interchangeable?

23     A      Yes.  Union rep and business agent -- well, it

24            depends on the union.  But if I say them, I

25            mean them interchangeably for the purposes of
```

July 21, 2020

16

```
 1        this interview.
 2    Q   Okay.  Was it Chuck Wilson?
 3    A   Yes, I believe it was.  That name sounds
 4        familiar.
 5    Q   So did you talk to any of the individual union
 6        members before the actual interviews?
 7    A   I don't recall doing so.  I believe I talked to
 8        Chuck before.  I don't recall talking to any of
 9        the individual members.
10    Q   Can you recall anything about that conversation
11        with Chuck?  Was it -- well, let me first ask,
12        was it just one conversation or was it multiple
13        conversations?
14    A   I don't remember.  I know that we briefly spoke
15        before the interviews began.  We may have
16        spoken in between each interview a little bit.
17        I don't recall, though.  I mean, I would say it
18        was multiple if you had to pick because -- go
19        ahead.
20    Q   Did you talk to him before the day of the
21        interviews?
22    A   Yes.  I don't remember any details, but I'm
23        sure I did.
24    Q   Okay.  Do you remember any details about the
25        conversation you had with him before the
```

```
 1           interviews?
 2     A     I vaguely remember -- I remember what the
 3           general topic of our conversations were, but
 4           not too many specifics.  For example, I know
 5           that the city was trying to say that the
 6           leaking of this information was potentially a
 7           criminal event and I recall him asking me what
 8           my thoughts were on that.  You know, I advised
 9           that I did not believe that this was a criminal
10           offense in any way.  Our conversations were
11           along those lines on that subject.
12     Q     Did you have any -- what other subjects did you
13           talk about?
14     A     Whether or not the members would be forced to
15           take a polygraph.  Whether they should sign the
16           Garrity waiver.
17     Q     Did you talk about potential polygraph before
18           the actual interviews?
19     A     Yes.  Because, I mean, Evans was known to be a
20           polygraph provider.  So, you know, clearly
21           there was speculation that if these interviews
22           didn't go as planned by the city, that
23           potentially they were -- you know, why is the
24           city hiring a polygraph expert to do these
25           interviews was a lot of talk that happened
```

```
 1        before.

 2   Q    What else did you talk about?  What other

 3        topics?

 4   A    Nothing else that I can recall at this time.

 5   Q    What was your conclusion, if any, with respect

 6        to whether the city could have the officers

 7        talk a polygraph examination?

 8                    MS. SAVOIE:  Objection.

 9   A    It was -- when she objects, do I just answer

10        and the judge will leave it out?

11                    MS. SAVOIE:  You can answer.

12   A    To the best of my recollection, there is

13        actually a city ordinance or a state statute

14        that prohibits employees from being forced to

15        take a polygraph.  To my recollection, there

16        may be an exception to that for law enforcement

17        officers.  And I'm not sure whether the city

18        ordinance said that even police officers

19        couldn't be.

20            I'm aware there is a state statute in

21        Ohio that no employee except for safety forces

22        may be forced to take a polygraph test.  I

23        don't recall whether there was also a city

24        ordinance on top of that saying that employers

25        could not force safety forces either.  I don't
```

July 21, 2020

```
 1          remember.
 2                    But it was my understanding at the time
 3          that no member could be forced to take a
 4          polygraph test, whether it was under the
 5          ordinance or under the CBA.  I remember by one
 6          mechanism or another, the city could not force
 7          anyone to take a polygraph test.
 8      Q   Some officers did end up taking a polygraph
 9          test, correct?
10                    MS. SAVOIE:  Objection.
11      A   Correct.
12      Q   And if you believed at the time that they
13          couldn't be compelled to take a polygraph, just
14          bluntly, why did they -- why was a polygraph
15          administered?
16      A   I feel uncomfortable answering that question
17          because I don't know why they would either
18          agree to it when they didn't have to or why the
19          city would push for it when they knew they
20          technically couldn't.  You'd have to ask those
21          people why this happened.
22      Q   What people?
23      A   You'd have to ask the officer who took the test
24          why he decided to take it when he didn't have
25          to; or ask the city why they pushed so hard for
```

20

| | | |
|---|---|---|
| 1 | | it when technically they weren't allowed to. |
| 2 | | You would have to ask them that question. |
| 3 | Q | Well, were the polygraphs prohibited under the |
| 4 | | collective bargaining agreement in place at the |
| 5 | | time? |
| 6 | A | I believe so. |
| 7 | Q | Okay. |
| 8 | | MR. STRANG:  Can we put up |
| 9 | | Exhibit 49. |
| 10 | | MS. SAVOIE:  Steven, was 49 |
| 11 | | revised? |
| 12 | | MR. STRANG:  Yeah. |
| 13 | | MS. SAVOIE:  Thank you. |
| 14 | Q | Ms. Liva, is this the -- and we can thumb |
| 15 | | through it.  Is this the collective bargaining |
| 16 | | agreement that was in place at the time in the |
| 17 | | spring of 2019? |
| 18 | A | For the supervisor's unit, yes. |
| 19 | Q | Okay.  And Lenny Mazzola was a supervisor, |
| 20 | | correct? |
| 21 | A | I believe so, yes. |
| 22 | Q | Showing you this document, do you -- you know, |
| 23 | | I hate to do this, but can you recognize any |
| 24 | | provision in this that prohibits the use of |
| 25 | | polygraphs? |

July 21, 2020

```
1    A    I would --
2    Q    We can defer to what's in there, I assume?
3    A    Yes.
4    Q    Okay.  If polygraphs were prohibited under the
5         collective bargaining agreement, can we assume
6         yourself or the union representative would have
7         made that point?
8    A    We would have mentioned that, yes.
9    Q    You would have mentioned that to who?
10   A    The business agent, anybody who was told that
11        they have to take a polygraph test.
12   Q    You would have told those people then, correct?
13        If they were prohibited, you would have told
14        those people, correct?
15   A    Assuming -- you know, are you asking me would I
16        have sent out a memo?  Would I have told the
17        business agent?
18   Q    Yeah.
19   A    I mean, we rely on the business agents or the
20        union reps, whatever you want to call them, to
21        keep the members informed of that sort of
22        information.  So if the union rep asked me, you
23        know, can the city force our members to take a
24        polygraph test, and then I reviewed the
25        contract and there was a provision saying, no,
```

July 21, 2020

22

```
 1          they can't, then I would have told the union

 2          rep that and he would have told the members

 3          that.

 4     Q    Do you recall any conversation like that with

 5          respect to the interviews that took place at

 6          the City of Independence on March 13, 2019?

 7     A    Not specifically, no.  I'm sure it must have

 8          come up, but I don't remember specifically

 9          those conversations.

10                         MR. STRANG:  I'm going to show

11          the witness Defendants' Exhibit 82.

12     Q    Ms. Liva, I'm showing you a document that's two

13          pages and I just --

14     A    One moment.  Sorry.

15     Q    That's okay.

16     A    Okay.  Sorry about that.

17     Q    I'm going to show you a document, and I'm just

18          basically trying to get you to identify what

19          this document is.

20     A    Okay.  Those look like notes I prepared.  Can

21          you show me the first page again?  It pretty

22          much speaks for itself.  I think I labeled it

23          as my notes of such and such day.

24     Q    I just want to confirm that.

25     A    Okay.
```

July 21, 2020

23

```
 1      Q    Are they indeed your notes that you took

 2           of -- it appears to be the March 13, 2019

 3           interviews?

 4      A    Yes, those are my notes.

 5      Q    Do you know when you prepared this document?

 6                     MR. MCLANDRICH:  Do we have a

 7           Bates number on there?

 8                     MR. STRANG:  Yeah, at the bottom.

 9           It's Phillips --

10                     MR. MCLANDRICH:  I see it now.

11           Thanks.

12      A    It would have been around the same time.  I

13           can't give you a specific date.  But I took

14           notes by hand and typed these up at some point

15           after that.  I don't know -- if you needed me

16           to give you a specific date, I could probably

17           find it, but I don't know whether it was

18           Thursday or Friday that week.

19      Q    What I'm driving at is, it was close in time to

20           when the interviews occurred, correct?

21      A    Yes, yes.

22      Q    Would it be safe to say that these notes were

23           composed at a time when your memory of the

24           interviews was fresher than it is today?

25      A    Yes.
```

July 21, 2020

24

```
 1    Q    Would I be correct in assuming that this
 2         summary of the interviews would, to the extent
 3         it conflicts with your recollection, that I
 4         should be relying on the summary provided in
 5         these notes?
 6    A    If they directly conflict, yes.  Again, this is
 7         a summary.  So there's obviously several
 8         interviews.  This went on all day.  Certainly,
 9         the notes don't capture absolutely everything.
10    Q    Right, right.  What is your recollection of the
11         interview involving Leonard Mazzola?
12    A    I remember him being asked in several different
13         ways if he either knew who leaked information
14         to the press about the ticket quotas or if he
15         did himself.  If he was aware of this
16         information getting to the media.  All the
17         questions were along those lines.  Same as
18         every other member.
19    Q    Did you participate?  Did you say anything
20         during that interview of Leonard Mazzola, do
21         you know?
22    A    I don't believe so, other than what it may say
23         in my notes about the Garrity waiver.
24    Q    Okay.  I'm going to show you Defendants' 35.
25              Mrs. Liva, this is the -- you mentioned a
```

July 21, 2020

```
 1        Garrity waiver?
 2   A    Warning.  Sorry.  The Garrity warning.
 3   Q    Is this that document for Leonard Mazzola?
 4   A    Yes.
 5   Q    And is that your signature at the bottom?
 6   A    Yes.
 7   Q    And did you read this document before Leonard
 8        Mazzola signed it?
 9   A    Yes.
10   Q    Did you have any discussions with Leonard
11        Mazzola about this Garrity warning or whether
12        he should sign the document?
13   A    Not that I recall, because we didn't believe it
14        was relevant because, again, the city was
15        putting this forth as a potential criminal
16        violation and we did not believe there was any
17        criminal issue here.  So it was kind of
18        immaterial whether they sign it or not in our
19        opinion.
20   Q    The substance of this, just generally, when
21        someone is -- let's say with Leonard Mazzola,
22        when he was provided with this Garrity warning,
23        the second paragraph of this essentially states
24        that the information gained cannot be used
25        against him in a criminal proceeding, correct?
```

July 21, 2020

```
1    A    Right.  That's what all Garrity warnings say.

2    Q    So was it your understanding that the results

3         of that interview of him could not be used

4         against him in a subsequent criminal charge?

5    A    Right.  Yes.  But again, we didn't believe

6         there was any criminal issue here to begin

7         with.  So, you know, when they asked us if they

8         should sign this, we said go ahead and sign it,

9         it's just a Garrity warning, but we don't

10        believe there is a criminal issue here.

11   Q    So you did not think that it was likely anyway

12        that criminal charges would be brought against

13        them?

14                  MS. SAVOIE:  Objection.

15   A    Correct.  That was what we believed at the time

16        based on what we knew of what the city's issue

17        was and the questions being asked.  Even if

18        someone did "confess" to having given

19        information about this, what they called the

20        quota, again, they're going to deny there was

21        ever a quota -- again, I'm using these terms

22        lightly -- that that would be a crime.

23   Q    Right.  You did not think that there was much

24        of a likelihood that even if the Garrity

25        warning was not given that a crime would end up
```

July 21, 2020

```
 1              being brought anyway, or a criminal proceeding?
 2       A    Correct.
 3       Q    But this then is kind of a belt and suspenders
 4              approach that not only do you not think it is
 5              likely, but also now that they've signed the
 6              Garrity warning, the city actually can't bring
 7              a criminal proceeding against them based in
 8              anyway on their statements, correct?
 9       A    Right.  Which is why we said go ahead and sign
10              it, it can't hurt anything.
11       Q    You actually told the union members to go ahead
12              and sign this?
13                        MS. SAVOIE:  Objection.
14       A    No.  I told the business rep.  The business rep
15              asked me -- the first thing Chuck asked me was
16              why are they having them sign a Garrity waiver,
17              you know, why are they treating this as if
18              there is a potential crime here.  We talked
19              about that.  And then he said, Do they need to
20              sign the Garrity warning?
21                   I don't remember my exact words, but I
22              said you can advise them to sign it if they
23              want to, go ahead, it doesn't seem like it's
24              going to make much difference one way or
25              another, but it can't hurt to sign it.
```

July 21, 2020

28

1    Q    Okay.

2    A    But I had that conversation with Chuck.

3    Q    Sure.  Do you know if during that meeting, did

4         Leonard Mazzola ask you any questions directly?

5    A    Not that I recall.  Not that I recall.  If it

6         was not in my notes, then I don't think so.

7    Q    If he would have asked you questions, would you

8         have answered them?

9    A    What kind of question?

10   Q    Just a general question about the process,

11        what's going on, the CBA, anything like that.

12                   MS. SAVOIE:  Objection.

13   A    From what I recall, the way the interviews were

14        conducted, if -- there wouldn't have been a

15        space of time in which he could have asked me a

16        question.  He would have had to pause the

17        interview and we would have had to leave the

18        room and he would have had to ask me whatever

19        he wanted to ask me.  And at that point, Chuck

20        would be there and it's likely that either

21        Chuck would have answered his question, or if

22        Chuck couldn't answer his questions, he would

23        have looked at me and I might have answered the

24        question.

25                   But the way these interviews were

July 21, 2020

29

```
 1              conducted, there really wasn't opportunity for

 2              the members to actually ask me questions.

 3              Occasionally, they would look at me as if to

 4              ask, you know, can I answer this question, and

 5              I wouldn't respond.  I would just gesture, you

 6              know, go ahead and answer these questions.

 7         Q    What was your involvement in this after the

 8              initial interviews on March 13, 2019?

 9         A    So after the initial interviews, apparently

10              nobody confessed to providing this information

11              to the media, so the city decided they were

12              going to start conducting polygraph tests; and

13              this was over the union's objection.

14         Q    Can you point me to -- how did the union object

15              to the polygraphs?

16         A    Correspondence.  The FOP president said, you

17              know, we object to this.  I don't know.  That's

18              usually how it happens.  Or maybe Bob sent an

19              e-mail or something.

20                   I shouldn't have answered.  I don't know.

21              I don't know how that happened.  I just know

22              that the union objected to it.

23         Q    How do you know that the union objected to it?

24         A    I don't remember.  I'm sure I was CC'd on the

25              e-mail or told by Bob or something to that
```

July 21, 2020

30

```
 1          effect.
 2     Q    Would that be a better question -- we're going
 3          to talk to Bob right after you.  Would that be
 4          a better question to Bob?
 5     A    Yes.
 6     Q    You would defer to his response on that topic?
 7                    MS. SAVOIE:  Object.
 8     A    Yes.
 9     Q    Did Bob have you attend the -- or did Bob have
10          you involved at all on the administration of
11          the polygraph?
12                    MS. SAVOIE:  Objection.
13     A    So our first understanding was that several
14          different members were going to be asked to
15          take the polygraph.  I do not recall
16          whether -- the only thing I remember is that we
17          asked the FOP, Do you want union counsel to be
18          there?  And the FOP president said, Yes.  Or
19          maybe it was Chuck who said yes.  In any case
20          we were told by the union that they would like
21          to have labor counsel there present.
22     Q    What was your role -- what would your role be
23          then at the polygraph?  What would your duties
24          be?  Why would you be there?
25                    MS. SAVOIE:  Objection.
```

July 21, 2020

31

```
 1    A    Sometimes -- you know, there was no clear role.

 2         There was no clear instruction from the union.

 3         Sometimes the union just feels better if we're

 4         there.  I don't know how much experience you

 5         have with labor unions, but they tend to, you

 6         know, get nervous and they don't know what

 7         could happen, they don't know how their rights

 8         might be violated.  So sometimes they like to

 9         have the labor counsel there just in case

10         something unexpected happens or something

11         unexpected comes up.

12              In this case, I know that they wanted me

13         to review the questions that were going to be

14         asked, you know, to the extent that any were

15         prepared in advance to make sure that the

16         polygraph examiner didn't go way off base and

17         start asking things that had nothing to do with

18         the issue.  Other than that, I was not given

19         any clear -- I was not given any particular

20         instructions as to what they wanted me to do

21         there other than to make sure no contract

22         rights were violated.

23    Q    You were basically the eyes and ears there to

24         make sure the CBA wasn't violated, correct?

25    A    Correct.
```

Sara Elias

July 21, 2020

32

```
 1       Q   So in the administration of this polygraph to
 2           union members, you were there to ensure that
 3           the CBA wasn't violated, correct?
 4       A   Correct.
 5       Q   You mentioned that you sent an e-mail
 6           specifically asking for the questions
 7           beforehand?
 8       A   I don't remember whether I asked for the
 9           questions beforehand, whether I e-mailed or
10           asked for them at the polygraph facility --
11       Q   I'll help you out, Sara.
12       A   Okay.  Please.
13       Q   It's not meant to be difficult.  It just
14           sometimes is.  So I'm going to throw up
15           Defendants' Exhibit 83.  It's an e-mail from
16           you to Bill Evans, BillEvansLaw@SBCglobal.com,
17           and you copied Bob Phillips?
18       A   Yes.
19       Q   Is this the e-mail you were talking about?
20       A   Correct, yes.
21       Q   And to be clear, the union itself was not under
22           investigation at this point, correct?
23                       MR. SAVOIE:   Objection.
24       A   The union itself?
25       Q   Correct.
```

July 21, 2020

33

```
 1     A    No, no.

 2     Q    Okay.  So the union brass were not being

 3          administered any sort of polygraph or being

 4          investigated for anything, correct?

 5     A    No.  Lenny was going to go first, but our

 6          understanding was that they were going to keep

 7          administering these polygraph tests until they

 8          found their guy.  So I'm asking for the

 9          questions they're going to ask Lenny, assuming

10          they are going to ask the same questions to

11          everybody.

12     Q    Right.  And you wanted to know the questions

13          they were going to ask Lenny Mazzola

14          beforehand, correct?

15                    MS. SAVOIE:  Objection.

16     A    Or any union member, yes.

17     Q    But to make sure those questions did not

18          violate that union member's rights under the

19          CBA, correct?

20     A    Yes.

21     Q    And if you believed the questions were going to

22          violate the rights under the CBA, would you

23          have advised the union rep of that or would you

24          have directed that to Bill Evans directly?

25     A    I'm sorry, could you repeat the question?
```

Sara Wied
July 21, 2020

34

```
 1        Q   Yeah.  If you believed that any of those
 2            questions did violate the CBA, would you have
 3            communicated that to Bill Evans directly or
 4            would you have advised the union rep, Chuck
 5            Wilson?
 6        A   I would have told Evans that directly and I
 7            would have CC'd Chuck and Bob.
 8        Q   And did you send any such e-mail?
 9        A   No, not to my recollection.  I'm not sure that
10            I ever received a list of questions either, but
11            maybe I did.
12        Q   I'm going to show you Defendants' Exhibit 39.
13            Sara, we're just going to take a general look
14            at this document and then maybe I'll ask you
15            some questions on it.
16                 This appears to be a letter you sent on
17            March 19, 2019, to Bill Evans?
18        A   Yes.
19        Q   It is a letter you sent to Bill Evans on March
20            19, 2019, correct?
21        A   Right.
22        Q   And it looks like you CC'd Chuck Wilson?
23        A   Yes.
24        Q   You CC'd Chuck Wilson, Leonard Mazzola and Bob
25            Phillips; is that correct?
```

July 21, 2020

```
1      A    Yes.

2      Q    Why did you CC Leonard Mazzola on this?

3      A    Because he was going to be the first to be

4           polygraphed.

5      Q    You wanted to communicate this information to

6           him?

7      A    Yes.  And let me say this.  The union had a

8           feeling, a suspicion, a belief that Mr. Mazzola

9           was who the city believed leaked this

10          information, that this was all targeted at him,

11          that he was who they thought did this, and they

12          were just going through the motions of doing

13          this, you know, interviewing everybody, but,

14          really, they believed that it was him.  We were

15          from the get-go expecting this would one way or

16          another result in Mr. Mazzola being

17          disciplined, and so we were kind of treating

18          this like -- you know, anticipating a

19          disciplinary action, and so that's part of the

20          reason we kept him in the loop on all of this.

21     Q    So you were particularly involved in this

22          because you were anticipating some sort of

23          action against Leonard Mazzola; is that

24          correct?

25                    MS. SAVOIE:  Objection.
```

July 21, 2020

36

```
 1      A    Yes.  The union was.  The union was

 2           anticipating it.

 3      Q    Okay.  So they specifically requested you be

 4           more involved than usual in this because they

 5           were anticipating some sort of action against

 6           Leonard Mazzola in the future; is that correct?

 7                      MS. SAVOIE:   Objection.

 8      A    Or somebody.  They were guessing it was going

 9           to be Mazzola, but they figured somebody was

10           going to be disciplined for it.

11      Q    Okay.  The city did hire a third party to

12           actually conduct this investigation, correct?

13      A    Right.  Well, to do the interviews and the

14           polygraph testing.  I don't know -- I never saw

15           the contract between the city and this third

16           party, so I don't know what all they contracted

17           them to do.  I know that they did the polygraph

18           testing and the initial interviews.

19      Q    And in your experience, you know sometimes

20           cities conduct these internal investigations

21           internally and sometimes they hire outside

22           firms to do it, correct?

23      A    This is the first time in my albeit limited

24           experience that a third party was ever hired.

25      Q    So generally the cities just do it in-house,
```

```
 1        correct?

 2   A    In my experience.  But again, I've only been

 3        doing this for three and a half years.  So I'm

 4        sure it's possible that other cities for other

 5        investigations have hired outside help.

 6   Q    Do you think it's a good idea for a city to

 7        hire an outside firm to do it?

 8                  MS. SAVOIE:  Objection.

 9   A    I can't answer that.  It would totally depend

10        on the situation.  That's got to be a

11        case-by-case determination.  And I don't think

12        I'm even qualified to make that -- to answer

13        that question.

14   Q    Well, would you recommend that a city hire an

15        impartial third party to conduct an

16        investigation?

17                  MS. SAVOIE:  Objection.

18   A    I don't know.  I can't answer that.  It would

19        depend on the circumstances.

20   Q    Okay.  So let's look at Defendants' Exhibit 39.

21        This is a -- I'm going to read parts of this.

22        Ms. Liva, the second sentence starts, "It has

23        come to my attention that you have been

24        selected to perform a polygraph examination of

25        Leonard Mazzola of the City of Independence
```

July 21, 2020

38

1          Police Department.  Please be informed that I

2          am Lieutenant Mazzola's legal and union

3          representative and that he has exercised his

4          rights to union representation in all

5          investigatory interviews regarding this

6          matter."  Do you see that?

7      A   Yes.

8      Q   You did say in this that you are Lieutenant

9          Mazzola's legal and union representative,

10         correct?

11     A   Yes.

12     Q   Did you mean that you were the union

13         representative or that the union representative

14         was going to be present as well as yourself?

15                   MS. SAVOIE:   Objection.

16     A   I don't recall.  That's a very clumsy sentence.

17         I don't know what I was saying there.

18         Sometimes I -- in terms of -- so, for example,

19         in disciplinary actions, the legal counsel can

20         operate as the member's union representative.

21         So I think that's what I was trying to say.

22         You know, in the event that Chuck could not be

23         there or -- again, my memory is not very good,

24         but I think that in the event that Chuck

25         couldn't be there, I would have served as his

July 21, 2020

```
 1              union rep as well -- I mean, I would have

 2              served as his union rep in Chuck's place.

 3      Q    As well as his legal representative?

 4      A    Well, I was the union's legal counsel, but I

 5              would have been Lenny's union representative

 6              for purposes of that hearing.  Because, if I

 7              recall, Chuck wasn't sure whether he was going

 8              to be able to make it, and the member is

 9              entitled to union representation during all

10              interviews.  So if for whatever reason Chuck

11              was not going to be available, I was going to

12              serve as his union rep for purposes of that

13              interview.

14      Q    Okay.  But Chuck did end up being able to come,

15              correct?

16      A    Correct.

17      Q    So Mr. Mazzola had Chuck there and you there

18              during the polygraph, correct?

19                     MR. SAVOIE:  Objection.

20      A    Right.

21      Q    And then you go on to basically tell Mr. Evans

22              that he should not violate the CBA during this

23              polygraph, correct?

24      A    Did I say that to Mr. Evans?

25      Q    You know, I can read it for you.  So after that
```

July 21, 2020

40

```
1        sentence, it goes, "As you may know, certain
2        requirements must be met in order to avoid
3        violation of Chapter 4117 of the Ohio Revised
4        Code as well as the terms of the Collective
5        Bargaining Agreement, CBA, between the City of
6        Independence and the FOP."
7    A   Okay.
8    Q   It goes on, "Please review the following in
9        preparing for Lieutenant Mazzola's polygraph
10       examination scheduled to take place on March
11       20, 2019 at 10:00 a.m."  And then you basically
12       give six bullet points of, I guess more or
13       less, telling Evans what he can and can't do?
14   A   Uh-huh.
15   Q   "Yes"?
16   A   Yes.
17   Q   Okay.  In number five you say, "As Lieutenant
18       Mazzola's legal and union representative, I
19       will determine when and how such representation
20       is necessary.  Please do not presume to
21       instruct me to remain silent," correct?
22   A   Correct.
23   Q   Again, this is --
24   A   I should have worded that differently.
25   Q   How should you have worded that?
```

July 21, 2020

41

```
 1    A   I should have made it clear that I'm the legal

 2        representative for the FOP and Mr. Mazzola's

 3        union representative.

 4    Q   And you were there to provide legal advice to

 5        the union representative, correct?

 6    A   Again, there is a fine line.  I'm there

 7        representing the union.  If the union says,

 8        Look, we need you to be here for this member to

 9        watch out, make sure their contract rights

10        aren't violated, how can you tell the

11        difference between whether I'm -- it looks the

12        same is all I can tell you, but it's not the

13        same.

14    Q   And here, you were asked by the union to do

15        just that, correct?

16                    MS. SAVOIE:  Objection.

17    A   Right.  I was asked to monitor the

18        investigation and make sure that the member's

19        rights under the contract were not violated.

20    Q   And it gets kind of fuzzy when we get into it

21        about exactly whose interests you're protecting

22        there; is that what you're getting at?

23                    MS. SAVOIE:  Objection.

24    A   I'm protecting the interests of the union

25        member.
```

July 21, 2020

42

 1   Q   Okay.  So I'm going to --

 2   A   And as a member of the union.  I'm protecting

 3       the union's interest, which are at that point

 4       in time the same as the member's interest.

 5   Q   Right.  And the union member at this point is

 6       Leonard Mazzola, correct?

 7   A   At this point.  But again, we expected others

 8       to be polygraphed.

 9   Q   Right.  And you would have been there and you

10       would have filled the same role for them, too,

11       correct?

12   A   Correct.

13   Q   Okay.  I'm going to move on to Defendant's

14       Exhibit 40.

15           Ms. Liva, can you tell me what this

16       document is?

17   A   I don't know what I would call it.  It's

18       something that Evans wanted Leonard to sign.

19   Q   And you marked it up for Mr. Mazzola, correct?

20   A   And going forward.  This was not just for

21       Mazzola.  This was for, again, any member who

22       was going to be signing this, I marked it up.

23   Q   To protect that member, correct?

24               MS. SAVOIE:  Objection.

25   A   I would have to review it longer to see what I

July 21, 2020

43

```
 1              changed.  Again, I feel like you're splitting

 2              hairs.  So if the union gives me any contract

 3              that they say, hey, look, the employer or

 4              whoever wants our members to sign this, is it

 5              okay for them to sign this?  I review it for

 6              their protection as the union members.  I'm

 7              doing it for the union, not the individual

 8              members.  But the union is asking me to protect

 9              the individual members.

10      Q    So that's what you're there doing?

11      A    Right.

12      Q    Okay.  Did you ever inform Mr. Mazzola at

13              either this polygraph or during that first

14              interview that you were not there to represent

15              him personally?

16      A    I remember on multiple occasions -- you know,

17              we always do that, clarify to them -- clarify

18              specifically to Leonard that I was not his

19              personal legal counsel, that I was the union

20              attorney, that I was FOP's legal counsel.  In

21              this particular case, it may seem as if I'm

22              representing him, but I'm always the FOP's

23              attorney.  And if ever the two should split, he

24              would have to find his own legal counsel.

25      Q    Do you believe that those interests split at
```

44

```
 1        all into this investigation into Leonard
 2        Mazzola?
 3                     MS. SAVOIE:  Objection.
 4   A    I don't know.  I don't know.  I don't think so.
 5        But again, it's hard to answer these questions
 6        because of the unique relationship.
 7   Q    Sure.  If a conflict like that did arise, would
 8        you specifically inform the union member or
 9        specifically inform the union rep?
10                     MS. SAVOIE:  Objection.
11   A    You would have to give me an example.
12   Q    Okay.  All right.  Well, I don't know anything
13        about union work, so this example may be
14        clumsy.  But let's say you are sitting there
15        with a union member for questioning, and during
16        that questioning it occurs to you that the
17        union's interests and that member's interest
18        may be diverging.
19   A    Okay.  So hypothetically, if the member was in
20        this interview and suddenly started blaming the
21        union for this leak.
22   Q    Sure.
23   A    Okay.  Honestly, in that case I would have to
24        excuse myself and I would call Bob and ask what
25        to do.  I wouldn't feel be comfortable sitting
```

July 21, 2020

```
 1              there any longer because, again, I represent

 2              the union.

 3       Q      Right.  You represent the union, and if there

 4              is a conflict between the union member and the

 5              union, you then take the union path, correct?

 6       A      Right.

 7       Q      But if there is not a conflict between the

 8              union and the union member, then everything

 9              basically stays simpatico and you keep doing

10              your job, correct?

11       A      It could also be that the union decides the

12              city is not -- again, not in this situation,

13              but in other situations there can be

14              circumstances where the union looks at the

15              situation and says, actually, we don't believe

16              the city has violated the contract, so we're

17              not going to pursue this any further.

18                   And in those cases the member may

19              disagree.  The member may still believe their

20              contract rights are violated.  But if the union

21              makes the decision they don't think so, in

22              those cases then I would not be involved

23              anymore because the union has decided they are

24              not going to pursue that grievance or that

25              issue any longer.
```

July 21, 2020

46

```
 1    Q   That did not occur in this case though,
 2        correct?
 3                    MS. SAVOIE:  Objection.
 4    A   This is a complicated case.  I mean, I can't
 5        answer that question with respect to this case
 6        in particular because it's very -- this is a
 7        unique situation.  It was very complicated.
 8        You would have to ask the union representatives
 9        that were more directly involved if they
10        believed that the city violated the contract or
11        not in terms of certain parts.
12    Q   Did Mr. Mazzola ever communicate to you that he
13        wanted to find his own attorney but was unable
14        to do so?
15    A   Not that I recall.
16    Q   Did he ever -- do you recall him at any point
17        ever asking you for any sort of reference for
18        an attorney that could represent him?
19    A   I vaguely remember him asking -- I remember
20        vaguely him asking -- or maybe he wasn't
21        asking.  Maybe he was simply talking about
22        having his own attorney.  I don't remember the
23        specifics of any of that though.
24    Q   You were present at the polygraph examination,
25        correct?
```

July 21, 2020

47

```
 1     A     I was on site.  They took him to a room by

 2           himself and they said that nobody else could be

 3           in the room because it might disturb the air or

 4           something and ruin the test.

 5     Q     How far away were you from him while the

 6           polygraph was actually being administered?

 7     A     In another room.

 8     Q     Were you in the room right next door?

 9     A     I think they were connected, yeah, or on the

10           other side of the same wall, I think.  I don't

11           remember the layout exactly of the building.  I

12           was close nearby.

13     Q     Could you actually see the polygraph being

14           administered?

15     A     Only through a security camera.

16     Q     You were actually watching it on camera,

17           correct?

18     A     Right.

19     Q     And was Chuck Wilson with you?

20     A     Yes.

21     Q     Were you aware that Mr. Mazzola was actually

22           recording the polygraph examination?

23     A     No.

24     Q     Does that come as a surprise -- sitting here

25           today, does that come as a surprise to you?
```

```
 1                      MS. SAVOIE:  Objection.
 2    A   I can't -- I'm not -- I can't answer that
 3        question.  I didn't know.  I was unaware.  I
 4        did not know that he was recording it.
 5    Q   You didn't know before today and I just told
 6        you that?
 7    A   I did not know that and he did not mention it
 8        to me before, that I recall.  I had no idea.
 9    Q   Would you have liked to know if he was
10        recording you beforehand?
11                      MS. SAVOIE:  Objection.
12    A   Are you saying he recorded -- did he record
13        everything?
14    Q   Yeah.  He recorded the entire examination.  The
15        whole thing.
16                      MS. SAVOIE:  Objection.
17    A   I did not know that.
18    Q   Do you find that problematic?
19                      MS. SAVOIE:  Objection.
20    A   I can't answer that question.
21    Q   Okay.  Do you recall him actually being
22        questioned by the polygraph examiner on whether
23        he was recording the conversation?
24    A   I'm sorry, I don't remember that either.  I
25        don't.  I honestly don't.  I don't remember
```

July 21, 2020

```
 1         that.  I don't remember him mentioning

 2         recording it.  I don't remember him being asked

 3         if he was recording it.

 4    Q    Do you remember him specifically telling the

 5         polygraph examiner that he was not recording?

 6    A    I do not remember that.

 7    Q    How did he do in the polygraph?

 8                   MS. SAVOIE:  Objection.

 9    A    They have a report.  I mean, I think that

10         report would speak for itself.

11    Q    Were you told at the examination that he

12         failed?

13                   MS. SAVOIE:  Objection.

14    A    They don't like to use words like that at the

15         polygraph institute.  They say they went

16         through all the places where their machinery

17         indicated that he was not telling the truth and

18         they explained all that and, you know, so there

19         were -- I remember them pointing out to the

20         three of us certain questions that he responded

21         to that the data collected suggested, based on

22         what they believe, that he was not telling the

23         truth.

24    Q    Do they use more jargoning language than

25         simply --
```

July 21, 2020

```
 1    A    Yes, yes.

 2    Q    Did you understand though that you were

 3         essentially being told that he had failed?

 4                   MS. SAVOIE:  Objection.

 5    A    You know, I don't want to put words in their

 6         mouth.  They said what they said.  I'm sure

 7         it's all in the report.

 8    Q    But, Ms. Liva, I'm more interested in not the

 9         results themselves, but I'm more interested in

10         the conversations that occurred after the

11         polygraph examination.  So that's where I'm

12         driving at, is who is in the room for that

13         conversation, who told you that, who was there,

14         what exactly they said.  That's what I'm

15         interested in.

16    A    I recall there was Evans there and one

17         other -- I don't know if the tech was there or

18         not, but there was at least Evans, myself,

19         Lenny and Chuck were all there when they went

20         through the report.  They went through how they

21         conducted the tests.  They showed the baseline

22         numbers.  They showed -- you know, which I

23         guess responses to questions like what is your

24         name, et cetera.  They showed what happens when

25         he was asked to deliberately lie about
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              something.
 2                      They basically went through their points
 3              of reference and then there were certain
 4              questions they -- I don't know.  There weren't
 5              that many.  I think there were one or two
 6              questions where they said it looks as if -- and
 7              again, this is from my memory, okay?  The
 8              report should speak for itself.  But I remember
 9              them making a big deal out of the fact that it
10              looked like he had been untruthful with his
11              response to his answers in at least two
12              questions.
13         Q    Do you recall what you were told about what
14              those questions were?
15         A    I believe the question -- one of the questions
16              was, Do you have any knowledge of who released
17              this information to the media?  Again, I don't
18              remember the specific questions, but it was
19              something to that effect.
20         Q    Do you remember what Mr. Mazzola said after the
21              polygraph examination when he was informed of
22              those results?
23         A    He just kept insisting that he had told the
24              truth.
25         Q    Did he mention anything that day to you about
```

July 21, 2020

52



```
 1            anything that may impair his ability to answer
 2            truthfully?
 3       A    He said he was stressed, very stressed, very
 4            nervous.  I don't recall.  He may have told me
 5            other things about -- from the get-go he was
 6            very concerned about the accuracy of these
 7            things.  He felt that his anxiety, his stress
 8            level would skew the results no matter how he
 9            answered.  He had all kinds of concerns like
10            that.  I don't remember specifically what he
11            said.  I know he told me -- he insisted that he
12            was being truthful the entire time.  His
13            position on that never changed even after they
14            showed him the results.
15       Q    Do you recall any other conversations with
16            Leonard Mazzola after that?
17       A    Not me.  He may have spoken to Bob more after
18            that.  I don't recall having much communication
19            with him at all after that test.
20       Q    Did you have any discussion -- but that day,
21            did you have any additional correspondences
22            with Chuck Wilson or Mr. Mazzola about the next
23            steps or what you anticipated was going to
24            happen?
25       A    Yes, both Chuck and I reassured him no matter
```

Case Filed

July 21, 2020

53

```
 1          what happened, you know, if the city does

 2          decide to discipline him for this, that the

 3          union would be there for him, that we would

 4          contest the discipline.  We basically reassured

 5          him no matter how the city took these tests, no

 6          matter what they decided to do, how they

 7          decided to discipline him, that the union would

 8          be there for him and would represent him

 9          through that.

10     Q    What did he say in response to that, if you

11          recall?

12     A    I think he said I know you will, you know, and

13          that was it.

14                    MR. STRANG:  Alex, can you play

15          that audio clip of 58?

16                      -  -  -  -  -

17          (Thereupon, a recording was played.)

18                      -  -  -  -  -

19     Q    Ms. Liva, do you recall that questioning by the

20          polygraph examiner?

21     A    It sounds familiar.

22     Q    And you mentioned before that you were not

23          aware that Leonard Mazzola was, in fact,

24          recording that on his cell phone?

25     A    I was not aware.
```

July 21, 2020

54



| | | |
|---|---|---|
| 1 | Q | You do not remember telling him that was not |
| 2 | | advisable? |
| 3 | A | Not that I recall. |
| 4 | Q | Have you had any conversations or interactions |
| 5 | | with anyone from the Chandra firm before today? |
| 6 | A | No.  The Chandra firm, that's legal counsel |
| 7 | | for -- |
| 8 | Q | Mazzola. |
| 9 | A | They did call us -- I did talk to her briefly. |
| 10 | | I think it was last week. |
| 11 | Q | Okay.  What did you talk about? |
| 12 | A | She just basically said I'm sorry you're having |
| 13 | | to be deposed on your vacation. |
| 14 | Q | Did you talk about the case at all? |
| 15 | A | Only briefly.  She asked me if I ever |
| 16 | | represented to Lenny that I was his personal |
| 17 | | attorney.  I said no.  That was really the |
| 18 | | extent of the conversation. |
| 19 | Q | Did you ever bring up to either Lenny Mazzola |
| 20 | | or to Chuck Wilson any First Amendment concerns |
| 21 | | with the polygraph or the interview? |
| 22 | A | First Amendment? |
| 23 | Q | Yeah. |
| 24 | A | In terms of the polygraph meaning what? |
| 25 | Q | Did you ever talk to -- did you ever voice any |

July 21, 2020

1          concerns to Chuck or to Lenny Mazzola as to

2          whether that initial interview that you sat in

3          on or the polygraph examination violated

4          anyone's First Amendment rights or whether

5          there were any First Amendment concerns about

6          it?

7     A    I don't remember if it was -- I know that there

8          was a member who said they believed that it was

9          their First Amendment right to talk

10         about -- you know, I don't recall.  Not with

11         Lenny.  I think there was another member who

12         asked if the city could discipline them for

13         talking about the police department, if talking

14         about the police department policies outside of

15         police department was a violation of their

16         First Amendment rights.  And again, I don't

17         remember if that was Lenny.  I think that was

18         maybe a different member.

19              But in any case, we told them that --

20         certainly, there are situations where they are

21         not allowed to talk and it's not a violation of

22         their First Amendment rights.  Obviously, they

23         all know they can't talk about ongoing

24         investigations outside the police department,

25         so clearly that's not a violation of First

July 21, 2020

1       Amendment right.

2              And then we reviewed with them their city

3       policy, certain things they can't talk about

4       without the chief's permission.  So we had that

5       conversation.  Again, I don't remember which

6       member it was that asked that question and I

7       don't remember who all was there, but I

8       remember it being briefly discussed.

9   Q   And you understand that police officers aren't

10      allowed to -- you know this investigation was

11      essentially about whether somebody leaked

12      documents to Channel 8, correct?

13  A   Documents?  I don't remember if it was

14      documents or just general information about how

15      the police department was getting tickets and

16      what they called the quota system.  Sorry.

17      Sorry.

18  Q   That's okay.  I'm just going to look over my

19      notes for a second before passing you off.

20  A   Do you know how much longer this might take?

21  Q   I'm going to pass you off.

22  A   Okay.

23              MS. SAVOIE:  Mr. McLandrich, do

24      you have any questions?  I will have a few.

25              MR. MCLANDRICH:  I do have

```
 1        questions.  I'm happy to go now if you'd like.

 2                       -  -  -  -  -

 3                  EXAMINATION OF SARA LIVA

 4     BY MR. MCLANDRICH:

 5     Q   Good morning Ms. Liva.  Is that how you say it?

 6         Liva?  Can you hear me?

 7     A   Good morning.

 8     Q   Good morning.  Can you hear me?

 9     A   It's saying my internet connection -- yes, but

10         it's kind of cutting in and out.

11     Q   I'll try to make sure to speak into the mic so

12         you can hear me better.

13             How do you say your last name so I can

14         hopefully get it right?

15     A   Liva.

16     Q   Great.  So, Ms. Liva, does your law firm, do

17         you know, does it have a contract with the

18         union?

19     A   I would assume so.  You should ask Bob that

20         question.

21     Q   Sure.  Does the union have a duty of fair

22         representation to its members?

23                     MS. SAVOIE:  Objection.

24     A   That's what the law says.

25     Q   Well, then I assume it must have such a duty if
```

July 21, 2020

58

```
 1            the law says it, correct?

 2      A    Correct.

 3      Q    All right.  And that duty extends to

 4            representing the employees throughout the

 5            grievance disciplinary process, as you

 6            understand, correct?

 7                        MS. SAVOIE:  Objection.

 8      A    If the union believes that the CBA has been

 9            violated, yes.

10      Q    Okay.  And when we have incipient discipline or

11            an investigation like we have in this case, we

12            don't know whether the union contract is

13            violated or going to be violated, correct?

14                        MS. SAVOIE:  Objection.

15      Q    You can answer.

16      A    I'm thinking of how to answer that question.

17            The union being involved is usually -- yes.

18      Q    So when the events have not yet unfolded, no

19            discipline has been issued, an investigation

20            hasn't been completed, we don't know whether

21            the union contract is violated, going to be

22            violated or not going to be violated, correct?

23                        MS. SAVOIE:  Objection.

24      A    In some circumstances, yes.  But in other

25            circumstances, if the relevant facts are all
```

July 21, 2020

59

```
 1          known and it's only peripheral facts that need

 2          to be determined -- it depends on the

 3          situation.  It really depends on the situation.

 4    Q     Sure.  Yes.  And that's sort of the way life

 5          is, right?  Many things are

 6          situation-dependent?

 7    A     Uh-huh.  Yes.

 8    Q     But as a general matter, when events have yet

 9          to unfold, we don't know whether a contract has

10          been violated or not?

11    A     I would say there are circumstances in which

12          the union believes -- can reasonably believe

13          that the contract has been violated in one

14          sense from the get-go, from the very beginning.

15          You're talking about just cause here, and the

16          contract says that an employee may not be

17          disciplined without just cause.

18    Q     So let's just take that as the premise so we

19          can hopefully move through this.

20                If we take that as the premise, because

21          in this circumstance that would generally be

22          the alleged contract violation if the employee

23          got disciplined and there wasn't just cause for

24          it, right?

25    A     Yes.
```

July 21, 2020

60

1   Q   And so until we know what discipline has been

2       meted out and what the alleged justifying cause

3       is, we can't make a determination as the union

4       or as the union's attorneys as to whether the

5       union contract has been violated, correct?

6                   MS. SAVOIE:  Objection.

7   A   I would say, no, because just cause is a

8       complicated analysis; and part of just cause is

9       there has to be a fair investigation.  Now, it

10      could become very obvious from the very

11      beginning even before there is any disciplinary

12      action taken that the investigation is not

13      being conducted fairly.

14              So I can't answer your question because

15      of the complexities of a just cause analysis.

16      If we believe the way that the city is

17      conducting the investigation is unfair from the

18      start, then the union can have grounds to feel

19      that the contract is being violated in a sense

20      even from the beginning.

21  Q   Okay.  And so that would be one of the bases on

22      which the union might object to the ultimate

23      discipline, that the investigation that led to

24      it was unfair?

25  A   Correct.

July 21, 2020

61

1    Q    Yes?

2    A    Yes.

3    Q    Or in the alternative, it could object on the

4         basis that even though, as you would say in

5         your prior example, the facts are known, that

6         the discipline that was meted out for that

7         violation was excessive and therefore not

8         commensurate with the cause?

9    A    Yes.  That comes into play as well.

10   Q    And in such a circumstance, the union's

11        position would be that discipline of that level

12        violates the contract, correct?

13   A    Right.

14   Q    All right.  And so if the union decides that

15        the contract has not been violated, doesn't the

16        law in the State of Ohio allow the employee to

17        pursue the grievance without the union's

18        participation?

19   A    I've never experienced that.

20   Q    Okay.  So you don't know whether there's a

21        specific statute in the State of Ohio that

22        allows an employee to take his grievance

23        forward without the union's attorney?

24   A    Well, yes, for state employees there is.  For

25        state employees, there is a procedure

```
 1          for -- yes, there is, for state employees, for
 2          service employees.
 3    Q     And do you know whether, in fact, that right
 4          also extends to someone like a police officer?
 5    A     I believe it does.
 6    Q     All right.  So in this case, if the union
 7          decided it wasn't going to pursue a grievance
 8          on behalf of Mr. Mazzola, either at the
 9          grievance level or at the arbitration level,
10          those are grievances or rights that he could
11          have continued to assert on his own behalf with
12          or without other legal counsel, correct?
13    A     You're using the term "grievance" -- the way I
14          recall, it has to do with appealing, stages of
15          appeal and under the Civil Service Act.
16    Q     Well, isn't the first stage of appealing a
17          piece of discipline to file a grievance?
18    A     If that's what they call it, okay.
19    Q     Wasn't that what this collective bargaining
20          agreement would call it?
21    A     I'm not familiar with much of the terminology
22          involved in the civil service rules.  We call
23          it a grievance.
24    Q     That's certainly what we call it in the general
25          vernacular; we call it a grievance, right?
```

July 21, 2020

```
 1    A    Okay.  All right.  Then, yes.

 2    Q    All right.  So if the city in this case, as I

 3         believe is the allegation, said to Mr. Mazzola,

 4         Mr. Mazzola, we think you were deceptive in

 5         your polygraph, it's our intention to

 6         discipline you unless we reach a resolution

 7         and, in fact, Mr. Mazzola was disciplined, he

 8         could have filed a grievance with respect to

 9         that discipline, correct?

10                   MS. SAVOIE:  Objection.

11    A    Yes.  He could have filed a grievance with the

12         union.

13    Q    Yes.  And if the union failed to pursue that

14         grievance, he could pursue it on his own

15         pursuant to law, correct?

16    A    Yes.  But I don't know why the union would not

17         pursue the grievance.

18    Q    Well, I don't either.  I'm just asking in the

19         alternative.  Either the union could pursue the

20         grievance or he could pursue it on his own

21         behalf, correct?

22    A    I believe so.  Unless there are some facts that

23         prohibit that.

24    Q    And then if for some reason the union decided

25         that its representation was going to stop at
```

July 21, 2020

64

```
 1          the grievance level, he could pursue that

 2          grievance to the next level through arbitration

 3          on his own, correct?

 4     A    If it's allowed under the civil service rules,

 5          yes.

 6     Q    All right.  Or under state law, right?

 7     A    Right.  When I say "civil service rules,"

 8          that's what I mean.

 9     Q    Okay.  So have there ever been occasions where

10          your firm has represented an employee in a

11          pre-disciplinary hearing?

12     A    Yes.

13     Q    And have there ever been occasions where your

14          firm has represented employees in the grievance

15          process?

16     A    Yes.

17     Q    And have there ever been occasions where your

18          firm has represented employees through

19          arbitration proceedings?

20     A    Yes.

21     Q    And some of these would include terminations,

22          correct?

23     A    Yes.

24     Q    And some of these would include situations

25          where you and the union came to the consensus
```

July 21, 2020

65

```
 1          that the employee's discipline was excessive

 2          for the conduct engaged in, correct?

 3     A    Yes.

 4     Q    And in such an occasion, the remedy you might

 5          be seeking is that there be a lesser discipline

 6          accorded for whatever that potential violation

 7          is, correct?

 8     A    Sure.  Yes.

 9     Q    All right.  So in this case, if

10          Mr. Mazzola -- if the city said we're going to

11          demote you to patrolman for releasing records

12          without authorization or for being untruthful,

13          that's discipline that he could have grieved,

14          correct?

15     A    Yes.

16     Q    And that grievance then could have proceeded to

17          arbitration, correct?

18     A    Yes.

19     Q    And if the arbitrator decided, well, you know,

20          I don't like what he did, but taking him from

21          lieutenant to patrolman is too punitive, then

22          he could have modified that discipline to some

23          lesser discipline including a day off and

24          leaving him as a lieutenant in the patrol

25          division?
```

July 21, 2020

66

```
 1    A    Hypothetically, yes.

 2    Q    All right.  Now, when you're representing

 3         employees in arbitrations, are you telling me

 4         that you've never -- you don't ever assert

 5         attorney/client privilege for your relationship

 6         with that employee?

 7                        MS. SAVOIE:  Objection.

 8    A    I don't -- who would be -- against who?  Have I

 9         ever --

10    Q    Let me give you an example to hopefully try to

11         make it clear.

12             So it's my understanding in this case

13         that your position and the position of your law

14         firm is we don't represent Lenny Mazzola; we

15         have no privileged relationship with him,

16         correct?

17    A    Right.

18    Q    And that's because you're not his attorney,

19         you're the union's attorney, correct?

20    A    Correct.

21    Q    So if we were in an arbitration proceeding

22         regarding his discipline, or any employee, then

23         the employer would be allowed to uncover all

24         your communications with that employee,

25         correct, because there would be no privilege to
```

July 21, 2020

1          protect that?

2     A    I don't know about that.  I don't think that's

3          correct.

4     Q    I don't think it's correct either, but it seems

5          to be the logical conclusion of the opinion

6          you're taking in this case.

7                    MS. SAVOIE:   Objection.

8     A    No.  Because, again, you're asking me to

9          describe something -- there's a privilege

10         there, but it's because the member is both part

11         of the union -- part of the union is my client

12         and not part of the union is my client.  So

13         there are circumstances in which the member and

14         the union become -- I don't want to say one in

15         the same, but for purposes of my

16         representation, my client can extend to include

17         that particular member in certain

18         circumstances.

19    Q    Okay.  So --

20    A    For example, suppose, you know, one of the

21         officers had confessed to me that he was the

22         one who released this information.  Would there

23         be any privilege there preventing me from

24         telling the union that?  No.  Obviously, I

25         would be telling the union that.  And that

July 21, 2020

68

```
 1        member is always told from the beginning, you
 2        know, nothing you tell me is private.  I work
 3        for the union; anything you tell me is
 4        essentially going to go back to the union.
 5        They know that.
 6    Q   Do you sign any sort of document with the
 7        employee that informs them that you're not
 8        their attorney and you have no attorney/client
 9        privilege relationship with them?
10    A   I know that this is made very clear to them
11        from the get-go.  I don't know if they sign
12        something.
13    Q   I'm sorry.  Just to try and get through this,
14        because I know your colleague is going to get
15        done at 1:00.
16            Simple question:  Is there a document
17        that's executed that acknowledges that there is
18        no privilege and no attorney/client
19        relationship?
20    A   Not that I -- I don't know.  There may be.  You
21        should ask Bob that question.
22    Q   All right.  Certainly not one that you executed
23        with Lenny Mazzola in this case?
24    A   Not that I recall.
25    Q   All right.  And so from what you were saying
```

July 21, 2020

69

```
 1              before, there can be situations where you have

 2              a joint representation, where you're the

 3              attorney for not only the union but also for

 4              the member?

 5      A       I don't know if I would call it a joint

 6              representation, but there is definitely an

 7              overlap of interest there.

 8      Q       Well, you were saying there were situations

 9              where privilege could exist where you're

10              representing both the union and the employee.

11              That's what I heard.  Now, did I not hear you

12              correctly?

13      A       I'm sorry, I'm not an expert on privilege in

14              these situations.  I don't know.  It's never

15              come up, honestly.  It's never come up where I

16              had to exert that kind of privilege.

17      Q       So isn't it true that the union is facilitating

18              its duty of fair representation by using your

19              law firm to represent its members, that that's

20              how it satisfies its duty of fair

21              representation is providing you, as their

22              lawyers, to represent that employee?  Isn't

23              that what's going on?

24                      MS. SAVOIE:  Objection.

25      A       I think I've already explained to the best that
```



```
 1              I can.  There are circumstances in which they

 2              are fulfilling their duty of fair

 3              representation by asking me to represent their

 4              side of the story, their interests in a

 5              particular matter.

 6      Q   But isn't it true that in a simple disciplinary

 7              matter, the only real interest is the union

 8              satisfying the employee's needs in the

 9              disciplinary matter?  There is no larger issue,

10              it's just simply whether Pete is going to get

11              five days off because he's been tardy too many

12              times or not, right?

13      A   No.  Because there are situations in which

14              there's --

15      Q   I know there are other situations, but I'm

16              asking about the situation I've just indicated

17              to you.  If it's a simple matter of should Pete

18              get three days off because he's missed too many

19              days, there are no larger issues.  It's simply

20              whether Pete is going to get three days off for

21              missing too many days, right?

22      A   You're saying if he's going to get three days

23              off because he was -- as a punishment for

24              absence?

25      Q   Just as an example, right.  So if somebody is
```

July 21, 2020

71

```
 1              late too many days in a row, the employer could
 2              say, You know what, you've been late two days
 3              in a row, Pete, we're giving you three days
 4              off.  Pete can say, I think that's unfair,
 5              Billy is late all the time, I want a grievance.
 6              And you guys represent the employee in that
 7              grievance, right?
 8        A     We could.  We could represent the employee in
 9              that grievance if we found that the contract
10              was violated.
11        Q     Or if you thought that was just too harsh,
12              which is the violation of the contract, right?
13        A     Correct.  Or if there is some sort of
14              discrimination going on.  You know, if the
15              other employees aren't being treated the same,
16              it could be an issue of discrimination.
17        Q     Right.  Right.  So in that instance, you're
18              representing the interest of the employee as to
19              whether he's going to get three days off or
20              not?
21        A     In that narrow circumstances, yes.  But there
22              are often more complicated situations.
23        Q     And so in this case, Mr. Mazzola, as you're I'm
24              sure aware, ultimately chose to retire,
25              correct?
```

July 21, 2020

72

```
 1                      MS. SAVOIE:  Objection.

 2      A    You know, again --

 3      Q    Were you aware of that?

 4      A    That's what Bob told me.  I was not involved in

 5           that at all.

 6      Q    That was going to be my next question.  Were

 7           you involved in any of those discussions or

 8           dialogues?

 9      A    No.  The last time I spoke to Lenny was right

10           after the polygraph test.

11      Q    Did you ever participate in any dialogue with

12           anyone about the city's intention to bring any

13           possible disciplinary action against

14           Mr. Mazzola?

15      A    I mean, after the polygraph test, no.  I was

16           out of this situation after the polygraph test.

17           I didn't have any further involvement.

18      Q    So do you know whether the union provides legal

19           representation to its members as a benefit of

20           union membership?

21      A    For the FOP?

22      Q    Yes.

23      A    No, not that I recall.

24      Q    Has your office, to your knowledge, or any FOP

25           attorney ever appeared in a civil lawsuit on
```



```
 1          behalf of the union member as additional

 2          counsel?

 3     A    Not that I'm aware of or was ever involved

 4          with.

 5     Q    Have you ever participated in negotiations

 6          between an employer and on behalf of a member

 7          regarding the discipline that they were going

 8          to receive for a potential infraction?

 9     A    I'm sure that we have.

10     Q    And that you're doing strictly on behalf of the

11          union; is that right?

12     A    Again, as I keep trying to explain, there is an

13          overlap there.  I'm doing it on behalf of the

14          union, at the request of the union, because the

15          union has asked me to negotiate on behalf of

16          the member.

17     Q    So what's happening, much like an insurance

18          company that has a duty to defend its insured,

19          it hires a lawyer to look out for the interest

20          of its insured.  It's sort of like that, right?

21                    MS. SAVOIE:  Objection.

22     A    I'm not an insurance lawyer, but it sounds like

23          there could be a comparison there.

24     Q    It's like a tripartite relationship.  The union

25          hires you as it's lawyer and asks you to render
```

```
 1         services to its member because of its
 2         relationship with the member, correct?
 3                   MS. SAVOIE:  Objection.
 4    A    I've told you guys everything I know about the
 5         nuances between union legal representation
 6         versus member legal representation.  I've only
 7         been a labor attorney for three and a half
 8         years.  There's nuances and complexity here
 9         that I don't have the words to articulate as
10         best as you may like.
11    Q    All right.  Just to sort of wrap it up then, so
12         what you're telling me is you don't understand
13         all the dimensions of the representation that
14         you engage in regarding the member?
15                   MS. SAVOIE:  Objection.
16    A    I didn't say I didn't understand it.  I
17         understand it.  I don't know how to articulate
18         it to satisfy --
19    Q    That's fine.  And if you understand it, just
20         answer this question for me and try to
21         articulate it as best you can.
22              When you were acting on behalf of the
23         member, you've been retained by the union to
24         render legal services on behalf of its member;
25         is that correct or not correct?
```



1     A    It's not correct.  I'm representing the union.

2          The union says negotiate with or defend or

3          whatever, you know, for this member, but I am

4          representing the union.  If at any given time

5          the union says drop it, we're not going to

6          pursue that, then I drop it.  If they say go

7          forward, I go forward.

8     Q    And, therefore, you have absolutely no duty to

9          that member to act in their best interest?

10    A    Not outside my duty to the union.  If I had a

11         legal duty to that member, obviously I would

12         have to follow through with their

13         representation to the very end.  That would be

14         my obligation.  But I represent the union.  I

15         do what the union tells me to do because I'm

16         the union lawyer.  If the union says we are no

17         longer going to pursue the grievance, I no

18         longer pursue the grievance, regardless of what

19         the member wants, and the member has to pursue

20         it on their own.

21    Q    So if the union said we think that Pete -- in

22         my prior example -- should get three days off,

23         and Pete says, no, I don't agree to that, the

24         union can just cause Pete to get three days off

25         whether Pete agrees to that or not --

July 21, 2020

76

```
 1                    MS. SAVOIE:  Objection.

 2      Q   -- and you would just go in and say, No, Pete,

 3          three days off?

 4      A   Theoretically, the union can come to a

 5          resolution and settlement with the employer

 6          over the member's objection.  Theoretically,

 7          that can happen.  It doesn't happen often that

 8          I'm aware of.  We do our best to

 9          either -- usually I'm convincing the member,

10          look, this is the best you're going to get,

11          this is what the union thinks is fair and

12          that's it.  I have yet to be involved in a

13          situation where the member objected to the

14          union's offer of settlement.

15      Q   All right.  And so if they disagree, then you

16          have to tell the member, look, I can't

17          represent you any longer, I'm strictly

18          representing the union, I can't talk for you

19          anymore, here's the union's position on it,

20          whatever position you want to take, go ahead

21          and take, right?  That's what you would do?

22      A   That's not what I would say.  What I would say

23          is, look, this is what the union thinks is

24          fair.  This is what the union is going to

25          present to the employer for settlement.  If the
```

```
 1          employer accepts, that's what it's going to be.
 2          And if you want to pursue it further -- you
 3          know, I don't know what the remedy would be at
 4          that point.  I don't know what happens if the
 5          union and the employer sign a settlement
 6          agreement and the member decides that it's not
 7          good enough.  I actually haven't been involved
 8          in that kind of situation before.
 9    Q    All right.  We will finish these things with
10          Mr. Phillips.  Thank you.
11                     MR. MCLANDRICH:  That's all I
12          have.
13                     MS. SAVOIE:     Thank you.
14                          -  -  -  -  -
15                EXAMINATION OF SARA LIVA
16    BY MS. SAVOIE:
17    Q    Ms. Liva, I have just a couple of questions.
18              First of all, did you ever have an
19          attorney/client relationship with Lenny
20          Mazzola?
21                     MR. MCLANDRICH:  Objection.
22    A    No.
23                     MS. SAVOIE:  What's the basis of
24          your objection, Counselor, so I can cure it,
25          please.
```

July 21, 2020

78

```
1    A   I only ever had an attorney/client privilege

2        with the union FOP.

3    Q   Thank you.

4              MS. SAVOIE:  Counselor, can you

5        please state the basis for your objection so I

6        can cure any form defects?

7              MR. MCLANDRICH:  No, thank you.

8              MS. SAVOIE:  No, you're not going

9        to state the basis for your objection?

10             MR. MCLANDRICH:  Well, I mean,

11       there's any potential number of legal basis for

12       it.  She's already testified to four different

13       opinions about whether she had an

14       attorney/client relationship with Mr. Mazzola.

15       She testified she doesn't frankly understand

16       the nuances of her relationship with

17       Mr. Mazzola and --

18             THE WITNESS:  I didn't say I

19       didn't understand it.  I said I'm -- since I've

20       been asked it 20 different times, I apparently

21       have difficulty articulating it to your

22       satisfaction.  I do understand it.

23   Q   Let me ask it this way, Ms. Liva.

24           Do you understand what relationship you

25       had with Leonard Mazzola?
```

July 21, 2020

1    A    Yes.

2    Q    Okay.  And so are you confident in saying you

3         did not have an attorney/client relationship

4         with Mr. Mazzola?

5    A    Yes.

6    Q    Thank you.  You were shown Exhibit 49 earlier,

7         which was a copy of the collective bargaining

8         agreement.

9              Do you know which version of the CBA was

10        in effect at the time the City of Independence

11        was doing its internal investigation that

12        included the polygraph with Mr. Mazzola?

13   A    I'm sorry, would you repeat the question?

14   Q    Yeah.  I'm asking if you know which version of

15        the CBA was in effect in March and April of

16        2019.  I may have heard at some point that the

17        2019 through 2021 CBA wasn't actually finalized

18        at that time.  Just as a housekeeping matter, I

19        would like to know which CBA was actually in

20        effect, if you know.

21   A    I want to say the one that is dated as

22        effective in 2019.  But you should ask Bob that

23        question because I was not involved in the

24        negotiations.  They may have negotiated

25        something different as to the retroactive

80

1      application of the contract.  Bob would know

2      that, though.

3   Q  Thank you.  You were asked some questions

4      earlier about Mr. Mazzola's ability to take any

5      disciplinary procedures to arbitration.  And at

6      that time, you said something to the effect of,

7      you know, an arbitrator could provide for a

8      lesser discipline than what the city wanted to

9      do, hypothetically.

10          Can you please explain what you meant

11      whenever you used the word "hypothetically" to

12      state that that was a possibility?

13   A  Typically when it comes to disciplinary issues,

14      when they go to arbitration, the union argues

15      it was without just cause; and the arbitrator

16      defines just cause or doesn't define just

17      cause.  And when there is no just cause, there

18      is no disciplinary action warranted.  If there

19      is just cause, occasionally an arbitrator will

20      say there was just cause for discipline,

21      however, the punishment was too severe and they

22      reduce it to a lesser punishment.  That does

23      happen.

24   Q  And whenever, as here, a city decides to impose

25      discipline on one of its employees, does the

July 21, 2020

```
 1            discipline become effective pending the results

 2            of any grievance or appeal process?

 3       A    Yes.  So if hypothetically they had demoted

 4            Mr. Mazzola, that demotion would be in effect

 5            until it was overturned by an arbitrator at

 6            arbitration; and that could take years.

 7       Q    Right.  And if Mr. Mazzola had been put on the

 8            Brady-Giglio list, would that also have become

 9            affected pending the results of any

10            disciplinary appeals process?

11       A    Yes.

12                      MR. MCLANDRICH:  Objection.

13       Q    To your knowledge, was Mr. Mazzola ordered to

14            submit to the interview with Bill Evans on

15            March 13, 2019?

16       A    "Ordered" in what sense?

17       Q    As in, did the chief order him to submit to the

18            interview?

19       A    I believe so, yes, to my recollection.

20       Q    If that is reflected in one of your letters

21            that was referenced earlier, would that be

22            correct?

23       A    I don't remember.  I can't answer that

24            question.  I don't know if he was ordered to or

25            if they said if you don't, we're going to
```

82

```
 1        assume that you were the one.  I don't remember
 2        the details of that.  There may be e-mails that
 3        document how that came about.
 4     Q  Okay.  And was Mr. Mazzola ordered to submit to
 5        the polygraph on March 20th of 2019?
 6     A  I believe so.
 7     Q  And again, if there were documents saying that
 8        he was, would you defer to those?
 9     A  Absolutely.
10     Q  Great.  Do you remember any specific
11        conversations with Leonard Mazzola in which you
12        made clear to him that you were not his
13        personal legal representative?
14     A  Yes.
15     Q  Can you describe those, please?
16     A  I don't remember the details, but I know that
17        at least on more than one occasion I did tell
18        him that I was legal counsel for the union and
19        that I represented the union and that he needed
20        to be aware of the fact that I was not his
21        attorney, that I was the FOP's attorney; and
22        that if he felt he needed legal counsel,
23        separate legal counsel of his own, he would
24        have to obtain that by himself.
25     Q  Did you counsel Mr. Mazzola on anything related
```

```
 1              to the circumstances of his departure from the

 2              City of Independence?

 3       A      No, I was not involved in any of that.

 4       Q      Was the scope of your representation of the

 5              city limited to whether -- I'm sorry.  Let me

 6              back up.

 7                   Was the scope of your representation of

 8              the union in this investigation limited to

 9              whether the investigation violated the terms of

10              the collective bargaining agreement?

11       A      Again, my recollection is that no employee may

12              be forced to take a polygraph test under the

13              terms of the collective bargaining agreement.

14       Q      Right.  And I'm just trying to clarify for the

15              record -- because you've been asked a lot of

16              specific questions about what your role was,

17              and I just want to have a more general

18              statement so it's clear on the record.

19                   So, I guess, was your role as union's

20              counsel during the course of this investigation

21              to ensure that the terms of the collective

22              bargaining agreement were met?

23       A      Yes.  And my understanding and my recollection

24              is that the collective bargaining agreement

25              says that no employee can be forced to take a
```

July 21, 2020

```
 1           polygraph test.  And again, the question of

 2           whether or not he was forced is difficult to

 3           answer.

 4     Q     Are you familiar with the City of Independence

 5           Department of Police General Order 103?

 6     A     Yes.  I can't quote it, but --

 7     Q     Okay.  I'm going to share my screen if I can.

 8           Can you see my screen, where I have a PDF up

 9           that is labeled Defendants' Exhibit 1?

10     A     Okay.

11     Q     So is this General Order 103 for the City of

12           Independence Department of Police?

13     A     Okay.

14     Q     Is that what it is?

15     A     It appears to be.

16     Q     Certainly.  And I'm scrolling down to a section

17           that is labeled III F-2.  Would you mind

18           reading what F-2 says into the record, please?

19     A     "Polygraph examination shall only be used in

20           criminal investigations."

21     Q     Were you aware of this policy at the time

22           Mr. Mazzola was subjected to a polygraph?

23     A     Yes.

24     Q     And did you make an objection to the

25           administration of the polygraph on that basis?
```

July 21, 2020

85

```
 1    A    We objected to the polygraphs for everybody

 2         from the very beginning on that basis, yes.

 3    Q    Thank you.  Did anyone tell you why the city

 4         was still administering the polygraph even

 5         though this policy prohibited it?

 6    A    Well, they were claiming that they weren't and

 7         that they were voluntary.

 8              MR. STRANG:  Objection.  I tried

 9         to do it, but my computer was on mute.

10              MS. SAVOIE:  Sure.  We we'll

11         stipulate.  No problem.

12    Q    So it was your understanding that the city

13         contended that the officers were submitting

14         voluntarily to the polygraph examination?

15    A    That is my recollection, that they were saying

16         it was voluntary.  You know, but obviously, if

17         you object to a polygraph test, the damage is

18         done.

19    Q    Okay.  Ms. Liva, those are all the questions I

20         have for you.  Thank you for your time.

21              MR. MCLANDRICH:  I have some

22         follow-up unless Steve is going to go next?

23              MR. STRANG:  John, you can jump

24         me.  That's okay.

25                      -  -  -  -  -
```

Sara Liva
July 21, 2020

```
 1                    REEXAMINATION OF SARA LIVA

 2      BY MR. MCLANDRICH:

 3      Q   All right.  So, Ms. Liva, are you familiar with

 4          Ohio Revised Code Section 4117.03?

 5      A   Yes.  I mean, again, I'm on vacation.  I don't

 6          have it in front of me.  I'm not going to quote

 7          it to you.

 8      Q   I apologize.  I'll just read you the pertinent

 9          section since I wasn't anticipating this.  So

10          it's entitled "Rights of Public Employees."  So

11          that would include, presumably, all public

12          employees of the State of Ohio, right?

13                        MS. SAVOIE:  Objection.

14      A   Well, unless -- the statute speaks for itself.

15          The people who are covered by it are covered by

16          it.

17      Q   I get that.  But you're an attorney and

18          accustomed to interpreting statutes, aren't

19          you?

20      A   Yes.

21      Q   All right.  So the term "public employee," you

22          would certainly understand Mr. Mazzola to fall

23          within the scope of public employee as an

24          attorney, wouldn't you?

25                        MS. SAVOIE:  Objection.
```

July 21, 2020

```
 1    A   Yes.  But safety force employees are exempted

 2        from a lot of provisions of that statute.

 3    Q   So 4117.03 reads, in part, as follows:  "A,

 4        public employees have the right to, 5, Present

 5        grievances and have them adjusted without the

 6        intervention of bargaining representative as

 7        long as the adjustment is not inconsistent with

 8        the terms in the bargaining agreement then in

 9        effect and as long as the bargaining

10        representatives have the opportunity to be

11        present at the adjustment."

12            Are you a familiar with that language?

13    A   Yes.

14    Q   Are you aware of any law that would prevent it

15        from applying to Mr. Mazzola in this case?

16                MS. SAVOIE:  Objection.

17    A   He wanted his union representatives there.

18    Q   Simple question.  Are you aware of any law that

19        would prevent the application of that section

20        of the Ohio Revised Code to Mr. Mazzola in this

21        case?

22                MS. SAVOIE:  Objection.

23    A   I don't know.

24    Q   All right.

25    A   I would need more time to evaluate that and
```

July 21, 2020

88

```
1            answer that question.

2       Q    You don't know, you don't know.  It's all I can

3            ask.  So you testified in response to counsel's

4            question that you didn't have an

5            attorney/client relationship with Mr. Mazzola

6            in this case, right?

7       A    Correct.

8                      MS. SAVOIE:  Objection.

9       Q    And so back to my prior question, which is, are

10           there any times where you have attorney/client

11           relationships with employees?

12      A    No.

13      Q    No, there's no times where you have

14           attorney/client relationships with employees,

15           correct?

16      A    Correct.

17      Q    All right.  So anytime your firm represents an

18           employee in an arbitration proceeding in the

19           future, we're allowed to put the attorneys on

20           the stand and find out what the employees told

21           that attorney, right?

22                      MS. SAVOIE:  Objection.

23      A    No.

24      Q    I just want to have -- so why isn't that true?

25      A    Because in that context, the member and the
```

July 21, 2020

89

```
 1            union are the same entity for purposes of

 2            privilege in those circumstances.

 3       Q    So in such a case, you would be asserting a

 4            privilege then on behalf of the employee,

 5            obviously?

 6       A    On behalf of the union.  The member is a

 7            witness of the union at that point.

 8       Q    But it's the employee's grievance, right?  We

 9            just read that in the statute.

10       A    The union files the grievances on behalf of the

11            members.  Even the grievance form says that,

12            "member."  It's the grievance of the union on

13            behalf of the member or members.  There are

14            such a thing as a group grievance.

15       Q    Well, there are all kinds of grievances, right?

16       A    Right.

17       Q    And so a group grievance is one that affects a

18            group of employees as opposed to a singular

19            employee like in this circumstance with

20            Mr. Mazzola potentially getting disciplined?

21       A    If he had been disciplined and he was the only

22            one disciplined, then, you know, it would be a

23            single grievance, yes.

24       Q    Right.  And regarding counsel's question about

25            effective date of discipline -- so employees
```

July 21, 2020

90

```
1              get disciplined and discipline gets modified or

2              not or reversed or not through the grievance

3              and arbitration process, right?

4         A    Right.

5         Q    And that's just the way it works, right?  There

6              is nothing wrong with that, it's just the way

7              it is, right?

8                        MS. SAVOIE:  Objection.

9         A    You're asking me if there is anything wrong

10             with the grievance and arbitration procedures?

11             Of what?

12        Q    No.  I'm just saying -- so if someone is

13             temporarily demoted and then later reinstated

14             or fired and brought back, that's the way the

15             system works, right?

16        A    Sometimes.  What are you asking me?

17        Q    Well, what I'm asking is there seems to be some

18             implication that Mr. Mazzola could be subject

19             to a demotion that might someday be reversed

20             and get reinstated to his prior rank.

21        A    That can happen.  It's possible.

22        Q    Exactly.  And if that happens, that's the way

23             the system operated in that particular case,

24             that's the relief to which he was or was not

25             entitled?
```

July 21, 2020

91

```
 1    A   In that hypothetical situation, sure.
 2    Q   Sure.  And the employer hasn't done anything
 3        wrong by meting out that discipline just
 4        because some arbitrator later disagrees with
 5        it, correct?
 6                     MS. SAVOIE:  Objection.
 7    A   I disagree.  I mean, obviously I disagree.
 8    Q   Why do you disagree?
 9    A   If the employer -- if the city issues unjust
10        discipline, it was unjust from the beginning.
11        It doesn't become unjust only until the
12        arbitrator decides it's unjust.  It was unjust
13        from the very beginning.  The arbitrator is
14        only confirming that it was.
15    Q   The arbitrator is deciding that it was?
16    A   Well, siding with the union.  The union always
17        knew it was unjust.
18    Q   Okay.  All right.  That's fine.  That's all for
19        you.  Thank you, ma'am.
20    A   Okay.
21                     MR. STRANG:  I suppose Ms. Liva
22        is -- well, you have no more questions,
23        correct, before we adjourn?
24                     MS. SAVOIE:  No more questions.
25                     THE WITNESS:  Can I go back to
```

July 21, 2020

92

```
1        the beach now, please?
2               MR. STRANG:  Ms. Liva, you have
3        the option of trusting that the court reporter
4        took down everything that you said accurately,
5        in which case you would waive signature; or you
6        can review the transcript to see if there are
7        any revisions that need to be made, see if
8        there are any errors made, at which point you
9        would say you want to read the transcript.  You
10       don't have a lawyer here, so you have to make
11       the decision.
12              THE WITNESS:  You're asking me if
13       I want the transcript or if I trust -- I trust
14       the court reporter.
15              MR. STRANG:  Okay.  Thank you.
16       Thank you for your time.
17              MS. SAVOIE:  Thank you, Ms. Liva.
18       We appreciate it.
19              THE WITNESS:  No problem.  Bye.
20              MR. MCLANDRICH:  Thank you.
21                -   -   -   -   -
22         (Thereupon, the deposition was concluded.)
23              (Signature was waived.)
24                -   -   -   -   -
25
```

July 21, 2020

93

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CADY REPORTING SERVICES, INC.

CADY REPORTING SERVICES, INC. 216-861-9270

July 21, 2020

94

THE STATE OF OHIO,    )    SS:
COUNTY OF CUYAHOGA.    )

    I, Tracy Lam, a Notary Public within and
for the State of Ohio, duly commissioned and
qualified, do hereby certify that SARA LIVA, was
first duly sworn to testify the truth, the whole
truth and nothing but the truth in the cause
aforesaid; that the testimony then given by her was
by me reduced to stenotypy in the presence of said
witness, afterwards transcribed on a
computer/printer, and that the foregoing is a true
and correct transcript of the testimony so given by
her, as aforesaid.

    I do further certify that this deposition was
taken at the time and place in the foregoing
caption specified.  I do further certify that I am
not a relative, counsel or attorney of either
party, or otherwise interested in the event of this
action.

    IN WITNESS WHEREOF, I have hereunto set my
hand and affixed my seal of office at Cleveland,
Ohio, on this 27th day of July, 2020.

Tracy Lam, Notary Public
within and for the State of Ohio
My Commission expires November 12, 2022.

           CADY REPORTING SERVICES, INC.