Leonard Mazzola

LEONARD MAZZOLA v. ANTHONY TOGLIATTI, et al.

July 20, 2020



# CADY
REPORTING SERVICES, INC.

Western Reserve Building
1468 West 9th Street, Suite 440
Cleveland, OH 44113
Phone: 216.861.9270

cadystaff@cadyreporting.com
www.cadyreporting.com

1             IN THE UNITED STATES DISTRICT COURT
                  NORTHERN DISTRICT OF OHIO
2                      EASTERN DIVISION

3

4      LEONARD MAZZOLA,                )
                                       )
5                   Plaintiff,         )
                                       ) Case No. 1:19-cv-02519
6      vs.                             ) Judge James S. Gwin
                                       )
7      ANTHONY TOGLIATTI, et al.,      )
                                       )
8                   Defendants.        )
                                       )
9                          - - - - -
10       THE VIDEOTAPED DEPOSITION OF LEONARD MAZZOLA
                  MONDAY, JULY 20, 2020
11                         - - - - -

12

13           The videotaped deposition of LEONARD MAZZOLA,

14      called by the Defendant for examination pursuant to

15      the Federal Rules of Civil Procedure, taken before me,

16      the undersigned, Tracy Lam, Notary Public within and

17      for the State of Ohio, taken remotely via Zoom,

18      Cleveland, Ohio, commencing at 9:14 a.m., the day and

19      date above set forth.

20

21

22

23

24

25

```
 1      APPEARANCES:

 2


 3       On behalf of the Plaintiff:

 4         Subodh Chandra, Esq.
           Jessica Savoie, Esq.
 5         The Chandra Law Firm, LLC
           The Chandra Law Building
 6         1265 W. 6th Street, Suite 400
           Cleveland, Ohio 44113
 7         jessica.savoie@chandralaw.com
           subodh.chandra@chandralaw.com
 8


 9
         On behalf of Defendants City of Independence,
10       Michael Kilbane and Greg O'Brien, Esq.:

11         Steven D. Strang, Esq.
           Maia E. Jerin, Esq.
12         Gallagher Sharp, LLP
           Sixth Floor Bulkley Building
13         1501 Euclid Avenue
           Cleveland, Ohio  44115
14         216.241.5310
           sstrang@gallaghersharp.com
15         mjerin@gallaghersharp.com

16

17       On behalf of Defendant Anthony Togliatti:

18         John T. McLandrich
           Mazanec, Raskin and Ryder Co., L.P.A.
19         100 Franklin's Row
           34305 Solon Road
20         Cleveland, Ohio 44139
           jmclandrich@mrrlaw.com
21

22      ALSO PRESENT:

23        Mr. Alex Cook
          Mr. Anthony Togliatti
24        Mr. Michael Kilbane
          Mr. Gregory O'Brien
25        Mr. Gregory Kurtz
```

```
 1                    LEONARD MAZZOLA DEPOSITION INDEX

 2

 3        EXAMINATION BY:                        PAGE NO.

 4        MR. STRANG          ...................    4

 5

 6

 7        EXHIBIT NO.                             PAGE NO.

 8                   (All exhibits were premarked.)

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        LEONARD MAZZOLA
 2          of lawful age, called by the Defendants for
 3          examination pursuant to the Federal Rules of Civil
 4          Procedure, having been first duly sworn, as
 5          hereinafter certified, was examined and testified
 6          as follows:
 7                    EXAMINATION OF LEONARD MAZZOLA
 8     BY MR. STRANG:
 9     Q   All right.  Mr. Mazzola, my name is Steven
10          Strang and I'm representing defendants Chief
11          Kilbane, Greg O'Brien and the City of
12          Independence in this case?
13                   Have you ever been deposed before?
14     A   Yes, I have.
15     Q   Okay.  Are you having trouble hearing me at
16          all?
17     A   No.
18     Q   Is there a delay at all from when you can see
19          me speaking to when you can hear my voice?
20     A   Slightly.
21     Q   Well, look, this is a little bit weird because
22          we're talking this by video conference, okay,
23          so there are a couple things I want you to keep
24          in mind today.  If for whatever reason my voice
25          cuts out or I freeze or there are any
```

Deana G. Niksich

```
 1          technological issues, please just note that and

 2          maybe raise your hand, note that I froze, note

 3          that you couldn't hear anything.  I'm going to

 4          try my best to speak loudly, but for whatever

 5          reason there is anything wrong with the

 6          computer audio, again, just note it and we'll

 7          take a break and we'll try and fix it, okay?

 8     A    Okay.

 9     Q    Okay.  Generally at depositions it is important

10          to keep in mind that we should not talk over

11          one another because the court reporter is

12          taking this down and it's difficult for the

13          court reporter to take down cross speaking,

14          okay.  So if you -- even if you know where I'm

15          going with the question, please just let me get

16          the question out because it's really important

17          today that we don't interrupt one another,

18          and I'll try to extend you the same courtesy,

19          but I want to make sure that only one of us is

20          talking at a time; and that's particularly

21          important because we're dealing with computer

22          audio issues and it's even more difficult to

23          hear two people talking when we're over the

24          computer, okay?

25     A    Yes, sir.
```

```
 1     Q    Okay.  I'm going to ask you -- or I'm going to

 2          insist today that your answers be verbal.  So a

 3          "yes" or a "no" as opposed to a head nod or an

 4          "uh-huh" or an "uh-uh."  I want it to be, to

 5          the extent that we can, a "yes" or a "no"

 6          because, again, it's being typed and the court

 7          reporter has a difficult time taking down a

 8          head nod or an "uh-huh" or an "uh-uh."  So I

 9          might note a couple times "is that a yes" or

10          "is that a no."  I'm not doing it to try and

11          get under your skin or needle you, I'm just

12          doing it so we have a clear record afterwards,

13          okay?

14     A    Yes, sir.

15     Q    This is also not a marathon session.  I don't

16          want you to be physically uncomfortable today.

17          If for whatever reason you need to take a break

18          to stretch your legs, to go to the bathroom,

19          even just a mental break, please just let me

20          know, that's no problem, I just ask that you

21          answer the question that I have posed before we

22          do take a break.

23               I also -- it's not my intention to try to

24          confuse you with any of my questions today.  To

25          the extent that you don't understand what I'm
```

Deshard Filed: 10

```
 1        saying, if you're confused with the question,

 2        please just let me know and I'll be happy to

 3        rephrase it.  I don't want you to try and guess

 4        at an answer or answer something you don't

 5        fully understand.

 6             Are you on any medication today that

 7        might affect your ability to testify?

 8    A   No, I'm not.

 9    Q   Are you on any psychological medication of any

10        sort today?

11    A   No, I'm not.

12    Q   Did you take any sort of sleeping medication or

13        psychological medication within 24 hours?

14    A   I have not.

15    Q   How much did you sleep last night?

16    A   Probably about six hours.

17    Q   And how much do you normally sleep a night?

18    A   That would probably be about the normal.

19    Q   Is six hours sufficient for you to come here

20        and answer my questions today?

21    A   Yes, sir.

22    Q   You're not tired or groggy or anything like

23        that?

24    A   No, sir.

25    Q   What effect does lack of sleep have on you?
```

```
 1     A    I guess the normal, like everybody else would.

 2     Q    What's that?

 3     A    General tiredness.

 4     Q    Anything else?  Does it make you -- does it

 5          tend to make you confused, irritable,

 6          lethargic, anything like that?

 7     A    No.

 8     Q    Does lack of sleep affect your ability to

 9          answer truthfully or to provide truthful

10          answers?

11     A    No, sir.

12     Q    Do you have COVID-19 as we're sitting here

13          today?

14     A    Yes, sir.

15     Q    When were you diagnosed?

16     A    I've had three diagnoses or, I guess, tests.

17          The first one was June 30, the second one

18          July 3rd, and the last one July 12th.

19     Q    What were the results of those tests?

20     A    Positive.

21     Q    All three positive?

22     A    Yes, sir.

23     Q    When did you start experiencing symptoms?

24     A    It was probably -- let's see.  The first test

25          was June 30th, that surprised me, I didn't have
```

```
 1              any symptoms at that time; and then probably a

 2              day or two after that I became dizzy and

 3              fatigued, so I was -- let's see, June 30th, so

 4              that would be July 1 or July 2.

 5         Q    Why did you get tested on June 30th?

 6         A    I had traveled to Phoenix for work and a

 7              coworker had symptoms, if you will, sinus

 8              issue, and then she ended up going home on day

 9              two when I was working with her; and two days

10              later she tested positive and notified the team

11              whom she was working with that she was positive

12              and that it would be, you know, good advice to

13              go get checked out.

14         Q    What symptoms are you experiencing today?

15         A    Just general -- kind of fatigued.  Nothing real

16              strong today.  The last major symptom was

17              sinuses, which ended roughly July the 8th.

18         Q    Do you have a temperature as we're sitting here

19              today?

20         A    I don't believe so, but I don't have a

21              thermometer.

22         Q    Do you believe that your illness will impact

23              your ability to testify today?

24         A    No.  I mean, if I start feeling fatigued I will

25              certainly let you know, but I don't believe
```

```
1            there's anything that would stop me from, you

2            know, talking with you today.

3     Q    Okay.  Well, I'm going to rely on the answers

4            that you give me today, so I am asking you if

5            you start experiencing any sort of symptoms

6            that's impacting your ability to testify, just

7            let me know; is that fair?

8     A    Yes, sir.

9     Q    What work trip were you -- brought you to

10           Phoenix?

11    A    I started working for Supply Source Products

12           and they had work at a Phoenix warehouse that

13           they currently operate.

14    Q    What do you do at Supply Source Products?

15    A    Operations manager.

16    Q    What do you do as operations manager?

17    A    Currently it's inventory control and general

18           operations for orders.

19    Q    Where is that company located?

20    A    Headquartered in Charlotte and a warehouse

21           currently in Phoenix.

22    Q    Do they have a Cleveland presence?

23    A    Just sales region.  No physical location.

24    Q    And what are your daily responsibilities?

25    A    The inventory control would be the most
```

```
 1          responsibility that I have currently.
 2     Q    Do you go into an office?
 3     A    No.  It's done by Fishbowl Inventory Control at
 4          this point, which is online.
 5     Q    What sort of products does Supply Service
 6          Products deal with?
 7     A    Stainless and copper pipe fittings.
 8     Q    Who is your boss?
 9     A    Tyson Higginbotham.
10     Q    Do you have a spelling for Higginbotham?  Am I
11          pronouncing that correctly?
12     A    I'm sorry.  I'm hearing other voices.  I
13          believe you said spell Higginbotham.  It's
14          H-I-G-G-I-N-B-O-T-H-A-M.
15     Q    Does the company have any sort of physical
16          office or address?
17     A    The headquarters right now is a -- I guess a
18          P.O. Box, if you will, in Charlotte.  Tyson
19          kind of runs things from his home office; and
20          then there's a physical warehouse in Phoenix,
21          Arizona.
22     Q    Do you know what the P.O. Box is?
23     A    I do not.
24     Q    Do you know where the company is incorporated?
25     A    South Carolina.
```

Leonard Radecki 08

```
 1    Q   Do you know where their principal place of

 2        business is?

 3    A   The business plan is for North America and

 4        Latin America.

 5    Q   When did you get this job?

 6    A   There was an e-mail exchange.  I believe it was

 7        June 10.

 8    Q   That's your date of hire?

 9    A   That's when Tyson and I spoke about me coming

10        on board.

11    Q   How did you hear about the opportunity?

12    A   Tyson started the company a few years ago.

13    Q   Did you know Tyson before you got this job?

14    A   Yes, sir.

15    Q   From where?

16    A   He worked in the Cleveland area and I met him

17        through my wife's friend who he was dating, I

18        guess, if you will.  I'm going to say, just

19        estimating, late '90s.

20    Q   Did you have to interview for the position?

21    A   We did a Zoom, call with him and his partner

22        Brian.

23    Q   What's Brian's last name?

24    A   Ragone.

25    Q   Can you spell that?  I'm just having a
```

```
 1          difficult time making that -- hearing even how

 2          to pronounce it?

 3     A    Can you hear me okay now?

 4     Q    I can.  Yeah, I can.  It's not a microphone

 5          problem.  But if you could just -- if you know

 6          how to spell it, that would be helpful.

 7     A    R-A-G-O-N-E.

 8     Q    Where does he live?

 9     A    I don't know where he lives.  He runs Phoenix,

10          Arizona.

11     Q    Do you have any plans to relocate for this job?

12     A    Currently right now I'm looking to relocate to

13          Charlotte.

14     Q    Do you have a time table for that?

15     A    I do not.

16     Q    When did you first apply to this job?

17     A    We began talking in April about the possibility

18          of me coming on board.

19     Q    How many interviews did you have?

20     A    I had traveled to Orlando in February of this

21          year.  That's when I met the team.  I don't

22          know if I would classify it as an interview,

23          but it was kind of get to know the

24          business-type introduction.

25     Q    Did you have any interviews after that?
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1      A   I did not.

 2      Q   And you were brought on officially on June 10th

 3          2020, correct?

 4      A   I'm not sure of the official date.  That was an

 5          e-mail, but that's -- I didn't fill out

 6          anything and I didn't get like an acceptance

 7          letter or nothing.  I'm sorry, I wish you could

 8          be more specific, but --

 9      Q   That's okay.  You do have that e-mail, correct,

10          or you can get it?

11      A   I do.

12      Q   What e-mail address have you used to

13          communicate with Mr. Higginbotham before you

14          were actually hired?

15      A   The lenchip one.

16      Q   And is that e-mail address lenchip@wowway.com?

17      A   Yes, sir.

18      Q   L-E-N-C-H-I-P-@-W-O-W-W-A-W.com, correct?

19      A   I think you had the ending wrong.  It's

20          W-O-W-W-A-Y.com.

21      Q   How long have you had that e-mail address?

22      A   I believe since '05.

23      Q   Is that your primary personal e-mail address?

24      A   Yes, sir.

25      Q   What other personal e-mail addresses have you
```

```
 1              had since -- you mentioned '05, I'll just pick
 2              that date kind of randomly.  What personal
 3              e-mail addresses have you had besides the
 4              lenchip e-mail address since '05?
 5        A     I have a gmail.  33940 M-A-Z-Z -- actually, it
 6              might be reversed.  I don't use it much.  It
 7              might be MAZZ3940@gmail.com.  I started that
 8              for scheduling purposes for the department.
 9        Q     Why did you use that as opposed to your
10              official department e-mail address for
11              scheduling the department?
12        A     I created a scheduling system using Google
13              Sheets and it integrates flawlessly with a
14              gmail as opposed to a non Google gmail.
15        Q     Okay.  What other personal addresses have you
16              had or maintained since 2005?
17        A     I don't have any.
18        Q     Those are the only two, this lenchip and the
19              gmail address?
20        A     Yes, sir.
21        Q     Have you had used either of those e-mail
22              addresses to correspond with your City of
23              Independence e-mail address?
24        A     I'm not sure I understand "correspond with."
25        Q     Yeah.  Sure.  So sometimes if I'm home over the
```

```
 1           weekend doing work I'll send a document or
 2           something like that to my work e-mail address
 3           from my home e-mail address.
 4                 Did you ever do that with any of
 5           your -- with this Wowway e-mail address or this
 6           gmail e-mail address?
 7     A     I don't know.  I've read e-mail at home, but I
 8           think I went through the city intranet, or
 9           whatever it was called, where you log in on a
10           the city website and then you go to e-mail
11           itself.  But then I'm not sure if that came
12           through an e-mail or just directly over their
13           account.
14     Q     Did you ever log on to either of those personal
15           e-mail addresses on a work computer at the City
16           of Independence?
17     A     I'm sure I have, yes.
18     Q     And did you ever use either of those e-mail
19           addresses, the gmail or the Wowway e-mail
20           address to conduct City of Independence
21           business?
22     A     No.  I would use my Mazzola L account for that.
23     Q     That would be your Independence account,
24           correct?
25     A     Yes, sir.
```

```
 1     Q   Did you ever send any -- have you ever attached

 2         or sent any City of Independence documents

 3         using the lenchip address or the gmail address?

 4     A   No, I have not.

 5     Q   Never?

 6     A   No, I have not.

 7     Q   How much do you make?

 8     A   In what context?

 9     Q   In your current salary or your current job,

10         what's your current salary?

11     A   Supply Source is $2,500 a month.

12     Q   Do you have commission that you make?

13     A   No, sir.

14     Q   How are you paid?

15     A   I just got paid one time so far and it was

16         direct wire transfer to my checking.

17     Q   Are you full time?

18     A   Yes.

19     Q   How many hours a week do you work?

20     A   It varies depending on the workload needed from

21         week to week.

22     Q   It varies between what then?

23     A   Like, for instance, last week was very heavy

24         because there were a lot of orders going out,

25         so I was working long hours each day.  And then
```

```
 1          this previous last week was very light.
 2     Q    Can you give me a sense of what "very light"
 3          means or what "working long hours" means?
 4     A    Sure.  Last week -- or I guess it would be two
 5          weeks ago now now that it's Monday -- I was
 6          probably working 10 hour days all five or six
 7          days of that week; compared to last week when I
 8          probably worked about five hours per day.  So
 9          about half.
10     Q    Do you get benefits?
11     A    No, sir.
12     Q    Do you currently have health benefits?
13     A    Yes, sir.
14     Q    Through who?
15     A    Through my wife's work at Cuyahoga County.
16     Q    Do you know who your -- do you know what
17          medical provider you use?
18     A    I believe it's Medical Mutual.
19     Q    Have you had any conversations with your
20          present employer about what sort of salary you
21          can expect in the coming years?
22                    MR. CHANDRA:  Object.
23              You may answer.
24     A    We've talked about progressing obviously with
25          the company, however it's just started up so
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1           nothing definitive.
 2     Q    Sure.  Well, what kind of --
 3                      MR. CHANDRA:  Steve, just a
 4           moment just so I can save time in the
 5           deposition.  Mr. Mazzola, if I lodge an
 6           objection, unless I specifically instruct you
 7           not to answer, you may answer after I've lodged
 8           the objection, okay.
 9                      THE WITNESS:  Okay.
10     Q    Mr. Mazzola, what kind of -- what's your
11           understanding of what sort of opportunities are
12           available at the company with respect to salary
13           in the coming years?
14     A    We had talked briefly about the ability of the
15           company to grow and then, you know, my salary,
16           if you will, growing from there.  However, that
17           would depend on the growth.  Right now I'm at
18           $2,500 a month up until something like that
19           would happen.
20     Q    Do you have an equity in the company?
21     A    I do not.
22     Q    Did you invest in the company at all?
23     A    No, sir.
24     Q    Do you have any plans to do so?
25     A    Currently, no.
```

```
 1    Q   Have you discussed an opportunity to invest in

 2        the company?

 3    A   The investment structure of the company I'm not

 4        aware of.  Currently I would not, if that

 5        answers your question.  If things change and it

 6        looks like a better investment, then maybe I

 7        would consider it at that time.

 8    Q   Did you sign any sort of employment agreement?

 9    A   No, I did not.

10    Q   Are you an equitable employee?

11    A   I guess so, yeah.

12    Q   Do you have any other jobs that you're

13        currently working?

14    A   Yes, sir.

15    Q   What is that?

16    A   Marblehead Police Department.

17    Q   When did you last work for Marblehead?

18    A   I have to check my calendar.  Back in the

19        springtime I would imagine.

20    Q   So it's been several months?

21    A   Yes, sir.

22    Q   My understanding of your Marblehead position is

23        that's sort of seasonal work; is that correct?

24    A   Correct.

25    Q   Are you paid by the hour at Marblehead?
```

```
 1    A   When it's paid, yes.
 2    Q   Why do you do this Marblehead thing?  Is it the
 3        second year you've done it?
 4    A   Yes, sir.  It hasn't started yet this year.
 5        But, yes, this will be my second year.
 6    Q   Why do you do it?
 7    A   I want to still serve.  You know, I was a
 8        police officer for a long time, did not want to
 9        end my police career, still think I have a lot
10        to give to the community and it was an
11        opportunity to keep my commission.
12    Q   It's to keep your commission essentially; is
13        that correct?
14    A   No, I think that's a secondary benefit.  Again,
15        I love being a police officer.  I loved serving
16        my community.  And then Independence was not
17        willing to keep my commission, so that was kind
18        of another benefit, if you will, of coming up
19        to Marblehead and continuing to serve.
20    Q   Do you own a house in Marblehead?
21    A   No, I do not.
22    Q   Well, what's your tie to Marblehead, if any?
23    A   This home where I'm at now is -- well, I call
24        him my step dad, he's been dating my mom since
25        1982, so I've known him since I've been a young
```

```
 1          child, he owns the home here.
 2     Q    In Marblehead?
 3     A    Yes, sir.
 4     Q    What is your title at Marblehead when you do
 5          work for the company -- or when you do work for
 6          the police department?
 7     A    Patrolman.
 8     Q    Do you have any plans to go full time with
 9          Marblehead?
10     A    I do not.
11     Q    What other jobs have you worked at since March
12          of 2019 besides Marblehead and besides your
13          current position?
14     A    When the pandemic started I started working for
15          Uber Eats, a Uber driver.
16     Q    How long did you do that?
17     A    I'd have to look at my records for you.  I'm
18          just going to say March through maybe June,
19          maybe late May, somewhere in there.
20     Q    Have you worked any other jobs besides Uber
21          Eats, besides Marblehead and besides your
22          current position since you stopped working for
23          the City of Independence?
24     A    No, sir.
25     Q    Have you had any other sources of revenue
```

```
1          besides those three jobs since you stopped

2          working for the City of Independence?

3     A    No, sir.

4     Q    Have you worked at any trade shows since you

5          stopped working at the City of Independence?

6     A    Yeah, I went -- well, I mentioned earlier I

7          went down to Orlando in February with Supply

8          Source.  I believe it was February 1st through

9          4th or 5th.  I was not paid though.

10    Q    What did you do down there?

11    A    Helped them set up their display booth and then

12         participated in the actual booth activity, if

13         you will, during the convention.

14    Q    Does anyone with your company have a condo in

15         Florida?

16    A    No, sir.

17    Q    Do you have any friends with Florida condos?

18    A    No, sir.

19    Q    Did you work at any trade shows in Florida

20         besides the one that we just talked about?

21    A    No, sir.

22    Q    Does your -- does Supply Service Products pay

23         you anything -- do they pay you cash on the

24         side at all?

25    A    No, sir.
```

```
 1    Q   Has anyone -- has anyone other than -- have

 2        you --  well, let me get to the point here.

 3             Mr. Mazzola, I've got all your

 4        psychological treatment records and some of

 5        them are -- some of the notes are more

 6        difficult to understand than others, but I've

 7        got a note that I'm kind of trying to make

 8        sense of that looks to me like it says you were

 9        at a trade show and you made what I think is

10        $200,000 on the side of the trade show in

11        Florida.  Is that true?

12    A   No.  Wish it was.

13    Q   Okay.  Do you know what I'm talking about when

14        I mention that?  Does that ring any bells?

15    A   Yes, sir.

16    Q   Okay.  Well, do you have an explanation for

17        that?

18                 MR. CHANDRA:  Objection.

19    A   Sure.  At the trade show there were two

20        gentlemen that only spoke Spanish, broken

21        English.  One of our suppliers for Supply

22        Sources is ISOTUBI-USA located out of

23        Barcelona, Spain.  So when these two gentlemen

24        came to the booth they were talking and I did

25        the best I could to translate for them and went
```

```
 1              ahead and got Maratell, the CEO of ISOTUBI, and

 2              went ahead and got Tyson, kind of pulled him

 3              away from a meeting, and we were able to sit

 4              down and facilitate a sale.  So it's a 200,000

 5              sale of product to these gentlemen.

 6      Q    That was to the company, not you, correct?

 7      A    Correct.  It's to the company.

 8      Q    Do you have -- are your plans in the future to

 9              basically stick with your present employer?

10                        MR. CHANDRA:  Objection.

11      A    You know, I'm still working out my future,

12              Mr. String.  This has been overwhelming to me.

13              Currently I'm going to plan to work for Supply

14              Source, hopefully that pans out.  And I'm to

15              maintain my relationship here with Marblehead

16              police.

17      Q    Since you got the job with Supply Source

18              Products in June of 2019, have you applied to

19              any other jobs?

20      A    That date is wrong.  Supply Source just started

21              like a month and a half ago.

22      Q    Well, since June of 2020 have you applied to

23              any other jobs?

24      A    I'm still in the process of applying to

25              Charlotte PD.  I'm sorry.  Charlotte Police
```

```
 1          Department.
 2     Q    Where are you in the process?
 3     A    They have a long process.  I believe there are
 4          two stages.  I believe I'm in the final phase,
 5          which is a background check before I would
 6          enter the second phase.  The second phase
 7          happens after a conditional offer is levied.
 8     Q    How many job interviews have you had with
 9          Charlotte Police Department?
10     A    Interviews, like one on one physically, zero.
11          It's all been virtual online except for my
12          written test and my agility test.
13     Q    Where were those?
14     A    Charlotte, North Carolina.
15     Q    And when did you take those?
16     A    May 30th of this year.
17     Q    If you get this job with the Charlotte Police
18          Department, will you continue working at your
19          present job at Supply Source Products?
20                    MR. CHANDRA:  Objection.
21     A    I guess I don't know how to answer that until I
22          receive an offer from Charlotte and then at
23          that time make the best decision for myself and
24          my family.
25     Q    Well, do you think it's possible to work at
```

```
 1        Supply Source Products and the Charlotte Police

 2        Department at the same time?

 3                 MR. CHANDRA:  Objection.

 4    A   Yeah.  I think it would be possible, yes, sir.

 5    Q   What position are you interviewing for at

 6        Charlotte Police Department?

 7    A   Everybody enters --  well, let me backtrack.

 8        It's a lateral.  So it's -- I'm not sure how

 9        they classify it, but it's a lateral position.

10        And I believe everybody starts in patrol is the

11        way it was described to me.

12    Q   So your expectation would be to be hired on as

13        a patrolman?

14    A   I think initially, yes, patrolman.  However,

15        they said I'd be assigned according to need and

16        qualifications.

17    Q   Why the interest in the Charlotte Police

18        Department?

19    A   It was one of very few departments that accept

20        lateral for officers my age.

21    Q   What research did you do to figure that out?

22    A   Just online searching.  And then I saw a

23        commercial, recruitment commercial, while I was

24        actually down in Charlotte.

25    Q   Have you retained any outside headhunting firm
```

```
 1            to help you with the job search?
 2     A   I have not.
 3     Q   Have you talked to anyone who could help you in
 4            your job search professionally?
 5     A   I have not.
 6     Q   What other police departments have you applied
 7            to besides Charlotte?
 8     A   None.
 9     Q   So you have not applied to any other Cleveland
10            area department; is that correct?
11     A   Correct.  I have not.
12     Q   You mentioned that if you got an offer from
13            Charlotte that you would make the best decision
14            for both yourself and your family.  Did I hear
15            that correctly?
16     A   Yes, sir.
17     Q   Is your family planning on moving down to
18            Charlotte with you?
19                      MR. CHANDRA:  Objection.
20     A   No, unfortunately not.
21     Q   Okay.  So you're planning on moving down to
22            Charlotte, or at least considering moving down
23            to Charlotte, whether you get this Charlotte
24            Police Department job or not, correct?
25     A   No, I don't think that classifies it correctly.
```

```
 1         It would just depend on the needs of Supply

 2         Source -- I'm sorry -- yeah, Supply Source

 3         Products because they are looking to expand a

 4         warehouse to the Charlotte area.  So it would

 5         just depend on the workload.  I think what will

 6         end up happening initially is me commuting back

 7         and forth.

 8    Q    So you've applied with Charlotte Police

 9         Department and you're still in the application

10         process, correct?

11    A    Yes, sir.

12    Q    Okay.  Your company appears to be at least

13         based in the Charlotte area, correct?

14    A    Correct.  Yes.  It's headquartered in

15         Charlotte.

16    Q    Okay.  Is that a coincidence the fact that your

17         present company is down in Charlotte and

18         Charlotte apparently is one of the only police

19         departments that accepts laterals?

20    A    I don't know if it was coincidence, but I saw

21         it as an opportunity.

22    Q    Did you specifically look at the Charlotte

23         Police Department because your present employer

24         has a presence in Charlotte?

25    A    I was in Charlotte and when I saw that
```

| | | |
|---|---|---|
| 1 | | recruitment and I figured, well, that's an |
| 2 | | opportunity as well in this area. |
| 3 | Q | Where did you see the recruitment? |
| 4 | A | They run local TV ads, if you will. |
| 5 | Q | What specific research have you done to the |
| 6 | | look at whether other police departments would |
| 7 | | accept you laterally? |
| 8 | A | I did an online search for lateral and, you |
| 9 | | know, they list the departments that are |
| 10 | | currently accepting lateral positions. |
| 11 | Q | Who lists the departments currently accepting |
| 12 | | lateral positions? |
| 13 | A | I don't know how the list comes up, sir.  You |
| 14 | | go to Google and then it throws you like to |
| 15 | | Indeed, I believe, or Monster.  And then the |
| 16 | | departments, if you will, have like job |
| 17 | | postings. |
| 18 | Q | Have you applied to any of those other |
| 19 | | departments? |
| 20 | A | I have not. |
| 21 | Q | What other departments did you see? |
| 22 | A | There's a lot, but they're all, I'd say -- not |
| 23 | | all, but a majority of them are way out. |
| 24 | | California, Washington, Oregon, Texas has a |
| 25 | | lot, Florida has a lot.  But I didn't want to |

Leonard Medvaio

31

```
1        be in a position to where I would be that far

2        away from Cleveland.

3    Q   What efforts have you made to see if there are

4        any lateral opportunities in Ohio police

5        departments?

6    A   Same thing.  They are listed.  I believe the

7        only ones that were listed that I saw were

8        Peninsula and Kent, Ohio.

9    Q   Did you apply to those?

10   A   I did not.

11   Q   Why not?

12   A   The job postings were for entry level patrol

13       and with a small department there would be no

14       way to advance or apply my qualifications.

15   Q   How do you know that?

16   A   I guess just based on experience and knowing

17       the job.

18   Q   You haven't contacted Peninsula or Kent about

19       verifying that, have you?

20   A   No, I haven't.

21   Q   Well, Kent is a large department, right?

22   A   I don't know.

23   Q   How long have you spent total online

24       researching if there are any Ohio lateral

25       opportunities for you?
```

```
 1                      MR. CHANDRA:   Objection.
 2      A    I have -- gosh, I wouldn't be able to log like
 3           the hours or specific times.  Just Google
 4           searches I guess.
 5      Q    How many, Google searchs?
 6      A    Just a couple actually.  When I went ahead and
 7           did my Google search, when I saw that Charlotte
 8           obviously was accepting the online
 9           applications, I went ahead and filled that one
10           out.
11      Q    You can't quantify to me how much time you've
12           spent looking for lateral jobs in Ohio?
13      A    I didn't spend -- other than seeing the
14           listings, I didn't pursue anything in Ohio.
15      Q    Have you reached out -- well, obviously we're
16           here because you're a police officer -- for how
17           many years?
18      A    Almost -- well, with Independence I think I
19           almost had 24 complete.
20      Q    And you were a police officer before that,
21           correct?
22      A    No, sir.
23      Q    What were you before?  You worked at, what was
24           it, the Department of Corrections?
25      A    Yeah.  Well, Department of Use Services.  I'm
```

```
 1        not sure what the title is now.

 2   Q    Well, in your years in the police department

 3        you must have contacts outside of the

 4        Independence Police Department, correct?

 5   A    Sure, that's fair.

 6   Q    At other departments?

 7   A    Yes, sir.

 8   Q    What efforts have you made to reach out to

 9        those contacts and see whether there would be

10        any lateral opportunities for you?

11   A    I have not contacted directly any departments.

12        Lateral transfer here in Ohio is very rare,

13        very, limited.  Lateral transfers throughout

14        the rest of the country are multiple.  They

15        love having police officers from the north,

16        this area in general, because we have better

17        training and just better qualifications and

18        they can't find enough people, especially

19        nowadays to do the job in the south and in the

20        west.

21                   MR. STRANG:  Reporter, would you

22        mind reading back my question?

23                        -   -   -

24                   (Record was read.)

25                        -   -   -
```

```
 1      Q   Is the answer to that question "none"?

 2      A   Correct.  I have not reached out to any of my

 3          contacts here, I guess, in the Cleveland area.

 4      Q   Have you even informally asked any of your

 5          buddies at any other police departments whether

 6          there would be any opportunities?

 7      A   I have not.

 8      Q   But you do have friends in other police

 9          departments, correct?

10      A   I wouldn't classify them as friends.  But I do

11          have contacts in other departments, yes.

12      Q   Have you called any of those departments

13          directly and asked them about lateral

14          opportunities?

15      A   No, sir.

16      Q   Do you want to work as a police officer in the

17          State of Ohio?

18      A   Well, that question is -- has a real long

19          answer to it.  I think we will probably get to

20          it later here in this deposition.  Obviously I

21          did not want to leave Independence.  I wanted

22          to be an Independence police officer until I

23          was able to retire and live the rest of my life

24          in the home that I built in Independence.  So

25          to ask me if I want to work elsewhere, the
```

```
 1          answer -- the direct answer would be, no, I

 2          don't want to work anywhere else in Ohio as a

 3          police officer.  I wanted to work for

 4          Independence.

 5     Q    Well, you don't work for Independence obviously

 6          and that's why we're here and we'll get into

 7          that.  But now that you don't work for

 8          Independence I'm asking you about --  obviously

 9          you're making a lost wage claim as part of this

10          case, correct?

11     A    Correct.

12     Q    And as part of that you need to mitigate your

13          damages and affirmatively seek out other work,

14          so that's where I'm going with this question.

15          I'm trying figure out what actual affirmative

16          efforts you've made to actually earn an income

17          since you left the City of Independence, okay.

18          So we'll get into what happened with the city

19          and any feelings you may have about your

20          departure a little bit later.  So I'm

21          specifically focusing my questions on efforts

22          that you've made to find other employment,

23          okay?

24     A    Okay.

25     Q    Okay.  So am I correct then that you do not
```

```
 1            have a desire to work at another department in

 2            the State of Ohio; is that correct?

 3     A    I do not -- Marblehead, obviously I am working

 4            for, I do have a desire to work here because of

 5            the home here, which makes it possible.  But to

 6            work somewhere else in Ohio, that creates a lot

 7            of difficulties for myself and my family.

 8     Q    You mentioned difficulties for yourself and

 9            your family, but you have looked for other

10            opportunities out of state like Charlotte

11            though, correct?

12     A    Correct.

13     Q    And as a result of -- you mentioned

14            that -- when you say "these difficulties," are

15            you talking about emotional difficulties?

16     A    I am.

17     Q    Okay.  And as a result of these emotional

18            difficulties you have not made any efforts to

19            seek full-time employment in the State of Ohio

20            as a police officer, correct?

21     A    I don't think that's necessarily 100 percent

22            true.  It just creates a lot of emotional

23            damage to myself being based in Independence.

24     Q    Do all these other police departments require

25            you to live in the city?
```

```
 1    A   I have not looked into residency requirements
 2        of Ohio police departments.
 3    Q   Okay.  I'm a resident of Shaker Heights.  And
 4        would it surprise you to learn that our police
 5        officers do not actually need to live in the
 6        city of Shaker Heights?
 7                    MR. CHANDRA:  Objection.
 8    A   No, that would not surprise me.
 9    Q   So you're aware that you don't actually have to
10        move out of the City of Independence to work as
11        a police officer in another community, correct?
12    A   Correct.
13    Q   And you mentioned that you have this special
14        affinity for the City of Independence and I'm
15        taking it to mean that that is part of your
16        motivation for not wanting to work at another
17        police department in the state of Ohio,
18        correct?
19                    MR. CHANDRA:  Objection.
20    A   No.  That's currently not it.
21    Q   What emotional issues or emotional obstacles do
22        you believe are preventing you from seeking
23        employment at another Ohio police department?
24                    MR. CHANDRA:  Objection.
25    A   Living in Independence is tremendously
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          emotional, tremendously hard and damaging on my
 2          mental, I guess, stability, if you will.
 3          Living inside them four walls of that city that
 4          I protected with my heart and soul for 24
 5          years, to see the streets, to drive on those
 6          streets, to see the police cars driving up and
 7          down my street, it's not a good situation for
 8          me mentally.
 9     Q    What does that have to do with finding another
10          police job in the Cleveland area?
11     A    I would have to be living in Independence in
12          order for myself to work in another community
13          unless I have a special situation like this
14          where I have a home available to me to work
15          hear in Marblehead.
16     Q    Sure.  But why would living in Independence
17          have anything to do with you working in another
18          community?  Why is that more difficult for you?
19     A    Just because of the emotional damage that this
20          situation has caused me and my family.
21     Q    Well, I think you just talked about living in
22          Independence causes you emotional damage,
23          correct?
24     A    Absolutely.
25     Q    Okay.  Well, wouldn't working elsewhere then,
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          getting you out of the City of Independence for

 2          work, wouldn't that be better?

 3     A    For an eight hour shift being outside of the

 4          city, sure, I would agree with you.  However,

 5          where would I return to?  I would return back

 6          to Independence, the city that has emotionally

 7          caused so much damage to me.

 8     Q    Sure.  But you're living in Independence 24/7

 9          now, you're not even leaving during the day for

10          a job elsewhere, correct?  Isn't that more

11          difficult?

12     A    I spend as much time as I can away from

13          Independence currently.  You know, last summer

14          I was up here in Marblehead and then during the

15          fall I took trips to get out of the city.  And

16          unfortunately because of Corona, obviously I

17          was confined to Independence for like three

18          months and now I've been back up here for

19          almost a month.

20     Q    Did you grow up in the City of Independence?

21     A    I did not.

22     Q    Where did you grow up?

23     A    Parma, Ohio.

24     Q    When did you move to the City of Independence?

25     A    Bought property in '04 and built a house in
```

```
 1            '05.

 2     Q    So you've been living in Independence for 15

 3          years, correct?

 4     A    Yeah.  I believe this fall will be 15 years,

 5          yes, sir.

 6     Q    And during that 15 years of living in

 7          Independence you've developed this emotional

 8          tie that you just talked about to the city?

 9     A    I don't think that classifies it.  I've always

10          loved Independence since the day I started

11          working for them.  Obviously I thought highly

12          enough of it to sell my home in Parma, build a

13          house in Independence and uproot my family and

14          put down roots in the city that I loved and

15          worked for.

16     Q    Parma and Independence are basically right next

17          door, correct?

18     A    No, sir.

19     Q    They're within five miles of each other,

20          correct?

21     A    Yes, sir.  Seven Hills is in between.

22     Q    How long did you live in the City of Parma?

23     A    Well, it would be 27 years.

24     Q    Have you made any efforts to gain employment

25          with the City of Parma?
```

```
 1     A   I have not.

 2     Q   You haven't applied to the City of Parma?

 3     A   No, sir.

 4     Q   Have you talked anyone at the City of Parma

 5         about possibly lateralling in?

 6     A   No, I don't believe they offer lateral.

 7     Q   How do you know that?

 8     A   I didn't see it on the list.

 9     Q   But have you actually checked with the

10         department to verify that?

11     A   No, I haven't.

12     Q   Do you know how long something like that would

13         take?  Would it just be a phone call to verify

14         that?

15                     MR. CHANDRA:  Objection.

16     A   I do not know.

17     Q   Yeah.  What about Seven Hills, have you made

18         any efforts to get in with the Seven Hills

19         Police Department?

20     A   No, I have not.

21     Q   And obviously you're talking about an emotional

22         connection you have with the City of

23         Independence.  I'm sure you have an emotional

24         connection with the City of Parma as well,

25         correct?
```

```
 1    A   No, actually I don't.

 2    Q   You did grow up there though, correct?

 3    A   Correct.

 4    Q   Where did you go to high school?

 5    A   Normandy.

 6    Q   When did you graduate?

 7    A   1987.

 8    Q   Did you go to college?

 9    A   Yes, sir.

10    Q   Where?

11    A   Started the fall of '87 at Ohio State and then

12        finished up at Kent in August of 1992.

13    Q   So you went to Kent for college?

14    A   Yes, sir.

15    Q   You've lived in Kent, correct?  You've lived in

16        Kent before or did you commute?

17    A   No, I did not live there.  I commuted.

18    Q   From where?

19    A   Commuted from either Parma or Akron.

20    Q   Where did you go to the academy?

21    A   Columbus, Ohio.

22    Q   When did you graduate from the academy?

23    A   I believe July of '95.

24    Q   What's your present address?

25    A   7065 Greenwood Street, Independence, Ohio
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1            44131.
 2     Q    How long have you lived there?
 3     A    September of '05.
 4     Q    Same address?
 5     A    Yes, sir.
 6     Q    Who do you live with?
 7     A    My wife and two children.
 8     Q    What are your children's names?
 9     A    My oldest is Kayla and my youngest is Cameron.
10     Q    I believe they were around high school age; is
11          that correct?  Teenagers?
12     A    Yes.  Teenagers.  Kayla is 17 and Cameron is
13          14.
14     Q    What's your wife's name?
15     A    Carrie.
16     Q    Mazzola?
17     A    Yes, sir.
18     Q    Do you live with Carrie currently?
19     A    Well, currently I'm quarantined in Marblehead,
20          but I do identify with my residence being in
21          Independence.
22     Q    How long have you been quarantined in
23          Marblehead?
24     A    Since June 30.
25     Q    Were you and your wife living together before
```

```
 1          June 30th?

 2    A     Yes, sir.

 3    Q     Are you and your wife estranged?

 4    A     Would you define what you mean by "estranged,"

 5          please?

 6    Q     I was hoping you'd help me out with that let me

 7          ask some other question, I'm not even sure what

 8          that means.  Have you guys -- you guys were

 9          obviously still living in the house before June

10          30, 2020, still living in the same residence,

11          correct?

12    A     Yeah.  I mean, we still live together and still

13          both are in that home.

14    Q     I guess to put it bluntly, are you having

15          marital issues currently?

16                    MR. CHANDRA:  Objection.  To the

17          extent that counsel is relying on confidential

18          mediation communications, then we object to

19          this line of questioning.

20               But beyond that, Mr. Mazzola, you are

21          free to answer.

22                    THE WITNESS:  Okay.

23    A     Mr. Strang --

24    Q     I'm sorry, do you want the question read back

25          to you?
```

```
 1    A    Yes.  That's what I was just going to ask if
 2         you could just read that back.
 3    Q    Sure.
 4                     MR. STRANG:  I'd ask the court
 5         reporter to do it because my memory
 6         is -- frankly, I don't remember what the
 7         question is either.
 8                        -   -   -
 9                     (Record was read.)
10                        -   -   -
11    A    Yes, unfortunately we are.
12    Q    Are you seeing counseling?
13    A    Yes, I am.
14    Q    Mr. Mazzola, this is not something that gives
15         me pleasure to get into.  There is a -- from my
16         understanding there is an emotional damage
17         claim as part of your lawsuit against the city.
18         You've made reference to some emotional issues
19         that you're having as a result your employment,
20         so I am going to go through some other
21         emotional -- some other things that may be
22         affecting your psychological state right now
23         that I'm sure you don't want to talk to, and
24         frankly I don't want to ask about, but I'm
25         going to it nonetheless because I think it's
```

```
 1              relevant to the damage claim.
 2                      Where are you seeking counseling with
 3              your wife?
 4     A    My wife and I have not sought like joint
 5          counseling, if you will.  I'm seeing Dr. Eddie
 6          Myers.  However, that's temporarily
 7          unfortunately.  Dr. Myers had a stroke.  And
 8          Carrie and the kids have seen a counsellor in
 9          Brecksville, but beyond seeing the co-pay, you
10          know, I don't have any additional information
11          on that.
12     Q    Do you even know who that counsellor in
13          Brecksville is?
14                      MR. CHANDRA:  Objection.
15     A    No, I do not.
16     Q    But you've had no counseling -- you've had no
17          joint counseling sessions with either your wife
18          or your children; is that correct?
19     A    No.  We had thought about it, we had talked
20          about it, and the counsellor that my wife and
21          children are seeing said that at this time they
22          would not recommend a group.  They wanted to
23          work with them on a more one-to-one and then
24          include me later.
25     Q    Do you have any appointments --  do you have
```

```
 1         any joint appointments set up?
 2    A    No, not at this time.
 3    Q    Do you know when you're going to get out of
 4         quarantine?
 5    A    You know, I've been doing as much research as
 6         possible, I've been in contact with my doctor
 7         at Cleveland Clinic, Dr. Jones.  The best
 8         course of action -- the CDC just put out new
 9         guidelines, so it's symptom-based.  So
10         currently as long as I don't develop new
11         symptoms, I'm planning on coming back to -- or
12         out of quarantine, I should say, next weekend.
13         And I'll actually be working up here that
14         weekend for Marblehead police.  I have to get a
15         doctor's note, return to work, if you will,
16         from Dr. Jones and then from there, you know, I
17         will not be quarantine here.
18    Q    When you get out of quarantine are you planning
19         on moving back into your house in Independence
20         with your wife and children?
21    A    I would very much like to be with my family.
22         However, you know, I just had a conversation
23         with my wife so I'm not quite sure what's going
24         to happen.
25    Q    Did you talk to your wife or children about
```

```
1              whether they are willing to move to Charlotte
2              with you?
3     A   I have.
4     Q   And what were the results of that conversation?
5                    MR. CHANDRA:  Objection.
6              And I instruct you not to answer about
7              any conversations with your wife.  That is
8              privileged.  Conversations with the children
9              outside of the presence your wife are fair game
10             and appropriate.  You may answer only to that
11             extent, Mr. Mazzola.
12    Q   Mr. Mazzola what are your -- are you planning
13             on moving down to Charlotte with your wife and
14             children?
15    A   I would like very much for that to happen,
16             however I don't believe it's going to.
17    Q   You mentioned that you're seeing Dr. Myers
18             for -- part because of marital issues, correct?
19    A   No, sir.
20    Q   Okay.  Well, what -- what I'm trying to figure
21             out exactly what you're going to see Dr. Myers
22             about.  Can you explain that to me and I can
23             ask some follow-up questions on it?
24    A   Sure.  Dr. Myers sort of specializes in police,
25             so he was referred and I'm seeing him now
```

```
 1            trying to deal with everything that's happened

 2            to me with Independence.

 3     Q    Are you also seeing Dr. Myers about family

 4            issues?

 5     A    No.  Family issues come up, I tell my doctor

 6            everything, you know, I'm an open book.  But my

 7            main reason for going to Dr. Myers was to sort

 8            through the trauma that's been caused by

 9            Independence.

10     Q    And have you seen anyone else to sort through

11            the family trauma that you're experiencing?

12     A    No.  I talked to Dr. Myers, you know, in

13            conversation with him.  And again, my wife and

14            my children have seen a counselor in

15            Brecksville.

16     Q    Who referred you to Dr. Myers?

17                    MR. CHANDRA:  Steve, I understand

18            that you may be focused on a particular topic,

19            but at the appropriate time, could we please

20            take a 10 minute stretch break whenever you're

21            ready?

22                    MR. STRANG:  Sure.  As soon as

23            he answers the question.

24                    MR. CHANDRA:  Sure.  Go ahead.

25     A    Okay.  I'm sorry, can you repeat that?
```

```
 1      Q    Yeah.  Who referred you to Dr. Myers?

 2      A    Dr. Myers has been seeing -- throughout the

 3           years he's seen, you know, numerous

 4           Independence officers so he was kind of

 5           referred to me by coworkers, I guess, if you

 6           will.

 7      Q    Which coworkers?

 8      A    You know, I don't know if it's appropriate for

 9           me to tell you who is seeing Dr. Myers.

10      Q    I don't care who is seeing Dr. Myers.  I just

11           want you to tell me who referred you to

12           Dr. Myers.

13                     MR. CHANDRA:  Objection.

14      Q    The inference of whether that person is

15           treating with Dr. Myers is not something that

16           I'm really interested in.  I am particularly

17           interested in who told you -- who referred you

18           to Dr. Myers.

19                     MR. CHANDRA:  Objection.

20      A    Well, I'll give you the names, but by answering

21           that am I violating any of their medical right?

22      Q    Look, I'm not asking you whether anyone else

23           has seen Dr. Myers.  I'm asking you who

24           specifically referred you to Dr. Myers.

25                     MR. CHANDRA:  Steve, just a
```

```
 1            minute, let me lodge an objection.  I think
 2            there is a concern here because Lenny was a
 3            lieutenant in the police department about a
 4            potential HIPAA violation on his part.  Would
 5            you mind just clarifying the question about
 6            whether the information was gained during the
 7            course of his employment or afterward?  If you
 8            could just refine the question that way, I
 9            would be okay with it if we're talking about
10            post-employment information?
11       Q   Mr. Mazzola, you started seeing Dr. Myers in
12            June of 2019, correct?
13       A   I don't have the dates in front of me, I don't
14            have any notes, but that sounds fair.
15       Q   My apologies.  Go ahead.
16       A   I had seen Dr. Myers earlier on as well.  I'm
17            not sure of those dates.
18       Q   Did you see Dr. Myers before you stopped
19            working for the City of Independence?
20       A   Yes.  I'm trying to think of the question here.
21            So before I stopped -- while I was working for
22            Independence I saw him, I want to say, I'm
23            guessing, 2009 or somewhere in there, 2010.
24       Q   So you had heard of Dr. Myers before April
25            2019; is that correct?
```

```
 1    A   Oh, yes, sir.

 2    Q   Okay.

 3                    MR. STRANG:     Okay.  Now is a

 4        fine time to take break.

 5                    MR. CHANDRA:    Okay.  Thanks,

 6        Steve.  Maybe just a little bit after 10:30

 7        okay?

 8                    MR. STRANG:     Sure.

 9                    MR. MCLANDRICH:  Just for

10        planning purposes, I have a call with the court

11        I have to do at 12:15.  Shouldn't take terribly

12        long, but they wouldn't be flexible?

13                    MR. CHANDRA:    Just remind us a

14        few minutes before, John, if you will.

15                    MR. MCLANDRICH:  Absolutely.

16                    MR. CHANDRA:    Thank you.

17                         -   -   -

18                    (Off the record.)

19                         -   -   -

20                    VIDEOGRAPHER:   Back on the

21        record.  The time is 10:38.

22    Q   Mr. Mazzola, when did you first see Dr. Eddie

23        Myers?

24    A   I don't have the exact date.  I'm going to

25        guess in the 2009 area I would believe.
```

```
 1    Q   For what?

 2    A   We had a call that occurred on the 480 bridge

 3        that I needed some help dealing with.

 4    Q   What happened with the call?

 5                    MR. CHANDRA:  Objection to this

 6        line of questioning.

 7             You may answer.

 8    A   There was a suicidal male that was clinging to

 9        the opposite side of the fence.  Negotiations

10        started and one of my officers, Matt Jones,

11        ended up on the other side of the fence and it

12        turned into a situation where we almost lost

13        Matt.

14    Q   How many appointments with Dr. Myers -- I'm

15        sorry.  How many appointments did you have with

16        Dr. Myers about that incident?

17    A   I'm not sure but, you know, it was multiple.

18    Q   Did you see Dr. Myers for anything else besides

19        that 480 bridge incident from 2009 to 2019?

20    A   No.  It was in '09 or '10.  It's whenever our

21        hospitalization changed with the city to HVSA

22        format.  I stopped seeing him at that point.

23    Q   Was Dr. Myers at a different office back in

24        2009?

25    A   No, sir.
```

```
 1      Q    Same office?

 2      A    Yes.  I believe it's North Rocky River Drive or

 3           Rocky River.

 4      Q    Have you seen, besides Dr. Myers, anyone else

 5           for therapy, mental health issues or psychology

 6           or psychiatric appointment in the last 20

 7           years?

 8                      MR. CHANDRA:  Objection.

 9      A    No, sir.

10      Q    Is Dr. Myers the only mental health

11           professional then that you have actual seen in

12           the last 20 years?

13                      MR. CHANDRA:  Objection.

14      A    Correct.

15      Q    In the last 20 years have you been on any

16           medication for any mental health issues?

17                      MR. CHANDRA:  Objection.

18      A    No, sir.  Mental health, no, sir.

19      Q    What about any sleeping issues?

20      A    No, sir.

21      Q    What about any anxiety issues?

22                      MR. CHANDRA:  Objection.

23      A    No, sir.

24      Q    Have you ever been diagnosed as bipolar?

25                      MR. CHANDRA:  Objection.
```

```
 1        A    No, sir.

 2        Q    Have you ever been diagnosed with depression?

 3                    MR. CHANDRA:  Objection.

 4        A    No, sir.

 5        Q    At any point in your life have you ever been

 6             diagnosed as suffering from depression?

 7                    MR. CHANDRA:  Objection.

 8        A    I don't believe it was a diagnosis.  Dr. Jones

 9             and I, you know, talked.  Not sure of the dates

10             or the years.  But again, I told Dr. Jones when

11             I've gone through troubling times due to, you

12             know, work.

13        Q    Who is Dr. Jones?

14        A    My family doctor.

15        Q    What's your family doctor's name?  What's his

16             full name?

17        A    Dr. Robert Jones.

18        Q    Where is his office?

19        A    Independence.

20        Q    Is he affiliated with any sort of hospital?

21        A    Yes, sir, Cleveland Clinic.

22        Q    How long has Dr. Jones been your general

23             practitioner?

24        A    I'm not sure.  A long time though.  I think

25             when I moved to Independence for sure and it
```

```
 1            may have been even before that.
 2      Q    So you've talked to Dr. Jones about depression
 3            issues before, correct?
 4                      MR. CHANDRA:  Objection.
 5      A    Not the depression.  Stress of the job, yes.
 6      Q    Have you ever talked to any other physician
 7            about any job-related stress or any other
 8            mental health issues?
 9                      MR. CHANDRA:  Objection.
10      A    No, sir.
11      Q    Have you ever seen anyone for any marital
12            issues?  Any other psychologists,
13            psychiatrists, mental health professional
14            therapists?  Anything like that?
15                      MR. CHANDRA:  Objection.
16      A    No, sir.
17      Q    Have you and your wife ever been in any
18            other --  in any marital therapy.
19                      MR. CHANDRA:  Objection.  And
20            just so I don't keep objecting, I just want to
21            lodge a continuing objection to the broad scope
22            of time of the question.  So I'll just note
23            that continuing objection.
24                You can answer?
25      A    I believe the question was about my wife and
```

```
 1        counseling?
 2   Q    Yeah.
 3   A    Yeah.  My wife and I have not been in
 4        counseling.
 5   Q    Have you and your wife ever been -- have you
 6        been -- have you and your wife ever divorced
 7        before?
 8   A    No, sir.
 9   Q    What is the source your current marital issues
10        with your wife?
11   A    I think we had a normal up and down marriage
12        throughout the years.  However, when this
13        happened in Independence, it took it to
14        crushing level that has just put enormous
15        strain on everything from basic living
16        conditions to the future of our children and
17        our family and finances.
18   Q    So are you blaming your current marital issues
19        on the loss of your job at Independence?
20   A    The loss of my job in Independence has been
21        responsible for an enormous impact on my
22        marriage.  Like I said, we had a normal up and
23        down marriage like I'm sure everybody does.
24        However, when I lost my job, it just destroyed
25        the family.
```

```
 1    Q   Why did it destroy the family?

 2    A   Well, the house unfortunately at this

 3        point -- I hate even saying that -- is located

 4        in Independence, so the physical location of my

 5        family is in the fours walls of that city

 6        that's caused this trauma and pain to myself

 7        and my family.

 8    Q   Well, sure, but how is that -- why has that

 9        affected the relationship between you and your

10        wife?

11    A   Well, until that point obviously I carried

12        insurance.  I carried the financial burden of

13        running the family, if you will.  So a lot of

14        things have changed in that regard.  And

15        psychologically it's just crushing for me to be

16        in Independence, physically living at that home

17        that I built; whereas I still have my children

18        in that school system and my wife still works

19        in the area.

20    Q   Did you build the home yourself?

21    A   Well, sort of.  Frank Rini, Renillo Homes built

22        my home.  However, we ran into intense

23        financial strain so I had to complete a lot of

24        the building myself.

25    Q   Are you having a difficult time paying your
```

```
 1        mortgage?
 2    A   Hello?  Can you hear me?
 3    Q   Yeah.  I can hear you.  You froze for a second.
 4    A   Yeah, that's why I raised my hand.  I couldn't
 5        see you there for a minute.
 6    Q   Yeah.  So let's see if that corrects itself and
 7        then --
 8                    MR. STRANG:  Tracy, would you
 9        mind reading back my question?
10                        -  -  -
11                    (Record was read.)
12                        -  -  -
13    A   No.  The mortgage is reasonable.
14    Q   Have you been late on any mortgage payments?
15    A   I have not.
16    Q   I'm asking because you referenced financial
17        strain, so I'm going to ask you a series of
18        questions about this financial strain that your
19        family may or may not be under.
20            Have you had a difficult time with any
21        car payments?
22    A   No, sir.
23    Q   Do you have a problem with credit card debt?
24    A   No, sir.
25    Q   Are you late on any bills, debts, anything like
```

| | | |
|---|---|---|
| 1 | | that? |
| 2 | A | No, sir. |
| 3 | Q | You are collecting a pension, correct? |
| 4 | A | Yes, sir. |
| 5 | Q | How much is that pension a month? |
| 6 | A | The gross amount is right around $6,000.  The |
| 7 | | net amount I believe is $5,330. |
| 8 | Q | And has that been sufficient to meet your |
| 9 | | financial needs? |
| 10 | A | Well, present financial -- you know, the bread |
| 11 | | and butter of keeping the home and my family |
| 12 | | secure, yes.  However, as far as future |
| 13 | | concerns, no. |
| 14 | Q | Well, you're going to get that -- you're going |
| 15 | | to get that pension indefinitely, correct? |
| 16 | | MR. CHANDRA:  Objection. |
| 17 | A | Hello?  Can you hear me? |
| 18 | Q | Yeah.  You're going to get that pension |
| 19 | | indefinitely, correct? |
| 20 | | MR. CHANDRA:  Objection. |
| 21 | A | You broke up.  I believe you asked about |
| 22 | | getting the pension indefinitely? |
| 23 | Q | Correct. |
| 24 | A | And the answer would be I'm getting the pension |
| 25 | | on a monthly basis until death. |

```
 1   Q   Do you have any other sort of retirement

 2       savings that you're drawing on right now?

 3               MR. CHANDRA:  I think he's frozen

 4       again.

 5   A   Is it my connection?

 6   Q   Yea, your connection is --

 7               MR. CHANDRA:  If I may just note,

 8       Steve, apparently he's on a hot spot data plan

 9       that has a cap on it and I think there was an

10       effort to try to increase the cap.

11           Are you approaching the cap, do you know,

12       Mr. Mazzola?  I'm wondering if that might be

13       the problem.  Can you hear me.

14               THE WITNESS:  Can you guys hear

15       me now?

16               MR. CHANDRA:  Yes.  Are you

17       approaching the cap of your data plan for your

18       hot spot?  I'm wondering if that might be why

19       things are slowing down because your connection

20       was excellent earlier.

21               THE WITNESS:  I think I'm okay on

22       data.  I just talk today Verizon this morning

23       and had it like doubled, so let me know if this

24       is better.

25               MR. CHANDRA:  May I
```

```
 1              suggest -- let me just suggest because you are
 2              a little bit -- there is a little bit of a
 3              jarred image, may I suggest that you reconnect?
 4              Is that ok, Steve, if he tries to reconnect and
 5              see if that solves the problem?
 6                          MR. STRANG:  Let's see if we run
 7              into the problem again and then we can try.
 8                  Okay.  Tracy, would you mind reading back
 9              that question?
10                                -   -   -
11                          (Record was read.)
12                                -   -   -
13      A   No.  I'm using my pension.
14      Q   Do you have any other sort of retirement
15          savings that you're not drawing from right now?
16      A   Yeah, I do have retirement savings.
17      Q   Is there a reason that you're not drawing on it
18          currently?
19      A   Yeah.  I was hoping to, you know, live off of
20          that when I actually retired as an old guy.
21          But now my intentions are to use that for my
22          daughter's college.
23      Q   Okay.  So for your current income, you're
24          drawing on your pension, you've got this $5,300
25          a month that you're drawing from your pension,
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1        correct?

 2                      MR. CHANDRA:  Objection.

 3    A   Correct.  I believe it's $5,330.

 4    Q   Okay.  And you're also getting paid with Supply

 5        Service Products.  And how much was that a

 6        month?

 7    A   It's Supply Source Products.  And it's $2,500 a

 8        month.  And I received my first wire, if you

 9        will, for July 1st.

10    Q   How much were you making as an Independence

11        police lieutenant?

12    A   I believe the base when I left was $105,000 and

13        I believe the pension calculated my average at

14        like $118,000 and change.  I don't have the

15        numbers in front of me.

16    Q   And that would be before taxes, correct?

17    A   Yeah.  That $118,000 and then if you add in the

18        hospitalization I believe it came to like

19        $125,000, $126,000.  But then obviously Uncle

20        Sam would then take his portion.

21    Q   Is your monthly income now approaching that?

22                      MR. CHANDRA:  Objection.

23    A   I don't have the figures to actually compare.

24        Roughly the pension is about 60,000, 65,000,

25        something like that.  So pension would be half.
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1      Q   Well, do you pay tax on the pension?

 2                      MR. CHANDRA:  Objection.

 3      A   Yes.

 4      Q   And with your current employer then with $2,500

 5          a month, that would be gross approximately

 6          $30,000 a year, correct?

 7      A   Yeah.  I believe he's going to 1099 me as an

 8          individual contractor or consultant or

 9          something like that.  I'm not really familiar

10          with the tax set up that he has going.

11      Q   And your family is still getting your wife's

12          salary, correct?

13      A   My wife works, yes, for Cuyahoga County.

14      Q   What does she do?

15      A   She's a lead chemist in the toxicology

16          department for the medical examiner's office.

17      Q   So would it be fair for me to say that your

18          family is not suffering a financial strain

19          because of the loss of your employment with the

20          City of Independence?

21                      MR. CHANDRA:  Objection.

22      A   No, I don't think that's fair at all.  It's

23          destroyed our future plans, our future dreams.

24          I, again, was going to use my retirement to

25          make sure my daughters could afford and go
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              wherever their hearts desired and where their

 2              smarts took them; and we also planned obviously

 3              living a retired life together as a normal

 4              family would.

 5      Q    What concrete plans has this -- I'm trying to

 6              separate the actual financials of this that

 7              you're claiming and the psychological effects

 8              that you're claiming this has on you, okay.

 9              And so I understand you're claiming that

10              there's a strain on your marriage because of

11              the psychological effect this has had on you,

12              correct?

13      A    There has been an immense strain on my marriage

14              because of this.  That's dentally a fair

15              assumption.

16      Q    Well, why has this actually -- why has this

17              caused a strain on your marriage?

18      A    My family's whole dynamic was changed.

19              Literally my life was thrown upside down.

20              Everything that my family, everything that my

21              children come to know was daddy was a police

22              officer in Independence and was a darn good one

23              and did a good job and was well liked.  And

24              obviously when something like this happens, it

25              emotionally just destroys that structure that
```

```
 1            my family has enjoyed now.

 2       Q    Do your kids get picked on or teased at school

 3            because of this?

 4       A    My children have dealt with teachers asking

 5            them, hey, what's going on.  Of course my

 6            children -- I don't divulge anything to them,

 7            they are kids.  But they come home with

 8            questions obviously about why Mr. or Mrs.

 9            so-and-so are asking questions.  I don't

10            believe I heard them speak of other children or

11            other students, you know, asking them but staff

12            has.

13       Q    What staff?

14       A    Their teachers in school.

15       Q    Which teachers?

16       A    You know, I believe the teachers that were

17            involved with the sports program, they all know

18            because obviously the scheduling of running

19            kids here and there.  I'm not home for the most

20            part, so that has all fallen on my wife to be

21            superwoman and she has done a good job.

22       Q    Which teachers?

23       A    Again, I would limit it to -- I don't have

24            those specific names for you.  I would limit it

25            to just the ones that are close enough to me
```

```
 1          and my family to know what's going on.  I was
 2          involved with coaching with the high school
 3          and, you know, all those involved know.
 4     Q    How do they know?
 5     A    I wouldn't know how they found out, you know,
 6          but obviously this has been big news in a small
 7          town like Independence.  I think everybody in
 8          this Zoom room would agree with me that
 9          Independence is a tight knit community and
10          everybody kind of knows everything that's going
11          on.
12     Q    Well, what I'm trying to separate out is
13          whether these people found out about it because
14          of something that happened internally at the
15          City of Independence or was it because of the
16          publicity that your attorneys sought when they
17          filed lawsuit.  Can you tell me which it is?
18                    MR. CHANDRA:  Objection.
19          Objection.  And, Mr. Mazzola, do not answer
20          that question to the extent it involves
21          confidential communications between you and
22          your counsel.
23     Q    Yeah.  So I'm curious, can you separate that
24          out for me?
25                    MR. CHANDRA:  Objection.
```

```
 1     A   Do I answer?

 2     Q   Yeah.

 3                     MR. CHANDRA:  You do not answer

 4         to the extent that it involves information you

 5         obtained through confidential communications

 6         with your counsel.  Otherwise, you may answer

 7         if you know.

 8     A   Yeah.  As far as people finding out in the

 9         city, I wouldn't be able to obviously answer

10         how specifically people found out.  I mean,

11         sure, it's been all over.  I've had numerous

12         people contact me.  And again, it's a small

13         town, big news.

14     Q   Right.  But the City of Independence did not

15         publicize what happened with you, correct?

16                     MR. CHANDRA:  Objection.

17     A   There has been some enormous information that

18         has been shared by the City of Independence

19         and/or its employees or officials that

20         absolutely they have shared it with anybody who

21         cared to search for it.

22     Q   What specifically?

23     A   There was a letter wrote by law director Greg

24         O'Brien that was released to the media.  There

25         was also a Facebook video posted by now
```

```
 1            ex-mayor, Anthony Togliatti.
 2      Q    But those weren't in response to your
 3            termination -- the termination of your
 4            employment.  Those were in response to your
 5            attorney's filing a lawsuit.  Do you understand
 6            the difference?
 7                       MR. CHANDRA:  Objection.
 8      A    Correct.  One happened I believe in -- shortly
 9            after we put litigation notice.  And then I
10            think the other happened once we actually
11            filed.
12      Q    Does that bother you that your attorneys have
13            publicized this so much?
14                       MR. CHANDRA:  Objection.
15      A    The whole situation bothers me, Mr. Strang.
16            You know, if you ask me specific things, I'll
17            do the best I can to answer it.  You know, I'm
18            a very private person.  I did the best I could
19            always for the City of Independence and I think
20            everybody in this room knows that.  I tried my
21            hardest to be the best cop, best person, best
22            resident that I could.  So this whole situation
23            has emotionally destroyed me.
24      Q    And I'll go into all that in a little bit.  But
25            I'm asking you specifically whether it bothers
```

```
 1          you that your attorneys have publicized this
 2          lawsuit.
 3                     MR. CHANDRA:  Objection.
 4     A    My attorneys have, in my opinion, not
 5          publicized this lawsuit.
 6     Q    Your attorneys actually put this -- did you
 7          ever see a Facebook solicitation that your
 8          attorneys put out when they were contemplating
 9          plating filing this lawsuit?  Did you ever see
10          that?
11     A    I don't have Facebook or any social media.
12     Q    But sitting here today, does that surprise you
13          that they did that?
14     A    Anything my attorneys do in this case or on my
15          behalf I have 100 percent confidence in them.
16     Q    So it bothers you when someone with the City of
17          Independence shares what happened to you, but
18          when your attorneys publicize it, when they put
19          it on Facebook, that doesn't bother you?  Is
20          that what I'm gathering?
21                     MR. CHANDRA:  Objection.
22     A    No, I don't think that's a fair assessment.  I
23          am an open book, Mr. Strang, and if the truth
24          and the facts are being represented correctly,
25          then I have no issue for it.  If they're not,
```

```
 1        then obviously anybody would feel slighted

 2        or -- I forget how you put it -- but of

 3        course -- you said bothered.  Of course they

 4        would be bothered by it.

 5     Q  But what I'm asking you is you mentioned before

 6        that some of your psychological stress comes

 7        from people in the community knowing what

 8        happened to you, correct?  You said that

 9        before, correct?

10                   MR. CHANDRA:  Objection.

11     A  I don't believe I actually said that here

12        today.  However, if you want to go down that

13        line, that's a fair assessment.  You know,

14        people in the community -- I've lost contacts

15        with countless people that for one reason or

16        another no longer reach out to me.  I was a

17        valued member in the community.  And, gosh, you

18        know, since this happened it's amazing at the,

19        I guess, lack of communication now that I've

20        received from people in the community.

21     Q  Well, since you filed the lawsuit people with

22        the City of Independence shouldn't be talking

23        to you any way and you shouldn't be talking to

24        people from the City of Independence, correct?

25                   MR. CHANDRA:  Objection
```

```
 1        objection.
 2   Q    I'll ask it another way.
 3                   MR. CHANDRA:  Hold on.  It also
 4        calls for a legal conclusion.
 5   Q    You can certainly understand why people at City
 6        of Independence have not been talking to you
 7        since you filed a lawsuit against the city,
 8        correct?
 9                   MR. CHANDRA:  Objection.
10   A    I'll talk it if one step further for you.  You
11        know, after I was forced out I didn't hear from
12        literally anybody with the city.  And then,
13        sure, once the lawsuit was filed, I don't
14        expect anybody to reach out to me; and if they
15        did, then obviously there would be no
16        discussion of this current litigation.  So that
17        would be, you know, the norm I guess.
18   Q    When did you retain the Chandra firm?
19   A    I don't have my file in front of me, but I
20        believe I was down at their office May 1st or
21        May 2nd, somewhere in that area of '19.
22   Q    Did you retain them before this -- did you
23        have --
24   A    Hello?
25   Q    Are you having technical issues?
```

```
 1    A   There you go.  Okay.  I'm good now.

 2    Q   Did you have any communication -- and I don't

 3        want to hear what communication that may have

 4        been.  Did you have any communication with the

 5        Chandra Firm while you were still employed with

 6        the City of Independence?

 7                    MR. CHANDRA:  Objection.

 8            You may answer.

 9    A   No, sir.

10    Q   Did you believe the City of Independence did

11        anything to publicize the termination of your

12        employment before your attorneys went public

13        with the lawsuit?

14                    MR. CHANDRA:  Objection.

15    A   I don't believe the city -- I guess I don't

16        know how to answer that.  I'm not sure what

17        they did on their end as far as releasing

18        anything.  I know they contacted my pension,

19        but I think they had to.  And then obviously my

20        pension board -- I said pension, I should say

21        Ohio Police and Fire.  Ohio Police and Fire was

22        then in communication with Independence.  And

23        then, you know, there were some things that

24        happened in April that really kind of

25        publicized it throughout the city because of
```

```
1              the treatment and the scheduling of the, I

2              guess, activities between the city and I.

3      Q   What things?

4      A   There was a couple of things obviously that

5              needed to happen and ran into road blocks each

6              and every step of the way to accomplish those.

7      Q   Mr. Mazzola, I'm specifically asking you about

8              what the city did to publicize this before your

9              attorneys started to go public with this.  I'm

10             asking you to point to specific thing you know

11             that the city did to publicize this.  Do you

12             have any?

13     A   I'm not aware of any media releases if that's

14             what you're getting to or anything of that

15             nature of the same ilk that the city did.

16             However, the word traveled real fast throughout

17             the city, meaning internal amongst its

18             employees because of the way the nature of the

19             investigation was handled; and the way the

20             treatment of me once I was forced out for that

21             to actually happen, that traveled quickly as

22             well.

23     Q   Which employees are you specifically referring

24             to?

25                       MR. CHANDRA:  Objection.
```

```
 1    A    I'm sorry.  The employer.  Just the City of

 2         Independence in general.

 3    Q    Yeah, but you're saying words spread like

 4         wildfire with employees of the City of

 5         Independence and I'm asking what employees

 6         you're referring to?

 7    A    Oh, okay.  The interviews, to begin with, were

 8         conducted on the city hall side of that complex

 9         there.  So unfortunately for the, I believe,

10         six of us that had to go through that, all the

11         city hall side employees were there.  I

12         personally -- I saw the issue, but it really

13         didn't effect me, but some of the other guys

14         were pretty upset, feeling as if they were

15         being grandstanded for everybody to see because

16         the investigation took place in a nonneutral

17         location.  So that would be the first example

18         of how this spread.  So you can imagine the

19         rumors the guys probably dealt with because of

20         that.

21    Q    I'm not asking about general rumors that guys

22         heard.  I'm asking you specifically what

23         employees at the City of Independence between

24         the time your employment ended and your lawyers

25         started publicizing this.  What specific
```

```
 1          employees did you learn became aware of what
 2          happened?  Did anyone specifically come up to
 3          you and talk to you about it?
 4                    MR. CHANDRA:  Objection.
 5     A    I physically didn't see -- you know, when I
 6          left work it was amazing unfortunately how fast
 7          everything happened.  So I didn't physically
 8          talk to anybody.  The first occurrence that I
 9          had was with service director -- or tech
10          service director, Dave Snyderbern.  And I want
11          to say that was on, I'm guessing, April the 3rd
12          that I had that.
13     Q    You mentioned before that you had an issue
14          with, I guess, some your children's coaches
15          hearing about this.  Did I hear that correctly?
16     A    No, I wouldn't say the coaches had a -- it was
17          just Mr. Moore is her -- and Mal-- are the
18          softball coaches.  They were aware of it
19          obviously.  Mr. Moore actually kind of pulled
20          me aside and offered his support to me.  But
21          what you're referring to is the trouble at
22          school and it was just questions that my
23          children were dealing with, either people
24          saying, hey, tell your dad blah, blah, blah;
25          or, hey, what happened to your dad?  And my
```

```
 1           daughters wanted to know, you know, how to
 2           answer that and I told them, I said, Tell them
 3           you don't know anything because you don't.  And
 4           that's basically how we handled that.  It was
 5           just a shame that after all these years my
 6           children actually had to field those questions
 7           as a kid in an educational environment.
 8      Q    When was that?  When do you believe that your
 9           children started fielding questions about that?
10      A    It was real soon after.  Now, you know, the
11           school year ended I believe, you know, early
12           June, so April/May would be when they were
13           dealing with some questions.
14      Q    From Mr. Moore?  Is that it?  Who else?
15      A    Again, I don't think Mr. Moore was questioning
16           my children because Mr. Moore and I are close
17           enough to where, you know, we talked.  As far
18           as specific teachers, I never asked my kids who
19           was asking the questions.  They were just kind
20           of generally asking questions of how they deal
21           with it.
22      Q    Do you believe that the amount of attention
23           that you've received from the people in the
24           community has increased since your lawyers have
25           taken efforts to publicize this lawsuit?
```

```
 1                    MR. CHANDRA:  Objection.

 2      A    No.  Actually, just the opposite.  Again, when

 3           I left, very little communication; and, you

 4           know, now that the lawsuit is filed, people

 5           keep their distance, which I guess I can't

 6           blame them.

 7      Q    Do you approve of your attorney's efforts to

 8           publicize this lawsuit by reaching out to local

 9           news about it?

10                    MR. CHANDRA:  Objection.

11               I'm going to instruct you not to answer

12           because you are now delving into confidential

13           communications between counsel and the client.

14                         MR. STRANG:  Okay.  I'm not going

15           to ask him about confidential communications.

16      Q    I don't want to hear about any conversations

17           with Mr. Chandra.  What I want to know is your

18           personal feelings about the -- when you see

19           this -- when you've seen this lawsuit on the

20           news, does that bother you?

21                    MR. CHANDRA:  Objection.

22      A    Again, I have 100 percent confidence in my

23           attorneys and I have zero problem with anything

24           being reported to anyone in the world as long

25           as it's truthful.
```

```
 1    Q    So you have no problem with the Facebook post

 2         by your attorneys in late October of 2019 about

 3         the lawsuit and soliciting witnesses?  You have

 4         no problems with that?

 5                   MR. CHANDRA:  Objection.  Asked

 6         and answered.

 7    A    I don't have Facebook, so I'm not privy to see

 8         anything that happens on there.  And again,

 9         whatever my attorneys are doing or not doing,

10         they have my 100 percent support.

11    Q    It's fine when your lawyers do it; is that

12         correct?

13                   MR. CHANDRA:  Objection.

14    A    Again, I have no problem with my attorneys and

15         I have no problem with anybody, including you,

16         Mr. Strang, as long as we get the truth out

17         there and things are reported accurately, then

18         I have zero problem with that.

19    Q    Have your children been treating you

20         differently because of what's happened because

21         of the loss of your job as a lieutenant?

22    A    Unfortunately the relationship with my

23         children, you know, has been a little, I

24         guess -- I'm trying to think of the word, but

25         it's been troubling.  They know obviously that
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          daddy is no longer the daddy that they knew

 2          growing up.  My professional life obviously has

 3          changed and they see the psychological mess I

 4          am because of it.  So my children definitely

 5          know that they -- they definitely treat me a

 6          little differently, which is crushing.

 7     Q    What I'm trying to gather is, is that a result

 8          of the way the children are acting towards you

 9          or the way you're acting towards your children?

10     A    Well, I think everything is a two-way street.

11          I'm sure I could do a better job being a father

12          to them and I'm sure they're confused.  I don't

13          know how a couple teenage daughters can handle

14          something so drastically changing in their

15          dynamic and their family structure.

16     Q    When did you first communicate with Ed Gallek?

17     A    We talked to Ed the night -- of or the evening

18          of the polygraph.  Chuck Wilson and I was able

19          to make contact with him.

20     Q    That's the first time you ever talked to Ed

21          Gallek?

22     A    Yes, sir.

23     Q    Did you have Ed Gallek's phone number before

24          that?

25     A    I did not.
```

```
 1      Q    What phone numbers did you have back in the
 2           fall of 2018 and the spring of 2019?
 3      A    Can you be more specific?  Like contacts in my
 4           phone?
 5      Q    No.  Phone numbers that you had, lines that you
 6           had, like your personal cell phone number.
 7      A    Oh, okay.  Just the one, the one that I
 8           currently have.
 9      Q    What is that?
10      A    216.402.7510.
11      Q    Who is your provider?
12      A    Verizon.
13      Q    No other phone numbers in the last three years?
14           You've had no others?
15      A    No, sir.
16      Q    Do you know what Ed Gallek's phone number is?
17      A    I do not.
18      Q    Who got Ed Gallek's phone number?  You
19           mentioned that you talked to him first the
20           night of the polygraph?
21      A    Correct.
22      Q    How did you get his phone number?
23      A    I had reached out to Jack Shay from Channel 8
24           and left a message with Jack.  Jack had
25           reported on some family personal things in the
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1            past.  I had Jack's number, so I left a number
 2            for Jack.  I actually called him from the car
 3            when Chuck Wilson and I were coming back and
 4            then left he left a message with Ed to get
 5            ahold of us.
 6       Q   And are you saying Ed called you?
 7       A   Correct.
 8       Q   On your phone or was it Chuck Wilson's phone?
 9       A   My phone.
10       Q   That 7510 number?
11       A   Correct.
12       Q   What's Jack Shay's phone number?
13       A   I don't know.
14       Q   Do you have it saved in your phone?
15       A   I can look if I have it.  My phone last
16            October -- I had to change phones because the
17            one that I had malfunctioned and froze up and
18            died.  So I was able to recover a majority of
19            my phone numbers.  I can look for it, but I
20            don't have it memorized or anything like that.
21       Q   Yeah, could you do that?
22       A   Would you like me to do that now?
23       Q   Yeah.
24       A   I'm not sure if this is still the number.  I do
25            have a number for Jack.  21 -- do you want the
```

```
 1        number?

 2   Q    Yeah.

 3   A    216.337.6928.

 4   Q    Did you talk to Jack Shay about any issues with

 5        the Independence Police Department from 2018 to

 6        2019?

 7   A    No, sir.

 8   Q    Did you have any calls or texts with Jack Shay

 9        at all in 2018 or 2019 before the call that we

10        were just talking about?

11   A    No.  Just the one made from the vehicle.

12   Q    Did you talk to anyone at the media about any

13        employment issues or any issues with the City

14        of Independence from 2018 and 2019?

15   A    No, sir.

16   Q    Did you have any media relations, as in any

17        special or cozy relationships, with any media

18        member while you were an Independence

19        lieutenant?

20                  MR. CHANDRA:  Objection.

21   A    No, sir.

22   Q    Did you have someone that you would -- did you

23        have any other -- did you have any media

24        member's number saved in your phone when you

25        were an Independence police officer?
```

1      A    No, sir.

2      Q    Had you talked anyone associated with Fox 8

3           before the night of your polygraph test?

4                       MR. CHANDRA:  Objection.

5      A    No, sir.

6      Q    Well, what about Jack Shay?  What was your

7           relationship with Jack Shay before this call?

8      A    Well, it's kind of a family personal thing with

9           Jack.  Unfortunately, my brother, Sam, had

10          passed and Jack handled the story.

11     Q    When was that?

12     A    2011.

13     Q    Did you have any communications Jack from 2011

14          until 2019?

15                      MR. CHANDRA:  Objection.

16     A    No, sir.

17     Q    What do you know -- or what do you believe Mary

18          Cox knows about the subject of your lawsuit?

19     A    Mary and I were real close work partners,

20          worked together on a daily basis.  I'm not sure

21          what she specifically or exactly knows other

22          than, you know, the obvious.

23     Q    Well, what is the obvious?

24     A    That, you know, I was forced to retire and I'm

25          no longer working there.

```
 1    Q    Why do you believe she has knowledge as to you

 2         being forced to retire?

 3                   MR. CHANDRA:  So I'm going to

 4         object only to the extent that you may have

 5         gained information through discussions with

 6         your counsel.  But outside of direct

 7         discussions with your counsel, you may answer

 8         that question.

 9    A    Okay.  You know, look, Mary Cox -- when people

10         ask me about Mary, here's how I describe her.

11         I say that she's the Swiss army knife of that

12         department.  Mary is capable of literally doing

13         everything but going out on the road and being

14         a police officer.  And I think if she did that,

15         she'd probably be a heck of an officer as well.

16         So Mary knows the inner workings and she keeps

17         that place going.  So what Mary knows or

18         doesn't know specifically, I couldn't answer,

19         but Mary keeps that place up and going and does

20         one heck of a job.

21    Q    You sat through her deposition, correct?

22    A    Yes, sir.

23    Q    Do you believe that she said anything

24         untruthful during her deposition?

25    A    I believe that there were some inconsistencies,
```

86

```
1              yes.

2     Q    And what were those?

3                   MR. CHANDRA:  Again, just a

4          minute.  I'm only going to object to the extent

5          that anything you would say in your response

6          comes from discussions with your counsel.  To

7          the extent you have independent knowledge or

8          information outside of that, you may answer.

9     A    You guys kind of got me confused.  So I guess

10         what am I directly addressing and should I be

11         addressing?

12    Q    Whether you saw anything in Mary's testimony

13         that you believe was untruthful.

14    A    Yeah.  Again, I think there was enormous

15         pressure on Mary.  It was readily obvious

16         through her line of questioning and answers

17         that she was under some immense stress on how

18         to answer and how to divulge details of what

19         she did and did not know.

20    Q    Well, you're the one who dragged her into a

21         deposition, right?  She didn't want to be

22         deposed, you could observe that, correct?

23                   MR. CHANDRA:  Objection.

24         Objection.  Don't answer that question.

25    Q    Did she appear to be uncomfortable because she
```

```
 1            was being deposed to you?
 2     A      To me, it seemed that she was only
 3            uncomfortable when she was asked pertinent
 4            questions that would obviously make it
 5            difficult for her to answer.
 6     Q      What I'm asking you is, what specifically did
 7            you see her testify to that you believe was
 8            untruthful specifically?
 9     A      I'd have to go over the transcript to actually
10            remember and give you a specific answer to a
11            specific question that I felt, you know, would
12            fall into your question that you just asked me.
13            Without referring to it nothing, you know, I
14            can't specifically give you from memory an
15            exact question and answer.
16     Q      You can't remember sitting here right now
17            whether anything -- nothing sticks out in your
18            mind as to her lying or saying something
19            untruthful?  Is that what you're telling me?
20     A      Specifically, no.  I would have to either
21            review the video, if there is one, or at least
22            the transcript.  However, we can cut to the
23            chase, Mr. Strang.  I believe that any easy
24            softball questions she handled real well.  And
25            I believe any question that might put her in a
```

```
 1            position for retaliation, I think she stumbled
 2            on it and I think she hesitated and I think the
 3            stress came out in her face and in her answer.
 4            That's my general takeaway from the deposition.
 5      Q    Yeah.  And I actually didn't ask you about your
 6            general takeaway from her deposition and I'm
 7            not terribly interested in your general
 8            takeaway from her deposition.  What I'm
 9            interested in is whether specific things you
10            believe she lied about and my understanding is
11            you simply can't tell me those right now?  You
12            don't remember, correct?
13      A    I think me accusing Mary Cox of lying I think
14            is inappropriate.  I think it would be better
15            classified as just not answering the questions
16            to maybe the best of her ability.
17      Q    But you can't think of any specific questions
18            as you sit here right now?
19      A    No.  Again, I could try to guess and probably
20            destroy the questions that either side of the
21            attorneys were asking her.  I can't remember
22            specific questions from that.  I'd have to
23            review the transcript.
24      Q    Do you believe that she lied during her
25            deposition?
```

```
 1     A    I don't believe she actively lied.  I think
 2          that I would classify it as being a stressful
 3          condition for her to answer questions while
 4          city officials are either listening in or
 5          physically in the room with her.  I can imagine
 6          that would be very stressful to her to answer
 7          some of those questions.
 8     Q    Well, would you agree with me that it's
 9          unpleasant being deposed?
10     A    I don't mind being deposed at all, Mr. Strang,
11          but that's just me because it's an opportunity
12          for me to speak to you and for me to speak to
13          everybody in this room and answer truthfully
14          and get the truth out there.  So if you ask me,
15          I would have been depoed 10 times already and
16          10 months ago.  Maybe we wouldn't be sitting
17          here if this happened earlier.
18     Q    Who is Mary Jane Horton?
19     A    Ms. Horton is a resident on Chestnut Road, I
20          believe.
21     Q    Do you know her?
22     A    I do not.
23     Q    Have you ever had any conversations with her?
24     A    No, sir.
25     Q    Have you ever had a phone call with her?
```

90

```
 1    A    No, sir.

 2    Q    How do you know she lives on Chestnut Road?

 3    A    Just general knowledge of who lives where and

 4         being an officer there for 24 years.

 5    Q    How do you know this specific person's address?

 6                    MR. CHANDRA:  Objection.

 7    A    I don't know.

 8    Q    What were your job duties as a lieutenant with

 9         the City of Independence?

10    A    I don't know what the official job description

11         was.  I can tell you that as lieutenant I was

12         the patrol commander and so I was in charge of

13         the uniform guys, aside from the detective

14         bureau and dispatch, but everybody else was

15         under my span of supervisory.  So I would

16         handle day-to-day scheduling and activities of

17         patrol.

18    Q    Was it your job to basically oversee patrol?

19    A    Yeah.  So I was in charge of the -- I think

20         they called it the uniform division, but I'm

21         not 100 percent on that.  Basically the uniform

22         guys working the road I was in charge of.

23    Q    You were their boss, correct?

24    A    I was.

25    Q    You expected them to listen to you?
```

```
 1    A    Well, yeah, of course.  When something was put

 2         out, sure, I expected them to listen.

 3    Q    And if they didn't -- if they disagreed with a

 4         decision that you made, you still expected them

 5         to carry it out, correct?

 6    A    I had an open door policy and I readily

 7         accepted feedback from my guys.  So if we put

 8         something out and it didn't work, then let's

 9         get together and talk about it and crunch out a

10         better solution as a team and implement that

11         and see if that works.

12    Q    But at the end of the day you were the one who

13         made the decision, correct?

14    A    Well, I'd say maybe half of the time.  I had a

15         good bunch of guys there, you know, so I would

16         put something out and if someone had a better

17         idea, then, again, we would go with that idea.

18         But ultimately whatever happened was my

19         responsibility.  So if something didn't work

20         out, then we would have to adjust and move

21         forward.  But I was never one to, you know, put

22         an order out and demand that everything was

23         followed to the T.  I was always open for

24         adjustment.

25    Q    You never actually issued an order to your
```

```
 1            patrolmen; is that what you're telling me?
 2    A     Oh, no, that's not what I'm saying at all.  You
 3            know, I always told the guys what I expected
 4            and how to operate and they came to me with
 5            questions and we just worked out problems, I
 6            guess, is what I thought you were looking for.
 7            Whenever there was a problem we would get
 8            together as a team and make it a team effort
 9            and come up with a team solution that not only
10            everybody came up with, but how everybody would
11            actually help in implementation for that
12            solution.
13    Q     Mr. Mazzola, I'm not asking you about your
14            managerial style or your willingness to listen
15            to your subordinates or how interested you were
16            in what they had to say.  What I'm asking you
17            is, you just told me that you did give them
18            orders, correct?
19    A     Yes, sir.
20    Q     And when you gave them an order you expected
21            them to carry that order out even if they
22            disagreed with you, correct?
23    A     Yeah.  I mean, if it was something that needed
24            to be done, absolutely.
25    Q     Well, even if it was something that didn't need
```

```
 1                to be done, if you gave them an order, they

 2                were to carry it out, correct?

 3                          MR. CHANDRA:  Objection.

 4        A    No.  Actually, that wasn't my style of

 5                management.  I know you just said you're not

 6                asking for that.  But if I gave an order and

 7                somebody had a better way of doing it, then by

 8                all means bring it to my attention because I'm

 9                definitely not the smartest guy in the room;

10                and so I accepted their feedback.

11        Q    Well, there is a difference between accepting

12                their feedback and disagreeing with their

13                feedback.  If you ultimately disagreed with

14                their suggestion, they were still supposed to

15                do what you told them, correct?

16                          MR. CHANDRA:  Objection.

17        A    Yeah.  I mean, look, we talked about it and

18                whatever was implemented, yeah, then they would

19                have to carry that out until a better idea came

20                up of making it more efficient or productive.

21        Q    Even if they disagreed with your ultimate

22                decision, correct, you're the boss?

23        A    I was never really heavy handed.  You keep

24                referring to me as "the boss."  I think there

25                was only one guy that called me boss man.  For
```

1          the most part all my guys called me Lenny and

2          we weren't really worried about titles and

3          directives as far as that goes.

4     Q    Mr. Mazzola, I'm asking you a very easy

5          question and I think you know where I'm going

6          with this.  I'm not asking what a great guy you

7          were or how much you guys liked you or how much

8          you liked to listen to them.  I'm asking you a

9          very simple question.

10              When your guys disagreed with an ultimate

11          decision that you made, you still expected them

12          to carry that order out whether they agreed

13          with it or not, correct?

14                   MR. CHANDRA:  Objection.

15    A    Yeah.  My guys, you know, we had a great

16          working relationship.  They thought I was a

17          good guy and I thought all my men did the best

18          they could.  When there was a problem or

19          solution, we would come up with an answer as

20          best we could and it would be implemented and

21          at that time they were expected to follow it.

22          And that would be in place until the next

23          problem or if we had an idea to improve it.

24          But they were expected to follow, you know, the

25          e-mail or the directive or whatever was put out

```
1           there.

2      Q    It's a police department at the end of the day,

3           correct, and you have to listen to your boss,

4           correct?

5                    MR. CHANDRA:  Objection.

6      A    Yeah, I mean, it's a police department.  You

7           know, everyone refers to it as a paramilitary

8           organization.  However, I ran things a little

9           different.  I gave my guys as much, you know,

10          empowerment to be part of the team, to be part

11          of the solution.  Because when you're leading a

12          group of men, that leadership style is the one

13          that works most effectively especially in

14          police work.

15     Q    Look, this is going to be a long day if you

16          won't agree with me to these very simple

17          questions and I think these are very simple

18          questions that I'm asking you, all right.  I'm

19          not asking you what a great guy you were or

20          what you think about management or what you

21          believe your guys thought of you or how much

22          you would listen when they had suggestions.

23          I'm asking you a very simple yes or no

24          question.

25                   At the end of the day if you gave them a
```

```
 1            directive, a directive they disagreed with, you

 2            expected them to carry it out nonetheless,

 3            correct?

 4                          MR. CHANDRA:  Objection.  Asked

 5            and answered.

 6       Q    Correct?

 7       A    Am I answering that, Mr. Strang?

 8       Q    Yes.

 9                          MR. CHANDRA:  You're free to

10            answer.  But it's been asked and answered.  Go

11            ahead.

12       A    Okay.  I don't mean to confuse the issue, I'm

13            just trying to explain to you --

14       Q    I don't want an explanation.  I just want an

15            answer to my question.

16                          MR. CHANDRA:  Objection.

17       A    Okay.  Yeah, I mean, obviously the simple

18            answer is of course.

19       Q    Obviously, correct?

20       A    When you put a directive out there guys would

21            follow it until a better way was brought to my

22            attention.

23       Q    But then when another way was brought to your

24            attention, again, it would have been up to you

25            whether you wanted to change the way you did
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1           things or whether you wanted to stick with your
 2           old ways because you were the boss?
 3                     MR. CHANDRA:  Objection.
 4     A     No, that's not how I operated.  If someone came
 5           up with a different idea, then what I would is
 6           call a team meeting and I would meet with the
 7           sergeants and I would actually bring the
 8           patrolman in, whoever had that idea, and we
 9           would sit down and discuss it to see if it was
10           something better, see if it was something that
11           was able to be done and then we would move
12           forward on that as well or not.
13     Q     Mr. Mazzola, I'm a little incredulous because
14           what it sounds like is you're operating your
15           police department in a way that I've never
16           heard a police department operated before.
17                Were you trained in this managerial
18           technique somewhere?
19                     MR. CHANDRA:  Objection.
20     A     No.  You know, I tried to just treat my guys in
21           a way that promoted a positive working
22           environment and tried to -- you know, I always
23           say I praised them in public and chewed them
24           out in private.  They were part of my team,
25           they were my guys and I tried to lead them to
```

```
 1            the best of my ability and it was effective.

 2      Q    What is a paramilitary organization?

 3      A    You know, the official definition, I don't

 4            know.  But what that does is it structures

 5            rank, you know, within a department.  And, you

 6            know, beyond that, I'm not sure how much

 7            paramilitary organization actually applies to

 8            modern day police work anymore.

 9      Q    Well, you're the one who used the word, not me,

10            so I'm asking you what you meant by it.  You

11            described the department as paramilitary.

12                      MR. CHANDRA:  Objection.

13      A    Right.  I used that term just for the general

14            structure of the department with patrolman and

15            sergeant and lieutenant and different

16            responsibilities from there.  I used it because

17            it sort of didn't apply with the way I ran

18            things.  I really needed everybody's help.  I

19            was a person, and still am, that always wants

20            to consider people's ideas and feelings and

21            come up with the best solution to move forward

22            to solve that problem.  So if a patrolman had

23            an idea, I would listen to him because it might

24            be a good darn idea.

25      Q    A paramilitary organization is basically an
```

```
 1            organization that has reporting structures

 2            similar to a military organization, correct?

 3     A      Again, I'm not 100 percent sure on the actual

 4            definition of what a paramilitary organization

 5            is; and I'm not sure how much Independence

 6            mirrored that or didn't mirror that.

 7     Q      Well, the City of Independence had actual /T-PG

 8            ranks, correct, and you reported up the chain,

 9            correct?

10     A      Correct.  They had ranks.  Changed throughout

11            the years, but, yeah, there was always rank.

12     Q      And the rank above you was essentially your

13            superior and you reported to the rank above

14            you, correct?

15     A      In my case, no, that was not correct.

16     Q      Are you telling me that you did not report to

17            the person who was above you in rank?

18     A      That's correct, I did not.

19     Q      Who did you report to then?

20     A      I reported to the chief of police.

21     Q      But the chief of police was your boss, correct?

22     A      Yes.  Well, ultimately he's everybody's boss.

23            My next in line chain of command would have

24            been deputy chief.  We lost one deputy chief,

25            John Cotabish.  That was never -- that position
```

```
 1            was never filled.  Then Jim Polak was my direct

 2            supervisor, if you will, under rank.  However,

 3            when I was brought to the position of patrol

 4            commander, I can't speak to what relationship

 5            or arrangement the chief made, but I then

 6            skipped my deputy chief and I just reported

 7            directly to Chief Kilbane.

 8   Q   Chief Kilbane was either your direct report

 9            then or the direct report to your direct

10            report, correct?

11                      MR. CHANDRA:  Objection.

12   A   Up until I had was promoted to the patrol

13            commander, I would report to Jim Polak.  After

14            that I would just report to the chief.  I don't

15            know if that answers the question or not, but

16            that's what it was.

17   Q   Yeah.  So the chief was above you and you

18            reported to the chief, correct?

19   A   That's correct.

20   Q   And if the chief gave you an order, it was your

21            job to carry that out, correct?

22   A   Correct.

23   Q   Even if you disagreed with it, correct?

24   A   Correct.

25   Q   Because not everybody has the same managerial
```

Leonard Mazzola

```
 1          style that you do, correct?

 2     A    I'm sure everybody has their own styles, sure,

 3          that's fair.

 4     Q    Okay.

 5                    MR. STRANG:   I'm showing the

 6          witness what's been marked as Defendants'

 7          Exhibit 6.

 8                    MR. CHANDRA:  Counsel, are you

 9          going to bring that up on the screen or are you

10          asking Mr. Mazzola to pull it up?

11                    MR. STRANG:   I'm going to bring

12          it up.

13                    MR. CHANDRA:  Thank you.

14     Q    Mr. Mazzola, I've handed you a City of

15          Independence Police Department -- it's

16          specifically General Order 502.  Do you

17          recognize this order?

18     A    Yeah, I see it's a department policy for

19          Independence.

20     Q    And as a police lieutenant for the City of

21          Independence, this general order would

22          essentially govern you while at work, correct?

23     A    Correct.

24     Q    It was your job to follow these general orders,

25          correct?
```

```
 1    A   Correct.

 2    Q   It was also your job to follow the orders of

 3        your superiors, correct?

 4                   MR. CHANDRA:  And I'd like to

 5        object, lodge a continuing objection to the use

 6        of the highlighted Exhibit 6.

 7                   MR. STRANG:   Sure.  I can note

 8        for the record that some of these highlights in

 9        there are not the actual general orders.

10                   MR. CHANDRA:  Same objection.  Go

11        ahead.

12    Q   Mr. Mazzola, is that correct?

13    A   I'm sorry, can you repeat what the exact

14        question was?

15    Q   Yeah.  As a City of Independence police

16        lieutenant, you're responsible for not only

17        following these orders but following any orders

18        the chief of police gave you, correct?

19    A   Correct.

20                   MR. STRANG:   I'm going to refer

21        the witness to Defendants' 921, specifically

22        16.

23                   MR. CHANDRA:  Can you repeat the

24        Exhibit number, please.

25                   MR. STRANG:   It's Exhibit 6.  At
```

Leonardo Mazzola

```
 1            the bottom it's defendant 921, the Bates
 2            number.
 3                       MR. CHANDRA:  Again, objection to
 4            the highlighting.
 5    Q    Mr. Mazzola, I'm going to direct your attention
 6         to paragraph 16, "Insubordination."  Do you see
 7         that?
 8    A    I do.
 9    Q    It state, "Employee shall willfully observe and
10         obey the verbal and written rules, duties,
11         policies, procedures and practices of the
12         Independence Police Department."
13              Do you agree that as a police lieutenant
14         with the City of Independence that you were
15         required to follow that?
16    A    I do.
17    Q    It goes on.  "They shall also subordinate their
18         personal preferences and work priorities to the
19         verbal and written rules, duties, policies,
20         procedures and practices of the department.  As
21         well as to the orders and directives of
22         supervisors and superior command personnel of
23         this department."
24              Do you agree that also applied to you as
25         a police lieutenant with the City of
```

Leonardo Mendozo

104

```
 1         Independence?
 2                    MR. CHANDRA:  Objection.
 3    A    Yeah, that would apply to everybody who is
 4         under these policies.
 5    Q    Including you as a police lieutenant with the
 6         City of Independence, correct?
 7    A    Yeah.  Everybody in department would, yes, sir.
 8    Q    And the chief of police would be your superior
 9         commander, correct?
10    A    Yeah.  He's obviously top dog of the department
11         and he was my direct supervisor from --
12         whenever that date was when I came to the
13         patrol commander position.  So we'd skip over
14         Jim Polak at that time.
15    Q    Correct.  And you had to listen to what he told
16         you, correct?
17                    MR. CHANDRA:  Objection.
18    A    Yeah.  The chief and I had a good relationship
19         and we would talk about things and I'd get
20         things done for him.
21    Q    Yeah.  But that's not what I'm asking you.
22         What I'm asking you whether you had to listen
23         to him.
24                    MR. CHANDRA:  Objection.
25    A    Well, sure.  Again, he's top dog so, yeah,
```

```
 1        everybody had to listen to him.
 2   Q    And this goes on, "Employee shall willfully
 3        perform all duties and tasks assigned by
 4        supervisory and/or superior ranked personnel.
 5        Direct tacit or constructive refusal to do so
 6        is insubordination."
 7             That applied to you as a City of
 8        Independence police lieutenant, correct?
 9   A    Correct.
10   Q    And were you -- were you aware of this policy
11        while you were a police lieutenant with the
12        City of Independence?
13   A    This list of numbering it was added to our
14        policy, I'm not sure when, but they started off
15        as the 21 rules and they got added actually
16        officially into our policy -- I'm not sure
17        when, but I have seen obviously them before.
18   Q    And do you understand what "direct tacit
19        constructive refusal to do something," do you
20        know what that means?
21   A    To be honest, I don't know what tacit means,
22        but I get the general gist of what it says,
23        yes.
24   Q    And what is the general gist of what that says?
25   A    Obviously to listen to, you know, the orders
```

```
 1           that come down.
 2      Q    It means that listening to an order and not
 3           carrying it out is just as bad as actively
 4           disobeying an order, correct?
 5      A    Again, I'm just looking at the words there.  If
 6           you're looking for me to agree that this
 7           applied to me, it did.  If you're looking for
 8           me to agree that the chief of police was the
 9           top dog, he was.  So I understand that applied
10           to me.
11      Q    I'm going to refer you to a -- at the very
12           bottom of this it starts, "Insubordination and
13           insubordinate behavior are considered to be
14           among the most serious offenses."
15                Do you agree with that statement?
16                     MR. CHANDRA:  Objection.
17      A    Yeah.  I mean, definitely a problem.
18      Q    Well, not just a problem but one of the most
19           serious offenses, correct?
20                     MR. CHANDRA:  Objection.
21      A    No.  I mean, look, unfortunately in police work
22           there's a lot of problems that pop up.  And
23           again, I'm not one to feel that anything that
24           doesn't apply to the guys on the road is a
25           major problem.  I would think that your major
```

Leonardo Maldonado

```
1              problems, things that are of the most serious

2              would be your officers on the road and

3              interacting with the public and knowing how to

4              do their job correctly and safely.  This is

5              kind of an administrative thing in my view.

6       Q      Okay.  So you agree with me that that's what it

7              says in this document, correct?

8       A      I mean, I agree, sure.  I'm looking at it right

9              now, I see what's in writing.  As far as one of

10             the most serious offenses, again, there's so

11             many things wrong in today's world and today's

12             police departments I would probably not put

13             this towards the top.

14      Q      So you disagree with what's in the general

15             order, correct?  Is that what you're telling

16             me?

17                      MR. CHANDRA:  Objection.

18      A      No.  And I don't mean to confuse the issue.  I

19             see the general order and it's in there.

20             Administratively, sure, you know, in order for

21             things to run efficiently and productively you

22             have to have officers that are willing to do

23             that.  I had numerous problems with a couple

24             sergeants and they weren't addressed and it

25             grew from there.  So when it says if it's
```

```
 1          allowed to go unchecked, boy, do I get that
 2          point.  I'm just saying for police departments
 3          in general there's a lot more serious problem;
 4          and I think we're witnessing some of them,
 5          unfortunately, in today's society.
 6     Q    Okay.  So you personally disagree with the
 7          statement, "Insubordinate behavior is amongst
 8          the most serious offenses"?  You personally
 9          disagree with that, is that what you're telling
10          me?
11     A    No, no, that's not what I'm saying.  Again, I
12          don't mean to confuse it.  I'm separating, I
13          guess, police work -- you know, practical
14          application of police work itself and the inner
15          workings of this policy.  So I'll get off that
16          on-road-type mentality.  That's where I spent
17          my entire career.
18               As far as insubordination here in this
19          policy, you know, it would be a serious offense
20          just for communication back and forth and
21          trying to be efficient.  If you had someone
22          that just flat out refused to do something and
23          offered no better way to do it, absolutely.
24     Q    Well, this policy doesn't have an exception for
25          employees who think they have a better way,
```

```
 1          correct?  That's not in here?  You don't see

 2          that in black and white, do you?

 3      A   No, no, I don't.  It's not in black and white.

 4      Q   There is no insubordinate exception to

 5          employees who think that they have a better way

 6          than their supervisor, correct?

 7      A   No, it doesn't have that listed.

 8      Q   Okay.  This goes on at the bottom of the page,

 9          "If insubordination is allowed to go

10          unchecked" -- start with the next page --

11          "management loses control in authority over its

12          workforce."

13              Do you agree with that statement?

14                      MR. CHANDRA:  Objection.

15      A   There is going to be -- I mean, I guess it just

16          depends on what degree it's at and the

17          interaction between the two.  Again, I had

18          serious insubordination issues with a sergeant

19          and there was definitely a loss of control, or

20          at least there was no authority, you know, over

21          that person.  So it would apply.

22      Q   And the chief had serious insubordination

23          issues with you, correct?

24                      MR. CHANDRA:  Objection.

25      A   No, sir, I don't believe so.
```

110

```
 1    Q   You don't believe that the chief had any

 2        insubordination issues?  Is that what you're

 3        telling me right now?

 4                    MR. CHANDRA:  Objection.

 5    A   Well, again, the chief and I had an outstanding

 6        relationship for, gosh, four-and-a-half years,

 7        whatever it would have been from the time he

 8        was hired until this incident came up.  So I

 9        could tell you that, at least from my point of

10        view, you know, he was a good chief and we

11        never had issues.  And I got the job done and

12        the department was running, you know, very well

13        and efficiently and then this came up.  So I'm

14        not sure -- if he's classifying this situation

15        as insubordinate, then I guess that's his

16        opinion.  We never really even had a chance to

17        talk about this.

18    Q   Okay.  Well, we will get into some of those

19        because I have some e-mails to show you later.

20                    But you do agree that this policy applies

21        to you at the time, the specific portion I just

22        read, correct?

23    A   Sure, yeah, it applied to me and it applied to

24        every Independence policeman, yes, sir.

25    Q   Okay.  I'm going to refer you then to the next
```

Leonardo Maldonado

```
 1        page starting with heading 19.  It says,

 2        "Courteous and respectful behavior towards

 3        positions of authority.  Employees shall be

 4        subordinate and display courtesy and respect in

 5        words, deeds, gestures and actions for

 6        personnels holding higher levels of official

 7        authority."

 8                    MR. CHANDRA:  Objection.  Calls

 9        for his alteration of the document.

10    Q   Did I -- well, did I read that correctly?

11    A   Yeah, I believe you did.

12    Q   No text has been altered, correct?

13    A   I haven't seen this policy in a number of

14        years, I've got to be honest with you.  I

15        didn't review policies.  But I'm going to take

16        you for your word, Mr. Strang, I don't think

17        you altered this in any way.

18    Q   Highlighting is not altering the words of this

19        document.  These were the words in effect when

20        you were an employee for the City of

21        Independence, correct?

22                    MR. CHANDRA:  Objection.

23    A   Again, I would assume, yes, that this was the

24        current policy going on, yes.

25    Q   And did you understand this policy when you
```

```
 1              were an employee with the City of Independence?
 2      A    Yeah.  I'll tell you, the only time you looked
 3              at these policies is when it's time to take a
 4              promotion, it seems, because there are a lot of
 5              them.  Like I said, they were known as the 21
 6              rules.  These have been in existence for a
 7              number of years.  I don't know if they have
 8              been tweaked or the text has been changed
 9              throughout the years, but they've been around
10              for a number of years.
11      Q    This was actually the one in effect though at
12              the time in 2018 and 2019, correct?
13                        MR. CHANDRA:  Objection.
14      A    I wouldn't know that.  Mary Cox kept the
15              up-to-date policies upfront and then we would
16              kind of photocopy them and throw them in the
17              back room.  So whatever Mary Cox has upfront,
18              that would have been the one that applied.  I'm
19              not sure where this was taken from.  If it was
20              taken from Mary's files, then, yes, it was the
21              one in place.
22      Q    When these are revised everyone has to read and
23              sign them, correct?
24      A    Jim Polak was in the process of going over
25              policies and then that kind of stopped because
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1            of -- well, again, I'm not one to speak of it,

 2            but just Jim Polak's, I guess, responsibilities

 3            in the department.  So I know there was a

 4            review of policies.  And then there was a book

 5            in the back and he would have like five

 6            policies and then guys would have to read and

 7            initial; and then if they wanted changes or if

 8            they thought a change needed to be made, then

 9            they would write it down and submit it to Jim

10            Polak.

11      Q    Did you ever make any suggestion, revisions or

12            changes to these policies regarding

13            insubordination and respect towards your

14            superior?

15      A    No, I haven't.

16      Q    Okay.  Do you believe that a subordinate

17            employee should yell at their supervisor?

18      A    Generally speaking, you know, I don't know what

19            kind of appropriate verbiage back and forth

20            between two guys are.  It would depend on the

21            topic and where they're at.

22      Q    Well, I'm not asking you about just generally

23            with your buddies or out in the world.  I'm

24            asking you specifically about this Independence

25            policy that I've got in front of you that
```

114

```
 1              requires you to display courtesy and respect in

 2              words, deeds, gestures and actions toward

 3              personnel holding higher levels of official

 4              authority.  And what I'm asking you is whether

 5              yelling at your superior would violate this?

 6                        MR. CHANDRA:  Objection.

 7      A    I believe yelling at your supervisor in a

 8              nonconstructive or in a demeaning way,

 9              something that's not going towards the solution

10              of the problem, sure, that would definitely be

11              a violation of this policy.  You know, if you

12              and I were having a conversation about

13              something and we were yelling at each other

14              back and forth, that's business, that's how

15              things get done.  Again, I'm not one to get

16              upset with how someone talks with me as long as

17              we're trying to get to a positive solution.

18              Mr. Strang, you can call me anything you want

19              and at the end of the day if we're shaking

20              hands and having a cup of coffee, then the job

21              gets done.  So, I mean, I guess you're looking

22              for an answer out of me and I guess it would

23              just depend on how the conversation was going

24              and I guess in what context.  If I started

25              calling you some nasty names, then obviously
```

115

```
 1              it's inappropriate and out of line.  But if me
 2              and you are just talking about a problem, then
 3              we may yell at each other, but as long as it
 4              gets solved at the end of the day, I don't have
 5              a problem with it.
 6         Q    What about lying bitch?  Is that a thing you
 7              can call your superior?
 8                       MR. CHANDRA:  Objection.
 9         A    Yeah, I know what you're referring to.  That
10              was frustration after a meeting.  I was alone
11              walking down the hallway frustrated, obviously,
12              with the untruthfulness of Chief Kilbane in the
13              meeting I just had.
14         Q    You'd agree with me though that you shouldn't
15              swear at a superior officer, correct?
16         A    To a superior officer's face, yeah, absolutely
17              not.
18         Q    Okay.  But you're telling me that you think you
19              can yell at your superior officer, it just has
20              to be in some sort of collaborative
21              environment?  Is that what you're telling me?
22                       MR. CHANDRA:  Objection.
23         A    No, that's not what I'm saying at all.  I mean,
24              I come from Italian decent, which the chief
25              reminded me about numerous times, made fun of
```

```
 1          me quite a bit about it, joked about it,
 2          brought up my race quite a bit.  So my family,
 3          if you come over for Sunday dinner, it gets
 4          pretty loud.  I think it's just the way people
 5          talk.
 6               Again, I'll cut to the chase and I'll get
 7          to your question and save some time here.  At
 8          no point did I yell anything inappropriately to
 9          Chief Kilbane.  And I would not do that to the
10          man regardless of our relationship and I don't
11          think he'd do that to me.  That comment you
12          heard recorded, that was said under my breath,
13          I was alone, I was walking down the hallway, no
14          one else could hear that.  And obviously it's
15          not something I'm proud of, however I was very
16          frustrated at the continuous untruthfulness of
17          Chief Kilbane and his attempts to keep that
18          truth covered up.
19     Q    Mr. Mazzola, I'm hoping that once you get the
20          story that you want to tell out today that
21          you'll actually respond to my questions a
22          little more succinctly.  I didn't ask about
23          your Italian heritage, I didn't ask about how
24          family dinners are, I didn't ask about anything
25          about any specific recording.
```

```
 1              I'm just trying to get a very basic

 2         answer and to have you agree or disagree that

 3         yelling at a superior violates this clause that

 4         we just looked at.  It's a very simple answer

 5         and it doesn't require you getting into your

 6         ancestry or dinners or anything like that.  I'm

 7         asking about this general order that applied to

 8         you as a police lieutenant with the City of

 9         Independence.

10                   MR. CHANDRA:  Objection.

11    A    Yeah.  Again, this policy -- again, I don't

12         mean to dodge your questions.  This policy

13         applied to me.  It applied to every officer in

14         the department.  Now, if you're asking me my

15         personal opinion of it, it is what it is.  You

16         have to follow it.  I'm just saying personally,

17         I guess, if someone is yelling or screaming at

18         me, it would matter the context of it.

19    Q    I'm not asking you personally what you get

20         offended about.  I'm asking you -- you

21         obviously were a member of the chain of command

22         with the City of Independence, correct?

23    A    Correct.

24                   MR. CHANDRA:  Counsel, I see

25         we're approaching the time that Mr. McLandrich
```

```
 1          is going to have to leave for his meeting, so

 2          do you have a wrap up question or two before

 3          that happens?

 4                     MR. STRANG:   Sure.  And I assume

 5          Mr. McLandrich can remind me himself, too.

 6    Q    You were obviously a member of the hierarchy at

 7          the City of Independence, correct?

 8    A    Correct.

 9    Q    Okay.  And so I'm not asking you what your

10          feelings are about this.  What I'm asking you

11          is, as a police lieutenant, what you understood

12          to be acceptable and unacceptable behavior at

13          the time to your superior, all right?  Do you

14          understand that?

15    A    Yes.  Go ahead.

16    Q    Okay.  In your role at the police department as

17          a police lieutenant with the city of the

18          Independence, do you believe it was appropriate

19          to yell at your superior officer?

20    A    No, I would not and it's not appropriate.

21    Q    Okay.  Do you believe that it was -- in your

22          role as a police lieutenant, do you believe it

23          was appropriate to swear at your superior

24          officer?

25    A    I don't think I ever did swear.
```

```
 1    Q   Not what I'm asking you.

 2    A   Yeah.  Someone speaking to a superior,

 3        obviously their language has to be appropriate.

 4    Q   And would you agree with me that disregarding a

 5        command by your superior officer would also be

 6        acting uncourteously toward your superior

 7        officer?

 8                    MR. CHANDRA:  Objection.

 9    A   Yeah, if you're given an order, it's got to be

10        somehow carried out, sure.

11                    MR. CHANDRA:    We've been going

12        for about an hour and a half, Steve.  Are we

13        going to break soon?

14                    MR. STRANG:     Sure.  We can

15        break for Mr. McLandrich's call.

16            John, how do you want to handle this

17        call?

18                    MR. MCLANDRICH:  So my call is at

19        12:15.  You know, I don't know how long the

20        court is going to want to chit chat, but I

21        wouldn't think it would be particularly

22        retracted unless he decides he wants to try to

23        settle this case or something, which isn't

24        going to happen.  So I would think a half

25        hour -- you know, I'm hoping it's 15 minutes
```

Leonardo Mazzone

120

```
 1          but I think a half hour would certainly be a
 2          safe estimate, I hope it would be.  So if we
 3          want to take a break for something like 15
 4          minutes or a half hour, whichever your
 5          pleasure, I'll pop back in and let you know
 6          whether I'm done or not at any of those
 7          intervals you want to have me check back.
 8                    MR. CHANDRA:    So what I'd like
 9          to do is take a lunch break until 1:00.  And,
10          John, if you end up finding yourself available
11          earlier and refreshed, if you could just maybe
12          send a chat on the chat function here on Zoom
13          and let us know and then we can see if we can
14          reconvene a little bit earlier.
15                    MR. MCLANDRICH:  That's fine with
16          me.
17                    MR. CHANDRA:     Thank you,
18          everyone.
19                    MR. MCLANDRICH:  Thanks.
20                    - - - - -
21        (Thereupon, a luncheon recess was taken.)
22                    - - - - -
23                    VIDEOGRAPHER:    Back on the
24          record.  The time is 1:29.
25      BY MR. STRANG:
```

121

```
1    Q   Mr. Mazzola, have you put your home on the

2        market?

3    A   I have not.

4    Q   Have you reached out to a realtor?

5    A   Yes, I have.

6    Q   What realtor?

7    A   One that's based in Charlotte.

8    Q   To sell your home here in Cleveland?

9    A   No.  The home is going to remain here.  I'm not

10       selling it.

11   Q   What were your job duties as a lieutenant with

12       the Independence Police Department?

13   A   I don't know the official description.  But

14       again, I think we touched on this earlier, I

15       was in charge of the uniform patrol guys,

16       patrol sergeants, scheduling, you know,

17       production and side jobs and stuff like that.

18   Q   What do you mean by "production"?

19   A   Tracking their activity.

20   Q   Were you in charge of the -- I'm not sure if

21       there is an actual word for it.  Were you in

22       charge of essentially the officers who were out

23       there running traffic detail?

24   A   Again, I was supervisor for everyone in patrol.

25       You're talking about the overtime traffic
```

```
 1        details where they would write tickets?

 2   Q    Yeah.  Just any -- the traffic detail in

 3        general, that was under your sphere of

 4        responsibility, correct?

 5   A    Correct.

 6   Q    And you were responsible for overseeing traffic

 7        detail; is that correct?

 8   A    I would schedule them and then there was an

 9        allotted amount of hours that was given to me

10        by Chief Kilbane.  So I just tried to keep

11        within those allotted hours to make sure it was

12        spread evenly and available to officers who

13        wanted to work them.  I didn't like, per se,

14        supervise them on the road when they were doing

15        it.

16   Q    Yeah, sure.  Well, you weren't on the road with

17        them, but you were in charge of making sure

18        that they were out on the road essentially

19        doing their jobs, correct?

20   A    That was kind of the sergeants.  I scheduled

21        them, made sure that the allotted hours were

22        enough.  But, I mean, they were expected to

23        obviously go out there and do their jobs.

24   Q    Right.  And they -- so the officers running

25        traffic detail reported to their sergeant,
```

```
 1        correct?

 2    A   Correct.  Or OIC.  Whoever was in charge that

 3        day.

 4    Q   Okay.  And then that person was in charge of

 5        essentially making sure that they were out

 6        doing their jobs, correct?

 7    A   Yes, I think that's fair, sure.

 8    Q   And then that person would then report to you,

 9        correct?

10    A   Yeah.  Depending on if it was a sergeant or an

11        OIC.  And then I would take the numbers and I

12        would put them into the points system and try

13        to keep an accurate account of what was going

14        on.

15    Q   It was also your job to make sure the sergeants

16        and patrol officers under the sergeants were

17        essentially doing what they were supposed to be

18        doing, correct?

19    A   Yeah, I mean ultimately -- again, anybody in a

20        uniform, aside from the bureau, would answer to

21        me.

22    Q   Besides detective bureau, is that what

23        you're --

24    A   I'm sorry.  Yes.  Detective bureau when I say

25        "bureau."
```

124

```
 1    Q   Okay.  So uniform officers would include
 2        officers doing traffic detail, correct?
 3    A   Correct.
 4    Q   You were in charge of -- you mentioned before
 5        a -- like a performance standard, correct?
 6    A   Yeah.  I don't know what timeframe you're
 7        talking.
 8    Q   I'm just talking about in general.  I'm trying
 9        to figure out what your job duties included.
10        And your job duties included ensuring that
11        those under you complied with whatever
12        performance standard was implemented at the
13        time, correct?
14    A   Yeah.  Affirmative.  You know, it changed
15        throughout the years obviously.  But, yeah, I
16        was able to -- tried to keep track of that and
17        I posted it on a monthly basis to -- go ahead.
18    Q   The exact performance standard changed over the
19        years, but you were always responsible for
20        ensuring that the performance standard was
21        implemented, correct?
22    A   Yeah, correct.
23    Q   And you were -- would you agree with me that
24        you were in charge of implementing any
25        procedures or policies with the uniform bureau
```

Leonardo Nedzlocca

125

```
 1          that the chief implemented?
 2     A    Sure, yeah.  Anything that you would, I guess,
 3          need to be passed down I would do.
 4     Q    You were responsible for making sure that the
 5          uniform bureau, which would include the traffic
 6          bureau or the traffic detail, they were
 7          actually out in the community doing what they
 8          were supposed to be doing, correct?
 9                    MR. CHANDRA:  Objection.
10     A    We didn't have a traffic bureau, per se.  But
11          if you're referring to guys running the traffic
12          details, I made sure obviously that we had
13          enough time to schedule them; and then when I
14          did the numbers to make sure that they were
15          actually out there doing their jobs.
16     Q    And if they weren't out there doing their jobs
17          then they would ultimately -- they would be
18          answerable to you ultimately, correct?
19     A    Yeah.  That changed as well throughout the
20          years.  So if they didn't, you know, be
21          productive enough, then they wouldn't even
22          qualify for traffic detail; and then once they
23          had the traffic detail, then if they went out
24          there and they did nothing, then obviously they
25          wouldn't qualify for additional ones.  Now, of
```

```
 1              course, things popped up time to time.  But,

 2              yeah, I tried to be responsible to make sure we

 3              were within budget and that they were

 4              productive.

 5       Q      Were you just referring to overtime traffic

 6              detail?

 7       A      Yes.  That's what I thought we were talking

 8              about.

 9       Q      Well, I'm just talking about regular traffic

10              detail, not overtime.  Just the guys out there

11              checking radar guns, making sure people don't

12              run red lights.  I'm not talking about overtime

13              traffic detail, okay.  That's going to be

14              different, if I even ask those questions.

15                   You were responsible for overseeing just

16              the normal traffic detail, correct?

17       A      Yeah.  Sorry about that.  I thought we were

18              talking about the overtime traffic detail.

19              There was no like really traffic details

20              assigned.  So guys -- patrolman -- we had zones

21              set up at times.  But they were responsible to

22              answer their calls and they were responsible

23              obviously to enforce traffic laws and whatever

24              else was thrown at them; accidents, neighbor

25              disputes, what have you.
```

Leonardo Mazzola

127

```
1    Q    And they were ultimately responsible to answer
2         to you while on the job, correct?
3    A    Yes, that's correct.
4    Q    Whatever performance standard was in effect at
5         the time for the guys just generally doing
6         traffic, you were responsible for making sure
7         that they complied with whatever performance
8         standard was in effect at the time, correct?
9    A    Correct.
10   Q    And you were in charge of enforcing any
11        policies or procedures implemented by the chief
12        with the guys out just doing regular traffic
13        detail, correct?
14   A    Yeah.  Any policy the chief gave to me I
15        forwarded it down to patrol guys, sergeants,
16        yeah.
17   Q    Because that was part your job
18        responsibilities, correct?
19   A    Yeah.  Oversee the guys, yeah.
20   Q    Mr. Mazzola, I'm going to refer you to
21        Exhibit 3.
22              MR. STRANG:  Maia, could you pull
23        that up?
24   Q    Mr. Mazzola, I'm putting up Defendants' Exhibit
25        3 in front of you.  I'm going to scroll down a
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              little bit so you can see the actual text of

 2              that.  I'm going to represent to you it's an

 3              e-mail from Michael Kilbane to "Police" dated

 4              Thursday, January 15, 2015 at 2:11 p.m.

 5              "Subject:  Personal Electronic Devices and

 6              Recording."

 7                   Have you seen that document before?

 8    A    Can you scroll down or do I have to scroll

 9         down?

10    Q    We can scroll down.

11    A    Okay.  I reviewed it.

12    Q    Have you seen this document before?

13    A    Yeah, I assume I did if it was mailed to me.

14    Q    Well, it was mailed to "Police."  Do you know

15         who that would be?

16    A    Yeah, I would be included in that.

17    Q    Who does police include?  Does that include the

18         entire police department?

19    A    I don't know, but I know I'm part of it -- or

20         was.

21    Q    Do you recall receiving this e-mail?

22    A    I don't.  I'm trying to think if this went back

23         to -- there was a situation with city council

24         that I didn't have any information on and I

25         wonder if it was involved with that and I just
```

```
 1        didn't pay -- you know, didn't pay attention to

 2        it at the time.

 3   Q    So you're telling me you think this was sent to

 4        you, you just didn't pay attention to it at the

 5        time?

 6   A    No, I'm sure I did.  I'm just -- I don't know

 7        what context it was sent to me as or what

 8        brought this on.  I think there was something

 9        to do with city council was contacted.

10   Q    Okay.  Well, look, this will streamline things

11        quite a bit.  When I show you a document, I'm

12        asking you very specific questions about that

13        document.  So something like context, if I ask

14        you what context this document was sent to you

15        in or something like that, then your comments I

16        think would be warranted.  But I just want to

17        be clear, again, after the lunch break that I'm

18        going to ask you very specific questions and I

19        would appreciate it if you could provide very

20        specific answers.

21                  MR. CHANDRA:  Objection.

22   Q    Was this sent to you as part of prep for the

23        Republican National Commission (sic)?

24                  MR. CHANDRA:  Objection.

25   A    I'm sorry the republican convention?
```

130

```
 1      Q    Yeah.

 2      A    I do not know.

 3      Q    Do you believe if this was sent to you that you

 4           would have reviewed it?

 5      A    Yes.

 6      Q    And as a lieutenant, would you agree with me

 7           that if this is sent to you from Chief Michael

 8           Kilbane that you had a duty to follow whatever

 9           instructions were in this e-mail?

10                    MR. CHANDRA:  Objection.

11      A    Correct.

12      Q    This e-mail starts, "If any employee elects to

13           use personal electronic devices for recording

14           purposes while at work, they may do so subject

15           to the following provisions."  First is "The

16           recordings are to be made and used only for

17           evidentiary purposes in official police

18           investigations."  The second is, "Any recording

19           made while on duty shall be considered property

20           of the police department."

21                You received those instructions from the

22           chief in 2015?

23      A    Yeah.  Again, if it's addressed to police, I

24           would have received it.

25      Q    And I'm asking you these questions because you
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          provided hours and hours of surreptitiously

 2          reported conversations that you have -- that

 3          you took at work involving the chief, the

 4          mayor, human resources and other people while

 5          at work.  And those recordings were all after

 6          January 15, 2015, correct?

 7                    MR. CHANDRA:  Objection.

 8          Counsel, what's the base number on this exhibit

 9          you're using?  I don't see Bates numbers on it.

10                    MR. STRANG:   I don't know what

11          it is.

12                    MR. CHANDRA:  Is there a reason

13          you're not using a Bates numbered version of

14          this document?

15                    MR. STRANG:   Because we pulled

16          the document together and apparently the one

17          that we picked didn't have a Bates number on

18          it.  It was not on purpose.

19                    MR. CHANDRA:  Has this been

20          produced?

21                    MR. STRANG:   We can check if

22          it's been produced after today's deposition.

23          If it hasn't been produced, it was certainly

24          not on purpose.

25               Tracy, can you read my question back into
```

132

```
 1            the record?
 2                              -   -   -
 3                      (Record was read.)
 4                              -   -   -
 5    A   Correct.  They would have occurred from like
 6        September of 2018 and on.
 7    Q   Were those recordings used for evidentiary
 8        purposes in an official police investigation?
 9    A   No.  There was no official investigation going
10        on, per se.
11    Q   Well, per se, was there any investigation at
12        all going on?
13    A   Yeah.  It was all part of a pre-disciplinary
14        hearing that I had going on against me.
15    Q   Yeah.  But the recordings were not made and
16        used for evidentiary purposes in an official
17        police investigation, correct?  These are
18        recordings that you made without people's
19        knowledge, correct?
20    A   Correct.  I recorded it for evidence of, you
21        know, what I said so it wouldn't be
22        misconstrued.
23    Q   The next sentence says, "Any recordings while
24        made while on duty should be considered
25        property of the police department."
```

```
 1              You were on duty when you made those

 2         recordings, correct?

 3    A    Correct.

 4    Q    Were those recordings catalogued and put into

 5         evidence with the police department?

 6    A    No, they weren't.

 7    Q    The next bullet point says, "All officers on

 8         scene should be notified by the recording

 9         officer that recording is being conducted."

10              Did you notify everybody who was being

11         recorded that they were being recorded?

12                   MR. CHANDRA:  Objection.  And I'm

13         going to lodge a continuing objection to this

14         entire course of questioning because we don't

15         have Bates numbered exhibit and it does not

16         appear that this was ever produced to us.  So

17         this is completely inappropriate and out of

18         line if that is the case.  If you would like to

19         show me a Bates numbered produced exhibit, I'd

20         be happy to reconsider, but this is classic

21         deposition sandbagging.  It's completely

22         inappropriate and I object on a continuing

23         basis?

24                   MR. STRANG:   Are you finished

25         with your objection?  Are you done with your
```

Leonardo Mazzola

134

```
 1          objection?

 2                         MR. CHANDRA:  Yes.  You know I'm

 3          done with my objection, Steve.

 4                         MR. STRANG:   Tracy, can you read

 5          back my question.

 6                              -  -  -

 7                         (Record was read.)

 8                              -  -  -

 9                         MR. CHANDRA:  Objection.

10     Q    Mr. Mazzola?

11     A    Yes, sir.

12     Q    Did you notify everyone that they were being

13          recorded?

14     A    Chuck Wilson was made aware that I was going to

15          be recording the procedures that he was in,

16          yes.  Other than him no one, no.

17     Q    The next bullet point says, "No recordings made

18          on duty shall be copied, distributed, shared or

19          posted in any manner without prior approval by

20          the chief or deputy chief."

21               Did you seek approval by the chief or

22          deputy chief to make those recordings?

23                         MR. CHANDRA:  Objection.

24     A    To copy, distribute, share or post?

25     Q    Are you claiming now that you did not violate
```

```
 1            that because you did not copy, distribute,

 2            share or post them?

 3      A    I made the recordings and I never copied or

 4            gave them to anybody else or shared them or

 5            posted them.

 6      Q    Did you get prior approval by the chief or

 7            deputy chief to make those recordings?

 8                      MR. CHANDRA:  Objection.

 9      A    No, sir.

10      Q    The next bullet point says, "Officers shall not

11            record any other employees without their

12            knowledge and consent, unless the recording is

13            occurring during official criminal justice

14            business and consent would not be readily

15            available".

16                 Did you record the other people in those

17            conversations without their knowledge and

18            consent?

19                      MR. CHANDRA:  Objection.

20      A    Again, in all the recordings that were turned

21            over, just Chuck Wilson and I were aware that

22            we were recording it.

23      Q    Okay.  The next bullet point says, "No

24            recording shall be conducted on the premises of

25            the police station unless it is a suspect
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              interrogation or witness interview."

 2                   Were some of those recordings conducted

 3              on the premises of the police station?

 4    A    Yes.

 5    Q    Were they during suspect interrogations or

 6              witness interviews?

 7    A    No.

 8    Q    The next bullet point says, "The officer making

 9              the recording shall be responsible for

10              documenting and preserving it as evidence."

11                   I think we went through this before, but

12              just to be clear, did you document and preserve

13              those recordings as evidence?

14    A    No, they were not logged into evidence.

15    Q    At the end the chief says, "All employees shall

16              take notice and assume that any officer, IPD or

17              not, working an official police matter/scene is

18              liable to be recording the events either

19              visually and/or audibly."

20                   Does that last sentence give you any

21              context as to whether that was provided in

22              anticipation of the RNC?

23    A    No, it doesn't.  I'm not sure what prep was

24              made for RNC.  It may be in reference to us

25              getting a couple vehicles outfitted with the
```

```
 1        body recorders and cameras on the car.
 2   Q    Does this e-mail have any sort of expiration
 3        date on it?
 4   A    I wouldn't think an e-mail has an expiration.
 5        Something says on the top.  But, no, I don't
 6        believe so.
 7   Q    So you would assume that these instructions
 8        should be followed until explicitly rescinded
 9        by the chief of police, correct?
10              MR. CHANDRA:  Objection.
11   A    Correct.
12   Q    Can you explain to me why you did not comply
13        with this e-mail?
14              MR. CHANDRA:  Objection.
15   A    Beginning with the pre-D hearing I notified
16        Chuck Wilson that I was going to be recording
17        and both of us agreed that it would be a good
18        idea to document what was said because it was
19        pretty sensitive information that I had to
20        divulge to the chief of police about the
21        inaccuracies of his numbers.  And so we both
22        decided it would be a good idea to document
23        what we were all saying so that things couldn't
24        be misconstrued and had to come back to me on
25        some sort of discipline level.
```

Leonardo Maldonado

138

```
 1    Q    Is there an exception in this e-mail allowing
 2         for recordings during pre-disciplinary
 3         hearings?
 4                   MR. CHANDRA:  Objection.
 5    A    One is not listed.
 6    Q    Because there is none, correct?
 7                   MR. CHANDRA:  Objection.
 8    A    Nothing the explicitly, you know, laid out as
 9         an exception to this rule.
10    Q    Well, do you find it implied anywhere in this?
11                   MR. CHANDRA:  Objection.
12    A    No, not necessarily.
13    Q    Would you agree with me that when an e-mail
14         like this is issued by the police that it
15         should have the effect of a written policy?
16                   MR. CHANDRA:  Objection.
17    A    Well, generally speaking the way it worked with
18         Independence is an e-mail would come out and,
19         you know, at some later time it would become
20         part of the policy if it needed to be.  Kind of
21         like those 21 rules that you had earlier, those
22         were kind of a standalone e-mail and then
23         eventually they became part of an actual
24         concrete policy if they were thought to stick
25         around.  So maybe this e-mail was a directive
```

```
 1        for that RNC.  I can tell you that this was not

 2        followed by many in the department.

 3   Q    It was certainly not followed by you, correct?

 4             MR. CHANDRA:  Objection.

 5   A    I started recording, again, with Chuck Wilson

 6        being aware for basically a union

 7        pre-disciplinary action to document what was

 8        said in the meeting just for obviously evidence

 9        of what was actually said and preserve the

10        moment.

11   Q    That's not what I asked you.  And again, you

12        keep giving me context or reasons why you did

13        something when I'm not asking for those.  I'm

14        asking you very specific questions and I expect

15        very specific answers to my questions.

16             MR. CHANDRA:  Objection.

17   Q    You mentioned that you had a conversation with

18        Chuck Wilson.  You keep throwing that in there.

19             Did you ever have a conversation with the

20        chief about this e-mail where you asked him

21        whether this was still in effect?

22   A    No, sir.

23   Q    So while you were making those recordings in

24        2018 and 2019, you would agree with me that you

25        were still required to follow the directive in
```

```
 1         this e-mail, correct?

 2                    MR. CHANDRA:  Objection.

 3    A    If, in fact, this e-mail was still in place I

 4         would agree, yes.

 5    Q    This e-mail in itself doesn't say that at any

 6         point in the future you can disregard it,

 7         correct?

 8    A    Correct.

 9    Q    Do you remember getting any e-mails saying,

10         Hey, forget that personal electronic device

11         recording e-mail I sent?  Do you remember any

12         e-mail like that?

13    A    No.  The only thing I can think of is this had

14         something to do with someone from the

15         department going to city council and shortly

16         after that this came out.  And again, it wasn't

17         really a big deal in the department.  Everyone

18         was kind of questioning where it came from or

19         who caused this to be put out.  But aside from

20         that, everybody just went about their business

21         and did what they've always done.

22    Q    And again, you're providing me with an

23         explanation for this when I didn't ask for an

24         explanation.  I asked a very specific question.

25         I didn't ask you whether people in the
```

Leonardo Marzano

141

```
 1        department disregarded this or what the

 2        reaction was in the department to this.

 3                    MR. CHANDRA:  Objection.

 4                    MR. STRANG:  Tracy, would you

 5        mind reading back my actual question.

 6                       -   -   -

 7                  (Record was read.)

 8                       -   -   -

 9   A    No, sir.

10   Q    Did you understand that there would be possible

11        punishment for violating this e-mail?

12                    MR. CHANDRA:  Objection.

13              Mr. Strang, we have reviewed all 6,540

14        Bates stamped pages and you do not seem to have

15        produced this e-mail.  Do you have any

16        explanation for why you did not produce this

17        e-mail either as an initial disclosure or in

18        response to our discovery requests before this

19        deposition?

20                    MR. STRANG:  Subodh, I don't

21        know whether what you just told me is true or

22        not.  I've been asking your guy questions for

23        the last five minutes.  I haven't looked at,

24        number one, your discovery requests.  Number

25        two, the documents we provided you.  I haven't
```

142

```
 1          looked into this at all.  I'm not going to make

 2          any assumptions.

 3                      MR. CHANDRA:  We are now going to

 4          take a break in this deposition until you're

 5          able to answer our question.

 6                      MR. STRANG:  No, we're not.

 7          Absolutely we're not.  We are absolutely not

 8          taking a break in this deposition --

 9                      MR. CHANDRA:  Yes, we are.

10                      MR. STRANG:  -- while I search

11          through 16,000 pages.  Absolutely we are not

12          doing that, all right?

13                      MR. CHANDRA:  6,540.

14                      MR. STRANG:  I'm just about done

15          with this document.  It's my deposition and we

16          are absolutely not taking a break in it while I

17          go off on some --

18                      MR. CHANDRA:  Tell me on the

19          record whether you produced this document,

20          Mr. Strang.  Yes or no?

21                      MR. STRANG:  I don't know.  But

22          we're not taking a break in my deposition, so

23          if you'd be quiet while I ask your client

24          questions.

25                      MR. CHANDRA:  Mr. Strang, if you
```

Leonardo Mendoza

143

```
 1          don't know, you are engaged in misconduct,
 2          okay.  If you did not produce this document,
 3          you are engaged in misconduct.  So I'm asking
 4          you to answer my question and we'll take
 5          whatever time is needed, even at a break --
 6                    MR. STRANG:  No, we won't.  It's
 7          my deposition and I going to move on because
 8          I'm done asking questions on this.  But you
 9          don't tell me when we're going to stop my
10          deposition or not, all right.
11                    MR. CHANDRA:  Mr. Strang --
12                    MR. STRANG:  We will deal with
13          this later.  If you believe that misconduct
14          occurred, I'm sure you're going to send me a
15          letter afterward and we can deal with it then.
16          But we're not dealing with it right now on the
17          record, okay.
18                    MR. CHANDRA:  The bottom line is
19          you are unable to tell me whether you produced
20          this document to us or not, correct?
21                    MR. STRANG:  I'm not unable to
22          tell you, I just choose not to deal with this
23          right now because we're in the middle of a
24          deposition and it's 2:00.
25                    MR. CHANDRA:  So you're choosing
```

Leonardo Melazzo

```
1              not to tell us the answer to that question,

2              correct?

3                        MR. STRANG:   I'm choosing not to

4              take a two hour break in my deposition right

5              now is what I'm choosing to do, all right.  So

6              I'm going to move on from this document and I

7              ask that you refrain from making further

8              instructions to me about taking long breaks

9              during my deposition.

10                       MR. CHANDRA:  The record will

11             reflect that you failed to answer the question.

12                       MR. STRANG:   The record will

13             reflect what the record is going to reflect.

14             But it's not going to represent a failure, it's

15             going to represent facts that --

16                       MR. CHANDRA:  It does reflect a

17             failure.  Thank you.

18                       MR. STRANG:   The record reflects

19             what it's going to reflect.

20                       MR. CHANDRA:  There will be no

21             further questions on this document until we

22             have communicated about your failure and until

23             we have taken it up with the court if

24             necessary.  So you can move on to another

25             document.
```

```
1                    MR. STRANG:   I already told you

2         I'm going to move on to another document.

3                    MR. CHANDRA:   Then go ahead.

4                    MR. STRANG:   I'm going to refer

5         to Defendant's Exhibit 7.

6    Q    Mr. Mazzola, I'm showing you a document that's

7         been marked Defendants' Exhibit 7.  It's dated

8         January 18, 2011.  It's a memorandum from

9         Lieutenant Len Mazzola from Chief John Nicastro

10        regarding counseling.

11                   MR. STRANG:   Can you down so

12        Mr. Mazzola can take a look at the whole

13        document?

14   Q    Mr. Mazzola, do you recognize this document?

15   A    I do.

16   Q    What is this?

17   A    This is a document that was given to me because

18        of a meeting that -- hello?

19   Q    Yes.  Did I freeze?

20   A    My video has gone haywire.  Can you hear me?

21   Q    Yeah, I can hear you fine.

22   A    Okay.  I just don't have video at the moment.

23        It's a document that came down after Vern Blaze

24        and Joe Lubin, at the direction of Greg Kurtz,

25        who was mayor at the time, came to my home to
```

Leonardo Maldonado

146

```
 1          discuss departmental issues with me.

 2     Q    Is the document up in front of your screen?

 3          Can you view it right now?

 4     A    I cannot.

 5     Q    Okay.  Is the issue you can't see anything on

 6          your screen right now?

 7     A    I just have lines.  I can take a picture of it

 8          and send it to Subodh if that would help.

 9     Q    Yeah, well --

10     A    Either that or I ran out of data.

11     Q    Okay.  So you can't see anyone's face?  You

12          can't see the Zoom meeting?  You can't see any

13          of the normal Zoom desktop stuff?

14     A    No.  It's just lines.  I'm sending a picture to

15          my attorney right now.

16               But if you can hear me, that's what that

17          letter is from.

18     Q    I just want to ask you some specific questions

19          about the letter and having -- I think it's

20          kind of important to have it in front of you.

21     A    Should I try to log off and log back on?

22     Q    Do you mind?

23     A    No.

24                         -  -  -

25                    (Off the record.)
```

```
 1                        -  -  -
 2                  MR. CHANDRA:   Is the technical
 3      issue ironed out?
 4                  THE WITNESS:   I believe so.  Can
 5      you guys hear me?
 6                  MR. STRANG:   Yeah.
 7                  VIDEOGRAPHER:  We're back on the
 8      record.
 9   BY MR. STRANG:
10   Q   Mr. Mazzola, we have that document back up,
11       Defendants' Exhibit 7.  You can see that
12       document, correct?
13   A   Correct.  The top half of it.
14   Q   That's your signature on the bottom of the
15       document, correct?
16   A   Correct.
17   Q   You actually remember receiving this, correct?
18   A   I do.
19   Q   This is from then chief John Nicastro; is that
20       correct?
21   A   Correct.
22   Q   Okay.  It starts, "On Monday 1/17/11 HR
23       director Joe Lubin and I met with you to
24       discuss personnel issues.  During the course of
25       the meeting we discussed multiple examples of
```

Leonardo Mazzola

148

```
 1          communication involving you both within the
 2          police department and outside the department
 3          that are not conducive to affirmatively
 4          promoting a positive image between you and the
 5          public.  You acknowledged these concerns and
 6          made a commitment to improving in these areas."
 7              Mr. Mazzola, what are the multiple
 8          examples that this refers to?
 9    A     The multiple examples would go back to me
10          talking with Joe Lubin and Vern -- there is
11          something really crazy in my ear right now.
12    Q     It sounds like someone is getting ice.
13    A     So that goes back to Joe Lubin and Vern Blaze
14          coming to my home on two occasions to talk
15          about the direction of the department and to
16          get my input on that.
17    Q     Well, what are the multiple examples of
18          communication involving you both in the
19          department and outside that are not conducive
20          to promoting a positive public image?
21    A     Right.  Multiple examples is Joe Lubin and Vern
22          Blaze coming to my home twice.
23    Q     Okay.  It goes on, "Effective immediately as a
24          result of this meeting you are counseled and
25          directed as follows.  You shall strictly follow
```

```
 1              the chain of command, which is DC Polak and

 2              then Chief Nicastro.  You shall advise DC Polak

 3              or Chief Nicastro of any police department

 4              issues you are taking outside the department

 5              prior to doing so, especially issues directed

 6              to other city officials.  If communication is

 7              initiated by personnel outside of the police

 8              department and involves administrative or

 9              operational police issues, in addition to

10              maintaining a positive demeanor, you shall also

11              advise DC Polak or Chief Nicastro of the

12              communication as soon as practical."

13                   So was this issue, in part, by you going

14              outside of the chain of command and

15              communicating with people outside the chain of

16              demand about department business?

17    A    They approached me.  And basically I was

18         sitting at home and I heard a knock on my front

19         door and it was my HR director and basically

20         the vice mayor at that time -- I'm not quite

21         sure what Vern Blaze was, I want to say he was

22         some sort of financial or economic

23         director -- were at my front door and they came

24         in and wanted to talk to me about the structure

25         and future of the department.  So we sat at my
```

```
1              kitchen table, we had a cup of coffee and we

2              talked.  I then -- when it says I should follow

3              chain of command, at that time I informed Polak

4              that it had happened.  I gave Jim Polak actual

5              copies of what we talked about and wrote down

6              on paper.  And then they had come back about

7              three days later for a follow-up meeting and

8              that was the last I heard of them.

9      Q      Did you invite them to your house?

10     A      No, sir.

11     Q      Did you expect them at your house or were you

12             surprise when they just showed up at the door?

13     A      No, I was surprised.  It was in the morning,

14             you know, 9:00 or 10:00, or so in the morning.

15             And I didn't know who was at the door until I

16             opened it.

17     Q      You are being admonished in this e-mail to

18             essentially stop talking to people outside of

19             the chain of command about police business,

20             correct?

21                      MR.  CHANDRA:  Objection.

22     A      Yeah.  It addresses outside the department, the

23             chain of command, yes.

24     Q      And that was back in 2011, correct?

25     A      Correct.
```

```
 1    Q   So in 2011 you were aware that you should not

 2        go outside of the police chain of command and

 3        discuss police business, correct?

 4    A   Yeah.  I was not seeking to go outside the

 5        chain of command on this.

 6    Q   Okay.  But this letter specifically says "even

 7        if the communication" -- and it's quoting --

 8        "is initiated by personnel outside of the

 9        police department" --

10                    MR. CHANDRA:  Objection.

11    Q   End quote.  "Even if" -- so you knew in 2011

12        that even if someone outside of the department

13        initiates that contact, you still are not to

14        discuss official police business outside of the

15        police chain of command, correct?

16                    MR. CHANDRA:  Objection.

17    A   Yes.  Correct.

18    Q   Did you ever receive any follow-up memo to this

19        telling you that you could essentially start

20        doing that again?

21    A   No, sir.

22                    MR. CHANDRA:  Objection.

23                    MR. STRANG:  I'm going to show

24        the witness Defendants' 8.

25    Q   Mr. Mazzola.  I've shown you an e-mail from
```

```
 1          Chief Kilbane to "Police" from July 20, 2018 at
 2          4:48 p.m.  "Subject:  Communications with city
 3          administration and council members."
 4               Did you receive this e-mail?
 5     A    If it came to police I did, yes.
 6     Q    And it says, "Information from the police
 7          department to city leadership needs to be
 8          complete, accurate and coordinate and all such
 9          dissemination should be done at the direction
10          of the chief or deputy chief.  This is a
11          reminder that all communication regarding any
12          department business to the mayor, department
13          heads, city council member or any other member
14          of the city administration must be approved by
15          myself or Deputy Chief Polak."
16               Did I read that accurately?
17     A    Yes, sir.
18     Q    And this is, in fact, the same policy -- this
19          was not Chief Kilbane -- this is not just Chief
20          Kilbane's policy, right?  Its predecessor also
21          was instructing you not to go outside the chain
22          of command and discuss police issues with other
23          people in the city, correct?
24     A    Yeah.  In that letter from Vern Blaze and Joe
25          Lubin outlines this.  Mr. Strang, this is the
```

```
 1          e-mail -- now that I see it, this is the e-mail
 2          where somebody went to city council.  This is
 3          the one that came out because someone had said
 4          something to city council and we were asking
 5          what brought this on, but we didn't get any
 6          response.  So the other one I guess was from
 7          the RNC.  That would make sense then.
 8     Q    Okay.  Mr. Mazzola, again, I'm not asking
 9          you -- when I show you each exhibit I'm asking
10          not asking you for a full explanation of the
11          context of that exhibit.  I'm just showing you
12          an exhibit and asking very specific questions
13          about it, okay.  And I specifically did not ask
14          you any questions about that last e-mail, about
15          what you just talked about, okay.
16                    MR. CHANDRA:  Objection.
17     A    Yeah.  That was just an attempt to clarify
18          prior testimony to make sure that I'm giving
19          you a solid, truthful answer, sir.
20     Q    Well, you thank you for that.
21                    MR. STRANG:   I'm going to show
22          the witness Defendants' Exhibit 9.  I'm showing
23          the witness what was marked as Defendants'
24          Exhibit 9.  It's an e-mail from Michael Kilbane
25          to Leonard Mazzola on July 20, 2018 at
```

Leonardo Madzzo...

```
1              8:34 p.m. about productivity.
2     Q    I just want to establish a timeline about this.
3              Was there a point in 2018 where the chief
4          was out for medical reasons?
5     A    Yeah.  It would have been -- yeah, that year,
6          2018.  I believe it was somewhere around April.
7     Q    How long was he out?
8     A    Quite a while but not as long as you would
9          expect.  I think we were expecting like three
10         months and somehow or another he was able to
11         rehab and got his butt back to work in, gosh,
12         like two months.  He made a good recovery.  So
13         maybe April, May and probably half of June
14         would be a guess, but I'm not sure.
15    Q    As of July 20th was the chief back?
16    A    Yeah, I believe so.
17    Q    Who was in charge while the chief was out?
18    A    Jim Polak was kind of acting chief at the time.
19         But a lot of the day-to-day activities I was
20         taking care of because Jim was going through
21         some of his own medical issues at the time.
22         But between Jim Polak and I we kept the ship on
23         the water.
24    Q    Did you have any sort of official designation
25         while the chief was out?  Any official change
```

1        in job title?

2    A   No, sir.

3    Q   Is there any memo or e-mail or anything like

4        that sent to you that gives you additional

5        powers, authority or responsibility while the

6        chief was out?

7    A   No, sir.

8    Q   This e-mail discusses -- the subject is

9        "Productivity."  And it starts, "Lenny, mayor's

10       court gave the report to the Mayor and he was

11       asking why our traffic citation productivity

12       has declined.  For the first six months of 2017

13       we had 1,696 tickets, but for the same period

14       in 2018 we only had 1,504.  In June of '17 we

15       wrote 283, but in June of this year we only had

16       173.  75 of those were detailed tickets.

17       Accidents and reports were also higher last

18       year.  Year to date we are only about 200

19       ticket behind last year."

20            It goes on, "There are some patrolman

21       that are not even writing a single ticket a

22       month on average.  Get with your sergeants ASAP

23       and get this turned around."

24            Is that a true statement?  Were there

25       some patrolman that were not even writing a

```
1          single ticket a month on average?

2     A    We had some guys that wrote very little

3          tickets.  It's not a zero -- or not a zero on

4          average, but definitely very, very low.  I

5          would agree.

6     Q    Did you believe that that was a problem that

7          some officers were writing so few tickets?

8     A    I constantly tried to address the guys who did

9          not write, you know, a lot of tickets; while at

10         the same time I had a lot of guys that were

11         functioning as OIC and/or had major health

12         issues, so I tried to make sure I took that

13         into consideration.

14    Q    Well, obviously from this e-mail the chief had

15         a problem with officers -- at least some

16         officers writing so few tickets, correct?

17    A    Correct.

18    Q    And as your boss, if the chief has a problem

19         with that, essentially then you have a problem

20         with it, correct?

21    A    Correct.

22    Q    And did you understand at the time from reading

23         this e-mail that the chief wanted you to do

24         something about it?

25    A    Correct.
```

```
1    Q   Do you believe that traffic citations can be

2        beneficial for a police department in a

3        community?

4    A   I think to some regard they do have a purpose

5        in police work.

6    Q   What is that purpose?

7    A   To change driving behavior.

8    Q   Do you believe that tickets also can help the

9        community stay safer because it deters other

10       crime?

11   A   No, I don't.

12   Q   You don't believe that tickets act as a

13       deterrent?

14   A   I do not.

15   Q   Have you --

16                       MR. STRANG:   I'm going to

17       refer the witness to Exhibit 25.  I'm sorry.

18       26.

19   Q   Mr. Mazzola, this is a letter -- and we will go

20       over what this is in a second, but I'm going to

21       refer you to the attachment that is General

22       Order 402 on the second page of this.  This is

23       General Order 402, Professional Traffic Stops.

24           Have you seen this general order before?

25                       MR. CHANDRA:  Show me the entire
```

```
 1              document, please.  This document, too, is not

 2              Bates stamped.  Could you please explain?

 3                        MR. STRANG:  Subodh, you

 4              certainly have the general orders, correct?

 5                        MR. CHANDRA:  Right, but I'm

 6              asking you to explain why we're not using a

 7              Bates stamped copy of this in the deposition.

 8                        MR. STRANG:  Okay.

 9       Q   Mr. Mazzola, I'm specifically referring to

10              General Order 402.

11                   Are you aware of General Order 402?

12       A   I'm not sure if I should be talking or if you

13              and Subodh are still having a discussion?

14                        MR. CHANDRA:  Mr. Strang, I'm

15              asking you for an explanation as to why we're

16              not using the produced documents in this

17              deposition.

18                        MR. STRANG:  And, Subodh, I

19              can't tell you why my paralegal produced some

20              documents and not other documents.  If indeed

21              you don't have this public record, this e-mail,

22              you know, we can talk about it afterwards.  But

23              my suspicion is you have all this and you have

24              all the general orders.

25                        MR. CHANDRA:  Proceed with your
```

```
 1           questioning, please.  Is this -- can you give

 2           me the exhibit number, please?  It's small on

 3           my screen.

 4                      MR. STRANG:   Yeah, I just did.

 5           It's Defendants' Exhibit 26.

 6                      MR. CHANDRA:  And it begins with

 7           the Ed Gallek e-mail, correct?

 8                      MR. STRANG:   Correct.  And I'm

 9           specifically referring the witness to General

10           Order 402, Professional Traffic Stops.

11                      MR. CHANDRA: Got it.  Okay.  Go

12           ahead.

13      Q    Mr. Mazzola, were you, while a police

14           lieutenant, aware of General Order 402?

15      A    Let me take a moment to read through this.

16      Q    I don't need you to review the whole thing.

17           I'm asking in general, based on memory, are

18           you familiar with -- were you familiar with

19           General Order 402, Professional traffic stops?

20                      MR. CHANDRA:  Objection.

21             Mr. Mazzola, you can take whatever time

22           you need with the exhibit.

23                      MR. STRANG:   Don't presume to

24           instruct my witness about what time he can take

25           and what he can't take.  I'm not asking him
```

```
1              specific questions on this document.
2                        MR. CHANDRA:  Objection.  My
3              statement still stands.
4                        MR. STRANG:   Okay.  That's fine.
5     Q   My question was not about any particular part
6              of this document or asking you whether any part
7              of it is correct.
8                   Just generally, were you aware of this
9              General Order 402, professional traffic stops?
10             It certainly would fit right within the
11             wheelhouse of your responsibilities, correct?
12                       MR. CHANDRA:  Objection.
13    A   Yeah, I'm familiar with the whole professional
14             traffic stops.  And if it's in the general
15             orders, then this is probably standard language
16             that, gosh, goes back to my days at the highway
17             patrol.
18    Q   Okay.  I'm going to read a statement and I can
19             tell you that the statement is on -- is going
20             to be 3 and it's under "General."  I'm going to
21             read you "A" and ask if you agree or disagree
22             with the content of the statement that I read
23             to you.
24                  "Traffic crashes are a leading cause of
25             death, injury and property damage to innocent
```

Leonardo Maldonado

161

```
 1          persons.  Citizens consistently name traffic
 2          violations as a major community policing
 3          concern in neighborhoods.  Active, visible
 4          traffic law enforcement sends a strong
 5          deterrent message that reduces the incident of
 6          aggressive driving and road rage and keeps the
 7          streets free from crime.  Wanted criminals,
 8          drug curriers and persons who have just
 9          committed or about to commit crimes are often
10          apprehended as the result of being stopped for
11          a traffic violation.  Police officers should be
12          alert and observant at all times during patrols
13          to identify and act upon usual occurrences in
14          violation of the law."
15              Do you agree or disagree that that is
16          true?
17                    MR. CHANDRA:  Objection.
18     A   I believe that that's --
19                    MR. CHANDRA:  Go ahead.
20     A   I agree that that is true.
21                    MR. STRANG:   I'm going to refer
22          the witness to Exhibit 10.
23     A   Mr. Strang, I'd like to clarify an answer that
24          I just gave you before.
25     Q   Sure.
```

Leonardo Mendoza

162

```
 1    A    You asked if I thought citations -- actually
 2         getting out a ticket -- writing someone a
 3         ticket, if that deters crime, and my answer was
 4         no.  You recently just asked me if making a
 5         professional traffic stop deters crime and my
 6         answer is 100 percent yes.  I just want to make
 7         sure you know there is a distinction there that
 8         the police officer's job is to obviously make
 9         those professional traffic stops; however,
10         writing a ticket does not have any bearing on
11         stopping crime.  Writing a ticket is a driving
12         behavior decision that's left in the hands and
13         discretion of the officer.
14    Q    So in your mind there is a distinction between
15         a traffic stop and tickets, correct?
16    A    Not just my mind, but the Ohio State Highway
17         patrol as well.
18    Q    Specifically what with the Ohio State Highway
19         patrol?  What are you specifically citing?
20    A    The Ohio State Highway Patrol where I went to
21         the academy and therefore trained initially in
22         police work, traffic citations are to be issued
23         to change driving behavior.  Again, I know you
24         don't want me to explain, but I think I have to
25         in this case.
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              If I pull Mr. Strang over and you have 20

 2         tickets already, then obviously tickets aren't

 3         working, so maybe I need to talk to Mr. Strang

 4         and give you a verbal warning and maybe that

 5         will stop you from driving the way you do.  If

 6         I pull you over and you have zero or one

 7         ticket, then maybe a ticket is what you need to

 8         change your driving behaviors.  So it really

 9         becomes to the discretion of the officer and

10         writing -- the act of writing the ticket

11         itself, by itself, does not deter crime.

12    Q    Well, a motorist potentially receiving a ticket

13         though can deter a crime, can deter future

14         moving violations, correct?

15    A    No.  Again, see we are having a definition

16         disagreement.  Writing a ticket to somebody is

17         going to deter a future traffic infraction, not

18         a crime as I defined crime.  You're talking

19         about robberies and break-ins and drugs and

20         whatever that last paragraph said.  Traffic

21         tickets deter traffic driving behavior.  They

22         don't deter crimes.  Traffic stops

23         do -- professional traffic stops do.

24    Q    Well, traffic tickets can certainly help reduce

25         traffic accidents, correct?
```

```
 1    A    Yeah.  I would agree traffic accidents, sure,

 2         because you're going to lower people's speed

 3         because they're going to see the police car out

 4         there.  Or, hey, I just got a ticket last

 5         month, I better slow down.  Traffic tickets are

 6         definitely going to deter driving behavior,

 7         which then translates to traffic accidents.

 8         The act of writing a ticket, though, has no

 9         bearing on crime and that's been proven in many

10         studies over and over.  Police presence and

11         making a traffic stop and developing your stop,

12         that's what deters crime.  For instance, if I

13         stop you for speeding and I just hurry up and I

14         write you that ticket and I'm not looking in

15         the backseat for drugs, then that ticket has no

16         bearing on crime.  I hope that makes sense to

17         you.  I didn't mean to confuse the issue, but I

18         wanted to clarify my stance on that.

19    Q    Can you name one of those studies that you're

20         referring to?  You said study after study or

21         something like that.  Can you name one?

22    A    Well, the first one that pops into my head

23         would be a Kansas City study talking about

24         police presence and its effect on crime.  And

25         what they found out is just merely having a
```

```
1            police officer there doesn't really matter too

2            much on the effect of crime, that officers have

3            to actively be engaged in traffic stops in

4            order to deter that.

5     Q     Do you have any -- sorry.  Go on.

6     A     Then there is references after that, you know,

7            to other studies.

8     Q     All within that Kansas City study is what

9            you're referring to; is that correct?

10    A     Well, I'm not sure if they are all cited in

11           there Mr. Strang.  But again, it's not the act

12           of writing a ticket that deters crime.  That

13           deters driving behavior.  That stops you from

14           doing 80.  That stops you from crashing into

15           somebody.  Me pulling you over and asking where

16           you're going, hey, how you doing, you're going

17           to the hospital, you're doing this, you develop

18           your stop, you're looking in the back seat,

19           making sure you know who is in your vehicle,

20           that type of thing, that's all part of

21           developing a professional traffic stop.  That

22           deters crime.  Not writing someone a ticket.

23    Q     Well, speeding in and of itself is a crime,

24           correct?

25    A     It's a minor misdemeanor, a traffic violation.
```

Leonard Mazzola

166

```
 1            So in Independence and most police departments
 2            everything is divided into traffic side and
 3            criminal side.
 4       Q    Right.  But it's a -- I mean, we're talking
 5            semantics, but you cite someone for a traffic
 6            violation, correct, it's a crime?
 7       A    Traffic crime, correct.
 8       Q    And you're certainly aware that the City of
 9            Independence lays at the intersection of
10            several major highways, correct?
11       A    Oh, yeah.  480 and 77.
12       Q    So it's of particular importance with the City
13            of Independence to make sure that motorists are
14            obeying traffic rules, correct, including
15            speed?
16       A    Yeah.  I always told my guys to make sure they
17            hit both parts of Independence, residential
18            area and the highway.  Because sometimes guys
19            would spend 12 hours just on the highway and
20            never touch an Independence street.  Then you
21            have other guys who spent 12 hours on the
22            street and never touched the highway.
23       Q    Do you know how many motorists pass through the
24            City of Independence every day on the highways?
25       A    I'm taking a guess -- and it's old data -- they
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonard Wadzinski

167

```
 1            did a study on 480 and it was 110,000 vehicles
 2            a day I believe.
 3       Q    Is it particularly difficult for your officers
 4            to, out of that number of motorists that you
 5            cite, to find someone who is violating a speed
 6            restriction?
 7       A    No.  I mean, depending on traffic during the
 8            day it makes it almost impossible because rush
 9            hour and stuff like that; or if it's the wee
10            hours of the morning there is no traffic.  So
11            there are certain hours where people tend to go
12            faster and then at that point you can go up to
13            the highway and very easily write tickets, you
14            know, hopefully without lowering your standards
15            too much.
16       Q    What standards are you referring to?
17       A    Well, just in general, you know, I mean, right
18            now the speed limit is 60, so you wouldn't
19            write somebody a ticket for 63.  You wouldn't
20            necessarily write a ticket for even 70.  For
21            the most part our officers, 78 miles an hour
22            and up -- for sure 80 and up they would go
23            ahead and pull them over and possibly give them
24            a ticket.  Because anything lower than that
25            you're -- you just wouldn't be able to
```

```
 1          accomplish that.
 2     Q    Have you ever been instructed or were you ever
 3          instructed by your superiors at the City of
 4          Independence to manufacture tickets or ticket
 5          anyone who was not violating a traffic law?
 6     A    No.  There wasn't anything written down or any
 7          kind of directive.  However, I had
 8          conversations with guys that I felt were, let's
 9          just say, not acting the way Independence
10          officers should act.
11     Q    And you instructed them not to do it, correct?
12     A    Yeah.  I mean, basically I instructed them to
13          not lower their standards to write tickets just
14          to meet a traffic -- an overtime traffic ticket
15          is what it came down to.  When guys were on an
16          overtime traffic detail, sometimes they were
17          acting a little inappropriately.
18     Q    And were you ever told by your superiors, Chief
19          Kilbane or the deputy chief, that you needed to
20          start citing people who didn't deserve tickets?
21     A    No.  Chief Kilbane and I were on the same page
22          on this.  Neither of us absolutely, you know,
23          didn't want guys out there writing cheap
24          tickets, for lack of a better term.
25     Q    So Chief Kilbane only wanted people being
```

Leonardo Mazzola

169

```
 1              ticketed who essentially were -- deserved it,

 2              for lack of a better word, correct?

 3         A    Yeah.  I mean --

 4                        MR. CHANDRA:  Objection.

 5         A    Neither of us, you know, wanted someone to get

 6              a ticket for 63 in a 60.  I mean, there are

 7              just certain things that a police officer

 8              should obviously have discretion on and you

 9              just don't want that to happen obviously.

10                        MR. STRANG:  I'm going to show

11              the witness Defendants' Exhibit 10.

12         Q    Mr. Mazzola, I'm showing you Defendants'

13              Exhibit 10.  It's an internal memorandum to

14              Lieutenant Mazzola from Chief Kilbane, CC

15              Deputy Polak from August 6, 2018 regarding

16              patrol activity.

17                   Do you recognize this document?

18         A    Yes, sir.

19         Q    Is this a memorandum that you actually

20              received?

21         A    Yes, sir.

22         Q    And was this memorandum a follow up to that

23              July 20, 2018 e-mail that we just looked at?

24         A    Yeah, I guess, that would be a way of

25              classifying it, sure.
```

```
1     Q    What did you understand this memo to be

2          directing you to do?

3     A    The memo took me by surprise when I got it

4          because the e-mail that you just referenced was

5          dated July 20th.  I didn't get it until the

6          24th.  Then I had to run homedays for three

7          days and I received this, I believe, the Monday

8          after home days -- or maybe the Tuesday, I'm

9          not sure of the dates, after home days.  So at

10         that point it kind of surprised me that it came

11         literally -- I think it was eight days that we

12         had of non homedays, if you will, to try to

13         start writing more tickets.  So it took me by

14         surprise.  Then basically I took it as, you

15         know, let's get the numbers up and to

16         notify -- put my four sergeants on notice that

17         they need to individually get their ships up.

18    Q    And did you actually have a discussion with

19         your four sergeants about getting their ships

20         up?

21    A    I did.

22    Q    What four sergeants?

23    A    Kurtz, Anders, Cross and Tinnerello.

24    Q    What did you tell them?

25    A    I printed a memo and all four of them got the
```

```
 1          same exact memo.  I just changed the name at
 2          the top.  And I personally met with each of
 3          them, explained to them that, hey, now the
 4          chief is obviously putting this stuff in
 5          writing to me to get this turned around.  I
 6          know we haven't had much time since July 24th
 7          to do this, but let's kick it in gear, you
 8          know, let's get these guys out there working
 9          and do this.  They signed the form that I had,
10          I gave them a copy, I kept a copy and then I
11          gave the originals to the chief.  And I told
12          them let's go work.
13     Q    Do you agree with the chief's concerns about
14          officer productivity?
15     A    It surprised me at that time.  I didn't have
16          the same numbers that he did, so it confused me
17          because the numbers that I had really didn't
18          seem much different than any other normal
19          average month in Independence; or year to year
20          for that matter.  So again, it surprised me,
21          but I knew what he was talking about and, you
22          know, told the guys let's pick it up, which
23          they did.
24     Q    And you understood whether you agreed or
25          disagreed with his reasoning that it was your
```

```
 1              job to essentially follow the chief's

 2              directives, correct?

 3                        MR. CHANDRA:  Objection.

 4        A   Yeah.  I followed what he said, talked to the

 5              sergeants.  And I think we increased the

 6              production in that month alone by 27 percent.

 7        Q   And it was your duty to follow the chief's

 8              direction, correct?

 9        A   Yeah.  Again, whatever the chief wanted I tried

10              to make happen for him, sure.

11                        MR. STRANG:  I'm going to show

12              the witness Defendants' Exhibit 11.

13        Q   Mr. Mazzola, I'm showing you Defendants'

14              Exhibit 11.

15              Do you recognize this document?

16        A   Yes, I do.

17        Q   Is this a memorandum that you sent to Sergeant

18              Kurtz?

19        A   This is the memorandum that I gave all four

20              sergeants.  All I did was change the name at

21              the top and then made them sign it because I

22              didn't want anything lost in translation; or I

23              didn't want to deliver a speech to four

24              different guys because they obviously pulled

25              different things from it.  So I wanted to make
```

```
 1              sure they all got the exact same message.  So
 2              all four of them received this and they signed
 3              four and I gave the originals to the chief.
 4         Q    Did you compose this memo?
 5         A    I did.
 6         Q    Did you actually provide an e-copy to each of
 7              your sergeants or did you just give them a hard
 8              copy to sign?
 9         A    No.  I hand delivered this personally to them
10              hard copy.  I don't think it went
11              electronically, but maybe it did.  I don't
12              remember if I did that.  But I know for sure I
13              handed them a written copy.
14         Q    So after you showed them the written copy, what
15              did you do with the document?
16         A    Photocopied it, gave them a copy so they had
17              one, made a copy for myself, and then I gave
18              the originals to Chief Kilbane.
19         Q    So you gave a copy to each sergeant?
20         A    Yes, sir.
21         Q    Okay.  And that would be Sergeant Kurtz
22              obviously, correct?
23         A    Correct.
24         Q    And what were the others, just for the record,
25              the other three sergeants?
```

```
 1    A    The other three sergeants would have been Dan

 2         Anders, Chris Cross and then Greg Tinnerello.

 3         They were served on different days though just

 4         because of their days off.  So, for instance, I

 5         didn't get to -- Greg Tinnerello was on

 6         vacation so I actually didn't get to him I

 7         believe until the 14th of August, which was my

 8         deadline to get this done.  But I was able to

 9         get it done and give it to the chief.

10    Q    All right.  So you kept copies of this,

11         correct, hard copies?

12    A    I did.  Yeah.  I just kept this one copy

13         because I knew I gave the same copy to all

14         four.  So I just kept this one copy as a

15         representation of what I gave to them.

16    Q    And did you give the chief copies of all four?

17    A    Yes, sir.

18    Q    So this one to Sergeant Kurtz -- this specific

19         one to Sergeant Kurtz, Sergeant Kurtz would

20         have had a copy, correct?

21    A    Correct.

22    Q    Leonard Mazzola would have had a copy, correct?

23    A    Correct.

24    Q    And Chief Kilbane would have had a copy,

25         correct?
```

175

```
 1      A    Correct.

 2      Q    Who else?

 3      A    Well, those are the ones that I gave out.  This

 4           particular one here was posted in the

 5           sergeant's office, so anybody in patrol or

 6           dispatch or whoever walked into that office

 7           would have had access to this one specifically.

 8      Q    Who posted it in the sergeant's office?

 9      A    Sergeant Kurtz did above his desk.

10      Q    Okay.  So a physical copy of this was posted

11           above Kurtz's desk, correct, not a message

12           board?

13      A    No.  It's kind of a desk with two file cabinets

14           on the top and it was posted on the right-hand

15           side of the top file cabinet.  It was there for

16           quite a while.

17      Q    For how long?

18      A    Quite a while.  Months.

19      Q    This says -- the third paragraph says, "Patrol

20           officers work 14 shifts a month.  Traffic

21           enforcement range should include at least two

22           to three traffic enforcement actions per shift.

23           If this cannot be accomplished, then officers

24           will need to complete daily activity logs for

25           each hour of work to address any time
```

Leonardo Mazzola

```
 1          management issues."
 2              Mr. Mazzola, did this -- did you mean to
 3          suggest by this memo that each officer had to
 4          write two to three traffic citations a shift?
 5     A    No, sir.  Two to three traffic enforcement
 6          actions; meaning make that stop, professionally
 7          as we just discussed, determine what needs to
 8          be done and then, you know, end the stop.
 9     Q    For each officer or for the entire platoon?
10     A    Each officer.
11     Q    Whoever told you that they expected officers to
12          complete two to three traffic enforcement
13          actions per shift?
14     A    That was kind of a general rule that, really,
15          all new guys are trained on during FTO.  Those
16          were passed down from an old sergeant we had,
17          Nick Screptock.  He said basically make two
18          traffic stops through your shift; and he took
19          it one step further to say write a ticket a
20          shift and try to stay in that range.
21     Q    Which officer did you get this from?  Can I
22          have that name again?
23     A    Originally it's an old time -- he's passed --
24          Sergeant Nick Screptock.  He was a cop in the
25          '60s and '70s and was still part time when I
```

```
 1            came on.  But again, it was the culture of the
 2            police department to go out there, make sure
 3            you're visible, make two, three traffic stops
 4            throughout the day; and obviously if you
 5            thought someone needed a ticket, you gave it to
 6            them.  And, you know, it was kind of a general
 7            type rule, I guess, if you will.
 8      Q     Okay.  So that statement, "traffic enforcement
 9            range to include at least two to three
10            enforcement actions per shift," that came from
11            you, not Chief Kilbane, correct?
12      A     Right.  This came from the general kind of
13            culture that we had, again, going back to Nick.
14            You know, make traffic stops throughout the
15            day, you could write two to three tickets if
16            you wanted or you could write zero.  But the
17            more important thing to do was to make those
18            traffic stops and be visible; and obviously
19            keep the lights on and deter people.
20      Q     Well, the chief before you sent that memo out
21            had specifically talked to you about actual
22            citations, correct, not traffic stops?
23      A     Yeah.  He was obviously talking about the
24            numbers of tickets.
25      Q     So why didn't you include the numbers of
```

Leonardo Mazzola

178

```
 1           tickets?  Why did you put "traffic stops" in
 2           this memo as opposed to number of tickets when
 3           the chief was specifically talking to you about
 4           increasing the number of tickets?
 5      A    Well, because the more stops you make, the more
 6           tickets that you're actually going to write.
 7           It doesn't work in reverse because then you end
 8           up with guys doing things that they shouldn't.
 9           So basically the more traffic stops you make,
10           then you're going to run into that person that
11           warrants a ticket.  And if you make two to
12           three stops, again, the general rule is, well,
13           one of those would deserve a ticket.  That was,
14           again, the Nick Screptock rules that we called
15           them.  So that's how that came about.
16      Q    Well, Mr. Mazzola, part of the problem was that
17           some of your officers were stopping people but
18           not writing a single ticket, correct?
19      A    Some guys made a lot of stops and didn't write
20           as many tickets as everybody else, specifically
21           Jim Grain.
22      Q    Okay.  So my question for you is, if you knew
23           that the chief was concerned about the number
24           of traffic citations issued, why you didn't
25           specifically urge your sergeants to increase
```

```
 1          the number of traffic citations?
 2    A     Well, that's exactly what I'm doing here,
 3          Mr. Strang, by telling them to increase their
 4          enforcement actions.  I mean, by "enforcement
 5          actions" a warning, you know, really doesn't
 6          qualify as that.  I mean, it does in some
 7          departments, but I'm sure the chief wouldn't
 8          want 50 warnings coming in either.  So by
 9          making more traffic stops, you're going to
10          then, you know, inherently write more tickets
11          because more opportunity obviously.
12    Q     But that was not true with your some of your
13          officers.  Some of your officers were making
14          all kinds of traffic stops and writing no
15          tickets.  In fact, that was the chief's
16          problem, correct?
17    A     There was one officer in particular, Ray
18          Patzel, who manipulated the system every which
19          way he could.  I wrote him up numerous times to
20          the chief of police for this.  And actually
21          Chief Kilbane and Ray Patzel had an exchange of
22          e-mails back and forth and nothing was ever
23          done about it.  So my job was to try to keep
24          guys active, keep guys safe and increase, you
25          know, the production without lowing the
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          standards.

 2     Q    I understand that, but that's not what I'm

 3          asking you.  I'm specifically

 4          referencing -- you know, look, I'm looking at

 5          this document, this memo that's Defendants'

 6          Exhibit 11, and nowhere in this memo to

 7          Sergeant Kurtz do you tell him that the

 8          specific issue is that some officers are not

 9          writing enough citations, right?  You've made

10          the distinction between citations and stops,

11          right?  And in this memo you're telling him

12          about two to three traffic enforcement actions

13          per shift.  And according to you that's a stop,

14          correct?

15     A    No.  Again, I think we're missing what's going

16          on here.  So you're going to make those stops,

17          two to three stops, and two to three

18          enforcement actions will come from those stops.

19          So, in other words, if it takes you 10 stops to

20          have two to three enforcements, which might be

21          an arrest and that wouldn't count as a ticket,

22          then you just need to up your production

23          without coming out and telling guys, hey, we

24          need this amount of tickets or else.  Because

25          obviously that's not something that should
```

```
 1        happen.
 2   Q    What shouldn't happen?
 3   A    Putting out a quota on how many tickets an
 4        officer must write.
 5   Q    Can you tell me the difference between a quota
 6        and a performance standard?
 7   A    Well, legally I could not.  I'm not an attorney
 8        obviously.
 9             I just lost that form.  I don't know if
10        it matters.
11   Q    No, we took it down.
12             You're not an attorney, but you
13        were -- for at least a period of time you were
14        a lieutenant in charge of the traffic bureau.
15        So I'm asking you whether you understand there
16        to be a difference between a quota and
17        productivity standard?
18   A    Sure.  First of all, we had, again, no traffic
19        bureau.  But I'll get into your actual
20        question.  As far as a quota, if you will,
21        versus a productivity scale, a productivity
22        scale measures multiple factors, which makes up
23        a good officer.  So, for instance, under our
24        scale you could write 10 DUIs and have zero
25        tickets out of it because it would count as an
```

```
 1              arrest.  Unless Mary and I got together and we
 2              were able to go into, at the time, Sundance,
 3              and make sure that those tickets were accounted
 4              for.  You could have an officer that wrote a
 5              DUI every night, which is something that
 6              everybody wants, you know, to keep the drunk
 7              drivers off the road, and yet you have zero
 8              tickets.  So if you ask give me for a report on
 9              tickets, that guy would have zero.  So there is
10              a distinction between a quota and tickets being
11              productive.  I would argue that an officer
12              could be the best officer in the department and
13              have zero tickets.
14      Q   And, in fact, that's an argument that you did
15              make to the chief, correct?
16      A   Well, again, we had obviously multiple
17              discussions, so -- and they were good ones, you
18              know.  But if somebody went out there like a
19              James Martin, if he went out there and made 20
20              drug arrests, he would have all criminal
21              charges and he wouldn't have traffic.
22                  Mr. Strang, if I could just kind of give
23              you a five minute warning, I need to use the
24              restroom sometime within the next five minutes.
25      Q   Sure.  Why don't you go now.
```

```
 1      A   You want to break now?

 2      Q   Yeah.

 3      A   Okay.

 4                      VIDEOGRAPHER:  Off the record.

 5          The time is 2:54.

 6                          -  -  -

 7                      (Off the record.)

 8                          -  -  -

 9                      VIDEOGRAPHER:  Back on the record.

10          The time is 3:03.

11      BY MR. STRANG:

12      Q   Mr. Mazzola, after receiving that memorandum

13          from the chief of police on August 6, 2018, did

14          you actually individually meet with each of

15          your sergeants?

16      A   I did.

17      Q   Did you specifically go over with each sergeant

18          potential problem officers?

19      A   I did.  Each shift -- each shift had at least

20          one, but some of the officers were on the same

21          one.  I forget which one had them, but some of

22          the older guys working day shift.

23      Q   Was the problem that some of the older guys

24          just weren't writing tickets anymore?

25      A   Well, it was a little bit more complicated than
```

```
 1          that.  You know, it's just older officers tend
 2          to slow down, if you will.
 3     Q    Which officers specifically were problem
 4          officers?
 5     A    Well, first, as far as just on low ticket total
 6          is what you're asking for?
 7     Q    Yeah.
 8     A    Jim Green and Charlie Kingzett were probably my
 9          two lowest ones.  Then Mark Coprich was.  Low
10          Ray Patzel was low.  Those are the ones that
11          come to mind.  I'm sure it's pretty close to
12          accurate.
13     Q    Mr. Mazzola, not only were tickets down but
14          traffic stops were also down, correct?
15     A    Each officer made traffic stops at kind of a
16          different pace.  Ray Patzel frequently made a
17          lot of stops and didn't write as many tickets.
18          But it varied from each officer.
19     Q    Sure.  But in the aggregate, not only were
20          tickets down, but traffic stops were down as
21          well, correct?
22     A    During what time period are we comparing?
23     Q    From 2017 to 2018.
24     A    The raw numbers by themselves were lower in '18
25          compared to '17.
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Mazza

185

```
 1      Q    With both traffic stops and traffic citations,

 2           correct?

 3      A    I don't have the numbers in front of me

 4           anymore.  I don't have my notebook with me

 5           either.  However, generally speaking, numbers

 6           were down.  I believe that one memo said that

 7           even accidents were down, which is a good

 8           thing.  So generally speaking, numbers were

 9           down.

10      Q    Okay.  I'm going to refer to you Defendants'

11           Exhibit 20.

12      A    Okay.

13      Q    It will pop up in a second for you.

14                This is an e-mail from the Chief Kilbane

15           to police patrol dated September 18, 2018.  And

16           this has the 2017 versus 2018 comparisons.

17                Do you see what I'm referring to?

18      A    I do.

19      Q    Do you dispute these numbers?

20                     MR. CHANDRA:  Objection.

21      A    No.  The numbers themselves is just raw data

22           that comes out of Sundance.  There is no need

23           to dispute the number itself.

24      Q    So you would agree that the difference in

25           traffic stops from 2017 to '18 there was a
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              reduction of 595 traffic stops?

 2      A     Correct.

 3      Q     And I think before -- you talked a bit before

 4              about the benefits of traffic stops and you

 5              believe that traffic stops can reduce crime,

 6              correct?

 7                          MR. CHANDRA:  Objection.

 8      A     Correct.

 9      Q     Were there fewer motorists driving through the

10              City of Independence between 2017 and 2018?

11      A     I don't have the figures, but I would seriously

12              doubt there would be a major difference unless

13              there was construction going on.

14      Q     So there is a decrease in traffic stops of 595.

15              There appears to be a decrease in misdemeanor

16              arrests, a reduction of -- it appears to be 28

17              fewer.  There appears to be a decrease in

18              felony arrests, in warrant arrests.  The

19              parking citations have decreased.  The traffic

20              citations have decreased by 331.

21                  Do you agree with me on all those points?

22      A     Yeah, I'm following along here, sir.

23      Q     Okay.  The OVI has remained about consistent,

24              there was actually one more in 2018.  Do you

25              see that?
```

1    A    Yes, sir.

2    Q    And you believe that the difference was

3         effectively due to some sort of internal

4         staffing issues you were having in your

5         department, correct?

6    A    I believe that the raw numbers here are

7         explained through probably about 15 different

8         factors that would make sense of these numbers,

9         yes, sir.

10   Q    Okay.  But at the end of the day though, these

11        felony arrests, traffic stops, traffic

12        citations, these are things that keep the

13        community safe, correct?

14   A    Yes, I would agree.

15   Q    Okay.  So whether or not there are internal

16        justifications for why these numbers are lower,

17        you would agree with me that it's a problem

18        that these numbers decreased from 2017 to 2018,

19        correct?

20   A    No, I do not.  I would not agree with that.

21        Due to the decrease in manpower and another

22        bunch of factors, we brought this on ourselves.

23   Q    Well, whether you think you brought it on

24        yourselves or not, I'm asking you whether this

25        decrease in numbers would potentially have a

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1        detrimental impact to the community?
 2    A   Well, I mean, obviously with the police
 3        presence out there I think the more you have,
 4        obviously, probably the more crime goes down.
 5        Again, a Kansas city study probably disagreed
 6        with that a little bit.  But, you know, bottom
 7        line is you want officers out there and you
 8        want them productive.
 9    Q   So would you agree with me that if you have
10        reduced manpower issues that it is even more
11        important that the officers who are on duty
12        need to be productive during their shifts?
13    A   Yeah.  Regardless of how many we got, whether
14        it's a three man minimum or five, yeah, they
15        all need to be doing their jobs.
16    Q   Yeah.  And if you have fewer officers, the
17        officers you do have need to be more
18        productive, correct?
19    A   No, I do not agree there.
20    Q   Well, if the officers were not more productive,
21        then you would see a decline in all of these
22        statistics, correct?  If you had the same
23        officers doing the same stuff and you had fewer
24        officers or fewer shifts, then you would see a
25        decrease in all of your numbers from 2017 to
```

Leonardo Velazco

```
1              2018, correct?
2                        MR. CHANDRA:  Objection.
3     A   That's exactly my point, yes.  That's a great
4         way of putting it.
5     Q   But at the end of the day, though, the
6         important thing is that you keep the numbers up
7         to keep the community safe, correct?
8                        MR. CHANDRA:  Objection.
9     A   No.  The numbers are going to vary depending on
10        how many officers and resources you put out.
11        Again, I can go into a big, long explanation,
12        but I don't want to get accused of not
13        answering your questions.
14             If you have 10 officers, there should be
15        10 units of production.  If you have three
16        officers, there should be three units of
17        production.  If you have three officers, you
18        cannot expect 10 units of production, if that
19        makes sense.
20    Q   You don't think it's fair to ask your officers
21        to be more productive if they're experiencing
22        manpower issues and there are fewer of them out
23        there?
24    A   Well, that's exactly what I asked them to do is
25        pick it up.  They always had an opportunity to
```

```
 1              pick it up a little bit.  I mean, let's face
 2              it, you worked a long shift, I get it, but
 3              everybody could be a little bit more
 4              productive.  So if that's what you're asking, I
 5              agree.  If you are asking whether or not I'm
 6              going to cut my manpower by half and still
 7              expect the same amount of tickets, then my
 8              answer is no.
 9       Q    And that's not what I'm -- again, I think the
10              first part is what I was asking you.  My
11              assumption is that your argument -- and I've
12              gone through a lot of these documents -- is
13              essentially that you had fewer officers doing
14              the job in 2018 and you had more guys
15              essentially on shift in 2017 and so that
16              accounts for the difference.
17                  Is that about it?
18       A    Yeah.  Along with some really other important
19              ones.  And I'm not sure what document you have.
20              I'm more than willing to go over each and every
21              one about with you, but police work is not all
22              about the numbers.  There are a lot of things
23              that happen internally; like reassigning guys,
24              taking guys out of task force and trying to
25              hold the psychological heads together of guys
```

```
 1              who are working as police officers.  There is a

 2              lot that goes into the program, sir.

 3       Q    Yeah.  And at the end of the day it's the

 4              chief's responsibility to keep the community

 5              safe, correct?

 6       A    I think it's the entire department.  It doesn't

 7              fall on just the chief.  It's all of our jobs

 8              to keep them safe, yes.

 9       Q    It's the chief's number one priority to keep

10              the community safe, correct?

11       A    Well, again, you're asking me to speak for

12              chief Kilbane or any police chief, but the

13              number one priority for any police chief across

14              the nation, generally speaking, is to make sure

15              that his police officers are safe and going

16              home at the end of their shift.  I would think

17              that's probably going to be your standard

18              answer.  But safety for everybody, Mr. Strang,

19              cops, community, you know, absolutely, I would

20              agree.

21       Q    Okay.  Are you saying that it was not fair for

22              the chief to ask that the officers in 2018 pick

23              up the slack for the decline in statistics?

24       A    No.  Just the opposite.  I agreed with the

25              chief.  Again, I think I stated a couple
```

```
 1          questions ago that everybody could pick it up a
 2          little bit.  You know, again, they worked 12
 3          hour shifts.  So the goal was to be obtainable,
 4          they were asked to pick it up and they did so
 5          to the tune of like 27 percent if I can
 6          remember the number right.
 7      Q   I'm going to refer you to Defendants' Exhibit
 8          13.  This is an e-mail -- Defendants' Exhibit
 9          13 is an e-mail from Chief Kilbane to you on
10          August 29, 2018 setting a pre-disciplinary
11          hearing for September 4th, correct?
12      A   Yes, that's correct.
13      Q   A sentence in here, I think the third sentence
14          says, "You are entitled to have union
15          representation at this meeting if you."
16              Then it goes on, "Please refrain from
17          discussing this with anyone other than your
18          union representative and/or attorney.  And
19          reserve and questions for myself or the HR
20          director for the meeting on the 4th."  Did I
21          read that correctly?
22      A   Yes, sir.
23      Q   Who did you discuss the pre-disciplinary
24          hearing with?
25      A   Chuck Wilson.
```

```
 1      Q    Who else?

 2      A    My wife, my family, just to give them a heads

 3           up of what was going on.

 4      Q    Who else?

 5      A    Whoever was at the station the day I got this,

 6           which would have been -- forgive me, I think it

 7           was the Wednesday before Labor Day -- would

 8           have heard me talking with Chief Kilbane about

 9           it as he was walking from his office to out of

10           the building, which would be down the hallway

11           and then like to the back door, if you will.

12      Q    Do you think that was appropriate to talk about

13           this meeting in front of other people?

14                      MR. CHANDRA:   Objection.

15      A    Well, in case you haven't noticed, I'm a talker

16           and, you know, I thought -- this took me by

17           surprise and I wanted to talk to the chief

18           about it.  So obviously when I got this I went

19           to his office and at that time he was packing

20           up to leave.  And I asked him, you know, let's

21           talk about this, what's going on, because it

22           hit me surprise.

23      Q    My question is, do you think it was

24           inappropriate to discuss this in front of other

25           people besides just the chief?
```

```
 1                   MR. CHANDRA:  Objection.
 2    A    I'm not sure, to be honest with you, if there
 3         was anybody around.  I went and just started
 4         talking to the chief and we were talking as he
 5         was walking.  But at that point in time I was
 6         pretty upset, so I don't know who else would
 7         have been around.  You were asking me who else
 8         and I'm just trying to help you out and trying
 9         to think of any possibility of that.
10    Q    Did you have a union representative at the
11         meeting?
12    A    Chuck Wilson was at the meeting.
13    Q    Did you have an attorney at the meeting?
14                   MR. CHANDRA:   Objection.
15    A    No, I did not.
16    Q    Who was actually at the meeting?
17    A    Bob Phillips, attorney for the FOP; Chuck
18         Wilson, my union rep; Letitia Linker, the HR
19         director; Mike Kilbane, the chief of police;
20         and myself.
21    Q    Who was the attorney from the FOP that you're
22         referring to?
23    A    Bob Phillips.
24    Q    Bob Phillips was actually there at the
25         pre-disciplinary meeting?
```

Leonard Mazzola

```
 1      A   Yes, sir.

 2      Q   Is it your contention that he was not acting as

 3          your attorney at the meeting?

 4                      MR. CHANDRA:  Objection.

 5      A   Bob Phillips was there as the union attorney

 6          because Chuck Wilson reached out to him as the

 7          union representative.  So Bob Phillips' role

 8          was to represent the union and the FOP CBA, you

 9          know, contract.

10      Q   He was actually representing your interests

11          though, correct?  He was advocating on your

12          behalf?

13                      MR. CHANDRA:  Objection.

14      A   I believe that day he was there to lookout for

15          the CBA and FOP interests, which obviously I'm

16          a member of.  However, he wasn't representing

17          me, per se, Lenny, at that meeting.

18      Q   Was the FOP or the union being investigated at

19          this point or were you, Mr. Mazzola, being

20          investigated at this point?

21      A   In all fairness, I don't think -- I think the

22          answer is, no.  I don't think the chief was

23          investigating, you know, me at that time and

24          certainly not the FOP.

25      Q   Okay.  So why did the FOP need legal
```

```
 1          representation at this if the FOP wasn't be

 2          investigated?

 3                    MR. CHANDRA:  Objection.

 4    A     I can just tell you how things work or have

 5          worked.  Maybe they've changed.  Anytime

 6          something like this happens you reach out to

 7          your union rep.  And when I left it was Chuck

 8          Wilson; and I believe Brian Vitron and maybe

 9          Jim Green were the patrolman; and I want to say

10          maybe Chris Cross was for the sergeants, but

11          it's just a guess.  So there are different

12          bargaining units.  So when that happened I

13          reached out to mine, which was Chuck Wilson, he

14          was the lieutenant.  And, I'm sorry, Chuck was

15          lieutenant and sergeant.  So I reached out to

16          Chuck and Chuck immediately notified Bob

17          Phillips.

18    Q     Did you make any efforts to reach out to any

19          other attorneys?

20    A     At this time, no.

21    Q     Did you know any -- how many days was this?

22          How many days notice did you have before that

23          hearing on September 4?

24    A     Again, I believe I got the notice on

25          Wednesday -- I don't have a calendar in front
```

Leonard Mazzola

197

```
 1              of me -- and then the chief took off Thursday

 2              and Friday because he had to go to -- again,

 3              from memory, he was going to Buffalo or

 4              somewhere up that way.  Maybe I'm way off.  I'm

 5              not sure.  And then the weekend.  And then

 6              September 3rd was Labor Day.  So what would

 7              that be?  Five full days or six from getting

 8              served.  I don't know if you want to count that

 9              one day or not.

10    Q    Do you think that you needed a lawyer at that

11         hearing?

12                   MR. CHANDRA:  Objection.

13    A    You know, at this point I didn't know what to

14         expect.  I did not try to, at that point, reach

15         out for a separate attorney.  The most

16         important person in the room, to me, was Chuck

17         Wilson.

18    Q    Okay.  Do you know -- did you know any

19         attorneys at this point?  Would that have been

20         an easy for you to find an attorney?

21                   MR. CHANDRA:  Objection.

22    A    I've never hired an attorney before, so it's

23         not like I had one on retainer.  So again,

24         Chuck and I talked about this in depth, you

25         know, before this pre-D.  So the most important
```

Leonardo Mazzola

```
 1              person in the room, to me, again, I don't mean

 2              to repeat myself, was Chuck Wilson.

 3         Q    I'm going to refer to you Defendants'

 4              Exhibit 14.

 5                   Mr. Mazzola, this is a memorandum to you

 6              from Chief Kilbane regarding this

 7              pre-disciplinary hearing.  This was actually

 8              sent to you, correct?

 9         A    Yeah.  What was the date on the other one

10              though because I'm not sure of the continuality

11              of this?

12         Q    The date on that e-mail was August 8, 2018 and

13              this is dated August 30, 2018.

14         A    Okay.  So I think maybe this was -- I'm just

15              trying to get my head around this.  This was

16              actually what was on my desk.  And I believe

17              the other one was an e-mail saying that this

18              was scheduled.

19         Q    So you received this?  It's just a simple

20              question.  You received this, correct, yes or

21              no?

22         A    Yeah.  Sorry about that.  Yes, sir.

23         Q    Okay.  And this was -- you understood at the

24              time that this meeting was essentially for

25              insubordination, which we went over before,
```

```
 1        correct?

 2                    MR. CHANDRA:  Objection.

 3     A  Yeah, I read through this.  So obviously I read

 4        through what had been listed.  So, yeah, at

 5        face value I understood what it was about.

 6     Q  Okay.  And at this point this had absolutely

 7        nothing to do with disclosing records, getting

 8        documents to the media, anything like that,

 9        correct?

10     A  The way I understood this was that I failed to

11        come through or comply with the August 6th memo

12        that the chief had given me.

13                    MR. STRANG:  I'm going to show

14        the witness what has been marked as Defendants'

15        Exhibit 16.  Actually, Maia, let's take that

16        down.  We will show him that in a second.  I

17        want to go in order so we don't get confused.

18     Q  Did you actually attend a pre-disciplinary

19        hearing on September 4, 2018?

20     A  Yes, sir.

21     Q  Did you talk to Bob Phillips before that

22        meeting?

23     A  Yeah.  I believe we walked in and then I think

24        Bob asked the chief and Letitia for a caucus.

25        And then at some point it was me, Bob Phillips
```

```
 1        and Chuck.  Again, there was some privilege
 2        there so I'm not going to tell you what we
 3        spoke about, I don't think -- or I don't know
 4        if I'm allowed, to be honest with you.
 5                 MR. CHANDRA:  It's fine.  There is
 6        no claim of privilege over discussions with
 7        Mr. Phillips.
 8    A   Okay.  So then we talked about the specifics of
 9        the letter and then we talked about whether or
10        not I was like able to proceed, if you will.
11        Bob knew kind of -- didn't know what was going
12        on.  And then we invited Letitia and the chief
13        back in.
14    Q   Mr. Mazzola, any claim of attorney/client
15        privilege is yours to make.  Not your
16        attorneys.  Okay.  So I'm asking you right now
17        whether you are claiming that Bob Phillips was
18        your attorney during this pre-disciplinary
19        hearing?
20                 MR. CHANDRA:  You know what,
21        don't answer that question.  I've already given
22        you instruction on the record and you've
23        already testified about it.  Don't respond to
24        that question.  You may continue.
25                 MR. STRANG:  Well, Subodh, it's
```

201

```
1        certainly the client's responsibility to assert
2        attorney/client privilege, correct?
3                    MR. CHANDRA:  And I've already
4        told you what the position is and you can move
5        on and he's not answering another question
6        about the subject.
7                    MR. STRANG:  Well, you've told
8        me your position on that.  I'm asking your
9        client's position on that.
10                   MR. CHANDRA:  And I'm telling you
11       he's not going to answer and you can move on.
12                   MR. STRANG:  He appears to be a
13       little unclear on the subject.
14                   MR. CHANDRA:  I don't care about
15       your opinion about what he appears to be,
16       Steve.  Move on to your next question.
17                   MR. STRANG:  You're instructing
18       your client not to answer?  You're asserting
19       attorney/client privilege on behalf of your
20       client?  Is that what you're doing right now?
21                   MR. CHANDRA:  I am asserting an
22       attorney/client privilege between myself and my
23       client as to advice rendered on the subject
24       matter you're now trying to delve into.  And
25       I've already told you that there is no claim of
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1              privilege that Mr. Mazzola is asserting as to

 2              his discussions with Mr. Phillips, who he's

 3              already testified was the union attorney.  Next

 4              question, please.

 5                        MR. STRANG:  You and I both know

 6              that that's your clients, but I'll move on any

 7              way.

 8                        MR. CHANDRA:  Next question.

 9              Thank you.

10         Q    I'm going to -- you recorded that

11              pre-disciplinary hearing, correct?

12         A    Yes, sir.

13         Q    Did everyone present at the meeting know you

14              recording it?

15         A    No.  Just Chuck Wilson and I.

16         Q    What device did you record the meeting on?

17         A    Just a cell phone.

18         Q    What cell phone?

19         A    My regular every day cell phone.

20         Q    Your personal cell phone or the city's cell

21              phone?

22         A    No, I didn't have a city phone.  It was my

23              personal phone.

24         Q    Okay.  And what make and model was that?

25         A    Gosh, I think that was the -- maybe an S5
```

Leonardo Mendozza

203

```
 1        Samsung.

 2    Q   Do you still have that phone?

 3    A   I do not.

 4    Q   When did you no longer have -- what happened to

 5        that phone, I suppose, is the easiest way of

 6        asking this?

 7    A   That phone was almost six or seven years old

 8        and it finally just quit.  And I got a new

 9        phone from Verizon, a Kyocera phone.

10    Q   And how did you -- so obviously you produced

11        recordings from this pre-disciplinary hearing.

12        How did you get the recordings from that

13        Samsung phone to me in this litigation?

14                MR. CHANDRA:  Objection as to any

15        communications you've had with counsel.  If

16        they were produced from us to Mr. Strang,

17        you're not permitted to comment on that through

18        communications with us from you.  But to the

19        extent -- can you just rephrase your question,

20        Steve?  It might make things easier.  I think I

21        know what you're driving at.

22                MR. STRANG:  No, I'm going to

23        let my question stand.

24    Q   I'm asking you how -- I'm not asking you for

25        what Subodh may have done or what
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonard Mazzola

```
1              conversations -- I'm not asking about any

2              conversations you had with Subodh.

3                   I'm asking, physically, how did the

4              documents get from this phone that you no

5              longer have to essentially the point of being

6              ready to produce in the litigation.

7                           MR. CHANDRA:  That's a different

8              question.

9        Q     Did you send it by e-mail?  Did you download

10             them to a cloud?  Did you store them on a hard

11             drive somewhere?  How did they end up on this

12             five year old phone -- how did they get from

13             there to you having possession of them at this

14             point?

15                          MR. CHANDRA:  That's a different

16             question and you're welcome to answer that,

17             Mr. Mazzola.  Go ahead.

18       A     Okay.  As far as -- it went from phone to

19             phone.  I used whatever Verizon's, you know,

20             app is to switch phones.  So everything just

21             transfers from phone to phone.  And then, you

22             know, I had them on my phone and then -- I'm

23             not sure if I'm supposed keep talking at this

24             point.

25                          MR. CHANDRA:  So, Mr. Mazzola,
```

```
 1          you may answer about anything you did with

 2          those documents, with those recordings, but not

 3          to any communications to us as counsel, okay.

 4          So anything you did up to but not including any

 5          communications to us as counsel.  You can

 6          otherwise answer his question.  Go ahead if you

 7          know.

 8     A    Okay.  Yeah.  I just transferred it from phone

 9          to phone using the switch app or whatever you

10          would call that from Verizon.

11     Q    Okay.  Did you use an app to record the

12          conversations?

13     A    No.  Just the audible thing on the phone.

14     Q    Did you record any conversations with any

15          employees of the City of Independence that you

16          did not produce in this litigation?

17                    MR. CHANDRA:  Objection.

18     A    No, sir.

19     Q    Did you delete any recordings with any City of

20          Independence employee before producing them in

21          this litigation?

22                    MR. CHANDRA:  Objection.  Go

23          ahead.

24     A    No, sir.

25     Q    So the recordings that you turned over in this
```

```
 1          litigation, I can assume that that is every

 2          recording that you ever made of a City of

 3          Independence employee?

 4     A    No, that wouldn't be accurate either.  I made

 5          recordings of traffic stops from, gosh, a long

 6          time ago.  Far back.  You know, back when I

 7          first started.  I mean, I'm talking like

 8          cassette tapes that have long been gone.  But

 9          as far as pertaining to the issues here at

10          hand, you guys have everything.

11     Q    And you have not deleted anything?

12     A    No, sir.

13     Q    Did you tell Bob Phillips prior to that meeting

14          that you had evidence that will blow the chief

15          out of the water?

16     A    I don't think so.  I think I stressed to Bob

17          just the facts that his data was off by not

18          five percent but 50 percent and that the

19          numbers weren't even close to the reality of

20          what was going on.

21     Q    And before this meeting you had

22          essentially -- had you argued your point with

23          the chief before?

24     A    No.  Unfortunately he refused to talk to me and

25          walked to his vehicle and left and went on
```

```
 1        vacation.
 2    Q   Well, he's the boss, right?  He gets to make
 3        that decision?
 4    A   True.
 5    Q   And it might irk you that he's not listening to
 6        you, but at the end of the day he doesn't
 7        have to, correct?
 8    A   He's the big dog.  He can do whatever he wants.
 9        I wouldn't say "irked" is the right word.  I
10        was just saddened.  I was disappointed.
11    Q   You were upset, correct?  You were angry at
12        him?
13    A   No.  Far from anger.  I was emotionally kind of
14        just -- again, saddened because a police chief
15        that I had a really good relationship with just
16        did this to me, you know.
17    Q   Well, he's disciplining you for performance
18        issues, correct?
19    A   Well, according to his numbers we had a
20        performance issue.  However, when those numbers
21        are 50 percent off, I would argue that there is
22        not an issue.
23    Q   Well, we went through those numbers a second
24        ago and the numbers, the totals, you agreed are
25        correct?  The totals are correct; would you
```

Leonard Mazzola

```
1            agree with that?

2      A    The numbers that you showed me in that one file

3            they're taken from Sundance, so I can only say

4            that they are correct.  I don't want to confuse

5            the issue, but the numbers that were being

6            considered in the pre-D are not them numbers.

7            They go back to your 283, you know, tickets in

8            one year compared to, I think, 135 in the other

9            year.  That's what we were there for.  We were

10           there for ticket and ticket only declines.

11     Q     Well, you were actually there not for ticket

12           decline.  You were there for not listening to

13           his instructions regarding getting productivity

14           up in your particular department, correct?

15                    MR. CHANDRA:  Objection.

16     A     No.  I mean, again, production went up 27

17           percent.  Again, I understood us to be

18           there -- the main point was that the

19           productivity didn't go up and that's why we

20           were there.  Now, the goal post changed quite a

21           bit during that meeting.  However, we started

22           with the main topic and the main topic of

23           conversation was, in fact, those numbers.  And

24           those numbers were 50 percent off and that's

25           the facts.
```

Leonardo Mendoza

```
 1     Q   Well, at the end of the day, look, the

 2         chief -- at the end of the day the hearing was

 3         for you not listening to the chief, correct?

 4                 MR. CHANDRA:  Objection.

 5     A   No, I do not believe that.  I believe we were

 6         there because ticket totals were down and the

 7         chief did not agree with obviously the actual

 8         numbers.  Because he was looking at the numbers

 9         and they were up by 50 percent.  The other

10         topic that came up in the pre-D was my

11         communication with the mayor.  So there were

12         two issues that was talked about.  There was,

13         one, tickets.  Two, my communications with the

14         mayor.

15     Q   And you had been specifically instructed not to

16         communicate with the mayor outside of chain of

17         command, correct?

18     A   I had been instructed as far as an e-mail goes.

19         However, that was part of my duty at that time

20         to communicate with the mayor.

21     Q   Who -- what -- I'm sorry.  Where can I find

22         that, that it was your duty to communicate

23         directly with the mayor at this point?

24                 MR. CHANDRA:  Objection.

25     A   At that time I was, again, filling in for the
```

Leonardo Maldonado

210

```
 1              chief's absence.  So between Jim Polak and I we
 2              handled doing mayor's court, talking with Angie
 3              at Clerk of Courts, helping the mayor out
 4              there.  The mayor had text me a coup;e other
 5              times about traffic details and I handled it.
 6              So it became sort of a normal part of my job to
 7              talk and discuss items with the mayor.
 8         Q    Jim Polak was specifically named acting chief,
 9              correct?
10         A    I don't know if he was specifically named
11              acting chief, but Jim Polak was the interim or
12              acting chief at the time.  I don't think there
13              was like a ceremony or anything like that.  But
14              Jim Polak would definitely be in charge.
15         Q    There was an e-mail -- there was certainly an
16              e-mail alerting everyone that Jim Polak was
17              acting chief, correct?
18         A    I don't know specifically.  However, knowing
19              Chief Kilbane, I would not doubt that he put
20              something like that out.  That would be a fair
21              statement.
22         Q    Were you ever told by anyone that you could
23              jump over the acting chief at the point and
24              communicate directly with the mayor?
25         A    No.  Jim Polak was kind of handling more the
```

```
 1              administrative and political-type duties.  And
 2              I was handling the patrol, court, payroll,
 3              communicating and that type nature with clerk
 4              of courts and the mayor's court and stuff like
 5              that.  I guess more of a production-type thing.
 6         Q    So you took it upon yourself to have these
 7              communications with the mayor, correct?
 8         A    No.  The mayor text me and I responded.
 9         Q    Well, look, we went over the document.  You
10              were actually disciplined back in 2011 for this
11              exact same thing, correct?  Communicating with
12              the mayor back then outside of the police chain
13              of command, correct?
14         A    No.  First of all, it was not discipline.  It
15              was a written documentation of counseling,
16              which according to our CBA is not discipline.
17              And secondly, I had not communicated with the
18              mayor.  I communicated with the HR director and
19              I communicated with te financial coordinator,
20              if you will, Vern Blaze, who knocked on my
21              front door and entered my home.
22         Q    But you were told even when communication is
23              initiated by someone else that you are still to
24              follow the chain of command, correct?
25         A    Sure.  Are we talking about the 2011 incident
```

Leonardo Mendoza

212

```
 1            or are we talking about text messages from

 2            2018?

 3      Q     Well, you were informed that you couldn't do

 4            that back in 2011.

 5      A     The text messages from 2018 they were taken by

 6            me.  The chief was at the time absent, you

 7            know, getting his shoulder taken care of.  And

 8            they were about details, traffic details, and

 9            the mayor asked me to handle it.  I gave him

10            pretty mundane responses of, Yep, we'll handle

11            it.  And it was taken care of.  There was zero

12            issue on that as far as me following through

13            with getting a traffic detail set up.

14      Q     Did anybody tell you that you could have

15            those -- did anybody in the police chain of

16            command tell you that you could communicate

17            directly with the mayor?

18                     MR. CHANDRA:  Objection.

19      A     You know, as far as telling me, no.  Again, Jim

20            Polak was very in and out at that time dealing

21            with his own health.  And the chief obviously

22            was out.  So I was kind of it.  Me and Jim

23            Kroger talked quite a bit on how to handle some

24            things.  I didn't get no official, hey, you can

25            talk to the mayor.  The mayor text me and, you
```

```
 1              know, I responded and took care of business for

 2              him.

 3       Q     That's what I asked you.  Again, this is a very

 4              simple answer.  I don't need these narrative

 5              responses that have nothing to do with what I'm

 6              asking you.

 7                   I asked you whether anyone specifically

 8              told you that you could this and it certainly

 9              sounds like the answer is no, correct?

10       A     No.  I received no official "you can do that

11              correspondence," I guess.

12       Q     And did you admit during this pre-disciplinary

13              hearing to texting with the mayor?

14       A     During the pre-D, yeah, that came up.  Yes,

15              sir.

16       Q     You were initially asked whether you texted

17              with the mayor about traffic detail enforcement

18              and you answered "No, I did not," correct?

19       A     Yeah.  I was asked if I text the mayor and I

20              responded with "No" because the mayor had text

21              me first.

22       Q     Do you think that that was an honest way of

23              answering that question?

24                        MR. CHANDRA:  Objection.

25       A     Absolutely.  You know, you mentioned after 2011
```

```
 1              that I was warned not to do that, so there was

 2              no way that I was going to text the mayor

 3              first.  And if the mayor texts me first, out of

 4              respect to the man, regardless of who it is,

 5              whether it's Anthony Togliatti or Greg Kurtz, I

 6              answer to them and I'm loyal to them.  I'm

 7              going to answer the man because they are in my

 8              chain of command.  I did not text them first,

 9              they text me, and at that point in time it

10              wasn't anything out of the ordinary,

11              Mr. Strang.  They had text me before and things

12              were handled.  It wasn't like I reacted with,

13              oh, my God, the mayor is texting me.  This was

14              something completely normal.

15      Q    The mayor is not in your chain of command

16              though, correct?

17                      MR. CHANDRA:  Objection.

18      A    The mayor is in the chain of command because he

19              has a dual function of mayor and safety

20              director.

21      Q    But he's specifically above the chief, correct?

22      A    Correct.

23      Q    And you were never chief, correct?

24      A    No, I was not.

25      Q    Did you reply to the mayor that you were
```

Leonardo Mendoza

```
 1            specifically instructed not to text him or

 2            anything like that?

 3     A      Initially I responded to the mayor -- and I

 4            have it somewhere, I believe we probably have

 5            it to you guys -- but I said I'd handle it.

 6            And then I text him back.  The chief had saw me

 7            upfront and basically chewed me out for doing

 8            it.  So I went back and I text the mayor and

 9            told him don't text me anymore, go through the

10            chief, the chief says it's not allowed or

11            doesn't want me to do it.  And then I put out

12            an e-mail because I had put out an earlier

13            e-mail saying, hey, I spoke with the mayor, we

14            need a traffic detail in this area.  So then I

15            put out another e-mail to rescind that.

16     Q      I'm going to go on to Defendants' Exhibit 16.

17            Can you identify this document?

18     A      Yes, sir.

19     Q      This is an e-mail from yourself to Ms. Linker

20            dated Thursday, September 13, 2017 at

21            6:20 p.m., correct?

22     A      I can't see the date, but I think it's 2018.

23     Q      Yeah.  I'm sorry if I mispronounced that.

24                 It attaches an Excel spreadsheet.  Are

25            you the one who actually composed that Excel
```

```
 1        spreadsheet?
 2   A    I was.
 3   Q    The information you put in that came from you,
 4        correct?
 5   A    Correct.
 6   Q    And was this spreadsheet a projection of when
 7        you expected police officers to retire?
 8   A    Yeah.  It was a way of trying to project out
 9        into the future retirements and when they were
10        going to drop.
11   Q    And you include yourself in this, correct?
12   A    Correct.
13   Q    And you specifically have yourself listed under
14        2024, correct?
15   A    Correct.  So the guys who are retiring I have
16        down the year they're retiring.  The guys who
17        are in drop, I have down as the beginning of
18        when they could get out.  So, in other words,
19        you see Kilbane, Borowy, Randy Wilson, myself,
20        Dalton and Kurtz, those are the first years
21        they would be eligible to actually get out and
22        then go from there.
23   Q    Well, Kilbane --
24   A    If they were in drop.  I'm sorry.  If they were
25        in drop.
```

Leonardo Mazzola

217

```
1    Q    Well, for Kilbane the year 2024 would be when

2         he has to get out of drop, correct?  Not the

3         first year he's eligible to get out of drop,

4         correct?

5    A    Right.  Yes.  So for Kilbane.  And I believe

6         same thing with Borowy.  Randy, me -- I think

7         Randy is a couple years before me.  But again,

8         I'm guessing at these.  It has been a long time

9         since I put this together.  And then Mazzola

10        and Dalton, Dalton has one year over me.  This

11        was just kind of a general let's put our thumb

12        on some sort of timeline of when we're going to

13        be losing guys.

14   Q    You were doing your best to alert human

15        resources as to what year human resources would

16        expect you to leave the department, correct?

17                  MR. CHANDRA:  Objection.

18   A    No.  This is done in response -- I was involved

19        with the hiring process when we hired Everett

20        Heyworth and Kroeger Jr. and also March, Jr.

21        And basically at that time we were looking to

22        hire two, but we had such good candidates that

23        we all decided, hey, maybe we should hire three

24        this year.  And so there was some discussion

25        on, well, if we hire three this year, how is it
```

218

```
 1        going to affect future hirings?  So I did this
 2        manpower projected retirement as a graph for
 3        the chief and Letitia and others in the room to
 4        kind of show, you know, a pretty drastic
 5        decline in officers within the next coming
 6        years.
 7     Q  Correct.  And you list yourself under 2024,
 8        correct?
 9     A  Yeah, I'm under 2024.  That would have been my
10        first year of eligibility after satisfying the
11        five year drop requirement.
12     Q  Right.  And that's the year you intended to
13        actually leave the police department, correct?
14     A  No.  That would be my first year of eligibility
15        to leave after completing that five years.  You
16        know, to predict what I would be doing five,
17        six and seven-and-a-half years from now, I
18        couldn't do that.  That year was the first year
19        where I could go and satisfy my drop.
20     Q  That's, in essence, what you were doing is you
21        were predicting for human resources when you
22        were going to leave the department?
23     A  Yeah.  But again, these were just kind
24        of -- obviously I didn't talk to all these guys
25        to get their wishes like, hey, for instance,
```

Leonard Mazzola

219

```
 1              Greg Tinnirello, you're for sure retiring in
 2              the year 2029?  I've talked to Greg and he said
 3              he's doing seven or all eight years.  So that's
 4              how I came up with 2029 for him.  So it's just
 5              kind of giving us a general sense within the
 6              next five to eight years half our department is
 7              going to be gone.
 8         Q    And no one would know when Leonard Mazzola
 9              planned to leave the department and retire
10              better than Leonard Mazzola; would you agree
11              with me on that point?
12         A    I mean, yeah.  At times obviously everyone's
13              prediction of the future changes.  But, yeah, I
14              would agree with you.  Sure.  That's fair.
15         Q    I'm going to show you Defendants' Exhibit 17.
16              That's an e-mail from lenchip@wowway.com to
17              your work e-mail address at 2:32 a.m.  Subject
18              is "Despite laws and lawsuits quota based
19              policing lingers."  And it has a link to an NPR
20              article.  Do you see that?
21         A    I do.
22         Q    Would it be safe to say that after your
23              pre-disciplinary hearing you were -- this issue
24              of productivity or standards or quotas, this
25              was still something that was on your mind?
```

220

```
 1    A    I believe this was after a meeting.  We have to

 2         double check the date on that.  I think this

 3         might have occurred after a meeting with

 4         Letitia and Chuck Wilson and the chief.

 5    Q    And you sent this to yourself at 2:32 in the

 6         morning, correct?

 7    A    Appears to be correct, yes.

 8    Q    And you're referencing a meeting.  There was,

 9         in fact, a meeting with yourself, human

10         resources, Ms. Linker, and the chief and Chuck

11         Wilson on 9/13/2018, correct?

12    A    That sounds right, yeah.

13    Q    And we know that because you recorded it,

14         correct?

15    A    I recorded that meeting as well, correct.

16    Q    Did the other participants in that meeting know

17         that you were recording it?

18    A    Chuck Wilson.

19    Q    What about everyone else?

20    A    No, sir.

21    Q    Do you believe that was dishonest of you to

22         record the meeting without their knowledge?

23                     MR. CHANDRA:  Objection.

24    A    No.  Again, I recorded it to make sure I

25         preserved what was said, when, who, how so
```

Leonardo Marzocco

221

```
 1            nothing could ever be misconstrued upon me

 2            because we were dealing with a delicate

 3            situation.

 4     Q      Sure.  But do you think that that's dishonest

 5            to record someone without their knowledge?

 6                     MR. CHANDRA:  Objection.  Asked

 7            and answered.

 8                     MR. STRANG:   Well, it was asked

 9            but not answered.

10                     MR. CHANDRA:  Objection.

11     A      Mr. Strang, I don't believe that's wrong.

12            You're welcome -- anyone is welcome to record

13            me on a daily basis.  Again, when you record a

14            conversation you're actually protecting the

15            truth.

16               We now expect officers to have body cams

17            on them and actually have recordings running.

18            So, no, I don't think it's dishonest.  I think

19            it's a way of protecting the evidence and the

20            truth.

21     Q      Are you saying that these recordings can amount

22            to body camera footage?  Is that what you're

23            telling me?

24     A      No.  There is no video obviously, but what it

25            is -- what it is in its raw form is it's a
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1        record.  It's a transcript of exactly what

 2        happened at the meeting.  You don't have to

 3        take Lenny's word for it, you don't have to

 4        take Chief Kilbane's word for it.  You don't

 5        have to take anybody's word for it.  You can

 6        push play and you can listen to it.  It just

 7        preserves what happens in the meetings.  There

 8        are no misinterpretations.  You know, on top of

 9        that, it's my legal right to do so under Ohio

10        law.

11   Q    Well, under Ohio law.  But it was a violation

12        of department policy, correct, and you knew

13        that at the time?

14                  MR. CHANDRA:  Objection.

15   A    Ohio is a one party consent state, so therefore

16        it's legal in the State of Ohio to do so.  The

17        memo you showed, me once you showed me that

18        second memo, I really don't think I ever saw

19        that first memo.  And if I did, it would have

20        been part of an RNC and I was not part of that

21        task force.  That would have went to Sergeant

22        Cross.  And Sergeant Cross was kind of in

23        charge of the RNC task force.  But according to

24        the e-mail it went to "Police."  Again, I'm a

25        member of that police so I would have to have
```

```
1         got it in some way.

2             But as far as the recording, again, it's

3         allowed in the State of Ohio and it was done to

4         actually protect and preserve what actually

5         happened that day.

6    Q   At this meeting did you tell the chief that you

7        are refusing to follow his orders?

8    A   I'd have to go back and listen to the context

9        of what you're referring to.  I know it got

10       heated a lot during that meeting.  I confronted

11       the chief.  He confronted me.  There was some

12       lies and some mistruths and some false

13       statements, so it was pretty active.  I kind of

14       felt bad for Letitia at that point.  I'd have

15       to go back and listen.  Do you have a

16       specific -- you know, something that I sent?

17   Q   I do.  Let's listen to Exhibit 70.

18                    MS. JERIN:    Alex, that would

19       be Exhibit 70, it's a recording.

20                    MR. STRANG:    Alex, are you

21       here?

22                    VIDEOGRAPHER:  Yeah, I am.  Hold

23       on.  I'm pulling this up now.

24                    -  -  -  -  -

25            (Thereupon, a recording was played.)
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Mazzola

224

```
 1                            -  -  -  -  -
 2      Q   Mr. Mazzola, did you hear that?
 3      A   I did, yes.
 4      Q   Did you just tell the chief that you would not
 5          do something?  That you would flat out refuse
 6          to do that order he just gave you?
 7      A   I did.
 8      Q   Do you think that's appropriate?
 9      A   Absolutely at the time.  And you have to
10          obviously know what we were talking about.
11      Q   Well, at this point the chief still wanted you
12          to -- he still wanted you in your position, he
13          was still rooting for you, he still wanted you
14          to succeed.  Would you agree with that?
15      A   No, I would not.
16                      MR. STRANG:  Okay.  Let's play 66.
17                            -  -  -  -  -
18          (Thereupon, a recording was played.)
19                            -  -  -  -  -
20      Q   Mr. Mazzola, is that part of the recording of
21          the meeting?
22      A   Yeah.  That's part of the Letitia, Chuck
23          Wilson, chief and I meeting.  Yes, sir.
24      Q   And that was the chief saying --
25                      MR. CHANDRA:  Objection based on
```

Leonardo Mazzola

```
 1            rule of completeness.  I'll just lodge a
 2            standing objection should this continue, but
 3            that's fine, go ahead.
 4       Q    And Mr. Mazzola, that was the chief saying I
 5            want you to do your job as police lieutenant;
 6            is that correct?
 7       A    Yeah.  That is him trying to bolster his
 8            position after he was confronted with some
 9            other issues.
10       Q    I'm just trying to hear -- I'm just trying to
11            establish what voices are whose voices, okay.
12                 So that was the chief and you, correct?
13                      MR. CHANDRA:  Objection.
14       A    Yeah.  I know what you're trying to do here.
15            Yes, that was -- it appeared to be me talking
16            to the chief and I think Letitia might be
17            saying something in the background.
18       Q    Okay.  And part of the problem at this meeting
19            was the chief had identified or the chief
20            believed that some of your officer were gaming
21            the system that you had set up, correct?
22                      MR. CHANDRA:  Objection.
23       A    No, I don't think that was a main topic.  It
24            was a follow-up meeting that was actually
25            organized by Letitia, but I'm not quite sure
```

```
 1        what Letitia's goals were other than to get us

 2        all together and to come up with a working

 3        plan.

 4    Q   The chief was communicating with you at this

 5        point that he wanted his performance standard

 6        implemented and you disagreed with that

 7        standard; is that correct?  You were still

 8        advocating for your old standard?

 9                    MR. CHANDRA:  Objection.

10        Compound.

11    A   No, see this is the problem with playing just a

12        snip-it of a recording.  When I said that I was

13        going to take discipline and I said absolutely,

14        I'd still take it today.  Because he wanted me

15        to tell Brian Dalton that he was not OIC

16        anymore; and he also wanted me to ask Dan

17        Anders if he had any medical issues that would

18        stop him from returning to work as sergeant.

19        And, you know what, again, I'm not the smartest

20        guy in the room but it sure seemed like a HIPAA

21        medical question that someone above my pay

22        grade that knows what they are doing should be

23        asking, especially when there is pending

24        litigation going with that.  And know I don't

25        know any details; and if I did, I don't know
```

```
 1          that I'd be allowed to talk to them.  But there

 2          is pending litigation going on that.  So when

 3          you ask me a question of whether or not I

 4          should just go and tell somebody -- ask

 5          somebody about their medical condition and then

 6          reverse a decision made by Lisa Zamiska and

 7          Mike Kilbane to make Brian Dalton the OIC, I'd

 8          gladly take discipline then get involved with a

 9          federal lawsuit.

10     Q    Well, that's not your job as a lieutenant to

11          enforce HIPAA, that would be Letitia, and she

12          was present at this meeting, correct?

13     A    Yes, Letitia was present.  However, this policy

14          was put in place by Lisa Zamiska who was the

15          immediate HR before her.  And Letitia was

16          unaware of the situation that was going on that

17          Lisa Zamiska and Mike Kilbane had well over 14

18          months prior put in as restriction on Dan

19          Anders, which is, again, causing litigation.

20               Again, I'm not refusing an order to be a

21          jerk, Mr. Strang.  I'll follow any order that's

22          legal.  I'll follow any order that's ethical

23          whether I agree with it or not.  But all I was

24          asking for was some clarification.

25               And to top that off, I actually followed
```

```
 1            up with an e-mail asking for us to please get

 2            together as a team on this because I was

 3            unaware of the legal ramifications of asking

 4            medical questions to someone like Sergeant

 5            Anders.  And no problem putting Dalton down,

 6            but then obviously that brought Anders up.

 7      Q    Well, Mr. Mazzola, again, I'm going to ask you

 8            to just answer my questions.  You're giving me

 9            these long meandering statements based on

10            things that I'm not even asking, all right.

11            Can you do that?  Can you just answer my

12            questions?

13                      MR. CHANDRA:  Objection.

14      A    Sure, but then don't ask me for an explanation

15            then either.

16                      MR. CHANDRA:  Can you play

17            Exhibit 68, Alex.

18                      -  -  -  -  -

19                 (Thereupon, a recording was played.)

20                      -  -  -  -  -

21      Q    Mr. Mazzola, was that your voice saying, "I'm

22            sure the media will end up seeing what I write,

23            I can guarantee you"?

24      A    Yes, sir.

25                      MR. STRANG:    Alex, can you
```

```
 1          play a portion of Exhibit 69.  It's longer --

 2          it's a longer recording and I'm going to ask

 3          you to start it about halfway through.

 4                          VIDEOGRAPHER:  It looks like it's

 5          about 4 minutes, 36 seconds.

 6                          MR. STRANG:    Yeah.  So let's

 7          just play it ==

 8                          VIDEOGRAPHER:  About 2:15?

 9                          MR. STRANG:    Yeah.

10                          -  -  -  -  -

11          (Thereupon, a recording was played.)

12                          -  -  -  -  -

13     Q    Mr. Mazzola, was that your voice we heard on

14          that recording?

15     A    Yes, sir.

16     Q    Was that a recording that you made after the

17          meeting with Linker, the chief and Chuck Wilson

18          on the 13th of September 2018?

19     A    Yes, sir.

20     Q    Who are you talking to?

21     A    Ray Patzel.

22     Q    Who is Ray Patzel?

23     A    Ray Patzel is a patrolman for Independence

24          Police Department.

25     Q    He's a subordinate of yours, correct?  Or he
```

```
 1              was?

 2    A    Correct.

 3    Q    At this point you were aware that the chief

 4         wanted to implement a system that basically

 5         looked at the average number of tickets that

 6         police officers write and have every officer

 7         get within 20 percent -- 20 percentage points

 8         of that, correct?

 9    A    No, that's not at all what the chief wanted.

10    Q    You were aware that the chief wanted to base

11         the number of tickets that officers would write

12         on the general productivity of the officers in

13         general, correct?

14    A    Could you repeat that one more time?  I want to

15         make sure I'm answering that accurately.

16                   MR. STRANG:  Yeah, Tracy, can

17         you repeat that?

18                        -  -  -

19                   (Record was read.)

20                        -  -  -

21    A    I'd ask you to rephrase but I think it would

22         probably upset you, so I'm going to go ahead

23         and answer as best I could.

24              The chief basing tickets was the focus of

25         an officer being productive.
```

```
 1      Q    Right.  But the chief had told you that he got

 2           his -- the chief had communicated to you where

 3           he was getting his numbers, his productivity

 4           numbers for tickets, correct?  He had told you

 5           about that before September 13, 2018?

 6      A    No.  The chief did not tell me anything about

 7           where he got any of his numbers at any point.

 8      Q    He never told you that?  He never had that

 9           discussion with you?

10      A    He would get his numbers from Sundance by

11           running reports.

12      Q    Yeah.  But you knew he wasn't -- you knew that

13           he wasn't just picking this number he wanted

14           officers to hit out of thin air, correct?

15      A    Okay.  All right.  We're talking about two

16           different things.  You're talking about the

17           3,000 minimum, the number of tickets, the ten

18           per officer or no?

19      Q    Yeah, correct, that's what I'm talking about,

20           the 10 per officer.

21                What was your understanding in September

22           of 2018 as to where that number came from, the

23           10 per officer?

24      A    Okay.  Sorry about that.  We were talking about

25           two different things.
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Matazzo

232

```
 1              So out of the meeting we were talking

 2         about, again, Nick Screptock being the old

 3         guard on the department saying, hey, you know,

 4         two to three enforcement actions, write a

 5         ticket a shift type thing, stay off the radar.

 6         So if guys worked 14 shifts a month, then in

 7         theory they should have 14.  But you have guys

 8         that are off sick, take vacation, work K-9, so

 9         we came up with 10.  Everybody should have 10

10         and that nine obviously would spell an issue.

11         And the chief came up with that number based

12         on -- I believe -- you'd have to ask him.  He

13         ran the numbers from the previous year and I

14         believe he said we had 3,000 tickets so that

15         was going to be the goal.  And then we took the

16         number of officers, divided the numbers of

17         officers by the number of months and came up

18         with that figure as well.

19    Q    And then the chief told you at one point though

20         that he was not -- that he was expecting

21         officers to be within 20 percent of that,

22         correct?

23    A    No.  That was based off of my point system that

24         I developed.  What I did is I took everybody

25         across the board and put their numbers up on
```

Leonardo Melazzo

233

```
 1              the board and then I did a 20 percent off mean,
 2              meaning you had to be within 80 or 120 percent
 3              off of the mean tickets that officer on average
 4              wrote.  So if you're under 80, you're in
 5              trouble and if you're over 120, you're writing
 6              too many tickets and you're burdening, in all
 7              likelihood, the other officers on your shift
 8              for their ability to go out there and get some
 9              traffic.  So that's how the 20 percent came up.
10              It also came back up in Dr. Vanmeter's course
11              as well.
12      Q    Why did you tell -- in that phone call we just
13              listened to, why did you say "Guys out here who
14              are writing fucking 50 tickets a month, you
15              know, I think maybe need to be told that the
16              new standard is what it is"?  What does that
17              mean?
18      A    Ray Patzel, unfortunately you can't hear him on
19              the other end.  Ray Patzel was expressing
20              concern because he worked with a number of guys
21              that went out and wrote all kinds of tickets
22              and Ray got stuck with all the accidents.  He
23              got stuck with going to all the neighbor
24              disputes.  So that took his time away from
25              actually writing tickets.  So again, as a
```

```
 1              shift, as a team -- and this is what I had

 2              talked to my sergeants about -- it needs to be

 3              a team effort.  So it was a response to Ray

 4              saying that guys are out there, all they do

 5              is spend 12 hours on the highway, and of course

 6              they're going to get all their tickets while

 7              Ray is back in the city taking reports.  So I

 8              said, yeah, they need to be talked to because

 9              at that point in time they need to write less

10              so the other guys who have little need to come

11              up.  So it's a team effort.  Again, when you

12              come up with a mean, you should be between 80

13              and 120 of that mean.

14     Q    Did you ever instruct your subordinate officers

15          that they should write fewer tickets?

16     A    No, sir.  Again, it would apply if a guy

17          was -- in that situation I just talked about,

18          if a guy is writing 50 tickets and a guy on his

19          shift is writing two because he's stuck with

20          all the accidents and calls, then, yeah, there

21          needs to be an adjustment.  He needs to get off

22          of the highway and come in and do some repots

23          and accidents and neighbor disputes and dog

24          calls and let the other guy go out and actually

25          get some tickets.
```

Leonardo Madz012

235

```
 1     Q    The officers who are writing -- you know what,
 2          drop that.
 3              At the end of that you said "fucking
 4          liar."  Who are you talking about?
 5     A    I was talking about Chief Kilbane.
 6     Q    Do you think that that was a violation of the
 7          general orders to call Chief Kilbane a "fucking
 8          liar"?
 9     A    No.  That was a private comment made to myself
10          under my breath.  If I would have said that to
11          his face, then obviously that would be a hands
12          down slam dunk violation of that policy.
13     Q    You mentioned that this was to Ray -- how do
14          you pronounce that?  Patzel?
15     A    Patzel.
16     Q    What did you say Ray was doing instead of
17          citing people?
18     A    I didn't say what Ray was doing.  Ray relayed
19          to me that, you know, the guys out there
20          writing 50 tickets -- and I think he was
21          basically accusing Chris Cross of that, but,
22          again, I would have to check to see who was on
23          his shift.
24     Q    What do you thing Ray was doing that prohibited
25          him from writing tickets?
```

236

```
1    A    Ray's point to me was that while someone is
2         writing 50 tickets, he's stuck doing all the
3         other, you know, non-traffic work.  And that's
4         when I said, yeah, they're going to have to get
5         talked to and they're going to have to dial it
6         back some, they're going to have to pull their
7         share and do accidents and stuff like that.
8         That's what was meant.
9    Q    And did you specifically say that you
10        understood Ray was basically picking up the
11        slack by doing reports?
12   A    No.  It would be the other way around.  What I
13        meant by that is the guys who are
14        writing -- if you go in and you do all the
15        traffic, then you're abandoning the city.
16        You're spending all your time an 480 and 77,
17        and we're not highway patrol, we're
18        Independence police officers.  So I
19        expected -- we talked about balance earlier.  I
20        expected my guys to spend half of the time in
21        the city and half the time on the highway, if
22        you will, that way it was a even, well-rounded
23        officer.
24   Q    Well Ray wasn't doing -- Ray wasn't doing
25        reports either, correct?
```

Leonardo Mazzola

237

```
 1    A    I'd have to look at the numbers.

 2         Ray -- that's a whole other conversation, sir.

 3         Ray was, again, wrote up by me numerous times

 4         for production.  And him and the chief

 5         exchanged e-mails that were so insubordinate it

 6         was amazing.  I actually recommended Ray Patzel

 7         for counseling at one time because I was afraid

 8         for the public and gave that to Chief Kilbane

 9         and nothing was done.  So Ray Patzel is a whole

10         other animal.

11    Q    Did you write up Ray Patzel any time between

12         August of 2018 and March of 2019?

13    A    I'd have to look at the dates.  I wrote him up

14         quite a bit.

15                   MR. CHANDRA:  Mr. Mazzola, you

16         broke up on my end.  On my end your voice broke

17         up and I don't know if that was true for the

18         court reporter as well.  Could you please

19         repeat your answer?

20                   THE WITNESS:  Okay.  Can you hear

21         me now, everybody?

22                   MR. CHANDRA:  Yes.  There was

23         just distortion over the line.

24    A    Okay.  I'm not sure where I stopped.  But I

25         wrote up Ray Patzel numerous times and, you
```

```
 1          know, gave the chief the e-mails.  Nothing ever

 2          happened.  So Ray Patzel's big -- he liked

 3          doing accidents.  He actually liked doing

 4          accidents for some strange reason because

 5          they're a real pain in the butt.  But Ray

 6          Patzel was very active doing the accidents.  He

 7          did a lot of reports, but then we were

 8          expecting him to go out and write traffic

 9          tickets.  So in order for him to do that, then

10          that meant somebody else would have to come in

11          and take over for Ray's accidents and reports

12          and what not.  So again, it's a balance of what

13          makes a well-rounded officer.

14     Q    How long does it actually take to pull over a

15          motorist?

16     A    Well, I'm sure the data has changed, but back

17          when I was going to the academy I want to say

18          it was anywhere from 7 to 10 minutes to conduct

19          a traffic stop.  But again, maybe the data has

20          changed.

21                    MR. STRANG:  I'm going to show

22          him -- or I would like to get the audio of

23          Exhibit 64.

24                         -  -  -  -  -

25          (Thereupon, a recording was played.)
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Mazzola

239

```
1                          -  -  -  -  -

2       Q    Mr. Mazzola, was that your voice?

3       A    Yes, sir.

4       Q    Who were you referring to as a "lying bitch"?

5       A    I was referring to Chief Kilbane coming out of

6            the meeting that we just had with Letitia,

7            Chuck and myself.

8       Q    So you referred to Chief Kilbane -- was anyone

9            within earshot when you called chief Kilbane a

10           "lying bitch"?

11      A    No, sir.  I had just closed the door.  The

12           chief had came over and accompanied me at the

13           coffee pot and I think that's when he was

14           calling Tommy Narduzi's wife a nasty woman.

15           And the glass door had shut and I started

16           walking down the hallway, nobody was in earshot

17           of me, and I kind of mumbled it under my

18           breath.

19      Q    Mr. Mazzola, it sounds like you have some

20           swipes that you came into today's deposition

21           specifically intending to take.  And again, I'm

22           going to just ask you to answer my questions as

23           opposed to getting into these little digs at

24           the chief every time when I'm not asking you

25           something, okay.
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Mazzola

240

```
 1                    MR. CHANDRA:  Objection.

 2                 Mr. Mazzola, you do not have to respond

 3           to that kind of personal attack.  Just wait for

 4           a question.

 5     A     The reason I bring that up, Mr. Strang, is I

 6           remember the door shutting.  That's my only

 7           reason for bringing that up.

 8     Q     That's why you brought up that little aside you

 9           had about the councilman's wife?

10     A     Correct.  Because the coffee pot is adjacent to

11           the glass door.

12     Q     You were upset with the chief at this point

13           back in September of 2018?

14     A     I'm sorry, what month?  September of what?

15     Q     2018.

16     A     Well, yeah, that was obviously a stressful

17           month.

18     Q     And you're still upset at the chief, correct?

19     A     You know, I got a lot of psychological trauma,

20           if you will, from what the City of Independence

21           in general did to me.  However, you know, we're

22           getting through it the best I can on a daily

23           basis.

24                    MR. STRANG:  So I'm going to show

25           the witness Defendants' Exhibit 19.
```

Leonardo Mazzola

241

```
 1      Q    Mr. Mazzola, this is the final disposition for

 2           your discipline -- your pre-disciplinary

 3           hearing, correct?

 4      A    I can't see anything, sir.

 5      Q    You can't see a document in front of you?

 6      A    No.  Nothing is showing up.  It has that Maia

 7           has started screen sharing.  Now it's just me

 8           again.

 9      Q    What about now?

10      A    No.  Still blank.  It just has that Maia has

11           started -- it's gone again.  It's me.

12      Q    All right.

13      A    Is there something I need to do on my end?

14      Q    I can't really tell you that.

15                    VIDEOGRAPHER:  Steven, that might

16           just be a lag.  If you put it for a minute

17           longer and let it catch up on Mr. Mazzola's

18           end.

19                    MR. CHANDRA:  Steve, if it

20           doesn't catch up here in a few seconds, then

21           I'll give him direction on how to find the

22           downloaded exhibit.  It's the same document.

23           So let's give it a few seconds.

24                Anything showing up or are you still

25           seeing that Maia is about to share?
```

Leonard Mazzola

242

```
 1                    THE WITNESS:   No, it's still
 2           black.  I can try to take a picture of it and
 3           send it to you if you need it.
 4                    MR. CHANDRA:   No, no, that's
 5           okay.  Are you able to find Exhibit 19 in the
 6           folder?  It's an e-mail.
 7                    MR. STRANG:    We are going to
 8           take a break while we figure this out.  Let's
 9           take a five minute break.
10                         -  -  -
11                    (Recess taken.)
12                         -  -  -
13      BY MR. STRANG:
14      Q   Mr. Mazzola, I'm showing you a document marked
15          Exhibit 19.  Do you see that?  It's an e-mail
16          from Mike Kilbane to Leonard Mazzola?
17      A   Yep.
18      Q   Do you see it's also to Bob Phillips, Letitia
19          Linker and Charles Wilson?  Do you see that?
20      A   Yes, sir.
21      Q   This is essentially the decision that was made
22          about your pre-disciplinary hearing, correct?
23      A   Yes, I believe that's correct.
24      Q   And I don't need to go through this whole
25          thing, but would it be fair to say that you
```

```
 1        were not disciplined after your
 2        pre-disciplinary hearing, at least not
 3        initially?
 4   A    I think we would have to go through because I
 5        believe there was mention of discipline in
 6        there and I forget what it was.
 7   Q    Let's look at the first page of that starting
 8        with "Lieutenant Mazzola."  It's after the
 9        e-mail.
10   A    I just have the -- never mind.  It's coming up
11        now.
12   Q    I'm going to specifically start with "To help
13        you achieve these goals we will do the
14        following"?
15   A    What paragraph are you in?
16   Q    Towards the end at the very bottom.  It starts
17        before "A."  There we go.  All right.
18             Mr. Mazzola, it starts with "To help you
19        achieve these goals, we will do the following."
20        And then starting there is an A and then
21        there's A, B, C, D, E and F.
22   A    Correct.
23   Q    Okay.  Is that what you're referring to that
24        there were certain things you were required to
25        do?
```

Leonardo Mendoza

```
 1   A   Yeah.  This outlines the disposition.  I'm

 2       sorry.  I thought you had asked about

 3       discipline.  I thought there was some mention

 4       of discipline.  Maybe it's in the top half.

 5   Q   Yeah.  My question is essentially that you

 6       weren't disciplined, you were given some,

 7       essentially, some additional training you had

 8       to undergo, correct?

 9                   MR. CHANDRA:  Objection.

10   A   It outlines -- yes.  I would agree it outlines,

11       you know, certain things that need to be done.

12       And I believe somewhere in here it would say

13       that there is no discipline but it's in

14       advance.  I might be wrong.

15   Q   I'll show you that starting with --

16                   MR. STRANG:  Can you go to the

17       next page halfway down starting with F.

18   Q   It starts "Lenny, I believe that many of these

19       issues can be adjusted through training and

20       counseling as opposed to discipline.  At this

21       time I will hold any disciplinary action in

22       abeyance provided you continue to monitor and

23       maintain productivity, performance and

24       professionalism."

25           Is that what you're referring to?
```

```
 1     A    Correct.  Yes, sir.

 2     Q    One of the things you were required to do is to

 3          speak with someone at PRADCO?

 4     A    Correct.

 5     Q    And you were also required to enroll in a class

 6          taught by Dr. Vanmeter, correct?

 7     A    Correct.

 8     Q    What did you think about that Vanmeter course?

 9     A    Could you give me a specific question so that I

10          can give you a good answer?

11     Q    Yeah, did you think the Vanmeter knew what he

12          was talking about?

13                    MR. CHANDRA:  Objection.

14     A    He's a very knowledgeable guy.  You know,

15          police training is hit or miss, but it was

16          decent training.

17     Q    Did you -- I'm going to specifically play some

18          audio recordings from -- the first one is going

19          to be 59.

20                           -  -  -  -  -

21               (Thereupon, a recording was played.)

22                           -  -  -  -  -

23                    MR. CHANDRA:  Objection.

24               You can answer.

25     Q    Mr. Mazzola, I just played you part of a
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonard Mazzola

246

```
 1            recording that you provided me and I just

 2            wanted to make sure that's your voice, correct?

 3    A    Correct.

 4    Q    Who are you talking to on that?

 5    A    I don't know.  What was the recording titled

 6            and I can get that for you?

 7    Q    "Gallek phone calls."

 8    A    Well, I'm assuming then that was a tape that

 9            Chuck Wilson made when we were speaking to Ed

10            Gallek.

11    Q    When was that?

12    A    That was the evening of -- I say evening, but

13            it could have been late afternoon still, I'm

14            not sure of the time -- the lie detector test

15            date.  So I believe that would be March 20.

16    Q    That was not in October?

17                    MR. CHANDRA:  Objection to the use

18            of this excerpt and the exhibit under the rule

19            of completeness.

20    A    Yeah, that would have been -- again, I think I

21            might have sent that to Bill Evens as well.  So

22            if that's from Ed Gallek then that happened

23            in -- forgive me if I'm wrong -- March 20th, I

24            believe, because it was after the lie detector

25            test, same day.
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Mazzola

```
 1                    MR. STRANG:    I'm going to -- I'd
 2        like to play audio clip 71.
 3                    -  -  -  -  -
 4            (Thereupon, a recording was played.)
 5                    -  -  -  -  -
 6                    MR. CHANDRA:  Objection to the
 7        use of the excerpt without context under the
 8        rule of completeness.
 9   Q    Mr. Mazzola, who are you talking to in that
10        audio excerpt?
11   A    I believe that was my conversation with
12        Mayor Togliatti.
13   Q    So that is you and Mayor Togliatti talking in
14        that clip, correct?
15   A    Correct.  As best I can tell from the little
16        section, yeah, it sounds like me and the mayor
17        talking.
18   Q    And you tell Mayor Togliatti, "My daughters are
19        done with school in five, so that's my plan, so
20        I really have about four and a half left,"
21        correct?
22   A    Correct.
23   Q    And you're referring to drop, correct?
24   A    Yeah.  I'm referring to -- like the plan at the
25        time was to get my daughters through high
```

Leonardo Mazzola

248

```
 1          school and then decide as a family what we were
 2          doing after that.
 3                       MR. STRANG:  I'm going to play
 4          the witness the audio from 72.
 5                       -  -  -  -  -
 6              (Thereupon, a recording was played.)
 7                       -  -  -  -  -
 8                       MR. CHANDRA:  Objection to the
 9          use of the excerpt without context under the
10          rules of completeness.
11     Q   Mr. Mazzola, is this another audio recording of
12          you having a discussion with Mayor Togliatti?
13     A   Yes.  It appears to be, yes.
14     Q   Did you actually make it through three
15          interviews with Amazon?
16     A   Well, it was two over the phone interviews and
17          then one kind of like on location at my buddy
18          Paul's house.
19     Q   So in -- on February 28, 2019 you were already
20          looking for other jobs, correct?
21     A   I've always looked to improve myself, so my
22          resume was up to date and what have you.  And
23          that Amazon opportunity would have been a heck
24          of a one to get, but it didn't pan out.
25     Q   Do you have the resume that you submitted to
```

249

```
1          Amazon?
2      A   My buddy, Paul, did it.  I believe it's
3          included at some point to you guys.  But, yes,
4          would be the answer.
5      Q   And this conversation took place before your
6          lie detector test, correct?
7      A   The conversation between Mayor Togliatti and I?
8      Q   Correct.
9      A   Okay.  So that was, I believe, February 28th.
10     Q   Okay.  So that was nearly --
11                  MR. CHANDRA:  Hold on, Steve.
12         Objection to the use of the word "lie
13         detector."  You may go.
14     Q   So that was almost a month before the lie
15         detector test, correct?
16                  MR. CHANDRA:  Objection.
17     A   No.  Again, the dates, I might be off, but I
18         believe the lie detector was March 20th.  So
19         that would be 20 days.  So one day shy of three
20         weeks.
21     Q   So you were looking to get out of the
22         Independence Police Department even before the
23         lie detector test was scheduled, correct?
24                  MR. CHANDRA:  Objection.
25     A   No.  Again, I was looking to improve myself and
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonardo Marzocca

```
 1            to obviously take any opportunity like anybody

 2            would.  I think everybody is in a perpetual job

 3            search.  But my plan was to obviously stay with

 4            Independence until an opportunity presented

 5            itself.

 6       Q   And again, I'm asking you specifically -- my

 7            question wasn't about what everybody else may

 8            do with a job search, okay.

 9                 You were specifically seeking other

10            employment approximately a month before the

11            polygraph test, correct?

12                      MR. CHANDRA:  Objection.

13       A   I was looking into Amazon and going through

14            interviews and, yeah, putting myself out there

15            to see what was available.

16       Q   Did you view this Fox 8 news report on the City

17            of Independence ticket policy?

18       A   Yeah, I've seen the TV reports, yes.

19       Q   Did you see it at the time?

20       A   Yeah.  We all kind of grouped in the back room

21            and watched it live, if you will, or the first

22            time it had come out.

23       Q   What date was that?

24       A   Gosh, I don't know the specific date.  I don't

25            have my notes.  I'm going to say January maybe
```

Leonardo Manzolo

251

```
 1          14th from memory.
 2     Q    Was it a surprise to you to see this news
 3          story?
 4     A    Yes.
 5     Q    Did you have any communications with -- well,
 6          let me state it -- let me ask it, I suppose,
 7          bluntly.  The news story showed some City of
 8          Independence documents, correct?
 9                    MR. CHANDRA:  Objection.
10     A    Yeah.  It appeared to show, you know,
11          documents.  I think two of them I could
12          identify.
13     Q    Did you provide Ed Gallek with those documents?
14     A    No, sir.
15     Q    Do you know who did?
16     A    No, sir.
17     Q    Did you provide someone else with those
18          documents with the intention of getting those
19          documents handed over to Ed Gallek?
20                    MR. CHANDRA:  Objection.
21     A    No, sir.
22     Q    Do you have any idea sitting here today how Ed
23          Gallek got those documents?
24                    MR. CHANDRA:  Objection.
25     A    No, sir.
```

CADY REPORTING SERVICES, INC. 216-861-9270

252

```
 1    Q    Would it be fair to assume that you have

 2         devoted a significant amount of time trying to

 3         figure out the answer to that very question?

 4                   MR. CHANDRA:  Objection.

 5    A    Me personally looking into it?

 6    Q    Yeah.

 7    A    I have not, no.

 8    Q    You haven't sat awake at night trying to figure

 9         out who framed you for disclosing these

10         documents?

11                   MR. CHANDRA:  Objection.

12    A    I've sat awake at night a lot.  It's been pure

13         hell for me what's happened to me.  And, sure,

14         I've wondered who and why did this and what

15         kind of motive they had to do this to me.

16    Q    Would you agree that it appears whoever did

17         provide these documents had some sort of

18         personal animus toward Chief Kilbane?

19                   MR. CHANDRA:  Objection.

20    A    No, I would not agree with that.

21    Q    You would not agree whoever leaked these

22         documents was attempting to get back at Chief

23         Kilbane for something?

24                   MR. CHANDRA:  Objection.

25    A    Again, I don't know who did it, so I can't get
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
1              into their head, but I don't think it was

2              against Chief Kilbane.

3      Q   Well, can you tell me back in January of 2019

4              who else may have had the motive to try and

5              impugn Chief Kilbane?

6      A   Not really, no, I can't.

7      Q   Do you know of any enemies Chief Kilbane may

8              have had at the time who may have been trying

9              to get back at him?

10                     MR. CHANDRA:  Objection.

11     A   No, I don't.  Chief Kilbane was, again, for

12             four-and-half years he was a breath of fresh

13             air.  We had a great relationship.  I'm not

14             going to drag that into any kind of mud.  He

15             was a good chief, we had a great relationship

16             and obviously everything changed.  I'm not

17             aware of anyone who has an axe to grind in the

18             department with him.  But, I mean, I don't talk

19             to everybody about their individual feelings

20             about that matter either.

21     Q   Well, are you aware of anyone else back in

22             January of 2019 who may have been subject to

23             any ongoing disputes with the chief?  Any

24             personnel issues with the chief?  Anything like

25             that?
```

Leonardo Velazco

254

```
 1    A    Yeah.  Well, obviously starting in January is
 2         when I wrote up Brian Dalton, so Brian Dalton
 3         was out of his mind upset about me writing him
 4         up.
 5    Q    Okay.  You were upset at the time still,
 6         correct?
 7    A    I was upset because of what happened to Brian.
 8         You know, I served him his letter and he
 9         immediately got a gallbladder attack and we
10         basically helped him get over to the firehouse
11         and they immediately transported him to the
12         hospital.  And I was a mess.  I felt so
13         responsible for bringing on a gallbladder
14         attack by serving him, you know, his discipline
15         or his write up, I should say.
16    Q    Was Brian Dalton embarrassed about that write
17         up?
18    A    Again, that's a question you would have to ask
19         Brian.  If you're looking for my opinion of
20         like how he reacted, he was very upset.  I
21         don't think embarrassment would describe it.
22         He was highly, highly upset and was -- and made
23         it difficult to serve him.
24    Q    Do you think Brian Dalton would have provided
25         that reprimand to the news media?
```

```
 1                    MR. CHANDRA:  Objection.

 2       A    I don't know.

 3       Q    Well, who actually -- and we'll go over these

 4            documents in detail in a moment.  Let me first

 5            show you Defendants' Exhibit 24, specifically

 6            24-B.

 7                    Mr. Mazzola, I'm going to represent to

 8            you that that's a screen grab of one of -- or

 9            part of that news story that aired on January

10            14, 2019.  Is that one of the documents you

11            were referring to?

12       A    That's an excerpt, I guess, if you will, of

13            I believe a document -- again, not in front of

14            me -- of maybe September 25th that had come

15            out.

16       Q    And on the second page of that, the next page,

17            there is a reference to something that states

18            at least 2 to 3 traffic enforcement actions per

19            shift.  Do you see that?

20       A    I do.

21       Q    Okay.  Both of those documents that we just saw

22            are documents that involved you to some extent,

23            correct?

24       A    Yes.  The first one was, I believe, September

25            25th.  And then this one here me and you
```

```
 1        covered, this was the one that went to the four
 2        sergeants.
 3                  MR. STRANG:  I'm going to show the
 4        witness what has been marked as Defendants'
 5        Exhibit 27.
 6    Q   Okay.  Mr. Mazzola, I'm showing you a
 7        document -- this is something that was provided
 8        to us by Bill Evans and there are several
 9        documents in Exhibit 27.  And I can represent
10        to you that the documents that are Exhibit 27
11        are the documents that I got from Bill Evans'
12        file that essentially we are surmising were
13        leaked to Ed Gallek.  So I'm going to ask you
14        some specific -- I'm just giving you some
15        background.  I'm going to ask you some specific
16        questions about some of these specific
17        documents, okay?
18    A   Okay.
19    Q   The first one at the bottom is Evans PTA 81 and
20        that's a memo to Sergeant JT Kurtz from Leonard
21        Mazzola, CC Chief Kilbane.  Do you see that?
22    A   Yes, sir.
23    Q   We went over that document earlier.  That's the
24        document that had that language, "at least two
25        to three traffic enforcement actions per
```

```
 1          shift."
 2                  And that's the language we can see in
 3          that January 14, 2019 news story, correct?
 4     A    Correct.
 5     Q    Who do you believe would have had access to
 6          this document on, let's say, January 13, 2019?
 7                       MR. CHANDRA:  Objection.  And
 8          objection to the use of the altered document,
 9          Exhibit 27.
10     A    Again, this document was distributed by myself
11          to the four sergeants, obviously just changing
12          the name at the top.  So me, my four sergeants,
13          chief of police; and then when JT posted this
14          on his desk then literally anybody who was in
15          the station would have had the ability to have
16          this document.  So all the policeman, all the
17          dispatchers, jailers, tech services guys that
18          come in.  I think that's probably about it that
19          I can think of off the top of my head.
20     Q    If those people would have taken the document
21          down and physically scanned it in and then
22          returned it, correct?
23                       MR. CHANDRA:  Objection.
24     A    Right.  I don't -- they would have -- they
25          could easily make a copy of it.  That document
```

```
 1          was there for -- well, for months.  So the

 2          opportunity would be there to do that.

 3     Q    I'm going to refer to the next document in this

 4          series.  At the very bottom it says "Evans PTA

 5          86."

 6               Mr. Mazzola, is this the Dalton reprimand

 7          you were just referring to?

 8     A    Yeah.  This is something that I wrote patrolman

 9          Dalton up for -- he wrote 20, I believe it was,

10          instead of 30.

11     Q    And this document has his signature at the

12          bottom?

13     A    Yeah.  Appears to be the last thing -- to the

14          right of my name, over though.

15     Q    And who would have actually had access to this

16          document on, let's say, January 13, 2019?

17               MR. CHANDRA:  Objection.

18     A    Well, I can tell you that I had it.  I ran back

19          and forth a few times because there was a lot

20          of trouble getting Brian to sign it.  He was

21          highly upset, as I stated.  So once it was done

22          I made a copy for Brian, a copy for Chris Cross

23          because he was his sergeant and he was in the

24          room --  he was in the sergeant's office when I

25          gave it to Brian -- and then a copy for myself
```

```
 1          and gave the original to the chief.

 2    Q    Was there -- did you scan this document in?

 3          Was it on your system?

 4    A    I believe the chief -- I remember having this

 5          discussion with Bill Evans.  I believe the

 6          chief gave me a template and then I used the

 7          template to write this up because I hadn't

 8          done this before and I printed it.  And then I

 9          didn't save it on the system because I didn't

10          want it getting around.  I didn't want anybody

11          else to be able to have access to it.

12    Q    So the people that would have had access to

13          this Dalton reprimand would have been

14          you -- so the people with access to this would

15          have been you, Sergeant Cross, Dalton and Chief

16          Kilbane, correct?

17    A    Yeah.  I can just testify to who I know had it

18          and that was me, Dalton, Cross and the chief.

19    Q    And where was this stored in your office?

20    A    This document was not stored in my office

21          because I didn't save it on my computer.  This

22          document was just stored in my file.

23    Q    Who had access to your file in January of 2019?

24                    MR. CHANDRA:  Objection.

25    A    My file was kept in a blue notebook, which I'm
```

```
 1            sure you've heard of or are aware of.  I kept
 2            it at my office with me and took it home with
 3            me and I kept pretty close contact with it.
 4       Q    I'm going to refer you to the next document,
 5            which is Evans PTA 89.  This is a memo to you
 6            from Chief Kilbane about the pre-disciplinary
 7            hearing.  We looked at this document briefly
 8            before.
 9                 Can you tell me who would have had access
10            to this document in January of 2019?
11                      MR. CHANDRA:  Objection.
12       A    I'm not sure who the chief gave access to.  The
13            date is wrong.  I see the dates are all kind of
14            crossed off and rehashed out.  I received this
15            on that Wednesday before Labor Day, so we're
16            talking probably, again, guessing, the 27th or
17            28th, whatever that Wednesday was.  This was on
18            an envelope on my keyboard in my office, which
19            is unlocked.  So when I got it I made a copy
20            for Chuck Wilson and then Chuck Wilson
21            contacted Bob Phillips.  And there was some
22            previous discussion on whether or not Chuck
23            made a copy of it or if he scanned it in; and I
24            think we came to the conclusion that he had
25            scanned it in with bizz hub upfront.
```

1    Q   Who had access to this bizz hub that you're

2        talking about?

3    A   It's called a bizz hub.  It's just a huge copy

4        machine that's in the front office.  So the

5        entire station.

6    Q   Do you believe the entire station would have

7        had access to this pre-disciplinary notice

8        hearing that you received?

9    A   Well, it went through the bizz hub, so whoever

10       has access to the bizz hub very easily could

11       have made a copy of this.

12   Q   Is that actually how that program works?

13       Anyone who has access to it can get any

14       document on it?

15   A   I don't know.  Chuck is kind of our technical

16       guy.  A lot smarter guy than me, that's for

17       sure.  So Chuck scanned it in and then used an

18       electronic image then for an e-mail that he

19       sent Bob Phillips.

20   Q   Yeah.  He would scan it into actually a

21       specific e-mail address, correct?

22   A   I'm not sure if it's saved in a local file in

23       the bizz hub or not to where somebody could

24       just hit reprint and get the last ten.  I know

25       that's happened in the past where guys have

```
 1          printed off stuff and gotten other people's

 2          documents that had previously been scanned in.

 3          But I'm not sure how Chuck did this, whether he

 4          did it directly to his e-mail or if he used the

 5          bizz hub.  It is what it is.

 6     Q    So we'd have to ask Chuck for the technical use

 7          of that?  You just don't know, correct?

 8     A    Yeah, I don't know.  That's definitely a

 9          question for Chuck.  He's a pretty smart guy.

10     Q    The next document at the bottom it's got Evans

11          PTA 96.  It's not that document.  It's the one

12          right after it.

13                    MR. CHANDRA:  Objection to the

14          use of the exhibit to the extent it's been

15          altered and marked.

16     Q    This is a document we received from Bill Evans

17          and it's got at the very bottom a Bates label,

18          but in the middle of it it has highlighted, "To

19          meet this productivity standard patrol officers

20          shall meet or exceed 10 traffic

21          citations/month."

22               That's the other excerpt from the Fox 8

23          story, correct?

24     A    Yeah, correct.  And the date was correct.  I

25          was referring to September 25th, yes, that's
```

263

```
 1          correct.
 2     Q    And this would have been sent to all police and
 3          all dispatchers; is that correct?
 4     A    Yeah.  It has police, dispatchers, data entry.
 5          I forgot about them earlier.  Yeah.  Data
 6          entry.
 7     Q    Can you tell me who besides yourself and the
 8          chief would have access to all of the documents
 9          that I have shown you in Exhibit 27?
10     A    The four documents that we just talked about?
11     Q    Yeah.
12     A    I can't tell you for sure who would have access
13          to all of them.  Obviously the chief and I did;
14          and then Chuck Wilson had access to all of them
15          as well; and then Bob Phillips would have had
16          access to all of them as well.  If you could
17          scroll up, I could maybe help you with some
18          more.  This one here Bill Evans -- this one
19          here Bill Evans didn't have.  This is the one
20          that I provided to Bill Evans, by the way.
21          What were the four documents, if you could
22          scroll up?
23     Q    Starting with 27 there is that first document.
24          It's the Kurtz memo.  Who had access to these
25          documents that we just went over, all the
```

```
 1        documents in Exhibit 27?
 2                    MR. CHANDRA:  Objection.
 3    A   Yeah.  So again, the chief, myself, Chuck
 4        Wilson, Bob Phillips.  And then Chris Cross
 5        would have had access to this one and Brian
 6        Dalton as well.  And I don't know if he had
 7        mine or not.  And then I think that's it.
 8        Again, I'd be speculating, I don't know if
 9        Letitia had them.  I have no idea.
10    Q   In terms of people sitting here today, those
11        are the only people you can think of who would
12        have had access to all those documents,
13        correct?
14                    MR. CHANDRA:  Objection.
15    A   Yeah, that's all I can think of right now.
16    Q   Were you permitted to respond to public records
17        requests as a tenant with the City of
18        Independence?
19    A   No, I've never responded to the media or any
20        kind of public document.
21    Q   And I don't want to go over the procedures in
22        this, but I can if I have to.
23            Just generally you're aware that there
24        are specific officers and positions that are
25        public records custodians and that are
```

```
 1            designated to respond to public records

 2            requests, correct?

 3      A     No, actually, I'm sorry, I don't know the

 4            procedure.  I know the chief is considered a

 5            public information officer.  Aside from that, I

 6            know Mary Cox -- again, Swiss army knife

 7            Mary -- she does everything.  I don't know the

 8            procedure or who has what authorization.

 9      Q     I mean, you didn't have that authorization

10            though, correct?

11      A     No, I didn't have authorization.

12      Q     You weren't provided any public records

13            training, correct?

14      A     No, I've never been to any kind of training on

15            public docs.

16      Q     Have you ever responded to a public records

17            request?

18      A     I don't think so.  I mean, I can't remember

19            anything where I would have wrote something out

20            or did anything like that.

21      Q     Were you aware that the police department had a

22            specific policy on responding to public

23            records?

24      A     I'm aware there is a policy, yes.

25      Q     Did you ever instruct your subordinates -- did
```

```
1            you ever tell them what Chief Kilbane was

2            implementing was a quota rather than a business

3            standard?

4      A     No, sir.

5      Q     Did you ever tell Shane Bates that you believed

6            it was a quota rather than a performance

7            standard?

8      A     No, sir.

9      Q     Were you ever aware that Shane Bates was

10           stopping motorists and informing them that they

11           had to be cited because they were under a

12           quota?

13     A     Yeah, I became aware of that when I received an

14           e-mail, I believe, from the chief of police.

15     Q     Did you have any discussions with Shane Bates

16           about doing that?  Suggesting that he pull

17           people over and tell them that that's why he

18           was pulling them over?

19     A     I had a discussion with Shane later on that

20           night when he came in for work and told him

21           that obviously he can't be doing that.

22     Q     Specifically before he was doing that, though,

23           did you tell him beforehand that he should do

24           that?

25     A     Oh, no.  I did not instruct him to do that, no.
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1    Q    Did you have any discussions with him

 2         beforehand about his plans to do that?

 3    A    No, sir.

 4    Q    Did you ever tell your subordinates that they

 5         should pull motorists over and say it's because

 6         of the chief's quota system?

 7    A    No, sir.

 8    Q    Would you agree that that would be completely

 9         improper to do something like that?

10                   MR. CHANDRA:  Objection.

11    A    Yeah, that would not be covered under any

12         professional traffic stop.

13    Q    It would be completely unprofessional for your

14         patrol officers to pull people over and say,

15         I'm sorry, I have to pull you over because of

16         the chief's quota system, correct?

17                   MR. CHANDRA:  Objection.

18    A    Correct.

19    Q    You attended that Dr. Vanmeter training,

20         correct?

21    A    Yes, sir.

22    Q    Did you ever tell -- afterwards did you tell

23         Letitia Linker that you do not believe that

24         Dr. Vanmeter's training methods were viable in

25         today's world?
```

```
 1    A   I wrote Letitia an e-mail outlining that I had

 2        attended Vanmeter and I think I said

 3        something -- again, I don't have the e-mail in

 4        front of me -- that he was an elderly gentleman

 5        and that he didn't think HR was appropriate in

 6        today's world.

 7    Q   But do you remember telling her that you

 8        believed his theory of management was not

 9        viable?

10    A   I would have to refer to that e-mail to

11        specifically tell you exactly what I said, I

12        believe you have it, from February 21st.

13    Q   Did you hear Dr. Vanmeter talk about,

14        essentially, his theory of management?

15    A   I did.

16    Q   And what did you understand that to be?

17    A   Basically it was mirroring what I had already

18        put in place as far as, you know, setting a

19        standard and then setting up a 20 percent

20        buffer for minimum and maximums for performance

21        management.

22    Q   And you believe that Dr. Vanmeter actually was

23        reenforcing what you had already done?

24    A   Dr. Vanmeter -- I have the syllabus.

25        Dr. Vanmeter basically backed up exactly that
```

```
 1          point where you would -- rather than avoiding
 2          an absolute number you would create a mean and
 3          then you would go 20 percent on either side of
 4          it.
 5     Q    And that's what the chief was doing, correct?
 6     A    No, sir.  That's what I was doing with my point
 7          system that I put in place, gosh, early 2000.
 8     Q    And had you actually read Dr. Vanmeter before
 9          implementing your point system in early 2000?
10     A    No, I hadn't.
11     Q    So were you shocked to go to Dr. Vanmeter's
12          training and discovered that he apparently
13          reenforced everything you had done up to that
14          point?
15     A    I don't think he reenforced everything that I
16          had done up to that point.  However, he
17          reenforced the average production and then
18          minus 20 percent on either side of it.
19     Q    So your takeaway from the Dr. Vanmeter training
20          was essentially that everything you were doing
21          was totally legit; is that it?
22                    MR. CHANDRA:  Objection.
23     A    The training dealt with HR a lot.  He was
24          talking a majority of the day about HR and
25          about troubled employees and how to discipline
```

```
 1            them and how to avoid grievances and what have

 2            you.  As far as actual productivity and

 3            performance management, Sergeant Cross and I

 4            had to kind of get him at a break to ask him to

 5            address some things; and then he was able to

 6            speak about it briefly in the class.

 7      Q    Did Dr. Vanmeter express to you that quotas

 8            were illegal?

 9      A    He did.  He said that quotas were -- I believe

10            he said it was 36 or 38 states or something

11            like that where there had been statutory or

12            case law findings against having a quota and

13            against having minimum numbers, I believe is

14            how he put it.

15      Q    In February of 2019 did you believe yourself

16            that quotas were illegal in the State of Ohio?

17      A    No.  I was aware that there was no statute in

18            Ohio addressing quotas.

19      Q    You were aware -- you're telling me that in

20            spring of -- let's say in February -- I just

21            asked about February.  But by February of 2019

22            you're telling me that you were aware that

23            ticket quotas were legal in Ohio, correct?

24                      MR. CHANDRA:  Objection.

25      A    Once I had gone to the class, I believe, again,
```

```
 1          it was 36 or 38 states, you know, had some sort
 2          of law or case law on it.  So at that point in
 3          time I was aware that Ohio wasn't one of them.
 4     Q    Right.  And you were aware that quotas were
 5          perfectly legal in Ohio, correct?
 6                    MR. CHANDRA:  Objection.
 7     A    At that point in time I was aware that there
 8          was no statutory law against them.
 9     Q    Were you aware that the draft complaint in this
10          case claimed that ticket quotas were illegal?
11                    MR. CHANDRA:  Objection.
12     A    I'd have to go back and review it.  That was
13          quite a few pages quite a long time ago.
14     Q    Yeah.  That would have been a mistake though
15          and you would have known that that was a
16          mistake, correct?
17                    MR. CHANDRA:  Objection.
18     A    I have to review it --
19                    MR. CHANDRA:  Hold on.  To the
20          except that your answer starts to get into
21          confidential conversations you've had with your
22          counsel, you are instructed and counselled not
23          to answer.  Outside of communications you've
24          had with us on that topic, you're free to
25          answer.
```

```
1      A    Again, I would have to review it.  And again, I

2           have confidence in my legal team.

3      Q    That would surprise you if the draft complaint

4           sent to us in this matter claimed that traffic

5           quotas were illegal in Ohio?

6                     MR. CHANDRA:  Objection.

7      A    No, it wouldn't necessarily surprise me because

8           you said it's a draft, so obviously there are

9           going to be changes made.

10     Q    I'm going to refer to you Defendants' 34.  This

11          is an e-mail from Chief Kilbane to Leonard

12          Mazzola dated March 7, 2019.  Subject is

13          "Administration investigation."

14               Did you receive this document, this

15          e-mail?

16     A    Yes, sir.

17     Q    And this notifies you that the city has

18          basically conducted an outside firm and giving

19          you notice of an interview that you are to

20          attend on Wednesday, March 13th, correct?

21     A    Correct.

22     Q    About halfway through the first paragraph it

23          states, "These interviews will take place in

24          the council caucus room at City Hall.  You are

25          required to answer all questions completely and
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1            honestly and assist investigators with any

 2            information they request.  If you fail or

 3            refuse to forthrightly answer any and all

 4            questions asked, you may be subject to

 5            disciplinary action up to and including

 6            termination of employment with the City of

 7            Independence."

 8                 It goes on, "You are further ordered not

 9            to discuss any aspect of this administration

10            investigation with anyone other than your

11            department head or chief, attorney or

12            designated union representative, if applicable.

13            A violation of this order will be considered an

14            act of insubordination, which could result in a

15            disciplinary action against you up to and

16            including termination of employment with the

17            City of Independence."

18                 Were you aware at this point that this

19            document was referring to -- this investigation

20            was with respect to the documents provided to

21            Fox 8?

22       A    No, I wasn't.

23       Q    Okay.  When did you become aware of that?

24       A    In Bill Evans' interview on the 13th.

25       Q    Were you represented by counsel at that
```

```
 1            interview with Bill Evans on the 13th?
 2    A    No, I was not.
 3    Q    Bob Phillips was present -- or I'm sorry.  Was
 4         Bob Phillips or Sara Liva present?
 5    A    Bob Phillips was not present.  He had sent Sara
 6         Liva in some form there, I don't know, to fill
 7         in for him or to actually represent the union.
 8    Q    And your opinion is that she was the union
 9         lawyer and not your lawyer?
10                   MR. CHANDRA:  Objection.
11    A    It's not my opinion.  She was the lawyer for
12         the union.  Not mine.
13    Q    Was your union the subject of an administration
14         investigation or were you?
15                   MR. CHANDRA:  Objection.
16    A    I don't think the union was.  I don't think the
17         chief or the city or whoever was doing this was
18         going after the FOP.  So I think it was us six
19         that received this letter that obviously we're
20         a target of the investigation.
21    Q    Right.  And Sara was there -- Sara was there to
22         accompany you into the meeting, correct?
23    A    No, that's not correct.  Sara was there
24         representing the FOP.  I attempted to obviously
25         have an attorney, but I was unable to get one.
```

Leonardo Mazzola

275

```
 1     Q    What efforts did you make between March 7th and

 2          March 13th to secure your own attorney?

 3     A    I had placed a phone call to Attorney Henry

 4          Hilow.

 5     Q    How do you know Attorney Henry Hilow?

 6     A    I had called a couple guys with the Cleveland

 7          Police Union and they recommended Henry and I

 8          tried to get ahold of him.

 9     Q    What happened?

10     A    Got a hold of him, gave him the time, gave him

11          the location --

12                    MR. CHANDRA:  Hold on a second,

13          Mr. Mazzola.  Time, location, that's fine.  But

14          don't get into the substance of any

15          conversation you had with him.  That's subject

16          to privilege, okay.  Go ahead.

17                    MR. STRANG:   Subodh, it's your

18          client's decision with respect to that.

19                    MR. CHANDRA:  And I'm counseling

20          him on what to do, Steven, so stop it, all

21          right.

22                    MR. STRANG:   You instructed him.

23     A    Hey, guys, nothing happened.  Nothing

24          happened --

25                    MR. CHANDRA:  Mr. Mazzola, stop
```

```
 1              for a minute.  Stop for a minute, please.  I'm
 2              responsible for protecting your legal rights.
 3                   Again, I want you to be very careful not
 4              to reveal any substantive conversation that was
 5              had with Mr. Hilow about what was happening.
 6              You mentioned date and time.  You can talk
 7              about logistical issues like that.  But that's
 8              it, okay.  Thank you.  Go ahead.  You may
 9              answer.
10     A   Okay.  Yeah.  So I contacted Henry, gave him
11              the date, gave him the time, he said he would
12              be there and never showed up.
13     Q   Did you let anyone know at the interview that,
14              hey, my attorney is not here, we need to push
15              this back?
16     A   No, sir.
17     Q   Did you ask anyone if it could be postponed
18              because your attorney didn't show up?
19     A   Oh, gosh, no.  I felt bad for Bill Evans and
20              Sara.  They were are there from 6:00 in the
21              morning interviewing folks.  No, I wouldn't
22              have asked for a delay.
23     Q   Because you felt -- are you telling me you did
24              not ask for a delay because you felt bad for
25              Sara?
```

Leonard Headzog

277

```
 1    A    It was a long day for everybody.  At that
 2         point, you know, it was happening so fast and
 3         so quickly.  I didn't even know what the nature
 4         of the interview was about.  So it would have
 5         been obviously problematic to try to delay it
 6         for an attorney that had already not responded
 7         or not shown, I should say.
 8    Q    But you don't know that because you never
 9         actually talked to anyone about it, correct?
10    A    No.  I didn't tell Bill -- I only talked to two
11         people, Bill and Sara, and I didn't tell them,
12         hey, my attorney did not show.
13    Q    Is attorney -- is it Kilow?
14    A    Hilow.
15    Q    Hilow.  Is he a criminal defense lawyer?
16    A    I'm not sure what his area of specialty is, but
17         I know he works a lot with the Cleveland Police
18         Union representing people.
19    Q    Did you discuss this investigation with anyone
20         other than your department head, attorney or
21         designated union representative?
22                   MR. CHANDRA:  Objection.
23    A    No.  I was unaware of what the investigation
24         was about, so I didn't discuss it with anybody.
25    Q    Did you bring any documents to the interview?
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1    A   Yeah.  I had my notebook of stuff.

 2    Q   Well, didn't you tell me you provided a

 3        document to Bill Evans at that interview?

 4    A   I did yes.

 5    Q   What document did you provide Bill Evans with?

 6    A   The one he was missing.  He was there

 7        investigating the Fox 8 story, of which two of

 8        them appeared on TV, and he was missing one

 9        document.

10    Q   And you just happened to have that document

11        with you?  Is that what you're telling me?

12    A   Yes, it was in my file.  It was a September

13        25th one.

14    Q   Okay.  Let me get this straight.  Before the

15        interview -- before sitting down at this

16        interview with Bill Evans, you're telling me

17        that you had no idea what he was there to talk

18        to you about, correct?

19    A   Correct.

20    Q   During the course of this interview you

21        apparently learned that he was there to talk to

22        you about some Fox 8 story, correct?

23    A   Right in the beginning he laid out what we were

24        there for, yes, sir.

25    Q   And that came as a surprise to you?
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1    A   It did.

 2    Q   Yet nonetheless you happened to have a document

 3        with you that was directly related to what he

 4        was investigating that day and it just happened

 5        to be in a binder that you brought with you

 6        that day, correct?

 7    A   I brought that thing literally everywhere I

 8        went.  It's a pretty large blue binder and had

 9        all kinds of stuff in it that I would keep.

10    Q   Why did you have -- why were you walking around

11        with a binder with these documents from the

12        Fox 8 story?

13    A   Those documents were -- they're not Fox 8

14        documents.  Those were documents dating, you

15        know, all the way back, gosh, two and three

16        years in some cases.

17    Q   And you believe that document that you had on

18        you at the time and you provided to him was

19        important enough to just be carrying around

20        with you that day?

21                 MR. CHANDRA:  Objection.

22    A   I think we're having a miscommunication,

23        Mr. Strang.  I had a document -- a big three

24        ring binder that I had all kinds of documents

25        in literally from, like I said, three years
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1          ago.  So I didn't know what the interview was
 2          about, so I brought along, you know, what I
 3          had, which included -- when I went in there I
 4          thought it was for a Facebook post that was
 5          made, and I had those as well, so I brought it
 6          in with me.
 7     Q    I thought you didn't have Facebook?
 8     A    I don't.  It was brought to my attention by one
 9          of the guys and they printed off screen shots
10          of some garbage that somebody had posted on a
11          fake Independence website -- Independence
12          police website or Facebook page or whatever you
13          call it.
14     Q    You were given a Garrity warning at this
15          interview on the 13th, correct?
16     A    Correct.
17     Q    I'm going to refer you to Defendants' Exhibit
18          35.
19               Mr. Mazzola, is this your signature on
20          this document?
21     A    Yes, sir.
22     Q    And you understood -- you understood that the
23          information obtained during that hearing could
24          not be used against you in any criminal
25          proceeding, correct?
```

```
1    A    After the Garrity was given, correct, yes.

2    Q    And had those statements -- has any information

3         that you gave that day been used against you in

4         any criminal proceeding?

5    A    No, sir.

6    Q    You were -- this document on the third

7         paragraph says, "You are further ordered not to

8         discuss this internal investigation with anyone

9         other than your chain of command or attorney,

10        including but not limited to, witnesses or

11        perspective witnesses."  Do you see that?

12   A    I do.

13   Q    Okay.  It says nothing about your -- it says

14        nothing about union attorney, correct?  It says

15        "Your attorney," correct?

16   A    It says "attorney."  Not "your."

17   Q    It says, "Your chain of command or attorney."

18        Do you see that?

19   A    Yeah, I see that.

20   Q    And Sara Liva was sitting there with you when

21        you signed this document, correct?

22   A    Correct.

23   Q    Was she physically with you during the

24        interview?

25   A    Yeah.  Sara was there and she was sitting to my
```

```
 1          left.

 2     Q    Was she sitting right next to you?

 3     A    I believe like two chairs away.

 4     Q    Who was sitting next to you?

 5     A    Nobody.  It was just me, Sara and then Bill

 6          Evans.

 7     Q    What happened after that initial -- or after

 8          that interview on the 13th?

 9     A    I'm sorry, what specifically can I address for

10          you?

11     Q    Yeah, let's actually scratch that question.

12               Did Sara Liva tell you at the

13          hearing -- did she give you any advice?

14     A    I don't believe -- there was a discussion

15          between Sara and Bill about the whole Garrity

16          thing and that went on, boy, it seemed like

17          forever back and forth with that.  She didn't

18          give me any like advice directly to me.

19     Q    Would I be safe in saying she was discussing

20          the -- was she acting as your advocate during

21          that interview?

22                    MR. CHANDRA:  Objection.

23     A    Again, she was there representing the union, so

24          I really cannot answer who was looking out for

25          me specifically.
```

Leonard Mazzola

```
 1     Q    Is it your opinion that no one was looking

 2          after you at that interview?  Is that what

 3          you're claiming?

 4                    MR. CHANDRA:  Objection.

 5     A    I'm claiming my attorney that I had arranged

 6          unfortunately no showed me, so I didn't have

 7          anyone there representing Lenny Mazzola.  I had

 8          a union attorney representing the FOP, which

 9          I'm a member of.

10     Q    And she was specifically talking to the

11          interviewer about that Garrity thing that you

12          signed, correct?

13     A    Yeah.  That was chaos to begin with.  Bill

14          Evans was talking to chief and Letitia while

15          Sara was talking to Bob and their heeds all

16          came together and then decided on Garrity.

17     Q    He called Bob Phillips during that hearing,

18          correct -- or during that interview?

19     A    You broke up.  Who called Bob Phillips?

20     Q    Did Sara call Bob Phillips?

21     A    Yeah.  Sara called Bob at the direction of

22          Bill, I believe, and then Bill called the chief

23          or Letitia on his side.

24     Q    What did they discuss?

25     A    I don't know the discussion between Sara -- I
```

Leonardo Maldonado

```
 1          think Sara stepped out of the room maybe and

 2          then I went back out in the hallway to wait, so

 3          I'm not sure if Bill -- I'm not sure who Bill

 4          talked to, whether it Letitia or the chief or

 5          both.

 6     Q    Did Sara advise you to sign or not sign the

 7          Garrity statement that we just saw?

 8     A    She worked out with Bill that this was a

 9          Garrity-type interview.  And I'm aware of

10          Garrity and aware or Miranda.  So once Garrity

11          was put in front of me, then I signed it and

12          Sara was just a witness at that point.

13     Q    Yeah, but did Sara say you should sign this or

14          not sign this to you at any point?

15                    MR. CHANDRA:  Objection.

16     A    I don't know if she did, but obviously that was

17          the prudent thing to do at that point would be

18          to sign a Garrity in that situation.

19     Q    Do you believe you were under -- did you have a

20          difficult time understanding what was going on

21          with this hearing at the time?

22     A    Well, yeah.  Like I said earlier, I didn't know

23          what it was about.  Bob Phillips had no idea

24          what it was about.  He had contacted Greg

25          O'Brien, Greg O'Brien didn't inform him that he
```

285

```
 1              knew anything about it, so we walked in there
 2              kind of blind.  And when I found out what it
 3              was about -- and Bill Evans started with
 4              criminal.  He said there was a possibility that
 5              this was going to be criminal.  Obviously I
 6              was, you know, pretty stressed out to hear that
 7              especially since my attorney didn't show up.
 8        Q     Did Sara advise you to sign that Garrity form
 9              after talking to Bob Phillips?
10        A     Yeah, specifically I can't recall.  I would
11              have -- I'm telling you just what I would have
12              done.  I know obviously Garrity is something
13              you should sign.  I can't recall, Steven, I'm
14              sorry.
15        Q     That's the answer --
16        A     Mr. Strang.  I'm sorry.
17        Q     Did you ever talk to Sara there?  Did you ask
18              her, hey, do I have to be here?  Can I get out
19              of this?  What's going on?  What are my rights
20              under the collective bargaining agreement?  Did
21              you have any discussions with her at the time?
22                        MR. CHANDRA:  Objection.
23        A     No.  Again, Sara was a couple seats away from
24              me.  She had just sat threw everybody else.
25              There was a discussion about Garrity and then
```

Leonardo Maldonado

286

```
 1            at the end there was a discussion about

 2            polygraph testing and whether or not it was

 3            allowable.  I believe Sara again called Bob and

 4            I think -- I forget the legal language, but

 5            basically it was unaddressed or something like

 6            that.  It was nonstated in the CBA, so then

 7            they moved forward with that.

 8       Q    Okay.  And again, that's not what I asked you.

 9            I asked you specifically whether -- I asked

10            whether you asked Sara any questions about your

11            rights under the CBA before the interview?

12       A    No.  And I'm sorry, I don't mean to confuse the

13            issue.  No, I didn't ask Sara for advice on how

14            to proceed.

15       Q    Did you have any discussions Bob Phillips or

16            Sara Liva between March 13th and March 16th?

17       A    Yeah.  I believe -- I'm not sure of the dates,

18            but there was contact made with Bob Phillips,

19            Chuck Wilson and I.  Chuck Wilson had set up

20            something to contact Bob.  And then I had

21            texted -- Bob Phillips got sick, so I had text

22            messaged Sara Liva back and forth a few times.

23       Q    You directly text messaged Sara Liva?

24       A    Yes, sir.

25       Q    Why did you text message Ms. Sara Liva?
```

Leonardo Maldonado

287

```
 1    A    She was trying to fill me in on what was going

 2         on because Bob Phillips was sick and was kind

 3         of unable to proceed for the union.

 4    Q    Okay.  Well, why would you be texting with an

 5         attorney -- why would you be texting with Sara

 6         Liva?  You keep saying she was this union

 7         attorney, she was representing the union, you

 8         were unrepresented.  Why were you then sending

 9         text messages to her?

10              MR. CHANDRA:  Objection.

11    A    Again, because Bob Phillips was ill.  And then

12         Chuck Wilson was trying to get ahold of Bob.

13         And I believe Bob was actually in the hospital,

14         but don't quote me on that.  So then he was

15         saying to directly get ahold of Sara to figure

16         out what was going on.

17    Q    Yeah.  But you were essentially texting with

18         Sara because Bob was in the hospital, correct?

19    A    I was texting with Sara because Chuck Wilson

20         told me that Bob was ill.  I never talked to

21         Bob or knew anything about Bob's condition.

22    Q    And you were texting Sara so she could provide

23         you with advice, correct?

24              MR. CHANDRA:  Objection.

25    A    No.  No advice.  I was asking her for an update
```

CADY REPORTING SERVICES, INC. 216-861-9270

Leonard Mazzola

288

```
 1            on what was going on.
 2                         MR. STRANG:   Okay.  Let's show
 3            the witness Exhibit 45.
 4    Q    Mr. Mazzola, are these the text messages that
 5         you're referring to that were sent between
 6         yourself and Sara?
 7    A    Yes, they appear to be.
 8    Q    When were these exchanged?
 9    A    I'm looking for a date.  So that would have
10         been -- I think those would have been -- Bob
11         was sick, so I think that would have been
12         sometime between the polygraph and when I went
13         ahead and was forced to retire.
14    Q    So these are after then -- these are after the
15         polygraph, correct?
16    A    I think so.  Just because I remember actually
17         being up here when I was texting her because it
18         was my kid's spring break and we were -- we had
19         planned to come up here for spring break, but
20         obviously that was pretty much ruined, but I
21         was still up here by myself.  So after the
22         20th, but before, say, the 28th or so.
23    Q    Okay.  And I just want to direct you to the
24         second document.  It says 1381.
25    A    Could you make -- there you go.  Thank you.
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1    Q   And is that -- can you identify which of
 2        those -- so it looks like a text message chain.
 3        Could you identify which of those are you and
 4        which of those are Sara?
 5    A   I'm the one that says, "Wow.  So I guess that's
 6        that.  What are my options."
 7    Q   That's you sending Sara a message asking Sara
 8        what your options are, correct.
 9    A   Yes.  I wrote the "Wow.  So I guess that's
10        that.  What are my options."  I don't have
11        color on here.  The other ones to the left is
12        Sara.
13    Q   Yeah.  So what efforts did you make after that
14        interview on March 13th to secure your own
15        attorney?
16    A   I called Henry Hilow a few times.
17                    MR. CHANDRA:  Objection.
18        Objection.  Again, I'm counseling you not to
19        get into any substantive discussion you may
20        have had with Hilow or any other attorney,
21        okay.  You can answer about efforts to contact
22        somebody, but that's it.  No substance of the
23        conversation.  Thank you.
24    Q   What efforts did you make to secure legal
25        counsel after that March 13, 2019 interview?
```

290

```
 1    A    I had called Mr. Hilow basically to find out
 2         what happened, where he was.  And he got back
 3         with me a couple days later.  I remember him
 4         leaving a message and said he was tied up with
 5         another case.  So then I asked him if he would
 6         be willing to get involved with me at this
 7         point and he said that he didn't have enough
 8         time.  He was going to possibly refer me to his
 9         partner, I forget his partners name, but that
10         he would get back to me.  And then obviously I
11         ran out of time because this just went so fast
12         to get -- I believe he was actually calling
13         me -- I believe he actually called me the same
14         night that Bob Phillips was calling me to tell
15         me that the city was going to demote me to
16         patrolman and put me on the Brady-Giglio list.
17    Q    That was after the polygraph test, correct?
18    A    Yeah.  That would have been Wednesday of that
19         final week there.
20    Q    Okay.  You're saying that this is moving so
21         fast, but you got the first notification on
22         March 7th that you were going to be subject to
23         an interview on March 13th, correct?
24    A    Correct.
25    Q    And then after that interview you got a notice
```

```
 1            on March 16th telling you that you would be

 2            subject to a polygraph test on March 20th,

 3            correct?

 4      A     I'm not sure on the 16th date but the 20th is

 5            accurate, yes.

 6      Q     So you had 13 days in between those two events

 7            to secure your own counsel and you did not do

 8            so, correct?

 9      A     I secured counsel, however, he didn't show up

10            on the 13th.  So I made a phone call and

11            unfortunately he didn't get back to me in time

12            for the polygraph.  And then talked to him

13            after the polygraph, but before the forced

14            retirement.

15      Q     And he never got -- and it didn't pan out,

16            correct?

17      A     Correct.  No, I never hooked up with him.

18      Q     Did you ever ask Bob Phillips or Sara Liva,

19            Hey, can you refer me to a lawyer?

20      A     I did not.

21      Q     Isn't it true that you did not make any other

22            efforts to secure other counsel because you

23            were perfectly satisfied with Bob Phillips and

24            Sara Liva representing your interests?

25                        MR. CHANDRA:  Objection.  Asked
```

Leonardo Marazzo

292

```
 1            and answered every which way to Sunday.

 2                   Can we move to other topics or are you

 3            going to keep asking the same question?

 4                        MR. STRANG:   It's a different

 5            question.

 6                   Can you repeat the question, Tracy?

 7                              -  -  -

 8                        (Record was read.)

 9                              -  -  -

10      A    No, sir.

11      Q    You were told --  I'm going to show you Exhibit

12            37.  And it's a March 16, 2019 e-mail from

13            Kilbane to you.  And you were -- the third

14            paragraph, "You are further ordered not to

15            discuss any aspect of this administrative

16            investigation with anyone other than your

17            department head or chief, attorney or

18            designated union representative, if

19            applicable."

20                   You received those instructions from

21            Chief Kilbane, correct?

22      A    Correct.  I received this letter, yes, sir.

23      Q    Did you have any discussions with anyone other

24            than your department head or chief, attorney or

25            designated union representative about the
```

```
1        investigation?

2    A   That would have been in between first

3        interview and -- so, yeah, I talked to Sara.  I

4        talked to Chuck Wilson a lot.  But, no, other

5        than that, no.  My family, I told my family

6        what was going on.

7    Q   You did talk to Sara Liva, correct?

8    A   I believe one time.  We either talked -- Chuck

9        was running things, so we either talked to Sara

10       or Bob during that week from interview to the

11       polygraph.

12   Q   Did you ask Sara or Bob whether you had to sit

13       for that polygraph?

14   A   Again, Chuck Wilson and I believe -- I can't

15       remember the legal term -- they said something

16       that since it wasn't addressed in the CBA that

17       I would have to.

18   Q   Okay.  I'm going to show you Defendants'

19       Exhibit 36.  I'm sorry.  38.

20           Did you have a discussion with anyone

21       working at your home about this investigation?

22   A   This is --

23   Q   Yeah.  I'm going to show you an e-mail from

24       Anthony Togliatti to Michael Kilbane where he

25       states, "An employee came into my office in
```

```
 1          confidence on Monday morning, March 11th

 2          because he wanted to share concerns about a

 3          conversation he had with another employee over

 4          the weekend.  He thought I needed to know what

 5          was said.  This person said there was a big

 6          investigation going on in his department and if

 7          things go bad he had information that could

 8          bury the Mayor."

 9                    MR. CHANDRA:  Steve, could you

10          show the whole exhibit?  Maia, if you could

11          scroll up a little bit.

12                    MR. STRANG:   That's the whole

13          exhibit.

14                    MR. CHANDRA:  Okay.  Thank you.

15          Go ahead.

16     Q    Do you know who this employee was?

17     A    Yes, I'm aware of the employee that went to the

18          mayor that morning.

19     Q    Who is he?

20     A    Rich Crane.

21     Q    Did you tell Rich Crane that there was a big

22          investigation going on in your department and

23          that if things go bad you had information that

24          could bury the mayor?

25     A    No, sir.
```

Leonardo Mazzola

295

```
 1      Q   Do you know why Rich Crane would have said that
 2          to the mayor?
 3      A   Rich and another guy had come to my home that
 4          Saturday and they were putting in a hot water
 5          tank for me.  And I was there about 10 minutes
 6          and then I had a leave for side jobs.  I
 7          remember Rich, you know, bringing stuff up and
 8          asking me why I wasn't acting as myself.  I
 9          told him there was an investigation going on, I
10          couldn't talk about it, but basically I would
11          be okay because, you know, I didn't have
12          anything to do with anything.  And I left and
13          went to my side jobs.  He stayed at home --
14      Q   Did you tell him that you had information that
15          could bury the mayor?
16      A   I did not.
17      Q   I'm going to show you Defendants' Exhibit 39.
18              Mr. Mazzola, this is a letter that Sara
19          Liva sent to Bob Phillips.  You're CC'd on this
20          letter.  Did you actually receive a copy of
21          this?
22      A   Could you blow it up for me, please, so you can
23          read through it?
24              Okay.  Your question on it?
25      Q   Did you receive a copy of this?
```

```
 1                    MR. CHANDRA:  Can you please show

 2          the whole document.

 3                    MR. STRANG:   Can you please

 4          what?

 5                    MR. CHANDRA:  Show the whole

 6          document.

 7                    MR. STRANG:   Subodh, you should

 8          have all these exhibits.  We sent them over to

 9          your office.

10                    MR. CHANDRA:  I know, but you're

11          only showing a snip-it of it to the witness and

12          that's not fair.

13                    MR. STRANG:   Well, I can do what

14          I want with these documents and you can object

15          if you want.  But you have all these documents.

16          You've seen these 50 times.

17     Q    Mr. Mazzola --

18                    MR. CHANDRA:  Mr. Mazzola --  just

19          a minute, Steve.

20               Mr. Mazzola, unless you see the entire

21          document, please don't answer any questions

22          about it.

23                    MR. STRANG:  Absolutely do not

24          instruct my witnesses -- do not make that

25          instruction, Subodh.  You're delaying today's
```

Leonardo Mazzola

297

```
 1          deposition.
 2                       MR. CHANDRA:  No.  You're showing
 3          a microscopic version of this document on the
 4          screen now.  It's not visible.
 5                       MR. STRANG:   I can do whatever I
 6          want with these documents and you can object.
 7          That's how depositions work.  So I'm going to
 8          go on with my questioning.
 9     Q    Mr. Mazzola, I understand that you testified
10          that you did receive a copy of this document,
11          correct?
12                       MR. CHANDRA:  Please show the
13          whole document, Mr. Strang.
14                       MR. STRANG:   You've objected.
15          That's what we're doing.
16                       MR. CHANDRA:  Hold on a second.
17          Mr. Strang, be a professional.  In a normal
18          deposition when we're all sitting together
19          around a table we get the whole document handed
20          to us and we're able to flip through it and
21          look at it.  You're now just showing like a
22          third of the first page of the document.  And
23          then when I asked you to show the whole thing,
24          you zoomed out so far that there were multiple
25          pages that were ineligible.  That's absurd and
```

```
1              unfair.  Be a professional and let Mr. Mazzola
2              look at the whole document before he answers
3              questions about it.  It's only fair.
4                          MR. STRANG:    Subodh, this is a
5              Zoom deposition.  You know that I would prefer
6              to show him the whole document, but I'm not
7              going to let you run the time out on my
8              deposition by --
9                          MR. CHANDRA:   In a Zoom
10             deposition we are required and expected by the
11             court to be fair to each other and to
12             accommodate each other.  So I'm asking you as a
13             professional, please accommodate my request.
14             And even the witness is pointing his finger now
15             and asking you to show him the whole document,
16             so would you do that, please.
17                         MR. STRANG:    Subodh, I've made
18             my stance on this clear.  I can ask my
19             questions.  I sent you these documents
20             beforehand and that if he --
21                         MR. CHANDRA:  Last night.
22                         MR. STRANG:    -- has questions, I
23             can answer those for him, but I'm not going to
24             let you run all the time out of my deposition.
25                         MR. CHANDRA:   Mr. Cook, how much
```

Leonardo Mazzola

299

```
 1          time is left on the deposition please?

 2                          VIDEOGRAPHER:  We are at 638.

 3                          MR. CHANDRA:   Mr. Mazzola, I'm

 4          counseling you not to answer questions about a

 5          document that Mr. Strang won't show you in its

 6          entirety, okay.

 7                          MR. STRANG:  We're going to go

 8          off the record right now.  You're not blowing

 9          all the time out of my deposition.  I want to

10          talk to Alex about this time requirement.

11                          VIDEOGRAPHER:   Off the record

12          the time is 6:03.

13                              -   -   -

14                          (Off the record.)

15                              -   -   -

16                          VIDEOGRAPHER:  Back on the

17          record.  The time is 6:14.

18                          MR. STRANG:    Alex, can you

19          play Exhibit 58 for Mr. Mazzola?

20                          -   -   -   -   -

21              (Thereupon, a recording was played.)

22                          -   -   -   -   -

23      Q   Mr. Mazzola, I've just played you an audio

24          excerpt.  Is that a discussion between yourself

25          and the individual who is administering the
```

Leonardo Mazzola

```
 1        polygraph examination?
 2                        MR. CHANDRA:  Objection to the
 3        use of the excerpt.
 4    A   Yes, sir.  I believe -- I forget his name, but,
 5        yeah, that was me and the polygragher doing the
 6        test.
 7    Q   And you were recording that conversation on
 8        your cell phone, correct?
 9    A   I had my phone going.  I got undressed and I
10        didn't have anything on me, but my phone was
11        still going in the corner of the room.
12    Q   I'm going to refer to you Exhibit 42.
13            Mr. Mazzola, where was Sara Liva standing
14        during your polygraph examination?
15                        MR. CHANDRA:  Objection.
16    A   I don't know where she was standing.  She
17        wasn't allowed to be with me.
18    Q   And you believe that she was prohibited from
19        being with you during the examination; is that
20        correct?
21    A   No.  I mean, I know it was just me and the
22        gentleman doing the test in the room.
23                        MR. CHANDRA:  Mr. Mazzola, your
24        response broke up for me.  Could you please
25        repeat it.
```

```
 1      A    I said, no, I know that to be a fact that she

 2           was -- it was just me and the polygraph

 3           technician in the room.  She was not allowed to

 4           be with me.

 5      Q    Between your polygraph and the end of March

 6           2019, did you have any direct discussions with

 7           anyone from the City of Independence about your

 8           polygraph examination or what the city intended

 9           on doing with respect to the results from your

10           polygraph examination?

11      A    So the dates are after the poly but before I

12           was forced to retire?

13      Q    Correct.

14      A    Well, right after the poly -- I'm sorry, you

15           asked if I talked to anyone.  Right after the

16           poly --

17      Q    With the City of Independence.

18      A    Okay.  Chuck Wilson.  And then I talked to Greg

19           Kurtz.  I'm not sure if it was the day before

20           or the day of my e-mail that I had to put into

21           the city.

22      Q    Current mayor, Greg Kurtz?

23      A    Correct.

24      Q    He was not actually employed by the City of

25           Independence at the time, correct?
```

```
 1    A   No.  He was ex-mayor then at that point.
 2    Q   Okay.  So that's not what I'm asking you.  I'm
 3        asking you whether you had any direct
 4        discussions with anyone at the City of
 5        Independence during that time period.
 6    A   I apologize for that.  I obviously think of him
 7        as with Independence.  So it would just be
 8        Chuck Wilson, Bob Phillips, of course, on that
 9        Wednesday.  And that's all I can recall right
10        now.
11    Q   Did anyone ever tell you that the city was
12        planning on taking -- was planning on firing
13        you or trying to demote you?
14    A   Yeah.  Chuck Wilson and I spoke and Chuck
15        Wilson informed me of that.
16    Q   What did Chuck Wilson tell you?
17    A   Again, Chuck Wilson was the union rep and he
18        was kind of the go between to Bob Phillips.
19        And he informed me that the city was going to
20        be demoting me down to patrolman and putting me
21        on a Brady-Giglio list.
22    Q   Well, the city couldn't actually do that
23        without a whole host of proceedings under your
24        CBA, correct?
25    A   I wasn't too advanced on the inner workings of
```

Leonard Mazzola

303

```
 1        the CBA, so I'm not sure how that would have

 2        worked.

 3   Q    But you had Bob Phillips to consult with,

 4        correct?

 5   A    No, sir.  Bob was sick.  My talking as far as

 6        the union goes was going through Chuck Wilson.

 7        Chuck Wilson actually received -- Bob Phillips

 8        called Chuck Wilson and then Chuck Wilson

 9        called me.

10   Q    I'm going to show you Defendants' Exhibit 42,

11        specifically Defendants 325 to 326.

12             Mr. Mazzola, is that an e-mail that you

13        sent to Bob Phillips?

14   A    Yeah.  I'm just getting the bottom portion of

15        this.  Is there a way to see the whole chain,

16        please?

17   Q    What do you want to see?

18   A    I just want to make sure we're talking about

19        the same page.

20   Q    So let's look at 325 and 326?

21   A    Okay.  If you can go back up to 325 and go down

22        from there.

23   Q    Okay.  At this point you were sending e-mails

24        to Bob Phillips essentially outlining what you

25        wanted to do, correct, directly to Bob
```

Leonardo Maldonado

304

```
 1        Phillips?

 2   A    Yeah.  If you could go -- whoever is

 3        controlling this, if you could go up a little

 4        bit to 325.

 5   Q    And Bob Phillips was acting as the go between

 6        between yourself and the city, correct?

 7                   MR. CHANDRA:  Objection.

 8   A    Yeah.  So starting with this one on March 28 at

 9        1:12, yeah, that's -- no, that's not from me,

10        that's to Greg O'Brien.

11   Q    I'm not asking for a running commentary on all

12        these e-mails.  I'm asking you just in general,

13        Bob Phillips was acting as the go between

14        between you and the city, correct?

15                   MR. CHANDRA:  Objection.

16   A    Bob contacted me on that Wednesday and then,

17        yeah, I believe this was Thursday.  These

18        things were going on.  And he was, I believe,

19        just talking to Greg O'Brien.  I'm not sure who

20        else was involved with the city.

21   Q    Why do you believe you were forced retire?

22   A    Facing an option of being demoted down to

23        patrolman and placed on a Brady-Giglio list was

24        no choice at all.

25   Q    So you believe that retiring was your best
```

```
 1        option at this point?
 2                      MR. CHANDRA:  Objection.
 3   A    No.  My best option would be to stay at the
 4        City of Independence working in my role as
 5        lieutenant like I had been doing.
 6   Q    I thought you just said that you did not
 7        believe that you had any option at this point.
 8        You did retire though, correct?
 9   A    Oh, yeah, obviously I submitted my retirement
10        e-mail to Mayor Togliatti.  And at that point
11        facing the demotion down to a patrolman and
12        placed on a Brady-Giglio list, I had to make
13        the best decision for my family, for my
14        pension, for my kid's future at that point.  So
15        there was really no option at all.  I was
16        forced to take option B.
17   Q    Well, Mr. Mazzola, you know that you wouldn't
18        have risked losing your pension even if you
19        were terminated, correct?
20                      MR. CHANDRA:  Objection.
21   A    At the time with all the talk of whether or not
22        Garrity or Miranda applied and based on, you
23        know, talking in depth with Chuck Wilson, we
24        weren't sure if this was going to transgress
25        into a criminal investigation if the civil or
```

Leonardo Mazzola

306

```
 1            Garrity didn't work out.  So with that, if I
 2            got convicted of criminal, then my pension
 3            would be affected.
 4                 Mr. Strang, during this last break that
 5            we just had I actually checked my e-mail and I
 6            was informed that at 9:20 this morning my gmail
 7            account was attempted to get hacked into.  And
 8            obviously I was talking to you, so I'm not
 9            accusing me or you, but at 9:20 this morning
10            somebody tried to get into my gmail account.  I
11            wish I saw it earlier, but I'm asking you now
12            just to double check with everybody who is on
13            this Zoom that they're using a secure device
14            because that was right after I told you I had a
15            gmail account and I had given you my e-mail, so
16            I don't know if there was a way to address
17            that, but I would appreciate it.
18       Q    Did you go over your collective bargaining
19            agreement with Bob Phillips or Sara Liva?
20       A    I'm sorry, did that come through about my gmail
21            account?
22       Q    It did.  I'm asking you a question as to
23            whether you actually went through your
24            collective bargaining rights with Bob Phillips
25            or Sara Liva.
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1    A    Okay.  We didn't even have a copy of the

 2         contract that day of the interview.

 3    Q    Well, I'm asking whether you had any

 4         discussions with Bob Phillips or Sara Liva

 5         about your collective bargaining rights as an

 6         employee?

 7    A    Not with Sara.  Bob Phillips mentioned

 8         that -- again, I'm not quoting him -- but

 9         basically, Hey, Len, we can fight this.  It's

10         going to take a long time, anywhere from four

11         to six months up to maybe even a year, and we

12         would have to get the union board to approve my

13         legal fees to fight it.  But as far as -- that

14         was really about the procedure of like trying

15         to go against this, I guess, or grieving this,

16         if you will.

17    Q    You decided you didn't want to go down that

18         route, correct?

19    A    Well, considering what I was looking

20         at -- again, I was thinking of obviously trying

21         to protect my family, trying to protect my

22         pension, so there was really no choice at all.

23         I had to protect my kids and my family and my

24         home, regardless of what happens with my wife

25         and I and my kids and I, so I made that
```

```
 1              decision based on not having any decision in my
 2              head whatsoever.  Plus the stigma of being on a
 3              Brady-Giglio list, I mean, that's like
 4              blackballing a college team from the playoffs.
 5              You know, how could I have executed my job
 6              being on a list like that?
 7         Q    So -- and again, you decided that you did not
 8              want to go through that, correct?
 9                        MR. CHANDRA:  Objection.
10         A    I decided to take option B and work with Bob
11              and Greg O'Brien, who I thought highly of, to
12              go ahead and work this out and, you know, take
13              the forced retirement.
14         Q    Well, it was actually a decision that you made
15              to retire, correct?  You did have -- you could
16              have -- A, you could have fought this; B, you
17              could have retired.  And you chose to take
18              option B, correct?
19                        MR. CHANDRA:  Objection.
20         A    I was backed into option B.  There was no
21              choice at all.
22         Q    I understand that you apparently think that you
23              had no choice, but in reality, you did -- under
24              the CBA you did have a choice and Bob Phillips
25              told you that you could fight this, correct?
```

CADY REPORTING SERVICES, INC. 216-861-9270

```
 1                    MR. CHANDRA:  Objection.
 2    A    Yeah.  Bob Phillips told me that it would be an
 3         immensely up-road battle and that it would
 4         take, like I said, four to six months to a year
 5         to accomplish and -- something just happened to
 6         my screen -- and that you guys would -- you
 7         know, as far as fighting it, it would take
 8         quite a long time and that they were looking
 9         for me to retire instead.
10    Q    So you chose to retire?
11                    MR. CHANDRA:  Objection.
12    A    I don't think it was a choice at all.  I had
13         option B in front of me to protect my family
14         and to, you know, protect my pension.  So,
15         yeah, I chose option B.
16    Q    You specifically signed a Garrity form saying
17         that they could not bring any criminal charges
18         against you though, correct?
19                    MR. CHANDRA:  Objection.
20    A    Yeah.  The way I understood that in talking
21         with Chuck Wilson -- and I'm sure -- I'm not
22         sure who he had talked to, but once the Garrity
23         and the administrative investigation was over,
24         then they would actually be able to use the
25         same evidence to bring it up again in a
```

```
 1            separate criminal case; and then if my criminal
 2            case was successful, then I would lose my
 3            pension.
 4       Q    Did you -- is that your belief sitting here
 5            right now?
 6                       MR. CHANDRA:  Objection.
 7       A    What's my belief?
 8       Q    This is your belief sitting here right now that
 9            you would have lost your pension?
10                       MR. CHANDRA:  Objection.
11       A    I'm not 100 percent, but I know that if an
12            officer is convicted of a criminal offense that
13            the pension then comes in play.  And also, to
14            be demoted down to patrolman would have a
15            pretty drastic effect on my accrued time
16            because it was -- I think 27 percent difference
17            in pay.
18       Q    Did you have any discussions with any other
19            lawyers after the polygraph examination?  Or
20            did you reach out to any lawyers after the
21            polygraph examination?
22       A    Yeah.  Again, I had continued to try to contact
23            Henry Hilow.  And again --
24                       MR. CHANDRA:  I'd counsel you not
25            to get into any substantive discussions.  Go
```

```
 1          ahead.
 2                      THE WITNESS:  Understood.
 3                      MR. CHANDRA:  You can finish your
 4          answer.
 5     A    Yeah.  I contacted Henry Hilow and he was
 6          unavailable and he was trying to check the
 7          availability of his partner -- and I want to
 8          say it was Spellacy, but I'm not sure.  I mean,
 9          we're talking within two days I had to be, you
10          now, know submitting an e-mail by 5:00 p.m. to
11          the mayor.  So it just went too quick to
12          accomplish getting a fill in at that point.
13     Q    Well, you had nearly a month to get another
14          lawyer, correct?  At the end of the day, from
15          that first notice you got of an interview until
16          the time you retired, that was nearly a month,
17          right?
18                      MR. CHANDRA:  Objection.
19     A    Well, again, at that point I had obtained an
20          attorney and I thought I was going to have one
21          on the 13th, however he no showed me.  And then
22          you're talking, what, 14 days later I'm on the
23          phone and I'm getting told that I'm getting
24          demoted and I'm getting placed on a
25          Brady-Giglio.  So it happened very fast, two
```

Leonardo Mazzola

312

```
 1            weeks after such a long career.  And then

 2            literally having a couple hours on Friday to

 3            hurry up, run home, gather my family and write

 4            an e-mail by 5:00, I mean, it was insane,

 5            unfairly fast.  And I didn't have really enough

 6            time to find somebody to help me out.  And you

 7            call it a choice, I don't.  I think it was no

 8            choice at all.  And here we sit today.

 9       Q    You understood that this retirement was one of

10            the more important decisions of your life,

11            correct?

12       A    Are you guys there?

13       Q    Yeah.  You understand that this retirement was

14            one of the most important decisions of your

15            life, correct?

16       A    Oh, it definitely was.  Yeah, top three, I'd

17            say as it turns out because it's had a crazy

18            impact on my life.  And I wish the city had

19            that because, again, we're talking lightening

20            speed.  Get the e-mail to me by 5:00.

21       Q    Who told you to get an e-mail to them by 5:00

22            making a decision?

23       A    Bob Phillips per Greg O'Brien.

24       Q    What did you understand would happen if you

25            didn't get that e-mail in.
```

313

```
 1                    MR. CHANDRA:   Objection.

 2              Alex, how much time is left on the depo,

 3         please?

 4                    VIDEOGRAPHER:  About 657.

 5                    MR. CHANDRA:   So about three

 6         minutes left or less.  Okay.  Go ahead.

 7         Proceed, please.

 8    Q    What did you believe would happen if you didn't

 9         get that e-mail in?

10    A    Bob Phillips relayed to me that, per his

11         conversation with Greg O'Brien, they had worked

12         out like a separate agreement -- again, I'm not

13         sure of the legal term -- but that this was a

14         separate agreement that had like stood by

15         itself and that that agreement would be honored

16         until 5:00 on Friday and that it needed to

17         happen before 5:00.  So Bob Phillips said that

18         if I didn't do it by 5:00 that that deal or

19         offer or that agreement that him and Greg

20         O'Brien worked out would be gone.

21    Q    That was well after you sent Bob Phillips an

22         e-mail saying that you had decided to retire,

23         correct?

24    A    No.  That was the next morning, next afternoon.

25         Bob was -- I guess I was in a spam folder or
```

```
 1              something.  I believe there was an e-mail that

 2              talks about that.  I didn't write anything out

 3              until, I believe, Thursday night.  I was

 4              overwhelmed by the whole situation obviously

 5              because this was getting forced on me to do.

 6              It wasn't something that I wanted to do.  So at

 7              that point in time I was trying to put together

 8              some bullet points, I think is what Bob

 9              requested, and I submitted that to him Thursday

10              evening, Thursday night I believe.  And Friday

11              I was taking my CDL test and right when we were

12              eating lunch, right around 2:00 is when I got

13              that call from Bob.  So I had less than three

14              hours to call my wife and my family to get them

15              back home and put this e-mail together.  It was

16              overwhelming.  It was incredibly stressful.

17      Q   And you were consulting with Bob Phillips

18              throughout this process, correct?

19                        MR. CHANDRA:  Objection.

20      A   No.  Unfortunately, I never spoke to Bob other

21              than on that Wednesday.  And then it was all

22              e-mail.  And like I said, I was in a spam

23              folder, so the communication was pretty rough

24              at best.  And then he called he me, you know,

25              again Friday afternoon and I had three hours or
```

```
1              two hours and some odd minutes to end my

2              career.  You know, being 50 years old -- or 49

3              at the time -- and 25, 24 years in the city was

4              just a horrible, horrible, horrible thing.

5                        MR. CHANDRA:  Okay.  The time has

6              expired now.  So we will read.

7                        THE WITNESS:  Is there a moment

8              where I could correct or update an answer that

9              I had given you earlier?

10                       MR. CHANDRA:   Yes, I'll permit

11             that time.

12                       MR. STRANG:   No, Subodh, you

13             actually already cut the deposition off.

14                       MR.  CHANDRA:  I will permit that

15             time.

16                       MR. STRANG:   I'll have

17             follow-up questions about it.

18                       MR.  CHANDRA:  Go ahead

19             Mr. Mazzola.  Go ahead and say what you wanted

20             to say.

21                       THE WITNESS:  Okay.  I had just

22             wrote down a couple things.  At the time you

23             asked the question, Mr. Strang, and I think you

24             were thinking I was like trying not answer it

25             and I apologize, I tend to ramble.  So when you
```

316

```
 1          were asking me about Mary Cox and her
 2          deposition, you know, the one thing that stood
 3          out to me was the whole discussion of the
 4          waiver and the whole discussion of her either
 5          overhearing or reporting to numerous officers
 6          who have told me about an argument between
 7          Chief Kilbane and Greg O'Brien, which occurred
 8          after our notice of litigation; and basically
 9          there was a fight over why Lenny didn't sign a
10          waiver.  So I was expecting her to -- I was
11          expecting her to tell the truth, but I
12          understand she was under a lot of pressure and
13          I understand maybe why she didn't answer that
14          in that fashion.
15               And then everything -- I think I confused
16          myself.  You asked me if -- it's when we were
17          talking about Jack Shay, you said if I had
18          talked to any other person, any other media,
19          and I just wanted to clarify I thought I was
20          answering a question about media.  The only
21          person I talked to was Jack Shay.  And then if
22          you meant did I talk to anybody else, well, the
23          answer is, of course, you know, my friends and
24          my neighbors and what have you are obviously
25          all aware of what had happened and what was
```

Leonardo Mazzola

317

```
1          going down.

2                     MR. CHANDRA:  Okay.

3                     THE WITNESS:  I don't know if

4          that matters.

5                     MR. CHANDRA:  Is that all you had

6          to say, Mr. Mazzola?

7                     THE WITNESS:  Yeah.  Again, I'm

8          not sure if it matters, but I just wanted to

9          clarify.

10                     MR. CHANDRA:   We will read.

11                     MR. STRANG:   No, no, no, no.

12         He can't give a statement at the end of his

13         deposition and not have me ask follow-up

14         questions about it.

15                     MR. CHANDRA:   He corrected his

16         testimony.

17                     MR. STRANG:   You may object to

18         it, but I'm going to ask him follow-up

19         questions.

20                     MR. CHANDRA:  Mr. Mazzola, you

21         can leave the deposition.  We are done.  Thank

22         you.

23                     MR. STRANG:   Nope.  I'm going

24         to ask some follow-up questions.

25                     MR. CHANDRA:   We're done.
```

```
1                      MR. STRANG:    You sit right
2          there.
3                      MR. CHANDRA:    You can have a
4          local 37.1 conference if you want.
5                      MR. STRANG:    You sit right
6          there.  He read a nonresponsive statement into
7          the record --
8                      MR. CHANDRA:    You can have a
9          local 37.1 conference on another occasion,
10         Steve.  We are done.
11            Mr. Mazzola --
12                     MR. STRANG:    No.  We are not
13         done.  We are not done.  He cannot put a
14         statement --
15                     MR. CHANDRA:    We are leaving.
16         You can have a local 37.1 rule conference with
17         us in the next couple of days if you want to
18         set it up and we can talk about it.  But the
19         time has expired.  You didn't use your time
20         well.  Thank you.
21                     VIDEOGRAPHER:    Off the record.
22         The time is 6:41.
23                         -  -  -  -  -
24         (Thereupon, the deposition was concluded.)
25             (Signature was reserved.)
```



320

THE STATE OF OHIO,    )    SS:
COUNTY OF CUYAHOGA.    )

     I, Tracy Lam, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that LEONARD MAZZOLA, was first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by him was by me reduced to stenotypy in the presence of said witness, afterwards transcribed on a computer/printer, and that the foregoing is a true and correct transcript of the testimony so given by him as aforesaid.

     I do further certify that this deposition was taken at the time and place in the foregoing caption specified.  I do further certify that I am not a relative, counsel or attorney of either party, or otherwise interested in the event of this action.

     IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 23rd day of July, 2020.

Tracy Lam, Notary Public
within and for the State of Ohio
My Commission expires November 12, 2022.

```
THE STATE OF                    )
                                )   SS:
COUNTY OF                       )
```

        Before me, a Notary Public in and for said

state and county, personally appeared the

above-named LEONARD MAZZOLA, who acknowledged that

he did sign the foregoing transcript and that the

same is a true and correct transcript of the

testimony so given.

        IN TESTIMONY WHEREOF, I have hereunto

affixed my name and official seal at

                                this        day of

          , 2020.

                        LEONARD MAZZOLA

                        Notary Public

My Commission expires:

Leonardo Avila zos

322

DEPOSITION ERRATA SHEET

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to:_____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

Page No. _____ Line No._____ Change to: _____

Reason for change: _____

SIGNATURE:_____ DATE:_____

**From:** Michael Kilbane
**Sent:** Thursday, January 15, 2015 2:11 PM
**To:** Police
**Subject:** personal electronic devices and recording

If any employee elects to use personal electronic devices for recording purposes while at work they may do so subject to the following provisions:

-The recordings are to be made and used only for evidentiary purposes in official police investigations

- Any recordings made while on duty shall be considered property of the police department



DEFENDANT
EXHIBIT

**EXHIBIT 03**

- All officers on scene should be notified by the recording officer that recording is being conducted. (i.e. Red light showing)

-No recordings made on-duty shall be copied, distributed, shared or posted in any manner without prior approval of the Chief or Deputy Chief

-Officers shall not record any other employees without their knowledge and consent, unless the recording is occurring during official criminal justice business and consent would not be readily available.

-No recording shall be conducted on the premises of the police station unless it is a suspect interrogation or witness interview

-The officer making the recording shall be responsible for documenting and preserving it as evidence

-These requirements shall also apply if the officer is working a uniformed side job or acting in any other official capacity as an Independence officer

_ Taping any training activity should only be done with the Instructor or Unit OIC's permission.


ALL employees should take notice **and assume** that any officer (IPD or not) working an official police matter/scene, is libel to be recording the events either visually and/or audibly.



**Chief Michael J. Kilbane**
**Independence Police Department**
**6800 Brecksville Rd.**
**Independence,  OH  44131**
**216-524-1234**

THE CITY OF INDEPENDENCE
DEPARTMENT OF POLICE

**GENERAL ORDER:** 502
**SUBJECT:** Uniform Standards
of Conduct
**EFFECTIVE DATE:** April 2, 1999
**REVIEWED:** October 1, 2017

I.  **POLICY**

To promote adherence to the Standards of Conduct through education, training, counseling, and enforcement.

II.  **PURPOSE**

To provide employees of the Independence Police Department with clear Standards of Conduct that they are expected to observe.

III.  **PROCEDURES**

A.  UNIFORM STANDARDS OF CONDUCT

1.  **Affirmatively Promoting a Positive Public Image**

Employees shall not be discourteous to members of the general public, and they shall conduct themselves (on duty as well as off duty) in a manner that does not damage or have the probable expectations of damaging or bringing the public image, integrity or reputation of the Independence Police Department into discredit or disrepute.

a.  Employees shall accept full responsibility for their behaviors and the results of their behaviors on duty as well as off duty.  Behavior that may not be considered wrong in private employment could be wrong in the public sector because of the nature of the public service mission.

Historically, citizens are quick to criticize and require that public safety employees be "right" as well as look "right" in their conduct and behavior.  Management recognizes its responsibility to balance standards of



DEFENDANT
EXHIBIT
**EXHIBIT 06**

329 of 397.  PageID #: 1434

conduct designed to promote public trust while at the same time to avoid unnecessary infringements on the employee's rights to privacy.  At the same time, employees who which to hold the honor of a public position and enjoy the privileges of public trust share an affirmative responsibility to conduct themselves (on duty as well as off duty) in a manner that does not bring public image or trust into question.  The employee's right to privacy does not create an obligation on management to finance those rights at the expense of effective, efficient, or safe operations of this department.

2.      **Aiding Other Employees**

Employees shall, during the line of duty, come to the aid of another employee when necessary.

a.      The nature of public safety work frequently requires the support, assistance and safety of other employees.  Knowing this support will be rendered in time of need promotes and maintains morale and a sense of well-being among all employees.

3.      **Alcohol Use and Related Conduct**

Employees shall not possess or consume alcoholic beverages on duty or while in uniform on duty or off duty unless authorized.  Nor shall any employee consume alcoholic beverages in proximate time to his or her reporting time for duty or report to duty with evidence of having consumed any alcoholic beverage.

a.      The consumption or possession of alcoholic beverages by public officials is high scrutinized by the public.  Improper and excessive uses of such chemicals lead to severe criticisms of this Department and of all its employees.  Because a large portion of public safety work depends on the employee's ability to evaluate critical situations and make judgments that often affect public confidence, life, liberty, and safety, it is critical that judgments be as unimpaired as practicable.  The effects of alcoholic beverages interfere with this decision making ability.

4.      **Maintaining an Acceptable Level of Availability for Work**

Each employee must maintain a satisfactory level of
availability for work during any regular reporting period.

a.      Public safety work requires team effort, and each
employee plays an important part as an employee of
the team.  Unless employees are regularly available for
duty, work cannot go on effectively or efficiently.
Excessive absenteeism causes unnecessary increases in
official operating expenses.  Employees who are
excessively unavailable for work (regardless of cause)
force others to carry their extra loads as well as tie up
job opportunities and positions for more available
personnel.

5.      **Committing or Condoning Illegal or Forbidden
Harassment**

Illegal or forbidden harassment (e.g., sex, race, religion,
national origin, ethnic, disability or age) are prohibited as a
basis for conduct, behavior, or decisions affecting another
employee's or potential employee's terms or conditions of
employment.  Employees shall not use sex, race, religion,
national origin, ethnic background, disability or age in their
words, actions, gestures, conducts or behaviors that could be
construed or perceived by another employee or potential
employee as hostile, offensive or intimidating.

a.      It is management's right and responsibility to channel,
control, and otherwise prohibit employee's behavior or
conduct that has the potential to cause employer
liability or disruption in the work force or to subject
management to civil liability for violations of en
employee's civil rights.

On-the-job or job related sexual, ethnic, racial,
national origin, or religious harassment is a serious
violation of an employee's, or potential employee's,
civil rights.

6.     **Committing Unsafe Acts or Endangering Self or Others**

Employees shall not commit acts or behave in such a manner that has the potential for endangering or injuring themselves, property, or another person.

    a.     Safe behavior in public service work is paramount due to the level of public trust and the nature of the equipment involved (e.g., firearms, motor vehicles, impact tools, chemicals, etc.).  Unsafe behavior and unsafe use and handling of equipment significantly increases the risk of injuries to citizens and personnel plus increases the risk of potential liability for this Department.

7.     **Conflicts of Interest**

Employees shall not create conflicts of interest with the duties and obligations of their positions within this Department.

    a.     Public service work requires that employees do not compromise the authority, integrity, trust, or confidence inherent in their offices.
Public safety officials have easy and often uncensored and unquestioned access to people, information, resources and positions of trust not easily available to the general citizen.  This "freedom of office" must be governed and controlled if the public trust is to be preserved.  Failure to do so will severely restrict the ability of this Department to provide its services in an effective and efficient manner.  When conflicts of interest occur between the employee's private rights as a citizen and privileged rights attributed to the employee's position with this Department, management attempts to bring about a reasonable balance, if possible.  When this balance cannot be made and the employees' interests are in promoting their own personal interests, management must initiate action designed to promote the mission of the Department.

8.     **Co-Operation with Employees and Other Officials**

Employees are required to affirmatively seek ways to cooperate and work with other employees, other public

officials, and employees of any organization with whom the employee or this Department needs to have a good working relationship in order to deliver lawful, effective, efficient, and safe services.

    a.    The need to work in a cooperative manner with employees of other agencies and public officials is self-evident.  In today's society, the effective, efficient and safe delivery of public services requires a coordinated effort of all employees and public service agencies.

**9.    Supervisors Shall Display Respect Towards Subordinate Ranked Personnel**

Supervisors shall treat subordinates with the same courtesy and respect that is required of subordinates to display to supervisors.  Criticisms of a employee or an employee's performances will be made directly to the subordinate and, when practicable, in a private setting.

    a.    Employees who are treated with respect, concern, and courtesy are typically better performers and have higher morale.  Supervisors who respect subordinates and limit criticisms to unsatisfactory work performances obtain higher levels of employee cooperation than those who direct their criticisms at the employee's person.

        Because supervisors are management's representatives, higher levels of performance are expected of them in this area; and they are expected to set a positive example for others to follow.

**10.    Discriminating or Establishing Patterns of Discrimination in the Performance of Duties**

In words, deeds, gestures, performance of jobs, duties, tasks and delivery of services, employees shall not discriminate; nor shall they establish a pattern of adverse impact in the delivery of services when such discrimination has a basis in such areas as a person's sex, ethnic background, race, color, national origin, lifestyle, preferred sexual orientation, religion, criminal history, age, disability or social status.

DFNTS_0000917

      a.      Public employees must strive to maintain neutrality in the performance of duties and delivery of services to all persons regardless of their personal characteristics social status or work conditions  Discriminatory services and treatment of all citizens creates a serious threat to the well-being of all as well as exposes this Department to the possibility of civil and/or criminal action.

**11.    Dishonesty or Untruthfulness**

Employees shall not lie, give misleading information, or falsify written or verbal communications in official reports or in their actions with another person or organization when such information may be relied upon because of the employee's position or affiliation with this Department.

      a.      Public work is based on public trust and confidence. Performance standards in this area are much higher for public employees than for the ordinary citizen.

**12.    Displaying Competent Performance and Achieving Competent Performance Results.**

Employees shall willfully display competent performance and consistently achieve competent performance results on all assigned or assumed job responsibilities, duties and tasks.

      a.      In a public safety organization where much of the work effort involves citizens' liberties and physical safety, incompetent performance cannot be tolerated.  When incompetent performance is discovered, its source must be dealt with effectively and efficiently or the potential of damage or injury exists.  When this potential occurs, the organization runs the risk of incurring severe criticism, the loss of public trust and the creation of civil liability.

NOTICE:  As the term is used here, **competency is a characteristic of a performance outcome, not a characteristic of an individual.**

      Employees are hired to achieve results; and if an employee brings about an acceptable performance outcome, he or she has displayed the ability to apply his or her combination of knowledge, skill, and attitude

within the context of the situation to bring about a
useful outcome for the organization.  Knowledge, skill,
and attitude are useless to the organization if the
employee is unable to apply them in a productive
manner.

13.   **Establishing Patterns of Absenteeism**

Employees shall not establish patterns of absenteeism.
Establishing a pattern of absenteeism is a violation of official
standards regardless of whether any part of the absenteeism
within the pattern has been approved or disapproved by
management.

a.      All absenteeism affects the effective, efficient, and safe
operations of this Department.  The nature of public
safety/security work requires a cadre of workers
capable and ready to handle any established or
expected service demanded by the public.  Public
personnel have specialized and specific training that
cannot be easily replaced or substituted by other
persons, and replacement or substitutions are usually
difficult for management.

Management accepts the fact that a certain amount of
"planned absenteeism" will occur in any organization,
and in many cases the causes are justified by the nature
of the individual and specific circumstances existing at
the time.  However, when an employee establishes
patterns of absenteeism, management interprets this as
substantial evidence of abuse and violation of this
standard.

14.   **Physical and Mental Readiness to Perform Primary Duties
and Tasks**

Employees shall report to work and while working remain
mentally, physically, and emotionally ready to assume and
competently perform all their responsibilities, duties, and
tasks.

a.      Effective, efficient and safe public service depends on
employees being ready to perform competently and
effectively at a moment's notice.  Public trust and quite
often threats to employee safety can occur in a public

safety organization if management had to wait for
nonperformance to occur before testing and monitoring
for readiness.  It is reasonable and logical to assume
that employees who are physically and mentally ready
to perform will be better performers than those who are
not as physically and mentally prepared.

Employees who lack the physical and mental
capabilities to assume the responsibilities and duties
expected of their jobs create a public safety hazard for
themselves as well as others who may depend on their
performance to provide an effective, efficient and safe
protective service.
It will be job tasks that are performed on a regular
basis that are used to determine in part the expected
level of the employee's fitness and mental and
emotional readiness.  For example, it is reasonable to
expect a uniformed employee (e.g., law enforcement
officers, firefighters, emergency medical personnel)
who encounter physical exertion on a regular basis to
maintain a higher level of physical and mental
readiness than perhaps an administrative employee
whose regular duties are more sedentary in nature.

Conversely, the non-uniformed employee who deals
daily with administrative decision is expected to be
able to handle higher levels of administrative stress
than perhaps the street officer or firefighter.  It is
reasonable to expect differences in their levels of
performance because of the priority and repetitive
nature of their daily tasks.

15.     **Giving a Full Day's Work for a Full Day's Pay**

Employees shall give a full day's work for a full day's pay and
not establish patterns of nonproductive work time.

a.      The concept of expecting employees to give a full
day's work for a full day's pay is heavily embedded in
joint American Labor/Management.

Although public work is typically reactive in nature, a
large portion of non-responsive work time can be spent
performing self initiated work.  It is during self-
initiated work periods that the preventive and deterrent

nature of protective and safety services is achieved and provides the creates opportunities to effectively and efficiently deliver services.

The concept of a full day's work for a full day's pay does not mean employees are expected to have identical levels of work from one day to the next. However, work patterns do exist and an analysis of data on a monthly, quarterly, semi-annual, or annual period provides a descriptive picture of the amount and type of work that can be reasonably expected from employees who are truly giving a full effort.

## 16. Insubordination

Employees shall willfully observe and obey the verbal and written rules, duties, policies, procedures, and practices of the Independence Police Department.  They shall also subordinate their personal preferences and work priorities to the verbal and written rules, duties, policies, procedures and practices of this Department, as well as to the orders and directives of supervisors and superior command personnel of this Department.  Employees shall willfully perform all duties and tasks assigned by supervisory and/or superior ranked personnel.  Direct, tacit or constructive refusal to do so is insubordination.

a. Employment is a mutual exchange of interests and benefits between management and its employees.  In exchange for the privilege of employment and paid compensation, management has the right to expect employees to willfully perform the duties and tasks of their positions or any other task assigned and to achieve effective and efficient performance results.  It is reasonable to expect employees to obey operational directives and the orders of the Department's supervisors.  When disagreements between management and employees occur, management has the right to expect employees to follow the accepted labor principle of "obey now and grieve later".

Insubordination and insubordinate behavior are considered to be among the most serious offenses.  If insubordination is allowed to go unchecked,

management loses control and authority over its work force.

**17.**   **Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions**

Employees shall display an affirmative, consistent effort to observe and comply with the directives, rules, policies, procedures, practices and traditions established for the effective, efficient, and safe operations of this Department. This standard applies to policies, procedures, and practices that are written as well as those established by past patterns or practices.

Affirmative effort as the term is used here means to self initiate acceptable ways to comply.  In other words, look for ways to comply with the standard and not look for the exceptions to the standard.

a.   Policies, procedures, and practices are management's tools to achieve overall official efficiency and effectiveness in day-to-day operations and decision making.  They are designed to communicate management's intent and to help management focus its resources.

**18.**   **Observance of Criminal and Civil Laws**

Employees shall obey the constitutional, criminal and civil laws of the township, city, county, state, and federal government.

a.   Service and protection of the public, impartial administration and carrying out of duties, observing and obeying the very laws sworn to uphold, and providing equal service to all are covenants public officials have with citizens and are bound to honor if they wish to remain in public office.  Officials who violate those very laws and canons that they are sworn to uphold and observe destroy public faith and respect for this Department and weaken this Department's ability to perform its service mission.

19.    **Courteous and Respectful Behavior Toward Positions of Authority**

Employees shall be subordinate and display courtesy and respect in words, deeds, gestures, and actions towards personnel holding higher levels of official authority.

a.    The purpose of supervisory positions is to ensure reasonably that the mission, goals and directives of this Department are carried out in an efficient, effective, and safe manner as well as to provide accountability for the performance of the work unit.

Management requires subordinates to display respect and courtesy to higher positions because it provides a sense of order as well as serves as a tangible indication that subordinates are willing to subordinate personal priorities, goals, and objectives to the needs and mission of this Department.  In addition, the willingness and ability of an employee to subordinate personal interests and to display respect and courtesy to a supervisor is a reasonable assessment of the employee's capabilities to set aside personal feelings and priorities when dealing with citizens.

20.    **Use or Unlawful Sale or Possession of Illegal or Unauthorized Drugs**

Employees shall not unlawfully possess, sell, consume, use or assist in the use of any illegal or unauthorized drugs or medications on duty or off duty.  Nor shall any employee consume any unauthorized drug or medication in proximate time to his or her reporting time for duty, nor shall he or she report to duty with evidence of having consumed such drugs or medication.

NOTE:  **Unauthorized means any substance, drug or medication that is illegal to possess as well as any legal substance, drug or medication that is used without medical approval as well as drugs used without the knowledge of management.**

a.  The illegal and improper use of drugs is a national problem.  Public officials who are known to use illegal drugs or use authorized drugs in an improper manner subject this Department to severe public criticism and damage the image of the total Department.  By its very nature, public safety work depends on the employee's ability to evaluate critical situations and make judgments that affect public confidence and often citizen's lives, liberties and safety.  It is critical that judgments be as unimpaired as practicable and free from the adverse effects of any drugs.

21.  **Use and Care of Property and Equipment**

Employees are accountable for the proper use and care of any property or equipment assigned to them, used by them, or under their direct or constructive care.

a.  Constructive care means caring for equipment not being used, found, left unattended, or unsupervised.  All employees are accountable for assuming the care for such equipment and are required to take action affirmatively to return it to its place of proper storage.

Property means tangible and intangible ownership of goods, rights, or privileges of this Department (e.g., tools, weapons, copyrights, logos).  Equipment is the tool by which this Department is able to accomplish its objectives and mission and represents a capital investment of public resources.

Management has the specific right and inherent interest in assuring the public that its equipment will be cared for and used in an effective, efficient and safe manner.  Part of this responsibility includes designating what equipment will be used, how it will be used, who shall and shall not use Department equipment or property, and how it shall be cared for while entrusted to an employee.

Approved by the Order of:

_____
Chief of Police, Mike Kilbane

January 18, 2011


To:     Lt. Len Mazzola
From:   Chief John Nicastro
Re:     Counseling

On Monday 1/17/11 H.R. Director Joe Lubin and I met with you to discuss personnel issues. During the course of the meeting we discussed multiple examples of communication involving you, both within the Police Department and outside of the department that are not conducive to affirmatively promoting a positive public image to you or to the department. You acknowledged these concerns and made a commitment to improving in these areas.

Effective immediately, as a result of this meeting, you are counseled and directed as follows:

You shall strictly follow the chain of command which is D.C. Polak then Chief Nicastro.  You shall advise D.C. Polak or Chief Nicastro of any police department issues you are taking outside the department prior to doing so, especially issues directed to other City officials.  If communication is initiated by personnel outside of the police department and involves administrative or operational police issues, in addition to maintaining a positive demeanor, you shall also advise D.C Polak or Chief Nicastro of the communication as soon as is practical.

You shall refrain from generating, promoting or repeating rumors within and outside of the department.  You shall be especially cognizant of making reckless statements that impugn the credibility or integrity of other members of the police department.

Consistent with our Standards of Conduct and your position of authority within the department you shall be honest and forthright while performing your duties, willfully observe and obey the verbal and written rules, duties, policies, procedures and practices of the department and shall be subordinate and display courtesy and respect in words, deeds, gestures and actions towards personnel holding higher levels of authority.

Any violation of these directives will result in progressive discipline.

Please be advised that you have the right to respond in writing to this notice and have that response placed in your personnel file.

Employee Comments: _____

_____

_____

Employee Signature ___*Mazzola*_____     Date ___01·22·2011___

*Employee's signature does not necessarily denote agreement with this corrective counseling notice.*

c: Personnel File

DEFENDANT
EXHIBIT

**EXHIBIT 07**

**From:**          Michael Kilbane
**Sent:**          Friday, July 20, 2018 8:34 PM
**To:**            Leonard Mazzola
**Subject:**       productivity

Lenny,

Mayor's court gave their report to the Mayor and he was asking why our traffic citation productivity has declined.  For the first six months of 2017 we had 1696 tickets but for the same period in 2018 we only have 1504.  In June of 17 we wrote 283 but in June of this year we only had 173 (75 of those were detail tickets).  Accidents and incident reports were also higher last year.    Year to date we are about 200 tickets behind last year.

There are some patrolmen that are not even writing a single ticket a month on average.  Get with your sergeants ASAP and get this turned around.  There is no way I can sell the Mayor on adding another officer this Fall if it appears there is not enough work for the ones we already have.  Please get with me early next week with a plan to fix this.

Chief K.



DEFENDANT
EXHIBIT
**EXHIBIT 09**

1

DFNTS_0000600

# *City of Independence, Ohio*
"THE HEART OF CUYAHOGA COUNTY"
6800 BRECKSVILLE ROAD INDEPENDENCE, OHIO 44131

## Police Department
(216) 524-4234
FAX (216) 328-0110

**To:** Lt. Mazzola
**From:** Chief Kilbane
**CC:** Deputy Chief Polak
**Date:** 08/06/2018
**Re:** Patrol Activity

Lt. Mazzola:

As commander of the patrol division you are responsible for the performance and productivity of the patrol shifts and their officers.

Officer activity and productivity has declined significantly in the patrol division and this trend needs to be reversed immediately.  You are to meet with each of the patrol sergeants this week and go over the productivity data for each member of their shift.  For each officer that is performing below the levels of productivity that are acceptable compared to last year's data as well as their peers performance you and the sergeant are to complete a written action plan to correct the deficiencies.

These action plans need to have specific performance expectations and timelines for the sergeant to follow up.  Performance should be monitored and documented daily and weekly at first until the officer shows improvement, and then monitored monthly to ensure continuous improvement. Please provide me copies of the action plans for each officer no later than August 14th. Some of the areas that need to be assessed:

- Does the officer have sufficient working knowledge in the use of the laser, MDT, e-ticketing and OH-1 processes?  If not have the sergeant or one of the FTO's provide immediate remedial training so that the officer is proficient with the required equipment and processes.

-

- If performance metrics are unacceptable, how is the officer accounting for the hours he is working?  If necessary the sergeant may require an activity log to document the officer's daily activities and help him address any time management issues.

1


DEFENDANT EXHIBIT
**EXHIBIT 10**

- Make sure that officers assigned to other details/duties such as SWAT, K-9, Bike Unit, FTO, Range, Taser, Video, Task Force etc. clearly understand that those duties are in addition to their patrol assignment and that they are expected to maintain acceptable performance levels.

You and the sergeants are to monitor the performance and compliance with these action plans

We have it very good here and the city provides us with great support, pay and benefits, especially compared to our counterparts in other cities, and our workload is definitely not as great as most other departments.  It is not unreasonable to expect some level of self-initiated activity from our officers, but those levels have dropped to the point that the administration is starting to pose questions, and unless we take immediate steps to fix this issue we may face questions and consequences that none of us want.


A couple of other issues that you need to reinforce with patrol:

When on duty all sergeants and patrol officers are required to be logged into their MDTs.  When we transition to the new dispatch operations later this year the officers will need to do a lot of things through the MDTs such as placing themselves in and out of calls and entering disposition info.  Make sure everybody is proficient with the computers and if there are any deficiencies have one of the FTOs provide the requisite update training.


Additionally, if an officer is assigned to a video-equipped car the use of the video system is mandatory under our policy.  Make sure everyone is complying with this.  If any video systems are not working they need to be reported to Ray via email immediately and preferably copied to you.  Communicate with Ray to make sure the video systems are being repaired in a timely manner and if the vendor gives him any push-back please let me know.

● Page 2

**Independence Police**

# Memo

**To:**      Sgt. JT Kurtz

**From:**    Lt. Mazzola

**cc:**      Chief Kilbane

**Date:**    August 8, 2018

**Re:**      Productivity

---

Sgt. Kurtz,

As Sergeant of your shift, you are responsible for the productivity of your shift.  Year over year productivity has significantly declined.  Immediate action is required.  As Sergeant you will need to meet with each one of your officers on your shift, and identify officers performing below acceptable levels of productivity.  You shall immediately implement an action plan to reverse the declining trend.

Please be sure your officers are properly trained in the use of tools required to enforce our ordinances as well as procedures and efficiency in completing E tickets.  Performance should be monitored and documented on a daily basis until the problem has been resolved.

Patrol officers work 14 shifts a month; traffic enforcement range should include at least 2-3 traffic enforcement actions per shift.  If this cannot be accomplished, then officers will need to complete daily activity logs accounting for each hour of work, to address any time management issues.

Officers assigned to special units and details must understand that their assignment is in addition to patrol duties.  Production from these officers is expected, albeit at a reduced rate, in patrol activities and enforcement.

I have a deadline of 08/14/2018, therefore this needs to be immediately implemented.  Please have your action plan in place immediately.

Lt. Mazzola



DEFENDANT
EXHIBIT
**EXHIBIT 11**

| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Wednesday, August 29, 2018 7:35 PM |
| **To:** | Leonard Mazzola |
| **Subject:** | Meeting on Tuesday, September 4 |

Lt. Mazzola,

Please see the letter on your desk.  You will need to be in my office on Tuesday, September 4th at 0900 hours for a pre-disciplinary meeting with me and Human Resources Director Linker. You are entitled to have union representation at this meeting if you wish.  Please refrain from discussing this with anyone other than your union representative and/or attorney and reserve any questions for myself or the H.R. Director for the meeting on the 4th.


Chief Kilbane



DEFENDANT
EXHIBIT
**EXHIBIT 13**

1

# *City of Independence, Ohio*

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD          INDEPENDENCE, OHIO 44131

### Police Department
**(216) 524-1234**
**FAX (216) 328-0110**

**To:**      Lieutenant Mazzola

**From:**    Chief Kilbane

**CC:**      H.R. Director Linker

**Date:**    08/30/2018

**Re:**      Pre-disciplinary Hearing

Lt. Mazzola.

On August 6, 2018 I issued a written directive instructing you to complete several specific actions. These actions are necessary to address identified performance deficiencies within the patrol division that is under your command.  As of this date I believe you have failed to comply with several of the assigned tasks.  Please be present on Tuesday, September 4th at 9:00 A.M. for a pre-disciplinary meeting in the Chief's office as required under the terms of your collective bargaining agreement. You are entitled to representation at this meeting under the terms of your collective bargaining agreement.

You may voluntarily waive your right to a pre-disciplinary hearing if you choose to do so by signing the attached waiver and having it witnessed.

This meeting will provide the opportunity for you to respond to alleged violations of the following departmental orders:

GENERAL ORDER: 502 Uniform Standards of Conduct

12. Displaying Competent Performance and Achieving Competent Performance Results.

16. Insubordination

17. Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions

Please consult your union representative if you have any questions regarding these proceedings.

Chief Michael J. Kilbane

1



DEFENDANT
EXHIBIT

**EXHIBIT 14**

| | |
|---|---|
| **From:** | Leonard Mazzola |
| **Sent:** | Thursday, September 13, 2018 6:20 PM |
| **To:** | Letitia Linker |
| **Subject:** | Manpower.xls |
| **Attachments:** | Manpower.xls |

Enjoy!

Len



1

# 12 Yr. Projected Manpower Requirements

## Critical Staffing Level = 36

### Chief, Executive LT, Patrol LT, DBLT, 2 DB, 4/6 Shifts, 2 SRO, HIDTA, HIS, VFTF, DEA

Eligible/Projected Retirement Against Manpower Requirements

| 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 | 2028 | 2029 | 2030 |
|------|------|------|------|------|------|------|------|------|------|------|------|------|
| 33 | 33 | 32 | 32 | 29 | 29 | 26 | 20 | 20 | 20 | 17 | 17 | 16 |
| 0 | 1 | 0 | 3 | 0 | 3 | 6 | 0 | 0 | 3 | 0 | 1 | 1 |
| **33** | **32** | **32** | **29** | **29** | **26** | **20** | **20** | **20** | **17** | **17** | **16** | **15** |

2018 -
2019 - Polak
2020 -
2021 - Kroeger, Kingzett, Paine
2022 -
2023 - Smagola, Cwils, Hoprich
2024 - Kilbane, Borowy, Rwils, Mazzola, Dalton, Kurtz
2025 -
2026 -
2027 - Pacl, Green, Cross
2028 -
2029 - Tinnirello
2030 - Anders

DROP = Kilbane, Polak, Kroeger, Kingzett, Paine, C Wilson, Borowy, Smagola, Rwils, Dalton

8/22/2018
Mazz40

**From:**                lenchip <lenchip@wowway.com>
**Sent:**                Friday, September 14, 2018 2:32 AM
**To:**                  Leonard Mazzola
**Subject:**           Despite Laws And Lawsuits, Quota-Based Policing Lingers : NPR

https://www.npr.org/2015/04/04/395061810/despite-laws-and-lawsuits-quota-based-policing-lingers



DEFENDANT
EXHIBIT

**EXHIBIT 17**

1

**Michael Kilbane**

| | |
|---|---|
| **From:** | Michael Kilbane |
| **Sent:** | Tuesday, September 18, 2018 09:23 AM |
| **To:** | Leonard Mazzola; 'Robert Phillips' |
| **Cc:** | Letitia Linker; Charles Wilson |
| **Subject:** | final disposition |
| **Attachments:** | Lt. Mazzola dispo.docx |

Lieutenant Mazzola:

Attached is the final disposition and copies have been sent to Mr. Phillips and your FOP representative Lieutenant Wilson.  Please let me know if you have any questions regarding the actions that you will need to take.

Sincerely,

Chief Kilbane

1



DEFENDANT
EXHIBIT

**EXHIBIT 19**

Lt. Mazzola:

In regards to your email about the resolution of the disciplinary process please be advised that as Chief it my responsibility to determine the outcome.  I asked Director Linker to participate in the process because we felt that she may have some input and resources that could assist you in moving forward with the performance and productivity goals that you are responsible for.

This process started with inquiries from the Mayor regarding declining volume in Mayor's Court related to Police operations. After review of the data resulting in the decline, I assigned you several specific tasks designed to address key productivity issues in the Patrol division. These tasks were not completed as assigned, nor was an explanation provided for your inaction, so a pre-disciplinary conference was scheduled and held on September 4, 2018, with Chuck Wilson, Bob Phillips, and Letitia Linker in attendance.

I have carefully reviewed all the data you have presented and your responses in the pre-disciplinary hearing as well as a subsequent meeting on September 13, 2018, with Chuck and Letitia in attendance. Regardless of the reports used, it is clear that productivity is an issue for several officers individually, and for Patrol in the aggregate.

After much discussion, you have agreed to implement, monitor and manage performance standards for all the officers in the division. Traffic enforcement is an integral element of the patrol function and is an effective tool to ensure traffic safety.  Officers assigned to patrol must display ongoing proficiency and performance as part of the core patrol function.  In 2017 we had a total of just over 3000 traffic citations issued and this is an appropriate number to demonstrate minimum proficiency for our department. Your responsibility is to institute and monitor accountability measures on an individual and aggregate level to ensure that this proficiency standard is met (and hopefully exceeded).  Productivity should be monitored on an ongoing basis and appropriate adjustments made to ensure individual and aggregate goals are met.

To reiterate, this is not a quota, it is a performance standard fundamental to effective policing.

While addressing the productivity opportunity is essential, the Patrol Lieutenant role is also responsible for ensuring excellence in the quality of the work performed by the officers, including accuracy and timeliness of reports, responsiveness, customer service, and safety. As Lieutenant, you also manage administrative functions, including the scheduling and management of staffing levels and assignments.

To help you achieve these goals we will do the following:

a.  I will communicate with the patrol sergeants and patrol officers that you will be setting reasonable individual and aggregate performance and productivity standards for them and will be doing so with my full backing and support.  You will have the responsibility for closely monitoring these goals and working with the shift sergeants to take appropriate actions if either the group or individual productivity does not meet acceptable levels. If issues are encountered, you will discuss those with me in a timely fashion.

b. Director Linker will provide you with action plan and/or performance improvement plan templates to use as a tool to monitor and adjust any identified deficiencies.

c. You will confirm with Sgt. Anders whether he has any current restrictions, and if not, officer Dalton will be removed as a second OIC on that shift, returning to his regular duties.

d. You will be enrolled in Dr. D.J. Van Meter's "Performance Directed Management" class scheduled for November 13 in Elyria. Dr. Van Meter is an expert in performance management and his class will give you some great tools to help accomplish organizational goals moving forward. Some of the key elements of this course are:

- Understanding why management must move away from people management and move towards performance management
- Providing support for the fact that courts and arbiters support the enforcement of management rights
- Defining the "Universal Rights" of management
- Designing the foundation for a performance-oriented style of Management

e. Sergeants Anders, Kurtz and yourself will be enrolled in Pradco's 360 coaching program. The other two patrol sergeants have completed this program. Development plans will be put in place for each of you after completion of the assessments.

f. You will conduct monthly patrol staff meetings with yourself and the four patrol sergeants. This will provide continuity among the shifts and allow effective dissemination of important information. With the transition to a regional dispatch center fast approaching we will need to implement changes in the procedures that patrol uses. Additionally these meetings can be an opportunity for each sergeant to present you with their shift's performance data and plans. Prepare an agenda prior to the meetings and an executive summary after the meeting concludes and make sure that the sergeants have input into the agenda.

Lenny, I believe that many of these issues can be adjusted through training and counseling as opposed to punitive discipline. At this time I will hold any disciplinary action in abeyance provided you continue to monitor and maintain productivity, performance and professionalism.

The goal is to maintain levels of proficiency, performance, productivity and professionalism while maintaining a positive workplace. Levels of performance that I feel are justifiable and defensible to my superiors are very attainable without placing onerous or unreasonable demands on our patrol officers. As a Lieutenant, your responsibility is to ensure that the officers under your command achieve and maintain those levels.

You are a valued member of my management team within the police department, and as such you are expected to support and positively advance the goals and standards that are set. While I certainly do not expect the members of my management staff to agree with every decision I

make, after appropriate conversation, you are obligated to carry out those decisions in a positive, professional manner.


Sincerely,


Chief Kilbane

**From:**          Michael Kilbane
**Sent:**          Tuesday, September 18, 2018 2:06 PM
**To:**            Police Patrol
**Subject:**       officer activity



DEFENDANT
EXHIBIT

**EXHIBIT 20**

Patrol:

It has come to my attention that there have been rumors circulating regarding expectations for patrol officers, so I wanted to be clear about what is driving the discussion.

In July of this year I was asked by the Mayor why our number of traffic citations had declined from the previous year - through June we were down almost 200 tickets over the same period last year.  In August he contacted me again to ask why the totals had declined even further over the month of July.  I assured him that we would investigate our productivity and take steps to address any issues immediately.

Below are the comparisons year to year for the January through July time period (01-01-2017 to 08-03-2017 vs. 01-01-2018 to 08-03-2018):

|                        | **2017** | **2018** | **Difference** |
|------------------------|----------|----------|----------------|
| Traffic Stops          | 4071     | 3476     | (595)          |
| Misdemeanor Arrests    | 239      | 211      | (28)           |
| Felony Arrests         | 42       | 33       | (9)            |
| Warrant Arrests        | 91       | 87       | (4)            |
| Parking Cites          | 55       | 21       | (34)           |
| Traffic Cites          | 2042     | 1711     | (331)          |
| OVI                    | 23       | 24       | 1              |
| Enforcement Services   | 6571     | 5578     | (993)          |
| MVA Reports            | 282      | 266      | (16)           |
| Incident Reports       | 457      | 407      | (50)           |
| Calls for Service      | 11889    | 9805     | (2084)         |

Lieutenant Mazzola and I have reviewed both individual officer and aggregate division performance at length, and there is no question our results are down.  Staffing levels ebb and flow as officers retire, get promoted, are assigned away from patrol etc., but even with the slight reduction in total hours worked, our call volume and activity levels do not justify such a drastic reduction in productivity. When we identify deficiencies, we need to address them ASAP.

Lieutenant Mazzola has the responsibility for setting and maintaining performance expectations to ensure that both department-wide and individual productivity is attained, and he does so with my full support and backing.  He will work with your sergeants to monitor performance and make adjustments when necessary.  If anyone thinks that these expectations are unreasonable or unfair, after discussing it with your sergeant and Lieutenant Mazzola, please come see me.

From my experience, I know that we have it very good here, with great pay, flexibility, time off, strong administrative and community support and a reasonable workload.  I appreciate your dedication to our community and look forward to your achieving strong results.

1

Sincerely,

Chief Kilbane

2

DFNTS_0000575





DEFENDANT'S EXHIBIT

24 B



**Michael Kilbane**

| | |
|---|---|
| **From:** | Gallek, Ed <egallek@fox8.com> |
| **Sent:** | Monday, January 14, 2019 11:08 AM |
| **To:** | Michael Kilbane |
| **Subject:** | discipline requests |



I am requesting the pre-disciplinary and disciplinary paperwork for:

Lt. Mazzola—process started last August for Achieving Competent Performance Results, Insubordination, Knowing .. ..All Directives, Rues, Policies, Procedures, Practices, and Traditions

Officer Brian Dalton—filed recently concerning number of traffic stops/tickets written.

I am also requesting any other discipline for any other supervisors or patrol officers issued since last August regarding traffic stops/tickets written.

I am also requesting any grievances filed for any of these disciplinary issues or policies concerning the number of traffic stops/tickets written/performance expectations.

Thanks
Ed Gallek
FOX 8
216-403-3727



DEFENDANT
EXHIBIT
**EXHIBIT 25**

1

**To:** 'Gallek, Ed'[egallek@fox8.com]
**From:** Michael Kilbane/O=FIRST ORGANIZATION/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=KILBANEM]
**Sent:** Tue 1/15/2019 5:22:25 PM (UTC)
**Subject:** RE: officer activity summary reports
[402 Professional Traffic Stops.pdf](#)
[Ed Gallek records request1.pdf](#)
[Ed Gallek records request 2.pdf](#)

Mr. Gallek:

Attached are the officer activity reports, accident summary data and paperwork associated with Lieutenant Mazzola's disciplinary proceedings. The grievance filed by Patrolman Dalton has been denied by the city and returned to the union. As soon as the grievance process is completed I can get you a copy of it. I additionally included our departmental policy regarding traffic enforcement. As clearly indicated in our policy, traffic enforcement plays a vital role in the safety of our community and appropriate traffic enforcement is a core requirement of every patrol officer's responsibilities. Officers need to display proficiency by spending an appropriate amount of time and effort in this very important function. Consequently, if an officer fails to meet reasonable expectations in fulfilling this core job requirement it is the responsibility of our department leadership to address the issue and correct the deficient performance. Failure to do so would be unfair to our citizens as well as the officers who are working hard to keep Independence safe.

Sincerely,

Chief Michael J. Kilbane
Independence Police Department

**From:** Gallek, Ed [mailto:egallek@fox8.com]
**Sent:** Monday, January 14, 2019 11:08 AM
**To:** Michael Kilbane
**Subject:** officer activity summary reports

I am requesting the officer activity summary reports for:

10/1/18 to 12/25/18

10/1/17 to 12/25/17

Thanks
Ed Gallek
FOX 8
216-403-3727



**THE CITY OF INDEPENDENCE**
**DEPARTMENT OF POLICE**

**GENERAL ORDER**:  402
**SUBJECT:**  Professional Traffic Stops
**EFFECTIVE DATE:** December 01, 2001
**REVIEWED:**  June 1, 2017

## I.    POLICY

All uniformed officers are expected to enforce the laws, and stop and detain motorists or pedestrians whenever there is reasonable suspicion that they have committed, are committing, or are about to commit an infraction of the law.

Officers must conduct themselves in a dignified and respectful manner at all times when dealing with the public.  The Law Enforcement Code of Ethics articulates the professional and personal behavior that is expected of all law enforcement officers.

Racial and ethnic profiling is totally unacceptable patrol tactics and will not be condoned.

Officers are prohibited from stopping, detaining, searching or arresting anyone on the basis of illegal profiling.  Officers shall make traffic stops and conduct field interviews only on the basis of reasonable suspicion, and shall make arrests only on the basis of probable cause.

This policy shall not preclude officers from stopping a person to offer assistance, such as upon observing a substance leaking from the vehicle, a flat tire, or someone who appears to be ill, lost, or confused.  This policy does not prohibit stopping someone suspected of a crime based on a description that includes one or more of those identified attributes, or considering a person's apparent age when investigating curfew or liquor law violations.

## II.    PURPOSE

The purpose of this policy is to provide guidelines for officers promoting non-discriminatory enforcement of the traffic laws and ordinances and to ensure that traffic enforcement is carried out in a proactive manner within the dictates of the U.S. and Ohio Constitutions and applicable laws. The goal being that all citizens are dealt with fairly and to protect our officers from unwarranted accusations of misconduct when they act within the dictates of the law.

III.    **GENERAL**

    A.    Traffic crashes are a leading cause of death, injury and property damage to innocent persons.  Citizens consistently name traffic violations as a major community policing concern in neighborhoods.  Active, visible traffic law enforcement sends a strong deterrent message that reduces the incidence of aggressive driving and road rage and keeps the streets free from crime.  Wanted criminals, drug couriers and persons who have just committed or are about to commit crimes are often apprehended as the result of being stopped for a traffic violation.  Police officers should be alert and observant at all times during patrols, to identify and act upon unusual occurrences and violations of the law.

    B.    A fundamental right guaranteed by both the U.S. and Ohio Constitutions is the "equal protection" clause.  The U.S. Constitution and in particular the Bill of Rights places an emphasis on the protection of citizens' fundamental rights.  Everyone, citizen and alien alike, is entitled to walk, drive, and move about in public free from police interference so long as they obey the law.  Likewise, innocent citizens are entitled to be free from crime and to move about freely without fear of those who do not obey the law.

    C.    Those who commit infractions must receive equal and fair treatment, regardless of their race, color, ethnicity, sex, sexual orientation, physical handicap, religion, or other belief system.

IV.    **DEFINITIONS**

    A.    **Illegal Profiling**:  Unequal treatment of any person including stopping, questioning, detention, or arrest on the sole basis of their racial characteristics, religion, gender, or sexual orientation.

    B.    **Reasonable suspicion**:  (Also known as articulable suspicion) more than a mere hunch.  Based on a set of articulable facts and circumstances that would warrant a person of average caution in believing that an offense has been committed, is being committed, or is about to be committed by a specific person.  It can be based on an officer's observations, training and experience, or information received from credible outside sources or third parties.  Police initiated action must be based on an individual's illegal behavior, or a situation where an individual matches the description of a specific suspect.

## V.    PROCEDURES

A.    Training

Officers will receive initial and ongoing training in conducting professional traffic stops.  Training programs will emphasize the need to respect the right of all persons to be treated equally and to be free from unreasonable searches and seizures.  In developing these training programs, the department shall consider the following aspects of professional traffic stops:

1.    Officer safety
2.    Courtesy
3.    Cultural awareness/language barriers
4.    Search and seizure laws, and other related constitutional issues
5.    Interpersonal communications skills

B.    Supervision

Traffic enforcement activities shall receive consistent, ongoing supervisory attention to ensure that officers are placing sufficient emphasis on the need for proactive traffic enforcement, are aware of its benefits, and conduct traffic stops in a courteous and constitutional manner.  Supervisors shall familiarize themselves with this policy and shall take appropriate steps whenever it appears that it is being violated. They shall be particularly alert to any indication of discriminatory practices or treatment of any segment of the public by individual officers or squads.

C.    Initiating the Stop

1.    There is no such thing as a "low risk" stop.  Too many officers have been hurt as the result of a sudden, unprovoked attack to regard any stop as "routine".  Officer safety must be the paramount consideration in all stops, but must not subsume common courtesy and helpfulness.  The risks involved in stops include not only hazards from the persons being stopped, but also from other traffic, and from other persons at or near the location of the stop.
2.    Prior to stopping a motorist or pedestrian, the officer shall notify the communications center in accordance with applicable communications protocols, and shall observe applicable safety precautions in selecting the site for the stop, signaling the individual to stop, positioning the police vehicle and approaching the motorist or pedestrian.  Upon concluding the stop, an appropriate log entry should be made of the stop and the enforcement action taken.

D.    Officer-Violator Relations

1.    The stopping of a motorist or a pedestrian constitutes a seizure under applicable constitutional law.  It is an opportunity for the department to make a favorable or an unfavorable impression on a citizen, depending on how the officer handles the situation.

2.    Officers should strive to maintain a proper balance between sufficient command presence to maintain control of the stop, and a courteous attitude.

3.    Officers should have the following objectives in mind for every traffic stop:

   a.    Prevention of traffic crashes and hazardous conditions.
   b.    Taking immediate action to interrupt an ongoing violation of the law.  This is achieved by pulling the vehicle over.
   c.    Having a symbolic effort on other traffic.  The sight of a police car with a violator pulled over reminds the public that the police are on the job.
   d.    Detecting any evidence of a more serious violation.  Proper observation skills and conversational tactics will enable this.
   e.    Having a positive effect on the motorist's future driving behavior.  This is less likely to occur if the officer's behavior alienates the motorist.

4.    Over time, officers develop their own individual approaches to the operators of vehicles that best fit their own personalities. OFFICERS ARE NOT PRECLUDED FROM USING THEIR OWN FORMULA IF IT WORKS WELL.  Otherwise, the following method of approach, used consistently, will minimize officer/violator conflict, and enable court testimony to be given with confidence.

   a.    Greeting:  "Good morning, sir, good evening, ma'am", etc.
   b.    Introduction:  "I am with the Independence Police Department".
   c.    Legal justification:  Give the reason why the person is being stopped or detained.  Describe the actions of the vehicle rather than personalizing the action to the driver. This will reduce tension.  "I stopped you because I observed your vehicle go through the stop sign at the last intersection without coming to a complete stop".  Never lecture the driver in a demeaning or belittling manner.
   d.    Feedback:  Invite the driver to offer a reasonable excuse. "Was there some reason, Ma'am, why you didn't stop?" Rather than leading to arguments, this approach allows the violator an "escape valve" and may reduce tension.

e.  <u>Documents</u>:  Politely ask for identification and any required documents.  "May I see your license and proof of insurance, please?"  When accepting the papers, have the driver reach outside the car, do not reach inside the vehicle.  Take the papers with the non-gun hand, and say, "Thank You".

  1.  Obtain another document of identification if the driver has no license.  If any suspicions of further infractions of the law develop, based on observations with any of the five senses, inquire further.

  2.  Do not talk down to or deliberately attempt to embarrass the person you have stopped.

f.  <u>Enforcement decision</u>:  Once satisfied that there are no further violations, request that the persons remain in the vehicle, and return to the cruiser.  "Please remain in the vehicle, for your safety and mine.  I will be back shortly".

  1.  Take an appropriate, documented enforcement action for every stop, generally a citation, warning, or arrest.

  2.  Avoid issuing tickets where a motorist who would otherwise be given a warning is cited or arrested simply because the officer considered them to be disrespectful.

  3.  Multiple citations should never be based on the motorist's race, ethnicity or other personal characteristics.

g.  <u>Closing the Contact</u>:  If there is no reason to hold the motorist further, return cautiously to the vehicle.

  1.  Advise the driver of the action taken and what if anything he or she needs to do as a result, such as signing the citation, appearing in court, etc.  Do not attempt to predict the actions of the court.

  2.  Return the drivers documents, along with a copy of the citation, and any public information pamphlets provided by the department.

  3.  Once cited or warned, and no further reasonable suspicion exists, the individual should be free to leave.

  4.  Use an appropriate closing.  For example, if the person was cooperative, thank him or her for their

cooperation.  If the person is still angry, simply say, "Please drive safely" or some other appropriate safety message.

5.     If the driver is upset, give him or her time to calm down before they resume driving.

6.     Make sure the driver is able to safely re-enter the traffic stream, then clear the stop with the communications center.  Make sure there is a record made of the enforcement action taken.

h.     If a search was conducted and no illegal items or evidence was found, thank the subjects for their cooperation and be sure the vehicle is returned as closely as possible to the condition in which it was found.  If requested, politely explain the reason for your actions.

## VI.     COMPLAINTS OF MISCONDUCT AT STOPS

A.     Any person may file a complaint with the department if they feel they have been stopped or searched based on illegal profiling, or subjected to improper treatment.  No person shall be discouraged, intimidated, or coerced from filing such a complaint, or discriminated against because they have filed such a complaint.

1.     Complaints will be handled in accordance with Internal Affairs Policy #103.

Approved by the order of:

_____
Mike Kilbane,
Chief of Police

# *City of Independence, Ohio*

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

## Police Department

**(216) 524-1234**
**FAX (216) 328-0110**

| | |
|---|---|
| **To:** | Lt. Mazzola |
| **From:** | Chief Kilbane |
| **CC:** | Deputy Chief Polak |
| **Date:** | 09/18/2018 |
| **Re:** | Patrol Activity |

Lt. Mazzola:

As commander of the patrol division you are responsible for the performance and productivity of the patrol shifts and their officers.

Officer activity and productivity has declined significantly in the patrol division and this trend needs to be reversed immediately.  You are to meet with each of the patrol sergeants this week and go over the productivity data for each member of their shift.  For each officer that is performing below the levels of productivity that are acceptable compared to last year's data as well as their peers performance you and the sergeant are to complete a written action plan to correct the deficiencies.

These action plans need to have specific performance expectations and timelines for the sergeant to follow up.  Performance should be monitored and documented daily and weekly at first until the officer shows improvement, and then monitored monthly to ensure continuous improvement. Please provide me copies of the action plans for each officer no later than August 14th. Some of the areas that need to be assessed:

- Does the officer have sufficient working knowledge in the use of the laser, MDT, e-ticketing and OH-1 processes?  If not have the sergeant or one of the FTO's provide immediate remedial training so that the officer is proficient with the required equipment and processes.

- 

- If performance metrics are unacceptable, how is the officer accounting for the hours he is working?  If necessary the sergeant may require an activity log to document the officer's daily activities and help him address any time management issues.

1

- Make sure that officers assigned to other details/duties such as SWAT, K-9, Bike Unit, FTO, Range, Taser, Video, Task Force etc. clearly understand that those duties are in addition to their patrol assignment and that they are expected to maintain acceptable performance levels.

You and the sergeants are to monitor the performance and compliance with these action plans

We have it very good here and the city provides us with great support, pay and benefits, especially compared to our counterparts in other cities, and our workload is definitely not as great as most other departments.  It is not unreasonable to expect some level of self-initiated activity from our officers, but those levels have dropped to the point that the administration is starting to pose questions, and unless we take immediate steps to fix this issue we may face questions and consequences that none of us want.

A couple of other issues that you need to reinforce with patrol:

When on duty all sergeants and patrol officers are required to be logged into their MDTs.  When we transition to the new dispatch operations later this year the officers will need to do a lot of things through the MDTs such as placing themselves in and out of calls and entering disposition info.  Make sure everybody is proficient with the computers and if there are any deficiencies have one of the FTOs provide the requisite update training.

Additionally, if an officer is assigned to a video-equipped car the use of the video system is mandatory under our policy.  Make sure everyone is complying with this.  If any video systems are not working they need to be reported to Ray via email immediately and preferably copied to you.  Communicate with Ray to make sure the video systems are being repaired in a timely manner and if the vendor gives him any push-back please let me know.

# *City of Independence, Ohio*

"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

## Police Department
### (216) 524-1234
### FAX (216) 328-0110

**To:**   Lieutenant Mazzola

**From:**   Chief Kilbane

**CC:**   H.R. Director Linker

**Date:**   09/18/2018

**Re:**   Pre-disciplinary Hearing

Lt. Mazzola:

On August 6, 2018 I issued a written directive instructing you to complete several specific actions. These actions are necessary to address identified performance deficiencies within the patrol division that is under your command.  As of this date I believe you have failed to comply with several of the assigned tasks.  Please be present on Tuesday, September 4th at 9:00 A.M. for a pre-disciplinary meeting in the Chief's office as required under the terms of your collective bargaining agreement. You are entitled to representation at this meeting under the terms of your collective bargaining agreement.

You may voluntarily waive your right to a pre-disciplinary hearing if you choose to do so by signing the attached waiver and having it witnessed.

This meeting will provide the opportunity for you to respond to alleged violations of the following departmental orders:

GENERAL ORDER: 502 Uniform Standards of Conduct

12. Displaying Competent Performance and Achieving Competent Performance Results.

16. Insubordination

17. Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions

Please consult your union representative if you have any questions regarding these proceedings.

Chief Michael J. Kilbane

1

Lt. Mazzola:

In regards to your email about the resolution of the disciplinary process please be advised that as Chief it my responsibility to determine the outcome.  I asked Director Linker to participate in the process because we felt that she may have some input and resources that could assist you in moving forward with the performance and productivity goals that you are responsible for.

This process started with inquiries from the Mayor regarding declining volume in Mayor's Court related to Police operations. After review of the data resulting in the decline, I assigned you several specific tasks designed to address key productivity issues in the Patrol division. These tasks were not completed as assigned, nor was an explanation provided for your inaction, so a pre-disciplinary conference was scheduled and held on September 4, 2018, with Chuck Wilson, Bob Phillips, and Letitia Linker in attendance.

I have carefully reviewed all the data you have presented and your responses in the pre-disciplinary hearing as well as a subsequent meeting on September 13, 2018, with Chuck and Letitia in attendance. Regardless of the reports used, it is clear that productivity is an issue for several officers individually, and for Patrol in the aggregate.

After much discussion, you have agreed to implement, monitor and manage performance standards for all the officers in the division. Traffic enforcement is an integral element of the patrol function and is an effective tool to ensure traffic safety.  Officers assigned to patrol must display ongoing proficiency and performance as part of the core patrol function.  In 2017 we had a total of just over 3000 traffic citations issued and this is an appropriate number to demonstrate minimum proficiency for our department. Your responsibility is to institute and monitor accountability measures on an individual and aggregate level to ensure that this proficiency standard is met (and hopefully exceeded).  Productivity should be monitored on an ongoing basis and appropriate adjustments made to ensure individual and aggregate goals are met.

To reiterate, this is not a quota, it is a performance standard fundamental to effective policing.

While addressing the productivity opportunity is essential, the Patrol Lieutenant role is also responsible for ensuring excellence in the quality of the work performed by the officers, including accuracy and timeliness of reports, responsiveness, customer service, and safety. As Lieutenant, you also manage administrative functions, including the scheduling and management of staffing levels and assignments.

To help you achieve these goals we will do the following:

   a.  I will communicate with the patrol sergeants and patrol officers that you will be setting reasonable individual and aggregate performance and productivity standards for them and will be doing so with my full backing and support.  You will have the responsibility for closely monitoring these goals and working with the shift sergeants to take appropriate actions if either the group or individual productivity does not meet acceptable levels. If issues are encountered, you will discuss those with me in a timely fashion.

b. Director Linker will provide you with action plan and/or performance improvement plan templates to use as a tool to monitor and adjust any identified deficiencies.

c. You will confirm with Sgt. Anders whether he has any current restrictions, and if not, officer Dalton will be removed as a second OIC on that shift, returning to his regular duties.

d. You will be enrolled in Dr. D.J. Van Meter's "Performance Directed Management" class scheduled for November 13 in Elyria. Dr. Van Meter is an expert in performance management and his class will give you some great tools to help accomplish organizational goals moving forward. Some of the key elements of this course are:
   - Understanding why management must move away from people management and move towards performance management
   - Providing support for the fact that courts and arbiters support the enforcement of management rights
   - Defining the "Universal Rights" of management
   - Designing the foundation for a performance-oriented style of Management

e. Sergeants Anders, Kurtz and yourself will be enrolled in Pradco's 360 coaching program. The other two patrol sergeants have completed this program. Development plans will be put in place for each of you after completion of the assessments.

f. You will conduct monthly patrol staff meetings with yourself and the four patrol sergeants. This will provide continuity among the shifts and allow effective dissemination of important information. With the transition to a regional dispatch center fast approaching we will need to implement changes in the procedures that patrol uses. Additionally these meetings can be an opportunity for each sergeant to present you with their shift's performance data and plans. Prepare an agenda prior to the meetings and an executive summary after the meeting concludes and make sure that the sergeants have input into the agenda.

Lenny, I believe that many of these issues can be adjusted through training and counseling as opposed to punitive discipline. At this time I will hold any disciplinary action in abeyance provided you continue to monitor and maintain productivity, performance and professionalism.

The goal is to maintain levels of proficiency, performance, productivity and professionalism while maintaining a positive workplace. Levels of performance that I feel are justifiable and defensible to my superiors are very attainable without placing onerous or unreasonable demands on our patrol officers. As a Lieutenant, your responsibility is to ensure that the officers under your command achieve and maintain those levels.

You are a valued member of my management team within the police department, and as such you are expected to support and positively advance the goals and standards that are set. While I certainly do not expect the members of my management staff to agree with every decision I

make, after appropriate conversation, you are obligated to carry out those decisions in a positive, professional manner.


Sincerely,


Chief Kilbane

01/14/2019



# INDEPENDENCE POLICE DEPT.



Month / Shift: _____

## Officer Activity Summary Report

*(Officer Activity Summary 3 : 10/01/2018 to 12/31/2018)*

### Productivity Analysis

| Officer | Self Init Contacts (Traffic Stops) | Misdemeanor Arrests | Felony Arrests | Warrant Arrests | Parking Citations | Traffic Citations | OVI Arrests | Enforcement Services | Accident Reports | Accident Reports (Traffic) | Incident Reports | Service Calls (CFS) | Reporting Services | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 030 Kingzett C | 75 | 0 | 0 | 0 | 1 | 31 | 0 | 107 | 0 | 10 | 7 | 133 | 150 | 257 |
| 029 Smagola G | 31 | 0 | 0 | 0 | 0 | 30 | 0 | 62 | 0 | 4 | 11 | 154 | 168 | 230 |
| 039 Dalton B | 63 | 0 | 1 | 0 | 0 | 20 | 0 | 84 | 0 | 2 | 2 | 190 | 196 | 280 |
| 043 Pael R | 72 | 2 | 0 | 2 | 1 | 33 | 0 | 110 | 0 | 10 | 15 | 192 | 217 | 327 |
| 044 Green J | 48 | 5 | 0 | 0 | 0 | 30 | 0 | 83 | 0 | 10 | 6 | 226 | 242 | 325 |
| 015 Hoprich M | 61 | 0 | 0 | 1 | 0 | 47 | 0 | 110 | 0 | 7 | 7 | 205 | 220 | 330 |
| 050 Collise C | 237 | 0 | 0 | 1 | 2 | 181 | 0 | 421 | 0 | 13 | 5 | 257 | 275 | 696 |
| 052 Keegan T | 49 | 1 | 0 | 0 | 0 | 30 | 0 | 80 | 0 | 1 | 3 | 175 | 179 | 259 |
| 053 Bates S | 62 | 4 | 0 | 3 | 0 | 50 | 3 | 135 | 0 | 3 | 18 | 150 | 171 | 306 |
| 056 Vitron B | 200 | 8 | 0 | 0 | 0 | 140 | 1 | 349 | 0 | 7 | 8 | 139 | 154 | 503 |
| 058 Martin J | 45 | 4 | 3 | 2 | 0 | 33 | 1 | 89 | 0 | 5 | 15 | 192 | 212 | 301 |
| 035 Luciano D | 22 | 0 | 0 | 0 | 0 | 0 | 0 | 33 | 0 | 12 | 10 | 113 | 135 | 168 |
| 033 Sedlock S | 122 | 4 | 0 | 3 | 0 | 50 | 0 | 179 | 0 | 1 | 9 | 193 | 203 | 382 |
| 026 March A | 67 | 8 | 1 | 2 | 0 | 40 | 1 | 120 | 0 | 5 | 12 | 209 | 231 | 351 |
| 012 Waldley E | 68 | 9 | 2 | 4 | 0 | 39 | 2 | 125 | 0 | 5 | 8 | 152 | 165 | 290 |
| 008 Haworth E | 148 | 0 | 4 | 5 | 0 | 78 | 0 | 242 | 0 | 3 | 10 | 125 | 138 | 380 |
| 017 March M | 83 | 0 | 2 | 7 | 0 | 35 | 1 | 138 | 0 | 4 | 15 | 225 | 244 | 382 |
| 907 Kroeger J | 119 | 10 | 1 | 5 | 0 | 72 | 1 | 206 | 0 | 8 | 20 | 242 | 270 | 476 |
| 949 Harper J | 153 | 8 | 3 | 4 | 0 | 84 | 0 | 252 | 0 | 5 | 14 | 219 | 238 | 490 |
| **TOTALS:** | 1824 | 86 | 21 | 41 | 4 | 1032 | 10 | 3024 | 0 | 122 | 195 | 3491 | 3808 | 6733 |
| **SHIFT AVG:** | | | | | | | | | | | | | | |

# Traffic Crashes - OH1 Summary

(rptTrafficOH1Summary2)

Crash Date Range:    01/01/2017 to 12/31/2017

| Date | Report # | CrashLocation | Reference | Unit Error | #Veh | PDO | Fatal | Injuries | # Inj | # Ped | Hit/Skip | Crash Severity | Private Pr |
|------|----------|---------------|-----------|-----------|------|-----|-------|----------|-------|-------|----------|----------------|------------|

## Traffic Crash Summary

| | | | |
|---|---|---|---|
| Traffic Crash Total: | 479 | *(Total # of Reports)* | |
| Property Damage Only: | 349 | *(Total Reports where Crash Severity = 3)* | |
| Personal Injury: | 129 | *(Total Reports where Crash Severity = 2)* | |
| Number of Persons Injured: | 188 | *(Total Injured where Injuries = 2, 3, 4, 5)* | |
| Fatality: | 1 | *(Total Reports where Crash Severity = 1)* | |
| Pedestrian: | 2 | *(Total Reports where MNI Entry Code = PED)* | |
| Hit/Skip: | 40 | *(Total Reports where Hit/Skip = 1 or 2)* | |
| Private Property: | 50 | *(Total Reports where Private Property = 1)* | |
| Unit Error (Animal): | 4 | *(Total Reports where Unit Error = 98)* | |
| Unit Error (Unknown): | 46 | *(Total Reports where Unit Error = 99)* | |

# Traffic Crashes - OH1 Summary
(rptTrafficOH1Summary2)

**Crash Date Range:** 01/01/2018 to 12/31/2018

| Date | Report # | CrashLocation | Reference | Unit Error | #Veh | PDO | Fatal | Injuries | # Inj | # Ped | Hit/ Skip | Crash Severity | Private Prop |
|------|----------|---------------|-----------|------------|------|-----|-------|----------|-------|-------|-----------|----------------|--------------|
| 12/22/2018 | 20181272 | SR 21 | SELIG BL | 1 | 1 | Y | | | 0 | 0 | 0 | 3 | |
| 12/23/2018 | 20181274 | ROCKSIDE RD | IR 77 | 1 | 2 | Y | | | 0 | 0 | 0 | 3 | |
| 12/27/2018 | 20181282 | WILLOW DRIVE DR | 6474 | 1 | 2 | Y | | | 0 | 0 | 0 | 3 | |

## Traffic Crash Summary

| | | |
|--|--|--|
| Traffic Crash Total: | 481 | *(Total # of Reports)* |
| Property Damage Only: | 376 | *(Total Reports where Crash Severity = 3)* |
| Personal Injury: | 101 | *(Total Reports where Crash Severity = 2)* |
| Number of Persons Injured: | 127 | *(Total Injured where Injuries = 2, 3, 4, 5)* |
| Fatality: | 1 | *(Total Reports where Crash Severity = 1)* |
| Pedestrian: | 1 | *(Total Reports where MNI Entry Code = PED)* |
| Hit/Skip: | 35 | *(Total Reports where Hit/Skip = 1 or 2)* |
| Private Property: | 55 | *(Total Reports where Private Property = Y)* |
| Unit Error (Animal): | 3 | *(Total Reports where Unit Error = 98)* |
| Unit Error (Unknown): | 37 | *(Total Reports where Unit Error = 99)* |

01/14/2019



# INDEPENDENCE POLICE DEPT.

Month / Shift:

**Officer Activity Summary Report**

*(Officer Activity Summary 3 : 10/01/2017 to 12/31/2017)*

**Productivity Analysis**

| Officer | Self Init Contacts (Traffic Stops) | Misdemeanor Arrests | Felony Arrests | Warrant Arrests | Parking Citations | Traffic Citations | OVI Arrests | Enforcement Services | Accident Reports | Accident2 Reports (Traffic) | Incident Reports | Service Calls (CFS) | Reporting Services | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 630 Kingzett C | 12 | 0 | 0 | 0 | 0 | 4 | 0 | 16 | 0 | 6 | 3 | 100 | 109 | 125 |
| 629 Smagola G | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 8 | 0 | 2 | 6 | 122 | 130 | 138 |
| 639 Dalton B | 27 | 3 | 0 | 1 | 0 | 5 | 0 | 35 | 0 | 3 | 5 | 199 | 207 | 242 |
| 2943 Paci R | 38 | 2 | 1 | 0 | 0 | 8 | 0 | 48 | 0 | 7 | 4 | 230 | 241 | 289 |
| 2444 Green J | 17 | 0 | 0 | 2 | 0 | 8 | 0 | 21 | 0 | 2 | 7 | 261 | 270 | 291 |
| 5915 Hoprich M | 14 | 5 | 0 | 0 | 0 | 0 | 0 | 30 | 0 | 10 | 6 | 194 | 210 | 240 |
| 2550 Collise C | 132 | 1 | 1 | 0 | 2 | 105 | 0 | 241 | 0 | 12 | 9 | 223 | 244 | 485 |
| 352 Keegan T | 18 | 0 | 1 | 0 | 0 | 7 | 0 | 28 | 0 | 0 | 1 | 215 | 216 | 244 |
| 353 Bates S | 15 | 0 | 0 | 0 | 0 | 13 | 0 | 29 | 0 | 0 | 1 | 4 | 5 | 34 |
| 356 Viron B | 107 | 9 | 1 | 1 | 0 | 79 | 3 | 202 | 0 | 3 | 11 | 215 | 229 | 431 |
| 358 Martin J | 26 | 1 | 1 | 1 | 0 | 4 | 1 | 38 | 0 | 2 | 5 | 162 | 169 | 207 |
| 335 Luciano D | 46 | 2 | 0 | 2 | 0 | 20 | 1 | 70 | 0 | 7 | 7 | 129 | 143 | 213 |
| 333 Sedlock S | 43 | 8 | 1 | 2 | 0 | 27 | 1 | 85 | 0 | 4 | 12 | 140 | 156 | 241 |
| 2226 March A | 39 | 6 | 0 | 0 | 1 | 12 | 1 | 61 | 0 | 14 | 16 | 270 | 300 | 361 |
| 612 Waldley E | 79 | 8 | 4 | 8 | 4 | 36 | 0 | 139 | 0 | 2 | 12 | 217 | 231 | 370 |
| 608 Haworth E | 94 | 6 | 0 | 3 | 0 | 42 | 1 | 146 | 0 | 2 | 11 | 139 | 152 | 298 |
| 417 March M | 81 | 7 | 1 | 3 | 0 | 35 | 0 | 127 | 0 | 16 | 20 | 293 | 329 | 456 |
| 2107 Kroeger J | 102 | 2 | 0 | 3 | 3 | 30 | 0 | 137 | 0 | 6 | 20 | 245 | 271 | 408 |
| 2149 Harper J | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **TOTALS:** | 1080 | 69 | 11 | 26 | 8 | 441 | 7 | 1648 | 0 | 98 | 156 | 3358 | 3612 | 5073 |
| **SHIFT AVG:** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |



**Independence Police**

# Memo

| | |
|---|---|
| **To:** | Sgt. JT Kurtz |
| **From:** | Lt. Mazzola |
| **cc:** | Chief Kilbane |
| **Date:** | August 8, 2018 |
| **Re:** | Productivity |

Sgt. Kurtz,

As Sergeant of your shift, you are responsible for the productivity of your shift.  Year over year productivity has significantly declined.  Immediate action is required.  As Sergeant you will need to meet with each one of your officers on your shift, and identify officers performing below acceptable levels of productivity.  You shall immediately implement an action plan to reverse the declining trend.

Please be sure your officers are properly trained in the use of tools required to enforce our ordinances as well as procedures and efficiency in completing E tickets.  Performance should be monitored and documented on a daily basis until the problem has been resolved.

Patrol officers work 14 shifts a month; traffic enforcement range should include at least 2-3 traffic enforcement actions per shift.  If this cannot be accomplished, then officers will need to complete daily activity logs accounting for each hour of work, to address any time management issues.

Officers assigned to special units and details must understand that their assignment is in addition to patrol duties.  Production from these officers is expected, albeit at a reduced rate, in patrol activities and enforcement.

I have a deadline of 08/14/2018, therefore this needs to be immediately implemented.  Please have your action plan in place immediately.

Lt. Mazzola



DEFENDANT
EXHIBIT
**EXHIBIT 27**

EVANS/PTA081



*3*

# *City of Independence, Ohio*
## "THE HEART OF CUYAHOGA COUNTY"
6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

### Police Department
**(216) 524-1234**
**FAX (216) 328-0110**

**To:**   Ptl. Brian Dalton

**From:**   Lt. Len Mazzola

**CC:**   Chief Michael Kilbane

**Date:**   01/07/2019

**Re:**   Performance Standard 10/01/18-12/31/18

---

Ptl. Dalton,

I have completed calculating the numbers for the 10/01/18-12/31/18 Performance Standard reporting period.  During this period you wrote 20 citations.  The Performance Standard outlined via email delivered to all Patrol, stated that each officer would be responsible to have a minimum of 10 citations per month, thus a total of 30 for each quarterly reporting period.

You have failed to comply with this directive issued.  Per Chief Kilbane, this letter serves as a written reprimand to document the situation.  Failure to meet acceptable Performance Standard numbers going forward will result in progressively more severe discipline.  All other members of the Patrol division have met the Performance Standard for this reporting period.

Please sign below acknowledging receipt of this written reprimand.

Ptl. Brian Dalton   *REFUSED No Just Cause!*
*I Have Threatened And Am Signing This Under Duress!*
Please let me know if there is anything I can do to help moving forward to avoid any issues.

Lt. Len Mazzola

1

EVANS/PTA086

# City of Independence, Ohio
"THE HEART OF CUYAHOGA COUNTY"

6800 BRECKSVILLE ROAD                    INDEPENDENCE, OHIO 44131

---

### Police Department
**(216) 524-1234**
**FAX (216) 328-0110**

**To:**    Lieutenant Mazzola

**From:**  Chief Kilbane

**CC:**    H.R. Director Linker

8/19/18  **Date:**  ~~01/21/2019~~  8/29/18

**Re:**    Pre-disciplinary Hearing

---

Lt. Mazzola:

On August 6, 2018 I issued a written directive instructing you to complete several specific actions. These actions are necessary to address identified performance deficiencies within the patrol division that is under your command. As of this date I believe you have failed to comply with several of the assigned tasks. Please be present on Tuesday, September 4th at 9:00 A.M. for a pre-disciplinary meeting in the Chief's office as required under the terms of your collective bargaining agreement. You are entitled to representation at this meeting under the terms of your collective bargaining agreement.

You may voluntarily waive your right to a pre-disciplinary hearing if you choose to do so by signing the attached waiver and having it witnessed.

This meeting will provide the opportunity for you to respond to alleged violations of the following departmental orders:

GENERAL ORDER: 502 Uniform Standards of Conduct

12. Displaying Competent Performance and Achieving Competent Performance Results.

16. Insubordination

17. Knowing, Observing, and Obeying All Directives, Rules, Policies, Procedures, Practices and Traditions

Please consult your union representative if you have any questions regarding these proceedings.


Chief Michael J. Kilbane

1

 

## Michael Kilbane

**From:** Michael Kilbane
**Sent:** 9/14/2018
**To:** Police Patrol
**Subject:** officer activity

Patrol:

It has come to my attention that there have been rumors circulating regarding expectations for patrol officers, so I wanted to be clear about what is driving the discussion.

In July of this year I was asked by the Mayor why our number of traffic citations had declined from the previous year - through June we were down almost 200 tickets over the same period last year.  In August he contacted me again to ask why the totals had declined even further over the month of July.  I assured him that we would investigate our productivity and take steps to address any issues immediately.

Below are the comparisons year to year for the January through July time period (01-01-2017 to 08-03-2017 vs. 01-01-2018 to 08-03-2018):

|  | 2017 | 2018 | Difference |
|---|---|---|---|
| Traffic Stops | 4071 | 3476 | (595) |
| Misdemeanor Arrests | 239 | 211 | (28) |
| Felony Arrests | 42 | 33 | (9) |
| Warrant Arrests | 91 | 87 | (4) |
| Parking Cites | 55 | 21 | (34) |
| Traffic Cites | 2042 | 1711 | (331) |
| OVI | 23 | 24 | 1 |
| Enforcement Services | 6571 | 5578 | (993) |
| MVA Reports | 282 | 266 | (16) |
| Incident Reports | 457 | 407 | (50) |
| Calls for Service | 11889 | 9805 | (2084) |

Lieutenant Mazzola and I have reviewed both individual officer and aggregate division performance at length, and there is no question our results are down.  Staffing levels ebb and flow as officers retire, get promoted, are assigned away from patrol etc., but even with the slight reduction in total hours worked, our call volume and activity levels do not justify such a drastic reduction in productivity.  When we identify deficiencies, we need to address them ASAP.

Lieutenant Mazzola has the responsibility for setting and maintaining performance expectations to ensure that both department-wide and individual productivity is attained, and he does so with my full support and backing.  He will work with your sergeants to monitor performance and make adjustments when necessary.  If anyone thinks that these expectations are unreasonable or unfair, after discussing it with your sergeant and Lieutenant Mazzola, please come see me.

From my experience, I know that we have it very good here, with great pay, flexibility, time off, strong administrative and community support and a reasonable workload.  I appreciate your dedication to our community and look forward to your achieving strong results.

EVANS/PTA083



**Leonard Mazzola**

| | |
|---|---|
| om: | Leonard Mazzola |
| ~ent: | Tuesday, September 25, 2018 04:11 PM |
| To: | Police; Dispatchers |
| Cc: | Data Entry |
| Subject: | Performance Standard |

Patrol,

Effective 10/01/2018,

Over the last month, I have had multiple conversations with Chief Kilbane, concerning Patrol Productivity, discussed at length was traffic citations totals.

After much discussion, it has been decided by the Chief of Police, that I now implement, monitor and manage a Performance Standard for all the officers in the Patrol Division. This Performance Standard will include everything from effective policing to performance and productivity.

The Patrol Sergeants will have a significant role in monitoring their individual shifts' compliance with the Performance Standard.

Chief Kilbane has set a minimum Performance Standard of approximately 3000 traffic citations/year for Patrol ~s a whole, this figure includes Overtime Traffic Details. To obtain this goal, approximately 2000 tickets need be written on shift, and approximately 1000 tickets need to be written on Overtime Traffic Details.

We have a total of 18 Full Time Patrolman in our Patrol Division, Monthly breakdown is 2000/18/12 = 9.26;

To meet this Productivity Standard, Patrol Officers shall meet or exceed 10 traffic citations/month.

This Productivity Standard is independent of time off, special assignment, and OIC assignment.

To ensure this Performance Standard is met, I will be running quarterly reports on officers to ensure compliance, this way an officer with extended time off or assignment will have sufficient time to meet the Productivity Standard without unreasonable demand. The first reporting period will be the last quarter of 2018, Oct18-Dec18.

It is also understood that each Patrol Shift is different in the amount and types of traffic they may encounter daily and that your first responsibility is to protect and serve the public; however this does include traffic enforcement. We will not in any way reduce our level of service, professionalism, or officer safety to meet our Performance Standard.

Please keep in mind that the Performance Standard set by the Chief is not unattainable and can be met.

I have been directed to report any Officer failing to meet their Performance Standard to their Sergeant & Chief Kilbane.

This is a new procedure for us, so no doubt there will be items to work out, I understand, and will do the best I can to operate Patrol as efficiently as possible.

1

EVANS/PTA096

With our transition to Chagrin Valley Dispatch, Officers **MUST log into Sundance on vehicle computers!  Dispatchers & Sergeants need to coordinate info to ensure ALL officers are logged in!**

Officers failing to comply with this computer procedure will be subject to discipline.  This email will be considered and reviewed in any discipline process.  If your computer is not functioning, please report the problem to IT and/or Lt. Kroeger immediately.

Officers assigned to camera cars **MUST use cameras within accordance to our policy!**  Officers failing to comply with this camera procedure will be subject to discipline.  This email will be considered and reviewed in any discipline process.  If your camera is not functioning, please report the problem to Ptl. Pacl and/or Lt. Kroeger immediately.

Lt. Mazzola

Patrol Commander

EVANS/PTA097

GARRITY WARNING

You are required to respond to all questions asked of you in this administrative investigation. Further, you are required to assist investigators with any information they should request. If you fail or refuse to forthrightly answer any and all questions asked, you may be subject to disciplinary action up to and including termination from employment with the City of Independence.

However, in accordance with the United States Supreme Court's decision in Garrity v. New Jersey, 385 U.S.. 493 (1967); your statement, as well as any information gained through your statement cannot be used against you in any criminal proceeding.

You are further ordered not to discuss this internal investigation with anyone other than your chain of command or attorney, including but not limited to witnesses or prospective witnesses. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you up to and including termination from employment with the City of Independence.

Your signature below declares that you have read and understood this warning prior to the initiation of any investigatory interrogation.

Date: 3/13/2019

Officer's Signature: _Mazzola_

Officer's Printed Name: LEONARD MAZZOLA

Witness: _Susan Fenn_

DEFENDANT
EXHIBIT
**EXHIBIT 35**

EVANS/PTA123

**Bill Evans**

| | |
|---|---|
| **From:** | Michael Kilbane <kilbanem@independenceohio.org> |
| **Sent:** | Saturday, March 16, 2019 8:42 AM |
| **To:** | Leonard Mazzola |
| **Subject:** | administrative investigation |

The city has retained an outside firm to conduct an administrative investigation into potential violations of city policies. This firm has determined that follow up interviews are required.  If you are in receipt of this email you will be required to be present for an interview on Wednesday, March 20 at the below listed time.  These interviews will take place at the offices of William D. Evans, 1185 South Main Street, Akron, Ohio 44301.  You are required to answer all questions completely and honestly and assist investigators with any information they request.  If you fail or refuse to forthrightly answer any and all questions asked you may be subject to disciplinary action up to and including termination of employment with the City of Independence.

If you are directed to take a polygraph as part of this investigation you are ordered to submit to a polygraph examination as directed and without delay. A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

You are further ordered not to discuss any aspect of this administrative investigation with anyone other than your department head or chief, attorney or designated union representative (if applicable).  A violation of this order will be considered an act of insubordination, which could result in disciplinary action against you, up to and including termination of employment with the City of Independence.

If you are in a bargaining unit covered by a collective bargaining agreement which provides for presence of a union representative, it is your responsibility to make arrangements for such representation if you so desire.  Sufficient advanced notice is being provided and no interviews will be delayed or rescheduled.

If you have any questions regarding these proceedings please address them directly with your department head or chief.

Employee:  Leonard Mazzola

Interview time: 1000

Location: 1185 South Main Street, Akron, Ohio 44301

1



DEFENDANT
EXHIBIT
**EXHIBIT 37**

EVANS/PTA113

**Michael Kilbane**

| | |
|---|---|
| **From:** | Anthony Togliatti |
| **Sent:** | Tuesday, March 19, 2019 01:30 PM |
| **To:** | Michael Kilbane |
| **Cc:** | Letitia Linker |
| **Subject:** | Conversation with an employee |

Chief,

I thought you should know about a conversation I had recently. An employee came to my office in confidence on Monday morning, March 11, because he wanted to share concerns about conversation he had with another employee over the weekend. He thought I needed to know what was said: this person said that there was a big investigation going on in his department, and if things go bad he had information that could bury the Mayor.

I asked the employee for the name of the person who made these comments, and he named Lenny Mazzola - he was doing work at Lenny's home over the weekend.

Anthony

1



DEFENDANT
EXHIBIT
**EXHIBIT 38**

# FAULKNER, HOFFMAN & PHILLIPS, LLC

A T T O R N E Y S  A T  L A W

**SARA A. LIVA**
DIRECT: 216.453.0587
MAIN: 216.781.3600
FAX: 216.781.8839
liva@fhplaw.com

March 19, 2019



DEFENDANT
EXHIBIT

**EXHIBIT 39**

**Sent via email (evans@polytechassoc.com and billevanslaw@sbcglobal.net)**
William D. Evans
Poly-Tech Associates Inc.
1185 South Main Street
Akron, OH  44301

**RE:    Polygraph of Lt. Leonard Mazzola Independence Police Department**

Dear Mr. Evans,

As you know, this law firm is legal counsel for the Fraternal Order of Police Lodge 67 ("Union" or "FOP"). It has come to my attention that you have been selected to perform a polygraph examination of Lieutenant Leonard Mazzola of the Independence Police Department.  Please be informed that I am Lieutenant Mazzola's legal and union representative and that he has exercised his right to Union representation at all investigatory interviews regarding this matter. As you may know, certain requirements must be met in order to avoid violations of Chapter 4117 of the Ohio Revised Code as well as the terms of the Collective Bargaining Agreement ("CBA") between the City of Independence and the FOP.

Please review the following in preparing for Lieutenant Mazzola's polygraph examination, scheduled to take place on March 20, 2019 at 10:00 AM:

1.    Lieutenant Mazzola has been ordered to submit to this test by representatives of his employer, the City of Independence. He is not submitting to this test voluntarily, but is doing so under threat of disciplinary action if he refuses. Therefore, he will not sign any statement that suggests, in any way, that this is a voluntary test.

2.    While Lieutenant Mazzola maintains that he has committed no violation of state or federal law, he hereby invokes the protections of *Garrity v. New Jersey*, 385 U.S. 493 (1967) and no part of the test results may ever be used against him in any criminal investigation or prosecution.

3.    You must agree to keep the test results confidential and refrain from disclosing those results to anyone not authorized to receive them.

**One International Place** · 20445 Emerald Parkway Dr., Suite 210 · Cleveland, OH 44135-6029

EVANS/PTA076

**FAULKNER, HOFFMAN
& PHILLIPS, LLC**
ATTORNEYS AT LAW

William D. Evans
March 19, 2019
Page **2** of **2**

3.  Lieutenant Mazzola must not be required to waive his right to sue and will not sign any release, general or specific, which would waive his right to bring legal action against you or Poly-Tech Associates Inc., should he have any cause to do so under state or federal law.

4.  It is our understanding that the results of this test could potentially lead to disciplinary action against Lieutenant Mazzola. Under Ohio Revised Code § 4117.03(A) and under Article 13.01 of the CBA, Lieutenant Mazzola has a right the presence of a Union representative at any investigatory interview that could result in disciplinary action. His right to representation includes representation during the entire investigatory interview, regardless of where or how the interview is conducted. Moreover, under the terms of the CBA, said representative must not be a person who is subject to interrogation as a result of the incident out of which the investigation arose. If you have an objection to my presence in the room during the polygraph test, or any portion thereof, please inform me immediately so that we may discuss the matter.

5.  As Lieutenant Mazzola's legal and union representative, I will determine when and how such representation is necessary. Please do not presume to instruct me to remain silent.

6.  Any explanations or descriptions of the testing process should be kept as brief as possible and should limited to only that information required for Lieutenant Mazzola to comply with the requirements of the test.

If you have any questions or comments, please do not hesitate in contact me.

Sincerely yours,

FAULKNER, HOFFMAN & PHILLIPS, LLC, by

Sara A. Liva

SAL:ms

cc:  Lt. Leonard Mazzola, FOP 67
Lt. Chuck Wilson, FOP 67
Robert M. Phillips, Esq.

EVANS/PTA077

EVANS & LIVA DISCUSSED ABOVE letter point by point on 3/19/19 around 4:15 PM.



**From:** O'Brien, Gregory J.
**Sent:** Friday, March 29, 2019 3:01 PM
**To:** 'Robert Phillips' <phillips@fhplaw.com>
**Subject:** Lt. Mazzola



DEFENDANT
EXHIBIT

**EXHIBIT 42**

Bob,

I spoke with the City and I think we can accommodate most of Lt. Mazzola's requests (which I pasted below). Provided Lt. Mazzola retires as set forth below, please be advised :

- Lt. Mazzola will send a correspondence today to the Mayor (togliattia@independenceohio.org) informing of his retirement effective April 1, 2019. He will be retiring at the rank of Lieutenant.
- Appear for work on April 1, 2019  (City will pay him the 4 hours of required show up time) so that his retirement day is established and his City Group Health Insurance will continue through the month of April 2019.  Upon appearing, Lt. Mazzola will return all City owned equipment, documents, keys, security cards,

1

DFNTS_0000323

etc. in his possession, custody, or control.  Should Lt. Mazzola want copies of any documents currently in his possession, to the extent they are public records, as defined under R.C. § 149.43, he may request the documents and I will timely get him a copy of each document that are public records.  Any information that is not a public record (e.g. officer's home address) will be redacted out.   Lt. Mazzola will sign a simple acknowledgement that he has returned all City property and equipment.

- Lt. Mazzola's personnel file will remain as it currently exists.  There have been no written reports created as a result of the most recent investigation.
- Lt Mazzola will receive the following remaining benefits as payouts (this is from the City's Finance Department):
  - 3 hours of Holiday Time;
  - provided he retires through the OP&F Pension Fund effective April 1, 2019, 480 hours Sick Time (this is the maximum permitted).
- Lt. Mazzola will receive payment for any retroactive wage increase from January 1, 2019 through April 1, 2019 should that be agreed to between the City and the Union relative to current negotiations for the Collective Bargaining Agreement.
- Lt. Mazzola will receive a "Letter of Creditable Coverage" from Medical Mutual once it processes his separation from the plan. It is my understanding that is what other plans, pension need as documentation.
- A Ordinance will be placed on the April Council Meeting awarding Lt. Mazzola with his badge and firearm as result of his retirement.

The City will not agree to keeping his commission as a retired officer, or allow him to work "off duty jobs".  The City has never allowed a retiree to work off duty jobs.  Lt. Mazzola may be referring to Savioli and Kavaras when they retired.  Savioli kept his certification as the City's only bomb technician since to certify another officer would substantial. Other than a bomb threat, Savioli's only other service to the City is to certify the inspection of the July 4th fireworks. Kavaras was a Detective when he retired and has kept his certification in the event the City has a major case needing his skill set.

Please have Lt. Mazzola submit his letter of retirement immediately to Mayor Togliatti.

If you could call me when you have 10 minutes as there are a couple other matters I would like to discuss with you.

---

* Retire out as Lieutenant
* Retire with clean employment file, no public docs from Evans
* Paid out for sick time (believe CBA allows 480 hours)
* Be included with any retro check from current negotiations when settled
* Paid out for any vacation and/or holiday per CBA, or paid time off, whatever they wish is fine.

2

DFNTS_0000324

* I'll need confirmation retirement letter from city to forward to health care coordinator at my wife's employment, pension board, deferred comp, etc
* I'd like to keep my status as retired like couple other guys have done. So I can still qualify each year, help them with special events/side jobs if they wish
* Weapon and badge is usually given to retired guys, I'd like that

---

**From:** Robert Phillips <phillips@fhplaw.com>
**Sent:** Thursday, March 28, 2019 1:12 PM
**To:** O'Brien, Gregory J. <gobrien@taftlaw.com>
**Subject:** FW:

Greg, Lenny's concerns are set forth below. Let's see that we are able to help him as much as we can. Nice comment about you.

Robert M. Phillips, Esq.
Faulkner, Hoffman & Phillips, LLC
1 International Place
20445 Emerald Parkway, Suite 210
Cleveland, Ohio 44135
Ph:   (216) 781-3600
Fax: (216) 781-8839
Email:  phillips@fhplaw.com

-----Original Message-----
From: Len Mazzola <lenchip@wowway.com>
Sent: Thursday, March 28, 2019 1:05 PM
To: Robert Phillips <phillips@fhplaw.com>
Subject: RE:

Hi Bob,


Pay periods end on April 6th, April 20th, May 4th, May 18th. So, I would prefer April 20th or Mat 18th (second pay period of each month) My anniversary date is April 16, so this would give me another full year of service, not that it matters at this point.


* Retire out as Lieutenant
* Retire with clean employment file, no public docs from Evans
* Paid out for sick time (believe CBA allows 480 hours)
* Be included with any retro check from current negotiations when settled
* Paid out for any vacation and/or holiday per CBA, or paid time off, whatever they wish is fine.
* I'll need confirmation retirement letter from city to forward to health care coordinator at my wife's employment, pension board, deferred comp, etc
* I'd like to keep my status as retired like couple other guys have done. So I can still qualify each year, help them with special events/side jobs if they wish

DFNTS_0000325

\* Weapon and badge is usually given to retired guys, I'd like that


Other than that I cant think of anything else right now, I'm overwhelmed by the whole situation, just trying to do my best to stay positive. I'm glad Greg Obrien is overseeing this, he is a good person, so let me know what else I can do to help.


Thx, Len


Sent from Mail <https://go.microsoft.com/fwlink/?LinkId=550986> for Windows 10


From: Robert Phillips <mailto:phillips@fhplaw.com>
Sent: Thursday, March 28, 2019 12:18 PM
To: lenchip@wowway.com <mailto:lenchip@wowway.com>
Subject:


As discussed last evening please send me a list of those specific issues/items that we need to insure are in place if you opt to retire. I would suggest that you/wife notify your wife's health carrier of anticipated enrollment. Also some of your paid time coming may need to allow you continue to receive pay while not physically working to allow a smoother transition. Anyway make me bullet points of those type matters. Thanks Bob


Robert M. Phillips, Esq.

Faulkner, Hoffman & Phillips, LLC

1 International Place

20445 Emerald Parkway, Suite 210

Cleveland, Ohio 44135

Ph: (216) 781-3600

Fax: (216) 781-8839

Email: phillips@fhplaw.com <mailto:phillips@fhplaw.com>


4



← AS **Atty Sara Liva** ⌄

Ed just said he asked for info from chief and mayor's office, wanted union or me on camera?

Hmm, we'll have to run that by Bob and Gary

Ok

Prob best not to I think

Well, not you, but the union prez maybe

What I mean is, obviously you probably

Message Atty

DEFENDANT
EXHIBIT
**EXHIBIT 45**

MAZZOLA001380

**AS**  Atty Sara Liva

but they haven't said so as far as I know yet

I believe, again, based on the little info I got from Bob, that they want you gone one way or another

Wow, so guess that's that, what are my options?

I must emphasize though, that I don't have all the information yet. I just know how you must be feeling, so I'm giving

Message Atty

MAZZOLA001381



Atty Sara Liva

3/26/19 12:03 PM

When can you retire?

I recall you saying you could retire in 4 months

I can retire whenever, just didn't want to go out like this

I don't have all the details, but apparently someone from outside the department told the Chief that you discussed the whole quota thing with him

Message Atty

MAZZOLA001382



**Atty Sara Liva**

True I just don't trust a chief obviously and I'd hate to put one of my guys in the crosshairs

I get it

You could do it yourself - since you're already in the hot seat

I mean, in for a dime, in for a dollar so to speak

If you do though, I'd like to go over what you might say and what you shouldn't say - just to be

Message Atty

MAZZOLA001383

Case: 1:19-cv-02519-JPC Doc #: 67 Filed: 06/03/20 395 of 397. PageID #: 1500



**Atty Sara Liva**

everything. Just hang tight for now. Sorry, I know this must be

incredibly stressful for you.

Yeah it has, might be best thing for me to retire anyway, I don't want them trying to mess with my pension

Right, exactly, but I'm not entirely sure how serious things have gotten at this point (or not gotten).

Message Atty

MAZZOLA001384

4:08 PM

← AS **Atty Sara Liva** ⌄

Bob recommends that Chuck Wilson to give an interview

Since he's the designated Union representative

I would rather not ask Chuck to do that, that puts him in a position for the chief to retaliate against him

Wouldn't that be a little too obvious?

Chief doesn't care, it's

＋ Message Atty ➤

MAZZOLA001385



MAZZOLA001386