# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | |
|---|---|
| **LEONARD MAZZOLA,** <br><br> *Plaintiff,* <br><br> vs. <br><br> **ANTHONY TOGLIATTI**, *et al.* <br><br> *Defendants.* | Case No. 1:19-CV-02519 <br><br> Judge James S. Gwin <br><br> Magistrate Judge David A. Ruiz |

**PLAINTIFF LEONARD MAZZOLA'S OPPOSITION TO MOTION FOR SUMMARY JUDGMENT BY DEFENDANTS MICHAEL KILBANE AND GREGORY O'BRIEN**

Plaintiff Leonard Mazzola respectfully opposes the motion for summary judgment filed by Defendants Michael Kilbane and Gregory O'Brien (Doc. #71) because, as the attached memorandum of law explains, there are genuine issues of material fact and these Defendants are not entitled to judgment as a matter of law.

TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

ISSUES PRESENTED ............................................................................................................1

FACTS ................................................................................................................................1

I.      Mazzola voices opposition to the traffic-ticket quota in late 2018 ...............................1

II.     After Kilbane doubles down on quota, Mazzola speaks out again ............................. 2

III.    I-TEAM reporter Ed Gallek publishes an exposé on the quota; the City investigates
        who gave him information ......................................................................................... 2

IV.     Believing Mazzola gave Gallek information, Defendants issue Mazzola an
        ultimatum: humiliating demotion or early retirement. ................................................ 4

V.      Gallek reveals that Mazzola gave him no information, but Defendants take further
        adverse action............................................................................................................ 6

LEGAL STANDARD ........................................................................................................... 6

LAW AND ARGUMENT ....................................................................................................... 7

I.      Defendants are not entitled to summary judgment on Mazzola's First
        Amendment-retaliation claim.................................................................................... 7

        A.   Mazzola engaged in constitutionally protected speech. ....................................... 7

             1.   Both Mazzola's speech to City officials and purported speech to the media
                  addressed a matter of public concern. .............................................. 9

             2.   Mazzola spoke as a private citizen. ................................................... 9

             3.   Mazzola's right to speak out on the traffic-ticket quota affecting
                  Independence drivers outweighed any purported "efficiency"
                  concerns..................................................................................... 11

        B.   Defendants took adverse actions against Mazzola that would chill a person
             of ordinary firmness from continuing to engage in speech on that subject........12

        C.   Defendants' adverse actions against Mazzola were motivated—at least in part—
             by his protected speech and/or Defendants' belief that he engaged in protected
             speech. ....................................................................................................15

        D.   Neither the presence of the union's lawyer nor the availability of union-
             grievance procedures absolves Defendants of fault for their adverse actions

against Mazzola.........................................................................................15

E.  Defendants are not entitled to qualified immunity because Mazzola's right to speak on a matter of public concern was clearly established. .............................16

II.  Defendants Kilbane and O'Brien aren't entitled to summary judgment for Ohio civil-liability-for-criminal-acts because the evidence supports interference with civil rights.......................................................................................................19

CONCLUSION.......................................................................................................20

TABLE OF AUTHORITIES

## Cases

*Alford v. South Carolina Dept. of Corrections,*
   No. 3:04-CV-23257, 2006 WL 1997434 (D.S.C. Jul. 17, 2006). ........................................ 13

*Allen v. Michigan Dep't of Corr.,*
   165 F.3d 405 (6th Cir. 1999). ........................................................................................ 13

*Anderson v. Creighton,*
   483 U.S. 635 (1987). ...................................................................................................... 17

*Ashcroft v. al-Kidd,*
   563 U.S. 731 (2011). ...................................................................................................... 17

*Banks v. Wolfe Cty. Bd. of Educ.,*
   330 F.3d 888 (6th Cir. 2003). .......................................................................................... 9

*Baumann v. District of Columbia,*
   987 F.Supp.2d 68 (D.D.C. Oct. 28, 2013). ...................................................................... 7

*Bell v. Johnson,*
   308 F.3d 594 (6th Cir. 2002). ........................................................................................ 17

*Benison v. Ross,*
   765 F.3d 649 (6th Cir. 2012). .......................................................................................... 7

*Bivins v. U.S. Pipe & Foundry Co.,*
   48 Fed. App'x 570 (6th Cir. 2002) ................................................................................. 13

*Breaux v. City of Garland,*
   205 F.3d 150 (5th Cir. 2000). ........................................................................................ 13

*Brodheim v. Cry,*
   583 F.3d 1262 (9th Cir. 2009). ...................................................................................... 13

*Brown v. Crowley,*
   312 F.3d 782 (6th Cir. 2002). ........................................................................................ 13

*Buddenberg v. Weisdack,*
   939 F.3d 732 (6th Cir. 2019). ....................................................................7, 9, 10, 15, 19

*Burgess v. Fischer,*
   735 F.3d 462 (6th Cir. 2013). .......................................................................................... 6

*Celotex Corp. v. Catrett,*
   477 U.S. 317 (1986). ...................................................................................................... 15

*Chappel v. Montgomery Cty. Fire Protection Dist. 1,*
   131 F.3d 564 (6th Cir. 1997). ..................................................................................... 17

*City of Lakewood v. Plain Dealer Pub. Co.,*
   486 U.S. 750 (1988). ................................................................................................. 19

*Cleare v. Jenkins,*
   No. 2:15-CV-2295, 2016 WL 3458193 (S.D. Ohio Jun. 24, 2016). ..................................... 13

*Connick v. Myers,*
   461 U.S. 138 (1983). ...............................................................................................9, 10

*Cox Broadcasting Corp. v. Cohn,*
   420 U.S. 469 (1975). ................................................................................................. 18

*Cox v. Louisiana,*
   379 U.S. 536 (1965). ................................................................................................. 19

*DeCrane v. Eckart,*
   Case No. 1:16-CV-2647, 2020 WL 2475357 (N.D. Ohio May 13, 2020). .......................... 14

*Dietrich v. Burrows,*
   167 F.3d 1007 (6th Cir. 1999) ..................................................................................... 17

*Dye v. Office of the Racing Comm'n,*
   702 F.3d 286, 303 (6th Cir. 2012) ...........................................................................12, 15

*Eckerman v. Tennessee Dep't of Safety,*
   636 F.3d 202 (6th Cir. 2010). ..................................................................................... 15

*Ehrlich v. Kovack,*
   710 Fed.App'x. 646 (6th Cir. 2017) ............................................................................ 13

*Evans-Marshall v. Board of Educ. Of Tipp City Exempted Village School Dist.,*
   624 F.3d 332 (6th Cir. 2010). ..................................................................................... 15

*Evans-Marshall v. Board of Education of the Tipp City Exempted Village School District,*
   428 F.3d 223 (6th Cir. 2005). ..................................................................................... 17

*Ford v. Hamilton County Juvenile Court,*
   No. 1:05-CV-557, 2007 WL2302816 (S.D. Ohio Aug. 8, 2007) ........................................ 14

*Fritz v. Charter Tp. of Comstock,*
   592 F.3d 718 (6th Cir. 2010). ..................................................................................... 12

*Garcetti v. Ceballos,*
   547 U.S. 410, 421 (2006) ..................................................................................... 9, 10, 11

*Gaspar v. Dicks*,
  No. 08-CV-13707, 2010 WL 5462546 (E.D. Mich. Dec. 29, 2010)....................................12

*Farmer v. Cleveland Public Power*,
  295 F.3d 593 (6th Cir. 2002). ...........................................................................................12

*Greisen v. Hanken*,
  925 F.3d 1097 (9th Cir. 2019) ...........................................................................................13

*Handy-Clay v. City of Memphis, Tenn.*,
  695 F.3d 531 (6th Cir. 2012). ...............................................................................9, 12, 17

*Heffernan v. City of Paterson, N.J.*,
  136 S.Ct. 1412 (2016). .............................................................................................7, 9, 17

*Hoover v. Radabaugh*,
  307 F.3d 460 (6th Cir. 2002). ......................................................................................9, 17

*Hughes v. Region VII Area Agency on Aging*,
  542 F.3d 169 (6th Cir. 2008). ...........................................................................................18

*Johnston v. O'Neill*,
  130 Fed.App'x 1(6th Cir. 2005). .......................................................................................13

*Klosowski v. City of Bay City*,
  696 F. App'x 707 (6th Cir. 2017)......................................................................................10

*Kocsis v. Multi-Care Management, Inc.*,
  97 F.3d 876 (6th Cir. 1996). .............................................................................................13

*Kunz v. New York*,
  340 U.S. 290 (1951).. ........................................................................................................19

*Lane v. Franks*,
  573 U.S. 228 (2014). ....................................................................................9, 10, 11, 12

*Laster v. Kalamazoo*,
  746 F.3d 714 (6th Cir. 2014). ...........................................................................................12

*Leary v. Daeschner*,
  349 F.3d 888 (6th Cir. 2003). .............................................................................................9

*Matulin v. Village of Lodi*,
  862 F.2d 609 (6th Cir. 1988). .....................................................................................15, 17

*Mayhew v. Town of Smyrna*,
  856 F.3d 456 (6th Cir. 2017). .............................................................................................7

*McDonnell Douglas Corp. v. Green,*
   411 U.S. 792 (1973). ........................................................................................................13

*Mitchell v. Vanderbilt University,*
   389 F.3d 177 (6th Cir. 2004). ..........................................................................................13

*Mullenix v. Luna,*
   136 S.Ct. 305 (2015). ......................................................................................................17

*Newton v. Meijer Stores Ltd. Partnership,*
   347 F.Supp.2d 516 (N.D. Ohio Dec. 8, 2004). ...............................................................13

*Okwedy v. Molinari,*
   333 F.3d 339 (2d Cir. 2003)............................................................................................13

*Pardi v. County of Wayne,*
   No. 12-CV-12063, 2013 WL 1011280 (E.D. Mich. Mar. 14, 2013)................................13

*Pickering v. Bd. of Educ.,*
   391 U.S. 563 (1968). ..................................................................................................10, 11

*Rademakers v. Scott,*
   No. 2:07-CV-718, 2009 WL 3459196 (M.D. Florida Jan. 22, 2009)...............................13

*Rahn v. Drake Center, Inc.,*
   31 F.3d 407 (6th Cir. 1994).. ............................................................................................9

*Regan v. Faurecia Auto. Seating, Inc.,*
   679 F.3d 475 (6th Cir. 2012). ..........................................................................................14

*Rodgers v. Banks,*
   344 F.3d 587 (6th Cir. 2003). ............................................................................................9

*Roth v. United States,*
   354 U.S. 476 (1957). ........................................................................................................10

*Saia v. New York,*
   334 U.S. 558 (1948). ........................................................................................................19

*Savage v. Gee,*
   665 F.3d 732 (6th Cir. 2012). ..........................................................................................14

*Scarborough v. Morgan County Bd. of Educ.,*
   470 F.3d 250 (6th Cir. 2006). ..........................................................................................17

*See v. City of Elyria,*
   502 F.3d 484 (6th Cir. 2007). ..........................................................................................16

*Sharp v. Lindsey,*
    285 F.3d 479 (6th Cir. 2002). ................................................................................... 9

*Simmington v. Gates,*
    No. DKC 08-3169, 2010 WL 1346462 (D. Maryland Mar. 30, 2010).................................. 13

*Smith v. Fruin,*
    28 F.3d 646 (7th Cir. 1994). .................................................................................... 12

*Smith v. Smith,*
    No. 5:05CV2069, 2006 WL 2855076 (N.D. Ohio 2006)......................................... 9, 11

*Spain v. Mansfield,*
    915 F.Supp. 919 (N.D.Ohio, Feb. 9, 1996). .......................................................... 19

*Spence v. Washington,*
    418 U.S. 405 (1974). ............................................................................................ 8

*Spencer v. City of Catlettsburg,*
    506 Fed. App'x 392 (6th Cir. 2012) ..................................................................... 18

*Staub v. City of Baxley,*
    355 U.S. 313 (1958). ........................................................................................... 19

*Taylor v. Keith,*
    338 F.3d 639 (6th Cir. 2003). ............................................................................... 15

*Texas v. Johnson,*
    491 U.S. 397 (1989). ........................................................................................ 7, 8

*Thaddeus-X v. Blatter,*
    175 F.3d 378 (6th Cir. 1999). ............................................................................... 15

*Thompson v. Ohio State Univ.,*
    990 F.Supp. 2d 801 (S.D. Ohio 2014). .................................................................. 13

*U.S. v. Kim,*
    808 F.Supp.2d 44 (D.D.C. 2011) ........................................................................... 8

*United States v. National Treasury Employees Union,*
    513 U.S. 454 (1995). ........................................................................................ 8, 11

*Van Compernolle v. City of Zeeland,*
    241 Fed.App'x. 244 (6th Cir. 2007)....................................................................... 9

*White v. Columbus Metro. Housing Authority,*
    429 F.3d 232 (6th Cir. 2010). ............................................................................... 12

*White v. Pauly*,
   137 S.Ct. 548 (2017) (per curiam). ..................................................................................... 17

*Whitney v. City of Milan*,
   677 F.3d 292 (6th Cir. 2012). .................................................................9, 11, 17, 18

*Wright v. City of Euclid*,
   962 F.3d 852 (6th Cir. 2020). ............................................................................................ 6

*Zickes v. County*,
   207 F.Supp. 3d 769 (N.D. Ohio Sep. 16, 2016)..............................................................13, 14

**Statutes**

42 U.S.C. § 1981...................................................................................................................... 13

42 U.S.C. § 1983 ..................................................................................................................... 20

42 U.S.C. § 2000e *et seq.*......................................................................................................12, 13

Ohio Rev. Code § 2307.60.....................................................................................................1, 19

Ohio Rev. Code § 2921.45.....................................................................................................1, 19

**Rules**

Fed. R. Civ. P. 30....................................................................................................................... 5
Fed. R. Civ. P. 56...................................................................................................................6, 15

**ISSUES PRESENTED**

1.  **First Amendment retaliation—speech on "public concern":** Public-employee speech addresses a matter of "public concern" if it relates to any political, social, or other community concern, including governmental wrongdoing or the operation of a public-safety organization. Mazzola spoke to City officials and allegedly spoke to the media about the police chief's traffic-ticket quota, which Mazzola considered unethical. Did Mazzola speak on a matter of public concern?

2.  **First Amendment retaliation—adverse action:** An "adverse action" to prove First Amendment retaliation is any that would deter a person of ordinary firmness from speaking. Defendants planned to immediately demote Mazzola from lieutenant to patrol officer, add him to the *Brady/Giglio* list of unethical police, and add investigative and disciplinary materials to his file. They conveyed, through union representatives, that his only alternative was premature retirement. Did Defendants take adverse actions?

3.  **Qualified immunity:** Public employees' right to engage in protected speech without retaliation is clearly established. The City planned to discipline Mazzola, in part, for his speech to Defendant Togliatti—made outside Mazzola's chain of command and in a private conversation—and for his alleged speech to a news reporter regarding ethical and legal concerns about Chief Kilbane's traffic-ticket quota. Should Defendants have known that Mazzola had a right to communicate with Togliatti and media about this quota?

4.  **Ohio civil-liability for criminal-acts claims:** Ohio Rev. Code § 2307.60 provides a civil cause of action to recover damages for violation of a criminal statute, and § 2921.45 criminalizes interfering with civil rights. Kilbane launched an investigation into Mazzola's purported speech, and O'Brien helped punish Mazzola for speech about the traffic-ticket quota, as reflected in an email O'Brien sent. Do fact issues preclude summary judgment?

**FACTS**

I.  **Mazzola voices opposition to the traffic-ticket quota in late 2018.**

In late 2018, Defendant Kilbane, police chief, imposed a "performance standard"—a quota—that required each patrol officer to issue a minimum number of 10 citations per month[1] because he was displeased by a perceived decline in citations based on raw data that didn't consider other factors.[2] Then-Lt. Mazzola thought this was an unfair ticket quota.[3] While Kilbane resisted calling his edict a "quota," he admitted that it required a minimum number of traffic citations.[4] Mazzola directed his sergeants to require officers to conduct "two to three enforcement actions per

---

[1] Dep. of Leonard Mazzola 232:1-18, 268:24–269:18 (July 20, 2020) (Doc. #67). (Excerpts at **Ex. 1**.)
[2] *Id.*, at 185:3-9, 185:21-23, 187:6-14 and Defs.' Exs. 9 and 20.
[3] Dep. of Charles Wilson 79:1-12 (Jul. 30, 2020) (Doc. #70). (Excerpts at **Ex. 2**.)
[4] Dep. of Michael Kilbane 127:1-14 (Jul. 29, 2020) (Doc. #65). (Excerpts at **Ex. 3**.)

shift"[5] and believed he was following Kilbane's order to increase citations. [6]

But on September 4, 2018, Kilbane summoned Mazzola to a pre-disciplinary meeting for insubordination.[7] After Mazzola explained that Kilbane's numbers were wrong,[8] Kilbane sent Mazzola to training,[9] which cautioned against citation minimums, reinforcing Mazzola's concerns.[10] Although Mazzola didn't agree with Kilbane's quota, he implemented it, and on January 7, 2019 issued a written reprimand to Ptl. Brian Dalton for failing to meet it.[11]

## II.    After Kilbane doubles down on quota, Mazzola speaks out again.

Mazzola remained troubled by the quota, so he emailed the human-resources manager to say he thought it was illegal and unethical.[12] Kilbane emailed Mazzola on February 27, 2019 to instruct that any productivity system he used must include the quota.[13] Mazzola met with then-Mayor Togliatti the next day to address his public-policy concerns about the quota.[14] He told Togliatti the quota would create legal and political nightmares. He explained the conflict between his professional responsibilities and personal principles: he wanted to follow Kilbane's order, but it was illegal and unethical. Mazzola asked Togliatti to review a draft email to Kilbane addressing his concerns, and Togliatti advised not to send it.[15]

## III.   I-TEAM reporter Ed Gallek publishes an exposé on the quota; the City investigates who gave him information.

Meanwhile, on January 14, 2019, reporter Ed Gallek published a story on the City's ticket quota.[16] Mazzola was surprised to see that Gallek appeared to have two police documents. He

---

[5] Mazzola Dep. at 170:18–171:12, 183:12-22 and Defs.' Exs. 11.
[6] *Id.* at 177:8–181:4.
[7] *Id.* at 192:7-12, 198:3-22 and Defs.' Ex. 13.
[8] *Id.* at 208:16-25.
[9] *Id.* at 245:5-7, Defs.' Ex. 19.
[10] *Id.* at 267:19–269:18.
[11] *Id.* at 258:3–259:11; Defs.' Ex. 27, EVANS/PTA086.
[12] Email from Mazzola to Linker (Feb. 21, 2019) (**Ex. 4**).
[13] Email from Kilbane to Mazzola (Feb. 27, 2019) (**Ex. 5**).
[14] Decl. of Mazzola ¶¶ 3–5 (Aug. 25, 2020) (**Ex. 6**).
[15] Mazzola Decl. at ¶ 5.
[16] Decl. of Ed Gallek (Aug. 13, 2020). (**Ex. 7**.)

neither gave the documents to Gallek nor to someone to pass along.[17]

Togliatti, at Kilbane's request, authorized William Evans to conduct an internal investigation[18] into who gave documents and information to Gallek.[19] Evans performed an administrative—not criminal—investigation.[20] On March 7, 2019, one week after his meeting with Togliatti, Mazzola received an email ordering him to attend a March 13 interview with Evans.[21] Until the interview began, he didn't know the investigation concerned Gallek's news story.[22]

The Fraternal Order of Police thought the City was targeting Mazzola and expected "this would one way or another result in Mr. Mazzola being disciplined."[23] During his interview, union representative Charles Wilson told Evans that the documents were in the union office and that someone could have taken them from there to give to Gallek.[24] But Kilbane ordered Mazzola—and only Mazzola—to take a polygraph.[25] The union objected because department policy only allowed polygraphs during *criminal* investigations—which this was not.[26] No one informed Evans of the prohibition,[27] but Evans's notes about a First Amendment discussion nonetheless revealed his concern that "retaliation could be a problem."[28] The polygraph, like the rest of the investigation, was laser-focused on finding out who communicated with Gallek.[29]

---

[17] Mazzola Dep. at 251:2-25.
[18] Dep. of Anthony Togliatti 9:11–10:13 (Jul. 24, 2020) (Doc. #69) (excerpts attached as **Ex. 8**).
[19] Dep. of Sara Liva 56:9-17 (Jul. 21, 2020) (Doc. #66) (excerpts attached as **Ex. 9**); Dep, of William Evans 15:3-8 (May 12, 2020) (Doc. #64) (excerpts attached as **Ex. 10**).
[20] Evans Dep. at 18:22–19:1.
[21] Mazzola Dep. at 272:10-21.
[22] *Id.* at 273:18-24, 278:14-24.
[23] Liva Dep. at 35:7-20.
[24] Wilson Dep. at 75:23-76:3.
[25] Evans Dep. at 121:3–19; Kilbane Dep. at 52:7–22.
[26] Liva Dep. at 29:7–22, 84:19–20.
[27] Evans Dep. at 86:5-17. If he had known about the policy, he would have asked the City whether they wanted to convert the administrative investigation to a criminal investigation *Id.* at 87:18-23.
[28] Evans records, EVANS/PTA103 (3-14-19, calls with Esposito and Kopp) (excerpts included in Ex. 2 to Evans Dep., **Ex. 10**).
[29] Evans records at EVANS/PTA002 (Polygraph questions: "1. Did you provide any information contained in those documents to the media? 2. Do you know for sure, who provided information contained in those documents to the media? 3. Did you help provide information contained in those documents to the media?")

## IV.     Believing Mazzola gave Gallek information, Defendants issue Mazzola an ultimatum: humiliating demotion or early retirement.

After the polygraph, Mazzola spoke to union representative Lieutenant Charles Wilson on Wednesday, March 27, 2019 at 4:34 p.m., and Wilson told him the City was going to demote him to patrolman and add him to the *Brady/Giglio* list of dishonest officers.[30] Wilson says the union's attorney Robert Phillips relayed this information, although Phillips now says the City was "thinking" about demoting Mazzola,[31] invoking a "rumor."[32] But even Phillips acknowledged it would "not be tenable" for Mazzola to live through demotion pending arbitration.[33] And he recognized that Wilson spoke on the union's behalf, so Mazzola could rely on representations Wilson made.[34]

Phillips called Mazzola at 6:11 p.m. and confirmed what Mazzola heard from Wilson.[35] The discipline would take effect immediately and remain in effect unless Mazzola pursued a union grievance and an arbitrator overturned it, which could take years—and wasn't guaranteed.[36] Per Phillips, the City would not follow through with the discipline if Mazzola entered early retirement, so Mazzola told Phillips he would discuss it with his family and consider it.[37]

O'Brien had told Phillips the City would discipline Mazzola—and expected Phillips to tell Mazzola that.[38] Then City Law Director Gregory O'Brien outlined the planned charges by email to Phillips the next day, March 28, 2019 at 11:57 a.m., writing that "the City intended on pursuing disciplinary action against Lt. Mazzola" for "Lying during a formal internal investigation on the unauthorized dissemination of departmental documents; Lying to the Mayor regarding performance measurement standards allegedly approved by the Chief[;] Intentionally ignoring a previous

---

[30] Wilson Dep. at 26:18–27:6; Mazzola Dep. at 302:11–303:9; Mazzola Decl. at ¶ 6.
[31] Dep. of Robert Phillips 64:5–8 (Jul. 21, 2020) (Doc. #68) (excerpts at **Ex. 11**).
[32] *Id.* at 46:3–4.
[33] *Id.* at 46:4–24.
[34] *Id.* at 85:7–18.
[35] Mazzola Decl. at ¶ 7.
[36] Liva Dep. at 81:3-11.
[37] Mazzola Decl. at ¶ 7.
[38] Dep. of Gregory O'Brien 97:23-99:12 (Jul. 30, 2020) (Doc. #81) (excerpts attached as **Ex. 12**).

departmental order, ten (10) incidents of usurping his superiors to directly communicate with City officials and employees regarding departmental staffing, training, and policies and procedures[;] [and] The release of departmental documents outside of the police department[.]"[39] Although O'Brien refused to disclose the factual basis for these charges, claiming attorney-client privilege,[40] it's clear that the first "dishonesty" charge referred to his failed polygraph; the "unauthorized release" charges referred to giving documents to Gallek; and the third "dishonesty" charge and one or more "insubordination" charges referred to his meeting with Togliatti.

Defendants obscured who planned the discipline. Kilbane says Togliatti made decisions on punitive discipline (like demotions)[41] with his advice.[42] But Togliatti insists *Kilbane* handled discipline for the police department,[43] and he denied discussing Mazzola's discipline with Kilbane or anyone else.[44] Kilbane, in turn, denied considering discipline for Mazzola[45] and denied any knowledge of anyone requiring Mazzola to retire or be demoted, and to be added to the *Brady/Giglio* list.[46] The official testimony of the City of Independence—given by Rule 30(b)(6) representative Kilbane—corroborated Kilbane's testimony that the City had not contemplated specific discipline.[47]

Phillips called Mazzola again at 3:49 p.m. on Friday, March 29, 2019[48] and said that the City would let him retire instead of facing discipline, but only if he emailed his retirement notice in just over an hour—by 5:00 p.m..[49] Under duress, and with no way to avoid his career being forever

---

[39] *Id.*, Defs.' Ex. 56 to O'Brien Dep.

[40] *Id.* at 28–29.

[41] Kilbane Dep. at 90:3-8.

[42] *Id.* at 96:8-16.

[43] Togliatti Dep. at 67:11-19, 75:14-17.

[44] *Id.* at 89:12–90:12.

[45] Kilbane Dep. at 63:18-24, 91:10-17, 93:4-15, 161:7-18.

[46] *Id.* at 216:12-22.

[47] Dep. of City of Independence 45:6–46:14 ("There was no specific discipline contemplated. We hadn't even determined potential specific charges yet[.]" *Id.* at 45:10–12.) (August 4, 2020) (Doc. #82) (Excerpts at **Ex. 13**).

[48] Mazzola Dep. at 314:10-13; Ex. 6, Mazzola Decl at ¶ 11.

[49] Mazzola Dep. at 312:1–314:16.

sullied by punitive discipline and a *Brady/Giglio* designation, Mazzola capitulated,[50] releasing no claims.[51]

## V.    Gallek reveals that Mazzola gave him no information, but Defendants take further adverse action.

On May 3, 2019, Gallek published just such a story, which was accurate.[52] Although Kilbane and O'Brien admitted in written discovery that Gallek admitted that Mazzola supplied no information to the I-TEAM,[53] in his deposition, Kilbane acted befuddled over Gallek's plain words,[54] pretending he had no idea who Gallek was saying hadn't provided information. Defendants took no action to remedy the harm they'd caused Mazzola after Gallek's May 3, 2019 reporting.[55] Instead, they took further adverse action against Mazzola a few months later: despite agreeing not to add any documents from Evans's investigation to Mazzola's file as a condition of his agreement to retire,[56] Kilbane double-crossed Mazzola and added the polygraph materials to Mazzola's file after Mazzola filed this lawsuit.[57]

## LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is appropriate if "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."[58] At this stage, courts should construe all evidence and draw all reasonable inferences in favor of the nonmoving party.[59]

---

[50] Mazzola Decl. at ¶¶ 13, 18.
[51] O'Brien Dep. at 78:20–24, 90:12–17. 96:19–97:9
[52] Gallek Decl., ¶ 7.
[53] Def. Kilbane's Ans. to Req. for Adm'n, No. 94 (attached as **Ex. 14**); Def. O'Brien's Ans. to Req. for Adm'n, No. 3 (attached as **Ex. 15**). Each answered: "Defendant admits that the Fox 8 news story posted on May 3, 2019 states, 'However, [Plaintiff] never supplied any information to the I-TEAM'..."
[54] Kilbane Dep. at 176:3–184:11.
[55] Togliatti Dep. at 48:5–51:23.
[56] O'Brien Dep. at 72:12–73:21.
[57] Kilbane Dep. at 251:16–252:17.
[58] Fed. R. Civ. P. 56(a).
[59] *Wright v. City of Euclid*, 962 F.3d 852, 864 (6th Cir. 2020), citing *Burgess v. Fischer*, 735 F.3d 462, 471 (6th Cir. 2013).

LAW AND ARGUMENT

**I.      Defendants are not entitled to summary judgment on Mazzola's First Amendment–retaliation claim.**

To establish a *prima facie* case of First Amendment retaliation, Mazzola need show only three elements: (1) He engaged in constitutionally protected speech; (2) Defendants took adverse action against him that would deter a "person of ordinary firmness" from continuing the speech; and (3) The adverse action was caused at least in part by the protected speech.[60]

**A.  Mazzola engaged in constitutionally protected speech.**

To decide whether Mazzola engaged in protected speech, courts apply three factors:[61] (1) whether the speech addressed a matter of public concern; (2) whether the employee spoke as a private citizen; and (3) whether the public employee's free-speech interest outweighs the employer's interest in "promoting the efficiency of the public services it performs[.]"[62] And an employer's mistaken belief that the employee engaged in protected speech confers protection against retaliation.[63]

Mazzola both actually engaged in speech (to the HR director and Togliatti) and was wrongly believed to have engaged in speech (to the media). Whoever gave documents to Gallek engaged in speech in two ways. First, releasing documents to the media is expressive conduct or "speech" under the First Amendment.[64] The Supreme Court has "long recognized" that the First Amendment's protection "does not end at the spoken or written word."[65] Conduct is "sufficiently imbued with

---

[60] *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019), citing *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2012).

[61] *Id.*, citing *Mayhew v. Town of Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017).

[62] *Id.*, citing *Mayhew*, 856 F.3d at 462

[63] *Heffernan v. City of Paterson, N.J.*, 136 S.Ct. 1412, 1418 (2016).

[64] *See, e.g.*, *Baumann v. District of Columbia*, 987 F.Supp.2d 68, 75 (D.D.C. Oct. 28, 2013) (holding that police officer who released emergency-call recording to media without authorization engaged in expressive conduct and spoke to media as a citizen on a matter of public concern).

[65] *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

elements of communication" to garner First Amendment protection when it presents "[a]n intent to convey a particularized message" and when "the likelihood was great that the message would be understood by those who viewed it."[66] And the Court has also "made clear that the First Amendment protects expressive conduct whether it is oral, written, or symbolic."[67]

Second, the content of Gallek's article shows that the person who gave the documents about Kilbane's quota to him engaged in other oral or written speech to provide more information. Indeed, Gallek's article specifically references information he learned from outside the four corners of each document, including reporting that "talk" about the quota "began in the police department months ago"[68] and that Brian Dalton had filed a grievance.[69]

Defendants protest, in revisionist and pretextual fashion, that they weren't concerned about any oral speech—only the unauthorized "theft" and transmission of public documents.[70] But Defendants' agent, Evans, who investigated Mazzola, focused entirely on finding out who communicated with Gallek. By Defendants' logic, the First Amendment would protect a public employee's spoken words to a reporter disclosing public records' contents, but not the employee's transmission of the records themselves. This distinction is supported by neither legal authority nor reason. The City's admitted broad "policy" is therefore an unconstitutional prior restraint,[71] as alleged in the Complaint.[72]

While Mazzola didn't actually provide the information to Gallek, Defendants' adverse actions, motivated by their incorrect perception he did so, is actionable as First Amendment

---

[66] *Id.*, citing *Spence v. Washington*, 418 U.S. 405, 409–11 (1974).
[67] *U.S. v. Kim*, 808 F.Supp.2d 44, 56 (D.D.C. 2011), citing *Texas v. Johnson*, 491 U.S. 397, 404 (1989).
[68] Gallek Decl. at ¶ 4.
[69] Gallek Decl. at ¶ 4.
[70] Kilbane Dep. at 182:14–22.; Kilbane's Answers to Interrogatories Nos. 9, 13 (**Ex. 16**.).
[71] *United States v. National Treasury Employees Union*, 513 U.S. 454, 475 (1995).
[72] *See* Am. Compl. ¶ 138 (Doc. #7).

retaliation.[73] Even accepting Defendants' untrue contentions that disclosing public records to another person isn't speech and that the City could punish this conduct as a policy violation, Defendants still took adverse action against Mazzola, in part, for other protected speech—to City officials and to Gallek.

### 1. Both Mazzola's speech to City officials and purported speech to the media addressed a matter of public concern.

The first factor used to decide whether public-employee speech is protected—whether it addressed an issue of "public concern"—is a question of law.[74] Speech is directed to a matter of public concern when it relates to "any matter of political, social, or other concern to the community," a "subject of legitimate news interest, or "a subject of … value and concern to the public."[75] This includes speech on governmental wrongdoing, abuses of power,[76] and the correct operation of a public-safety institution.[77] Matters of personal interest are not protected.[78] But "[t]he entirety of the employee's speech does not have to involve matters of public concern, so long as some portion does.[79] Here, where Mazzola spoke to City officials (and allegedly spoke to the media) about how the quota was legally and ethically problematic, this speech addressed governmental wrongdoing and the police department's correct operation—textbook matters of public concern.

### 2. Mazzola spoke as a private citizen.

The second factor—whether the employee spoke as a private citizen—examines whether the employee spoke pursuant to his ordinary job duties. Whether the speech *relates* to the public

---

[73] *Heffernan v. City of Paterson*, N.J., 136 S.Ct. 1412 (2016).

[74] *Van Compernolle v. City of Zeeland*, 241 Fed.App'x. 244, 249 (6th Cir. 2007), citing *Garcetti*, 547 U.S. at 418.

[75] *Buddenberg*, 939 F.3d at 739, citing *Lane v. Franks*, 573 U.S. 228, 241 (2014).

[76] *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 544 (6th Cir. 2012); *Whitney v. City of Milan*, 677 F.3d 292, 297 (6th Cir. 2012).

[77] *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002).

[78] *Smith v. Smith*, No. 5:05-CV-2069, 2006 WL 2855076, *6 (N.D. Ohio 2006), citing *Connick v. Myers*, 461 U.S. 142, 146-47 (1983); *Leary v. Daeschner*, 349 F.3d 888, 899 (6th Cir. 2003); *Rodgers v. Banks*, 344 F.3d 587, 596 (6th Cir. 2003); *Banks v. Wolfe Cty. Bd. of Educ.*, 330 F.3d 888, 893 (6th Cir. 2003); *Sharp v. Lindsey*, 285 F.3d 479, 484 (6th Cir. 2002)).

[79] *Id.,* citing *Connick*, 461 U.S. at 149; *Leary*, 349 F.3d at 899–900; *Rodgers*, 344 F.3d at 597; *Rahn v. Drake Center, Inc.*, 31 F.3d 407, 411 (6th Cir. 1994).

employment doesn't matter because "[s]peech by citizens on matters of public concern lies at the heart of the First Amendment," and "[t]his remains true when speech concerns information related to or learned through public employment."[80] Indeed, public employees' speech on issues *related* to their duties—as distinct from speech *for* their official duties[81]—is especially valuable because of the knowledge they gained from their jobs.[82]

The key to this distinction is whether the speech is "ordinarily within the scope of an employee's duties" or "merely concerns those duties[,]"[83] and the inquiry turns on the "content, form, and context" of the speech.[84] Here, when Mazzola spoke to the HR director and the mayor, he did so outside the scope of his job duties, which didn't include criticizing Kilbane's orders.[85] Indeed, Defendants themselves insist Mazzola spoke to Togliatti outside his chain of command and deemed his speech to Togliatti insubordination.[86] If Mazzola had spoken to Gallek, that would've been outside the scope of his job duties, which didn't involve communicating with the media or producing public records.[87] Considering the content, form, and context of Mazzola's speech—in which he spoke privately to City officials, trying to change a policy that didn't affect him personally, and then allegedly spoke to a reporter about a policy affecting Independence drivers—Mazzola spoke as a private citizen.

---

[80] *Lane v. Franks*, 573 U.S. 228, 235–36 (2014), citing *Roth v. United States*, 354 U.S. 476, 484 (1957).
[81] *Id.,* 573 U.S. at 237, citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).
[82] *Id.*, 573 U.S. at 235–36, citing to *Pickering*, 391 U.S. at 572.
[83] *Id.*, 573 U.S. at 240.
[84] *Id.*, 573 U.S. at 241, citing *Connick*, 461 U.S. at 147–48.
[85] Togliatti Dep. at 20-22.
[86] Togliatti Dep. at 22; O'Brien Dep. at Defs' Ex. 56.
[87] Mazzola Dep. at 264; *Buddenberg v. Weisdack,* 939 F.3d 732 (6th Cir. 2019) (noting that employee's ordinary duties did not include reporting misconduct and that speech beyond the chain of command is unlikely to be within any employee's ordinary duties.); *see also Klosowski v. City of Bay City*, 696 F. App'x 707, 713 (6th Cir. 2017) (reversing summary judgment; district court improperly found that criticizing government spending was within employees ordinary job duties.)

### 3. Mazzola's right to speak out on the traffic-ticket quota affecting Independence drivers outweighed any purported "efficiency" concerns.

The third factor in deciding whether public-employee speech is protected—whether the employee's right to speak outweighs government-efficiency needs—asks courts to determine whether the employer "had an adequate justification for treating the employee differently from any other member of the public." [88] The government employer must articulate an "efficiency" need that outweighs both the employee's right to speak[89] and "the public's interest in receiving the well-informed views of government employees[.]"[90] This balance depends on whether an employee's speech meaningfully interferes with his or her duties, undermines a legitimate goal of the employer, creates disharmony, impairs discipline, or destroys the trust required of confidential employees.[91] Unsubstantiated concerns of workplace "disruption" do not move the needle.[92]

Here, Mazzola's speech to City officials about the quota undermined no legitimate goal of the department, nor created disharmony or "disruption." To the contrary: despite opposing the quota, Mazzola increased productivity and reprimanded Brian Dalton for not meeting the quota. Mazzola's speech neither impeded "his daily duties" as patrol commander nor interfered with the regular operation of the police department generally," so the City's needs did not outweigh his free-speech rights.[93]

The City also lacked an efficiency interest that outweighed any employee's right to speak to Gallek. The City's interests in ensuring that public records weren't released outside of official procedures don't outweigh its employees' rights to speak on matters of public concern.[94]

---

[88] *Lane*, 573 U.S. at 242.
[89] *Lane*, 573 U.S. at 242.
[90] *Garcetti*, 547 U.S. at 419; *National Treasury Employees' Union*, 513 U.S. at 468.
[91] *Smith*, 2006 WL 2855076 at *6.
[92] *Whitney*, 677 F.3d at 298.
[93] *Pickering*, 391 U.S. at 572–74.
[94] These documents were public records. Kilbane Dep. at 22–23; Gallek's public-records request at DFNT_0000417 (Jan. 14, 2019) (**Ex. 17**); Kilbane reply to Gallek at DFNT_0000530 (Jan. 15, 2019) (**Ex. 18**).

Defendants' purported worry that the person who gave documents to Gallek may have also "taken" or transmitted other documents[95] is unsupported speculation, not a legitimate interest. As in *Lane*, the employer's side of the scale is empty.[96]

## B. Defendants took adverse actions against Mazzola that would chill a person of ordinary firmness from continuing to engage in speech on that subject.

The second element of First Amendment–retaliation requires evidence that Defendants' adverse actions would deter a "person of ordinary firmness" from continuing the speech. "[A]ny action that would deter a person of ordinary firmness from exercising protected conduct will suffice."[97] This includes minor forms of retaliation because "they may have just as much of a chilling effect on speech as more drastic measures."[98] Defendants' investigation and constructive discharge of Mazzola readily clear this low hurdle.

Defendants improperly conflate First Amendment "adverse action" with the "adverse-employment action" standard applied in Title VII–discrimination claims[99] and other types of cases— a different standard that contemplates formal-employment action.[100] Defendants repeatedly argue that they took no adverse action against Mazzola because they didn't formally discipline him,

---

[95] Kilbane Dep. at 44–51.
[96] *Lane*, 573 U.S. at 242.
[97] *Fritz v. Charter Tp. of Comstock*, 592 F.3d 718, 724 (6th Cir. 2010). Examples include harassment, publicizing facts damaging to a person's reputation, and threat to terminate a business contract. *Id.*, 592 F.3d at 725-26.
[98] *Gaspar v. Dicks*, No. 08-CV-13707, 2010 WL 5462546 at *8 (E.D. Mich. Dec. 29, 2010), citing *Farmer v. Cleveland Public Power*, 295 F.3d 593, 602 (6th Cir. 2002), abrogated on other grounds, *White v. Columbus Metro. Housing Authority*, 429 F.3d 232 (6th Cir. 2010), (quoting *Smith v. Fruin*, 28 F.3d 646, 649 n. 3 (7th Cir. 1994)).
[99] *Laster v. Kalamazoo*, 746 F.3d 714, 732 (6th Cir. 2014) ("[T]he framework for analyzing a Title VII retaliation claim is distinct from the framework for analyzing a First Amendment retaliation claim.").
[100] *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 303 (6th Cir. 2012), quoting *Handy-Clay v. City of Memphis*, 695 F.3d 531, 545 (6th Cir. 2012).

errantly citing cases applying inapposite[101] legal standards[102] and otherwise factually distinguishable claims.[103]

But First Amendment retaliation doesn't require formal discipline or traditional adverse-employment action—just adverse action that would chill a reasonable person from continuing protected speech. An investigation alone may be an adverse action.[104] Defendants' threat of imminent discipline was an adverse action because it was retaliatory speech indicating that punishment would follow.[105] A reasonable jury could find that Defendants subjected Mazzola to these and other adverse actions—including constructive discharge.[106]

Even within Defendants' non-applicable adverse-*employment* action framework, Defendants' constructive discharge of Mazzola qualifies as both an adverse-employment action and an adverse

---

[101] Defendants' cases applying standard for Title VII–discrimination claims (which includes a burden-shifting analysis under *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), absent direct evidence of discrimination): *Johnston v. O'Neill*, 130 Fed.App'x 1, 8–9 (6th Cir. 2005) (investigation conducted into "leak" of confidential information, not public records); *Bivins v. U.S. Pipe & Foundry Co.*, 48 Fed. App'x 570, 572 (6th Cir. 2002); *Newton v. Meijer Stores Ltd. Partnership*, 347 F.Supp.2d 516, 522–23 (N.D. Ohio Dec. 8, 2004) (42 U.S.C. § 1981 claim, which uses Title VII analysis); *Rademakers v. Scott*, No. 2-07-CV-718, 2009 WL 3459196 at *2 (M.D. Florida Jan. 22, 2009); *Simmington v. Gates*, No. DKC 08-3169, 2010 WL 1346462 at *11 (D. Maryland Mar. 30, 2010); *Alford v. South Carolina Dept. of Corrections*, Case No. 3:04-CV-23257, 2006 WL 1997434, *4–5 (D.S.C. Jul. 17, 2006) (noted that employer policies allowed polygraphs).

[102] Defendants' cases applying standard for Age Discrimination in Employment claims: *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885–86 (6th Cir. 1996) (also factually distinguishable because plaintiff could not show constructive discharge, only generalized statements of hostile work environment, *id.*, 97 F.3d at 886); *Mitchell v. Vanderbilt University*, 389 F.3d 177, 181–82 (6th Cir. 2004).

[103] *Breaux v. City of Garland*, 205 F.3d 150, 154 (2000) (no claim of constructive discharge; polygraph used to evaluate veracity of serious allegations); *Pardi v. County of Wayne*, 2013 WL 1011280, *13 (E.D. Mich. Mar. 14, 2013) (plaintiff alleged that employer told him he could be disciplined in the future, but discipline was not certain or planned, and court found mere possibility of future discipline too speculative).

[104] *Zickes v. County*, 207 F.Supp. 3d 769, 780 (N.D. Ohio Sep. 16, 2016), citing *Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 410 (6th Cir. 1999) (citing *Kocsis v. Multi-Care Management, Inc.*, 97 F.3d 876, 885 (6th Cir. 1996)). Although Defendants cited *Ehrlich v. Kovack*, 710 Fed.Appx. 646 (6th Cir. 2017) for their assertion that an investigation isn't an adverse action," the *Ehrlich* court actually held that being placed on administrative *leave* during an investigation wasn't an adverse action. *Id.* Mazzola was not placed on leave.

[105] *Greisen v. Hanken*, 925 F.3d 1097, 1114 (9th Cir. 2019), quoting *Brodheim v. Cry*, 583 F.3d 1262, 1270 (9th Cir. 2009), quoting *Okwedy v. Molinari*, 333 F.3d 339, 343 (2d Cir. 2003). *See also Brown v. Crowley*, 312 F.3d 782, 789 (6th Cir. 2002) (issuance of misconduct charges was adverse act in First Amendment–retaliation case because it subjected plaintiff to "the risk of significant sanctions"); *Cleare v. Jenkins*, No. 2:15-CV-2295, 2016 WL 3458193, at *6 (S.D. Ohio June 24, 2016) (later-retracted disciplinary charges).

[106] *Thompson v. Ohio State Univ.*, 990 F. Supp. 2d 801, 809 (S.D. Ohio 2014) ("Whether an alleged adverse action is sufficient to deter a person of ordinary firmness . . . is generally a question of fact.").

action.[107] A plaintiff proves constructive discharge by showing: "(1) the employer deliberately created intolerable working conditions, as perceived by a reasonable person, (2) the employer did so with the intention of forcing the employee to quit, and (3) the employee actually quit."[108]

Defendants intentionally created "intolerable working conditions" for Mazzola under the objective standard of "[w]hether a reasonable person would have [felt] compelled to resign"[109] They targeted him with a biased investigation and forced him to take a legally unreliable polygraph—in violation of City policy—while hooked up to beeping machines in a "horror chamber."[110] Then Defendants threatened discipline—presented as certain and impending—which would have busted him down to patrolman, where he would be supervised by his former subordinates and performing work far beneath his level of experience (and for far less money), while being publicly branded a liar any time he testified in court.[111] The plaintiff in *Ford v. Hamilton County Juvenile Court*[112] received a similar threat when she was informed that her employer was going to fire her. As with Wilson's statement to Mazzola, this discipline was presented to Ford as "a foregone conclusion." The court found it was reasonable for Ford to believe that her only alternative was to resign.[113] As in *Ford*, any reasonable person in Mazzola's position would have felt compelled to resign to escape this stressful humiliation.

Defendants thrust Mazzola into these intolerable conditions with the intention of forcing

---

[107] *DeCrane v. Eckart*, Case No. 1:16-CV-2647, 2020 WL 2475357 at *7 (N.D. Ohio May 13, 2020).
[108] *Id.*, citing *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 481–82 (6th Cir. 2012) (quoting *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)).
[109] *Id.*, citing *Regan*, 679 F.3d at 481–82.
[110] Dep. of Robert Phillips 39–40 (July 21, 2020), Doc. #68. (Excerpts at **Ex. 17**.) ("You ever been to Evans's facility down there in Akron? It's like a horror chamber. They got lights and things beeping and burping and he scares the hell out of the person who's going to be subject of the interview." Phillips Dep. at 39:24–40:3.)
[111] *See Zickes*, 207 F.Supp. 3d at 781, citing *Regan*, 679 F.3d at 481–82 (listing, among non-exclusive factors demonstrating intolerable working conditions: demoting the employee; reducing the employee's wages; reducing the employee's job responsibilities; reassigning the employee to menial or degrading work; reassigning the employee to work under a different supervisor; badgering, harassing, or humiliating the employee to encourage resignation.)
[112] *Ford v. Hamilton County Juvenile Court*, No. 1:05-CV-557, 2007 WL2302816 at *5 (S.D. Ohio Aug. 8, 2007).
[113] *Id.*

him to prematurely retire or resign. After they made his working conditions miserable, as described above, Defendants threatened severe discipline and offered early retirement as his only way out. Their demand that Mazzola retire immediately or endure the demotion, the scarlet letter of *Brady-Giglio*, and the humiliation of having investigative and disciplinary records added to his public-record personnel file was hardly inadvertent. They intentionally contrived a no-win scenario. A reasonable jury could find that Defendants deliberately applied increasing pressure to crack Mazzola's will and force him out. And they succeeded: he prematurely retired effective April 1, 2019, leaving behind hundreds of thousands of dollars in pension benefits.

## C. Defendants' adverse actions against Mazzola were motivated—at least in part—by his protected speech and/or Defendants' belief that he engaged in protected speech.

For the third and final element required to show First Amendment retaliation—that the adverse action was caused *at least in part* by protected speech—a reasonable factfinder could conclude that Defendants were motivated, at least in part, by Mazzola's protected speech because O'Brien's email outlined discipline for that speech.[114] And the fact that Defendants did not plan or threaten punitive discipline until shortly after Mazzola's protected speech further evinces Defendants' motives.[115] Summary judgment is rarely granted in First Amendment–retaliation cases because motive is a jury question[116] and courts cannot make credibility judgments or weigh evidence at the summary-judgment stage.[117] A reasonable jury could find that Defendants took adverse action, at least in part, to retaliate for Mazzola's protected speech.

## D. Neither the presence of the union's lawyer nor the availability of union-grievance procedures absolves Defendants of fault for their adverse actions against Mazzola.

Throughout this litigation, Defendants have attempted to impose an attorney-client

---

[114] *Taylor v. Keith*, 338 F.3d 639, 646 (6th Cir. 2003).

[115] *Evans-Marshall v. Board of Educ. Of Tipp City Exempted Village School Dist.*, 624 F.3d 332, 339–40 (6th Cir. 2010); *Buddenberg v. Weisdack*, 939 F.3d 732, 741 (6th Cir. 2019), citing *Dye*, 702 F.3d at 306.

[116] *Thaddeus-X v. Blatter*, 175 F.3d 378, 385–86 (6th Cir. 1999); *Matulin v. Vill. of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988); *Eckerman v. Tennessee Dep't of Safety*, 636 F.3d 202, 208–09 (6th Cir. 2010).

[117] Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

relationship upon Mazzola and the union's lawyers to suggest that he "voluntarily" retired, with advice of counsel. [118] More recently, they have also suggested that Mazzola should have pursued union grievance and appeal procedure—even implying that he would have prevailed (*i.e.*, that Defendants were wrong all along!).[119] But, as Mazzola and the union's lawyers have testified, they didn't represent him.[120] Nor is Mazzola required to pursue a union grievance to prove First Amendment retaliation—much less endure being busted down to a patrol officer, a wage cut, being branded a lying officer, and the stain on his personnel file while hoping for a favorable grievance outcome. Tellingly, Defendants didn't quite argue this point, instead insisting that the occasional presence of the union's lawyers, who didn't represent Mazzola, and the fact that Defendants' threat of crushingly swift discipline dissuaded Mazzola from pursuing a grievance somehow transmuted his constructive discharge to a free, informed choice. Defendants will be hard-pressed to sell that argument to a jury and should have no luck convincing this Court that it has legal support. It doesn't.

### E.  Defendants are not entitled to qualified immunity because Mazzola's right to speak on a matter of public concern was clearly established.

Public employees have a clearly established right to speak on matters of public concern without facing government retaliation.[121] All public officials are charged with knowing that public

---

[118] See Answer, Doc. #9, p. 2 ("Mazzola was represented by an attorney…throughout the investigation…The issue…was never raised by his attorney…during the investigation."); p. 3 ("At no time was any allegation of the suppression of free speech brought up during these negotiations by Mazzola, his union representative, or his attorney"); Kilbane's and O'Brien's Ans. to Interrog. No. 17 (referring to Liva and Phillips as Mazzola's "previous attorneys"); Kilbane's and O'Brien's Ans. to Req. for Adm. No. 65 ("…Plaintiff was represented by legal counsel, Sara Liva…"); Evans Dep. at 117:16–118:1; Mazzola Dep. at 273:25–274:25, 282:12–283:9; Phillips Dep. at 19:10–23:23; Liva Dep. at 8:22–13:20; O'Brien Dep. at 97:3–9. It's a mutant of the advice-of-counsel defense: defending themselves on the basis of someone else's purported advice to an opponent.

[119] Kilbane's and O'Brien's memorandum, Doc. #71-3, p. 9 ("Phillips advised Mazzola that he could fight any potential discipline and that he would have 'absolutely' prevailed on a grievance, but Mazzola vetoed this option.").

[120] Liva Dep. at 7:2–8:7, 10:2–11:23, 43:12–24; Phillips Dep. at 23:16–23; Mazzola Dep. at 273:25–274:25, 282:12–283:9.

[121] *See v. City of Elyria*, 502 F.3d 484, 495 (6th Cir. 2007).

employees may not be disciplined for speaking on matters of public concern.[122] And a reasonable official would know that disciplining a public employee "with the motivation, even in part, of quieting the plaintiff's public speech about the illegal activities of [a government agency] violates the Constitution."[123] While clearly established law must be "particularized" to the facts of the case,[124] that does not require a case "directly on point" with all factual minutiae.[125] Instead, "existing precedent must have placed the statutory or constitutional question beyond debate."[126] Here, Mazzola's right to speak about governmental wrongdoing[127] and the correct operation of a public-safety institution[128] in his capacity as a citizen was clearly established in the Sixth Circuit long before Defendants took adverse action against him, placing the constitutional question beyond debate. Indeed, the Sixth Circuit has not hesitated to deny qualified immunity to government officials who participated in First Amendment retaliation.[129]

Kilbane and O'Brien participated in the City's plan to discipline Mazzola, at least in part, for his protected speech about the quota to the HR director and to Togliatti. As a longtime law director, O'Brien should've known that employees have a clearly established right to speak as private citizens on matters of public concern—and that speech on traffic-ticket quotas (to the mayor or to the news media[130]) was a matter of public concern. As police chief, Kilbane also should have known about

---

[122] *Chappel v. Montgomery Cty. Fire Protection Dist. 1*, 131 F.3d 564, 580 (6th Cir. 1997).

[123] *Hoover v. Radabaugh*, 307 F.3d 460, 469 (6th Cir. 2002).

[124] *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

[125] *White v. Pauly*, 137 S.Ct. 548, 551 (2017) (per curiam), quoting *Mullenix v. Luna*, 136 S.Ct. 305, 308 (2015); *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

[126] *Id.*

[127] *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 544 (6th Cir. 2012); *Whitney v. City of Milan*, 677 F.3d 292, 297 (6th Cir. 2012).

[128] *Hoover v. Radabaugh*, 307 F.3d 460, 466 (6th Cir. 2002).

[129] *Dietrich v. Burrows*, 167 F.3d 1007, 1013 (6th Cir. 1999) (affirming denial of summary judgment); *Scarborough v. Morgan County Bd. of Educ.*, 470 F.3d 250, 263 (6th Cir. 2006) (reversing summary judgment); *Bell v. Johnson*, 308 F.3d 594, 612–13 (6th Cir. 2002) (reversing judgment granted as a matter of law); *Evans-Marshall v. Board of Education of the Tipp City Exempted Village School District*, 428 F.3d 223, 232–33 (6th Cir. 2005) (affirming denial of motion to dismiss).

[130] *Matulin v. Village of Lodi*, 862 F.2d 609, 613 (6th Cir. 1988) (holding public employee's statements to reporter about public records were protected by First Amendment).

Mazzola's clearly established rights. On this basis alone, they are not immune.

Kilbane and O'Brien also collaborated in the City's decision to discipline Mazzola for his alleged protected speech to Gallek. Even if Mazzola had spoken to Gallek or given him public records, Defendants wouldn't be entitled to qualified immunity. Under the First Amendment, a public employee cannot be disciplined for revealing a public policy.[131] Whoever tipped off the press to the quota engaged in constitutionally protected conduct.[132]

Even if Defendants believed they could constitutionally punish someone for releasing documents to the media, Gallek's article made clear that whoever gave him documents also otherwise spoke to him orally or in writing. Kilbane and O'Brien cannot genuinely dispute that oral or written speech to a journalist about a traffic-ticket quota is protected speech. And clearly established law prohibited adverse action against public employees even in part for protected speech. Kilbane and O'Brien knew or should have known better. So they can't hide behind qualified immunity.

Defendants also should have known that Kilbane's investigation was premised upon alleged violations of City policies imposing unconstitutional prior restraints on employee speech. Kilbane directed Evans to investigate possible violations of policies that required employees to seek prior authorization from Kilbane to speak to the media or to give *any* information to *any* person outside the department—with the express threat of discipline for "unauthorized" disclosure.[133] These

---

[131] *See Whitney v. City of Milan*, 677 F.3d 292, 297–98 (6th Cir. 2012) (revealing mayor's evasion of nepotism policy); *Spencer v. City of Catlettsburg*, 506 Fed. App'x 392, 395–96 (6th Cir. 2012) (revealing that public records were missing). *See Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491–97 (1975) ("Public records by their very nature are of interest to those concerned with the administration of government, and a public benefit is performed by the reporting of the true contents of the records by the media." *Id.*, 420 U.S. at 495.)

[132] *See Spencer*, 506 Fed. App'x at 395–96 (affirming that city clerk's statements to reporters about missing public records were constitutionally protected); *Hughes v. Region VII Area Agency on Aging*, 542 F.3d 169, 182 (6th Cir. 2008) (public employee's conversations with reporter about official's improprieties were protected speech).

[133] These policies included requirements that employees not "submit to personal interviews" with the media "without first consulting with the Chief of Police" when the employee "is representing himself as an employee of the City" and when "the content of the…interview involves City issues" (Evans records at

stunningly overbroad policies—which are, notably, not limited to confidential or sensitive

information and therefore encompass public-record information—are facially unconstitutional prior

restraints[134] and unconstitutional as applied to Mazzola.[135] Both Kilbane and O'Brien should have

realized that it was unconstitutional to investigate and discipline employees under these policies.

And O'Brien's lawyer status doesn't cloak him with qualified immunity when he actively

participated in the retaliation.[136] By confecting a list of disciplinary charges that specifically included

punishment for protected speech; by using Phillips to cajole Mazzola into retirement to avoid

demotion, the *Brady/Giglio* taint, and the calamity of having investigatory materials placed in his file;

and by causing Kilbane to despoil Mazzola's file with a polygraph report *deliberately written after*

*Mazzola retired* because Mazzola filed suit, O'Brien retaliated against Mazzola. He's culpable.

## II.    Defendants Kilbane and O'Brien aren't entitled to summary judgment for Ohio civil-liability-for-criminal-acts because the same evidence establishes interference with civil rights.

Ohio Rev. Code § 2307.60 establishes a civil cause of action for criminal acts. Criminal

statute Ohio Rev. Code § 2921.45(A) provides that "[n]o public servant, under color of his office,

employment, or authority, shall knowingly deprive, or conspire or attempt to deprive any person of

a constitutional or statutory right." As described above, both Defendants Kilbane and O'Brien

---

EVANS/PTA154, Gen. Order 108, III(B)(10)); that employees not release "[i]nformation regarding personnel of this department" without "proper authorization" (*Id.* at EVANS/PTA156, Gen. Order 108, III(E)(2)(c)(2)); that "[n]o information is to be released to any person outside of the department except as may be authorized by practices established by the Chief of Police" (*Id.* at EVANS/PTA158, Gen. Order 601, III(A)(1)); and that "[p]ersons copying or releasing information in an unauthorized manner may be disciplined" (*Id.* at EVANS/PTA158, General Order 601, III(A)(3)).

[134] Policies placing "unbridled discretion in the hands of government official or agency" to pre-approve speech are facially unconstitutional prior restraints. *City of Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988), citing *Cox v. Louisiana*, 379 U.S. 536 (1965); *Staub v. City of Baxley*, 355 U.S. 313, 321-22 (1958); *Kunz v. New York*, 340 U.S. 290, 294 (1951); *Saia v. New York*, 334 U.S. 558 (1948); *Spain v. Mansfield*, 915 F.Supp. 919 (N.D.Ohio, Feb. 9, 1996).

[135] Policies requiring public employees to obtain pre-authorization to speak about their department are unconstitutional-as-applied for employees who engaged in protected speech. *Spain*, 915 F.Supp. at 923.

[136] *Buddenberg v. Weisdack*, 939 F.3d 732, 740–42 (6th Cir. 2019) (denying qualified immunity to attorney who participated in retaliation against plaintiff, including issuing notice of disciplinary action).

personally participated in retaliating against Mazzola for First Amendment– and Ohio constitution–protected speech, so they're both liable for damages. And qualified immunity—a federal, judicially created § 1983 doctrine—doesn't apply to these claims.

### CONCLUSION

The Court should deny Defendants Kilbane and O'Brien's motion for summary judgment.

Dated: August 25, 2020                 Respectfully submitted,

*/s/ Subodh Chandra*
Subodh Chandra (0069233)
Jessica S. Savoie (LA33378)[137]
Brian Bardwell (0098423)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 West Sixth Street, Suite 400
Cleveland, Ohio 44113
216.578.1700 (p) / 216.578.1800 (f)
Subodh.Chandra@ChandraLaw.com
Jessica.Savoie@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Leonard Mazzola*

---

[137] Ms. Savoie is admitted to practice in this Court. She is licensed to practice in Louisiana and certified to practice pending admission in Ohio. (Practice temporarily authorized pending admission under Gov. Bar R. I., Sec. 19. Ohio Attorney Registration No. 0099330).

**VERIFICATION OF COMPLIANCE WITH PAGE LIMITS**

I certify that this case has been assigned to the standard track, and that the Memorandum in Opposition to Defendant Michael Kilbane's and Defendant Gregory O'Brien's Motion for Summary Judgment adheres to the page limitations set forth in Loc. R. 7.1(f).

Dated: August 25, 2020

*/s/ Subodh Chandra*
Subodh Chandra (0069233)
Jessica S. Savoie (LA33378[1])
Brian Bardwell (0098423)
THE CHANDRA LAW FIRM LLC
The Chandra Law Building
1265 W. 6th St., Suite 400
Cleveland, OH 44113-1326
216.578.1700 Phone/216.578.1800 Fax
Subodh.Chandra@ChandraLaw.com
Jessica.Savoie@ChandraLaw.com
Brian.Bardwell@ChandraLaw.com

*Attorneys for Plaintiff Leonard Mazzola*

---

[1] Ms. Savoie is admitted to practice in this Court. She is licensed to practice in Louisiana and certified to practice pending admission in Ohio. (Practice temporarily authorized pending admission under Gov. Bar R. I, Sec. 19. Ohio Attorney Registration #0099330.)