UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
------------------------------------------------------------
:
LEONARD MAZZOLA, :
 :
        Plaintiff, : CASE NO. 1:19-cv-02519
 :
   vs. : OPINION & ORDER
 : [Resolving Docs. 62, 71, 73]
ANTHONY TOGLIATTI, *et al.*, :
 :
        Defendants. :
 :
------------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

Plaintiff Leonard Mazzola worked nearly 24 years as an Independence, Ohio police officer.[1] With this lawsuit, he brings First Amendment retaliation claims against Defendants Independence Mayor Togliatti, Independence Police Chief Kilbane, and Independence Law Director O'Brien. Mazzola also sues Defendant City of Independence.[2] Plaintiff also alleges that Defendants Togliatti, Kilbane, and O'Brien violated his civil rights under Ohio law.[3]

Defendant Togliatti filed a Motion for Summary Judgment,[4] Defendants Kilbane and O'Brien filed another Motion for Summary Judgment,[5] and Defendant City of Independence filed a third Motion for Summary Judgment.[6] The Court addresses each here.

---

[1] Doc. 1 at 3.
[2] *Id.* at 17, 19.
[3] *Id.* at 20.
[4] Doc. 62.
[5] Doc. 71.
[6] Doc. 73.

Case No. 1:19-cv-02519
Gwin, J.

For the following reasons, the Court **DENIES** Defendants' Motions for Summary Judgment, with the exceptions that the Court **GRANTS** Defendant Togliatti's motion for summary judgment on Plaintiff's false light claim and **GRANTS** Defendant O'Brien's motion for summary judgment.

I. Background

Plaintiff Mazzola worked as a Lieutenant and patrol commander in the Independence police force. Mazzola was near the top of the chain of command in the force, reporting only to the deputy police chief and Defendant Chief Kilbane.[7]

With this case, Plaintiff Mazzola says Defendants forced him to resign his Lieutenant position[8] because Defendants believed—Plaintiff says falsely—that Plaintiff had been the source for a television news report that Independence's Police Chief and Mayor enforced a traffic ticket quota requirement.[9] Plaintiff previously expressed his concern about the traffic ticket quota to Human Resources[10] and Defendant Mayor Togliatti.[11]

Plaintiff says Defendants retaliated against Plaintiff Mazzola for being understood to have exercised his First Amendment rights. Plaintiff and the reporter[12] say Plaintiff had not sourced a critical television news report but Defendants believed he had[13] and forced his retirement in retaliation.

II. Discussion

  a. Summary Judgment Standard

---

[7] Doc. 71-3 at 2.
[8] Doc. 83 at 4.
[9] Doc. 62-1 at 3; Doc. 71-3 at 4–5; Doc. 83 at 2–3.
[10] Doc. 83 at 1–2.
[11] *Id.*
[12] Doc. 83 at 6.
[13] Doc. 71-3 at 7–9, Doc. 62-1 at 3–4.

-2-

Case No. 1:19-cv-02519
Gwin, J.

A party is entitled to summary judgment if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[14] "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"[15] The Court views all of the evidence in the light most favorable to the nonmoving party.[16] The nonmoving party "must show sufficient evidence to create a genuine issue of material fact"[17] as to each of the claim's required elements. A scintilla of evidence is not enough to defeat a summary judgment motion.[18]

### b. First Amendment Retaliation

Plaintiff brings First Amendment retaliation claims under 42 USC § 1983 against Defendants Togliatti, Kilbane, O'Brien, and the City of Independence.[19]

In July 2018, Defendant former-Mayor Togliatti asked Defendant Police Chief Kilbane to explain a traffic ticket decline.[20] Seemingly in response to Mayor Togliatti's questions regarding the lost ticket revenue, Chief Kilbane sent Plaintiff Mazzola an email asking for increased traffic citations.[21] Chief Kilbane repeated this order to Plaintiff Mazzola

---

[14] Fed. R. Civ. P. 56(c).
[15] *Peffer v. Stephens*, 880 F.3d 256, 262 (6th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)).
[16] *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-501 (6th Cir. 2007) (citation omitted).
[17] *Id.* (citation omitted).
[18] *Id.*
[19] Doc. 1 at 19.
[20] Doc. 62-1 at 1.
[21] *Id.*

Case No. 1:19-cv-02519
Gwin, J.

in a memo two weeks later.[22] In part, Chief Kilbane directed Mazzola to prepare a written action plan for any officers who failed to issue sufficient tickets.[23]

Plaintiff Mazzola believed Mayor Togliatti and Police Chief Kilbane had misread the police department's citation statistics.[24] Mazzola also claims that he thought a traffic citation quota would be unfair. Nonetheless, Plaintiff Mazzola instructed the officers he supervised to "conduct two to three enforcement actions per shift and believed he was following Kilbane's order to increase citations."[25]

Several months later and in early September 2018, Defendant Chief Kilbane brought disciplinary charges against Plaintiff Mazzola related to the ticket quota/productivity requirement.[26] With his charges, Chief Kilbane alleged "violations of several departmental orders, including insubordination."[27]

At the September 2018 disciplinary hearing, Plaintiff Mazzola says he again tried to explain why he believed Chief Kilbane had misinterpreted the Department statistics and why he disagreed with the traffic ticket quota.[28] Mazzola says the meeting was "confrontational."[29]

---

[22] Doc. 62-1 at 1; Doc. 71-3 at 2.
[23] Doc. 71-3 at 3 (citing Kilbane Dep. At Doc. 65 at 154).
[24] Doc. 83 at 1.
[25] Doc. 83 at 1–2.
[26] Doc. 71-3 at 3; Doc. 83 at 2; 62-1 at 2.
[27] Doc. 71-3 at 3; Doc. 83 at 2; 62-1 at 2.
[28] Doc. 83 at 2.
[29] Doc. 67 at 223:6–13.

-4-

Case No. 1:19-cv-02519
Gwin, J.

After the September 2018, disciplinary hearing, Chief Kilbane did not discipline Mazzola but required Mazzola comply with the ticket quota.[30] Although he had earlier argued against the ticket quota, Mazzola says he complied with Defendant Chief Kilbane's instruction and reprimanded an officer for not meeting a ticketing goal.[31]

On January 14, 2019, Fox 8 News television reporter Ed Gallek ran a story reporting that Independence pressured police officers to issue more traffic tickets. Gallek cited internal police department documents, including an email and a Mazzola memorandum about the quota/requirement.[32] In the television report, Gallek did not identify his source, although reporter Gallek later said the source was not Mazzola.[33]

Mazzola maintains that he did not give the documents to Gallek and says he did not give the documents to anyone else to pass on to Gallek.[34]

While these internal documents are public record, Defendants say the documents were improperly disclosed to reporter Gallek and that there was no news report mention of the documents in Gallek's news report.[35]

In March 2019, Defendant City hired a private investigator to investigate how news reporter Gallek obtained city documents.[36] Defendant Chief Kilbane also required Mazzola take a polygraph test though the police department's policy only allowed

---

[30] Doc. 62-1 at 2; Doc. 71-3 at 3–4.
[31] Doc. 83 at 2; Doc. 71-3 at 4.
[32] Doc. 62-1 at 3; Doc. 71-3 at 4–5; Doc. 83 at 2–3.
[33] Doc. 83 at 6.
[34] Doc. 83 at 2–3.
[35] Doc. 71-3 at 6; Doc. 62-1 at 3.
[36] Doc. 71-3 at 6; Doc. 62-1 at 3–4. According to Plaintiff, the investigation was authorized by Defendant Togliatti at Defendant Kilbane's request. Doc. 83 at 3.

Case No. 1:19-cv-02519
Gwin, J.

polygraph tests in criminal investigations, not administrative ones.[37] Mazzola's polygraph test results were interpreted as "indicative of deception."[38]

The parties differ on the timeline and nature of events following the polygraph test, but Plaintiff Mazzola ultimately took early retirement. In summary, Mazzola claims that Defendants threatened that Plaintiff Mazzola could take early retirement or Independence would begin disciplinary efforts to demote him while putting him on a Brady-Giglio list that would be given to all criminal defendants whose cases he was involved with.[39] In contrast, Defendants claim that Mazzola retired before the City took any definitive disciplinary actions.[40]

Plaintiff says Defendants forced his retirement to retaliate because Defendants believed Plaintiff had sourced the critical television news report discussing traffic ticketing quotas. Plaintiff says he had not sourced the story and, says that even if he had sourced the story, it would be First Amendment protected conduct.

To establish a First Amendment retaliation claim, Plaintiff Mazzola must show that 1) he engaged in constitutionally protected speech or conduct, 2) that Defendants took "an adverse action against [him] that would deter a person of ordinary firmness from continuing to engage in that speech," and 3) that there is a causal connection between the adverse employment action and the constitutionally protected speech.[41]

---

[37] Doc. 83 at 3. Plaintiff notes that the third-party investigator's notes "about a First Amendment discussion" stated that "retaliation could be a problem." *Id.* Defendants claim that the polygraph test was ordered at the third-party investigator's suggestion. Doc. 71-3 at 8; Doc. 62-1 at 4.
[38] 62-1 at 4.
[39] Doc. 83 at 5. Plaintiff's deposition suggests that this call may have been earlier, around 2:00 PM. Doc. 67 at 314:12–13. *See also* Doc. 83 at 4; Doc. 71-3 at 9.
[40] Doc. 71-3 at 9.
[41] *Buddenberg v. Weisdack*, 939 F.3d 732, 739 (6th Cir. 2019).

-6-

Case No. 1:19-cv-02519
Gwin, J.

In turn, to be constitutionally protected, a public employee's speech or conduct must satisfy three requirements: First, the employee must speak on a "matter of public concern."[42] Second, the employee must speak in their capacity as a private person, "not as an employee pursuant to [their] official duties."[43] Third, the employee "must show that his speech interest outweighs 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'"[44]

### i. Constitutionally Protected Speech

Plaintiff's speech and perceived speech were constitutionally protected.

Plaintiff contends that he engaged in protected speech when he discussed his concerns related to the ticket quota/requirement with Human Resources officials and with Defendant Mayor Togliatti. In addition, Plaintiff Mazzola claims Defendants wrongly believed Mazzola to have engaged in protected speech by giving documents to and speaking with reporter Gallek.[45] Defendants believed Mazzola gave the documents to reporter Gallek, even though Mazzola says he did not.

In both instances, the speech was a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."[46]

---

[42] *Mayhew v. Smyrna*, 856 F.3d 456, 462 (6th Cir. 2017) (citing *Connick v. Myers*, 461 U.S. 138, 143 (1983)).
[43] *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)).
[44] *Id.* (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)).
[45] Doc. 85 at 8–9. In *Heffernan v. Paterson*, a supervisor's mistaken belief that employee had engaged in protected speech, when employee had not, did not bar a claim for First Amendment retaliation. 136 S.Ct. 1412 (2016).
[46] *Buddenberg*, 939 F.3d at 739 (citing *Lane v. Franks*, 573 U.S. 228, 241 (2014)).

Case No. 1:19-cv-02519
Gwin, J.

In other words, the speech is of public concern if it "involves issues about which information is needed or appropriate to enable the members of society to make informed decisions about the operation of their government."[47] Whether speech is a matter of public concern is a question of law for the Court to decide.[48]

Although non-binding precedent, the Sixth Circuit has said that police ticket quotas are of public concern.[49] The public can reasonably have concerns and interest regarding whether ticket quotas caused officers to issue tickets.

Plaintiff Mazzola also raised questions regarding whether Police Chief Kilbane and Independence targeted out-of-town drivers for stricter enforcement. Again, disparate ticketing treatment is a public concern.

Plaintiff spoke in his private citizen capacity. The essential question is "whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties."[50] While Plaintiff implemented and oversaw the quota/productivity requirement, his job duties did not task him to express concerns to then-Mayor Togliatti or Human Resources—he spoke outside of the chain of command.

Likewise, Plaintiff enjoyed no media responsibilities regarding the quota/productivity requirement. "Speech outside the chain of command is less likely to be

---

[47] *Brandenburg v. Housing Authority of Irvine*, 253 F.3d 891, 898 (6th Cir. 2001) (internal citations omitted).
[48] *Van Compernolle v. Zeeland*, 241 Fed. App'x. 244, 249 (6th Cir. 2007) (citing *Garcetti*, 547 U.S. at 418).
[49] *Graham v. City of Mentor*, 118 Fed. Appx. 27, 30 (6th Cir. 2004).
[50] *Lane*, 573 U.S. at 240.

Case No. 1:19-cv-02519
Gwin, J.

within an employee's ordinary job responsibilities."[51] As in *Buddenberg*, Mazzola's responsibilities did not include raising ethical concerns with the Mayor or the media.[52]

Finally, the City's "interests in ensuring that internal police documents are released according to [its] policies"[53] do not outweigh Mazzola's free speech interests. The third element instructs that the employee's speech must be sufficiently important to "outweigh the state's interest, as an employer, in promoting the efficiency of the public services it performs through its employees."[54] "In striking the balance, courts should consider whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees."[55]

While the City may have had a legitimate efficiency interest in following official public document release procedures,[56] it does not outweigh Mazzola's interest in speaking to Togliatti or, as Defendants believed, to the media. As Plaintiff notes, Mazzola's speech did not interfere with his ability to perform his duties—he implemented the quota requirement—or otherwise impact police department's operations.[57]

Plaintiff has shown that he engaged in constitutionally protected speech.

---

[51] *Buddenberg*, 939 F.3d at 740.
[52] *Id.*
[53] Doc. 71-3 at 13.
[54] *Handy-Clay v. Memphis*, 695 F.3d 531, 540 (6th Cir. 2012) (internal quotation omitted).
[55] *Williams v. Kentucky*, 24 F.3d 1526, 1536 (6th Cir.1994). Defendants cite *Cherry v. Pickell* for the argument that, in the context of police departments, courts should show "deference to the city's judgment on the matter of discouraging public dissension within its safety forces." 188 Fed. Appx. 465, 469–70. That case is distinguishable, however, as the employee's speech in that case dealt with an internal employment dispute and caused considerable disruption within the police force. *Id.* at 470.
[56] *Lane*, 573 U.S. at 242.
[57] Doc. 83 at 11.

Case No. 1:19-cv-02519
Gwin, J.

### ii. Adverse Action

To continue his First Amendment retaliation claim, Plaintiff must show that Defendants took "an adverse action against [him] that would deter a person of ordinary firmness from continuing to engage in that speech."[58]

Defendants hang their summary judgment on arguments that they did not formally start an official discipline procedure against Plaintiff before his resignation.

But, First Amendment retaliation adverse action claims are not limited to formal demotion, firing, or discipline.[59] Constructive discharge can be an adverse action.[60] Constructive discharge claims requires a plaintiff show that 1) the employer deliberately created intolerable working conditions, "as perceived by a reasonable person," 2) the employer intended to force the employee to quit, and 3) the employee actually quit.[61]

Viewed in the light most favorable to Mazzola, while deciding whether to retire, he believed that Defendants gave him an ultimatum: Take early retirement and preserve his clean disciplinary record or face demotion "down to patrolman, where he would be supervised by his former subordinates and performing work far below his experience level (and for far less money), while being publicly branded a liar any time he testified in court."[62]

---

[58] *Buddenberg*, 939 F.3d at 739.
[59] Defendants argue that an investigation, such as the one in this instance, cannot be an adverse action. Doc. 71-3 at 15 (citing *Ehrlich v. Kovack*, 710 F.App'x 646, 650 (6th Cir. 2017)). Some of Defendants legal support is persuasive but nonbinding, *see Breau v. City of Garland*, 205 F.3d 150, 158 (5th Cir. 2000), while some is not directly on point. *See Ehrlich*, 710 F.App'x at 650. Investigations could be adverse actions. *Zickes v. County*, 2077 F. Supp. 3d. 769, 780 (N.D. Ohio 2016) (stating that an investigation could be an adverse action, given "its length and many stages"). In this instance, though, Plaintiff's constructive discharge claim is sufficient to weigh against summary judgment.
[60] *Buddenberg*, 939 F.3d at 740 (citing *Savage v. Gee*, 665 F.3d 732, 739 (6th Cir. 2012)).
[61] *Savage*, 655 F.3d at 740.
[62] Doc. 83 at 14.

-10-

Case No. 1:19-cv-02519
Gwin, J.

This Court will not give summary judgment here. A reasonable jury could find that the threatened punishment, although not formally implemented, went beyond "criticisms and public challenges" that are insufficient to show intolerable working conditions. Further, a jury could find that Defendants' actions in relaying the planned demotion and other punishments, that Mazzola saw as a done deal, were intended to push him toward early retirement.[63]

### iii. Causal Connection

Finally, sufficient evidence establishes a causation issue that defeats summary judgment. To establish a First Amendment retaliation claim, a plaintiff must show a causal connection between the constitutionally protected speech and the adverse employment action.[64]

Plaintiff Mazzola did not decide to retire out of the blue. Plaintiff argues that his discussions with Human Resources and Defendant Togliatti about the traffic quota and Defendants mistaken belief that Plaintiff Mazzola spoke to reporter required him to retire or face severe punishment.[65] Defendant O'Brien's email regarding potential charges provides one example of evidence that suggests Plaintiff's fears were legitimate.

Defendants respond that Plaintiff's unsubstantiated punishment fear after a failed polygraph test led him to retire. They argue that insufficient evidence shows causation.[66]

---

[63] *Savage,* 665 F.3d at 739 ("To determine if there is a constructive discharge, both the employer's intent and the employee's objective feelings must be examined.") (internal citation removed).
[64] *Buddenberg,* 939 F.3d at 739.
[65] Doc. 83 at 15.
[66] Doc. 71-3 at 18–19.

-11-

Case No. 1:19-cv-02519
Gwin, J.

This is a question of material fact that is appropriate for a factfinder, not summary judgment.[67]

For these reasons, Defendants Kilbane, O'Brien, and Togliatti's motion for summary judgment for Plaintiff's First Amendment retaliation claims are denied.

### c. Defendant City of Independence's Liability

Defendant City of Independence also moves for summary judgment on Plaintiff's 42 U.S.C. § 1983 First Amendment retaliation claim. Municipalities are liable when the allegedly unconstitutional municipal action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers,' or where such actions emanate from informal governmental custom."[68]

This is not a *respondeat superior* claim, rather, a plaintiff must establish that a municipality was the "moving force" by "showing that the municipality had a 'policy or custom' that caused the violation of his rights."[69]

A plaintiff can show a policy or custom by proving: "(1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations."[70]

---

[67] *Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999).
[68] *Alman v. Reed*, 703 F.3d 887, 902 (6th Cir. 2013) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)).
[69] *Wright v. Euclid*, 962 F.3d 852, 879–880 (6th Cir. 2020) (citing *Monell*, 436 U.S. at 690).
[70] *Jackson v. Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019)

-12-

Case No. 1:19-cv-02519
Gwin, J.

As described above, for the purposes of summary judgment, Plaintiff Mazzola has established a prima facie constitutional violation. In making a *Monell* claim, Mazzola must show that the City was responsible for the constitutional violation.[71]

Mazzola makes two main arguments: First, that a policymaker (Defendant Mayor Togliatti) or an authorized subordinate (Kilbane or O'Brien) violated Mazzola's speech rights through their investigation and their disciplinary ultimatum.[72] And second, that City policy is a prior restraint in violation of the First Amendment because it limits employees' ability to speak to the media and release documents or information without "proper authorization."[73]

On the first argument, when a "plaintiff alleges that an unconstitutional municipal policy is evinced by a single decision by a municipal official, 'only those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability' and that state law determines whether a municipal official has "final policymaking authority."[74] Plaintiffs show that the Independence City Charter gives the mayor final employment decision authority.[75] Regarding employee practices, the mayor makes the policy and he makes the policy when he ratifies subordinates actions..[76]

Plaintiff's claim against the City survives summary judgment. Whether the mayor ratified the investigation or the potential punishment are factfinder questions.

---

[71] *Graham v. Washtenaw,* 358 F.3d 377, 382 (6th Cir. 2004).
[72] Doc. 84 at 14–18.
[73] *Id.* at 18-20.
[74] *Jones v. Clark County,* 959 F.3d 748, 762 (6th Cir. 2020) (citing *St. Louis v. Praprotnik,* 485 U.S. 112 (1988)).
[75] Doc. 84 at 15.
[76] *Praprotnik,* 485 U.S. at 127.

-13-

Case No. 1:19-cv-02519
Gwin, J.

Defendant City counters that neither Defendant former Mayor Togliatti nor Defendant Kilbane had final policymaking authority over Plaintiff's employment because the City's Civil Service Commission can review the mayor's employment decisions and because Mazzola's Collective Bargaining Agreement permitted a grievance of employment decisions.[77]

But Defendant City relies upon cases involving different facts where the policymakers were not, as here, alleged to be the mayor or the "final word" in the city.[78] Further, the issue here is more whether a final policymaker offered Mazzola an ultimatum—face demotion or retire—and less whether the investigation and polygraph test were actions indicative of a city policy.

On this point, the Plaintiff's citation of *Milardo v. Westbrook* persuades even though it is not controlling: "Whether an official is a policymaker 'depends on whether [his] word is final within [the City's] structure of government, not on whether a neutral decisionmaker ultimately can undo its decisions.'"[79]

For these reasons, summary judgment fails on Plaintiff's *Monell* claim. In addition, Plaintiff's second *Monell* liability argument need not be fully considered. Still the it could be a viable argument: With this argument, Plaintiff Mazzola contends that the investigation and the alleged retaliation against him were based upon city policies restricting employees' abilities to give interviews or release information without prior authorization. Plaintiff Mazzola says the restrictions are unconstitutional prior restraints on speech.[80]

---

[77] Doc. 73-3 at 6–9.
[78] *Id.* at 7-9.
[79] Doc. 84 at 16 (citing *Milardo v. Westbrook*, 120 F.Supp. 3d 206, 215 (D. Conn. Aug. 10, 2015)).
[80] *Id.* at 18. See *Jackson v. Cleveland*, 925 F.3d 793, 828 (6th Cir. 2019).

-14-

Case No. 1:19-cv-02519
Gwin, J.

According to Mazzola, the city is liable in this case because the city's policies "preemptively" restrict employees' speech, even when they are speaking as private citizens, by requiring them to seek authorization from a government official. The policies threaten punishment if they do not seek permission.[81] The record is not clear whether this is an example of ""unbridled discretion in the hands of government official or agency."[82] But Defendant's argument that the City's policies are not prior restraints because employees are not totally barred from speaking does not prevail here.[83]

### d. Qualified Immunity

Defendants Togliatti, Kilbane, and O'Brien each argue that they are entitled to summary judgment based on qualified immunity.

The doctrine of qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."[84] Relying upon the Sixth Circuit *Buddenberg v. Weisdack* decision, Plaintiff has alleged facts sufficient to support his claim that he engaged in constitutionally protected speech (or was believed to have done so) that motivated Defendants adverse action against him. Plaintiff Mazzola satisfies the first prong of the qualified immunity inquiry.[85]

---

[81] Doc. 84 at 19.
[82] *Spain v. Mansfield*, 915 F.Supp. 919, 923 (N.D. Ohio 1996) (citing *Lakewood v. Plain Dealer Pub. Co.*, 486 U.S. 750, 757 (1988)).
[83] Doc. 89 at 11.
[84] *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).
[85]

-15-

Case No. 1:19-cv-02519
Gwin, J.

The Sixth Circuit in *Buddenberg* went on to say that it has "long recognized that a public employer may not retaliate against an employee for her exercise of constitutionally protected speech."[86] Kilbane and Togliatti each participated in hiring, firing, and oversight of the police department in different ways and should have known that retaliation for First Amendment speech in the form of constructive discharge is not permitted. Defendant O'Brien, however, is entitled to qualified immunity. In this instance, O'Brien, as attorney for the City, served as a conduit not a decisionmaker for potential punishment.

O'Brien's involvement was largely limited to relaying information. Defendant O'Brien, Defendant City's law director, testified that he told union lawyer Phillips that the City planned to punish Mazzola and "expected Phillips" to relay that information.[87] Further, O'Brien emailed Phillips just before noon and outlined the City's potential charges against Mazzola.[88] The record does not show that Mazzola ever saw this email.[89]

The evidence is insufficient to show that he was acting in a "discretionary" capacity to violate Mazzola's First Amendment rights. As the interlocutor between the City and Phillips and as the City's law director, the evidence does not show that Defendant O'Brien clearly violated Mazzola's rights or that he had any decision-making input into the alleged retaliation scheme. In other words, it is not clear that "a hypothetical official, standing in

---

[86] *Id.* (citing *See v. Elyria*, 502 F.3d 484, 495 (6th Cir. 2007); *Chappel v. Montgomery County Fire Protection Dist. No. 1*, 131 F.3d 564, 580 (6th Cir. 1997)).

[87] *Id.*

[88] Doc. 83 at 4. The charges included "Lying during a formal internal investigation on the unauthorized dissemination of departmental documents; Lying to the Mayor regarding performance measurement standards allegedly approved by the Chief[;] Intentionally ignoring a previous departmental order, ten (10) incidents of usurping his superiors to directly communicate with City officials and employees regarding departmental staffing, training, and policies and procedures[;] [and] The release of departmental documents outside of the police department[.]" *Id.* at 4–5 (citing O'Brien Dep.Doc. 80 at 97:23–99:12; Defs.' Ex. 56 to O'Brien Dep.)).

[89] Doc. 62-1 at 6; Doc. 62-14. However, Phillips and O'Brien had spoken on the phone before O'Brien sent that email and Phillips indicated that Mazzola was considering retirement. Doc. 62-1 at 6.

Case No. 1:19-cv-02519
Gwin, J.

the [O'Brien]'s shoes, would necessarily have understood that taking the steps challenged by the plaintiff would violate the plaintiff's clearly established" First Amendment Rights.[90]

### e. State Law Claims

Defendants Togliatti, Kilbane, and O'Brien argue that they are entitled to summary judgment on Ohio law claims of civil liability for criminal interference with civil rights pursuant to R.C. 2307.60 and R.C. 2921.45 because Mazzola's rights were not violated.[91] Because the Court finds that Plaintiff has shown sufficient evidence to raise a jury issue of a constitutional violation, Defendants are not entitled to summary judgement.

### f. False Light Claim Against Defendant Togliatti

Defendant former-Mayor Togliatti asserts that he is entitled to summary judgment on Plaintiff Mazzola's Ohio false light claim.

After Plaintiff filed this suit on October 28, 2019 and "less than a week before the mayoral election," Defendant Togliatti posted a video to his campaign's Facebook page, stating that the lawsuit's allegations were false.[92] Plaintiff Mazzola claims Mayor Togliatti "falsely accus[ed] Mazzola of filing suit to harm him politically," and "recklessly cast Mazzola's motivations in a false light."[93] Togliatti responds that his statements were opinion and that he is immune from false light liability under Ohio law.[94]

In Ohio,

> one who gives publicity to a matter concerning another that places the other before the public in a false light is subject to liability to the other for invasion of his privacy if (a) the false light in which the other was placed would be highly offensive to a

---

[90] *Cullinan v. Abramson*, 128 F.3d 301, 309 (6th Cir. 1997).
[91] Doc. 71-3 at 20; Doc. 62-1 at 16.
[92] Doc. 62-1 at 6–7.
[93] Doc. 85 at 19.
[94] Doc. 90-1 at 15.

-17-

Case No. 1:19-cv-02519
Gwin, J.

> reasonable person, and (b) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed.[95]

In turn, publicized means "that the matter is made public, by communicating it to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge."[96] The statement must be false but "[i]t is enough that he is given unreasonable and highly objectionable publicity that attributes to him characteristics, conduct or beliefs that are false, and so is placed before the public in a false position."[97]

The real question, then, is whether the video placed Mazzola in a false light that a reasonable person would find "highly offensive" and whether the actor had knowledge of the falsity or acted with reckless disregard.[98] Viewed in the light most favorable to Mazzola, the video implies that Mazzola filed this "suit to harm [Togliatti] politically." Defendant Togliatti said that this lawsuits allegations were "absolutely false" and that he was blindsided by the suit."[99] Further, Mazzola contends that his reputation was harmed when Togliatti claimed that Mazzola had failed his polygraph test, "despite the fact that, as of October 28, 2019, the polygraph examiner had not issued any report."[100]

The Court finds insufficient evidence to find Mayor Togliatti's video highly offensive. Togliatti's video's statement that Mazzola's claim was untrue was insufficient to

---

[95] *Welling v. Weinfeld*, 113 Ohio St.3d 464, 473 (Ohio 2007).
[96] *Id.* at 472.
[97] *Alahverdian v. Grebinski*, No. 3:13–cv–00132; 2014 WL 2048190, at *12–13 (S.D. Ohio May 19, 2014) (citing Restatement (Second) of Torts § 652E (Am. Law Inst. 1977)).
[98] *King v. Semi Valley Sound, LLC*, No. 25655, 2011 WL 2853215, at *3.
[99] Doc. 85 at 19. Mazzola notes that Togliatti had received letters alerting him to a litigation hold in the matter for months, so the suit was not a surprise. Doc. 7 at 23.
[100] *Id.*

-18-

Case No. 1:19-cv-02519
Gwin, J.

be highly offensive. For example, in a different case, plaintiff made a viable false light claim where defendant published plaintiff's personal information (such as name, address, and photograph) and falsely labeled him a registered sexual offender.[101] In another case, defendants publicized that their neighbor-plaintiffs were cutting down trees and polluting streams on their property, when plaintiffs showed that was not the case.[102] Unlike these cases, Togliatti's video speaks more to his opinion than it attributes "characteristics, conduct or beliefs that are false" to Mazzola.

### III. Conclusion

For the foregoing reasons, the Court **DENIES** Defendants' summary judgment motions with the exceptions that the Court **GRANTS** Defendant Togliatti's motion for summary judgment on Plaintiff's false light claim and **GRANTS** Defendant O'Brien's motion for summary judgment.

IT IS SO ORDERED.

Dated: October 15, 2020         *s/      James S. Gwin*
                                JAMES S. GWIN
                                UNITED STATES DISTRICT JUDGE

---

[101] *King v. Semi Valley Sound, LLC*, No. 25655, 2011 WL 2853215, at *3–4.
[102] *Mangelluzzi v. Morley*, 40 N.E.3d 588, 599 (Ohio Ct. App. 2015). *See also Mann v. Cincinnati Enquirer*, No. No. C–090747, 2010 WL 3328631, at *3–4 (Ohio Ct. App. Aug. 25, 2010) (finding no viable false light claim were article misquoted dancer to say that he knew he was expected to have sex with customers as part of his job because the "gist of the article" did not paint him in a false light.)